ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

MAR 1 1 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| PORT ELEVATOR-<br>BROWNSVILLE, L.C. | §<br>§<br>§ | |
| VS. | §<br>§ | CIVIL NO. B-98-23 |
| IVONNE SOTO VEGA, BERSAIN<br>GUTIERREZ, AND SYSCO DE BAJA<br>S.A. DE C.V. | §<br>§<br>§ | |

PLAINTIFF IN INTERPLEADER, MOTION FOR SUMMARY JUDGMENT;
CROSS-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT;
INCLUDING PLAINTIFF IN INTERPLEADER MOTION
FOR DEFAULT JUDGMENT; INCLUDING CERTIFICATE
OF CONFERENCE AND INCLUDING CITATION TO AUTHORITIES

TABLE OF CONTENTS

CERTIFICATE OF CONFERENCE------------------------------- 3

AUTHORITIES RELEVANT HERETO -------------------------- 3

PARTIES REQUESTING RELIEF------------------------------ 4

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING----- 4

STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT--- 5

FACTUAL BACKGROUND------------------------------------- 6

BRIEFING AND MEMORANDUM OF AUTHORITIES----------------- 8

1.   Whether Ivonne Soto Vega may maintain her action
     for "negligence, conversion, fraud, and Texas
     Deceptive Trade Practices Violations" despite
     her failure to respond to this Motion for
     Summary Judgment pursuant to Rule 56 F.R.C.P
     Standard for entry of judgment assuming there
     is no reply filed by Vega------------------------- 9

          Standard for entry of judgment assuming
          there is no reply filed by Vega

          No evidence by Vega

          Evidence in support of the assertion that
          Port Elevator, Elkins, and Southwest Grain

1

engaged in acts and behavior which preclude
any finding of liability to Vega

    Conclusion

2.   Whether Port Elevator, Elkins, and Southwest
Grain are entitled to a judgment on the merits
as against Ivonne Soto Vega; and whether Port
Elevator is entitled to a judgment by default
against Bersain Gutierrez and Sysco de Baja S.A.
de C.V.---------------------------------------- 13

    Relief requested

    Vega and Gutierrez Agency Relationship

    Declaratory relief

    Default judgment as to Bersain Gutierrez
    and Sysco de Baja S.A. de C.V.

    Conclusion

3.   Whether Port Elevator is entitled to reimbursement
for actual damages as against Vega, Bersain
Gutierrez, and Sysco de Baja S.A. de C.V.--------- 17

4.   Whether Port Elevator, Elkins and Southwest Grain
are entitled to reimbursement of legal
expenses, including attorneys' fees, costs, and
interest as against Vega, Bersain Gutierrez, and
Sysco de Baja------------------------------------- 17

    Claim for attorneys' fees and costs

    Interest

    Claim for costs and fees pursuant to 28
    U.S.C. Section 1927

    Costs and fees

REQUEST FOR RELIEF------------------------------------- 24

## CERTIFICATE OF CONFERENCE

A settlement in substance was announced to the Court at the previous pre-trial conference which occurred on January 15, 2002. The proposed settlement required the consent of Ivonne Soto Vega (hereinafter "Vega"), and was expected to take a certain amount of time due to her incarceration in a federal prison in Mexico City (signatures would be required, and so forth). Discussions were had about the possibility of concluding this matter without the actual need for signatures from Ms. Vega.

The Court ordered that all such paperwork be concluded and submitted by March 1, 2002; otherwise, "dispositive motions" were to be filed by March 11, 2002.

Prior to March 1, 2002, the undersigned counsel communicated with Ms. Vega's counsel to determine the status of settlement documents. On March 1, 2002, an announcement was made by counsel to the Court's case manager (via, the Court voice mail system) by both counsel, to the effect that consent was expected from Ms. Vega in short order, but counsel would not ignore the Court's March 11th deadline.

Thereafter, between March 1, 2002 and March 8, 2002, the undersigned attempted to confirm on more than one occasion with opposing counsel to determine the status of settlement documents. Receiving no specific answer, the undersigned has prepared this Motion.

## AUTHORITIES RELEVANT HERETO

This Motion for relief is made pursuant to Rule 56 F.R.C.P.

3

Other relevant authorities are contained in the body of the Motion.

PARTIES REQUESTING RELIEF

This Motion is filed by Port Elevator-Brownsville, L.C., Craig Elkins, and Southwest Grain Co., Inc.   Such parties are each referred to respectively hereafter as "Port Elevator", "Elkins", and "Southwest Grain".

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

This is an interpleader action filed by "Port Elevator". Port Elevator also requests affirmative relief in damages, for breach of contract, including costs, attorneys' fees, and interest. Port Elevator further requests the entry of a declaratory judgment adjudicating the rights and liabilities of the parties (see "Second Amended Complaint" which is part of the appendix to this Motion).

Plaintiff/Plaintiff in Interpleader seeks judgment against Ivonne Soto Vega individually. Vega has appeared in this action. Relief is further sought as against Bersain Gutierrez and Sysco de Baja S.A. de C.V.  Gutierrez and Sysco de Baja S.A. de C.V. were served on November 8, 1998, and have wholly made default (see Summons in a Civil Case and Return of Service which is part of the appendix to this Motion).

Walter Puffelis has never been cited by Plaintiff/Plaintiff in Interpleader.   Puffelis was cited to appear and answer in the related proceeding in State District Court of Hidalgo County, Texas, and made default.   A default judgment was subsequently entered against Puffelis and AGI/Akron Group, Inc.

Defendant Ivonne Soto Vega has appeared and counter-claimed,

4

also seeking declaratory relief regarding funds on deposit with this Court, but denied the existence of a contract under which she may be obligated. Vega sues for "negligence, conversion, fraud, and Texas Deceptive Trade Practices Act violations". Vega generally seeks damages for an alleged mishandling of the corn stored at Port Elevator-Brownsville (see Defendant "Ivonne Soto Vega's Original Answer and Counter-Claim" which is contained in the appendix to this Motion).

Vega has also sued Craig Elkins and Southwest Grain Co., Inc. alleging relationships with Port Elevator including joint enterprise, joint venture, "alter ego", and "other joint business arrangements". Vega requests damages as against Elkins and Southwest to the same extent she requests such relief against Port Elevator (see "Third-Party Complaint" which is contained in the appendix to this Motion).

### STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

Port Elevator, Elkins and Southwest Grain present the following issues for determination by the Court:

A.     Whether Ivonne Soto Vega may maintain her action for "negligence, conversion, fraud, and Texas Deceptive Trade Practices violations" despite her failure to respond to this Motion for Summary Judgment pursuant to Rule 56 F.R.C.P.

B.     Whether Port Elevator, Elkins, and Southwest Grain are entitled to a judgment on the merits as against Ivonne Soto Vega; and whether Port Elevator is entitled to a judgment by default against Bersain Gutierrez and Sysco de Baja S.A. de C.V.

5

C.   Whether Port Elevator is entitled to reimbursement for actual damages as against Vega, Bersain Gutierrez, and Sysco de Baja S.A. de C.V.

D.   Whether Port Elevator, Elkins and Southwest Grain are entitled to reimbursement of legal expenses, including attorneys' fees, costs, and interest as against Vega, Bersain Gutierrez, and Sysco de Baja.

### FACTUAL BACKGROUND

Movant relies to a very great extent on the affidavit of Craig Elkins which is contained in the appendix to this Motion.  Such affidavit should be deemed incorporated in its entirety at this point.

In 1996, two individuals (Bersain Gutierrez and Walter Puffelis) delivered in excess of 5,000 metric tons of corn (literally a trainload) to Port Elevator in Brownsville, Texas.  At such time, Walter Puffelis was acting on behalf of Akron Group, Inc., and Bersain Gutierrez was acting on behalf of Sysco de Baja S.A. de C.V.  The parties agreed that Sysco de Baja S.A. de C.V. and Bersain Gutierrez were exercising custody of the corn as owners, and all parties entered into a "rate and service contract" for unloading the rail cars, and for subsequent handling (and consequential brief storage) of the corn.

Pursuant to contract, any "delivering" of the corn to third-parties was to be done only upon the written instructions "of Sysco de Baja S.A. de C.V. and signed by Bersain Gutierrez".  The contract expired under its own terms on December 31, 1996.  (The

6

contract at issue, which is the only written contract, and which is the same contract referenced in Mr. Elkins' affidavit, is attached to this Motion and marked as Exhibit D. Its terms should be deemed incorporated at this point by reference.)

Subsequently, during the course of the next year, Port Elevator released in excess of 3,000 metric ton of corn under the terms of the contract, pursuant to the written instructions of Bersain Gutierrez. Presumably, most of the released corn was sold by Sysco de Baja S.A. de C.V. to third-parties. However, Port Elevator shared in none of these assumed sale proceeds. Port Elevator's contract dealt solely with the handling of the corn.

Sysco de Baja S.A. de C.V. and Bersain Gutierrez failed to pay contractual handling charges.

Slightly less than a year after the receipt of the first trainload of corn at the Port Elevator facility, an individual named Ivonne Soto Vega appeared at the Port of Brownsville requesting information about "her" corn. Mr. Elkins, who is the only managerial employee at Port Elevator, had never heard of Ms. Vega. Ms. Vega subsequently hired attorney Guillermo Vega of Brownsville who made a claim for the corn. Bersain Gutierrez was advised about Ms. Vega's claim to the corn, and Bersain Gutierrez subsequently contested Vega's claim in writing and orally.

Port Elevator was unable to resolve the conflicting claim for ownership of the corn, and ultimately advised the claimants (Ivonne Soto Vega and Bersain Gutierrez) that it would release the corn to them jointly; or sell the corn at market prices, tendering sales

7

proceeds to Vega and Gutierrez jointly; or, alternatively, that sales proceeds would be tendered to a court for resolution of competing ownership claims. (All correspondence related to Port Elevator's attempts to resolve the ownership dispute are contained in the appendix to this Motion as Exhibit C, and separately supported by the affidavit of John Skaggs.  Such affidavit and referenced correspondence should be deemed incorporated herein by reference.)

The original complaint, also interpleading disputed funds, was filed on February 11, 1998.  The appropriate waivers of summons were tendered to opposing parties, Vega and Bersain Gutierrez shortly thereafter (see the appendix, Exhibit C, for references to correspondence tendering such waivers).  Upon the tender of disputed funds to the custody of the United States District Court, Vega and Gutierrez abruptly ceased any demands or other communications regarding payment of these proceeds.  Bersain Gutierrez was ultimately served with citation on November 8, 1998, and Gutierrez has never made an appearance in this action to demand payment.  Ivonne Soto Vega and her attorneys waited over 13 months following the receipt of the notification of interpleader and the tender of waiver of summons to finally make an appearance in this action.  When Vega appeared in the action, it was to contest the jurisdiction of this Court.  It was not until January 2001 (almost 3 years later) that Vega asserted her counter-claims as otherwise described in this Motion.

<u>BRIEFING AND MEMORANDUM OF AUTHORITIES</u>

8

1.    <u>Whether Ivonne Soto Vega may maintain her action for</u>
<u>"negligence, conversion, fraud, and Texas Deceptive Trade Practices</u>
<u>Violations" despite her failure to respond to this Motion for</u>
<u>Summary Judgment pursuant to Rule 56 F.R.C.P.</u>

It is not anticipated that Ivonne Soto Vega will respond to
this Motion.  In the past, Vega has:

--    Ignored the interpleader of disputed funds into the
registry of the Court, and declined to make claim for such funds
until she was actually served.   Only then did she make a
conditional appearance to contest this Court's jurisdiction.  From
the date of filing the original interpleader to the date Vega
appeared to contest this Court's jurisdiction, 13 months elapsed.

--    From the date of the filing of the original interpleader
to the date Vega filed her counter-claim in this action, 3 years
elapsed.

--    Vega declined to give any substantive deposition
testimony related to her claims on multiple occasions, most
recently in July of 2001 in San Diego, California.  The inability
to obtain Ms. Vega's testimony voluntarily resulted in a Motion for
Sanctions and Costs filed in connection with pleadings appearing as
Exhibit L of this motion, filed in August 2001 (a copy of the
referenced Motion, without attachments is contained in the appendix
to this Motion).

--    Vega was subsequently arrested and incarcerated in Mexico
City.  Upon information, her detention status has not changed in
the past seven months.

9

-- On January 15, 2002, a probable settlement was announced to this Court, and the Court gave Vega's counsel 45 days to obtain appropriate consents or signatures. Opposing counsel has apparently been unable to obtain such direct consent from Vega.

<u>Standard for entry of judgment assuming there is no reply filed by Vega</u>:

"The Judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law". Rule 56(c) T.R.C.P.

"When a motion for summary judgment is made and supported as provided in this Rule, <u>an adverse party may not rest upon the mere allegations or denals of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial.</u> If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party. Rule 56(e) T.R.C.P. (Emphasis supplied)

<u>No evidence from Vega</u>

After 4 years of litigation in this action, dispite numerous attempts to obtain testimony from Vega, there is absolutely no evidence or factual detail in support of Vega's claim, aside from the "mere allegations or denials" in Vega's pleadings. Vega has no evidence regarding her pled assertions of "conversion, negligence, fraud, or Texas Deceptive Trade Practices Act violations".

10

Likewise, Vega has no evidence related to her pleadings as to any "joint venture, joint enterprise, alter ego or ...other joint business arrangements". (See "Defendant Ivonne Soto Vega's Original Answer and Counter-Claim" contained in the appendix).

Port Elevator, Elkins, and Southwest Grain are unable to respond to evidence which does not exist; and are unable to brief the sufficiency of any such evidence as it may support Vega's pled legal theories. For such reason, this Motion does not as yet contain extensive briefing regarding these issues. In the event a response is filed by Vega, such briefing may become appropriate, and these parties hereby affirmatively express their intention to brief these issues in the unlikely event a response is received from Vega.

Evidence in support of the assertion that Port Elevator, Elkins, and Southwest Grain engaged in acts and behavior which preclude any finding of liability to Vega:

In this connection, Defendants present the affidavit of Craig Elkins, marked as Exhibit  A to this Motion, and incorporated at this point by reference. Mr. Elkins details the relationship of the parties, and the lack of any relationship or knowledge of the existence of Ms. Vega. Mr. Elkins' affidavit further authenticates the contract in question and provides details regarding the reasonable remedial measures undertaken by Port Elevator following Vega's assertions that she had an ownership interest in the corn. (Remedial correspondence is attached hereto and incorporated as Exhibit C.)

11

This Motion is further supported by the affidavit of John Skaggs who serves to authenticate the various letters attempting to propose solutions to the issue of disputed ownership. These letters further detail the actual remedial measures undertaken by Port Elevator, leading up to the filing of the interpleader action in this Court.

Such affidavits and exhibits or attachments to such affidavits conclusively establish, absent any evidence from Vega to the contrary, that there were no actions by Port Elevator, Elkins, or Southwest Grain which amounted to conversion, negligence, fraud, or Texas Deceptive Trade Practices Act violations.

The evidence, as contained in this Motion further establishes conclusively that Craig Elkins signed the "rate and service contract" in his capacity as a representative of Port Elevator-Brownsville, L.C., and not in an individual capacity. In any event, the affidavits and evidence presented herein establishes that all actions were undertaken by Mr. Elkins, either personally or at his direction, and no other managerial personnel were involved in the actions which occurred beginning with the delivery of the rail cars of corn to the Port of Brownsville in 1996. Such narrative testimony contained in Mr. Elkins' affidavit establishes the conduct of himself and Port Elevator in the regular course of the business of Port Elevator, using established contract forms and the incorporation of published rates and tariffs.

Further evidence in this connection is likewise omitted pending any response from Vega.

12

Conclusion.

Vega has established no factual basis for any cause of action against Port Elevator, Elkins, or Southwest Grain.  Such claims should be dismissed by this Court.

2.   <u>Whether Port Elevator, Elkins, and Southwest Grain are entitled to a judgment on the merits as against Ivonne Soto Vega; and whether Port Elevator is entitled to a judgment by default against Bersain Gutierrez and Sysco de Baja S.A. de C.V.</u>

Relief requested:

Port Elevator asserts that Bersain Gutierrez and Sysco de Baja S.A. de C.V. are in breach of the "rate and service contract" previously identified in this Motion.  (The same assertion is made as to Walter Puffelis and AGI/Akron Group, Inc.; but service has never been obtained on such entities, so no relief is requested as against Puffelis and AGI at this time.)

Port Elevator has therefore sued Bersain Gutierrez and Sysco de Baja S.A. de C.V. for breach of contract, and for economic damages as supported in much greater detail in the previously identified affidavit of Craig Elkins which is contained in the appendix to this Motion.

Mr. Elkins' affidavit testimony establishes the execution and existence of the written contract which is also an exhibit to this Motion.   Mr. Elkins' testimony establishes the breach of said contract and the actual amount of economic damages (the existence or measure of damages is separately treated elsewhere in this Motion, below).

13

<u>Vega and Gutierrez Agency Relationship</u>

Again, without extensive briefing pending any response from Vega in connection with this Motion, Port Elevator cites the Court to general principals of agency, to-wit: "where an agency is undisclosed, a contract negotiated by the agent in the agent's own name but within the scope of the agent's authority is generally treated as the contract of the principal. Therefore, the principal is ordinarily liable on the agreement to the third-person with whom the agent has contracted". <u>Agency</u>, Section 213, Tx. Jur.3rd (2001).

"A partially disclosed principal is also generally liable to the third-party with whom the authorized agent has contracted." <u>Agency</u>, Section 213, Tx. Jur.3rd (2001). (The treatise contained in Tex. Jur. cites certain exceptions and limitations to these stated principles of agency. Such exceptions and limitations are not factually pertinent to the Court's present analysis of liability). (A copy of the cited Tex. Jur. materials is contained in the appendix to this Motion.)

Though Ivonne Soto Vega disputes the existence of a contract to which she is bound, she nonetheless asserts in her pleadings that she "instructed Bersain Gutierrez to travel to Brownsville, Texas to oversee the transfer of Counter-Plaintiff's corn to Port Elevator for storage" (see "Defendant Ivonne Soto Vega's Original Answer and Counter-Claim" contained in the appendix, specifically Paragraph 50, Page 8). Port Elevator accepts such statement as true for the purposes of resolution of the issues in connection

14

with this Motion.

Mr. Elkins' affidavit further details the undisclosed agency relationship between Mr. Gutierrez and Ivonne Soto Vega; or alternatively, the partial disclosure of such agency relationship mentioned in Vega's pleadings.

Assuming the validity of Vega's statement as to her agency relationship with Bersain Gutierrez; and further assuming the factual evidence set forth in Craig Elkins' affidavit, Port Elevator asserts its claim of breach of contract not only to Bersain Gutierrez and Sysco de Baja, (the signatory parties to the contract), but also asserts a claim against Ivonne Soto Vega as principal in connection with the transaction which led to the "storage" of the corn at the Port Elevator facility.

### Declaratory relief:

Port Elevator has sued for economic relief in connection with breach of contract claims, as detailed above.  Additionally, Port Elevator (joined by Southwest Grain and Elkins) request a declaratory judgment which adjudicates the ownership of the corn, or the value thereof; and which determines that Elkins, Port Elevator, and Southwest Grain are without fault in the circumstances related to the contracting, storage, and disposal of the corn, and the money which is the subject of this action.  Port Elevator, Elkins, and Southwest Grain request that the Court discharge them from further liability herewith.  Such relief is appropriate pursuant to 28 U.S.C. Section 201; Rule 57 T.R.C.P.; and Texas Civil Practice and Remedies Code, Section 37.001, et.seq.

(Vernon 2001) (The text of such statutes and rules is contained in the appendix to this Motion.)

### Default judgment as to Bersain Gutierrez and Sysco de Baja S.A. de C.V.

Bersain Gutierrez was served on November 8, 1998. Bersain Gutierrez has made no appearance of any kind in this action. The original Summons in a Civil Case along with the Return of Service were previously filed with the Court. A copy of such instrument is attached hereto and made part of the appendix to this Motion. In accordance with Rule 54 T.R.C.P., Port Elevator, Elkins, and Southwest Grain hereby formally make a demand for judgment against Bersain Gutierrez and Sysco de Baja S.A. de C.V. Furthermore, pursuant to Rule 55 T.R.C.P., the entry of a default by the Court would appear to be more appropriate (as opposed to an entry of default by the clerk) due to the circumstances of this action, including the request for unliquidated damages, attorneys' fees, and costs, and due to the need for entry of a declaratory judgment. (Copies of Rules 54 and 55 are contained in the appendix to this Motion.)

### Conclusion.

Port Elevator requests the entry of a judgment on the merits in connection with the breach of contract; and that such judgment be entered against Bersain Gutierrez, Sysco de Baja S.A. de C.V., and Ivonne Soto Vega, jointly and severally; alternatively, as against Bersain Gutierrez and Sysco de Baja S.A. de C.V. only. Port Elevator joined by Elkins and Southwest Grain further request

16

the entry of a declaratory judgment adjudicating the rights and liabilities of all of the parties as between each other. Port Elevator, Elkins, and Southwest Grain request a default judgment as to liability by Bersain Gutierrez and Sysco de Baja S.A. de C.V.

3. <u>Whether Port Elevator is entitled to reimbursement for actual damages as against Vega, Bersain Gutierrez, and Sysco de Baja S.A. de C.V.</u>

Assuming Port Elevator prevails in connection with this Motion for summary judgment on issues of contractual liability against Bersain Gutierrez, Sysco de Baja S.A. de C.V., and Ivonne Soto Vega (or against any combination of these parties), Port Elevator requests an award of economic damages related to the breach of the contract, as supported by the affidavit of Craig Elkins which is marked as Exhibit A to this Motion. The affidavit evidence presented by Mr. Elkins establishes such economic damage as totalling $81,438.04. Economic damages for breach of contract are requested in such amount.

4. <u>Whether Port Elevator, Elkins and Southwest Grain are entitled to reimbursement of legal expenses, including attorneys' fees, costs, and interest as against Vega, Bersain Gutierrez, and Sysco de Baja.</u>

Assuming Port Elevator, Elkins, and Southwest Grain prevail on their request for relief in connection with this Motion for Summary Judgment, such parties request a reimbursement of legal expenses, costs of Court, and interest.

This request for relief is made separately from the request

17

for economic damages contained in the preceding subsection of this Motion.  Such separate request has been made due to the fact that Craig Elkins is not an individual contracting party under the contract which controls the disposition of issues in this action. Likewise, Southwest Grain Co., Inc. is not a contracting party.  As detailed below, Elkins and Southwest Grain are separately entitled to legal expenses, costs, and interest.

Claim for attorneys' fees and costs.

Port Elevator, Elkins, and Southwest Grain have had to jointly defend Vega's action related to alleged violations of Texas Deceptive Trade Practices provisions.  "On a finding by the Court that an action under this section was groundless in fact or law or brought in bad faith or brought for the purpose of harassment, the Court shall award to the Defendant reasonable and necessary attorney's fees and court costs".  (Texas Business and Commerce Code, Section 17.50(c) Vernon 2001.)

Separately, Port Elevator asserts the following ground for recovery of attorneys' fees:  "A person may recover reasonable attorney's fees from an individual or a corporation, in addition to the amount of claim and costs, if the claim is for:  (1)  rendered services; (2)  performed labor;... (8)  an    oral    or    written contract" (Texas Civil Practice and Remedies Code, Section 38.006, Vernon 2001).

Interest:

An award of interest is appropriate pursuant to 28 U.S.C. Section 1961.

18

Copies of the cited State and Federal statutes are contained in the appendix to this Motion.

Claim for costs and fees pursuant to 28 U.S.C. Section 1927.

Port Elevator, Elkins, and Southwest Grain assert that Vega has "multiplied the proceedings in (this) case unreasonably and vexatiously" pursuant to 28 U.S.C. Section 1927.  Vega and the other responsible parties as determined by the Court should be ordered to pay "the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct".  In this connection, such parties engaged in the following conduct:

(a)  Following the filing of this action, Defendant Vega declined to make a voluntary appearance for a period of 13 months, and only filed a counter-claim in January 2001, almost 3 years after the institution of this action.

(b)  Defendant Vega contested jurisdiction in this action on two occasions resulting in many hours of formal pleading, briefing, and Court appearances.  Ultimately, Vega's attempts to avoid the jurisdiction of this Court were unsuccessful.

(c)  Vega has avoided participation in discovery, resulting in the facts and circumstances outlined in "Plaintiff in Interpleader's Response to Defendant's Motion for Sanctions and Costs; Including Cross-Motion for Sanctions and Costs; Including Certificate of Conference; Including Citation to Authorities", marked as Exhibit L and contained in the appendix of this Motion.  In summary, Vega not only avoided an appearance to give substantive testimony by deposition on

19

multiple occasions, Vega asserted she was likewise "unavailable" to give deposition testimony in San Diego, California in July 2001, but became "available" to appear at the deposition of another witness on the same occasion.

(d) Notwithstanding the existence of this action, Vega has filed two other actions in the State District Courts of Hidalgo County, Texas in efforts to circumvent the jurisdiction of this Court. Specifically, Vega has filed the following lawsuits notwithstanding the existence of this present action:

1.  Cause NO. C-2969-99-A; "Ivonne Soto Vega v. Port Elevator-Brownsville, L.C., Inc., AGI/Akron Group, Inc., Sysco de Baja, Walter Puffelis, Galvan, III, Individually and d/b/a AGI/Akron Group, Inc., Craig Elkins, Individually and d/b/a Port Elevator-Brownsville, L.C. and Southwest Grain Co., Inc., Bersain Gutierrez Zenteno, Individually and d/b/a Sysco de Baja"; 92nd District Court, Hidalgo County, Texas;

2.  Cause No. C-723-01-B; "Ivonne Soto Vega v. Universal Surety of America, Port Elevator-Brownsville, L.C. and Southwest Grain Co., Inc.; 93rd District Court.

In connection with the lawsuit pending in the 92nd District Court, Vega's actions necessitated the filing of a motion to abate the State Court action in deference to

20

this Federal Court action; and Port Elevator had to
contend with the actual scheduling of a jury trial in the
92nd District Court which was scheduled for the first
week in January 2001.  Such jury trial was ultimately
continued, and the case was abated.

The claim against Universal Surety, referenced above, is a
claim against the Elevator's bond, which necessitated the
acknowledgment of formal indemnity proceedings as between
Universal Surety (the bonding company) and Port Elevator.
Port Elevator is defending Vega's claims in the Universal
Surety matter.

(d)  These parties have been forced to respond to a separate
proceeding initiated before the Texas Department of
Agriculture, to-wit: T.D.A. Complaint initated July 13, 2000
requesting the forfeiture of any bond or letter of credit on
file with the State to satisfy Vega's alleged damages, and a
request to revoke Port Elevator-Brownsville, L.C.'s license
pursuant to asserted violations of Section 14 of the Texas
Agriculture Code.  Such complaint further asserted that Craig
Elkins should be individually <u>"investigated for criminal
conduct under Sections 14.030, 14.031,1 14.032, and/or 14.034"</u>
and requested that the State conduct an <u>"investigation for
possible criminal prosecution"</u>.  Such activities necessitated
a response by Port Elevator representatives and by the office
of the undersigned attorney.  A copy of such Texas Department
of Agriculture proceeding is marked as Exhibit I and contained

21

in the appendix to this Motion.

(e)   In the present suit, Vega has specifically <u>denied</u> that she entered into any written contract with Port Elevator (see her assertions contained in Paragraphs 31 and 32 of her counter-claim, at Page 6).   Notwithstanding, such assertion Vega has previously contended she <u>was a party</u> to the above referenced contract.   Vega filed one of her State Court petitions in the 92nd Judicial District Court in Hidalgo County, Texas, Cause No. C-2969-90-A.   On Page 7, Paragraph "c", of Ms. Vega's State Court pleading, Ms. Vega alleged that she "entered into a contract" with Plaintiff to "store corn at their facility in Brownsville, Texas" in the fall of 1996.   Such reference is contained in Port Elevator's "Second Amended Complaint", and the specific State Court pleading has previously been filed as an exhibit to other documents in this present federal action.

(f)   The undersigned counsel has received repeated assertions from Vega's counsel, beginning in mid-January 2002, that this present action "could be" settled pursuant to the terms announced at the Federal Court Status Conference on January 15, 2002.   During the ensuing 55 days, the undersigned counsel has proceeded under the assumption that the case was going to be settled, subject to a written confirmation by Ms. Vega. The undersigned counsel conferred with opposing counsel as recently as Wednesday, March 6, 2002, and was informed that Vega's counsel were "waiting for her son" to return from a

visit at the federal prison in Mexico City to confirm the existence of and terms of the proposed settlement.  To this date (Sunday afternoon, March 10, 2002), the undersigned counsel has received no direct communication from Vega's attorneys confirming or repudiating the settlement which Vega's attorneys themselves proposed.  The undersigned has therefore prepared this Motion for timely filing tomorrow, March 11, 2002, as ordered by the Court.  Such Motion has been prepared without the benefit of knowing whether Vega's proposed settlement, announced to the Court, will be proposed again on a later date.  Due to the lack of contact from Vega's attorneys, the undersigned must presume that the settlement proposal has been repudiated, and the undersigned has therefore endeavored to prepare this Motion.

Under the premise of the above recited facts, Port Elevator, Elkins, and Southwest Grain assert that they are entitled to relief pursuant to 28 U.S.C. Section 1927, and that they should receive reimbursement for "excess costs, expenses, and attorneys' fees reasonably incurred" by the conduct of Ivonne Soto Vega and others. Port Elevator, Elkins, and Southwest Grain further assert that all of the proceedings which have been brought before this Court and otherwise, were unreasonably created, and subsequently multiplied by Vega.

From the beginning, Port Elevator merely wanted to pay the parties the money which they might each show themselves entitled to receive.  Port Elevator (and the other parties) deeply resent the

23

present abuse of the Court system by Vega, and strongly urge the Court to award fees and costs pursuant to 28 U.S.C. Section 1927.

Costs and fees.

The total of the costs and fees incurred by Southwest Grain, Elkins, and Southwest Grain in defending the allegations, equal $58,200.00. Such amount is supported by the affidavit of John Skaggs, marked as Exhibit B, and contained in the appendix to this Motion. Such amount would have been incurred, regardless of Vega's relatively recent addition of Elkins and Southwest Grain as formal "Third-Party Defendants".

REQUEST FOR RELIEF

Port Elevator, Elkins, and Southwest Grain, both individually and in combination with each other request that the Court impose the following relief, and enter judgment in connection therewith:

1.   That Ivonne Soto Vega take nothing by reason of her actions against these parties.

2.   That judgment of default be entered as against Bersain Gutierrez and Sysco de Baja S.A. de C.V.

3.   That the Court enter a judgment awarding Port Elevator-Brownsville, L.C. economic damages for breach of contract in the total amount of $81,438.04; and that such judgment be entered against Bersain Gutierrez, Sysco de Baja S.A. de C.V., and Ivonne Soto Vega either jointly and severally, or in other combination as may be required by the application of law to the facts of this case.

4.   That the Court enter a declaratory judgment adjudicating

24

the ownership of the corn or the value thereof; and that the Court determine that Port Elevator, Elkins, and Southwest Grain are without fault in the circumstances related to the contracting, storage, and disposal of the corn, and money which is the subject of this action. These parties further pray that the Court discharge each of these parties from further liability herewith.

5. For an award of reasonable attorneys' fees, and costs totalling $58,200.00; and interest.

6. That this Court enter a permanent injunction restraining Ivonne Soto Vega, Bersain Gutierrez, and Sysco de Baja S.A. de C.V. from instituting or prosecuting any proceeding in any state or United States Court affecting the property, instrument, or obligation involved in this interpleader action pursuant 28 U.S.C. Section 2361 (a copy of the statute is contained in the appendix).

7. That this Court Order such sums awarded to Port Elevator, Elkins, and Southwest Grain paid from the registry of this Court, to the extent of available funds on deposit.

8. These parties pray for general relief.

Respectfully Submitted,

JOHN SKAGGS
P.O. Drawer 2285
710 Laurel
McAllen, Texas 78502-2285
Phone (956) 687-8216
Fax (956) 630-6570

JOHN SKAGGS
State Bar No. 18452500

25

Federal ID #1225
ATTORNEYS FOR PLAINTIFFS


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing document has been served on opposing counsel on this the 11 day of _MARCH_, 2002:

Roy Dale
William Mount
6301 N. 10th St.
McAllen, Texas 78504

_____
John Skaggs

26

<u>**APPENDIX**</u>

ELKINS AFFIDAVIT                          EXHIBIT A

AFFIDAVIT OF JOHN SKAGGS                   EXHIBIT B

REMEDIAL MEASURES                          EXHIBIT C

CONTRACT                                   EXHIBIT D

SECOND AMENDED COMPLAINT                   EXHIBIT E

BERSAIN GUTIERREZ DEFAULT                  EXHIBIT F

VEGA'S "COUNTERCLAIM"                      EXHIBIT G

VEGA'S "THIRD PARTY COMPLAINT"             EXHIBIT H

TDA COMPLAINT                              EXHIBIT I

LEGAL AUTHORITIES                          EXHIBIT J
        28 USC §1336
        28 USC §1927
        28 USC §1961
        28 USC §2201
        28 USC §2361
        RULE 54 F.R.C.P.
        RULE 55 F.R.C.P.
        RULE 56 F.R.C.P.
        RULE 57 F.R.C.P.
        TCPRC § 37.001 ET. SEQ.
        TCPRC § 38.001 ET. SEQ.
        TX BCC § 17.50
        TEX. JUR § 215 AGENCY

MARIA GONZALEZ DEPOSITION                  EXHIBIT K

MOTION FOR SANCTIONS AND COSTS             EXHIBIT L

THE STATE OF TEXAS                §
                                  §            **AFFIDAVIT**
COUNTY OF HIDALGO                 §

BEFORE ME, the undersigned Notary Public in and for the State of Texas, on this day personally appeared Craig Elkins known to me to be the person whose name is subscribed hereto, who being first duly sworn in the manner provided by law, on oath, stated as follows:

1.  My name is Craig Elkins.  I am over the age of 18 years, have personal knowledge of, and am competent and authorized to make this affidavit.

2.   I am not otherwise disqualified to make this affidavit.

**THE CONTRACT**

3.   I further affirmatively represent to the Court that the document titled "Port Elevator-Brownsville, L.C. Rate and Service Contract", executed October 31, 1996 with an expiration date of December 31, 1996, is the only written contract regarding the storage of the corn at issue in this action.

4.   I personally dealt with the individuals who negotiated and signed the contract.  The contracting parties were "Sysco de Baja, S.A. de C.V." represented by Bersain Gutierrez and "Akron Group, Inc. (AGI) " represented by Walter Puffelis.

5.   Following our negotiation of the agreements regarding the handling of the corn, the two above identified individuals executed the contract on behalf of the indicated corporations.

**MY DEALINGS WITH THE CONTRACTING PARTIES**

6.   I did not at any time deal with Ivonne Soto Vega regarding the contract.  Ivonne Soto Vega was not present at any

EXHIBIT A                              ELKINS AFFIDAVIT

negotiations.   Ivonne Soto Vega did not sign the contract identified in this affidavit.

7.   There were no oral contracts or agreements of any kind related to the transactions at issue in this lawsuit.

8.   During the negotiations regarding storage of the corn, and at the time the contract at issue was signed, it was affirmatively represented to me by Walter Puffelis and Bersain Gutierrez that the corn was being sold to Sysco de Baja, S.A. de C.V.   The purchaser (and therefore new owner) of the corn was identified to me as "Sysco de Baja, S.A. de C.V." both by Mr. Walter Puffelis  and by Mr. Bersain Gutierrez, representing Sysco de Baja, S.A. de C.V.

9.   At no time during the negotiation of the storage contract was Ivonne Soto Vega mentioned or identified as an owner or purchaser of the corn.

10.   At no time during the negotiation of the storage contract was Ivonne Soto Vega identified as a principal or owner of "Sysco de Baja, S.A. de C.V."

11.   At no time during the negotiation of the storage contact did Bersain Gutierrez or Walter Puffellis indicate or represent to me that Bersain Gutierrez was acting as an agent or representative of Ivonne Soto Vega individually.

12.   Up until the date appearing on this affidavit, I have never heard any testimony, or seen any documents authenticated under oath which assert that Ivonne Soto Vega had any ownership interest in Sysco de Baja, S.A. de C.V.

13.   No other individual in a managerial capacity at Port

Elevator-Brownsville, L.C. dealt with any of the individuals identified in this affidavit during the negotiation and signing of the contract at issue. I was the only person in a managerial capacity who had any contact whatsoever with any of these individuals. Non-managerial employees had additional contact with Bersain Gutierrez under the limited circumstances identified below.

14. The contract in question was signed on October 31, 1996. Until September 1997 (almost a year later), I had never even heard or seen the name "Ivonne Soto Vega". Starting in September 1997, Ivonne Soto Vega came to my office at the Port of Brownsville, while I was out of town. Shortly thereafter she hired a lawyer to make a claim that the corn stored at Port Elevator-Brownsville was actually hers. I have never in my life met Ivonne Soto Vega, and saw her for the first time in person in July, 2001 when I accompanied our attorney John Skaggs to San Diego, California to try to take her deposition, and the deposition of Bersain Gutierrez.

Ivonne Soto Vega has never represented to me, directly or indirectly, that she is a stockholder or an officer in the corporation called "Sysco de Baja, S.A. de C.V.", or that either Mr. Bersain Gutierrez or Mr. Walter Puffelis were her agents or representatives in connection with the sale or purchase of the corn. I only learned that she had made some of these allegations through her lawyers, and only after her lawyers became involved to make a claim for her more than a year after the contract was signed by the other parties.

15. I understand Ms. Vega's lawyers have produced a piece of

paper which contains the typewritten notation "sold to Ivonne Soto Vega" and "notify" Ivonne Soto Vega. I affirmatively represent under oath that prior to lawyers making a claim on behalf of Ms. Vega in this case, I had not seen, and was never advised about this piece of paper, or the existence of the typewritten notation.

On that same piece of paper, a Port Elevator-Brownsville employee notarized the signature of Bersain Gutierrez. That employee does not have a managerial role at Port Elevator-Brownsville. The document in question is not a document that is part of our records, nor would we normally keep a document of that kind in our records. No one at Port Elevator-Brownsville was ever asked to "notify" Ms. Vega or anyone else about anything.

The employee in question (Maria Gonzalez) gave deposition testimony in this lawsuit, and I was present at her deposition. She confirmed that it was not part of her regular duties to notarize documents on behalf of Port Elevator-Brownsville, that she did not read the document in question, that she did not note, or otherwise notice the name "Ivonne Soto Vega" under the signature blank on the document, and that she questions whether the notation was even on the document at the time the document was notarized. In any event, her deposition speaks for itself and I have asked my attorneys to attach a copy of her deposition to the motion which is annexed to this affidavit.

Had I seen the notation, it would not have made me assume there was any agency relationship between Ivonne Soto Vega and any of the parties. For example, various notifications are required pursuant to banking obligations and letters of credit, and as a

result of rail transport.  A successive chain of "ownership" occurs occasionally.  "Ivonne Soto Vega" could have been anyone, from a banker to a railroad representative to a prior owner or seller of the corn.  If she had an agency relationship with Bersain Gutierrez, I was never notified of the relationship.

Any other non-managerial employee of Port Elevator-Brownsville who may have dealt with Bersain Gutierrez did so only from the standpoint of logistical details related to the shipment of the corn.

## HANDLING OF THE CORN

16.  After the signing of the contract by Mr. Bersain Gutierrez, representing Sysco de Baja, S.A. de C.V., (and before Ivonne Soto Vega made her claim) I released corn to customers of Sysco de Baja, S.A. de C.V. only "upon written instructions of Sysco de Baja, S.A. de C.V.", as specifically required under the express terms of the contract.  Port Elevator-Brownsville, L.C. made no money on any of the sales made by Sysco de Baja, and has no knowledge of how the sales were made nor how the sales proceeds were paid.  All of the money charged and collected by Port Elevator-Brownsville was related to handling charges for shipping and receiving and any fees associated with storage pursuant to the terms of the service contract after Vega made her claim.

Before Ivonne Soto Vega made her claim, all delivery of corn was made only through the express written direction of Mr. Gutierrez.  After Ivonne Soto Vega made her claim, the remaining delivery of corn was made through arrangements with our attorney John Skaggs.  I discuss Mr. Skaggs' role in more detail below.

17.   After Ms. Vega made her claim, I contacted our attorney, John Skaggs of McAllen, Texas.   Mr. Skaggs dealt with Ms. Vega's attorneys, and sent numerous pieces of correspondence, and formal notifications to Ms. Vega and to Bersain Gutierrez.   I have asked our attorney Mr. Skaggs to sign an affidavit confirming what he did and authenticating the documents and letters which were sent to Ms. Vega's lawyer.   Essentially, we notified Ms. Vega and Bersain Gutierrez of our intention to dispose of the corn and asked them to remove it from our warehouse.   They did not remove the remaining corn from our warehouse.   Then we informed Ms. Vega and Mr. Gutierrez that if they did not remove the corn from our warehouse, we would sell the corn.   We offered to allow Ms. Vega and Mr. Gutierrez to dispute the price paid for the corn when we sold it to third-parties, or if they believed the corn was being sold for less than a fair amount, that Mr. Gutierrez or Ms. Vega were welcome to find a buyer who was willing to pay what they believed would be a fair price.   Neither Mr. Gutierrez nor Ms. Vega ever complained about the price nor did they direct anyone to come to the warehouse to pay a price different than the price which was obtained by Port Elevator-Brownsville to sell the corn after the notification letters were mailed to Ms. Vega and Mr. Gutierrez.   Ultimately, all of the corn was sold for a reasonable price, reflecting market values under the circumstances.

Since Mr. Gutierrez wanted all of the money, and since Ms. Vega wanted all of the money, we asked our attorney Mr. Skaggs what we should do.   Mr. Skaggs filed the present lawsuit and made an "interpleader" of $76,000.00 representing corn sale proceeds.

## LATER DEALINGS WITH VEGA AND GUTIERREZ

18.   I do not know why it took Ms. Vega more than a year to answer the lawsuit and make a formal claim for the money once we gave the money to the Federal Judge.

19.   I do not know why Mr. Gutierrez has never made an appearance in the lawsuit to ask for "his" share of the money.  My last contact with Bersain Gutierrez was by phone just prior to Ms. Vega's arrest in Mexico.  Since Ms. Vega's arrest, Mr. Gutierrez has not returned any of my phone calls.  Mr. Gutierrez failed to appear at his scheduled deposition in San Diego, California in July 2001 after agreeing to be present at the deposition.  I don't know where Mr. Gutierrez is today, and I don't know what circumstances led to his non-appearance at the deposition.

## EVIDENCE IN SUPPORT OF CONTERCLAIM BY PORT ELEVATOR

20.   Sysco de Baja (and its representative Bersain Gutierrez) was the contracting party.   Sysco de Baja and Mr. Gutierrez breached their contract.   They were given a reduced rate for handling the corn under conditions expressed in the contract (that a certain number of "bushels" of corn would be handled by the warehouse, and that it would all be shipped prior to December 31, 1996).   Sysco de Baja was given a reduced rate for handling in consideration of its promise to accomplish these conditions.  Upon non-accomplishment of these conditions, the actual rate was set by contract.   In addition, Sysco de Baja continued to store corn in the Port Elevator-Brownsville facility beyond the term of the contract.   As a result of the breach of the contract by Sysco de Baja, and Bersain Gutierrez, the contractual claim by Port

Elevator-Brownsville as calculated under the terms of the contract is $81,438.04.

The above amounts are due and no payment has been received from Sysco de Baja or Bersain Gutierrez (or Ivonne Soto Vega) related thereto.

In addition, we had to hire attorney John Skaggs to collect the above mentioned amounts, and to defend us in the resulting lawsuit related to the alleged "mishandling" of the corn which was filed by Ms. Vega. I have asked Mr. Skaggs to separately prepare an affidavit which details the amount of expenses and attorneys' fees related to our efforts to collect the additional money due under the contract. All amounts of money billed by Mr. Skaggs directly to us have been paid.

I have read the factual allegations contained in this affidavit, and such factual allegations are true.

_____

CRAIG ELKINS


SWORN TO AND SUBSCRIBED before me, the undersigned authority by the said Craig Elkins, on this the 10th day of March, 2002, to certify which witness my hand and seal of office.

CHERYL OYAMA
Notary Public
STATE OF TEXAS
My Comm. Exp. 06 - 26 - 2005

_____
Notary Public in and for
the State of Texas

My Commission Expires: 6/26/05

THE STATE OF TEXAS         § 
                                §       **AFFIDAVIT**

COUNTY OF HIDALGO       §

BEFORE ME, the undersigned Notary Public in and for the State of Texas, on this day personally appeared John Skaggs known to me to be the person whose name is subscribed hereto, who being first duly sworn in the manner provided by law, on oath, stated as follows:

1.  My name is John Skaggs.  I am over the age of 18 years, have personal knowledge of, and am competent and authorized to make this affidavit.

2.  I personally supervised and have personally reviewed the photostatic copies of the documents attached as Exhibits to this Motion; and also the deposition of Maria Gonzalez, and exhibits, which is attached to this Motion.  Such photostatic copies are true and accurate representations of the originals. The documents contained in such Exhibits are business records contained in the files in my law office, and represent documents or instruments received by me in the regular course of my business and representation of Port Elevator-Brownsville, L.C., Craig Elkins, and Southwest Grain.  Furthermore, I was personally in attendance at the deposition of Maria Gonzalez.  The transcription of Ms. Gonzalez' testimony is a fair and accurate transcription of the testimony which I heard her make on the day the deposition was given, insofar as such testimony is material and relevant to the subject of this Motion.

3.  I am licensed to practice law in the State of Texas, and

EXHIBIT  B                                       SKAGGS AFFIDAVIT

have been a practicing attorney for twenty years. In my opinion a reasonable hourly charge in connection with the prosecution of this matter would be $200.00 per hour. Based on a review of the non-privileged materials contained in my litigation file, Plaintiff's attorneys have expended in excess of 291 hours of time which was both reasonable and also was necessary for the prosecution of this action. Plaintiff has, therefore incurred a reasonable and necessary attorneys' fee equal to or in excess of $58,200.00 in this connection. Such figure is current through the date of this declaration, and in my opinion will increase in amount prior to trial; also as a result of trial; also as a result of appellate proceedings.

4. I have read the factual statements contained in "Plaintiff in Interpleader, Motion for Summary Judgment; Cross-Defendants' Motion for Summary Judgment; Including Plaintiff in Interpleader's Motion for Default Judgment; Including Certificate of Conference and Including Citation to Authorities" and, to the extent not otherwise supported by the affidavit of Craig Elkins and the deposition testimony of Maria Gonzalez, to my personal knowledge, such factual statements are true.

5. I have read the statements contained in this affidavit and the factual allegations are true.

John Skaggs

SWORN TO AND SUBSCRIBED before me, the undersigned authority by the said John Skaggs, on this the _17th_ day of _March_, 2002, to certify which witness my hand and seal of office.

CHERYL OYAMA
Notary Public
STATE OF TEXAS
My Comm. Exp. 06 - 26 - 2005

Notary Public in and for
the State of Texas

My Commission Expires: _6 26/05_

# SKAGGS & REYNA, L.L.P.

ATTORNEYS AT LAW
710 LAUREL
P.O. DRAWER 2285

McALLEN, TEXAS 78502-2285

**November 18, 1997**

JOHN SKAGGS
ROSE GUERRA REYNA
VIOLA GARCIA-GARZA

PHONE: (956) 687-8216
FAX: (956) 630-6570

Mr. Guillermo Vega, Jr. - VIA FAX NO. 542-1977
302 Kings Highway, Suite 105
Brownsville, Texas 78521

      Re:  Port Elevator, Brownsville and
           Ivonne Soto Vega

Dear Mr. Vega:

      I submit the following for your consideration:

1.    Mr. Bersain Gutierrez' letter of November 17, 1997.

2.    A copy of a draft in the total amount of $111,105.00 US, transmitted by Mr. Gutierrez; also containing his hand-written explanation of the origin of this draft.

3.    The "Rate and Service Contract" executed by Bersain Gutierrez and Walter Puffelis at the time the corn was deposited. Please note Mr. Puffelis' specific instructions in the context of the contract that, "Delivering of grain will be done only upon the written instructions of Sysco de Baja, SA de CV and signed by Bersain Gutierrez".

4.    Please also be advised that at the time of the deposit of the corn, it was affirmatively represented by Mr. Puffelis that Mr. Bersain Gutierrez was the "owner" of the corn. This is contrary to Mr. Puffelis' current representations that Ms. Soto Vega is the owner.

      Obviously, the enclosed documents establish more than an unsupported claim by Bersain Gutierrez that he may be the owner of the corn.

      Port Elevator finds itself in a position where it will probably elect to interplead the corn, or value thereof to the Court, and let the Judge decide who the true owner is.

      Port Elevator has an interest in helping the parties mitigate any damages. Accordingly, upon written instructions and authorization by Ms. Soto Vega, Port Elevator will complete the transaction with Mr. Enrique Villarreal, or some other willing buyer at the current market rate. Upon collection of the proceeds,

EXHIBIT C          REMEDIAL MEASURES

Port Elevator will tender the disputed funds to the Registry of the Court so the disputing parties can assert ownership. Alternatively, Port Elevator will tender the disputed money to any third-party deemed acceptable by both Mr. Gutierrez and Ms. Soto Vega.

Mr. Vega, please bear in mind that only 1,600 tons (more or less) remain in storage due to transactions which occurred before Ms. Soto Vega identified herself as a prospective owner.

The above arrangement has several advantages:

1.    It avoids any further decline in value due to spoiling.

2.    It avoids any decline in value related to market factors.

3.    Authorization to sell the corn at a current market price (other then to Enrique Villarreal) allows Southwest Grain to convert the corn to cash even if Mr. Enrique Villarreal is no longer willing to consummate his arrangement with Ms. Soto Vega due to the difference in the amount of available commodity.

Mr. Bersain Gutierrez has contacted us and has already approved the above arrangement orally. All we lack is your client's approval.

I'm confident this proposal will resolve all of the problems you raised, and I look forward to receiving Ms. Soto Vega's written authorization in the immediate future due to the potential for accumulation of additional damages.

Very truly yours,

SKAGGS & REYNA, L.L.P.

John Skaggs

JS/co
Enclosure

# SKAGGS & REYNA, L.L.P.

ATTORNEYS AT LAW
710 LAUREL
P.O. DRAWER 2285

McALLEN, TEXAS 78502-2285

JOHN SKAGGS
ROSE GUERRA REYNA
VIOLA GARCIA-GARZA

**November 26, 1997**

PHONE: (956) 687-8216
FAX: (956) 630-6570

Mr. Guillermo Vega, Jr. - VIA FAX NO. 542-1977
302 Kings Highway, Suite 105
Brownsville, Texas 78521

Mr. Bersain Gutierrez Zenteno - VIA FAX NO. (619) 482-5557
Sysco de Baja
2295 Paseo de la Americas, Suite 22
Otay Mesa, California  92173

    Re:  Port Elevator-Brownsville and
        Ivonne Soto Vega

Gentlemen:

I enclose a copy of my letter of November 18, 1997, which was addressed to Mr. Guillermo Vega, and which has previously been received by both of you.

We have received no response to the proposal outlined in the referenced November 18, 1997 letter.

Accordingly, please take notice that Port Elevator-Brownsville intends to handle, and dispose the grain in accordance with the Tariffs established for operation of the Elevator.  I enclose a copy of the rate and service contract, which includes the rates, and also the rules and regulations pertinent to the Elevator Tariffs.

Pursuant to Item 6 thereof, Port Elevator-Brownsville, hereby notifies all interested parties that the "grain" (defined therein to include corn) has been examined, and has been determined to be "out-of-condition".  Consequently:

1.    Port Elevator-Brownsville hereby orders the removal of the corn, and orders the same out, on or before December 3, 1997.

2.    If the owners (purported to be Bersain Gutierrez Zenteno and Ivonne Soto Vega) do not remove the corn from the Elevator before expiration of the herein stated time, take further notice that the Elevator management intends to remove and dispose of such corn at the expense of, and for the account of the stated owners.

Please take further notice that Port Elevator-Brownsville intends to solicit bids for the sale of the referenced corn, and intends to sell the corn to the highest bidder. This letter will further constitute a solicitation of bids from Bersain Gutierrez Zenteno and Ivonne Soto Vega. This letter will further serve to invite Bersain Gutierrez Zenteno and Ivonne Soto Vega to solicit third-party bidders for the purchase of the corn. Bids may be tendered to the Port Elevator-Brownsville offices, 9155 R.L. Ostos, Brownsville, Texas 78521, or by fax (956) 831-3181, or by delivering the same in-person to the Elevator offices at the Port of Brownsville.

Port Elevator-Brownsville intends to close the transaction for the sale of the corn within three business days following December 3, 1997.

In accordance therewith, upon collection of the proceeds, Port Elevator-Brownsville intends to tender the disputed funds to the Registry of a Court of appropriate jurisdiction, so the disputing parties can assert ownership. Alternatively, Port Elevator-Brownsville will tender the disputed money to any third-party deemed acceptable by both Mr. Gutierrez and Ms. Soto Vega; provided such instructions are conveyed to the Elevator in writing prior to the tender of the disputed funds to the Registry of the Court.

Very truly yours,

SKAGGS & REYNA, L.L.P.

John Skaggs

JS/co
Enclosure

# SKAGGS & REYNA, L.L.P.

ATTORNEYS AT LAW
710 LAUREL
P.O. DRAWER 2285

McALLEN, TEXAS 78502-2285

JOHN SKAGGS
ROSE GUERRA REYNA
VIOLA GARCIA-GARZA

December 4, 1997

PHONE: (956) 687-8216
FAX: (956) 630-6570

Mr. Guillermo Vega, Jr. - VIA FAX NO. 542-1977
302 Kings Highway, Suite 105
Brownsville, Texas 78521

      Re:  Port Elevator, Brownsville and
            Ivonne Soto Vega

Dear Mr. Vega:

      I am in receipt of your demand letter of of November 28, 1997.

      I am enclosing another copy of our November 28, 1997 correspondence to you. Please advise me regarding Ms. Soto Vega's intention at your first opportunity.

      In response to your November 28, 1997 correspondence:

1.    No one at Port Elevator ever had any dealings with Ms. Soto Vega related to the subject corn. If Ms. Soto Vega believes this is in error, please provide any information so indicating.

2.    There was no written disclosure of any agency relationship at the time the corn was deposited in the Elevator. If you are aware of any such written disclosure, please forward it to me immediately.

3.    Our Elevator was not aware of any purported involvement claimed by Ms. Soto Vega with the corn prior to approximately sixty days ago. If you have any information to the contrary, please sent this to me.

4.    All written instructions to date place authority for handling the corn in the hands of Bersain Gutierrez. If you have any writings to the contrary, please let me have them.

5.    No representations were ever made to Ms. Soto Vega. If she believes any such representations were made, (as described in your letter) please tell me who communicated such representations, in what manner, and when.

Mr. Vega, you're going to have to show each of these things to a Judge at the time of some hypothetical trial on these issues. Please make time to look at them now so we can determine the basis of your client's misunderstanding.

Very truly yours,

SKAGGS & REYNA, L.L.P.


John Skaggs

JS/co
Enclosure
cc:  Mr. Craig Elkins - VIA FAX NO. 831-3181

# PORT ELEVATOR—BROWNSVILLE, L. C.

9155 R.L. Ostos Road
Brownsville, Texas 78521
Tel (956) 831-8245  Fax (956) 831-3181

## TELEFAX MESSAGE

### Pages ( 1 )

To:        Interested Parties

From:      Craig Elkins
           Port Elevator-Brownsville, L.C.
Date:      18 December 1997

Ref:       Approximately 1,600 metric tons of yellow corn

Port Elevator-Brownsville, LC is now accepting bids/offers on
approximately 1,600 metric tons of yellow corn.  This corn has been in
storage and is subject to both a handling shrink and moisture shrink.
On average this corn is US Sample Grade or US #5 due to heating.  This
corn can be purchased as either whole corn or cracked corn.

A deposit of 25% of the total value must be made prior to 4:00 PM CST
Monday December 22nd 1997.   Shipment must be completed prior to
January 9th, 1998.   Payment is required the same day shipments are
made.

Please fax your bid/offer to (956) 831-3181 no later than 12:00 AM
CST, Monday December 22nd, 1997.  The successful bidder will be
notified by fax or telephone no later than 2:00 PM CST that same day.
All bids/offers must be in US dollars and specifing as whole or
cracked corn.

Port Elevator-Brownsville, LC esta aceptando ofrecimientos para
aproximadamente 1,600 toneladas metricas de maiz amarillo.  Este maiz
estaba almacenado y esta sujeto a mermas de maniobras y humedad.  En
general la calidad de este maiz es US Sample Grade o US #5 por razones
de calor.  Este maiz puede ser comprado como maiz entero o maiz
quebrado.

Se require un deposito de 25% del valor total antes de las 4:00 PM CST
lunes el dia 22 de diciembre 1997.  Los embaques tiene que  estar
completos antes del dia 9 de enero 1998.  Se require el pago el mismo
dia de los embarques.

Favor de enviar su ofrecimiento via fax a (956) 831-3181 antes de las
12:00 AM CST viernes el dia 22 de diciembre 1997.  Notificaremos el
ganador por fax o telefono a mas tardar las 2:00 PM CST el mismo dia.
Todo los ofrecimientos tiene que ser en US dolares y specificando si
es para maiz entero o maiz quebrado.

# SKAGGS & REYNA, L.L.P.

ATTORNEYS AT LAW
710 LAUREL
P.O. DRAWER 2285

McALLEN, TEXAS 78502-2285

JOHN SKAGGS
ROSE GUERRA REYNA
VIOLA GARCIA-GARZA

**December 18, 1997**

PHONE: (956) 687-8216
FAX: (956) 630-6570

Mr. Guillermo Vega, Jr. - VIA FAX NO. 542-1977
302 Kings Highway, Suite 105
Brownsville, Texas 78521

Mr. Bersain Gutierrez Zenteno - VIA FAX NO. (619) 482-5557
Sysco de Baja
2295 Paseo de la Americas, Suite 22
Otay Mesa, California  92173

      Re:  Port Elevator-Brownsville and
          Ivonne Soto Vega

Gentlemen:

    Reference is made to my letter dated November 26, 1997, a copy of which is attached.

    Please be advised, bids were taken as indicated in the attachment.  At the conclusion of the bidding process, a single bid was received, which was deemed by Port Elevator to be insufficient to reflect the market value of the corn.

    Port Elevator is therefore exercising its option to offer the corn for sale in smaller lots in order to sell the corn for amounts in excess of the aforementioned bid.

    Port Elevator will commence selling the corn in lots, at negotiated prices commencing Monday, December 22, 1997.

    Please direct any comments or suggestions to my office in writing at the above address.

              Very truly yours,

              SKAGGS & REYNA, L.L.P.

              John Skaggs

JS/co
Enclosure
cc:  cc:  Mr. Craig Elkins - VIA FAX NO. 831-3181

## SKAGGS & REYNA, L.L.P.

ATTORNEYS AT LAW
710 LAUREL
P.O. DRAWER 2285

McALLEN, TEXAS 78502-2285

JOHN SKAGGS
ROSE GUERRA REYNA
VIOLA GARCIA-GARZA

December 31, 1997

PHONE: (956) 687-8216
FAX: (956) 630-6570

Mr. Guillermo Vega, Jr. - VIA FAX NO. 542-1977
302 Kings Highway, Suite 105
Brownsville, Texas 78521

        Re:  Port Elevator, Brownsville and
             Ivonne Soto Vega

Dear Mr. Vega:

        I'm in receipt of your letters of December 18 and December 19, 1997.

        In response, please note we cannot dispute Ms. Soto Vega's claim that she owns the corn; nor can we dispute Mr. Bersain Gutierrez' claim that he owns the corn.

        Please note, both of them claim to own the corn.

        The only third-party to the transaction ambiguously indicates that some corn is owned by Ms. Soto Vega, but directs that no one can remove corn from the Elevator except Bersain Gutierrez.

        This is why we have elected to tender everything to the Judge to resolve the dispute.

        We realize Ms. Soto Vega may not want to bid on the corn. However, we wanted to make it clear that she could invite anyone to make a bid on the corn.  This allows her original purchaser to participate in the bidding process, and also preserves the integrity of the bidding process.

                        Very truly yours,

                        SKAGGS & REYNA, L.L.P.

                        John Skaggs

JS/co

# SKAGGS & REYNA, L.L.P.

ATTORNEYS AT LAW
710 LAUREL
P.O. DRAWER 2285

McALLEN, TEXAS 78502-2285

## January 19, 1998

JOHN SKAGGS
ROSE GUERRA REYNA
VIOLA GARCIA-GARZA

PHONE: (956) 687-8216
FAX: (956) 630-6570

Mr. Guillermo Vega, Jr. - VIA FAX NO. 542-1977
302 Kings Highway, Suite 105
Brownsville, Texas 78521

     Re:  Port Elevator, Brownsville and
          Ivonne Soto Vega

Dear Mr. Vega:

    I am in receipt, and thank you for your letters of December 31, 1997 and January 2, 1998.

    In one of your letters, you mentioned that your client "stored" the corn at my client's elevator. Our records do not indicate that your client was a customer of ours at any time. Please send any documentation which establishes that your client stored the corn with us.

    In a different letter, you indicate that my client specifically instructed the method of payment or the payee in connection with the storage of the corn. Likewise, please send me any written correspondence, invoice, or other documentation supporting these facts.

    I await your reply.

                Very truly yours,

                SKAGGS & REYNA, L.L.P.

                John Skaggs

JS/co
cc:  Mr. Craig Elkins - VIA FAX 831-3181

# SKAGGS & REYNA, L.L.P.

ATTORNEYS AT LAW
710 LAUREL
P.O. DRAWER 2285

McALLEN, TEXAS 78502-2285

JOHN SKAGGS
ROSE GUERRA REYNA
VIOLA GARCIA-GARZA

**February 11, 1998**

PHONE: (956) 687-8216
FAX: (956) 630-6570

Mr. Bersain Gutierrez - VIA FAX NO. (619) 482-5557
Sysco de Baja
2295 Paseo de la Americas, Suite 22
Otay Mesa, California  92173

>        Re:  Port Elevator vs. Ivonne Soto Vega,
>             Bersain Gutierrez, and Sysco de Baja S.A. de C.V.

Dear Mr. Gutierrez:

As you know, Port Elevator is in the process of selling the corn.

I understand you called Mr. Elkins in late January, indicating you had found a buyer.  However, Port Elevator heard nothing more from you, nor has your buyer contacted the Elevator.

Of course, when the corn is received, it is still the intention of Port Elevator to give the money to a Judge so he can decide who owns it (whether you own the money or Ms. Vega owns the money).

By copy of this letter, I have advised Ms. Vega's attorney of your communication to Port Elevator.

>                     Very truly yours,
>
>                     SKAGGS & REYNA, L.L.P.
>
>
>                     John Skaggs

JS/co
cc:  Mr. Guillermo Vega, Jr. - VIA FAX NO. 542-1977

## SKAGGS & REYNA, L.L.P.

ATTORNEYS AT LAW
710 LAUREL
P.O. DRAWER 2285

McALLEN, TEXAS 78502-2285

**February 11, 1998**

JOHN SKAGGS
ROSE GUERRA REYNA
VIOLA GARCIA-GARZA

PHONE: (956) 687-8216
FAX: (956) 630-6570

Mr. Bersain Gutierrez
Sysco de Baja S.A. de C.V.
2295 Paseo de la Americas, Suite 22
Otay Mesa, California  92173

     Re:  Port Elevator vs. Ivonne Soto Vega,
         Bersain Gutierrez, and Sysco de Baja S.A. de C.V.

Dear Mr. Gutierrez:

    I enclose a Complaint in Interpleader which was sent to the United States District Court in Brownsville for filing today.

    Pursuant to applicable rules, I tender herewith a waiver of summons and appropriate documents for execution by you.

              Very truly yours,

              SKAGGS & REYNA, L.L.P.

              John Skaggs

JS/co
Enclosure

# SKAGGS & REYNA, L.L.P.

ATTORNEYS AT LAW
710 LAUREL
P.O. DRAWER 2285

McALLEN, TEXAS 78502-2285

**March 13, 1998**

JOHN SKAGGS
ROSE GUERRA REYNA
VIOLA GARCIA-GARZA

PHONE: (956) 687-8216
FAX: (956) 630-6570

Mr. Bersain Gutierrez – VIA FAX NO. (619) 482-5557
Sysco de Baja
2295 Paseo de la Americas, Suite 22
Otay Mesa, California  92173

Mr. Guillermo Vega, Jr. – VIA FAX NO. 542-1977
302 Kings Highway, Suite 105
Brownsville, Texas 78521

     Re:  Port Elevator vs. Ivonne Soto Vega,
           Bersain Gutierrez, and Sysco de Baja S.A. de C.Y.

Dear Mr. Gutierrez and Mr. Vega:

    Port Elevator has tendered a total of $75,000 to the Court Registry for the United States District Court in Brownsville. Port Elevator makes no claim over this money which has been deposited with the Judge.

    I attach copies of checks tendering these payments into the custody of the Judge.

    If you wish to make a claim for this money, you should contact the United States District Court in Brownsville, or retain an attorney to do so on your behalf.

    I enclose another copy of the Waiver of Service of Summons for your use in appearing to make a claim for this money.

            Very truly yours,

            SKAGGS & REYNA, L.L.P.

            John Skaggs

JS/co
Enclosure

# SKAGGS, REYNA & GARZA, L.L.P.

**ATTORNEYS AT LAW**
**710 LAUREL**
**P.O. DRAWER 2285**
**McALLEN, TEXAS 78502-2285**

September 2, 1998

JOHN SKAGGS
ROSE GUERRA REYNA
VIOLA GARCIA-GARZA

PHONE: (956) 687-8203
(956) 687-8216
FAX: (956) 630-6570

Mr. Guillermo Vega, Jr. - VIA FAX NO. 542-1977
302 Kings Highway, Suite 105
Brownsville, Texas 78521

     Re:  Port Elevator, Brownsville and
         Ivonne Soto Vega

Dear Mr. Vega:

    As a follow-up to our recent conversation, the corn money has been placed in the registry of the United States District Court, Brownsville Division.

    Bursain Gutierrez has continued to make demand for the money, most recently approximately a week ago.  We have suggested to Mr. Gutierrez that he contact the Court direct to make claim for the money, and I am advised he has done this.  I have not received any written confirmation from him or from the Court regarding the manner of his contact with the Judge or the Court's clerk.

    I have tendered waiver of citation to your client, Ms. Vega, through your law office.  Ms. Vega has made no appearance in the Court.  Please advise me whether you continue to represent Ms. Vega in connection with this matter, and whether she intends to make an appearance in the Court to claim the deposited money.

    If she does not indicate that you will be representing her in this matter, I will need to arrange for personal service of citation on her in connection with the interpleader.

    Please try to let me know something as soon as you can.

        Very truly yours,

        SKAGGS, REYNA & GARZA, L.L.P.

        John Skaggs

JBS/cmo

liability related thereto. Moreover, Plaintiff prays that the court find Defendants have breached the contract entered into between the parties. Plaintiff further requests an award of actual damages related to the prosecution or defense of this action, for costs of Court, for pre-judgment interest, and post-judgment interest; and further for award of attorneys' fees arising out of the prosecution or defense of this action.

28. A jury is demanded in connection with this Complaint.

Respectfully submitted,

John Skaggs
P.O. Drawer 2285
McAllen, Texas 78502-2285
Phone (956) 687-8203
Fax (956) 630-6570

JOHN SKAGGS
State Bar No. 18452500
Fed I.D. No. 1225
ATTORNEY FOR PLAINTIFF

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel on this the 21 day of December 2000:

Roy Dale
6301 N. 10th St.
McAllen, Texas 78504

JOHN SKAGGS

AO 440 (Rev. 10/93) Summons in a Civil action

# United States District Court

SOUTHERN ———————— DISTRICT OF ———————— TEXAS

## BROWNSVILLE DIVISION

PORT ELEVATOR - BROWNSVILLE, L.C.

### SUMMONS IN A CIVIL CASE

V.

IVONNE SOTO VEGA, BERSAIN GUTIERREZ,
& SISCO DE BAJA, S.A. DE C.V.

CASE NUMBER:      B-98-23

TO: (Name and address of defendant)

Bersain Gutierrez
1853 Carolyn Drive
Chula Vista, CA 91913

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

John Skaggs
SKAGGS, REYNA & GARZA, L.L.P.
710 Laurel
P.O. Drawer 2285
McAllen, Texas 78502

an answer to the complaint which is herewith served upon you, within ___TWENTY DAYS (20)___ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

Michael N. Milby, Clerk

10-27-98

CLERK                                      DATE

_(signature)_

(BY) DEPUTY CLERK

EXHIBIT F

BERSAIN GUTIERREZ
DEFAULT

AO 440 (Rev. 10/93) Summons in a Civil Action

| RETURN OF SERVICE | |
|---|---|
| Service of the Summons and Complaint was made by me[1] | DATE 11-8-98 |
| NAME OF SERVER (PRINT) Gabriel Aguilar | TITLE Process server |

Check one box below to indicate appropriate method of service

☒ Served personally upon the defendant. Place where served: _____
1853 Carolyn Dr. Chula Vista CA 91913

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.
Name of person with whom the summons and complaint were left: _____
_____

☐ Returned unexecuted: _____
_____
_____

☐ Other (specify): _____
_____
_____

| STATEMENT OF SERVICE FEES | | |
|---|---|---|
| TRAVEL | SERVICES $25.00 | TOTAL $25.00 |

DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on  11-13-98
_____
Date

_____
Signature of Server

3115 4th Ave. San Diego CA
_____
Address of Server

(1)   As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

IN THE UNITED DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| PORT ELEVATOR - | § | |
| BROWNSVILLE, L.C. | § | |
| | § | |
| VS. | § | CIVIL NO.  B-98-23 |
| | § | |
| IVONNE SOTO VEGA, BERSAIN | § | |
| GUTIERREZ, AND SYSCO DE BAJA | § | |
| S.A. DE C.V. | § | |

AFFIDAVIT

| | |
|---|---|
| STATE OF CALIFORNIA | § |
| | § |
| COUNTY OF _SAN DIEGO_ | § |

BEFORE ME, the undersigned authority, on this day personally appeared Gabriel Aguilar, who by me being duly sworn on oath, deposes and says:

"My name is Gabriel Aguilar.  I am over the age of 18 years and competent to make this affidavit.  The facts contained in this affidavit are within my knowledge and are true and correct.

1.    I am over 18 years of age.

2.    I am not a party nor have I ever been a party to this lawsuit.

3.    I am employed as a process server with Legal Support, Inc. in Vista, California.

1

The factual statements contained in this affidavit are true".

GABRIEL AGUILAR

SWORN AND SUBSCRIBED TO before me on the _14'TH_ day of _JANUARY_ 1998.

Notary Public in and for
the State of California
My commission expires: _August 7, 2000_

LAURIE J. VANDEN BERG
Commission # 1107822
Notary Public - California
San Diego County
My Comm. Expires Aug 7, 2000

2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

PORT ELEVATOR –                      §
BROWNSVILLE, L.C. AND                §
SOUTHWEST GRAIN CO., INC.            §
                                     §
VS.                                  §        CIVIL NO. B-98-23
                                     §
IVONNE SOTO VEGA, BERSAIN           §        JURY DEMANDED
GUTIERREZ, SYSCO DE BAJA,            §
S.A. DE C.V. AND WALTER              §
PUFFELIS, INDIVIDUALLY AND           §
D/B/A AGI AKRON GROUP, INC.          §

**DEFENDANT IVONNE SOTO VEGA'S ORIGINAL ANSWER AND COUNTERCLAIM**

TO THE HONORABLE JUDGE OF SAID COURT:

1.    **IVONNE SOTO VEGA,** Defendant and Counter-Plaintiff herein files

this her Original Answer to Plaintiffs **PORT ELEVATOR-BROWNSVILLE,**

**L.C. (PORT ELEVATOR)** and **SOUTHWEST GRAIN CO., INC.'S (SOUTHWEST**

**GRAIN)** Second Amended Complaint and her Counterclaim against **PORT**

**ELEVATOR** and **SOUTHWEST GRAIN.**

**A.  MS. VEGA'S ANSWER**

2.    In response to paragraph 1 of Plaintiffs' Second Amended

Complaint, Defendant admits.

3.    In response to paragraph 2 of Plaintiffs' Second Amended

Complaint, Defendant is without knowledge or information sufficient

to form a belief as to the truth of the allegations contained in

said paragraph, and on that basis denies each and every allegation

contained therein.

4.    Defendant denies that she has been properly served, but admits

H:\p\99-3843\pleading\Orig Ans & Counterclaim                          Page 1


EXHIBIT G


VEGA'S "COUNTERCLAIM"

that her address has been correctly stated. As to the other allegations in paragraph 3, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in the paragraph, and on that basis denies each and every allegation contained therein not expressly admitted.

5. In answer to paragraph 4 of Plaintiffs' Second Amended Complaint, Defendant denies each and every allegation contained therein.

6. In answer to paragraph 5 of Plaintiffs' Second Amended Complaint, Defendant denies each and every allegation contained therein.

7. In answer to paragraph 6 of Plaintiffs' Second Amended Complaint, Defendant denies each and every allegation contained therein.

8. In response to paragraph 7 of Plaintiffs' Second Amended Complaint, Defendant denies each and every allegation contained therein.

9. In response to paragraph 8 of Plaintiffs' Second Amended Complaint, Defendant denies each and every allegation contained therein.

10. In response to paragraph 9 of Plaintiffs' Second Amended Complaint, Defendant denies each and every allegation contained therein.

11. In response to paragraph 10 of Plaintiffs' Second Amended Complaint, Defendant denies each and every allegation contained

therein.

12. In response to paragraph 11 of Plaintiffs' Second Amended Complaint, Defendant denies each and every allegation contained therein.

13. In response to paragraph 12 of Plaintiffs' Second Amended Complaint, Defendant denies each and every allegation contained therein.

14. In response to paragraph 13 of Plaintiffs' Second Amended Complaint, Defendant denies each and every allegation contained therein.

15. In response to paragraph 14 of Plaintiffs' Second Amended Complaint, Defendant admits that Plaintiffs are seeking relief pursuant to 28 U.S.C. § 22.01, but otherwise denies.

16. In response to paragraph 15 of Plaintiffs' Second Amended Complaint, Defendant denies each and every allegation contained therein.

17. In response to paragraph 16 of Plaintiffs' Second Amended Complaint, Defendant admits that she filed a lawsuit in State District Court in Hidalgo County, Texas against the Plaintiffs in this case and that the lawsuit has been partially abated at this time upon further order of the State District Court. Except as so admitted, Defendant denies each and every allegation contained in the said paragraph.

18. In response to paragraph 17 of Plaintiffs' Second Amended Complaint, Defendant denies each and every allegation contained

therein.  Defendant's copy of Plaintiffs' Second Complaint does not contain documents attached.

19.   In response to paragraph 18 of Plaintiffs' Second Complaint, Defendant admits that **PORT ELEVATOR** is apparently seeking a declaration pursuant to the purported contract and is seeking a determination of relative liabilities.   Except as so admitted, Defendant denies each and every allegation contained in the said paragraph.

20.   In response to paragraph 19 of Plaintiffs' Second Complaint, Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in said paragraph, and on that basis denies each and every allegation contained therein.

21.   In response to paragraph 20 of Plaintiffs' Second Amended Complaint, Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in said paragraph, and on that basis denies each and every allegation contained therein.

22.  In response to paragraph 21 of Plaintiffs' Second Amended Complaint, Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in said paragraph, and on that basis denies each and every allegation contained therein.

23.  In response to paragraph 22 of Plaintiffs' Second Amended Complaint, Defendant denies each and every allegation contained

therein.

24.  In response to paragraph 23 of Plaintiffs' Second Amended Complaint, Defendant admits that she filed a lawsuit in the 92nd District Court of Hidalgo County, Texas bearing Cause No. C-2969-99-A.   Except as so admitted, Defendant denies each and every allegation contained in said paragraph.

25.  In response to paragraph 24 of Plaintiffs' Second Amended Complaint, Defendant denies that she breached the contract allegedly entered into with Plaintiff in October, 1996 and further denies that Plaintiffs have suffered damages.  For further answer, Defendant is without sufficient knowledge or information to form a belief as to the truth of the other allegations contained in paragraph 24, and on that basis denies the other allegations contained therein.

26.  In response to paragraph 25 of Plaintiffs' Second Amended Complaint, Defendant denies each and every allegation contained therein.

27.  In response to paragraph 26 of Plaintiffs' Second Amended Complaint, Defendant denies each and every allegation contained therein.

28.  In response to paragraph 27 of Plaintiffs' Second Amended Complaint, Defendant denies each and every allegation contained therein.

29.  In response to paragraph 28 of Plaintiffs' Second Amended Complaint, Defendant admits that a jury has been demanded.

## B.  AFFIRMATIVE DEFENSES AND SPECIAL DENIALS

30.  Defendant would show that there are no other parties claiming an interest in the corn and funds at issue. As such, interpleader relief is not appropriate.

31.  Plaintiffs seek declaratory relief to construe a written contract under 28 U.S.C. § 22.01. Defendant specially denies that she entered into any written contract with Plaintiffs on the terms and conditions asserted by Plaintiffs.  As such, Plaintiffs' declaratory relief claim must fail.

32.  Plaintiffs contend that Defendant breached a written contract which she allegedly entered into with Plaintiffs.  Defendant specially denies that she entered into any written contract with Plaintiffs. As such, Plaintiffs' breach of contract claim against Defendant must fail.

33. As an affirmative defense, Defendant alleges that the contract alleged in Plaintiffs' Second Amended Complaint is unenforceable against Defendant due to fraud on Plaintiff's part.

34.  Defendant asserts the affirmative defense of offset or set off.

35.  Defendant asserts the affirmative defense of payment.

36.  Defendant asserts the affirmative defense of waiver.

37.  Defendant asserts the affirmative defense of statute of frauds.

38.  Defendant asserts that Plaintiffs have failed to mitigate their damages.

39.   Defendant asserts that any claim by Plaintiffs for attorneys fees is unnecessary and the purported fees are unreasonable.

## C.   COUNTERCLAIM

40.   Counter-Plaintiff **IVONNE SOTO VEGA** sues Counter-Defendants **PORT ELEVATOR** and **SOUTHWEST GRAIN**.   Service of this Counterclaim may be effectuated by forwarding a copy of the Counterclaim to the attorney for Counter-Defendants in this lawsuit, John Skaggs, at P.O. Drawer 2285, McAllen, Texas 78502-2285. **PORT ELEVATOR** was the original Plaintiff in this lawsuit.   **SOUTHWEST GRAIN CO., INC.** appeared as a Plaintiff for the first time in Plaintiffs' Second Amended Complaint.

41.   Counter-Plaintiff initially brought her claims against Counter-Defendants on or about May 26, 1999 in state court when she initiated her lawsuit against Counter-Defendants in Cause No. C-2969-99-A, in the 92nd Judicial District Court of Hidalgo County, Texas, styled, Ivonne Soto Vega v. Port Elevator-Brownsville, L.C., et al.   These claims are still pending.

42.   Counter-Plaintiff would assert that **PORT ELEVATOR** is a Texas limited liability company licensed to do business in the State of Texas.

43.   Counter-Plaintiff would show that Defendant **SOUTHWEST GRAIN** is a Texas corporation licensed to do business in Texas.

44.   **PORT ELEVATOR** and **SOUTHWEST GRAIN** are jointly responsible for Counter-Plaintiff's losses in that **MR. ELKINS** was jointly working

for both **PORT ELEVATOR** and **SOUTHWEST GRAIN** at the times of the incidents made the basis of this lawsuit and **PORT ELEVATOR** and **SOUTHWEST GRAIN** are a joint venture, joint enterprise, alter ego or have other joint business arrangements.

45. Counter-Plaintiff sues Counter-Defendants for negligence, conversion, fraud, and Texas Deceptive Trade Practices Act violations.

46. On or about October 21, 1996, Counter-Plaintiff purchased 3,444.434 metric tons of yellow corn from **WALTER PUFFELIS, III** and **AGI/AKRON GROUP, INC.** The purchase price was $170.00 per metric ton.

47. On or about November 13, 1996, Counter-Plaintiff made two more purchases from **WALTER PUFFELIS, III** and **AGI/AKRON GROUP, INC.** One purchase was for 688.309 metric tons and the other was for 1,791.566 metric tons. The price for metric ton again was $170.00.

48. Pursuant to Counter-Plaintiff's instructions, the yellow corn was transported via rail car to **PORT ELEVATOR**.

49. **CRAIG ELKINS** accepted the corn at **PORT ELEVATOR** on the occasions when it arrived and approved its release at the times it was taken out.

50. Counter-Plaintiff instructed **BERSAIN GUTIERREZ** to travel to Brownsville, Texas to oversee the transfer of Counter-Plaintiff's corn to **PORT ELEVATOR** for storage.

51. **MR. GUTIERREZ** does business under the name **SYSCO DE BAJA S.A.**

DE C.V.

52. Neither **MR. GUTIERREZ** or **SYSCO DE BAJA S.A. DE C.V.** had any authority from Counter-Plaintiff to sell Counter-Plaintiff's corn or enter into any contracts concerning storage without Counter-Plaintiff's express authority.

53. After the corn's arrival at **PORT ELEVATOR, PORT ELEVATOR** released about 3,400 metric tons of Counter-Plaintiff's yellow corn to third parties without Counter-Plaintiff's permission.

54. At the time **PORT ELEVATOR** released the yellow corn, **PORT ELEVATOR** was aware that the owner of the commodity was Counter-Plaintiff.

55. Counter-Plaintiff found a buyer for her approximately 5,000 metric tons of corn in 1997.

56. In about September 1997, Counter-Plaintiff notified **PORT ELEVATOR** she had a buyer and gave the elevator company authority to release the corn.  The elevator company refused to do so.

57. To this day, **PORT ELEVATOR** has refused to give Counter-Plaintiff her corn.

58. **PORT ELEVATOR-BROWNSVILLE, L.C.** later sold what remained of Counter-Plaintiff's yellow corn without her permission.

### Conversion

59. Counter-Plaintiff would show that she was the sole owner of the yellow corn which was stored at **PORT ELEVATOR**.  She had the right of possession of this property.

60.  **PORT ELEVATOR** unlawfully and/or without authority assumed dominion and control over Counter-Plaintiff's property to the exclusion of Counter-Plaintiff's right in this property. Counter-Plaintiff would show that **PORT ELEVATOR** turned over Counter-Plaintiff's property to one or more third parties to the exclusion of Counter-Plaintiff's rights in the property and without her permission.

61.  Counter-Plaintiff would show that she left her corn in **PORT ELEVATOR'S** possession for the purpose of storing the commodity until the property was to be sold.

62.  Counter-Plaintiff would show that **PORT ELEVATOR'S** conduct was unlawful in that it turned over Counter-Plaintiff's corn to one or more third parties without her permission. She would further show that **PORT ELEVATOR'S** possession was unlawful when the elevator company refused to return Counter-Plaintiff's corn when she requested that said corn be returned at a time when she had a buyer for the corn.

63.  Counter-Plaintiff sues for the fair market value of the corn at the times and places of the conversion. Counter-Plaintiff is also entitled to interest on the sum of the value of the property converted from the dates of conversion, at the prejudgment rate of interest.

64.  Counter-Plaintiff would further show that **PORT ELEVATOR'S** conversion of the property was fraudulent and/or malicious in that

the elevator company knew the property belonged to Counter-Plaintiff, but deliberately released the property to one or more third parties and later refused upon request by Counter-Plaintiff to release the property to Counter-Plaintiff for sale to a third party. Counter-Plaintiff would show that **PORT ELEVATOR** specifically intended to cause substantial injury to Counter-Plaintiff and accordingly Counter-Plaintiff asks that exemplary damages be awarded against **PORT ELEVATOR-BROWNSVILLE, L.C.**

## NEGLIGENCE

65. **PORT ELEVATOR** breached the duty owed to Counter-Plaintiff to store her yellow corn, safeguard it, and not release the property without her express permission. **PORT ELEVATOR-BROWNSVILLE, L.C.** breached the duties owed to Counter-Plaintiff by negligently releasing Counter-Plaintiff's property to one or more third parties and by later refusing to release Counter-Plaintiff's property to her upon request, proximately causing damages.

66. Counter-Plaintiff contends that **PORT ELEVATOR** was grossly negligent and requests exemplary damages.

## FRAUD

67. **PORT ELEVATOR** represents to its clients that commodities stored in its elevator will not be released without the express authority of the client.

68. The elevator company's representation to Counter-Plaintiff

that her corn would not be released without her permission was a false representation.

69.    The elevator company intended Plaintiff to rely and act upon the representation and store her corn in the facility based upon the representation.

70.    Counter-Plaintiff would show that **PORT ELEVATOR** acted contrary to its representation by releasing her corn to one or more third parties without her permission and by selling her corn to one or more third parties without her permission.

71.    Counter-Plaintiff acted in reliance upon the elevator company's representation and Counter-Plaintiff was injured as a result thereof. Counter-Plaintiffs hereby sues for her injury and requests that damages be awarded. She further requests an award of exemplary damages.

## TEXAS DECEPTIVE TRADE PRACTICES ACT VIOLATIONS

72.    Counter-Plaintiff sues **PORT ELEVATOR** for violations of the Texas Deceptive Trade Practices Act and requests damages, costs, and attorney's fees.

73.    Counter-Plaintiff would show that **PORT ELEVATOR** has committed one or more deceptive trade practices as outlined at Section 14.46 of the Texas Business & Commerce Code.

74. Counter-Plaintiff would show that pursuant to Section 17.50 of the Texas Business & Commerce Code, Counter-Plaintiff is entitled to relief due to unconscionable action or a course of action by

**PORT ELEVATOR** or by the elevator company's violation of one or more provisions of Section 17.46 of the Texas Business & Commerce Code which was relied on by Counter-Plaintiff to Counter-Plaintiff's detriment.

75. Counter-Plaintiff requests damages, court costs and reasonable and necessary attorney's fees as provided by Section 17.50 of the Texas Business & Commerce Code.

**WHEREFORE, PREMISES CONSIDERED,** Defendant **IVONNE SOTO VEGA** respectfully requests that all relief prayed for in Plaintiffs' Second Amended Complaint be denied, and that she be awarded her taxable court costs and as to **MS. VEGA'S** Counterclaim that **MS. VEGA,** as Counter-Plaintiff, be awarded judgment against Counter-Defendants **PORT ELEVATOR** and **SOUTHWEST GRAIN** for a sum within the jurisdictional limits of the court, pre and post-judgment interest as provided by law, an award of exemplary damages against Counter-Defendants in a sum determined by the trier of fact, attorney's fees, costs of court and such other and further relief which Counter-Plaintiff may justly be entitled.

Respectfully submitted,

DALE & KLEIN, L.L.P.
6301 N. 10th St.
McAllen, Texas 78504
Tel. No. (956) 687-8700
Fax. No. (956) 687-2416


ROY S. DALE
State Bar No. 05326700
WILLIAM D. MOUNT, JR.
State Bar No. 14602950

ATTORNEYS FOR DEFENDANT/COUNTER-
PLAINTIFF IVONNE SOTO VEGA


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing document has been forwarded to counsel of record, to wit:

John Skaggs
SKAGGS & GARZA, L.L.P.
710 Laurel
P.O. Drawer 2285
McAllen, Texas 78502-2285 ,

**VIA CERTIFIED MAIL/RRR** on this the 22nd day of January, 2001.


WILLIAM D. MOUNT, JR.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

FEB 2 3 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| PORT ELEVATOR –<br>BROWNSVILLE, L.C. AND<br>SOUTHWEST GRAIN CO., INC. | § § § § | |
| VS. | § § | CIVIL NO. B-98-23 |
| IVONNE SOTO VEGA, BERSAIN<br>GUTIERREZ, SYSCO DE BAJA,<br>S.A. DE C.V. AND WALTER<br>PUFFELIS, INDIVIDUALLY AND<br>D/B/A AGI AKRON GROUP, INC. | § § § § § § | JURY DEMANDED |
| VS. | § § | |
| CRAIG ELKINS, INDIVIDUALLY<br>AND D/B/A PORT ELEVATOR-<br>BROWNSVILLE, L.C., AND<br>SOUTHWEST GRAIN CO. , INC. | § § § § | |

## THIRD-PARTY COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

NOW COMES, Third-Party Plaintiff **IVONNE SOTO VEGA**, and sues **CRAIG ELKINS, INDIVIDUALLY AND D/B/A PORT ELEVATOR-BROWNSVILLE, L.C. AND SOUTHWEST GRAIN CO., INC.** (hereinafter **CRAIG ELKINS**) and in support thereof would show:

1.     **PORT ELEVATOR-BROWNSVILLE, L.C.** and **SOUTHWEST GRAIN CO., INC.** have sued **IVONNE SOTO VEGA.** A copy of the Second Amended Complaint is attached hereto as **Exhibit "A"** and incorporated herein for all purposes.

2.     **IVONNE SOTO VEGA** has responded to the Complaint by filing her Original Answer and Counterclaim against **PORT ELEVATOR-BROWNSVILLE, L.C.** and **SOUTHWEST GRAIN CO., INC.** A copy of **MS.**

EXHIBIT  H          VEGA'S "THIRD PARTY COMPLAINT"

VEGA'S Original Answer and Counterclaim are attached hereto as **Exhibit "B"**.

3.   In **MS. VEGA'S** Counterclaim, she sues **PORT ELEVATOR-BROWNSVILLE, L.C.** and **SOUTHWEST GRAIN CO., INC.** for negligence, conversion, fraud and Texas Deceptive Trade Practices Act violations.

4.   **MS. VEGA** contends that **MR. ELKINS** was jointly working for **PORT ELEVATOR-BROWNSVILLE, L.C.** and **SOUTHWEST GRAIN CO., INC.** at the times of the incidents made the basis of **MS. VEGA'S** Counterclaim.

5.   **MS. VEGA** would show that at the times **PORT ELEVATOR-BROWNSVILLE, L.C.** received her corn and at the times of the corn's release that **MR. ELKINS** was at all times responsible for the receipt and release of the corn.

6.   **MS. VEGA** sues **MR. ELKINS** for negligence, conversion, fraud and Deceptive Trade Practices Act violations arising out of his acceptance of the corn in Brownsville and his release of the corn.

7.   **WHEREFORE, PREMISES CONSIDERED,** Third-Party Plaintiff **IVONNE SOTO VEGA** respectfully requests that she be awarded judgment against Third-Party Defendant **CRAIG ELKINS, INDIVIDUALLY AND D/B/A PORT ELEVATOR-BROWNSVILLE, L.C. AND SOUTHWEST GRAIN CO., INC.** for a sum within the jurisdictional limits of the court, pre- and post-judgment interest as provided by law, an award of exemplary damages

against Third-Party Defendant in a sum determined by the trier of fact, attorney's fees, costs of court and such other and further relief which Third-Party Plaintiff may justly be entitled.

Respectfully submitted,

DALE & KLEIN, L.L.P.
6301 N. 10th St.
McAllen, Texas 78504
Tel. No. (956) 687-8700
Fax. No. (956) 687-2416

ROY S. DALE
State Bar No. 05326700
Federal I.D. No. 1184
WILLIAM D. MOUNT, JR.
State Bar No. 14602950
Federal I.D. No. 14992

ATTORNEYS FOR THIRD-PARTY PLAINTIFF
IVONNE SOTO VEGA

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing document has been forwarded to counsel of record, to wit:

John Skaggs
SKAGGS & GARZA, L.L.P.
710 Laurel
P.O. Drawer 2285
McAllen, Texas 78502-2285

VIA CERTIFIED MAIL/RRR on this the 23rd day of February, 2001.

WILLIAM D. MOUNT, JR.

# TEXAS DEPARTMENT OF AGRICULTURE
## Susan Combs, Commissioner
P. O. Box 12847 =Austin, Texas 78711= (512) 463-7476
Internet Address: http://www.agr.state.tx.us
For the hearing impaired: 1-800-735-2988 (voice) or 1-800-735-2989 (TDD/TT)

**Open Records Request Form**

| | | |
|---|---|---|
| Craig Elkins | | 956-831-8245 |
| Name of Requestor | Company Name | Telephone Number |
| 9155 R.L. Ostos Rd. | Brownsville     TX | 78521 |
| Address | City     State | Zip |

Description of information requested: Requesting a copy of complaint on Port Elevator-Brownsville, LC and a copy of TDA's reply.

Signature of requestor: _____ Date: _____

| Format/Description | No./Hours/Minutes | Cost | Charge |
|---|---|---|---|
| Standard-size paper copy (8 ½ x 11 or 8 ½ x 14) | 7 pages | .10 | .70 |
| Non-standard-size copy format (diskette, audio/video cassette, etc.) | | | |
| Personnel charge | | $15/hr | 0.00 |
| Overhead charge (20% of personnel charge) | | | |
| Microfiche or microfilm charge | | | |
| Remote document retrieval charge | | | |
| Computer resource charge | | Actual | 0.00 |
| Miscellaneous supplies | | | |
| Postage and shipping charge | | Actual | .55 |
| Fax charge | | | |

**Total Amount Due:** $ 1.25

**NO CHARGES**

Please return this invoice with your payment to: **Texas Department of Agriculture**
**P. O. Box 12847**
**Austin, Texas 78711**

| TDA Office Use Only | | | |
|---|---|---|---|
| Jon Garza | Regulatory 1731-4210 | August 21, 2000 | |
| Request taken by | Division | Date | Telephone Number |

Records Custodian: _____ Date: 8/22/00
Counsel Approval By: _____ Date: 8/22/00
Copy of form forwarded to General Accounting By: _____ Date: 8-22-00
Payment Received By: _____ Date: _____
Amount of Payment: $ _____ Remittance # : _____

EXHIBIT I                    TDA COMPLAINT



# d&k
## dale & klein, l.l.p.
## attorneys at law

Roy S. Dale, P.C.
Katie Pearson Klein, P.C.*
* Board Certified Texas Board of Legal Specialization
Family Law and Civil Trial Law
Marcus E. Morris
William D. Mount, Jr.

A. Peter Thaddeus Jr
Kathryn M Flagg
Marina Garcia

July 13, 2000

**VIA FAX # 512-463-8225**
**AND CERTIFIED MAIL/RRR**
Mr. Juan Garza
Texas Department of Agriculture
Post Office Box 12847
Austin, Texas 78711

   Re: Yvonne Soto Vega's claim against Port Elevator-
    Brownsville, L.C.; Our File No. 99-3843

Dear Mr. Garza:

  This letter is a follow up to yesterday's telephone conversation.

  My client, Yvonne Soto Vega, stored 4,924 metric tons of corn at Port Elevator-Brownsville, L.C. at the Port of Brownsville. Three shipments were received at Port Elevator-Brownsville, L.C. by railcar on October 31, 1996, November 13, 1996 and November 27, 1996. 54 railcars are believed to be involved. Without my client's knowledge, Port Elevator immediately began releasing my client's corn to third parties, beginning on November 4, 1996. My client had purchased the corn at $170 per ton from AGI, 9480 Marconi Drive, Suite F, Otay Mesa, San Diego, California 92173. AGI's agent was Walter Puffelis, III. My client had a buyer for the corn at $150 a ton with the delivery date being November 1, 1997. My client's buyer was unable to take delivery after being told by Craig Elkins, manager of Port Elevator-Brownsville, L.C., that the corn had been released to third parties. My client, through this office, has attempted to resolve the matter with Port Elevator, but Port Elevator has denied all responsibility. My client requests that the Texas Department of Agriculture initiate and conduct an investigation into this matter.

  We believe Port Elevator-Brownsville, L.C. has violated Section 14.010 of the Texas Agriculture Code in that Port Elevator-Brownsville, L.C. has failed to exercise the care that a reasonably prudent person would exercise in regard to the corn under similar circumstances and is therefore liable for damages. We request that

6301 North Tenth Street McAllen, Texas 78504
Telephone 956.687.8700 Fax 956.687.2416
Brownsville Office
915 Ridgewood Brownsville, Texas 78520
Telephone 956.546.5100



Mr. Juan Garza
July 13, 2000
Page 2

any bond or letter of credit on file with the State be forfeited to
help satisfy my client's damages. Additionally, we further believe
that under Section 14.015 that the Texas Department of Agriculture
should revoke Port Elevator-Brownsville, L.C.'s license for
violations of Section 14. We would note that Port Elevator-
Brownsville, L.C. has violated Section 14.017(a) in that it did not
issue to Ms. Vega "a serially numbered scale weight ticket" in a
form approved by the Department of Agriculture. Lastly, we believe
that Craig Elkins, the manager of the Elevator, should be
investigated for criminal conduct under Sections 14.030, 14.031,
14.032 and/or 14.034 and request that the State conduct an
investigation for possible criminal prosecution.

As evidence of my client's ownership of the corn, I have
enclosed herewith the following:

    1.    Invoice 0000001 from AGI;
    2.    Invoice 0000002 from AGI;
    3.    Invoice 0000003 from AGI;
    4.    My client's affidavit; and
    5.    Statement of Seller.

Should you have any questions, please do not hesitate to
contact me.

                              Very truly yours,

                              Bill Mount

                              WILLIAM D. MOUNT, JR.

ENCLOSURES
WDM:dm
h:\p\99-3843\ltrs\garza

```
A   G   I                          INVOICE  0000001
9460 MARCONI DRIVE SUITE F
OTAY MESA, SAN DIEGO CA. 92173      OCTOBER 25, 1996.
PHONE: 619) 661-6481
FAX:   619) 661-6484

SOLD TO:                           SHIP TO:

MRS. IVONNE SOTO VEGA              MRS. IVONNE SOTO VEGA
PASEO RIO TIJUANA No. 1716         BROWNSVILLE, TEXAS 78521
ZONA DEL RIO, TIJUANA B.C. MEXICO
```

| P. O. NUMBER | TERMS | | SALESMAN |
|---|---|---|---|
| 0008-08/23/96 | PRICE BASIS CIF BROWNSVILLE, TEXAS | | W.P. |

| QUANTITY | DESCRIPTION | PRICE | UNIT | AMOUNT |
|---|---|---|---|---|
| 2,444.434 TON/METRICAS | 2,444.434 TON/METRICAS DE MAIZ AMARILLO # 2 GRADO B PARA CONSUMO HUMANO CON LAS SIGUIENTES ESPECIFI-CACIONES: MOISTURE MAXIMUM 14.5 % MINIMUM TEDNSITY 67.5 % EXTRANEOUS FORRIGN 3.3 % CHIPPED MAIZE 3 % MAX AFLATOXIN 15 PPB MAX. ORIGIN UNITED STATES | $ 170.00 | TONELADA METRICA | $ 415,553.78 |

```
            RECEIVED BY:

      MR. BERSAIN GUTIERREZ              MR. WALTER PUFFERIS III
      OR MRS. IVONNE SOTO VEGA

      DATE:  10-30-96

      THIS NOTARIZATION IS TO AUTHENTICATE THAT THE ABOVE
      SIGNATURE IS THAT OF MR. BERSAIN GUTIERREZ.
```

| | | | TOTAL | $ 415,553.78 |

```
          SWORN AND
          SUBSCRIBED BEFORE ME THIS  30TH DAY  OCTOBER   19 96
          MY COMMISSION EXPIRES
          AUGUST 21, 1999

                              MARIA GONZALEZ    NOTARY PUBLIC
                              IN AND FOR CAMERON COUNTY   STATE OF TEXAS

NOTIFY:
MRS. IVONNE SOTO VEGA
PASEO RIO TIJUANA No. 1716
ZONA DEL RIO, TIJUANA B.C. MEXICO
```

```
A   G   I                              INVOICE  0000002
9480 MARCONI DRIVE SUITE F
OTAY MESA, SAN DIEGO CA. 92173         NOVEMBER 12, 1996.
PHONE: 619) 661-6481
FAX:   619) 661-6484

SOLD TO:                               SHIP TO:

MRS. IVONNE SOTO VEGA                  MRS. IVONNE SOTO VEGA
PASEO RIO TIJUANA No. 1716             BROWNSVILLE, TEXAS 78521
ZONA DEL RIO, TIJUANA B.C. MEXICO
```

| P. O. NUMBER | TERMS | | SALESMAN |
|---|---|---|---|
| 0006-08/23/96 | PRICE BASIS CIF BROWNSVILLE, TEXAS | | W.P. |

| QUANTITY | DESCRIPTION | PRICE | UNIT | AMOUNT |
|---|---|---|---|---|
| 1,791,566 TON/METRICAS<br><br>MERCHANDISE SPECIFICATION: | 1,791,566. TON/METRICAS DE MAIZ AMARILLO # 2 GRADO B PARA CONSUMO HUMANO CON LAS SIGUIENTES ESPECIFI- CACIONES: MOISTURE MAXIMUM 14.5 % MINIMUM TEDNSITY 67.5 % EXTRANEOUS FOREIGN 3.3 % CHIPPED MAIZE 3 % AFLATOXIN 15 PPB MAX. ORIGIN UNITED STATES | $ 170.00 | TONELADA METRICA | $ 304,566.22 |

```
              RECEIVED BY:


      MR. BERSAIN GUTIERREZ
      OR MRS. IVONNE SOTO VEGA

      DATE: NOV 13 OF 1996

      THE ATTACHED NOTARIZATION IS TO AUTHENTICATE THAT
      THE ABOVE SIGNATURE IS THAT OF BERSAIN GUTIERREZ
```

| | | T O T A L | $ 304,566.22 |
|---|---|---|---|

```
OTIFY: MRS. IVONNE SOTO VEGA  AND BERSAIN GUTIERREZ
ASEO RIO TIJUANA No. 1716
ONA DEL RIO, TIJUANA B.C. MEXICO
```

WALTER PUFFELIS III

```
  A     G    I                           INVOICE   0000003
9480 MARCONI DRIVE SUITE F
OTAY MESA, SAN DIEGO CA. 92173           NOVEMBER 13, 1996.
PHONE: 619) 661-6481
FAX:   619) 661-6484

SOLD TO:                                 SHIP TO:

MRS. IVONNE SOTO VEGA                    MRS. IVONNE SOTO VEGA
PASEO RIO TIJUANA No. 1716               BROWNSVILLE, TEXAS 78521
ZONA DEL RIO, TIJUANA B.C. MEXICO
```

| P. O. NUMBER | TERMS | SALESMAN |
|---|---|---|
| 0008-08/23/96 | PRICE BASIS CIF BROWNSVILLE, TEXAS | W.P. |

| QUANTITY | DESCRIPTION | PRICE | UNIT | AMOUNT |
|---|---|---|---|---|
| 688,309. TON/METRICAS | 688,309. TON/METRICAS DE MAIZ AMARILLO # 2 GRADO B PARA CONSUMO HUMANO | $ 170.00 | TONELADA METRICA | $ 117,012.53 |
| MERCHANDISE SPECIFICATION: | CON LAS SIGUIENTES ESPECIFI-CACIONES: MOISTURE MAXIMUM 14.5 % MINIMUM TENDSITY 67.5 % EXTRANEOUS FOREIGN 3.3 % CHIPPED MAIZE 3 % AFLATOXIN 15 PPB MAX. ORIGIN UNITED STATES | | | |

```
             RECEIVED BY:


      _____
      MR. BERSAIN GUTIERREZ        | MR. WALTER PUFFELIS III
      OR MRS. IVONNE SOTO VEGA     |

      DATE:_____
```

| | | | TOTAL | $ 117,012.53 |
|---|---|---|---|---|

```
NOTIFY: MRS. YVONNE SOTO VEGA
PASEO RIO TIJUANA No. 1716
ZONA DEL RIO, TIJUANA B.C. MEXICO
```

## AFFIDAVIT OF OWNERSHIP

DATE:        OCTOBER 30, 1997

AFFIANT:     IVONNE SOTO VEGA

Affiant on oath swears that the following statement is true:

That affiant bought 4,236.00 metric tons of corn from AGI on October 25, 1996 and on November 12, 1996 respectively. Ivonne Soto Vega paid AGI with a letter of credit drawn from Norwest Bank in El Paso, Texas. The funds used to pay for the corn belonged solely to Ivonne Soto Vega. Ivonne Soto Vega gave instructions to the seller AGI to transport the corn to the Port of Brownsville to store at a grain elevator. Ivonne Soto Vega never entered into an agreement with Bersain Gutierrez wherein he would participate as owner of the corn.

Ivonne Soto Vega has never relinquish ownership of the corn from the date of purchase to the date of execution of this document. Ivonne Soto Vega has never given anyone authority to dispose of the corn from the date of purchase to the date of execution of this document.

Ivonne Soto Vega now desires to sell the corn that she bought to Enrique Villarreal for a price which has been agreed to between the parties. Ivonne Soto Vega is instructing the owner of the grain elevator to release the corn to the buyer, Enrique Villarreal, once the sale contract is executed.

Signed this __3RD__ day of __November__, 1997.

_signature: Ivonne Soto_
Ivonne Soto Vega

### JURAT

SWORN AND SUBSCRIBED before me by Ivonne Soto Vega on this the __THIRD__

day of __November__, 1997.

_signature: Consuelo Canino_
Notary Public in and For the State
of California

Commission Expires: __Sep 26, 2001__

CONSUELO CANINO
Commission # 1154600
Notary Public — California
San Diego County
My Comm. Expires Sep 26, 2001

EXHIBIT J                    LEGAL AUTHORITIES

(b) The district courts for such districts shall have jurisdiction of appeals from interlocutory orders and decrees of bankruptcy courts, but only by leave of the district court to which the appeal is taken.

(c) A district court may not refer an appeal under that section to a magistrate or to a special master.

Section 402(b) of Pub.L. 95–598 was amended by section 113 of Pub.L. 98–353 by substituting "shall not be effective" for "shall take effect on June 28, 1984", thereby eliminating the amendment by section 238(a) of Pub.L. 95–598, effective June 27, 1984, pursuant to section 122(c) of Pub.L. 98–353, set out as an Effective and Applicability Provisions note under section 151 of this title.

Section 121(a) of Pub.L. 98–353 directed that section 402(b) of Pub.L. 95–598 be amended by substituting "the date of enactment of the Bankruptcy Amendments and Federal Judgeship Act of 1984 [i.e. July 10, 1984]" for "June 28, 1984". This amendment was not executed in view of the prior amendment to section 402(b) of Pub.L. 95–598 by section 113 of Pub.L. 98–353.

**Effective and Applicability Provisions**

**1994 Acts.** Amendment by Pub.L. 103–394 effective on Oct. 22, 1994, and not to apply with respect to cases commenced under Title 11 of the United States Code before Oct. 22, 1994, see section 702 of Pub.L. 103–394, set out as a note under section 101 of Title 11, Bankruptcy.

**1986 Acts.** Amendment by Pub.L. 99–554 effective 30 days after Oct. 27, 1986, except as otherwise provided for, see section 302(a) of Pub.L. 99–554, as amended, set out as a note under section 581 of this title.

**1984 Acts.** Amendment by Pub.L. 98–353, except for subsec. (c)(2), effective July 10, 1984, see section 122(a) of Pub.L. 98–353, set out as a note under section 151 of this title.

Subsec. (c)(2) not applicable with respect to cases under Title 11, Bankruptcy, that are pending on July 10, 1984, or to proceedings arising in or related to such cases, see section 122(b) of Pub.L. 98–353, set out as a note under section 151 of this title.

**Separability of Provisions**

If any provision of or amendment made by Pub.L. 103–394 or the application of such provision or amendment to any person or circumstance is held to be unconstitutional, the remaining provisions of and amendments made by Pub.L. 103–394 and the application of such provisions and amendments to any person or circumstance shall not be affected thereby, see section 701 of Pub.L. 103–394, set out as a note under section 101 of Title 11, Bankruptcy.

**Jurisdiction Over and Transfer of Bankruptcy Cases and Proceedings**

Section 115 of Pub.L. 98–353 provided that:

"(a) On the date of the enactment of this Act [July 10, 1984] the appropriate district court of the United States shall have jurisdiction of—

"(1) cases, and matters and proceedings in cases, under the Bankruptcy Act [former Title 11, Bankruptcy] that are pending immediately before such date in the bankruptcy courts continued by section 404(a) of the Act of November 6, 1978 (Public Law 95–598; 92 Stat. 2687 [Pub.L. 95–598, Title IV, § 404(a), Nov. 6, 1978, 92 Stat. 2683, formerly set out as a note preceding section 151 of this title], and

"(2) cases under title 11 of the United States Code [Title 11, Bankruptcy], and proceedings arising under title 11 of the United States Code or arising in or related to cases under title 11 of the United States Code, that are pending immediately before such date in the bankruptcy courts continued by section 404(a) of the Act of November 6, 1978 (Public Law 95–598; 92 Stat. 2687).

"(b) On the date of the enactment of this Act [July 10, 1984], there shall be transferred to the appropriate district court of the United States appeals from final judgments, orders, and decrees of the bankruptcy courts pending immediately before such date in the bankruptcy appellate panels appointed under section 405(c) of the Act of November 6, 1978 (Public Law 95–598; 92 Stat. 2685) [formerly set out as a note preceding section 1471 of this title]."

§ 1335.  **Interpleader**

(a) The district courts shall have original jurisdiction of any civil action of interpleader or in the nature of interpleader filed by any person, firm, or corporation, association, or society having in his or its custody or possession money or property of the value of $500 or more, or having issued a note, bond, certificate, policy of insurance, or other instrument of value or amount of $500 or more, or providing for the delivery or payment or the loan of money or property of such amount or value, under any obligation written or unwritten to the amount of $500 or more, if

(1) Two or more adverse claimants, of diverse citizenship as defined in section 1332 of this title, are claiming or may claim to be entitled to such money or property, or to any one or more of the benefits arising by virtue of any note, bond, certificate, policy or other instrument, or arising by virtue of any such obligation; and if (2) the plaintiff has deposited such money or property or has paid the amount of or the loan or other value of such instrument or the amount due under such obligation into the registry of the court, there to abide the judgment of the court, or has given bond payable to the clerk of the court in such amount and with such surety as the court or judge may deem proper, conditioned upon the compliance by the plaintiff with the future order or judgment of the court with respect to the subject matter of the controversy.

(b) Such an action may be entertained although the titles or claims of the conflicting claimants do not have a common origin, or are not identical, but are adverse to and independent of one another.
(June 25, 1948, c. 646, 62 Stat. 931.)

§ 1336.  **Surface Transportation Board's orders**

(a) Except as otherwise provided by Act of Congress, the district courts shall have jurisdiction of any civil action to enforce, in whole or in part, any order of the Surface Transportation Board, and to enjoin or suspend, in whole or in part, any order of the Surface Transportation Board for the payment of money or the collection of fines, penalties, and forfeitures.

28 USC § 1336

## APPENDIX I

The Judicial Conference has prescribed fees for electronic access to court data, as set forth above in the Miscellaneous Fee Schedule. The schedule provides that the court may exempt persons or classes of persons from the fees, in order to avoid unreasonable burdens and to promote public access to such information. Exemptions should be granted as the exception, not the rule. The exemption language is intended to accommodate those users who might otherwise not have access to the information in this electronic form. It is not intended to provide a means by which a court would exempt all users.

Examples of persons and classes of persons who may be exempted from electronic public access fees include, but are not limited to: indigents; bankruptcy case trustees; not-for-profit organizations; and voluntary ADR neutrals.

## APPENDIX II

a. The Judicial Conference has prescribed a fee for access to court data obtained electronically from the public records of individual cases in the court, including filed documents and the docket sheet, except as provided below.

b. Courts may provide other local court information at no cost. Examples of information which can be provided at no cost include: local rules, court forms, news items, court calendars, opinions designated by the court for publication, and other information—such as court hours, court location, telephone listings—determined locally to benefit the public and the court.

## § 1927. Counsel's liability for excessive costs

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

(June 25, 1948, c. 646, 62 Stat. 957; Sept. 12, 1980, Pub.L. 96–349, § 3, 94 Stat. 1156.)

## § 1928. Patent infringement action; disclaimer not filed

Whenever a judgment is rendered for the plaintiff in any patent infringement action involving a part of a patent and it appears that the patentee, in his specifications, claimed to be, but was not, the original and first inventor or discoverer of any material or substantial part of the thing patented, no costs shall be included in such judgment, unless the proper disclaimer has been filed in the United States Patent and Trademark Office prior to the commencement of the action.

(June 25, 1948, c. 646, 62 Stat. 957; Nov. 29, 1999, Pub.L. 106–113, Div. B, § 1000(a)(9) [Title IV, § 4732(b)(17)], 113 Stat. 1536, 1501A–585.)

## HISTORICAL AND STATUTORY NOTES

**Effective and Applicability Provisions**

1999 Acts. Amendment by Pub.L. 106–113 [§ 4732], effective 4 months after Nov. 29, 1999, see Pub.L. 106–113 [§ 4731], set out as a note under section 1 of Title 35.

**Change of Name**

Patent Office redesignated Patent and Trademark Office by section 3 of Pub.L. 93–596, Jan. 2, 1975, 88 Stat. 1949, set out as a note under section 1 of Title 35, Patents.

## § 1929. Extraordinary expenses not expressly authorized

Where the ministerial officers of the United States incur extraordinary expense in executing Acts of Congress, the payment of which is not specifically provided for, the Attorney General may allow the payment thereof.

(June 25, 1948, c. 646, 62 Stat. 957.)

## § 1930. Bankruptcy fees

(a) Notwithstanding section 1915 of this title, the parties commencing a case under title 11 shall pay to the clerk of the district court or the clerk of the bankruptcy court, if one has been certified pursuant to section 156(b) of this title, the following filing fees:

(1) For a case commenced under chapter 7 or 13 of title 11, $155.

(2) For a case commenced under chapter 9 of title 11, equal to the fee specified in paragraph (3) for filing a case under chapter 11 of title 11. The amount by which the fee payable under this paragraph exceeds $300 shall be deposited in the fund established under section 1931 of this title.

(3) For a case commenced under chapter 11 of title 11 that does not concern a railroad, as defined in section 101 of title 11, $800.

(4) For a case commenced under chapter 11 of title 11 concerning a railroad, as so defined, $1,000.

(5) For a case commenced under chapter 12 of title 11, $200.

(6) In addition to the filing fee paid to the clerk, a quarterly fee shall be paid to the United States trustee, for deposit in the Treasury, in each case under chapter 11 of title 11 for each quarter (including any fraction thereof) until the case is converted or dismissed, whichever occurs first. The fee shall be $250 for each quarter in which disbursements total less than $15,000; $500 for each quarter in which disbursements total $15,000 or more but less than $75,000; $750 for each quarter in which disbursements total $75,000 or more but less than $150,000; $1,250 for each quarter in which disbursements total $150,000 or more but less than $225,000; $1,500 for each quarter in which disbursements total $225,000 or more but less than $300,000; $3,750 for each quarter in which disbursements total $300,000 or more but less than $1,000,000;

## CHAPTER 125—PENDING ACTIONS AND JUDGMENTS

Sec.
1961.   Interest.
1962.   Lien.
1963.   Registration of judgments for enforcement in other districts.
[1963A.   Repealed.]
1964.   Constructive notice of pending actions.

### § 1961.   Interest

(a) Interest shall be allowed on any money judgment in a civil case recovered in a district court. Execution therefor may be levied by the marshal, in any case where, by the law of the State in which such court is held, execution may be levied for interest on judgments recovered in the courts of the State. Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment. The Director of the Administrative Office of the United States Courts shall distribute notice of that rate and any changes in it to all Federal judges.

(b) Interest shall be computed daily to the date of payment except as provided in section 2516(b) of this title and section 1304(b) of title 31, and shall be compounded annually.

(c)(1) This section shall not apply in any judgment of any court with respect to any internal revenue tax case. Interest shall be allowed in such cases at the underpayment rate or overpayment rate (whichever is appropriate) established under section 6621 of the Internal Revenue Code of 1986.

(2) Except as otherwise provided in paragraph (1) of this subsection, interest shall be allowed on all final judgments against the United States in the United States Court of Appeals for the Federal circuit,[1] at the rate provided in subsection (a) and as provided in subsection (b).

(3) Interest shall be allowed, computed, and paid on judgments of the United States Court of Federal Claims only as provided in paragraph (1) of this subsection or in any other provision of law.

(4) This section shall not be construed to affect the interest on any judgment of any court not specified in this section.

(June 25, 1948, c. 646, 62 Stat. 957; Apr. 2, 1982, Pub.L. 97–164, Title III, § 302(a), 96 Stat. 55; Sept. 13, 1982, Pub.L. 97–258, § 2(m)(1), 96 Stat. 1062; Jan. 12, 1983, Pub.L. 97–452, § 2(d)(1), 96 Stat. 2478; Oct. 22, 1986, Pub.L. 99–514, § 2, Title XV, § 1511(c)(17), 100 Stat. 2095, 2745; Oct. 29, 1992, Pub.L. 102–572, Title IX, § 902(b)(1), 106 Stat. 4516; Dec. 21, 2000, Pub.L. 106–554, § 1(a)(7) [Title III, § 307(d)(1)], 114 Stat. 2763, 2763–____.)

[1] So in original.  Probably should be "Circuit,".

### HISTORICAL AND STATUTORY NOTES

**References in Text**

Section 6621 of the Internal Revenue Code of 1986, referred to in subsec. (c)(1), is section 6621 of Title 26, Internal Revenue Code.

**Codifications**

Amendment of subsec. (b) by Pub.L. 97–452, substituting "section 1304(b) of title 31" for "section 1302 of the Act of July 27, 1956 (31 U.S.C. 724a)" was executed without reference to the intervening amendment by Pub.L. 97–258, as the probable intent of Congress.

**Effective and Applicability Provisions**

**1992 Acts.** Amendment by Pub.L. 102–572 effective Oct. 29, 1992, see section 911 of Pub.L. 102–572, set out as a note under section 171 of this title.

**1986 Acts.** Amendment by section 1511(c)(17) of Pub.L. 99–514 applicable for purposes of determining interest for periods after Dec. 31, 1986, see section 1511(d) of Pub.L. 99–514, set out as a note under section 47 of Title 26, Internal Revenue Code.

**1982 Acts.** Section 2(m) of Pub.L. 97–258 provided in part that the amendment to subsec. (b) would be effective on Oct. 1, 1982.

Amendment by Pub.L. 97–164 effective Oct. 1, 1982, see section 402 of Pub.L. 97–164, set out as a note under section 171 of this title.

**Calculation of Interest**

The method of calculation of interest on money judgments in civil cases recovered in district courts changed as of December 21, 2000, the date of enactment of Pub.L. 106–554, § 1(a)(7) [Title III, § 307(d)(1)] which amended subsec. (a) of this section. It was formerly calculated at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills (for past rates, see Table set out below). It is now calculated at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System. For information regarding weekly releases see *www.federalreserve.gov.*

**52-WEEK T–BILL RATE TABLE OF CHANGES**

| Date of Auction | Equivalent Coupon Issue Yield |
|---|---|
| 12/11/74 | 7.07% |
| 01/08/75 | 6.80% |
| 02/05/75 | 5.61% |
| 03/05/75 | 5.99% |
| 04/02/75 | 6.92% |
| 04/30/75 | 6.84% |
| 05/28/75 | 6.17% |
| 06/24/75 | 6.72% |
| 07/24/75 | 7.27% |

28 USC § 1961

# PART VI—PARTICULAR PROCEEDINGS

| Chapter | | Section |
|---|---|---|
| 151. | Declaratory Judgments | 2201 |
| 153. | Habeas Corpus | 2241 |
| 154. | Special Habeas Corpus Procedures in Capital Cases | 2261.[1] |
| 155. | Injunctions; Three-Judge Courts | 2281 |
| 157. | Surface Transportation Board Orders; Enforcement and Review | 2321 |
| 158. | Orders of Federal Agencies; Review | 2341 |
| 159. | Interpleader | 2361 |
| 161. | United States as Party Generally | 2401 |
| 163. | Fines, Penalties and Forfeitures | 2461 |
| 165. | United States Court of Federal Claims Procedure | 2501 |

| Chapter | | Section |
|---|---|---|
| [167. | Repealed] | |
| 169. | Court of International Trade Procedure | 2631 |
| 171. | Tort Claims Procedure | 2671 |
| 173. | Attachment in Postal Suits | 2710 |
| [175. | Repealed] | |
| 176. | Federal Debt Collection Procedure | 3001 |
| 178. | Professional and Amateur Sports Protection | 3701 |
| 179. | Judicial Review of Certain Actions by Presidential Offices | 3901 |
| 180. | Assumption of Certain Contractual Obligations | 4001 |

[1] So in original. The period probably should not appear.

[1] So in original. The period probably should not appear.

## HISTORICAL AND STATUTORY NOTES

**Effective and Applicability Provisions**

1996 Acts. Amendment of analysis by section 3(e) of Pub.L. 104–331, effective Oct. 1, 1997, see section 3(d) of Pub.L. 104–331, set out as a note under section 1296 of this title.

# CHAPTER 151—DECLARATORY JUDGMENTS

Sec.
2201. Creation of remedy.
2202. Further relief.

## § 2201.  Creation of remedy

(a) In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(10) of the Tariff Act of 1930, as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

(b) For limitations on actions brought with respect to drug patents see section 505 or 512 of the Federal Food, Drug, and Cosmetic Act.

(June 25, 1948, c. 646, 62 Stat. 964; May 24, 1949, c. 139, § 111, 63 Stat. 105; Aug. 28, 1954, c. 1033, 68 Stat. 890; July 7, 1958, Pub.L. 85–508, § 12(p), 72 Stat. 349; Oct. 4, 1976, Pub.L. 94–455, Title XIII, § 1306(b)(8), 90 Stat. 1719; Nov. 6, 1978, Pub.L. 95–598, Title II, § 249, 92 Stat. 2672; Sept. 24, 1984, Pub.L. 98–417, Title I, § 106, 98 Stat. 1597; Sept. 28, 1988, Pub.L. 100–449, Title IV, § 402(c), 102 Stat. 1884; Nov. 16, 1988, Pub.L. 100–670, Title I, § 107(b), 102 Stat. 3984; Dec. 8, 1993, Pub.L. 103–182, Title IV, § 414(b), 107 Stat. 2147.)

**Termination of Amendments**

*For provisions directing that, except for transition provisions relating to proceedings regarding protective orders and undertakings, and binational panel and extraordinary challenge committee reviews, the amendment to this section by Title IV of Pub.L. 103–182 shall cease to have effect with respect to any country on the date on which such country ceases to be a NAFTA country, see 19 U.S.C.A. § 3451.*

*For provisions directing that the amendments made by Pub.L. 100–449, which amended this section, shall cease to have effect on the date on which the United States-Canada Free-Trade Agreement ceases to be in force, see section 501(c) of Pub.L. 100–449, set out in the note under 19 U.S.C.A. § 2112.*

28 USC § 2201

**A G I**
*9870 MARCONI DRIVE SUITE F*
*SAN DIEGO CA. 92173*
*PHONE: 619) 661-1404*
*FAX: 619) 661-6484*

OCTUBRE 28, 1997.

A QUIEN CORRESPONDA,

POR MEDIO DE LA PRESENTE RATIFICAMOS QUE LA **SRA: IVONNE SOTO**, NOS COMPRO EN FECHAS 25 DE OCTUBRE Y 12 DE NOVIEMBRE DE 1996, AL AMPARO DE LAS FACTURAS 001 Y 002 MAIZ AMARILLO # 2 PARA CONSUMO HUMANO, HACIENDO UN TOTAL DE 4,236.00 TON/MET. CON LAS SIGUIENTES ESPECIFICACIONES:

| | |
|---|---|
| MOISTURE MAXIMUM | 15% |
| MINIMUM TEST DENSITY | 67.5% |
| EXTRANEOUS FOREIGN | 3.3% |
| CHIPPED MAIZE | 3.% |
| AFLATOXIN | 15 PPM MAX. |

DICHAS COMPRAS FUERON HECHAS ATRAVEZ DE CARTA DE CREDITO POR MEDIO DE BANORO Y NORWEST BANK, EN EL PASO TEXAS.

LA PRESENTE SE EXTIENDE A PETICION DEL INTERESADA Y PARA LOS FINES QUE ELLA JUZGUE CONVENIENTE.

ATENTAMENTE

SR. WALTER PHEFFER

rtiorari

locutory
d a final
eding to
v by the
ided by
the writ
e order
t, as the
y, or an
writ of

nis title,
) of this
s under

624, and
102 Stat.

3

ve ninety
nt not to
ch effec-
anner of
nich was
f Pub.L.
his title.

district

specifi-
person
193 of

624.)

Nov. 6,

;

tat. 624,
promul-
nference
ocedure,
edings to
2 of this

e repeal
al rules
to the
main in
uthority
89–773.

**[§ 2353.   Repealed. Pub.L 97–164, Title I, § 138, Apr. 2, 1982, 96 Stat. 42]**

**HISTORICAL AND STATUTORY NOTES**

Section, added Pub.L. 91–577, Title III, § 143(c), Dec. 24, 1970, 84 Stat. 1559, gave the court of appeals nonexclusive jurisdiction to hear appeals under section 71 of the Plant Variety Protection Act [7 U.S.C.A. § 2461]. See section 1295(a) (8) of this title.

**Effective Date of Repeal**

Repeal effective Oct. 1, 1982, see section 402 of Pub.L. 97–164, set out as a note under section 171 of this title.

# CHAPTER 159—INTERPLEADER

Sec.
2361.   Process and procedure.

## § 2361.   Process and procedure

In any civil action of interpleader or in the nature of interpleader under section 1335 of this title, a district court may issue its process for all claimants and enter its order restraining them from instituting or prosecuting any proceeding in any State or United States court affecting the property, instrument or obligation involved in the interpleader action until further order of the court. Such process and order shall be returnable at such time as the court or judge thereof directs, and shall be addressed to and served by the United States marshals for the respective districts where the claimants reside or may be found.

Such district court shall hear and determine the case, and may discharge the plaintiff from further liability, make the injunction permanent, and make all appropriate orders to enforce its judgment. (June 25, 1948, c. 646, 62 Stat. 970; May 24, 1949, c. 139, § 117, 63 Stat. 105.)

# CHAPTER 161—UNITED STATES AS PARTY GENERALLY

Sec.
2401.   Time for commencing action against United States.
2402.   Jury trial in actions against United States.
2403.   Intervention by United States or a State; constitutional question.
2404.   Death of defendant in damage action.
2405.   Garnishment.
2406.   Credits in actions by United States; prior disallowance.
2407.   Delinquents for public money; judgment at return term; continuance.
2408.   Security not required of United States.
2409.   Partition actions involving United States.
2409a.  Real property quiet title actions.
2410.   Actions affecting property on which United States has lien.
2411.   Interest.
2412.   Costs and fees.
2413.   Executions in favor of United States.
2414.   Payment of judgments and compromise settlements.
2415.   Time for commencing actions brought by the United States.
2416.   Time for commencing actions brought by the United States—Exclusions.

## § 2401.   Time for commencing action against United States

(a) Except as provided by the Contract Disputes Act of 1978, every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues. The action of any person under legal disability or beyond the seas at the time the claim accrues may be commenced within three years after the disability ceases.

(b) A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented. (June 25, 1948, c. 646, 62 Stat. 971; Apr. 25, 1949, c. 92, § 1, 63 Stat. 62; Sept. 8, 1959, Pub.L. 86–238, § 1(3), 73 Stat. 472; July 18, 1966, Pub.L. 89–506, § 7, 80 Stat. 307; Nov. 1, 1978, Pub.L. 95–563, § 14(b), 92 Stat. 2389.)

**HISTORICAL AND STATUTORY NOTES**

**Senate Revision Amendment**

Subsection (b) amended in the Senate to insert the 1 year limitation on the bringing of tort actions and to include the limitation upon the time in which tort claims not exceeding $1000 must be presented to the appropriate Federal agencies for administrative disposition. 80th Congress Senate Report No. 1559, Amendment No. 48.

1949 Acts. House Report No. 276, see 1949 U.S. Code Cong. Service, p. 1226.

1959 Acts. Senate Report No. 797, see 1959 U.S. Code Cong. and Adm. News, p. 2272.

1966 Acts. Senate Report No. 1327, see 1966 U.S. Code Cong. and Adm. News, p. 2515.

1978 Acts. Senate Report No. 95–1118, see 1978 U.S. Code Cong. and Adm. News, p. 5235.

28 USC § 2361

**Subdivision (c).** The amendment recognizes the abrogation of Federal Rule 43(c) by the Federal Rules of Evidence.

**Subdivision (f).** The new subdivision responds to confusion flowing from the dual authority for references of pretrial matters to magistrates. Such references can be made, with or without the consent of the parties, pursuant to Rule 53 or under 28 U.S.C. § 636(b)(1)(A) and (b)(1)(B). There are a number of distinctions between references made under the statute and under the rule. For example, under the statute nondispositive pretrial matters may be referred to a magistrate, without consent, for final determination with reconsideration by the district judge if the magistrate's order is clearly erroneous or contrary to law. Under the rule, however, the appointment of a master, without consent of the parties, to supervise discovery would require some exceptional condition (Rule 53(b)) and would subject the proceedings to the report procedures of Rule 53(e). If an order of reference does not clearly articulate the source of the court's authority the resulting proceedings could be subject to attack on grounds of the magistrate's noncompliance with the provisions of Rule 53. This subdivision therefore establishes a presumption that the limitations of Rule 53 are not applicable unless the reference is specifically made subject to Rule 53.

A magistrate serving as a special master under 28 U.S.C. § 636(b)(2) is governed by the provisions of Rule 53, with the exceptional condition requirement lifted in the case of a consensual reference.

**1987 Amendment**

The amendments are technical. No substantive change is intended.

**1991 Amendment**

The purpose of the revision is to expedite proceedings before a master. The former rule required only a filing of the master's report, with the clerk then notifying the parties of the filing. To receive a copy, a party would then be required to secure it from the clerk. By transmitting directly to the parties, the master can save some efforts of counsel. Some local rules have previously required such action by the master.

**1993 Amendments**

This revision is made to conform the rule to changes made by the Judicial Improvements Act of 1990.

**HISTORICAL NOTES**

**References in Text**

The Federal Rules of Evidence, referred to in subd. (d), are set out in this title.

**Change of Name**

United States magistrate appointed under section 631 of Title 28, Judiciary and Judicial Procedure, to be known as United States magistrate judge after Dec. 1, 1990, with any reference to United States magistrate or magistrate in Title 28, in any other Federal statute, etc., deemed a reference to United States magistrate judge appointed under section 631 of Title 28, see section 321 of Pub.L. 101-650, set out as a note under section 631 of Title 28.

## VII.  JUDGMENT

# Rule 54.  Judgments; Costs

**(a) Definition; Form.** "Judgment" as used in these rules includes a decree and any order from which an appeal lies. A judgment shall not contain a recital of pleadings, the report of a master, or the record of prior proceedings.

**(b) Judgment Upon Multiple Claims or Involving Multiple Parties.** When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

**(c) Demand for Judgment.** A judgment by default shall not be different in kind from or exceed in amount that prayed for in the demand for judgment. Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings.

**(d) Costs; Attorneys' Fees.**

**(1) Costs Other than Attorneys' Fees.** Except when express provision therefor is made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs; but costs against the United States, its officers, and agencies shall be imposed only to the extent permitted by law. Such costs may be taxed by the clerk on one day's notice. On motion served within 5 days thereafter, the action of the clerk may be reviewed by the court.

**(2) Attorneys' Fees.**

**(A)** Claims for attorneys' fees and related non-taxable expenses shall be made by motion unless the substantive law governing the action provides

RULE 54  F.R.C.P

## Rule 54      RULES OF CIVIL PROCEDURE

for the recovery of such fees as an element of damages to be proved at trial.

(B) Unless otherwise provided by statute or order of the court, the motion must be filed and served no later than 14 days after entry of judgment; must specify the judgment and the statute, rule, or other grounds entitling the moving party to the award; and must state the amount or provide a fair estimate of the amount sought. If directed by the court, the motion shall also disclose the terms of any agreement with respect to fees to be paid for the services for which claim is made.

(C) On request of a party or class member, the court shall afford an opportunity for adversary submissions with respect to the motion in accordance with Rule 43(e) or Rule 78. The court may determine issues of liability for fees before receiving submissions bearing on issues of evaluation of services for which liability is imposed by the court. The court shall find the facts and state its conclusions of law as provided in Rule 52(a), and a judgment shall be set forth in a separate document as provided in Rule 58.

(D) By local rule the court may establish special procedures by which issues relating to such fees may be resolved without extensive evidentiary hearings. In addition, the court may refer issues relating to the value of services to a special master under Rule 53 without regard to the provisions of subdivision (b) thereof and may refer a motion for attorneys' fees to a magistrate judge under Rule 72(b) as if it were a dispositive pretrial matter.

(E) The provisions of subparagraphs (A) through (D) do not apply to claims for fees and expenses as sanctions for violations of these rules or under 28 U.S.C. § 1927.

(As amended Dec. 27, 1946, eff. Mar. 19, 1948; Apr. 17, 1961, eff. July 19, 1961; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 22, 1993, eff. Dec. 1, 1993.)

### ADVISORY COMMITTEE NOTES

#### 1937 Adoption

**Note to Subdivision (a).** The second sentence is derived substantially from [former] Equity Rule 71 (Form of Decree).

**Note to Subdivision (b).** This provides for the separate judgment of equity and code practice. See Wis.Stat. (1935) § 270.54; Compare N.Y.C.P.A. (1937) § 476.

**Note to Subdivision (c).** For the limitation on default contained in the first sentence, see 2 N.D.Comp.Laws Ann. (1913) § 7680; N.Y.C.P.A. (1937) § 479. Compare *English Rules Under the Judicature Act* (The Annual Practice, 1937) O. 13, r.r. 3–12. The remainder is a usual code provision. It makes clear that a judgment should give the relief to which a party is entitled, regardless of whether it is legal or equitable or both. This necessarily includes the deficiency judgment

in foreclosure cases formerly provided for by Equity Rule 10 (Decree for Deficiency in Foreclosures, Etc.).

**Note to Subdivision (d).** For the present rule in common law actions, see *Ex parte Peterson*, 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919 (1920); Payne, *Costs in Common Law Actions in the Federal Courts* (1935), 21 Va.L.Rev. 397.

The provisions as to costs in actions in forma pauperis contained in U.S.C., Title 28, former §§ 832–836 [now 1915] are unaffected by this rule. Other sections of U.S.C., Title 28, which are unaffected by this rule are: [former] §§ 815 (Costs; plaintiff not entitled to, when), 821 [now 1923] (Costs; infringement of patent; disclaimer), 825 (Costs; several actions), 829 [now 1927] (Costs; attorney liable for, when), and 830 [now 1920] (Costs; bill of; taxation).

The provisions of the following and similar statutes as to costs against the United States and its officers and agencies are specifically continued:

    U.S.C., Title 15, §§ 77v(a), 78aa, 79y (Securities Exchange Commission)

    U.S.C., Title 16, § 825p (Federal Power Commission)

    U.S.C., Title 26, [former] §§ 3679(d) and 3745(d) (Internal revenue actions)

    U.S.C., Title 26, [former] § 3770(b)(2) (Reimbursement of costs of recovery against revenue officers)

    U.S.C., Title 28, [former] § 817 (Internal revenue actions)

    U.S.C., Title 28, § 836 [now 1915] (United States—actions in *forma pauperis*)

    U.S.C., Title 28, § 842 [now 2006] (Actions against revenue officers)

    U.S.C., Title 28, § 870 [now 2408] (United States—in certain cases)

    U.S.C., Title 28, [former] § 906 (United States—foreclosure actions)

    U.S.C., Title 47, § 401 (Communications Commission)

The provisions of the following and similar statutes as to costs are unaffected:

    U.S.C., Title 7, § 210(f) (Actions for damages based on an order of the Secretary of Agriculture under Stockyards Act)

    U.S.C., Title 7, § 499g(c) (Appeals from reparations orders of Secretary of Agriculture under Perishable Commodities Act)

    U.S.C., Title 8, [former] § 45 (Action against district attorneys in certain cases)

    U.S.C., Title 15, § 15 (Actions for injuries due to violation of antitrust laws)

    U.S.C., Title 15, § 72 (Actions for violation of law forbidding importation or sale of articles at less than market value or wholesale prices)

    U.S.C., Title 15, § 77k (Actions by persons acquiring securities registered with untrue statements under Securities Act of 1933)

    U.S.C., Title 15, § 78i(e) (Certain actions under the Securities Exchange Act of 1934)

    U.S.C., Title 15, § 78r (Similar to 78i(e) )

    U.S.C., Title 15, § 96 (Infringement of trade-mark—damages)

    U.S.C., Title 15, § 99 (Infringement of trade-mark—injunctions)

    U.S.C., Title 15, § 124 (Infringement of trade-mark—damages)

JUDGMENT                                                    **Rule 55**

ien
:al-
to
iph
l or
)27.

for
the
e of
ned
rior
for
loy-
the
tely
lote
ome
28

: to
ices
t in
uest
s to
:ase.

not
)ugh
·r to
)tion
, the
g on
dice,
lling
does
iitial
may
filed
; will
ing a
ng of

ed at
n the
due
ict in
·ed is
.d the
such

uired
attor-
ward-
t of a
court
other
ts re-
, rule
ts are
rt for
*ange*"
1452,

In the settlement of class actions resulting in a common fund from which fees will be sought, courts frequently have required that claims for fees be presented in advance of hearings to consider approval of the proposed settlement. The rule does not affect this practice, as it permits the court to require submissions of fee claims in advance of entry of judgment.

Subparagraph (C) assures the parties of an opportunity to make an appropriate presentation with respect to issues involving the evaluation of legal services. In some cases, an evidentiary hearing may be needed, but this is not required in every case. The amount of time to be allowed for the preparation of submissions both in support of and in opposition to awards should be tailored to the particular case.

The court is explicitly authorized to make a determination of the liability for fees before receiving submissions by the parties bearing on the amount of an award. This option may be appropriate in actions in which the liability issue is doubtful and the evaluation issues are numerous and complex.

The court may order disclosure of additional information, such as that bearing on prevailing local rates or on the appropriateness of particular services for which compensation is sought.

On rare occasion, the court may determine that discovery under Rules 26–37 would be useful to the parties. *Compare* Rules Governing Section 2254 Cases in the U.S. District Courts, Rule 6. *See* Note, *Determining the Reasonableness of Attorneys' Fees—the Discoverability of Billing Records,* 64 *B.U.L.Rev.* 241 (1984). In complex fee disputes, the court may use case management techniques to limit the scope of the dispute or to facilitate the settlement of fee award disputes.

Fee awards should be made in the form of a separate judgment under Rule 58 since such awards are subject to review in the court of appeals. To facilitate review, the paragraph provides that the court set forth its findings and conclusions as under Rule 52(a), though in most cases this explanation could be quite brief.

Subparagraph (D) explicitly authorizes the court to establish procedures facilitating the efficient and fair resolution of fee claims. A local rule, for example, might call for matters to be presented through affidavits, or might provide for issuance of proposed findings by the court, which would be treated as accepted by the parties unless objected to within a specified time. A court might also consider establishing a schedule reflecting customary fees or factors affecting fees within the community, as implicitly suggested by Justice O'Connor in *Pennsylvania v. Delaware Valley Citizens' Council,* 483 U.S. 711, 733 (1987) (O'Connor, J., concurring) (how particular markets compensate for contingency). *Cf. Thompson v. Kennickell,* 710 F.Supp. 1 (D.D.C.1989) (use of findings in other cases to promote consistency). The parties, of course, should be permitted to show that in the circumstances of the case such a schedule should not be applied or that different hourly rates would be appropriate.

The rule also explicitly permits, without need for a local rule, the court to refer issues regarding the amount of a fee award in a particular case to a master under Rule 53. The district judge may designate a magistrate judge to act as a master for this purpose or may refer a motion for attorneys' fees to a magistrate judge for proposed findings and recom-

mendations under Rule 72(b). This authorization eliminates any controversy as to whether such references are permitted under Rule 53(b) as "matters of account and of difficult computation of damages" and whether motions for attorneys' fees can be treated as the equivalent of a dispositive pretrial matter that can be referred to a magistrate judge. For consistency and efficiency, all such matters might be referred to the same magistrate judge.

Subparagraph (E) excludes from this rule the award of fees as sanctions under these rules or under 28 U.S.C. § 1927.

### HISTORICAL NOTES

**Effective and Applicability Provisions**

**1961 Amendments.** Amendment adopted on Apr. 17, 1961, effective July 19, 1961, see Rule 86(d).

## Rule 55.  Default

**(a) Entry.** When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter the party's default.

**(b) Judgment.** Judgment by default may be entered as follows:

**(1) By the Clerk.** When the plaintiff's claim against a defendant is for a sum certain or for a sum which can by computation be made certain, the clerk upon request of the plaintiff and upon affidavit of the amount due shall enter judgment for that amount and costs against the defendant, if the defendant has been defaulted for failure to appear and is not an infant or incompetent person.

**(2) By the Court.** In all other cases the party entitled to a judgment by default shall apply to the court therefor; but no judgment by default shall be entered against an infant or incompetent person unless represented in the action by a general guardian, committee, conservator, or other such representative who has appeared therein. If the party against whom judgment by default is sought has appeared in the action, the party (or, if appearing by representative, the party's representative) shall be served with written notice of the application for judgment at least 3 days prior to the hearing on such application. If, in order to enable the court to enter judgment or to carry it into effect, it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any other matter, the court may conduct such hearings or order such references as it deems necessary and proper and shall accord a right of trial by jury to the parties when and as required by any statute of the United States.

**(c) Setting Aside Default.** For good cause shown the court may set aside an entry of default and, if a

RULe 55 F.R.C.P

## Rule 55        RULES OF CIVIL PROCEDURE

judgment by default has been entered, may likewise set it aside in accordance with Rule 60(b).

**(d) Plaintiffs, Counterclaimants, Cross-Claimants.** The provisions of this rule apply whether the party entitled to the judgment by default is a plaintiff, a third-party plaintiff, or a party who has pleaded a cross-claim or counterclaim. In all cases a judgment by default is subject to the limitations of Rule 54(c).

**(e) Judgment Against the United States.** No judgment by default shall be entered against the United States or an officer or agency thereof unless the claimant establishes a claim or right to relief by evidence satisfactory to the court.

(As amended Mar. 2, 1987, eff. Aug. 1, 1987.)

### ADVISORY COMMITTEE NOTES

#### 1937 Adoption

This represents the joining of the equity decree *pro confesso* (former Equity Rules 12 (Issue of Subpoena—Time for Answer), 16 (Defendant to Answer—Default—Decree *Pro Confesso* ), 17 (Decree *Pro Confesso* to be Followed by Final Decree—Setting *Aside* Default), 29 (Defenses—How Presented), 31 (Reply—When Required—When Cause at Issue) ) and the judgment by default now governed by U.S.C., Title 28, [former] § 724 (Conformity act). For dismissal of an action for failure to comply with these rules or any order of the court, see Rule 41(b).

**Note to Subdivision (a).** The provision for the entry of default comes from the Massachusetts practice, 2 Mass.Gen. Laws (Ter.Ed., 1932) ch. 231, § 57. For affidavit of default, see 2 Minn.Stat. (Mason, 1927) § 9256.

**Note to Subdivision (b).** The provision in paragraph (1) for the entry of judgment by the clerk when plaintiff claims a sum certain is found in the N.Y.C.P.A. (1937) § 485, in Calif.Code Civ.Proc. (Deering, 1937) § 585(1), and in Conn.Practice Book (1934) § 47. For provisions similar to paragraph (2), compare Calif.Code, *supra,* § 585(2); N.Y.C.P.A. (1937) § 490; 2 Minn.Stat. (Mason, 1927) § 9256(3); 2 Wash.Rev.Stat.Ann. (Remington, 1932) § 411(2). U.S.C., Title 28, § 1874, formerly § 785 (Action to recover forfeiture in bond) and similar statutes are preserved by the last clause of paragraph (2).

**Note to Subdivision (e).** This restates substantially the last clause of U.S.C., Title 28, [former] § 763 (Action against the United States under the Tucker Act). As this rule governs in all actions against the United States, U.S.C., Title 28, [former] § 45 (Practice and procedure in certain cases under the interstate commerce laws) and similar statutes are modified insofar as they contain anything inconsistent therewith.

#### Supplementary Note

**Note.** The operation of Rule 55(b) (Judgment) is directly affected by the Soldiers' and Sailors' Civil Relief Act of 1940, 50 U.S.C. Appendix, § 501 et seq. Section 200 of the Act [50 U.S.C. Appendix, § 520] imposes specific requirements which must be fulfilled before a default judgment can be entered, e.g., *Ledwith v. Storkan,* D.Neb.1942, 6 Fed.Rules Serv. 60b.24, Case 2, 2 F.R.D. 539, and also provides for the vacation of a judgment in certain circumstances. See discus-

sion in Commentary, Effect of Conscription Legislation on the Federal Rules, 1940, 3 Fed.Rules Serv. 725; 3 *Moore's Federal Practice,* 1938, Cum.Supplement § 55.02.

#### 1987 Amendment

The amendments are technical. No substantive change is intended.

## Rule 56.   Summary Judgment

**(a) For Claimant.** A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

**(b) For Defending Party.** A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

**(c) Motion and Proceedings Thereon.** The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

**(d) Case Not Fully Adjudicated on Motion.** If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

**(e) Form of Affidavits; Further Testimony; Defense Required.** Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and

## Rule 55

RULES OF CIVIL PROCEDURE

judgment by default has been entered, may likewise set it aside in accordance with Rule 60(b).

**(d) Plaintiffs, Counterclaimants, Cross-Claimants.** The provisions of this rule apply whether the party entitled to the judgment by default is a plaintiff, a third-party plaintiff, or a party who has pleaded a cross-claim or counterclaim. In all cases a judgment by default is subject to the limitations of Rule 54(c).

**(e) Judgment Against the United States.** No judgment by default shall be entered against the United States or an officer or agency thereof unless the claimant establishes a claim or right to relief by evidence satisfactory to the court.
(As amended Mar. 2, 1987, eff. Aug. 1, 1987.)

### ADVISORY COMMITTEE NOTES
#### 1937 Adoption

This represents the joining of the equity decree *pro confesso* (former Equity Rules 12 (Issue of Subpoena—Time for Answer), 16 (Defendant to Answer—Default—Decree *Pro Confesso*), 17 (Decree *Pro Confesso* to be Followed by Final Decree—Setting Aside Default), 29 (Defenses—How Presented), 31 (Reply—When Required—When Cause at Issue) ) and the judgment by default now governed by U.S.C., Title 28, [former] § 724 (Conformity act). For dismissal of an action for failure to comply with these rules or any order of the court, see Rule 41(b).

**Note to Subdivision (a).** The provision for the entry of default comes from the Massachusetts practice, 2 Mass.Gen. Laws (Ter.Ed., 1932) ch. 231, § 57. For affidavit of default, see 2 Minn.Stat. (Mason, 1927) § 9256.

**Note to Subdivision (b).** The provision in paragraph (1) for the entry of judgment by the clerk when plaintiff claims a sum certain is found in the N.Y.C.P.A. (1937) § 485, in Calif.Code Civ.Proc. (Deering, 1937) § 585(1), and in Conn.Practice Book (1934) § 47. For provisions similar to paragraph (2), compare Calif.Code, *supra*, § 585(2); N.Y.C.P.A. (1937) § 490; 2 Minn.Stat. (Mason, 1927) § 9256(3); 2 Wash.Rev.Stat.Ann. (Remington, 1932) § 411(2). U.S.C., Title 28, § 1874, formerly § 785 (Action to recover forfeiture in bond) and similar statutes are preserved by the last clause of paragraph (2).

**Note to Subdivision (e).** This restates substantially the last clause of U.S.C., Title 28, [former] § 763 (Action against the United States under the Tucker Act). As this rule governs in all actions against the United States, Title 28, [former] § 45 (Practice and procedure in certain cases under the interstate commerce laws) and similar statutes are modified insofar as they contain anything inconsistent therewith.

#### Supplementary Note

**Note.** The operation of Rule 55(b) (Judgment) is directly affected by the Soldiers' and Sailors' Civil Relief Act of 1940, 50 U.S.C. Appendix, § 501 et seq. Section 200 of the Act [50 U.S.C. Appendix, § 520] imposes specific requirements which must be fulfilled before a default judgment can be entered, e.g., *Ledwith v. Storkan*, D.Neb.1942, 6 Fed.Rules Serv. 60b.24, Case 2, 2 F.R.D. 539, and also provides for the vacation of a judgment in certain circumstances. See discus-

sion in Commentary, Effect of Conscription Legislation on the Federal Rules, 1940, 3 Fed.Rules Serv. 725; 3 *Moore's Federal Practice*, 1938, Cum.Supplement § 55.02.

#### 1987 Amendment

The amendments are technical. No substantive change is intended.

## Rule 56.   Summary Judgment

**(a) For Claimant.** A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

**(b) For Defending Party.** A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

**(c) Motion and Proceedings Thereon.** The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

**(d) Case Not Fully Adjudicated on Motion.** If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

**(e) Form of Affidavits; Further Testimony; Defense Required.** Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and

RULE 56 FRCP

shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

**(f) When Affidavits are Unavailable.** Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

**(g) Affidavits Made in Bad Faith.** Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused the other party to incur, including reasonable attorney's fees, and any offending party or attorney may be adjudged guilty of contempt.

(As amended Dec. 27, 1946, eff. Mar. 19, 1948; Jan. 21, 1963, eff. July 1, 1963; Mar. 2, 1987, eff. Aug. 1, 1987.)

### ADVISORY COMMITTEE NOTES

#### 1937 Adoption

This rule is applicable to all actions, including those against the United States or an officer or agency thereof.

Summary judgment procedure is a method for promptly disposing of actions in which there is no genuine issue as to any material fact. It has been extensively used in England for more than 50 years and has been adopted in a number of American states. New York, for example, has made great use of it. During the first nine years after its adoption there, the records of New York county alone show 5,600 applications for summary judgments. Report of the Commission on the Administration of Justice in New York State (1934), p. 383. See also *Third Annual Report of the Judicial Council of the State of New York* (1937), p. 30.

In England it was first employed only in cases of liquidated claims, but there has been a steady enlargement of the scope of the remedy until it is now used in actions to recover land or chattels and in all other actions at law, for liquidated or unliquidated claims, except for a few designated torts and

breach of promise of marriage. *English Rules Under the Judicature Act* (The Annual Practice, 1937) O. 3, r. 6; Orders 14, 14A, and 15; see also O. 32, r. 6, authorizing an application for judgment at any time upon admissions. In Michigan (3 Comp.Laws (1929) § 14260) and Illinois (Smith-Hurd Ill.Stats. c. 110, §§ 181, 259.15, 259.16), it is not limited to liquidated demands. New York (N.Y.R.C.P. (1937) Rule 113; see also Rule 107) has brought so many classes of actions under the operation of the rule that the Commission on Administration of Justice in New York State (1934) recommend that all restrictions be removed and that the remedy be available "in any action" (p. 287). For the history and nature of the summary judgment procedure and citations of state statutes, see Clark and Samenow, *The Summary Judgment* (1929), 38 Yale L.J. 423.

**Note to Subdivision (d).** See Rule 16 (Pre-Trial Procedure; Formulating Issues) and the Note thereto.

**Note to Subdivisions (e) and (f).** These are similar to rules in Michigan. Mich.Court Rules Ann. (Searl, 1933) Rule 30.

#### 1946 Amendment

**Note to Subdivision (a).** The amendment allows a claimant to move for a summary judgment at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party. This will normally operate to permit an earlier motion by the claimant than under the original rule, where the phrase "at any time after the pleading in answer thereto has been served" operates to prevent a claimant from moving for summary judgment, even in a case clearly proper for its exercise, until a formal answer has been filed. Thus in *Peoples Bank v. Federal Reserve Bank of San Francisco*, N.D.Cal.1944, 58 F.Supp. 25, the plaintiff's countermotion for a summary judgment was stricken as premature, because the defendant had not filed an answer. Since Rule 12(a) allows at least 20 days for an answer, that time plus the 10 days required in Rule 56(c) means that under original Rule 56(a) a minimum period of 30 days necessarily has to elapse in every case before the claimant can be heard on his right to a summary judgment. An extension of time by the court or the service of preliminary motions of any kind will prolong that period even further. In many cases this merely represents unnecessary delay. See *United States v. Adler's Creamery, Inc.*, C.C.A.2, 1939, 107 F.2d 987. The changes are in the interest of more expeditious litigation. The 20-day period, as provided, gives the defendant an opportunity to secure counsel and determine a course of action. But in a case where the defendant himself makes a motion for summary judgment within that time, there is no reason to restrict the plaintiff and the amended rule so provides.

**Subdivision (c).** The amendment of Rule 56(c), by the addition of the final sentence, resolves a doubt expressed in *Sartor v. Arkansas Natural Gas Corp.*, 1944, 64 S.Ct. 724, 321 U.S. 620, 88 L.Ed. 967. See also Commentary, Summary Judgment as to Damages, 1944, 7 Fed.Rules Serv. 974; *Madeirense Do Brasil S/A v. Stulman-Emrick Lumber Co.*, C.C.A.2d, 1945, 147 F.2d 399, certiorari denied 1945, 65 S.Ct. 1201, 325 U.S. 861, 89 L.Ed. 1982. It makes clear that although the question of recovery depends on the amount of damages, the summary judgment rule is applicable and summary judgment may be granted in a proper case. If the case is not fully adjudicated it may be dealt with as provided

## Rule 56

### RULES OF CIVIL PROCEDURE

in subdivision (d) of Rule 56, and the right to summary recovery determined by a preliminary order, interlocutory in character, and the precise amount of recovery left for trial.

Subdivision (d). Rule 54(a) defines "judgment" as including a decree and "any order from which an appeal lies." Subdivision (d) of Rule 56 indicates clearly, however, that a partial summary "judgment" is not a final judgment, and, therefore, that it is not appealable, unless in the particular case some statute allows an appeal from the interlocutory order involved. The partial summary judgment is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case. This adjudication is more nearly akin to the preliminary order under Rule 16, and likewise serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact. See *Leonard v. Socony-Vacuum Oil Co.*, C.C.A.7, 1942, 130 F.2d 535; *Biggins v. Oltmer Iron Works*, C.C.A.7, 1946, 154 F.2d 214; 3 *Moore's Federal Practice*, 1938, 3190–3192. Since interlocutory appeals are not allowed, except where specifically provided by statute, see 3 Moore, op. cit. supra, 3155–3156, this interpretation is in line with that policy, *Leonard v. Socony-Vacuum Oil Co.*, supra. See also *Audi Vision Inc. v. RCA Mfg. Co.*, C.C.A.2, 1943, 136 F.2d 621; *Toomey v. Toomey*, 1945, 149 F.2d 19, 80 U.S.App.D.C. 77; *Biggins v. Oltmer Iron Works*, supra; *Catlin v. United States*, 1945, 65 S.Ct. 631, 324 U.S. 229, 89 L.Ed. 911.

#### 1963 Amendment

Subdivision (c). By the amendment "answers to interrogatories" are included among the materials which may be considered on motion for summary judgment. The phrase was inadvertently omitted from the rule, see 3 Barron & Holtzoff, *Federal Practice & Procedure* 159–60 (Wright ed. 1958), and the courts have generally reached by interpretation the result which will hereafter be required by the text of the amended rule. See Annot., 74 A.L.R.2d 984 (1960).

Subdivision (e). The words "answers to interrogatories" are added in the third sentence of this subdivision to conform to the amendment of subdivision (c).

The last two sentences are added to overcome a line of cases, chiefly in the Third Circuit, which has impaired the utility of the summary judgment device. A typical case is as follows: A party supports his motion for summary judgment by affidavits or other evidentiary matter sufficient to show that there is no genuine issue as to a material fact. The adverse party, in opposing the motion, does not produce any evidentiary matter, or produces some but not enough to establish that there is a genuine issue for trial. Instead, the adverse party rests on averments of his pleadings which on their face present an issue. In this situation Third Circuit cases have taken the view that summary judgment must be denied, at least if the averments are "well-pleaded," and not suppositious, conclusory, or ultimate. See *Frederick Hart & Co., Inc. v. Recordgraph Corp.*, 169 F.2d 580 (3d Cir. 1948); *United States ex rel. Kolton v. Halpern*, 260 F.2d 590 (3d Cir. 1958); *United States ex rel. Nobles v. Ivey Bros. Constr. Co., Inc.*, 191 F.Supp. 383 (D.Del.1961); *Jamison v. Pennsylvania Salt Mfg. Co.*, 22 F.R.D. 238 (W.D.Pa.1958); *Bunny Bear, Inc. v. Dennis Mitchell Industries*, 139 F.Supp. 542 (E.D.Pa.1956); *Levy v. Equitable Life Assur. Society*, 18 F.R.D. 164 (E.D.Pa.1955).

The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial. The Third Circuit doctrine, which permits the pleadings themselves to stand in the way of granting an otherwise justified summary judgment, is incompatible with the basic purpose of the rule. See 6 *Moore's Federal Practice* 2069 (2d ed. 1953); 3 Barron & Holtzoff, supra, § 1235.1.

It is hoped that the amendment will contribute to the more effective utilization of the salutary device of summary judgment.

The amendment is not intended to derogate from the solemnity of the pleadings. Rather it recognizes that, despite the best efforts of counsel to make his pleadings accurate, they may be overwhelmingly contradicted by the proof available to his adversary.

Nor is the amendment designed to affect the ordinary standards applicable to the summary judgment motion. So, for example: Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate. Where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented. And summary judgment may be inappropriate where the party opposing it shows under subdivision (f) that he cannot at the time present facts essential to justify his opposition.

#### 1987 Amendment

The amendments are technical. No substantive change is intended.

## Rule 57.    Declaratory Judgments

The procedure for obtaining a declaratory judgment pursuant to Title 28, U.S.C., § 2201, shall be in accordance with these rules, and the right to trial by jury may be demanded under the circumstances and in the manner provided in Rules 38 and 39. The existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate. The court may order a speedy hearing of an action for a declaratory judgment and may advance it on the calendar.

(As amended Dec. 29, 1948, eff. Oct. 20, 1949.)

#### ADVISORY COMMITTEE NOTES

#### 1937 Adoption

The fact that a declaratory judgment may be granted "whether or not further relief is or could be prayed" indicates that declaratory relief is alternative or cumulative and not exclusive or extraordinary. A declaratory judgment is appropriate when it will "terminate the controversy" giving rise on undisputed or relatively undisputed facts, it operates frequently as a summary proceeding, justifying docketing the case for early hearing as on a motion, as provided for in California (Code Civ.Proc. (Deering, 1937) § 1062a), Michigan (3 Comp.Laws (1929) § 13904), and Kentucky (Codes (Carroll, 1932) Civ.Pract. § 639a–3).

RULE 57 F.R.C.P

**TRIAL, JUDGMENT, AND APPEAL**
Ch. 37

(2) the defendant voluntarily appeared in the proceedings, other than for the purpose of protecting property seized or threatened with seizure in the proceedings or of contesting the jurisdiction of the court over him;

(3) the defendant prior to the commencement of the proceedings had agreed to submit to the jurisdiction of the foreign country court with respect to the subject matter involved;

(4) the defendant was domiciled in the foreign country when the proceedings were instituted or, if the defendant is a body corporate, had its principal place of business, was incorporated, or had otherwise acquired corporate status in the foreign country;

(5) the defendant had a business office in the foreign country and the proceedings in the foreign country court involved a cause of action arising out of business done by the defendant through that office in the foreign country; or

(6) the defendant operated a motor vehicle or airplane in the foreign country and the proceedings involved a cause of action arising out of operation of the motor vehicle or airplane.

(b) A court of this state may recognize other bases of jurisdiction.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

## § 36.007.  Stay in Case of Appeal

If the defendant satisfies the court either that an appeal is pending or that the defendant is entitled and intends to appeal from the foreign country judgment, the court may stay the proceedings until the appeal has been determined or until a period of time sufficient to enable the defendant to prosecute the appeal has expired.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

## § 36.008.  Other Foreign Country Judgments

This chapter does not prevent the recognition of a foreign country judgment in a situation not covered by this chapter.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

# CHAPTER 37.   DECLARATORY JUDGMENTS

**Section**
37.001.   Definition.
37.002.   Short Title, Construction, Interpretation.
37.003.   Power of Courts to Render Judgment;  Form and Effect.
37.004.   Subject Matter of Relief.
37.005.   Declarations Relating to Trust or Estate.
37.006.   Parties.
37.007.   Jury Trial.
37.008.   Court Refusal to Render.
37.009.   Costs.
37.010.   Review.

123

TCPRC § 37.001 ET. seq.

CIVIL PRACTICE & REMEDIES CODE
Title 2

**Section**
37.011.   Supplemental Relief.

## § 37.001.   Definition

In this chapter, "person" means an individual, partnership, joint-stock company, unincorporated association or society, or municipal or other corporation of any character.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

## § 37.002.   Short Title, Construction, Interpretation

(a) This chapter may be cited as the Uniform Declaratory Judgments Act.

(b) This chapter is remedial; its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations; and it is to be liberally construed and administered.

(c) This chapter shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states that enact it and to harmonize, as far as possible, with federal laws and regulations on the subject of declaratory judgments and decrees.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

## § 37.003.   Power of Courts to Render Judgment; Form and Effect

(a) A court of record within its jurisdiction has power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. An action or proceeding is not open to objection on the ground that a declaratory judgment or decree is prayed for.

(b) The declaration may be either affirmative or negative in form and effect, and the declaration has the force and effect of a final judgment or decree.

(c) The enumerations in Sections 37.004 and 37.005 do not limit or restrict the exercise of the general powers conferred in this section in any proceeding in which declaratory relief is sought and a judgment or decree will terminate the controversy or remove an uncertainty.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

## § 37.004.   Subject Matter of Relief

(a) A person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

(b) A contract may be construed either before or after there has been a breach.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

124

## § 37.005.  Declarations Relating to Trust or Estate

A person interested as or through an executor or administrator, including an independent executor or administrator, a trustee, guardian, other fiduciary, creditor, devisee, legatee, heir, next of kin, or cestui que trust in the administration of a trust or of the estate of a decedent, an infant, mentally incapacitated person, or insolvent may have a declaration of rights or legal relations in respect to the trust or estate:

    (1) to ascertain any class of creditors, devisees, legatees, heirs, next of kin, or others;

    (2) to direct the executors, administrators, or trustees to do or abstain from doing any particular act in their fiduciary capacity;

    (3) to determine any question arising in the administration of the trust or estate, including questions of construction of wills and other writings;  or

    (4) to determine rights or legal relations of an independent executor or independent administrator regarding fiduciary fees and the settling of accounts.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.  Amended by Acts 1987, 70th Leg., ch. 167, § 3.08(a), eff. Sept. 1, 1987;  Acts 1999, 76th Leg., ch. 855, § 10, eff. Sept. 1, 1999.

Section 13 of Acts 1999, 76th Leg., ch. 855 provides:

"Except as provided by Sections 11 and 12 of this Act, the changes in law made by this Act apply only to the estate of a person who dies on or after the effective date of this Act.  An estate of a person who dies before the effective date of this Act is governed by the law in effect on the date of the person's death, and the former law is continued in effect for that purpose."

## § 37.006.  Parties

(a) When declaratory relief is sought, all persons who have or claim any interest that would be affected by the declaration must be made parties.  A declaration does not prejudice the rights of a person not a party to the proceeding.

(b) In any proceeding that involves the validity of a municipal ordinance or franchise, the municipality must be made a party and is entitled to be heard, and if the statute, ordinance, or franchise is alleged to be unconstitutional, the attorney general of the state must also be served with a copy of the proceeding and is entitled to be heard.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

## § 37.007.  Jury Trial

If a proceeding under this chapter involves the determination of an issue of fact, the issue may be tried and determined in the same manner as issues of fact are tried and determined in other civil actions in the court in which the proceeding is pending.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

**§ 37.008.  Court Refusal to Render**

The court may refuse to render or enter a declaratory judgment or decree if the judgment or decree would not terminate the uncertainty or controversy giving rise to the proceeding.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

**§ 37.009.  Costs**

In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

**§ 37.010.  Review**

All orders, judgments, and decrees under this chapter may be reviewed as other orders, judgments, and decrees.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

**§ 37.011.  Supplemental Relief**

Further relief based on a declaratory judgment or decree may be granted whenever necessary or proper.  The application must be by petition to a court having jurisdiction to grant the relief.  If the application is deemed sufficient, the court shall, on reasonable notice, require any adverse party whose rights have been adjudicated by the declaratory judgment or decree to show cause why further relief should not be granted forthwith.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

# CHAPTER 38.   ATTORNEY'S FEES

**Section**

38.001.   Recovery of Attorney's Fees.
38.002.   Procedure for Recovery of Attorney's Fees.
38.003.   Presumption.
38.004.   Judicial Notice.
38.005.   Liberal Construction.
38.006.   Exceptions.

**§ 38.001.  Recovery of Attorney's Fees**

A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for:

(1) rendered services;

(2) performed labor;

(3) furnished material;

(4) freight or express overcharges;

(5) lost or damaged freight or express;

126

## § 37.008.  Court Refusal to Render

The court may refuse to render or enter a declaratory judgment or decree if the judgment or decree would not terminate the uncertainty or controversy giving rise to the proceeding.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

## § 37.009.  Costs

In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

## § 37.010.  Review

All orders, judgments, and decrees under this chapter may be reviewed as other orders, judgments, and decrees.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

## § 37.011.  Supplemental Relief

Further relief based on a declaratory judgment or decree may be granted whenever necessary or proper.  The application must be by petition to a court having jurisdiction to grant the relief.  If the application is deemed sufficient, the court shall, on reasonable notice, require any adverse party whose rights have been adjudicated by the declaratory judgment or decree to show cause why further relief should not be granted forthwith.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

# CHAPTER 38.   ATTORNEY'S FEES

Section
38.001.  Recovery of Attorney's Fees.
38.002.  Procedure for Recovery of Attorney's Fees.
38.003.  Presumption.
38.004.  Judicial Notice.
38.005.  Liberal Construction.
38.006.  Exceptions.

## § 38.001.  Recovery of Attorney's Fees

A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for:

    (1) rendered services;

    (2) performed labor;

    (3) furnished material;

    (4) freight or express overcharges;

    (5) lost or damaged freight or express;

126

TCPRC § 38.001 eT seq

 (6) killed or injured stock;

 (7) a sworn account;  or

 (8) an oral or written contract.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

## § 38.002.  Procedure for Recovery of Attorney's Fees

 To recover attorney's fees under this chapter:

 (1) the claimant must be represented by an attorney;

 (2) the claimant must present the claim to the opposing party or to a duly authorized agent of the opposing party;  and

 (3) payment for the just amount owed must not have been tendered before the expiration of the 30th day after the claim is presented.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

## § 38.003.  Presumption

 It is presumed that the usual and customary attorney's fees for a claim of the type described in Section 38.001 are reasonable.  The presumption may be rebutted.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

## § 38.004.  Judicial Notice

 The court may take judicial notice of the usual and customary attorney's fees and of the contents of the case file without receiving further evidence in:

 (1) a proceeding before the court;  or

 (2) a jury case in which the amount of attorney's fees is submitted to the court by agreement.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

## § 38.005.  Liberal Construction

 This chapter shall be liberally construed to promote its underlying purposes.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

## § 38.006.  Exceptions

 This chapter does not apply to a contract issued by an insurer that is subject to the provisions of:

 (1) Article 3.62, Insurance Code;[1]

 (2) Section 1, Chapter 387, Acts of the 55th Legislature, Regular Session, 1957 (Article 3.62–1, Vernon's Texas Insurance Code);[2]

 (3) Chapter 9, Insurance Code;

 (4) Article 21.21, Insurance Code;  or

§ 38.006                        CIVIL PRACTICE & REMEDIES CODE
                                                             Title 2

(5) the Unfair Claim Settlement Practices Act (Article 21.21-2, Insurance Code).

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

[1] Repealed; see, generally, V.A.T.S. Insurance Code, art. 21.55.

[2] Repealed; see, generally, V.A.T.S. Insurance Code, art. 21.55.


# CHAPTER 39.   DEFAULT JUDGMENTS IN CERTAIN CASES DEFENDED BY ATTORNEY GENERAL

**Section**
39.001.   Notice of Intent to Take Default Judgment.
39.002.   Failure to Give Notice.

## § 39.001.   Notice of Intent to Take Default Judgment

Notice of intent to take a default judgment against the state, a state agency, or a party in a civil case for which Chapter 104 authorizes representation by the attorney general shall be mailed to the attorney general at the attorney general's office in Austin, Texas, by United States Postal Service certified mail, return receipt requested, not later than the 10th day before the entry of the default judgment.

Added by Acts 1987, 70th Leg., ch. 167, § 3.09(a), eff. Sept. 1, 1987.

## § 39.002.   Failure to Give Notice

Failure to give notice in a case in which notice is required by Section 30.004(b) or Section 39.001 results in any default judgment in the case being set aside without costs.

Added by Acts 1987, 70th Leg., ch. 167, § 3.09(a), eff. Sept. 1, 1987.

[Chapter 40   reserved for expansion]


# CHAPTER 41.   EXEMPLARY DAMAGES

**Section**
41.001.   Definitions.
41.002.   Applicability.
41.003.   Standards for Recovery of Exemplary Damages.
41.004.   Factors Precluding Recovery.
41.005.   Harm Resulting From Criminal Act.
41.006.   Award Specific to Defendant.
41.007.   Prejudgment Interest.
41.008.   Limitation on Amount of Recovery.
41.009.   Bifurcated Trial.
41.010.   Considerations in Making Award.
41.011.   Evidence Relating to Amount of Exemplary Damages.
41.012.   Jury Instructions.
41.013.   Judicial Review of Award.

*Chapter 41, previously consisting of §§ 41.001 to 41.009, was amended by Acts 1995, 74th Leg., ch. 19, § 1.*

rized as advice, judgment, or

: the person who provided the
ntity that could be found to be

. Section 17.50, nothing in this
· death or for the infliction of

t of a written contract if:

of transactions related to the
ner of more than $100,000;
·d by legal counsel who is not
defendant or an agent of the

n arising from a transaction, a
ivolving total consideration by
action involving a consumer's

·y provisions of the 1995 amenda-
e following V.T.C.A., Business &
§ 17.42.

aries

·ade Practices and Consumer Pro-
ct.  Eve L. Pouliot, 49 SMU
. (1996).

home equity for a walk, but keep-
. leash!, 30 Tex. Tech L.Rev. 197

·rtion group and its principal were
·rom this subchapter as dissemina-
·n for third parties through adver-
·wspapers, magazines, or yellow
·established that group and its
·owledge of improper advertising,
·v exemption from group and prin-
·indicated that principal initiated
·low pages and submitted allegedly
·isement, that he specified head-
·group to appear under, which
·s for abortion services and infor-
·ment.  Mother & Unborn Baby
·exas, Inc. v. State (App. 2 Dist.
·1 533, writ denied, certiorari de-
·431, 490 U.S. 1090, 104 L.Ed.2d

·1 with federal law
·de Practices-Consumer Protection
·ies to act or practice prohibited by

Federal Trade Commission (FTC) rule or regula-
tion.  Century 21 Real Estate Corp. v. Hometown
Real Estate Co. (App. 6 Dist. 1994) 890 S.W.2d
118, rehearing overruled, writ denied, rehearing of
writ of error overruled.

Farmers' damages claims against herbicide sell-
er were based on purchase of product which alleg-
edly failed to perform in accordance with sales-
man's representations and thus were not precluded
by Deceptive Trade Practices Act's (DTPA) bar
against damages claims based on rendering of
professional service, even though salesman had
knowledge of testing of herbicide and calculated
amounts to be used by farmers.  Cole v. Central
Valley Chemicals, Inc. (App. 4 Dist. 1999) 9 S.W.3d
207, rehearing overruled, review denied.

## § 17.50.  Relief for Consumers

(a) A consumer may maintain an action under any of the following constitute a producing
cause of economic damages or damages for mental anguish:

(1) the use or employment by any person of a false, misleading, or deceptive act or
practice that is:

(A) specifically enumerated in a subdivision of Subsection (b) of Section 17.46 of this
subchapter; and

(B) relied on by a consumer to the consumer's detriment;

(2) breach of an express or implied warranty;

(3) any unconscionable action or course of action by any person; or

(4) the use or employment by any person of an act or practice in violation of Article
21.21, Insurance Code.

(b) In a suit filed under this section, each consumer who prevails may obtain:

(1) the amount of economic damages found by the trier of fact.  If the trier of fact finds
that the conduct of the defendant was committed knowingly, the consumer may also
recover damages for mental anguish, as found by the trier of fact, and the trier of fact may
award not more than three times the amount of economic damages; or if the trier of fact
finds the conduct was committed intentionally, the consumer may recover damages for
mental anguish, as found by the trier of fact, and the trier of fact may award not more than
three times the amount of damages for mental anguish and economic damages;

(2) an order enjoining such acts or failure to act;

(3) orders necessary to restore to any party to the suit any money or property, real or
personal, which may have been acquired in violation of this subchapter; and

(4) any other relief which the court deems proper, including the appointment of a
receiver or the revocation of a license or certificate authorizing a person to engage in
business in this state if the judgment has not been satisfied within three months of the date
of the final judgment.  The court may not revoke or suspend a license to do business in this
state or appoint a receiver to take over the affairs of a person who has failed to satisfy a
judgment if the person is a licensee of or regulated by a state agency which has statutory
authority to revoke or suspend a license or to appoint a receiver or trustee.  Costs and fees
of such receivership or other relief shall be assessed against the defendant.

(c) On a finding by the court that an action under this section was groundless in fact or law
or brought in bad faith, or brought for the purpose of harassment, the court shall award to
the defendant reasonable and necessary attorneys' fees and court costs.

(d) Each consumer who prevails shall be awarded court costs and reasonable and necessary
attorneys' fees.

(e) In computing additional damages under Subsection (b), attorneys' fees, costs, and
prejudgment interest may not be considered.

(f) A court may not award prejudgment interest applicable to:

(1) damages for future loss under this subchapter; or

(2) additional damages under Subsection (b).

(g) Chapter 41, Civil Practice and Remedies Code, does not apply to a cause of action
brought under this subchapter.

(h) Notwithstanding any other provision of this subchapter, if a claimant is granted the
right to bring a cause of action under this subchapter by another law, the claimant is not
limited to recovery of economic damages only, but may recover any actual damages incurred

TX BCC § 17.50

**§ 17.50**　　　　　COMPETITION & TRADE PRACTICES
　　　　　　　　　　　　　Title 2

by the claimant, without regard to whether the conduct of the defendant was committed intentionally. For the purpose of the recovery of damages for a cause of action described by this subsection only, a reference in this subchapter to economic damages means actual damages. In applying Subsection (b)(1) to an award of damages under this subsection, the trier of fact is authorized to award a total of not more than three times actual damages, in accordance with that subsection.

Amended by Acts 1989, 71st Leg., ch. 380, § 2, eff. Sept. 1, 1989; Acts 1995, 74th Leg., ch. 414, § 5, eff. Sept. 1, 1995.

### Historical and Statutory Notes

**1989 Legislation**

The 1989 amendment, in subd. (b)(1) added ", provided that:" and pars. (A) and (B).

Section 6 of the 1989 amendatory act provides:

"(a) This Act applies to all actions or claims commenced on or after the effective date of this Act.

"(b) An action or claim commenced before the effective date of this Act is governed with respect to the specific subject matters of this Act by the applicable law in effect before the effective date of this Act, and that prior law is continued in effect only for that purpose.

"(c) In an action, claim, or suit in which a statute requires written notice to be given before the filing or bringing of the action, claim, or suit, personally delivering or depositing the notice, postage prepaid, in the United States mail before the effective date of this Act is considered filing or bringing the action before the effective date of this Act, if the suit is formally filed or otherwise brought within 120 days after the date of the delivery or mailing."

**1995 Legislation**

The 1995 amendment, in subsec. (a), in the introductory language, substituted "economic" for "actual", and inserted "or damages for mental anguish", in subd. (1), designated par. (A) and added par. (B), and in subd. (4), deleted "Texas" preceding "Insurance" and, following "Insurance Code", deleted ", as amended, or rules or regulations issued by the State Board of Insurance under Article 21.21, Texas Insurance Code, as amended"; rewrote subsec. (b)(1); in subsec. (c), substituted "in fact or law or" for "and"; and added subsecs. (e) to (h). Subsection (b)(1) formerly read:

"the amount of actual damages found by the trier of fact. In addition the court shall award two times that portion of the actual damages that does not exceed $1,000. If the trier of fact finds that the conduct of the defendant was committed knowingly, the trier of fact may award not more than three times the amount of actual damages in excess of $1,000, provided that:

"(A) the provisions of Chapters 33 and 41, Civil Practice and Remedies Code, shall govern the determination of the consumer's right under this subchapter to recover actual and other damages, including exemplary damages, and the amount of those damages that may be recovered by the consumer under this subchapter, in an action seeking damages for (i) death; (ii) personal injury other than mental anguish or distress associated with a violation of this subchapter that does not involve death or bodily injury; or (iii) damage to property other than the goods acquired by the purchase or lease that is involved in the consumer's action or claim if that damage arises out of an occurrence that involves death or bodily injury; and

"(B) only in an action under this subchapter that is subject to Paragraph (A) of this subdivision, the consumer's right to recover damages shall be subject to any defense or defensive matter that could be considered by the trier of fact in an action subject to Chapter 33, Civil Practice and Remedies Code, in determining the percentage of responsibility attributable to the consumer claimant under that chapter;"

For applicability provisions of the 1995 amendatory act, see note following V.T.C.A., Bus. & C. § 17.42.

### Cross References

Exemplary damages, deceptive trade practices and consumer protection actions, see V.T.C.A., Civil Practice & Remedies Code § 41.002.

Manufactured Housing Standards Act, failure to give warranties and notices as deceptive trade practice, see Vernon's Ann.Civ.St. art. 5221f.

Proportionate responsibility, deceptive trade practices and consumer protection actions, see V.T.C.A., Civil Practice & Remedies Code § 33.002.

### Law Review and Journal Commentaries

A DTPA cause of action for the terminated or nonrenewed franchisee: A jack in the box for the unfair franchisor. Martin E. Loeber, 43 Baylor L.Rev. 809 (1991).

Annual survey of Texas law: Commercial transactions. John Krahmer, 49 SMU L.Rev. 775 (1996).

---

Deceptive Trade Practices—Cons
tection Act. A. Michael Ferrill a
A. Japhet. 51 SMU L.Rev. 909
1998); 52 SMU L.Rev. 971 (1999)

Deceptive Trade Practices and Con:
tection Act. Eve L. Pouliot,
L.Rev. 871 (1996).

Auditor liability under the DTPA:
any worse for accountants? 44 Baylor
(1992).

Bambi meets godzilla: Reflections o
scholarship and teaching vs. state unf
ceptive trade practices and consumer
statutes. Stewart Macaulay, 26 Hous
(1989).

*Boyles v. Kerr:* the wrong decision :
time: implications for mental anguish d
der the DTPA. Charles E. Cantu an
Woodfill, V, 45 Baylor L.Rev. 827 (1998

Builder liability: The implied warran
workmanship and habitability and th
statute of repose. William T. Little a
Paxson, 56 Tex.B.J. 462 (1993).

Business of medicine—health care
physicians, and the Deceptive Trade Pi
Richard M. Alderman, 26 Hous.L.Rev.

Emerging trends in Texas DTF
James H. Pearson, 24 Hous.Law. 22
1986).

Implied warranty of good and workn
ity extends to the repair and modifica
ing tangible goods. Note, 19 Tex.'
1141 (1988).

Is privity still required in a breac
warranty cause of action for personal
ages? Brit Nelson, 43 Baylor L.Rev

Illustrative Texas statutes and au
Zabel & Smith, 1 Texas Forms §

Un

Mortgage foreclosure, Truth-in-Len
firmative recoupment defense, right

Accrual, maintaining an action　13
Admissibility of evidence, maintai
tion　69.5
Agents, liability, maintaining an ac
Alternative theories, maintaining
129
Apportionment, attorney fees and c
Arbitration
　Attorney fees and costs　328.6
　Maintaining an action　134
Assignees, maintaining an action

instead a deed with a special warranty, the deed is still valid to the extent of the agent's authority, and will operate to convey the land to the extent of the principal's power to do so.[67]

## § 214. Agent's representations as to authority

In the absence of actual or apparent authority on the part of the purported agent, the principal will not be liable on a contract made by the agent, even though the agent represents to the other party to the contract that the agent has authority to enter into it.[68] If the third person deals with the agent without having ascertained both the fact and the scope of the agent's authority, the third person deals with the agent at the third person's own risk.[69]

### c. Undisclosed Agency or Partial Disclosure
[§§ 215-217]

## § 215. Generally

Where an agency is undisclosed, a contract negotiated by the agent in the agent's own name but within the scope of the agent's authority is generally treated as the contract of the principal. Therefore, the principal is ordinarily liable on the agreement to the third person with whom the agent has contracted.[70]

---

430, 118 SW 132; State v Magnolia Petroleum Co. (1943, Tex Civ App) 173 SW2d 186, writ ref w o m; Morton v Morris (1901) 27 Tex Civ App 262, 66 SW 94.

**67.** Kane v Sholars (1905) 41 Tex Civ App 154, 90 SW 937.

The execution of a deed by an agent generally is discussed in Tex Jur 3d, Deeds § 14.

The title conveyed to a grantee generally is discussed in Tex Jur 3d, Deeds § 154.

**68.** Munoz v II Jaz Inc. (1993, Tex App Houston (14th Dist)) 863 SW2d 207.

As to actual authority generally, see §§ 48 et seq.

As to apparent authority generally, see §§ 57 et seq.

As to the principal's conduct being an element of an agent's apparent authority, see § 63.

**69.** Southwest Land Title Co. v Gemini Financial Co. (1988, App Dallas) 752 SW2d 5 (attorney's lack of authority to bind title company to lease agreement despite evidence of attorney's statement).

As to the principal's duty to give notice of limitations on an agent's authority where agency exists, see § 71.

**70.** Wynne v Adcock Pipe & Supply (1988, Tex App San Antonio) 761 SW2d 67, writ den (Apr 12, 1989); Moerbe v Meece (1981, Tex App Austin)

TEX. JUR § 215 AGENCY

Where recovery is sought from an alleged principal who gave the alleged agent no actual or apparent authority, the principles governing undisclosed agency are not invoked.[71]

A partially disclosed principal[72] is also generally liable to the third party with whom the authorized agent has contracted.[73]

## § 216. Exceptions

An undisclosed principal is not liable on contracts entered into by his or her authorized agent where exclusive credit is given to the agent, and it is intended by both parties that there will be no recovery from the principal.[74] An undisclosed principal is also not liable on instruments that were required by the common law to be under seal, such as conveyances of land.[75]

---

630 SW2d 278, writ granted (Tex) 25 Tex Sup Ct Jour 246 and affd in part and revd in part on other grounds (Tex) 631 SW2d 729.

As to the agent's personal liability on a contract made for an undisclosed principal, see §§ 187 et seq.

As to the third person's contractual liability to the undisclosed principal, generally, see § 233.

As to the use of parol evidence in connection with an undisclosed principal, see § 277.

**Annotations:** Principal's payment to or settlement with agent as affecting former's liability to third person with respect to contract negotiated by agent, 71 ALR2d 911.

**71.** American Employers Ins. Co. v Kilgore (1967, Tex Civ App Amarillo) 412 SW2d 67, writ ref n r e (Jul 5, 1967).

As to the principal's liability to the third party where an unauthorized agent contracts, see § 212.

**72.** As to the definition of a partially disclosed principal, see § 188.

**73.** Abbott v Adams (1952, Tex Civ App) 248 SW2d 514, affd 151 Tex 601, 254 SW2d 78 (specific performance of real estate sales agreement between landowner and agent acting for existing but unidentified principal).

**74.** Sanger v Warren (1898) 91 Tex 472, 44 SW 477.

As to a principal's general lack of liability where the third party extends credit solely to the agent, see § 210.

**75.** Sanger v Warren (1898) 91 Tex 472, 44 SW 477; Salopek v Logan (1923, Tex Civ App) 256 SW 299; Farrier v Hopkins (1938) 131 Tex 75, 112 SW2d 182; Burnett v Atteberry (1912) 105 Tex 119, 145 SW 582.

As to the requirement that an agent have written authorization to convey land, see § 53.

The effect and use of private seals generally is discussed in Tex Jur 3d, Seals § 4.

An agent's conveyance or attempted conveyance of his or her principal's land by deed is discussed in Tex Jur 3d, Deeds § 14.

SHEET 1   PAGE 1

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

PORT ELEVATOR - BROWNSVILLE,   *
L.C. AND SOUTHWEST GRAIN       *
COMPANY, INC.                  *
                               *
VS.                            *   C. A. NO. B-98-23
                               *
IVONNE SOTO VEGA, BERSAIN      *   JURY DEMANDED
GUTIERREZ, SYSCO DE BAJA,      *
S.A. DE C.V. AND WALTER        *
PUFFELIS, INDIVIDUALLY AND     *
D/B/A AGI AKRON GROUP, INC.    *
                               *
VS.                            *
                               *
CRAIG ELKINS, INDIVIDUALLY     *
AND D/B/A PORT ELEVATOR-       *
BROWNSVILLE, L.C., AND         *
SOUTHWEST GRAIN CO., INC.      *

-----------------------------------------------------------

ORAL/VIDEOTAPED DEPOSITION OF
MARIA GONZALEZ
June 22, 2001

-----------------------------------------------------------

    Oral/Video deposition of MARIA GONZALEZ, produced as a
witness on behalf of Ivonne Soto Vega, and duly sworn, was
taken in the above-styled and numbered cause on the 22nd day
of June, 2001, from 10:15 a.m. to 12:23 p.m. before GERALD
SMITH, CSR in and for the State of Texas, reported by oral

EXHIBIT K

MARIA GONZALEZ DEPO-SITION

Port Elevator-Brownsville V. Ivonne Soto Vega
DEPOSITION OF MARIA GONZALEZ
6-22-01

SHEET 2   PAGE 2                                                      2

stenography at the offices of Dale & Klein, 815 Ridgewood,
Brownsville, Cameron County, Texas, pursuant to the Federal
Rules of Civil Procedure and the provisions stated on the
record or attached hereto.

PAGE 3                                                               3

A P P E A R A N C E S
FOR PORT ELEVATOR-BROWNSVILLE:
        MR. JOHN SKAGGS
        Skaggs & Associates
        710 Laurel
        McAllen, Texas  78501
FOR IVONNE SOTO VEGA:
        MR. WILLIAM D. MOUNT
        Dale & Klein
        6301 N. 10th
        McAllen, Texas  78504
ALSO PRESENTS:
        MS. DONANN SMITH, Videographer

PAGE 4                                                               4

I N D E X
Appearances ........................................... 2
Stipulations .......................................... 4
    Examination by Mr. Mount .......................... 6
    Examination by Mr. Skaggs ......................... 66
    Re-Examination by Mr. Mount ....................... 76
    Re-Examination by Mr. Skaggs ...................... 87
    Re-Examination by Mr. Mount ....................... 89
Signature and Changes ................................. 92
Reporter's Certificate ................................ 94
E X H I B I T S
NO.     DESCRIPTION                            MARKED
No. 1   Deposition Notice ........................... 15
No. 2   10/25/96 Invoice ............................ 15
No. 3   11/4/96 Invoice ............................. 21
No. 4   11/5/96 Invoice ............................. 27
No. 5   11/6/96 Invoice ............................. 39
No. 6   11/6/96 Invoice ............................. 42
No. 7   11/12/96 Invoice ............................ 45
No. 8   Notary Public Records ....................... 57

PAGE 5                                                               5

1       Oral/Videotaped deposition and answers of MARIA
2  GONZALEZ, who resides in Cameron County, Texas, was taken
3  herein by William D. Mount, Counsel for Ivonne Soto Vega,
4  before Gerald Smith, a Certified Shorthand Reporter in and
5  for the State of Texas, on the 22nd day of June, A.D., 2001,
6  pursuant to the Notice issued in the above styled and
7  numbered cause, pursuant to the Federal Rules of Civil
8  Procedure and with the following stipulations and
9  agreements:
10      IT WAS AGREED that the witness must appear in
11 accordance with the Federal Rules of Civil Procedure before
12 any Notary Public or official authorized to administer oaths
13 for purpose of reading over the deposition and making any
14 corrections the witness finds to be necessary, such
15 corrections to be recorded on a correction sheet submitted
16 with the original of the deposition.

*Compliments of Action Reporting*
1-800-884-1024 / 956-631-1024

SHEET 3   PAGE 6 _____

PAGE 7 _____

6

```
 1                      MARIA GONZALEZ,
 2        having been first duly sworn, testified as follows,
 3                    E X A M I N A T I O N
 4   BY MR. MOUNT:
 5        Q    State your name for the record, please?
 6        A    Maria Gonzalez.
 7        Q    Maria Gonzalez, my name is Bill Mount, and I'm an
 8   attorney today representing Ivonne Soto Vega in a lawsuit
 9   where she's been sued by Port Elevator-Brownsville and
10   Southwest Grain Company in federal court.  Do you understand
11   that?
12        A    Yes, sir.
13        Q    Have you ever been deposed before?
14        A    Yes.
15        Q    Has it been a while since you've been deposed?
16        A    Yes.
17        Q    Well, let me just tell you that a deposition, it's
18   just like being in court today, and we can play the
19   videotape that the videographer is taking to the jury and to
20   the judge and also we can read the booklet that the court
21   reporter will put together for the benefit of the judge and
22   jury.  Do you understand that?
23        A    Yes, sir.
24        Q    And also you've sworn an oath today to tell the
25   truth, and that's exactly what we also do when we're in
```

7

```
 1   court.  Do you understand that?
 2        A    Yes, sir.
 3        Q    As we go along, allow me the opportunity to ask a
 4   complete question and then I'll allow you the opportunity to
 5   respond.  The court reporter can't take us down if we're
 6   both talking at the same time.  Is that okay?
 7        A    Yes, sir.
 8        Q    And, additionally, the court reporter and the
 9   judge and I, we need verbal answers to all of these
10   questions so we'll have a complete record.  Is that okay?
11        A    Yes, sir.
12        Q    Could you tell me what your current address is,
13   that is where you live?
14        A    FM 2893, Los Fresnos.
15        Q    What is your home telephone number?
16        A    956-233-4142.
17        Q    As far as this particular address is concerned,
18   it's on FM 2893; is that right?
19        A    Yes.
20        Q    Is there a better way to be able to identify where
21   your house is?
22        A    Okay.  It's about three miles past Los Fresnos and
23   then it's about a mile and a half off of FM 2893, you know,
24   on FM 2893.
25        Q    So it's about three miles outside of Los Fresnos?
```

PAGE 8 _____

PAGE 9 _____

8

```
 1        A    Yes.
 2        Q    And since I'm not familiar with FM 2893, is that
 3   north, south, east or west of Los Fresnos?
 4        A    North.
 5        Q    North.  Now are you married?
 6        A    No; no, sir.
 7        Q    Do you have any children?
 8        A    No, sir.
 9        Q    Do you live alone?
10        A    Yes, sir.
11        Q    How long have you lived at this address on 2893?
12        A    It's more than forty years.
13        Q    Your social security number, what is your social
14   security number?
15        A    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.
16        Q    I'm going to have to ask you what your date of
17   birth is.  What is your date of birth?
18        A    July the 9th.
19        Q    And what year was that?
20        A    Thirty-eight.
21        Q    1938.  Now are you currently working at Port
22   Elavator-Brownsville, L.C.
23        A    That's correct.
24        Q    How long have you worked for Port Elavator-
25   Brownsville, L.C.?
```

9

```
 1        A    Since July the 13th, 1970 -- 15th, I believe.
 2        Q    As far as working for Port Elevator-Brownsville,
 3   L.C., what is it that you do for the business?
 4        A    Bookkeeping, payroll, accounts receivable, GL,
 5   accounts payable.
 6        Q    And when you say GL, you're talking about the
 7   general ledger?
 8        A    General ledger, yes.
 9        Q    Who is your supervisor?
10        A    Mr. Craig Elkins.
11        Q    As far as your work history is concerned, where
12   did you work prior to working for Port Elevator-Brownsville,
13   L.C.?
14        A    Brownsville Navigation District.
15        Q    What did you do for Brownsville Navigation
16   District?
17        A    Just a general office clerk with the Port
18   Elevator.
19        Q    As far as Mr. Elkins is concerned, how long has he
20   been down at Port Elevator-Brownsville, L.C.?
21        A    Since the day we started to work.
22        Q    And that would be back, what, 1970?
23        A    Yes.
24        Q    As far as -- as far as what you do, do you have
25   any assistants that help you out?
```

SHEET 4  PAGE 10

10

```
1      A    Not in my work, no.
2      Q    So then, really, to summarize your title or your
3  position would be, basically, the bookkeeper?
4      A    Yes; that's correct, sir.
5      Q    As far as your employer is concerned, is your
6  employer Port Elevator-Brownsville, L.C.?
7      A    That is correct, sir.
8      Q    So as far as when you receive a paycheck, does the
9  paycheck say on it paid by or does it have Port Elevator-
10 Brownsville, L.C. on the check?
11     A    Port Elevator-Brownsville, L.C.
12     Q    And when you're paid, are you paid twice monthly
13 or are you paid every week?  How does it --
14     A    Weekly.
15     Q    And you actually cut the checks for the business,
16 right?
17     A    That's correct, sir.
18     Q    And then as far as signing payroll, who signs
19 payroll?
20     A    Mr. Craig Elkins.
21     Q    Now we're here today because there -- because of a
22 dispute over some corn involving a couple of parties.  Do
23 you understand that?
24     A    Yes, sir.
25     Q    Have you ever met Bersain Gutierrez, who has been
```

PAGE 11

11

```
1  named as a defendant in this lawsuit?
2      A    He was by the office once.
3      Q    Do you recall what year it was that he was by the
4  office?
5      A    1996.
6      Q    And as far as your recollection is concerned, do
7  you recall the month or the day?
8      A    No.  I would have to look that up, as to what day
9  it was.
10     Q    As far as being able to look it up, is there any
11 particular way you would be able to look it up?
12     A    Look at my notary log.
13     Q    In your notary log it mentions that he was by Port
14 Elevator-Brownsville, L.C. in October of 1996.  Does that
15 sound right?
16     A    That is correct, sir.
17     Q    And I believe the particular date was October 25,
18 19 --
19         MR. MOUNT:  Scratch that.
20     Q    (Mr. Mount)  The date that shows in your notary
21 log is October 30, 1996, correct?
22     A    That's correct.
23     Q    So it appears that you've notarized a document, a
24 commercial invoice for Mr. Gutierrez, on October 30, 1996,
25 correct?
```

PAGE 12

12

```
1      A    That's correct, sir.
2      Q    And when you notarized that particular document,
3  you also asked for his ID card?
4      A    That's correct.
5      Q    And when you asked for his ID card, what type of
6  ID card did you look at, do you recall?
7      A    It was his resident alien card.
8      Q    And as far as his resident alien card is
9  concerned, you actually took down the number off of his
10 card?
11     A    That's correct, sir.
12     Q    And what was that number?
13     A    A092555562.
14     Q    Then also in your notary book you wrote down an
15 address for Mr. Gutierrez, correct?
16     A    Yes.
17     Q    Where did you obtain the address?
18     A    Off of his ID card from California.
19     Q    All right.  So you didn't ask him what his address
20 was --
21     A    No.
22     Q    -- you took it off of his --
23     A    Yes.
24     Q    -- card?
25     A    That's correct.
```

PAGE 13

13

```
1          MR. SKAGGS:  Maria, when you're answering
2  questions, give him a chance to finish the answers.
3          WITNESS:  Okay.
4          MR. SKAGGS:  In normal conversation we talk
5  over each other, but the man that's sitting here has to type
6  a question and then an answer.  I know it feels a little
7  awkward, but go ahead and do that.  It will make the record
8  read better in the typed part.
9          WITNESS:  Okay.
10     Q    (Mr. Mount)  The best depositions that we do are
11 when we have a translator and it goes from English to
12 Spanish, because the translator translates everything and
13 the witness gets to answer, and then the next question comes
14 so the record is perfect, as far as question-answer,
15 question-answer, and that's what we're striving for is
16 question-answer, question-answer.  Now the address you took
17 from the ID card was what?
18     A    529 Canyon Drive, Bonita, California, 91902.
19     Q    So it appears from your notary book that you
20 actually saw him on two dates, one was October 30, 1996 and
21 the other date was November 1, 1996, correct?
22     A    That's correct.
23     Q    The second document that you notarized for Mr.
24 Gutierrez on November 1, 1996, what was that document?
25     A    What I have in my log book says weight
```

SHEET 5   PAGE 14

**14**

1  certificate.
2       Q     Concerning Mr. Gutierrez, do you recall what his
3  -- what he looked like?
4       A     No, sir. I do not.
5       Q     So you can't describe to the jury what his
6  physical appearance was?
7       A     No.
8       Q     Do you recall when you spoke with him in order to
9  get the documents notarized, whether the conversation was in
10 English or in Spanish?
11      A     Spanish.
12      Q     Then as far as talking to him to get these
13 documents notarized on these two dates, do you recall anyone
14 else being present besides yourself?
15      A     Mr. Walter Puffelis.
16      Q     Do you recall anyone else being present besides
17 Mr. Puffelis?
18      A     No, sir.
19      Q     Was Mr. Elkins present?
20      A     He was in the office, yes, sir.
21      Q     What about Ms. Ivonne Vega, was she present?
22      A     No, sir, she was not.
23      Q     Have you ever met Ms. Vega before?
24      A     She came by the office once.
25      Q     So you did meet her?

PAGE 15

**15**

1       A     A year or two later, whatever.
2       Q     Okay. So, yes, you did meet her, correct?
3       A     Yes.
4       Q     So then you're sure that you don't recall seeing
5  Ms. Vega there on October 30, 1996, or November 1, 1996,
6  correct?
7       A     That is correct.
8       Q     Have you ever met Loren Walters?
9       A     I do not recall that name.
10      Q     The name doesn't sound familiar?
11      A     No.
12      Q     So then you wouldn't really know, one way or the
13 other, whether he was present in Brownsville at the Port on
14 October 30, 1996 or November 1, 1996, correct?
15      A     Correct.
16      Q     Now as far as the document that was notarized on
17 October 30, 1996, do you remember what that document was,
18 other than your notation that it was a commercial invoice?
19      A     Just that it was an invoice.
20            (Exhibits No. 1 and 2 were marked.)
21      Q     (Mr. Mount) What we're going to do is we're going
22 to mark as Exhibit No. 1 your deposition notice, and then
23 we'll mark Exhibit No. 2 a commercial invoice. And I'll ask
24 you if you're able to identify Exhibit No. 2? Are you able
25 to identify Exhibit No. 2 as a document that you notarized

PAGE 16

**16**

1  on October 30, 1996?
2       A     Yes.
3       Q     Your signature appears at the bottom of that
4  document, correct?
5       A     That's correct, sir.
6       Q     And as far as the signature you were notarizing,
7  you were notarizing Mr. Gutierrez' signature, correct?
8       A     That's correct, sir.
9       Q     Do you recall, one way or the other, at the time
10 you notarized this document whether the signature to the
11 right of Mr. Gutierrez, that is the signature of Mr.
12 Puffelis, had already been done or not?
13      A     I do not recall.
14      Q     So as far as Mr. Puffelis signing Exhibit No. 2,
15 he could have done it either before you notarized Gutierrez'
16 signature or after?
17      A     That's correct, sir.
18      Q     As far as this particular document is concerned,
19 did you have a hand in preparing it at all?
20      A     No, sir. I did not.
21      Q     As far as what appears on the bottom of the
22 document where it has your name typed up, it says -- it's
23 typed up Maria Gonzalez, and it says notary public in and
24 for Cameron County, State of Texas. Was that already typed
25 on the document --

PAGE 17

**17**

1       A     No.
2       Q     -- at the time you notarized it?
3       A     No, sir. It was not.
4       Q     That was something that you typed on the document?
5       A     That's correct, sir.
6       Q     And you did that at Port Elevator-Brownsville,
7  L.C., correct?
8       A     That's correct, sir.
9       Q     And you used -- I guess you used one of their
10 typewriters to do it?
11      A     That's correct.
12      Q     Then, also, where it says,"Sworn and subscribed
13 before me this 30th day October 1996" did you type that
14 language on Exhibit No. 2?
15      A     That's correct, sir.
16      Q     And then where it says,"My commission expires
17 August 21, 1999", you typed that, also, correct?
18      A     That's correct, sir.
19      Q     Where it says, "This notarization is to
20 authenticate that the above signature is that of Mr. Bersain
21 Gutierrez", did you type that, also?
22      A     No, sir. I did not.
23      Q     Are you aware of who may have typed that?
24      A     No, sir. I am not.
25      Q     Would you agree with me or disagree with me that

SHEET 6  PAGE 18

18

1 that language I just quoted you that says, "This
2 notarization is to authenticate that the above signature is
3 that of Mr. Bersain Gutierrez", that particular type looks
4 very similar to the type you used? Would you agree or
5 disagree with that statement?
6     A    I don't think it looks the same.
7     Q    So then, in your opinion, that type looks more
8 like the type on the rest of the document than what you
9 typed?
10    A    Yes.
11    Q    So as far as that particular typing is concerned,
12 the language I read to you, "This notarization is to
13 authenticate that the above signature is that of Mr. Bersain
14 Gutierrez, you don't know who typed that, correct?
15    A    No, I do not, sir.
16    Q    Now I assume that Mr. Gutierrez signed in your
17 presence when you notarized the document, correct?
18    A    That's correct, sir.
19    Q    And, generally, that's your practice, when you
20 notarize documents you have the person who is signing sign
21 in your presence, correct?
22    A    That is correct, sir.
23    Q    As far as the person who created this particular
24 document, do you have any idea who created the portions of
25 the document that you didn't type?

PAGE 19

19

1     A    No, I do not.
2     Q    Do you recall who it was that handed you this
3 document for notarization?
4     A    No, I do not, sir.
5     Q    So you don't know if it was Mr. Gutierrez, Mr.
6 Puffelis, or Mr. Elkins, correct?
7     A    No. It would have been either Mr. Gutierrez or
8 Mr. Puffelis.
9     Q    So when you say it would have had to have been
10 either one of those two individuals --
11    A    Uh-huh.
12    Q    -- why is it that you believe it was one of those
13 two individuals?
14    A    Because I remember clearly they were at the
15 counter in front and they wanted me to notarize.
16    Q    So as far as the counter in front, is there some
17 kind of lobby or area when you --
18    A    Yes.
19    Q    -- first walk in the door there?
20    A    Uh-huh.
21    Q    Okay. And they were -- you were on one side of
22 the counter and --
23    A    And they were on the other side.
24    Q    And then as far as Mr. Elkins, do you recall where
25 he was at that time?

PAGE 20

20

1     A    Probably in his office.
2     Q    Well, as far as probably being in his office,
3 could have also been there visiting with these two
4 gentlemen, Mr. Gutierrez and Mr. Puffelis.
5     A    At the time that this was notarized, no.
6     Q    And when you say that, why is it that you say
7 that?
8     A    Because they were alone and standing in front, and
9 I was sitting at my desk, which is right past that counter.
10    Q    Do you recall if they had you notarize any other
11 documents that day?
12    A    No. I do not recall.
13    Q    Are there occasions where you notarize a document
14 and you don't necessarily write it down in your log book?
15    A    No.
16    Q    So then it's your testimony that every time you
17 notarize a document you will write it down in your log book?
18    A    Yes.
19    Q    How long have you been a notary for?
20    A    Since 199 -- 1991, I believe.
21    Q    Do you recall if those two gentlemen asked you to
22 make copies of this document, this commercial invoice,
23 Exhibit No. 2, after it was notarized?
24    A    I do not recall.
25    Q    If they would have asked you to make copies, you

PAGE 21

21

1 certainly would have obliged them?
2     A    That's correct.
3     Q    Concerning Mr. Puffelis, do you recall what he
4 looked like?
5     A    No, I do not.
6     Q    So you can't describe to the jury what his
7 physical appearance looks like, correct?
8     A    No.
9     Q    When you spoke with Mr. Puffelis, do you recall if
10 the conversations were in English or in Spanish?
11    A    I do not recall.
12    Q    Then your log book mentions that you notarized
13 something on November 1, 1996 for Mr. Gutierrez, correct?
14    A    That's correct.
15    Q    By the way, on Exhibit No. 2 you do recognize Mr.
16 Gutierrez' signature on that document, correct?
17    A    That's correct.
18    Q    His signature appears under the words "received
19 by", correct?
20    A    That's correct.
21         (Deposition Exhibit No. 3 was marked.)
22    Q    (Mr. Mount) Let me ask you if you're able to
23 identify Exhibit No. 3? Does the document look familiar?
24    A    That's my signature. It is an invoice.
25    Q    As far as the signature that was notarized, it

SHEET 7    PAGE 22

22
1  appears that you notarized Mr. Gutierrez' signature; is that
2  correct?
3      A    No. It says, "I hereby certify that this is a
4  true copy of the original document."
5      Q    So as far as the signatures on this document, who
6  -- what signatures do you see on this document?
7      A    Craig Elkins.
8      Q    Then below -- and your signature is on this
9  document, too --
10     A    Uh-huh.
11     Q    -- above the word "Maria Gonzalez", correct?
12     A    Uh-huh.
13     Q    Who is the middle signature, between your
14  signature and Mr. Elkins' signature?
15     A    I do not recall. I don't know.
16     Q    Okay. And as far as this particular document is
17  concerned, above the words "by" -- or next to the word "by"
18  you see Craig Elkins' signature, correct?
19     A    That's correct.
20     Q    And then it says "B. G. Grain"? Do you see where
21  it says "B. G. Grain"?
22     A    Yes, sir.
23     Q    What is B. G. Grain?
24     A    B. G. Grain, Bersain Gutierrez.
25     Q    So B. G. Grain stands for Bersain Gutierrez Grain,

PAGE 23

23
1  correct?
2      A    I believe so, but I am not certain.
3      Q    Okay. And then also the top left-hand corner of
4  the document it says -- it's not too legible there, but it
5  says "G. Grain", correct?
6      A    That's correct.
7      Q    We would presume that there could be a "B" there
8  for B. G. Grain, correct?
9      A    Correct.
10     Q    This gives an address of California, Chula Vista,
11  California, correct?
12     A    Correct.
13     Q    As far as this particular document, it says --
14  towards the right, on the top part of the document it says,
15  "Invoice No. BG1", correct?
16     A    Correct.
17     Q    What is this an invoice concerning?
18     A    This is covering corn.
19     Q    This invoice is covering corn that was loaded at
20  Port of -- at the Port of Brownsville and being shipped out
21  of the Port of Brownsville, correct?
22     A    Correct.
23     Q    And it appears that it was corn that was going to
24  be sold to a business down in Mexico, correct?
25     A    Correct.

PAGE 24

24
1      Q    Now as far as this particular document is
2  concerned, what were you asked to do concerning this
3  particular document?
4      A    I didn't understand that question.
5      Q    Okay. Concerning this particular document, you
6  were asked to swear that this was a true and correct copy of
7  the original?
8      A    Of the original document.
9      Q    Is that correct?
10     A    That's correct.
11     Q    And so I presume that you saw the original
12  document before you certified that this was a copy?
13     A    That is correct, sir.
14     Q    As far as where the original document is located,
15  do you know where the original was located?
16     A    No, I do not know.
17     Q    So this particular document, basically, shows that
18  159,104 metric tons of corn is going to be shipped out of
19  Port of Brownsville being sold to someone in Mexico,
20  correct?
21     A    Correct.
22     Q    And it appears that the corn was going to be
23  loaded on November 4, 1996?
24     A    Correct.
25     Q    So it appears from this particular document that

PAGE 25

25
1  Mr. Elkins is acting as an agent for B. G. Grain; is that
2  correct?
3          MR. SKAGGS:  Ma'am, don't answer that
4  question as phrased. I object to that question based on
5  form.
6      Q    (Mr. Mount)  Concerning that particular question,
7  are you going to follow Mr. Skaggs' advice and not answer
8  it, or are you willing to answer it?
9          MR. SKAGGS:  No, she will not answer
10  questions that I instruct her not to answer.
11     Q    (Mr. Mount)  As far as -- as far as the record is
12  concerned, I need you to say either, yes, you're going to
13  answer it or --
14     A    I will follow Mr. Skaggs' advice.
15     Q    All right. So you're refusing to answer that
16  question, correct?
17          MR. SKAGGS:  Ma'am, I'm going to instruct you
18  that you don't have to engage in any kind of conversations
19  with him about whether you're going to follow your lawyer's
20  advice or not. I'll answer those kind of questions for you,
21  and I'm going to instruct you not to be guessing about legal
22  matters that have to do with what lawyers understand and
23  judges understand about what an agent is and who agents are
24  and things like that. And that's my instruction to you.
25          MR. MOUNT:  And I'll object to Mr. Skaggs'

SHEET 8   PAGE 26

**26**

1 speaking objection, as far as what he just told the witness.
2    Q    (Mr. Mount)  So in order to make the record clear,
3 you're refusing to answer the question I submitted you
4 earlier, correct?
5         MR. SKAGGS:  Don't answer that last question
6 that you were asked.
7    Q    (Mr. Mount)  Is that correct?
8         MR. SKAGGS:  I'm answering the question for
9 her, Counsel.  She's not going to answer those kind of
10 questions.
11    Q    (Mr. Mount)  Is that correct?
12         MR. SKAGGS:  Don't answer the question.  If
13 the question is asked again, ma'am, we will adjourn the
14 deposition.
15    Q    (Mr. Mount)  As far as this deposition is
16 concerned, do you consider Mr. Skaggs your lawyer for this
17 particular deposition?
18    A    That is correct.
19    Q    So as this deposition goes along, you will be
20 taking advice from Mr. Skaggs; is that correct?
21    A    You don't have to answer that
22 question, ma'am, and I'll instruct you that you don't have
23 to, and I will state for the record that I am the witness'
24 attorney for all purposes during the course of this
25 deposition and for other purposes outside the context of

**PAGE 27**

**27**

1 this deposition.
2    Q    (Mr. Mount)  Is Mr. Skaggs correct in what he
3 said?
4         MR. SKAGGS:  You can answer that one.
5    A    (Witness) Yes.
6    Q    Thank you.
7         (Deposition Exhibit No. 4 was marked.)
8    Q    (Mr. Mount)  Let me show you what we just marked
9 as Exhibit No. 4.  It's a two page document, it appears to
10 be a two page document.  Are you able to identify Exhibit
11 No. 4?
12    A    Yes, sir.
13    Q    Concerning Exhibit No. 4, your signature appears
14 in the bottom right-hand corner above the words "B. G.
15 Grain", correct?
16    A    Correct.
17    Q    And then also you notarized this particular
18 document, correct?
19    A    Correct.
20    Q    And the purpose for you notarizing this particular
21 document is to certify that this is a true and correct copy
22 of the original, correct?
23    A    Correct.
24    Q    The original would be at Port Elevator-
25 Brownsville, L.C., correct?

**PAGE 28**

**28**

1    A    I didn't understand your question.
2    Q    The original document -- where would the original
3 document be located?
4    A    I believe the original document would go to the --
5 to the company who bought the product.
6    Q    So as far as the company who bought the product,
7 who is the company that bought the product?
8    A    Marchantex.
9    Q    That is a company out of Monterrey, Mexico?
10    A    Yes, sir.
11    Q    Now this particular invoice is involving 133,657
12 metric tons of corn; is that correct?
13    A    That's correct.
14    Q    The date the corn was loaded would have been
15 November 5, 1996?
16    A    That's correct.
17    Q    So as far as this particular invoice is concerned,
18 Port Elevator-Brownsville, L.C. would have kept a copy of
19 the document; is that right?
20    A    Yes, sir.
21    Q    And you say the original would have gone to the
22 company from Mexico, right?
23    A    Yes, sir.
24    Q    And as far as it being shipped out, how was the
25 corn shipped out?

**PAGE 29**

**29**

1    A    By truck.
2    Q    As far as this particular document is concerned,
3 Exhibit No. 4, do you know who created this document?
4    A    It was created in the elevator office.
5    Q    And as far as being created, was it created by
6 you?
7    A    I believe so.
8    Q    And then you would assign the document for -- or
9 actually you signed it by Maria Gonzalez for B. G. Grain,
10 correct?
11    A    Correct, sir.
12    Q    And B. G. Grain, to your understanding, stands for
13 Bersain Gutierrez Grain?
14    A    Yes, sir.
15    Q    As far as the person that gave you instructions
16 to create this document, Exhibit No. 4, who was the person that
17 gave you the instructions to create the document?
18    A    I do not remember.
19    Q    So as far as creating the document, you just can't
20 recall who it was?  As far as who asked you to create this
21 document you can't recall, correct?
22    A    No, I can't recall.
23    Q    But you would agree with me that you were acting
24 for Mr. Gutierrez when this document was created, correct?
25    A    Correct, sir.

SHEET 9   PAGE 30

30

1  Q   So then you were acting as his agent, as far as
2  this document is concerned, correct?
3           MR. SKAGGS: Ma'am, you do not have to
4  comment on a legal conclusion and I'll instruct you not to
5  do so. I'll object to that question as calling for a legal
6  conclusion.
7  Q   (Mr. Mount) Are you refusing to answer that
8  question?
9           MR. SKAGGS: Do not answer questions
10 inquiring whether you're going to follow your lawyer's
11 instructions. You do not have to answer questions like
12 that, ma'am.
13 Q   (Mr. Mount) Would you agree with me, ma'am, that
14 you were acting as Bersain Gutierrez' representative when
15 you created and you signed this particular document, Exhibit
16 No. 4?
17          MR. SKAGGS: You can answer that, if you
18 know.
19 A   (Witness) Would you repeat your question?
20 Q   Okay. Would you agree with me that when you
21 created and you signed this particular document concerning
22 the corn that was going to be shipped into Mexico, Exhibit
23 No. 4, that you were acting as Mr. Gutierrez'
24 representative?
25 A   Correct, sir.

PAGE 31

31

1  Q   Also, in this particular document, there is
2  another signature of a Mr. Gomez; is that correct?
3  A   I see it on here.
4  Q   Did he sign in your presence or do you know?
5  A   No, sir. He did not.
6  Q   Do you know who Mr. Gomez is?
7  A   No, I do not.
8  Q   And this invoice basically shows that the corn is
9  going to be shipped out by truck?
10 A   That is correct.
11 Q   Appears to be two different trucks?
12 A   Four.
13 Q   Four. Then on the following page, the next page,
14 does your signature appear to be on the next page?
15 A   Correct, sir.
16 Q   And your -- and concerning that particular
17 signature, you were acting as an agent for B. G. Grain at
18 the time, correct?
19          MR. SKAGGS: Ma'am, don't answer lawyer
20 questions that have to do with legal opinions. I object to
21 that question as calling for a legal conclusion.
22          MR. MOUNT: Mr. Skaggs, her signature appears
23 right above the term 'agent for B. G. Grain'. Are you still
24 refusing to have her answer that question?
25          MR. SKAGGS: I don't mind you asking any

PAGE 32

32

1  question about a factual -- something that factually appears
2  in a document, but regarding her opinion about something,
3  I'll instruct her not to answer.
4  Q   (Mr. Mount) So I presume you're refusing to
5  answer that question, correct?
6           MR. SKAGGS: Well, reask your question.
7  We'll see.
8  Q   (Mr. Mount) Ma'am, your signature appears on this
9  particular document, page 2 of Exhibit No. 4, correct?
10 A   Correct.
11 Q   And when you signed on that particular document,
12 you signed as agent for B. G. Grain, correct?
13          MR. SKAGGS: Don't answer the question that
14 asks you in what capacity you signed. If he asks you a
15 question about what it says under your name, you can answer
16 that; but about whether you think that that has some legal
17 significance or whatever that actually means under the law,
18 don't answer those kind of questions, and I will instruct
19 you not to do that.
20 Q   (Mr. Mount) So I presume you will follow your
21 lawyer's advice, correct?
22          MR. SKAGGS: Okay. We'll go --
23 A   (Witness) Correct.
24          MR. SKAGGS: We will adjourn the deposition
25 at this time and we'll go off the record.

PAGE 33

33

1           MR. MOUNT: I'm refusing to go off the
2  record. If counsel will tell me why he wants to go off the
3  record.
4           MR. SKAGGS: Then you'll be taking pictures
5  of an empty chair, because I indicated that if we persist in
6  asking legal conclusion questions or if we persist in trying
7  to get a witness to state whether she's going to answer --
8  or take her lawyer's advice, that we will conclude the
9  deposition and take it under court supervision. She will
10 not answer those questions and she doesn't have to put up
11 with that, Bill. However you want to handle that, but you
12 can ask the court later on if you want her to -- if the
13 court wants to instruct her to say whether she's going to
14 answer questions that her lawyer has told her not to answer,
15 that's fine, but we don't have to continually have the
16 argument. We'll quit having it now. I'll bring her back,
17 but I'm not going to have her answer questions like that
18 unless the court tells us -- unless the judge tells us we
19 have to.
20          MR. MOUNT: What I need from you is if
21 there's a question she's not going to answer, I generally
22 need to hear that from her that she's not going to answer
23 it. So if I certify it to the judge and ask the judge to
24 have her answer it, I can do so.
25          MR. SKAGGS: I don't believe that's correct,

SHEET 10   PAGE 34

34

1  and I don't believe you can ask her that question.  If the
2  judge tells me I'm wrong, then the judge tells her to answer
3  that question, then she will, but if asked repeatedly, I'll
4  adjourn the deposition and you can take a picture of an
5  empty chair for the rest of the day, but she's not going to
6  have to answer that question unless a judge tells her she
7  does.  She's been instructed not to answer.  I am her
8  lawyer.  I've told her not to.  If she's going to get in
9  trouble about it, she's not going to get in trouble, I am,
10  because I'm the one who told her not to do it, if it's
11  wrong.
12          MR. MOUNT:  Well, I need an agreement from
13  you, I guess, that every time she's not going to answer a
14  ques -- when you say she's not going to answer a question, I
15  need an agreement from you that she's going to follow her
16  lawyer's advice.  That's what I need to know, because --
17          MR. SKAGGS:  I will agree that she's going to
18  follow --
19          MR. MOUNT:  -- sometimes witnesses don't
20  follow their lawyer's advice.
21          MR. SKAGGS:  Yeah.  I will agree that she's
22  going to follow her lawyer's advice.
23          MR. MOUNT:  Okay.  Well, with that
24  understanding, then we can proceed.
25          MR. SKAGGS:  Okay.  Sure.

PAGE 35

35

1      Q    (Mr. Mount)  Okay.  And I don't think that I got
2  an answer to my last question, which is that you signed your
3  name, Maria Gonzalez, and below that it says "agent for B.
4  G. Grain"; is that correct?
5          MR. SKAGGS:  You can answer that question.
6      A    (Witness)  That's correct.
7      Q    All right.  And as far as the shipment of corn is
8  concerned, this was corn that was shipped on November 5,
9  1996; is that right?
10     A    That's correct.
11     Q    As far as S. Lee Gonzalez is concerned, who is S.
12  Lee Gonzalez?  Do you see her name on page 2 above the words
13  "Rio Grande Valley Chamber of Commerce"?
14     A    She was an employee of the Elevator.
15     Q    So this particular document would have been signed
16  by you and by Ms. Gonzalez at the Elevator, correct?
17     A    That's correct, sir.
18     Q    What is her title or her job duty at the Elevator?
19     A    She was a clerk at the Elevator at the time.
20     Q    Does she still work at the Elevator?
21     A    No, she does not, sir.
22     Q    And by Elevator, we're referring to Port Elevator-
23  Brownsville, L.C., correct?
24     A    That's correct.
25     Q    When did she cease or quit working for the

PAGE 36

36

1  Elevator?
2      A    I do not recall the -- the exact date.
3      Q    Do you know why she doesn't work there any longer?
4      A    She chose to stay home.
5      Q    As far as the Exhibit No. 4, the corn being
6  shipped out to Mexico, this is all corn that would have come
7  in to the Elevator on October 30, 1996?
8      A    Could you rephrase your question, please?
9      Q    Sure.  It appears that about two thousand, forty
10  -- two thousand, four hundred and forty-four metric tons of
11  corn came to the Elevator on or about October 30, 1996?
12     A    Correct, sir.
13     Q    And the corn that was being shipped out on
14  November 5, 1996 was a portion of that corn, correct?
15     A    Correct.
16     Q    And that two thousand, four hundred and forty-four
17  metric tons of corn that I just referred to earlier, that's
18  corn dealing with the invoice that I showed you, which is
19  Exhibit No. 2, I believe?
20     A    Correct, sir.
21     Q    Then the corn that were shipped out that we talked
22  about concerning Exhibit No. 3, that is a portion of the
23  corn that's referenced in Exhibit No. 2, also, correct?
24     A    Correct.
25     Q    As far as Exhibit No.'s 3 and 4 go, they both have

PAGE 37

37

1  an F.O.B. value on them, correct?
2      A    That's correct.
3      Q    As far as F.O.B., that stands for what, for free
4  on board?
5      A    I do not really know.
6      Q    Okay.  When a value is placed, what is that
7  particular value, when it says F.O.B. value?  Do you know
8  what that means or is?
9      A    No, I do not.
10     Q    So when there's a dollar sign, say on Exhibit No.
11  3, and it says $33,411.04, do you know what that is in
12  regard to?
13     A    To the value of the corn on that invoice.
14     Q    So that would be the value of the corn that's
15  being shipped out to Mexico?
16     A    Correct.
17     Q    As far as determining the value, how is the value
18  determined?
19     A    The owner determines the value.
20     Q    Okay.  So for Exhibit No. 3, you already told me
21  you typed up this document, correct, Exhibit No. 3?
22     A    Yes.
23     Q    Okay.  Where did you obtain the information to put
24  the value of the corn?
25     A    I do not recall.

Port Elevator-Brownsville V. Ivonne Soto Vega
DEPOSITION OF MARIA GONZALEZ
6-22-01

SHEET 11  PAGE 38

38
```
1     Q    And then also Exhibit No. 4 you typed up, too; is
2  that right?
3     A    Correct.
4     Q    As far as getting the value of $28,087.97, do you
5  recall where you got that number from, that is who gave you
6  that number?
7     A    There's a price on here of $210 per metric ton.
8     Q    Right. Okay. And so you probably would have
9  multiplied the $210 times the number of metric tons to get
10 the value, correct?
11    A    Correct.
12    Q    As far as getting the price is concerned, do you
13 know where you would have gotten the price from?
14    A    It would have to come from the owner of the
15 product.
16    Q    And when you say the owner of the product, do you
17 mean the buyer or the seller?
18    A    Seller.
19    Q    And as far as obtaining that information, you
20 can't recall who it was that you spoke to to get that two
21 dollars and ten cents per metric ton price?
22    A    No, I do not recall.
23    Q    And so as far as getting that particular price, do
24 you recall if you --
25         MR. MOUNT:  Scratch that.
```

PAGE 39

39
```
1         (Deposition Exhibit No. 5 was marked.)
2     Q    (Mr. Mount) Let me show you what we just marked
3  as Exhibit No. 5. Have you seen Exhibit No. 5 before?
4     A    The invoice, yes, sir.
5     Q    This is invoice number BG3. That's what it says
6  in the right-hand corner; is that correct?
7     A    Correct, sir.
8     Q    And as far as this invoice is concerned, your
9  signature appears in the bottom right-hand corner under the
10 words "B. G. Grain", correct?
11    A    Correct.
12    Q    Then also you notarized this particular document
13 as being a true and correct copy of the original, correct?
14    A    Correct.
15    Q    And then we also see a signature of a Mr. Gomez,
16 correct?
17    A    I see it on here now, yes.
18    Q    Okay. But as far as Mr. Gomez is concerned,
19 you've already told us that you don't know who Mr. Gomez is,
20 correct?
21    A    That's correct, sir.
22    Q    Now this was, again, corn that was shipped into
23 Mexico from the Port of Brownsville?
24    A    From Port Elevator, sir.
25    Q    Okay. And that corn had a value of $17,685.15,
```

PAGE 40

40
```
1  correct?
2     A    Correct, sir.
3     Q    And, again, it's the same unit price on the other
4  two invoices, two dollars and -- two hundred and ten
5  dollars.
6     A    That's correct.
7     Q    Then on the second page of this two page exhibit,
8  your signature appears on the second page, correct?
9     A    Correct.
10    Q    And, by the way, this is a document that would
11 have been created at Port Elevator-Brownsville, L.C.,
12 correct?
13    A    Correct.
14    Q    And most likely you would have created it,
15 correct?
16    A    Correct.
17    Q    And then your signature appears above the words
18 "agent for B. G. Grain", correct?
19    A    Correct.
20         MR. SKAGGS:  That's something you can answer,
21 yes, ma'am.
22    Q    (Mr. Mount) And then did we see Ms. -- or do we
23 see Ms. Gonzalez' signature on this particular document?
24    A    That's correct.
25    Q    Her document (sic) appears in the lower right-hand
```

PAGE 41

41
```
1  corner, correct?
2     A    Correct.
3     Q    And as far as whether you were acting as an agent
4  or not for B. G. Grain, you're not going to let me know
5  that, right?
6         MR. SKAGGS:  Not if she doesn't know. I'll
7  take the witness on voir dire at this point. I will ask
8  you, ma'am, do you have a legal education?
9         WITNESS:  I do not.
10        MR. SKAGGS:  Do you have a legal degree, a
11 lawyer's degree?
12        WITNESS:  No, I do not.
13        MR. SKAGGS:  Are you licensed to practice law
14 in the state of Texas?
15        WITNESS:  No, I am not.
16        MR. SKAGGS:  With that predicate, I am going
17 to continue to instruct her not to answer questions that
18 call for a legal conclusion about the legal definition of
19 agency, irrespective of what it says under her signature. I
20 don't lodge an objection to you asking her what the actual
21 words are on the printed page under her signature; just what
22 they mean is something I'm not going to let her go there
23 without any more background or education. I object on that
24 basis, and make the instruction on that basis, as well.
25    Q    (Mr. Mount) As far as this particular shipment
```

SHEET 12  PAGE 42          PAGE 43

**42**

1  was concerned, this involved one truckload of corn, correct?
2  And, again, we're referring to Exhibit No. 5.
3      A    That is two truckloads.
4      Q    That's correct.  We have two license numbers,
5  correct?
6      A    Correct, sir.
7      Q    Okay.  And then, again, this is the same corn
8  that's referenced in Exhibit No. 2, the invoice that I
9  showed you earlier?
10     A    Correct, sir.
11     Q    And as far as creating this invoice, you don't
12 recall who it was that asked you to create Exhibit No. 5,
13 correct?
14     A    Would you rephrase --
15     Q    Okay.  This particular invoice that's created that
16 says BG3?
17     A    Yes.
18     Q    You don't recall who asked you to create it,
19 correct?
20     A    That's part of our work when trucks are loaded.
21     Q    But I guess the question is you don't recall who
22 it was that asked you to create it, this invoice?  In other
23 words, who asked you to create this invoice, do you recall?
24     A    No, I do not.
25         (Deposition Exhibit No. 6 was marked.)

**43**

1      Q    (Mr. Mount)  Let me show you what we just marked
2  as Exhibit No. 6, and it appears to be an invoice number BG
3  number 4, and ask you if you are able to identify that one?
4      A    Yes, sir.
5      Q    This document has your signature on the lower
6  right-hand corner above the words "B. G. Grain", correct?
7      A    Correct, sir.
8      Q    And it's your understanding B. G. Grain stands for
9  Bersain Gutierrez Grain, correct?
10     A    That's what I believe, sir.
11     Q    Then your signature appears above your name where
12 it says "notary public" also, correct?
13     A    Correct, sir.
14     Q    And it appears that you certified that this was a
15 true and correct copy of the document on August 27, 1997,
16 correct?
17     A    Correct, sir.
18     Q    And this is a document that would have been
19 created at Port Elevator-Brownsville, L.C., Exhibit No. 6,
20 correct?
21     A    Correct.
22     Q    As far as its creation date, would it have been
23 created on or about November 6, 1996?
24     A    Correct.
25     Q    So then you weren't asked to certify that it was a

PAGE 44          PAGE 45

**44**

1  copy until about ten months later, nine or ten months later,
2  right?  In other words, you were -- in other words, the
3  document was created on November 6, 1996, and that's the
4  date you signed it, yet you didn't swear that it was a true
5  and correct copy of the document until August 27, 1997,
6  correct?
7      A    I do not recall this.
8      Q    Well, if we look at each of those documents that
9  I've showed you --
10     A    Yes.
11     Q    -- starting with Exhibit No. 3, and go 3, 4, 5 and
12 6, each of those shows that you notarized them on August 27,
13 1997.
14     A    1997.
15     Q    Right.  Yet, each of the documents -- if we look
16 at Exhibit No. 3, was created on November 4, 1996; Exhibit
17 No. --
18         MR. MOUNT:  Scratch that.
19     Q    (Mr. Mount)  Exhibit No. 3 was created on November
20 4, 1996.  Exhibit No. 4 was created on November 5, 1996, and
21 then Exhibits 5 and 6 were created on November 6, 1996,
22 correct?
23     A    Correct.
24     Q    Are you aware of why it was that you -- or can you
25 tell the jury why it was that you notarized these particular

**45**

1  documents, each of these four documents, on August 27, 1997?
2      A    I do not recall.
3      Q    In order to put your notary seal on them, these
4  four documents, Exhibits 3 through 6, do you recall if you
5  would have looked at the original and compared it to the
6  copy before you notarized the document?
7      A    That is correct.
8      Q    But earlier you said the originals would have gone
9  with the corn into Mexico, right?
10     A    With the broker, yes.
11     Q    With the broker?
12     A    That's correct.
13     Q    So do you recall who it was that you would have
14 seen the originals in order to say these were copies of the
15 originals?
16     A    I do not recall, sir.
17     Q    And as far as the broker is concerned for these
18 four shipments of corn contained in Exhibits 3 through 6, do
19 you know who the broker would have been?
20     A    I do not recall.
21     Q    As far as trying to attempt to recall, are there
22 any documents that you could look at at Port Elevator that
23 would help you to recall?
24     A    No, sir.
25         (Deposition Exhibit No. 7 was marked.)

SHEET 13   PAGE 46

PAGE 47

**46**

1  Q    (Mr. Mount)  Let me show you Exhibit No. 7.
2  That's a two page exhibit that has your signature on both
3  pages of it, right?
4  A    Correct.
5  Q    And this is invoice number BG5, correct?
6  A    Yes.
7  Q    This particular document would have been created
8  at Port Elevator-Brownsville, L.C., correct?
9  A    Correct.
10  Q    Your signature is on the first page of the
11  document above the words "B. G. Grain" or "Bersain Gutierrez
12  Grain", correct?
13  A    Correct.
14  Q    And on the second page your signature is above the
15  term "agent for B. G. Grain", correct?
16  A    Correct.
17  Q    This is involving five truckloads of corn,
18  correct?
19  A    Correct.
20  Q    Again, this is the same corn involved in the
21  invoice number 2, correct?
22  A    Correct.
23  Q    This corn has a value of -- appears to have a
24  value of $38,700.04, correct?
25  A    That's correct, sir.

**47**

1  Q    And, again, it's based on a unit price of $210?
2  A    That's correct, sir.
3  Q    Then, again, you notarized this saying it was a
4  true and correct copy of the original on August 27, 1997,
5  correct?
6  A    Correct.
7  Q    But the document was created on November 12, 1996,
8  correct?
9  A    That's correct, sir.
10  Q    And then Ms. Gonzalez' signature also appears on
11  the second page of the document?
12  A    Correct.
13  Q    As far as this particular document and you saying
14  it's a copy on August 27, 1997, of the original, you don't
15  know why you did it on that particular day, correct?
16  A    I do not recall.
17  Q    As far as these exhibits are concerned, Exhibits 3
18  through 7, these are all invoices from or concerning B. G.
19  Grain, correct?
20  A    Correct.
21  Q    I believe we have invoice numbers BG1 through BG5,
22  correct?
23  A    Correct.
24  Q    As far as these invoices are concerned, each of
25  these invoices concern corn that was truckloaded out of Port

PAGE 48

PAGE 49

**48**

1  Elevator-Brownsville, L.C., right?
2  A    Correct.
3  Q    You say these documents would have gone along with
4  the broker, right?
5  A    Correct.
6  Q    And you don't know who the broker is, right?
7  A    I do not recall.
8  Q    As far as other documentation that would have gone
9  along with the broker, do you know of any other
10  documentation that would generally go along with the broker,
11  other than what you've -- what we've looked at, Exhibits 3
12  through 7?
13  A    Weight tickets.
14  Q    As far as the weight tickets are concerned, those
15  are something that is created at Port Elevator-Brownsville,
16  L.C., correct?
17  A    Correct.
18  Q    The corn is weighed somehow before --
19  A    That's correct.
20  Q    What other documentation, generally, would go
21  along with the corn?  And, again, I'm referring to Exhibits
22  3 through 7 concerning the corn that was shipped into
23  Mexico.
24  A    Weight ticket and invoice.
25  Q    Okay.  So we have the invoices here, 3 through 7,

**49**

1  right?
2  A    Uh-huh.  That's correct.
3  Q    Okay.  And then weight tickets, too, right, that
4  would go along?
5  A    That's correct.
6  Q    Then what about any documentation to show the
7  quality or the origin of the corn?  Any type of documents
8  that --
9  A    The quality.
10  Q    And, for instance --
11  A    A grade.
12  Q    Would we have like a certificate of quality
13  document that would go along with the corn?
14  A    I believe so, yes.
15  Q    And what about a certificate of origin document,
16  would that go along with the corn to?
17  A    No, sir.
18  Q    What is a certificate of origin document, if you
19  know?
20  A    No.
21  Q    What about a -- I think it's called a phyto
22  sanitary certificate?
23  A    Okay.
24  Q    Are you familiar with those?
25  A    Yes, sir.

SHEET 14 PAGE 50

PAGE 51

**50**

1  Q   Do those go along with the corn, too?
2  A   Yes, sir; that's correct.
3  Q   What is a -- what's your understanding of what a
4  phyto sanitary certificate is?  I mean, what is it?
5  A   It's a government certificate by the USDA that
6  states the amount of trucks, rail and weight, and the origin
7  of the product and type of product.
8  Q   It's a document that's created by the government,
9  right?  It's created by the government or the Department of
10 Agriculture?
11 A   Yes.  That's correct.
12 Q   Generally, that would go along with the corn, too?
13 A   Yes.
14 Q   And then can you think of anything else, any other
15 paperwork that might go along with the corn?
16 A   No, sir.
17 Q   At Port Elevator-Brownsville, L.C., does the
18 business -- do they issue warehouse receipts for either corn
19 or grain that they hold?
20 A   I believe so, yes.
21 Q   And as far as those warehouse receipts being
22 issued, who generally issues them?
23 A   Rephrase your question.
24 Q   Okay.  You mentioned that warehouse receipts --
25 A   Yes.

**51**

1  Q   -- sometimes are issued by Port Elevator-
2  Brownsville, L.C.  I'm trying to find out whether it's Mr.
3  Elkins that issues these receipts or is it some other person
4  that might issue them?
5  A   It would be Mr. Elkins.
6  Q   Do you ever issue warehouse receipts?
7  A   No, sir.  I do not.
8  Q   Okay.  So you've never done that, right?
9  A   No.
10 Q   As far as where you work at Port Elevator-
11 Brownsville, L.C., where is it that you work in relation to
12 where Mr. Elkins works or has his office?
13 A   It's the same building, different offices.
14 Q   Okay.  Do you have your own office within the
15 building or are you outside in a general area?
16 A   Outside in a general area.
17 Q   Is your area close to where Mr. Elkins is?
18 A   Yes.
19 Q   About how far is where you work from where his
20 office is?
21 A   From here to the window.
22 Q   So -- I mean, I'm not very good at figuring that
23 out, but that's not very far away, is it?
24 A   No, sir.
25 Q   Okay.  And you work at a desk, right?

PAGE 52

PAGE 53

**52**

1  A   That's correct.
2  Q   I presume Mr. Elkins has a desk in his office?
3  A   That's correct.
4  Q   As far as a shipment of corn or grain coming into
5  Port Elevator-Brownsville, L.C., what is the general
6  protocol or what have you, as far as corn or grain that's
7  coming in by train?  How is that usually handled?
8  A   Would you rephrase -- I mean repeat your question,
9  please?
10 Q   Okay.  When Port Elevator-Brownsville, L.C.
11 receives a shipment of grain or corn by train into the
12 facility, based on your own knowledge, how is the -- how is
13 it usually handled, as far as the trainload coming in?
14 A   That's handled by Mr. Elkins, so -- I don't really
15 understand your question as to --
16 Q   I'm trying to find out what the process is.  In
17 other words, is it weighed when it comes in?
18 A   Yes.
19 Q   That would be one question.
20 A   Yes.
21 Q   Okay.
22 A   Okay.
23 Q   So -- and as far as being involved in the
24 weighing, you're not involved in that?
25 A   No.  No, I am not.

**53**

1  Q   And then as far as the documentation that comes
2  with the trainload, is there any type of documentation that
3  will come with a trainload of corn, based on your knowledge?
4  A   Not -- no.  I don't handle that, so I would not
5  know.
6  Q   Okay.  Let me ask you this.  On days that Mr.
7  Elkins is out traveling, who would handle a shipment of corn
8  or grain that might come into the Elevator?
9  A   Let me ask, how would you -- what do you mean by
10 handle?
11 Q   Well, you mentioned that as far as shipments of
12 corn or grain coming into the Elevator, that usually Mr.
13 Elkins handles the corn or grain coming in, as far as --
14 A   The paperwork involved.
15 Q   -- as far as the paperwork?
16 A   Yes.
17 Q   As far as the paperwork, correct?  And Mr. Elkins
18 travels a lot, does he not?
19 A   Correct.
20 Q   On days that he's out traveling and he's not in
21 the office and you may get a shipment of corn or grain by
22 train in, who would handle the paperwork on those days?
23 A   Everything has been -- he has left everything
24 prepared in advance for any incoming or outgoing shipments.
25 Q   All right.  So even if he's out traveling or what

Port Elevator-Brownsville V. Ivonne Soto Vega
DEPOSITION OF MARIA GONZALEZ
6-22-01

SHEET 15  PAGE 54

54

1  have you, he's aware of what's going --
2      A    That's correct.
3      Q    It's your understanding he's aware of what's going
4  on?
5      A    That is correct.
6      Q    Okay. And so then it's your understanding that he
7  handles all the paperwork concerning the shipments that are
8  coming in, even if he's out of town?
9      A    That is correct.
10     Q    As far as your deposition is concerned, did you
11 get to see Exhibit 1 prior to your deposition, which is the
12 deposition notice along with the request for documents?
13     A    Yes.
14     Q    Okay. And as far as documents are concerned, did
15 you bring anything with you to your deposition that might be
16 responsive to the document request?
17     A    Notary log. Notary log.
18     Q    Okay. Let me -- if you could hand me the last
19 page and just let me ask you, number one asks for any and
20 all documents that you reviewed in preparation for your
21 deposition. Did you look at any documents?
22     A    A copy of --
23     Q    What you looked at was a copy of the invoice that
24 we marked as Exhibit No. 2, correct?
25     A    Correct.

PAGE 55

55

1      Q    And I presume that you went over this document
2  with your counsel or discussed it with your counsel?
3          MR. SKAGGS: Ma'am, you don't need to answer
4  that question about conversations you might have had with
5  your lawyer, and I will instruct you that you don't have to
6  answer that, and I'll object to that question.
7      Q    (Mr. Mount) Did you discuss this document at all
8  with Mr. Elkins prior to your deposition?
9          MR. SKAGGS: I'll instruct you that you don't
10 have to answer questions that have to do with conversations
11 between you and your employer who has been sued as a party
12 in this case that relate to the facts having to do with the
13 case. I'll object to that question and I will instruct you
14 not to answer that question as phrased.
15     Q    (Mr. Mount) So the only document you reviewed
16 prior to your deposition was probably your -- was Exhibit
17 No. 2 and your notary book, correct?
18     A    That's correct.
19     Q    Okay. And then number two, you brought your
20 notary public book for the years '96 through '98, right?
21     A    That's correct.
22     Q    Okay. And then number three we asked for any and
23 all documents in your possession, custody and/or control
24 related to the corn that is the subject of this dispute.
25          MR. SKAGGS: All of those documents are in

PAGE 56

56

1  the possession, custody, or control of her employer, Port
2  Elevator, so she has no such documents.
3      Q    (Mr. Mount) Number four asks for --
4          MR. MOUNT: And I presume that Port Elevator
5  has produced those documents already?
6          MR. SKAGGS: I don't know if --
7          MR. MOUNT: You don't know, okay.
8      Q    (Mr. Mount) Number four asks for your most recent
9  resume, if you have one. No?
10     A    I do not have one.
11     Q    You don't have one. Number five asks for your
12 file, your employee file with your employer.
13          MR. SKAGGS: And, again, that's in the
14 possession of her employer, and if asked of her employer,
15 we'll respond to it appropriately, but she does not have
16 possession, custody, or control of her employer's employee
17 file on her.
18     Q    (Mr. Mount) As far as the employee files there at
19 Port Elevator-Brownsville, L.C., who is the custodian of
20 those files or who keeps them in the daily course of
21 business?
22     A    Ask that question again, please.
23     Q    Okay. I presume that at Port Elevator-
24 Brownsville, L.C. you've got employee files on employees,
25 right?

PAGE 57

57

1      A    Correct.
2      Q    As far as the person that's in charge of record
3  keeping there, wouldn't that be yourself --
4      A    That's correct.
5      Q    -- as the bookkeeper? Okay. So you're in charge
6  of the employee files there, correct?
7      A    Correct.
8      Q    All right. So if -- say when Ms. Gonzalez was
9  working there and you needed to put something in her
10 employee file, you would be the one to do that?
11     A    Correct.
12     Q    Do you mind if I take a look at your notary book,
13 briefly? Thank you.
14          MR. MOUNT: Why don't we just go off the
15 record briefly.
16          MR. SKAGGS: Sure.
17          (OFF THE RECORD) (11:30-11:39)
18          (Deposition Exhibit No. 8 was marked.)
19     Q    (Mr. Mount) Let me show you Exhibit No. 8. Do
20 you recognize Exhibit No. 8 as being excerpts from your
21 notary public record book?
22     A    Correct.
23     Q    Those particular records are records that you keep
24 in the ordinary course of your business as a notary public,
25 correct?

SHEET 16   PAGE 58

**58**

```
1      A    Correct.
2      Q    The entries made in that book are made at or near
3  the time of the events, act, or conditions reflected
4  therein, correct?
5      A    Correct.
6            MR. SKAGGS:  I'll stipulate that those are
7  authentic documents.
8            MR. MOUNT:  Thank you.  And you're
9  stipulating that they're her business records, correct?
10           MR. SKAGGS:  Well, yes, they're authentic for
11  all evidentiary purposes.  They're real.
12           MR. MOUNT:  Thank you.
13           MR. SKAGGS:  You're welcome.
14     Q    (Mr. Mount)  Concerning the issue or the matters
15  that we're here for, it's your understanding we're here over
16  a dispute over who owns some corn, correct?
17     A    Correct.
18     Q    And as far as that dispute goes, do you have any
19  evidence or know of any evidence that would show who owns
20  the corn that's in dispute?
21     A    No, I do not.
22     Q    And so, obviously, you don't have an opinion today
23  as to who owned the corn that is in dispute, correct?
24     A    Correct.
25     Q    And as far as any documents that have -- that
```

PAGE 59

**59**

```
1  you're aware of concerning the corn in dispute, really the
2  only thing you've ever seen has been Exhibit No. 2, that
3  commercial invoice that you notarized, correct?
4      A    Correct.
5      Q    And I guess -- I guess for clarity on the record,
6  you also saw Exhibits 3 through 7, which were BG invoices,
7  correct?
8      A    Correct.
9      Q    So as far as your knowledge is concerned, you
10  don't know who owns or owned the corn in dispute, right?
11     A    Correct.
12     Q    You're just here as a bookkeeper for Port
13  Elevator-Brownsville, L.C., right?
14     A    That is correct, sir.
15     Q    As a bookkeeper for Brownsville Port -- excuse me.
16  As a bookkeeper for Port Elevator-Brownsville, L.C., do you
17  ever cut checks for Mr. Elkins, as far as his salary is
18  concerned?
19     A    No, sir.  I do not.
20     Q    So as far as since you've been there since, I
21  think you said, 1970, you've never cut a check for him for
22  his salary, correct?
23     A    No, that is not correct, sir.
24     Q    It's your understanding that he's paid by
25  Southwest Grain Co., Inc.?
```

PAGE 60

**60**

```
1      A    I do not know.
2      Q    You don't know?
3      A    No.
4      Q    So you don't know how Mr. --
5      A    No.
6      Q    -- Elkins is compensated, right?
7      A    No.
8      Q    And at least since 1996 you haven't known how he's
9  been compensated, correct?
10     A    That's correct, sir.
11     Q    And as far as the number of employees there at
12  that particular business is concerned, Port Elevator-
13  Brownsville, L.C., how many employees does the business
14  have?
15     A    At the moment?
16     Q    Yes.
17     A    Twenty.
18     Q    Twenty.  And as far as the hierarchy is concerned,
19  Mr. Elkins would be at the top of the hierarchy; is that
20  right, or would there be someone else at the top?
21     A    At Port Elevator?
22     Q    Right.  Who runs the Port Elevator?
23     A    Mr. Craig Elkins.
24     Q    Okay.  And are there any lieutenants or anybody
25  right under him that assist him?
```

PAGE 61

**61**

```
1      A    We have a foreman.
2      Q    Okay.  And what is the foreman's name?
3      A    Porfirio Vela.
4      Q    How long has Mr. Vela been there?
5      A    Ten years.
6      Q    What does Mr. Vela do?
7      A    He's a foreman at the Elevator.
8      Q    And what do foremen do?  For instance, what does
9  he do on a daily basis that you see that he does?
10     A    Carries out the instructions from Mr. Craig
11  Elkins.
12     Q    And does Mr. Elkins have anybody else that's right
13  under him that helps him besides Mr. Vela?
14     A    Not at the Elevator.
15     Q    Are there other businesses that Mr. Elkins is into
16  other than the business at the Elevator?
17     A    I do not know.
18     Q    So you don't know what other businesses he might
19  be into?
20     A    No.  I do not know, sir.
21     Q    When he's at the Elevator, does he ever conduct
22  work concerning other businesses, while he's at the
23  Elevator?
24     A    I would not know, sir.
25     Q    Besides yourself and Mr. Vela, can you think of
```

Port Elevator-Brownsville V. Ivonne Soto Vega
DEPOSITION OF MARIA GONZALEZ
6-22-01

SHEET 17    PAGE 62

62

1  any other employees that have been there for a long period
2  of time?
3      A    Yes.
4      Q    Could you give me some of those names?
5      A    Juan Antonio Dorado; Leocardio Gutierrez;
6  (phonics) Juventino Abrego; Leonardo Gamez.
7      Q    How long has Mr. Alvarado been there?
8      A    Alvarado?
9      Q    Didn't you say Juan Antonio --
10     A    Dorado.
11     Q    Dorado. Okay. How long has Mr. Dorado been
12 there?
13     A    He's been there since 1970.
14     Q    And then Mr. Gutierrez?
15     A    Same.
16     Q    Mr. Abrego?
17     A    Same.
18     Q    Mr. Gomez?
19     A    Gamez.
20     Q    Gamez.
21     A    Same.
22     Q    What does Mr. Dorado do?
23     A    He works in the control room, the weigh in, in the
24 control room.
25     Q    What does Mr. Gutierrez do?

PAGE 63

63

1      A    I believe he works in the basement.
2      Q    And then Mr. Abrego, what does he do?
3      A    I believe he's in the head house.
4      Q    What does he do in the head house?
5      A    I really do not know.
6      Q    Mr. Gamez. Do you know what Mr. Gamez does?
7      A    Maintenance.
8      Q    You write checks for all of these people, right?
9      A    That is correct.
10     Q    You pay them, right?
11     A    Yes.
12     Q    Okay. As far as preparing storage charges on corn
13 or grain that's being held at the Elevator, who is it that
14 prepares the bills on those storage charges?
15     A    Mr. Elkins.
16     Q    So as far as preparing those type of bills, those
17 aren't something that you do, right?
18     A    I just input into computer.
19     Q    Okay. So Mr. Elkins might give you some
20 information in order to create a bill; is that right?
21     A    That is correct.
22     Q    Okay. You mentioned earlier that you met Ms. Vega
23 on one occasion, right?
24     A    She came by the office, yes.
25     Q    Do you recall when it was she came by the office?

PAGE 64

64

1      A    I'm sorry?
2      Q    Do you recall when it was that she came by the
3  office?
4      A    No.
5      Q    When she came by the office, she spoke to you, I
6  presume. Did she speak to you?
7      A    Yes, she did.
8      Q    Do you recall what was discussed when you spoke
9  with her?
10     A    She wanted to talk to Mr. Craig Elkins. I believe
11 he was out of town at the time.
12     Q    Was there anybody else with her when she came to
13 try and meet with Mr. Elkins?
14     A    I do not recall.
15     Q    Do you recall anything else regarding that
16 conversation other than she came and talked to you about
17 wanting to speak with Mr. Elkins?
18     A    No.
19     Q    Do you recall if you've ever spoken with Ms. Vega
20 on the telephone?
21     A    No, I have not.
22     Q    As far as her coming to the Elevator, and that
23 would be Ms. Vega, you can't recall what year it was, right?
24     A    I don't know if it was '97 or '98.
25     Q    So, in your mind, it could have been one of those

PAGE 65

65

1  two years, either '97 or '98?
2      A    That's correct.
3      Q    Have you ever discussed this particular -- well,
4  actually, have you ever discussed with Mr. Elkins this
5  dispute concerning the corn that we're here for today?
6      A    No, I have not.
7      Q    As far as speaking to Mr. Gutierrez, I think you
8  saw him on, what, two occasions?
9      A    I believe so, yes.
10     Q    And as far as any conversations that you ever had
11 with him, can you recall any of your conversations that you
12 ever had with him?
13     A    No.
14     Q    Have you ever spoken with him on the telephone?
15     A    If he called, yes, to speak to Mr. Elkins.
16     Q    Okay. But you never spoke to him about any
17 elevator business?
18     A    No. No, I did not.
19     Q    That is if he ever called, you would have passed
20 the call directly on to Mr. Elkins?
21     A    He would call to speak to him, yes.
22     Q    Have you ever met Guillermo Vega?
23     A    No.
24         MR. MOUNT: I believe at this time I'll pass
25 the witness. (11:51)

*Compliments of Action Reporting*
1-800-884-1024 / 956-631-1024

SHEET 18  PAGE 66

66
1         MR. SKAGGS: Thank you, Counsel.
2              E X A M I N A T I O N
3 BY MR. SKAGGS:
4    Q   Ms. Gonzalez, you understand that this deposition
5 might not be read to or presented to the jury in the same
6 order it was taken, and so I might have to ask you some
7 questions that you've already answered?  Do you understand
8 that?
9    A   Yes, sir.
10   Q   And you'll bear with me while I do that?
11   A   Yes, sir.
12   Q   Please state your name for the record.
13   A   Maria Gonzalez.
14   Q   And, Ms. Gonzalez, what did you do for a living,
15 what did you do for a job, back in 1996?
16   A   1996 I was employed by Port Elevator-Brownsville.
17   Q   You have been employed at the Port of Brownsville
18 for how many years?
19   A   Going on thirty-one.
20   Q   Before you worked for Port of Brownsville, did you
21 work for the Brownsville Navigation District?
22   A   That is correct.
23   Q   And when did you start working for the Brownsville
24 Navigation District?
25   A   August the 17th of 1970.

PAGE 67

67
1    Q   And then you continued to work at the Brownsville
2 Navigation District and ultimately went to work specifically
3 at the grain elevator that's at the Port; is that right?
4    A   That's correct.
5    Q   So you start working at the grain elevator that's
6 at the port before Craig Elkins became associated with the
7 grain elevator?
8    A   That's correct.
9    Q   So you've been there as an employee at the grain
10 elevator even before the present owners or managers of the
11 Elevator were there; is that correct?
12   A   That's correct.
13   Q   During all of that time, have you, basically, done
14 the same thing at the Elevator?  And by that, I mean have
15 you had the same kind of job duties and so forth, or did
16 they change when the new owners or manager --
17   A   They changed some.
18   Q   In 1996, what kind of work did you do for the
19 Elevator?
20   A   Payroll, general ledger, accounts payable.
21   Q   Kind of the bookkeeper; is that right?
22   A   Kind of bookkeeper, yes.
23   Q   All right.  In connection with that employment,
24 you handle certain documents and you file certain documents
25 and so forth; do you do that?

PAGE 68

68
1         MR. MOUNT: Objection, leading.
2    Q   (Mr. Skaggs) Tell me what you do -- what your
3 involvement with document handling is.  What do you do with
4 documents when -- that you have to handle in the Elevator?
5    A   Documents would be like weight certificates and do
6 phytos on things that are exported, that are going into
7 Mexico?
8    Q   Whatever it is that you might handle on a day-to-
9 day basis.  What do you do with them?
10   A   That would be about it.  I prepare the phyto
11 sanitary certificates.
12   Q   All right.  Are you the filing person for the kind
13 of documents that have to do with the things that you're
14 involved with as a bookkeeper?
15   A   Yes.
16   Q   All right.  Separate and apart from your job and
17 your duties at Port Elevator, are you also a State official?
18   A   Notary public.
19   Q   Your notary public commission comes from the State
20 of Texas, is that correct?
21   A   That is correct.
22   Q   Port Elevator-Brownsville does not issue your
23 notary public certificate; is that right?
24        MR. MOUNT: Object to form, leading.
25   Q   (Mr. Skaggs) Do you know whether Port Elevator

PAGE 69

69
1 issues your notary public certificate?
2    A   They do not.
3    Q   Do you understand that you're bound by statutes
4 and rules and regulations that govern the behavior of a
5 notary public?
6        MR. MOUNT: Objection, leading and calls for
7 a legal conclusion.
8    A   (Witness) That's correct.
9    Q   Have you eve read any of the statutes or
10 regulations or rules that have to do with being a notary
11 public?
12   A   Yes.
13   Q   Do you know whether or not you have any particular
14 duties as a notary public?
15   A   Would you repeat your question?
16   Q   Well, do you have any understanding about the kind
17 of things you can and can't do as a notary public -- as a --
18 as a State official?
19   A   Yes.
20   Q   And, generally, what are those rules?
21        MR. MOUNT: Object -- object as calling for a
22 legal conclusion.
23   Q   (Mr. Skaggs) I only ask you for the rules that
24 you know about or are aware of sitting here that you've read
25 about.  I'm not going to ask you what your opinion of those

SHEET 19   PAGE 70

70

1 rules is. I just want to know which ones you know about,
2 what you understand from your reading of those.
3     A   When you notarize a signature of a person, that
4 person must be present. You must see his ID to be sure he
5 is the person that he claims, you know, to be.
6     Q   Right. Do you purchase and are you subject to a
7 bond as a notary public to secure the proper function of
8 your duties?
9         MR. MOUNT: Objection, leading.
10     A   (Witness) Yes.
11     Q   Is your bond current?
12     A   Yes.
13     Q   Have you maintained the bond for the entire time
14 you've been a notary public?
15     A   Yes.
16     Q   Since what year have you been a notary public,
17 ma'am?
18     A   I believe it's 1991.
19     Q   In connection with your duties as a notary public,
20 do you maintain a notary public record book?
21     A   Yes.
22     Q   Is that a faithful record of all of the signatures
23 that you have witnessed and notarized during your tenure as
24 a notary public during the years 1996 and 1997?
25     A   Yes.

PAGE 71

71

1     Q   There has been a copy of your notary public book
2 which has been made and which has been attached to your
3 deposition that contains the entries that you have made; is
4 that correct?
5     A   That's correct.
6     Q   Could you read the exhibit number from the lower
7 right-hand corner of that copy of your official notary
8 public record book?
9     A   Eight.
10     Q   That would be Exhibit No. 8?
11     A   Uh-huh.
12     Q   All right. You have been asked at a different
13 part of the deposition by the other lawyer in this case some
14 questions about something that's called Deposition Exhibit
15 No. 2, which is a different exhibit number from the one that
16 is your notary public book.
17     A   Yes.
18     Q   Do you recognize that piece of paper?
19     A   Yes.
20     Q   Does that piece of paper have your signature on
21 it?
22     A   Yes, it does.
23     Q   Did you notarize that piece of paper as part of
24 your formal duties as an official of the State of Texas?
25         MR. MOUNT: Objection, leading.

PAGE 72

72

1     A   (Witness) Yes.
2     Q   Can you describe the process -- and what I'm
3 curious about right now is -- well, let me ask the question
4 this way. Do you actually recall the day that you notarized
5 this particular document, this Exhibit No. 2?
6     A   Yes.
7     Q   Can you describe the process of what happened?
8 And by that I mean who asked you to notarize the document,
9 who handed you the document, what you asked from them and so
10 forth, and you can tell it in your own words?
11         MR. MOUNT: Objection, compound question, and
12 it calls for a narrative.
13     Q   (Mr. Skaggs) Would you please describe the
14 process of notarizing this particular document, Exhibit No.
15 2?
16         MR. MOUNT: Objection, calls for a narrative.
17     A   (Witness) Mr. Bersain Gutierrez and Mr. Walter
18 Puffelis appeared there and they had this document with
19 them.
20     Q   And when you say appeared, do you mean like came
21 in the door?
22     A   They came in the door.
23     Q   Okay.
24     A   They came into the office.
25     Q   All right.

PAGE 73

73

1     A   They were there, and they wanted this notarized.
2 They wanted me to notarize Mr. Bersain Gutierrez' signature,
3 so I asked for his ID and he signed in front of me and I
4 notarized his signature.
5     Q   All right.
6         MR. MOUNT: Objection, nonresponsive. There
7 wasn't a question on the table.
8     Q   (Mr. Skaggs) And you did see -- did you see
9 Mr. Bersain Gutierrez' ID?
10     A   Yes, I did.
11     Q   That entire process that you have just described,
12 can you estimate, in seconds or minutes, how long that
13 process took?
14         MR. MOUNT: Objection, calls for speculation.
15     A   (Witness) One minute.
16     Q   All right. There was somebody else speaking in
17 the room. Can you go ahead and answer that question again?
18         MR. MOUNT: Same objection.
19     A   (Witness) One minute.
20     Q   All right. Do you think it might have taken more
21 or less time, or do you have any idea?
22     A   Maybe thirty seconds more.
23     Q   When you notarize a document, do you keep copies
24 of the documents that you notarize?
25     A   No, I do not.

SHEET 20  PAGE 74

74

1    Q    Were you provided with a copy of this document,
2  this Exhibit No. 2, to keep?
3    A    No, I was not.
4    Q    Was it offered to you to keep?
5    A    No, it was not.
6    Q    During the, approximately, one minute that you
7  described, would you have read every word of everything
8  that's in that document?
9    A    No, I would not.
10   Q    In fact, did you read every word?
11   A    No, I did not.
12   Q    Is there anything factually about this document
13 that leads you to believe that it was altered, changed,
14 after you notarized the document?
15              MR. MOUNT:  Object to form.  Calls for
16 speculation.
17   A    (Witness)  Yes.
18   Q    Would you tell me just the things that you see on
19 that document which factually lead you to believe or lead to
20 conclude that the document was altered after you notarized
21 it?
22   A    It has "Or Mrs. Ivonne Soto Vega", and that was
23 not on there, or I would not have notarized it.
24   Q    All right.  Would you hold that piece of paper up?
25 There's a lady who is running a videotape who is going to

PAGE 75

75

1  get to show the videotape to the jury one day.  You need to
2  hold it very very still so that the lady can zoom in on what
3  you're talking about.  Now I know you can see the shadow of
4  my finger through the paper, and I'll ask you am I pointing
5  to what you were just describing to the jury?
6    A    That is correct.
7    Q    All right.  That -- you can put that down now.  I
8  think the jury has probably seen it.  Do you -- now that the
9  jury has seen what you're talking about -- well, I tell you
10 what, let's hold it up again because you may need to
11 describe it.  I'm going to hold it for you.  I'm going to
12 move it slowly so the lady can follow us, and I'm going to
13 ask you to please point to what it was that leads you to
14 conclude that the document was altered after it was signed
15 by you or acknowledged by you.
16   A    The typing of Mrs. Ivonne Soto Vega is over the
17 signature of Mr. Bersain Soto.
18   Q    Will you notarize a document that has an alternate
19 or two signatures that might have appeared in a blank?
20   A    No, I would not.
21   Q    Have you ever done that, to your knowledge?
22   A    No, I have not.
23   Q    If the language "Mr. Bersain Gutierrez or Mrs.
24 Ivonne Soto Vega" had appeared in the document that you were
25 handed that day, would you have notarized it in that form?

PAGE 76

76

1              MR. MOUNT:  Object to form.  Assumes facts
2  not in evidence.
3    A    (Witness)  No.
4    Q    Did you notarize it in that form?
5              MR. MOUNT:  Same objection.
6    A    (Witness)  No, I did not.
7    Q    Are you certain, as you sit here today, to the
8  best you can say, and it's a number of years later, did you
9  -- did you notarize that document in the form it's in right
10 now?
11             MR. MOUNT:  Objection, asked and answered.
12   A    (Witness)  No, I did not.
13             MR. SKAGGS:  I'll pass the witness, and thank
14 you very much.  (12:02)
15             R E - E X A M I N A T I O N
16 BY MR. MOUNT:
17   Q    Concerning the particular document that Mr. Skaggs
18 has shown you, Exhibit No. 2, you earlier said that you
19 notarized this particular document, correct?
20   A    Correct.
21   Q    And as far as this particular document is
22 concerned, would you agree with me that you may have read
23 this particular document before you notarized it?
24   A    No.  I was only notarizing his signature on the
25 document.

PAGE 77

77

1    Q    And as far as notarizing his signature on the
2  document, then you would have actually read his particular
3  name on the document, correct?
4    A    That is correct.
5    Q    So you would have actually -- you would have
6  looked at the document prior to notarizing it, correct?
7    A    His name and his signature.
8    Q    Right.  And earlier you said this whole process
9  took a minute to a minute and a half maximum, correct?
10   A    Correct.
11   Q    And as far as the process is concerned, it took
12 place at the counter there at the front of Port Elevator; is
13 that right?
14   A    The witnessing of his signature?
15   Q    Right.
16   A    Yes.
17   Q    Right.  Okay.  And so what you're telling me that
18 during that entire one to one and a half minutes, you were
19 able to witness his signature and then also take his ID and
20 to sign your name, correct?
21   A    Correct.
22   Q    And does that also include the time that it took
23 for you to actually take this document and put it in your
24 typewriter and type in the words that we've already talked
25 about that you typed in, correct?

SHEET 21  PAGE 78

78

1    A    The "sworn and subscribed"?
2    Q    Right.
3    A    I have that in memory, so that just -- it's in
4 memory on my typewriter.
5    Q    Right.  And so it's your testimony that you were
6 able to have that typed out also within that minute to a
7 minute and a half period, correct?
8    A    That's correct.
9    Q    And as far as your typewriter is located, is your
10 typewriter located right there at the reception area of Port
11 Elevator?
12    A    Yes.
13    Q    And as far as your typing is concerned, you say
14 that you have that particular form in your memory; is that
15 right?
16    A    Yes, that's correct.
17    Q    But you would have to change the date?
18    A    No, that's blank spaces and I filled them in.
19    Q    Okay.  So you would have actually had to type
20 those in yourself, correct?
21    A    That's correct.
22    Q    So as far as actual typing is concerned, you would
23 have actually had to type October 30th, and then '96,
24 correct?
25    A    Correct.

PAGE 79

79

1    Q    And as far as the type is concerned where it says
2 "Mr. Bersain Gutierrez or Mrs. Ivonne Soto Vega" -- you see
3 that typed right there?
4    A    That's correct.
5    Q    You see that?
6    A    Yes.
7    Q    That appears to be in the same type format,
8 correct?  That appears to be in the same type format,
9 correct?
10    A    Yes.
11    Q    In other words it's all in capital letters,
12 correct?
13    A    Correct.
14    Q    And it appears to have come from the same
15 typewriter, correct?
16    A    That's the way it looks.
17    Q    Okay.  And as far as this particular document is
18 concerned, who was it that you gave this particular document
19 back to after you notarized it?
20    A    Mr. Gutierrez.
21    Q    And as far as the signature for Mr. Puffelis is
22 concerned, do you recall whether his signature was on that
23 document at the time or not?
24    A    I believe it was, but I am not certain.
25    Q    As far as notary rules are concerned, when you

PAGE 80

80

1 notarize a signature, is it proper to notarize a signature
2 such as Mr. Gutierrez' here when you have the language "Mr.
3 Bersain Gutierrez or Mrs. Ivonne Soto Vega"?
4    A    No, it would not be, but I do not recall her name
5 as being on there.
6    Q    It may have been on there, you just don't recall?
7    A    He signed it and I -- the best of my knowledge,
8 his name was the only one on there.
9    Q    My question is her name could have been on there
10 at the time?
11    A    I do not believe so.
12    Q    And if it's your belief her name wasn't on this
13 particular document, you have no idea the circumstances
14 involving how that name got on there or not, correct?
15    A    Correct.
16    Q    As far as this document is concerned, do you
17 recall where it says date, 10-30-96, do you see that there?
18    A    Yes.
19    Q    Concerning that particular date, is that your
20 handwriting for the date?
21    A    No, it is not.
22    Q    Do you know whose handwriting that is?
23    A    No, I do not.
24    Q    Do you recall if that date was on there at the
25 time you notarized the document?

PAGE 81

81

1    A    No, I do not.
2    Q    Let me ask you some questions here about your
3 notary book.  Actually, I'll let you keep the book and I'll
4 take the exhibit.  You have an acknowledge -- you have a
5 notarization done on January 4, 1996, correct, in your book?
6    A    That's correct.
7    Q    And the notarization that was done on January 4,
8 1996 is the first notarization that appears in your book,
9 right?
10    A    That's correct.
11    Q    And this was concerning a Robert W. Fielding; is
12 that correct?
13    A    That's correct.
14    Q    And it appears from what you say, you were
15 notarizing a power of attorney; is that correct?
16    A    That's correct.
17    Q    Do you recall the circumstances of notarizing that
18 particular document?
19    A    No, not really, other than Bobby was employed at
20 the Elevator.
21    Q    As far as what that document was for --
22    A    No.
23    Q    -- you don't know?
24    A    No, I do not know.
25    Q    And as far as who would have been present at the

Port Elevator-Brownsville V. Ivonne Soto Vega
DEPOSITION OF MARIA GONZALEZ
6-22-01

SHEET 22  PAGE 82

82

1  time it was notarized, you don't remember who was present,
2  do you?
3      A    Bobby Fielding.
4      Q    Other than Mr. Fielding, do you recall if anyone
5  else was present or not?
6      A    No.
7      Q    Do you remember the circumstances of notarizing
8  that particular document?
9      A    No, I do not.
10     Q    Okay.  The next document you notarized was on May
11 17, 1996, according to your book, correct?
12     A    Uh-huh.
13     Q    Is that a "yes"?
14     A    Yes.
15     Q    And you have a notation that you notarized a
16 financial statement, correct?
17     A    Correct.
18     Q    And you notarized that for Craig Elkins, correct?
19     A    That's correct.
20     Q    Concerning the circumstances of notarizing that
21 particular document, do you recall what the circumstances
22 were --
23     A    No.
24     Q    -- concerning notarizing that document?
25     A    No, I do not.

PAGE 83

83

1      Q    Then your next two entries are for Mr. Gutierrez,
2  dated November -- dated October 3, 1996 and November 1,
3  1996, correct?
4      A    That's correct.
5      Q    The next entry you have is November 8, 1996,
6  concerning notarizing a document, correct?
7      A    Correct.
8      Q    And according to your book, you notarized a letter
9  for your supervisor or boss, Craig Elkins, correct?
10     A    Correct.
11     Q    Concerning that particular document that was
12 notarized, do you recall the circumstances of that
13 particular notarization?
14     A    No, I do not.
15     Q    Then your next notarization that was done was on
16 February 26, 1997.  Do you see that in your book?
17     A    Yes.
18     Q    You notarized a document for Craig Elkins, right?
19     A    Correct.
20     Q    And your book says it's for what type of document?
21     A    Title.
22     Q    Do you recall the circumstances concerning
23 notarizing that particular document?
24     A    No, I do not.
25     Q    And then your next entry is March 3, 1997, where

PAGE 84

84

1  you notarize a document for Sandra Lee Gonzalez, correct?
2      A    Yes.
3      Q    Do you recall what the circumstances were
4  concerning notarizing that particular document?
5      A    I had to notarize the paperwork for a public
6  weigher.
7      Q    It says type of document, correct, bond weigher?
8      A    Yes.
9      Q    All right.  But as far as the particular
10 circumstances as to who was there, what was done, or the
11 length of time that it took to notarize that document, you
12 couldn't give me testimony?
13     A    No.  Who was there, other than Sandra?
14     Q    Right.  You couldn't give me --
15     A    No.
16     Q    And you couldn't give me how long it took to
17 notarize that document, either?
18     A    No.
19     Q    And you couldn't tell me, as we sit here today,
20 what was on that particular document, other than the
21 description of the document?
22     A    On the weigher's bond?
23     Q    Right.
24     A    It's a bond that comes from the State, and I
25 notarized her signature on there.

PAGE 85

85

1      Q    So again as far as the exact timing and the
2  circumstances, you couldn't tell me that information,
3  correct?
4      A    Correct.
5      Q    Then the next entry is March 14, 1997, which is
6  the last entry in your notary public book, correct?
7      A    Correct.
8      Q    You notarized a signature for who?
9      A    Henry Hart Garig.
10     Q    Who is Mr. Garig?
11     A    He was employed there at that time.
12     Q    You notarized what for him?
13     A    A Cash surrender release.
14     Q    You're getting that information from your log
15 book, correct?
16     A    Yes, that's correct.
17     Q    As far as the exact circumstances concerning what
18 happened when it was notarized, you can't recall the
19 circumstances?
20     A    No.
21     Q    And then the one entry we have here for Mr.
22 Gutierrez, November 1, 1996, where it says type of document
23 and under that we have what?
24     A    Weight certificate.
25     Q    Concerning the circumstances of notarizing that

SHEET 23   PAGE 86

86

1   particular document, you don't recall --
2       A   No.
3       Q   -- specifically what happened, right?
4       A   No. I do not recall.
5       Q   Okay. So as far as the time that it took you to
6   notarize that document, you can't recall how long it took,
7   correct?
8       A   I just notarized it. I mean -- yes, his
9   signature.
10      Q   Right. But as far as the exact time that it took
11  to do the notary process you can't recall?
12      A   A minute, a minute and a half.
13      Q   You actually recall the time?
14      A   No, but that's what it would take to --
15      Q   Typically, when you do a notarization, it takes a
16  minute to a minute and a half for you, correct?
17      A   Correct.
18      Q   As far as this notarization that you did for Mr.
19  Gutierrez on November 1, 1996, do you recall, one way or the
20  other, whether you had to have anything typed on that
21  particular document?
22      A   I do not recall.
23      Q   And as far as other people being present, you
24  can't recall either, correct?
25      A   Correct.

PAGE 87

87

1       Q   So you don't know if Mr. Elkins was there or not
2   at the time?
3       A   He might have been in his office. I do not
4   recall.
5       Q   And you also don't recall, likewise, whether Mr.
6   Puffelis was there, either, correct?
7       A   Correct.
8       Q   Now just to clarify the record and be clear, the
9   reason you say on Exhibit No. 2 that you believe that Mrs.
10  Ivonne Soto Vega's name was not on that document is that the
11  signature or marking comes over her name, and, secondly, you
12  don't remember it being there on that day?
13      A   I do not remember it being there, and this appears
14  that -- where Mr. Gutierrez signed his name, it's been typed
15  over, his signature.
16      Q   So, in other words, you think from looking at
17  Exhibit No. 2 --
18      A   Yes.
19      Q   -- it looks like that Ms. Vega's name has been
20  typed over the portion of the signature that goes through
21  her name, correct?
22      A   That's correct.
23          MR. MOUNT: I'll pass the witness. (12:18)
24          R E - E X A M I N A T I O N
25  BY MR. SKAGGS:

PAGE 88

88

1       Q   Ma'am, in listening to the answers to the
2   questions that the other lawyer was just asking you, I
3   couldn't help but notice that all of the other signatures
4   and all of the other notarizations in your log, with the
5   exception of Mr. Gutierrez, are actually employees at the
6   Elevator where you work.
7           MR. MOUNT: Objection leading.
8       Q   (Mr. Skaggs) Am I correctly --
9       A   Correct.
10      Q   -- summarizing your deposition?
11          MR. MOUNT: Object, leading.
12      Q   (Mr. Skaggs) Okay. Am I correctly summarizing
13  what you told the other lawyer?
14          MR. MOUNT: Object, leading.
15      A   (Witness) Correct.
16      Q   Okay. Well, let me ask you the question this way.
17  With regard to everybody except Mr. Gutierrez, what
18  relationship do all of the other people that appear in your
19  notary book have with the Elevator?
20      A   Employees.
21      Q   Let me ask you this then. Would it have been
22  usual or unusual for you to have been notarizing something
23  for somebody from the outside during 1996 and 1997? By the
24  outside, I mean somebody who was not an employee at the
25  Elevator.

PAGE 89

89

1       A   Unusual.
2       Q   Ma'am, you have testified that you don't recall
3   the precise circumstances of the other notarizations that
4   you have recorded in your log, other than that of Mr.
5   Gutierrez; is that correct?
6       A   Correct.
7       Q   Now is it that you can recall the details of the
8   encounter that you had with Mr. Gutierrez when you notarized
9   his signature, that same one which appears on Exhibit No. 2?
10      A   Because it's not something that was done very --
11  done at all.
12      Q   I appreciate that. Thank you, ma'am.
13          MR. SKAGGS: And I'll pass the witness.
14          R E - E X A M I N A T I O N
15  BY MR. MOUNT: (12:19)
16      Q   You mentioned earlier in your testimony weight
17  certificates, phytos and sanitary certificates; is that
18  right?
19      A   Phyto sanitary certificates.
20      Q   Okay. So a phyto sanitary certificate is one
21  document, it's the same document?
22      A   Yes.
23      Q   Okay. And is that -- that's the document that we
24  talked about that's created by the government, a phyto
25  sanitary certificate?

SHEET 24  PAGE 90

90

1    A    They're sold by the government.  I usually prepare
2    them.
3    Q    Okay.
4    A    But they inspect whatever is on that.
5    Q    So tell the jury what a phyto sanitary certificate
6    is.
7    A    It describes who sold the product or who is
8    importing the product where, the amount or weight, the type
9    of product, and mode of transportation, be it vehicle or
10   rail.
11           (OFF THE RECORD) (12:20-12:21)
12   Q    (Mr. Mount)  We've gone over exhibits 3 through 7,
13   which are invoices for B. G. Grain, correct?
14   A    Correct.
15   Q    And these invoices deal with shipments of corn out
16   of Port Elevator-Brownsville, L.C. to Monterrey, Mexico,
17   correct?
18   A    Correct.
19   Q    And concerning shipments out from Port Elevator-
20   Brownsville, L.C. to Monterrey in these invoices Exhibits 3
21   through 7, would phyto sanitary certificates have also been
22   created to go along with these invoices?
23   A    Correct.
24   Q    Those certificates would be certificates that you
25   would have created, correct?

PAGE 91

91

1    A    Correct.
2    Q    And as far as obtaining the information for those
3    certificates, where would you get that information?
4    A    The information?  From the weight tickets.
5    Q    Any other source of information to put into those
6    sanitary certificates?  Let me go ahead and rephrase it.
7    You say that to do the phyto -- the phytos or the phyto
8    sanitary certificates you obtained information from the
9    weight tickets.  Is there any other place that you would
10   obtain information from in order to do those certificates?
11   A    We would have to know who is selling it and who
12   they're selling to.
13   Q    And as far as getting that information, where
14   would you get that information?
15   A    From the invoice.
16           MR. MOUNT:  I believe I'll pass the witness.
17           MR. SKAGGS:  We are finished.
18           MR. MOUNT:  Thank you.
19
20      (The deposition was concluded at 12:23 p.m.)
21
22
23
24
25

PAGE 92

92

CHANGES AND SIGNATURE

PAGE     LINE     CHANGE                    REASON

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

PAGE 93

93

1       I, MARIA GONZALEZ, have read the foregoing deposition
and hereby affix my signature that same is true and correct,
except as noted above.

                        _____
                        MARIA GONZALEZ
THE STATE OF TEXAS          *
        Before me, _____, on this day personally
appeared MARIA GONZALEZ, known to me (or proved to me under
oath or through_____) (description of identity
card or other document) to be the person whose name is
subscribed to the foregoing instrument and acknowledged to
me that they executed the same for the purposes and
consideration therein expressed.
        Given under my hand and seal of office this _____ day
of _____, 2001.

                        _____
                        NOTARY PUBLIC IN AND FOR
                        THE STATE OF TEXAS

SHEET 25   PAGE 94
94

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

PORT ELEVATOR - BROWNSVILLE,   *
L.C. AND SOUTHWEST GRAIN       *
COMPANY, INC.                  *
                               *
VS.                            *  C. A. NO. B-98-23
                               *
IVONNE SOTO VEGA, BERSAIN      *  JURY DEMANDED
GUTIERREZ, SYSCO DE BAJA,      *
S.A. DE C.V. AND WALTER        *
PUFFELIS, INDIVIDUALLY AND     *
D/B/A AGI AKRON GROUP, INC.    *
                               *
VS.                            *
                               *
CRAIG ELKINS, INDIVIDUALLY     *
AND D/B/A PORT ELEVATOR-       *
BROWNSVILLE, L.C., AND         *
SOUTHWEST GRAIN CO., INC.      *

REPORTER'S CERTIFICATION
DEPOSITION OF MARIA GONZALEZ
Taken on 6-22-01
       I, GERALD SMITH, Certified Shorthand Reporter in and
for the State of Texas, hereby certify to the following:
       That the witness, MARIA GONZALEZ, was duly sworn by the
officer and that the transcript of the oral deposition is a
true record of the testimony given by the witness;
       That the deposition transcript was submitted on
          , to the witness or to the attorney for the
witness for examination, signature and return to me by
          ;
       That $         is the deposition officer's charge to

---

PAGE 95
95

William D. Mount, for preparing the original deposition
transcript and any copies of exhibits;
       That pursuant to information given to the deposition
officer at the time said testimony was taken, the following
includes counsel for all parties of record:
          MR. JOHN SKAGGS
          Skaggs & Associates
          710 Laurel
          McAllen, Texas  78501
          MR. WILLIAM D. MOUNT
          Dale & Klein
          6301 N. 10th
          McAllen, Texas  78504
       I further certify that I am neither counsel for,
related to, nor employed by any of the parties or attorneys
in the action in which this proceeding was taken, and
further, that I am not financially or otherwise interested
in the outcome of the action.
       Certified to by me this          day of          ,
2001.

                    GERALD SMITH, Texas CSR #2305
                    Expiration Date: 12-31-01
                    Action Reporting
                    P. O. Box 4513
                    McAllen, Texas  78502
                    (956)  631-1024

**$**

$17,685.15 [1] 39:25
$210 [3] 38:7,9 47:1
$28,087.97 [1] 38:4
$33,411.04 [1] 37:11
$38,700.04 [1] 46:24

**1**

1 [11] 13:21,24 15:5,14,20,22 21:13
54:11 83:2 85:22 86:19
10-30-96 [1] 80:17
11:30-11:39 [1] 57:17
11:51 [1] 65:25
12 [1] 47:7
12:02 [1] 76:14
12:18 [1] 87:23
12:19 [1] 89:15
12:20-12:21 [1] 90:11
12:23 [1] 91:20
133,657 [1] 28:11
13th [1] 9:1
14 [1] 85:5
159,104 [1] 24:18
15th [1] 9:1
17 [1] 82:11
17th [1] 66:25
19 [1] 11:18
1938 [1] 8:21
1970 [3] 9:1,22 59:21 62:13 66:25
199 [1] 20:20
1991 [2] 20:20 70:18
1996 [42] 11:5,14,21,24 13:20,21,24
15:5,5,14,14,17 16:1 17:13 21:13
24:23 28:15 35:9 36:7,11,14 43:23
44:3,16,20,20,21 47:7 60:8 66:15,16
67:18 70:24 81:5,8 82:11 83:2,3,5
85:22 86:19 88:23
1997 [12] 43:15 44:5,13,14 45:1 47:4,
14 70:24 83:16,25 85:5 88:23
1999 [1] 17:17

**2**

2 [25] 15:20,23,24,25 16:14 17:14 20:
23 21:15 32:9 35:12 36:13 42:8
46:21 54:24 55:17 59:2 71:15 72:5,
15 74:2 76:18 87:9,17 89:9
2001 [1] 5:5
21 [1] 17:17
22nd [1] 5:5
25 [1] 11:17
26 [1] 83:16
27 [6] 43:15 44:5,12 45:1 47:4,14
2893 [6] 7:14,18,23,24 8:2,11

**3**

3 [22] 21:21,23 36:22,25 37:11,20,21
44:11,11,16,19 45:4,18 47:17 48:11,
22,25 59:6 83:2,25 90:12,20
30 [9] 11:21,24 13:20 15:5,14,17 16:

1 36:7,11
30th [2] 17:13 78:23

**4**

4 [20] 24:23 27:7,9,11,13 29:3,16 30:
16,23 32:9 36:5,25 38:1 43:3 44:11,
16,20,20 81:5,7
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 [1] 8:15

**5**

5 [11] 28:15 35:8 36:14 39:1,3,3 42:2,
12 44:11,20,21
529 [1] 13:18

**6**

6 [10] 42:25 43:2,19,23 44:3,12,21,21
45:4,18

**7**

7 [9] 45:25 46:1 47:18 48:12,22,25 59:
6 90:12,21

**8**

8 [5] 57:18,19,20 71:10 83:5

**9**

91902 [1] 13:18
956-233-4142 [1] 7:16
9th [1] 8:18

**'**

'96 [2] 55:20 78:23
'97 [2] 64:24 65:1
'98 [3] 55:20 64:24 65:1

**"**

"agent [4] 31:23 35:3 40:18 46:15
"b [6] 22:20,21 27:14 39:10 43:6 46:
11
"b" [1] 23:7
"bersain [1] 46:11
"by" [2] 22:17,17
"g [1] 23:5
"i [1] 22:3
"invoice [1] 23:15
"maria [1] 22:11
"mr [3] 75:23 79:2 80:2
"notary [1] 43:12
"or [1] 74:22
"received [1] 21:18
"rio [1] 35:13
"sworn [1] 78:1
"this [3] 17:19 18:1,12
"yes" [1] 82:13

**A**

a.d [1] 5:5
a092555562 [1] 12:13
able [10] 7:20 11:10,11 15:24,24 21:
22 27:10 43:3 77:19 78:6
above [14] 5:6 17:20 18:2,13 22:11,
17 27:14 31:23 35:12 40:17 43:6,11

46:11,14
abrego [3] 62:6,16 63:2
accordance [1] 5:11
according [2] 82:11 83:8
accounts [3] 9:4,5 67:20
acknowledge [1] 81:4
acknowledged [1] 75:15
act [1] 58:3
acting [7] 25:1 29:23 30:1,14,23 31:
17 41:3
actual [2] 41:20 78:22
actually [15] 10:15 12:9 13:20 29:9
32:17 65:4 72:4 77:2,5,23 78:19,23
81:3 86:13 88:5
additionally [1] 77:8
address [7] 7:12,17 8:11 12:15,17,
19 13:16 23:10
adjourn [1] 26:13 32:24 34:4
administer [1] 5:12
advance [1] 33:24
advice [9] 25:7,14,20 26:20 32:21
33:8 34:16,20,22
agency [1] 41:19
agent [6] 25:1,23 30:1 31:17 32:12
41:3
agents [1] 25:23
agree [8] 17:25 18:4 29:23 30:13,20
34:17,21 76:22
agreed [1] 5:10
agreement [2] 34:12,15
agreements [1] 5:9
agriculture [1] 50:10
ahead [3] 13:7 73:17 91:6
alien [2] 12:7,8
allow [2] 7:3,4
alone [2] 8:9 20:8
already [7] 16:12,24 37:20 39:19 56:
5 66:7 77:24
altered [3] 74:13,20 75:14
alternate [1] 75:18
alvarado [2] 62:7,8
amount [3] 50:6 90:8
and/or [1] 55:23
another [1] 31:2
answer [43] 13:6,13 25:3,7,8,9,10,13,
15,20 26:3,5,9,12,21 27:4 30:7,9,11,
17 31:19,24 32:3,5,13,15,18 33:7,10,
14,14,17,21,22,24 34:2,6,7,13,14 35:
2,5 40:20 41:17 55:3,6,10,14 73:17
answered [2] 66:7 76:11
answering [2] 13:1 26:8
answers [4] 5:1 7:9 13:2 88:1
antonio [2] 62:5,9
anybody [3] 60:24 61:12 64:12
apart [1] 68:16
appear [3] 5:10 31:14 88:18
appearance [2] 14:6 21:7
appeared [4] 72:18,20 75:19,24
appears [32] 11:23 13:19 16:3,21 21:

18 22:1 23:23 24:22,25 27:9,13 31:
11,22 32:1,8 36:9 39:9 40:8,17,25
43:2,11,14 46:23 47:10 79:7,8,14
81:8,14 87:13 89:9
appreciate [1] 89:12
appropriately [1] 56:15
approximately [1] 74:6
area [5] 19:17 51:15,16,17 78:10
aren't [1] 63:17
argument [1] 33:16
asks [6] 32:14,14 54:19 56:3,8,11
assign [1] 29:8
assist [1] 60:25
assistants [1] 9:25
associated [1] 67:6
assume [1] 18:16
assumes [1] 76:1
attached [1] 71:2
attempt [1] 45:21
attorney [3] 6:8 26:24 81:15
august [8] 17:17 43:15 44:5,12 45:1
47:4,14 66:25
authentic [2] 58:7,10
authenticate [3] 17:20 18:2,13
authorized [1] 5:12
aware [6] 17:23 44:24 54:1,3 59:1
69:24
away [1] 51:23
awkward [1] 13:7

**B**

back [4] 9:22 33:16 66:15 79:19
background [1] 41:23
based [4] 25:4 47:1 52:12 53:3
basement [1] 63:1
basically [4] 24:17 31:8 67:13
basis [4] 41:24,24 61:9 68:9
bear [1] 66:10
became [1] 67:6
behavior [1] 69:4
belief [1] 80:12
believe [26] 9:1 11:17 19:12 20:20
23:2 28:4 29:7 33:25 34:1 36:19 43:
10 47:21 49:14 50:20 63:1,3 64:10
65:9,24 70:18 74:13,19 79:24 80:11
87:9 91:16
below [2] 22:8 35:3
benefit [1] 6:21
bersain [16] 10:25 17:20 18:3,13 22:
24,25 29:13 30:14 43:9 72:17 73:2,
9 75:17,23 79:2 80:3
besides [4] 14:14,16 61:13,25
best [3] 13:10 76:8 80:7
better [2] 7:20 13:8
between [2] 22:13 55:11
bg [2] 43:2 59:6
bg1 [2] 23:15 47:21
bg3 [2] 39:5 42:16
bg5 [2] 46:5 47:21
bill [3] 6:7 33:11 63:20

Port Elevator-Brownsville V. Ivonne Soto Vega
DEPOSITION OF MARIA GONZALEZ
6-22-01

**bills** [2] 63:14,16
**birth** [2] 8:17,17
**blank** [2] 75:19 78:18
**board** [1] 37:4
**bobby** [2] 81:19 82:3
**bond** [6] 70:7,11,13 84:7,22,24
**bonita** [1] 13:18
**book** [26] 12:14 13:19,25 20:14,17 21:12 55:17,20 57:12,21 58:2 70:20 71:1,8,16 81:3,3,5,8 82:11 83:8,16, 20 85:6,15 88:19
**bookkeeper** [6] 10:3 57:5 59:12,15, 16 67:21,22 68:14
**bookkeeping** [1] 9:4
**booklet** [1] 6:20
**boss** [1] 83:9
**both** [3] 7:6 36:25 46:2
**bottom** [4] 16:3,21 27:14 39:9
**bought** [3] 28:5,6,7
**bound** [1] 69:3
**briefly** [2] 57:13,15
**bring** [2] 33:16 54:15
**broker** [8] 45:10,11,17,19 48:4,6,9, 10
**brought** [1] 55:19
**brownsville** [22] 8:25 9:14,15 10:10 15:13 23:20,21 24:19 27:25 35:23 39:23 51:2,11 56:24 59:15 60:13 66: 17,20,21,23 67:1 90:20
**building** [2] 51:13,15
**business** [11] 9:3 10:15 23:24 50:18 56:21 57:24 58:9 60:12,13 61:16 65: 17
**businesses** [3] 61:15,18,22
**buyer** [1] 38:17
**by"** [1] 21:19

**C**

**california** [4] 12:18 13:18 23:10,11
**call** [3] 41:18 65:20,21
**called** [4] 49:21 65:15,19 71:14
**calling** [3] 30:5 31:21 69:21
**calls** [5] 69:6 72:12,16 73:14 74:15
**came** [11] 14:24 36:11 63:24,25 64:2, 5,12,16 72:20,22,24
**cameron** [2] 5:2 16:24
**can't** [13] 7:5 14:5 21:6 29:19,21,22 38:20 64:23 69:17 85:18 86:6,11,24
**canyon** [1] 13:18
**capacity** [1] 32:14
**capital** [1] 79:11
**card** [9] 12:3,5,6,7,8,10,18,24 13:17
**carries** [1] 61:10
**case** [3] 55:12,13 71:13
**cash** [1] 85:13
**cause** [1] 5:7
**cease** [1] 35:25
**cents** [1] 38:21
**certain** [5] 23:2 67:24,24 76:7 79:24
**certainly** [1] 21:1

**certificate** [13] 14:1 49:12,15,18,22 50:4,5 68:23 69:1 85:24 89:20,25 90:5
**certificates** [12] 68:5,11 89:17,17,19 90:21,24,24 91:3,6,8,10
**certified** [3] 5:4 24:12 43:14
**certify** [4] 22:3 27:21 33:23 43:25
**chair** [2] 33:5 34:5
**chamber** [1] 35:13
**chance** [1] 13:2
**change** [2] 67:16 78:17
**changed** [2] 67:17 74:13
**charge** [2] 57:2,5
**charges** [2] 63:12,14
**check** [2] 10:10 59:21
**checks** [3] 10:15 59:17 63:8
**children** [1] 8:7
**chose** [1] 36:4
**chula** [1] 23:10
**circumstances** [14] 80:13 81:17 82: 7,20,21 83:12,22 84:3,10 85:2,17,19, 25 89:3
**civil** [2] 5:7,11
**claims** [1] 70:5
**clarify** [1] 87:8
**clarity** [1] 59:5
**clear** [2] 26:2 87:8
**clearly** [1] 19:14
**clerk** [2] 9:17 35:19
**close** [1] 51:17
**co** [1] 59:25
**come** [5] 36:6 38:14 53:3,8 79:14
**comes** [3] 13:13 52:17 53:1 68:19 84:24 87:11
**coming** [7] 52:4,7,13 53:12,13 54:8 64:22
**comment** [1] 30:4
**commerce"** [1] 35:13
**commercial** [5] 11:24 15:18,23 20: 22 59:3
**commission** [2] 17:16 68:19
**company** [6] 6:10 28:5,6,7,9,22
**compared** [1] 45:5
**compensated** [2] 60:6,9
**complete** [2] 7:4,10
**compound** [1] 72:11
**computer** [1] 63:18
**concern** [1] 47:25
**concerned** [40] 7:17 9:11,19 10:5 11:6 12:9 16:18 18:11 22:17 24:2 25:12 26:16 28:17 29:2 30:2 35:8, 11 38:12 39:8,18 42:1 45:17 47:17, 24 48:14 54:10,14 59:9,18 60:12,18 76:22 77:11 78:13,22 79:1,18,22,25 80:16
**concerning** [29] 14:2 21:3 23:17 24: 2,5 25:6 27:13 30:21 31:16 36:22 47:18 48:22 54:7 58:14 59:1 61:22 65:5 76:17 80:19 81:11 82:20,24 83:

6,11,22 84:4 85:17,25 90:19
**conclude** [3] 33:8 74:20 75:14
**concluded** [1] 91:20
**conclusion** [7] 30:4,6 31:21 33:6 41: 18 69:7,22
**conditions** [1] 58:3
**conduct** [1] 61:21
**connection** [2] 67:23 70:19
**consider** [1] 26:16
**contained** [1] 45:18
**contains** [1] 71:3
**context** [1] 26:25
**continually** [1] 33:15
**continue** [1] 41:17
**continued** [1] 67:1
**control** [5] 55:23 56:1,16 62:23,24
**conversation** [3] 13:4 14:9 64:16
**conversations** [6] 21:10 25:18 55:4, 10 65:10,11
**copies** [2] 20:22,25 45:14 73:23
**copy** [17] 22:4 24:6,12 27:21 28:18 39:13 43:15 44:1,5 45:6 47:4,14 54: 22,23 71:1,7 74:1
**corn** [62] 10:22 23:18,19,23 24:18,22 28:12,14,25 30:22 31:8 35:7,8 36:5, 6,11,13,14,17,18,21,23 37:13,14,24 39:22,25 42:1,7 45:9,18 46:17,20,23 47:25 48:18,21,22 49:7,13,16 50:1, 12,15,18 52:4,6,11 53:3,7,12,13,21 55:24 58:16,20,23 59:1,10 63:12 65: 5 90:15
**corner** [7] 23:3 27:14 39:6,9 41:1 43: 6 71:7
**correct** [333] 8:23 10:4,7,17 11:16, 21,22,25 12:1,4,11,15,25 13:21,22 15:2,6,7,14,15 16:4,5,7,8,17 17:5,7, 8,11,15,17,18 18:14,17,18,21,22 19: 6 21:2,7,13,14,16,17,19,20 22:2,11, 18,19 23:1,5,6,8,9,11,12,15,16,21, 22,24,25 24:6,9,10,13,20,21,24 25:2, 16 26:4,7,11,18,20 27:2,15,16,18,19, 21,22,23,25 28:12,13,16 29:10,11, 11,24,25 30:2,25 31:2,10,15,18 32:5, 9,10,12,21,23 33:3 35:4,6,10,16,17, 23,24 36:12,14,15,20,23,24 37:1,2, 16,21 38:3,10,11 39:6,7,10,11,13,13, 14,16,20,21 40:1,2,6,8,9,12,13,15, 16,18,19,24 41:1,2 42:1,4,5,6,10,13, 19 43:6,7,9,12 44:24 45:7,8,9,10 46: 8,8,9,12,15,19,20,22,23 48:2,5,16, 17,19 49:2,5 50:2,11 52:1,3 53:17, 19 54:2,5,9,24,25 55:17,18,21 57:1, 4,6,7,11,22,25 58:1,4,5,9,16,17,23, 24 59:3,4,7,8,11,14,22,23 60:9,10 63:9,21 65:2 66:22 67:4,8,11,12 68: 20,21 69:8 71:4,5 75:6 76:19,20 77: 3,4,6,9,10,20,21,25 78:7,8,16,20,21,

24,25 79:4,8,9,12,13,15 80:14,15 81: 5,6,10,12,13,15,16 82:11,16,17,18, 19 83:3,4,6,7,9,10,19 84:1,7 85:3,4, 6,7,15,16 86:7,16,17,24,25 87:6,7, 21,22 88:9,15 89:5,6 90:13,14,17,18, 23,25 91:1
**correction** [1] 5:15
**corrections** [2] 5:14,15
**correctly** [2] 88:8,12
**couldn't** [6] 84:12,14,16,19 85:2 88: 3
**counsel** [6] 5:3 26:9 33:2 55:2,2 66: 1
**counter** [5] 19:15,16,22 20:9 77:12
**county** [2] 5:2 16:24
**couple** [1] 10:22
**course** [3] 26:24 56:20 57:24
**court** [10] 6:10,18,20 7:1,5,8 33:9,12, 13,18
**covering** [2] 23:18,19
**craig** [11] 9:10 10:20 22:7,18 60:23 61:10 64:10 67:6 82:18 83:9,18
**create** [8] 29:16,17,20 42:12,18,22, 23 63:20
**created** [27] 18:23,24 29:3,4,5,5,24 30:15,21 40:11,14 42:15 43:19,23 44:3,16,19,20,21 46:7 47:7 48:15 50:8,9 89:24 90:22,25
**creating** [2] 29:19 42:11
**creation** [1] 43:22
**curious** [1] 72:3
**current** [2] 7:12 70:11
**currently** [1] 8:21
**custodian** [1] 56:19
**custody** [3] 55:23 56:1,16
**cut** [3] 10:15 59:17,21

**D**

**daily** [2] 56:20 61:9
**date** [14] 8:16,17 11:17,20 13:21 28: 14 36:2 43:22 44:4 78:17 80:17,19, 20,24
**dated** [2] 83:2,2
**dates** [2] 13:20 14:13
**day** [13] 5:5 9:21 11:7,8 17:13 20:11 34:5 47:15 68:9 72:4 75:1,25 87:12
**day-to** [1] 68:8
**days** [3] 53:6,20,22
**deal** [1] 90:15
**dealing** [1] 36:18
**defendant** [1] 11:1
**definition** [1] 41:18
**degree** [2] 41:10,11
**department** [1] 50:9
**deposed** [2] 6:13,15
**deposition** [33] 5:1,13,16 6:17 15: 22 21:21 26:14,15,17,19,25 27:1,7 32:24 33:9 34:4 39:1 42:25 45:25 54:10,11,12,15,21 55:8,16 57:18 66: 4 71:3,13,14 88:10 91:20

Port Elevator-Brownsville V. Ivonne Soto Vega
DEPOSITION OF MARIA GONZALEZ
6-22-01

depositions [1] 13:10
describe [6] 14:5 21:6 72:2,7,13 75:11
described [2] 73:11 74:7
describes [1] 90:7
describing [1] 175:5
description [1] 184:21
desk [3] 20:9 51:25 52:2
details [1] 89:7
determined [1] 37:18
determines [1] 37:19
determining [1] 37:17
didn't [6] 12:19 18:25 24:4 28:1 44:4 62:9
different [4] 31:11 51:13 71:12,15
dire [1] 41:7
directly [1] 65:20
disagree [2] 17:25 18:5
discuss [1] 55:7
discussed [6] 52:2 64:8 65:3,4
dispute [9] 10:22 55:24 58:16,18,20, 23 59:1,10 65:5
district [5] 9:14,16 66:21,24 67:2
document [144] 11:23 12:2 13:23,24 15:16,17,25 16:4,10,18,22,25 17:4 18:8,17,24,25 19:3 20:13,17,22 21:16,23 22:5,6,9,16 23:4,13,14 24:1,3, 5,8,12,14,17,25 27:9,10,18,21 28:2, 3,4,19 29:2,3,8,16,17,19,21,24 30:2, 15,21 31:1 32:2,9,11 35:15 37:21 39:12 40:10,23,25 43:5,15,18 44:3,5 45:6 46:7,11 47:7,11,13 49:13,15,18 50:8 54:16 55:1,7,15 68:3 72:5,8,9, 14,18 73:23 74:1,8,12,14,19,20 75:14,18,24 76:9,17,19,21,23,25 77:2,3, 6,23 79:17,18,23 80:13,15,16,25 81:18, 21 82:8,10,21,24 83:6,11,18,20,23 84:1,4,7,11,17,20,21 85:22 86:1,6, 21 87:10 89:21,21,23
document." [1] 22:4
documentation [6] 48:8,10,20 49:6 53:1,2
documents [28] 14:9,13 18:20 20:11 44:8,15 45:1,1,4,22 48:3 49:7 54:12,14,20,21 55:23,25 56:2,5 58:7,25 67:24,24 68:4,5,13 73:24
doesn't [4] 15:10 33:10 36:3 41:6
dollar [1] 37:10
dollars [3] 38:21 40:4,5
don't [51] 15:4 18:6,14 19:5 20:14 22:15 25:3,18 26:5,12,21,22 31:19, 25 32:13,18 33:15,25 34:1,19 35:1 39:19 41:20 42:11,18,24 47:14 48:6 52:14 53:4 55:3,5,9 56:6,7,11 57:14 58:22 59:10 60:2,4 61:18 64:24 80: 6 81:23 82:1 86:1 87:1,5,12 89:2
done [11] 16:12,15 51:8 67:13 75:21 81:5,7 83:15 84:10 89:10,11
door [3] 19:19 72:21,22

dorado [5] 62:5,10,11,11,22
down [8] 7:5 9:20 12:9,14 20:14,17 23:24 75:7
drive [1] 13:18
duly [1] 6:2
during [7] 26:24 67:13 70:23,24 74: 6 77:18 88:23
duties [6] 67:15 68:17 69:14 70:8,19 71:24
duty [1] 35:18

**E**

e-e [3] 76:15 87:24 89:14
each [6] 13:5 44:8,12,15 45:1 47:24
earlier [8] 26:4 36:17 42:9 45:8 63: 22 76:18 77:8 89:16
east [1] 8:3
education [2] 41:8,23
eight [1] 171:9
either [9] 16:15 19:7,10 25:12 50:18 65:1 84:17 86:24 87:6
elavator [1] 8:24
elevator-brownsville [2] 8:22 9:12
elevator [51] 9:18 10:9 27:24 29:4 35:14,16,18,19,20,22,22 36:1,7,11 39:24 45:22 51:1,10 53:8,12 56:2,4, 23 60:12,21,22 61:7,14,16,21,23 63: 13 64:22 65:17 67:3,5,7,10,11,14,19 68:4,17,25 77:12 78:11 81:20 88:6, 19,25 90:19
elevator-brownsville [22] 6:9 9:2, 20 10:6,11 11:14 17:6 28:18 40:11 43:19 46:8 48:1,15 50:17 52:5,10 56:19 59:13,16 66:16 68:22 90:17
elkins [38] 9:10,19 10:20 14:19 19:6, 24 22:7 25:1 51:3,5,12,17 52:2,14 53:7,13,17 55:8 59:17 60:6,19,23 61:11,12,15 63:15,19 64:10,13,17 65:4,15,20 67:6 82:18 83:9,18 87:1
elkins' [2] 22:14,18
employed [4] 66:16,17 81:19 85:11
employee [9] 35:14 56:12,16,18,24 57:6,10 67:9 88:24
employees [6] 56:24 60:11,13 62:1 88:5,20
employer [7] 10:5,6 55:11 56:1,12, 14,14
employer's [1] 56:16
employment [1] 67:23
empty [2] 33:5 34:5
encounter [1] 89:8
engage [1] 25:18
english [3] 13:11 14:10 21:10
entire [3] 70:13 73:11 77:18
entries [3] 58:2 71:3 83:1
entry [5] 83:5,25 85:5,6,21
estimate [1] 73:12
eve [1] 69:9
even [3] 53:25 54:8 67:10
events [1] 58:3

everybody [1] 88:17
everything [4] 13:12 53:23,23 74:7
evidence [3] 58:19,19 76:2
evidentiary [1] 58:11
exact [4] 36:2 85:1,17 86:10
exactly [1] 6:25
except [1] 88:17
exception [1] 88:5
excerpts [1] 57:20
excuse [1] 59:15
exhibit [85] 15:22,23,24,25 16:14 17: 14 20:23 21:15,21,23 27:7,9,10,13 29:3,16 30:15,22 32:9 36:5,19,22,23, 25 37:10,20,21 38:1 39:1,3,3 40:7 42:2,8,12,25 43:2,19 44:11,16,16,19, 20 45:25 46:1,2 54:11,24 55:16 57: 18,19,20 59:2 71:6,10,14,15 72:5,14 74:2 76:18 81:4 87:9,17 89:9
exhibits [11] 15:20 44:21 45:4,18 47: 17,17 48:11,21 59:6 90:12,20
expires [1] 17:16
exported [1] 68:6

**F**

f.o.b [3] 37:1,3,7
facility [1] 52:12
fact [1] 74:10
facts [2] 55:12 76:1
factual [1] 32:1
factually [3] 32:1 74:12,19
faithful [1] 70:22
familiar [8] 8:2 15:10 21:23 49:24
far [117] 7:17 9:2,11,19,24,24 10:5,8, 18 11:6,10 12:8 13:14 14:12 15:16 16:6,14,18,21 18:11,23 19:16,24 20: 2 21:25 22:5,16 23:13 24:1,14 25: 11,11 26:1,15 28:6,17,24 29:2,5,15, 19,20 30:1 35:7,11 36:5,25 37:3,17 38:4,12,19,23 39:8,18 41:3,25 42:11 43:22 45:17,21 47:13,17,24 48:8,14 50:21 51:10,19,23 52:4,6,15 53:1, 11,13,15,17 54:10,14 56:18 57:2 58: 18,25 59:9,17,20 60:11,18 63:12,16 64:22 65:7,10 76:21 77:1,11 78:9, 13,22 79:1,17,21,25 80:16 81:21,25 84:9 85:1,17 86:5,10,18,23 91:2,13
february [1] 83:16
federal [5] 7,11 6:10
feels [1] 13:6
fielding [3] 81:11 82:3,4
figuring [1] 51:22
file [5] 56:12,12,17 57:10 67:24
files [4] 56:18,20,24 57:6
filing [1] 68:12
filled [1] 78:18
financial [1] 82:16
find [2] 51:2 52:16
finds [1] 5:14
fine [1] 33:15
finger [1] 75:4

finish [1] 13:2
finished [1] 91:17
first [4] 6:2 19:19 46:10 81:8
five [2] 46:17 56:11
fm [5] 7:14,18,23,24 8:2
follow [10] 25:7,14,19 30:10 32:20 34:15,18,20,22 75:12
following [2] 5:8 31:13
follows [1] 6:2
foreman [2] 61:1,7
foreman's [1] 61:2
foremen [1] 61:8
form [8] 25:5 68:24 74:15 75:25 76:1, 4,9 78:14
formal [1] 71:24
format [2] 79:7,8
forth [3] 67:15,25 72:10
forty [2] 8:12 36:9
forty-four [2] 36:10,16
four [3] 31:12,13 36:10,16 45:1,4,18 56:3,8
free [1] 37:3
fresnos [4] 7:14,22,25 8:3
front [5] 19:15,16 20:8 73:3 77:12
function [1] 70:7

**G**

gamez [5] 62:6,19,20 63:6,6
garig [2] 85:9,10
gave [4] 29:15,17 38:5 79:18
general [7] 9:7,8,17 51:15,16 52:5 67:20
generally [7] 18:19 33:21 48:10,20 50:12,22 69:20
gentlemen [2] 20:4,21
gerald [1] 5:4
gets [1] 13:13
getting [5] 38:4,12,23 85:14 91:13
give [6] 13:2 62:4 63:19 84:12,14,16
gives [1] 23:10
gl [2] 9:4,6
gomez [6] 31:2,6 39:15,18,19 62:18
gonzalez [15] 5:2 6:1,6,7 16:23 29:9 35:3,11,12,16 57:8 66:4,13,14 84:1
gonzalez' [2] 40:23 47:10
gonzalez" [1] 22:11
got [4] 35:1 38:5 56:24 80:14
gotten [1] 38:13
govern [1] 69:4
government [9] 50:5,8,9 89:24 90:1
grade [1] 49:11
grain [31] 6:10 22:23,24,25,25 23:8 25:1 29:9,12,13 31:17 32:12 41:4 43:8,9 47:19 50:19 52:4,6,11 53:8, 12,13,21 59:25 63:13 67:3,5,7,9 90: 13
grain" [12] 22:20,21 23:5 27:15 31: 23 35:4 39:10 40:18 43:6 46:11,12, 15
grande [1] 35:13

Port Elevator-Brownsville V. Ivonne Soto Vega
DEPOSITION OF MARIA GONZALEZ
6-22-01

**guess** [5] 17:9 34:13 42:21 59:5,5
**guessing** [1]25:21
**guillermo** [1]65:22
**gutierrez** [34] 10:25 11:24 12:15 13: 24 14:2 16:11 18:14,16 19:5,7 20:4 21:13 22:24,25 29:13,24 43:9 46:11 62:5,14,25 65:7 72:17 75:23 79:2, 20 80:3 83:1 85:22 86:19 87:14 88: 17 89:5,8
**gutierrez'** [10] 16:7,15 21:16 22:1 30:14,23 73:2,9 80:2 88:5
**gutierrez"** [2] 17:21 18:3

**H**

**half** [6] 7:23 77:9,18 78:7 86:12,16
**hand** [2] 16:19 54:18
**handed** [3] 19:2 72:9 75:25
**handle** [5] 33:11 53:4,7,10,22 67:24 68:4,8
**handled** [2] 52:7,13,14
**handles** [2] 53:13 54:7
**handling** [1] 68:3
**handwriting** [2] 80:20,22
**happened** [3] 72:7 85:18 86:3
**hart** [1]85:9
**haven't** [1] 60:8
**he's** [13] 53:20,20,25 54:1,3,8 59:24 60:8 61:7,21,22 62:13 63:3
**head** [2]63:3,4
**hear** [1] 33:22
**held** [1] 63:13
**help** [3] 9:25 45:23 88:3
**helps** [1]61:13
**henry** [1]85:9
**hereby** [1] 22:3
**herein** [1] 5:3
**hierarchy** [2] 60:18,19
**history** [1] 9:11
**hold** [5] 50:19 74:24 75:2,10,11
**home** [2] 7:15 36:4
**house** [2] 7:21 63:3,4
**however** [1] 33:11
**hundred** [3] 36:10,16 40:4

**I**

**I'll** [23] 7:4 15:23 25:20,25 26:22 30:4, 5 32:3 33:16 34:3 41:6 55:6,9,13 58: 6 65:24 75:4 76:13 81:3,3 87:23 89: 13 91:16
**i'm** [21] 6:7 8:2,16 25:17,21 26:8 33: 1,17 34:2,10 41:22 48:21 51:2,22 52:16 64:1 69:25 72:2 75:11,11,12
**i've** [2] 34:8 44:9
**id** [9] 12:3,5,6,18 13:17 70:4 73:3,9 77:19
**idea** [3] 18:24 73:21 80:13
**identify** [6] 7:20 15:24,25 21:23 27: 10 43:3
**importing** [1]90:8
**inc** [1]59:25

**include** [1]77:22
**incoming** [1] 53:24
**indicated** [1] 33:5
**individuals** [2] 19:10,13
**information** [13] 37:23 38:19 63:20 85:2,14 91:2,3,4,5,8,10,13,14
**input** [1] 63:18
**inquiring** [1] 30:10
**inspect** [1] 90:4
**instance** [2] 49:10 61:8
**instruct** [12] 25:10,17,21 26:22 30:4 32:3,18 33:13 41:17 55:5,9,13
**instructed** [1] 34:7
**instruction** [2] 25:24 41:24
**instructions** [4] 29:15,17 30:11 61: 10
**invoice** [29] 11:24 15:18,19,23 20:22 21:24 23:17,19 28:11,17 31:8 36:18 37:13 39:4,5,8 42:8,11,15,22,23 43: 2 46:5,21 47:21 48:24 54:23 59:3 91:15
**invoices** [10] 40:4 47:18,24,25 48:25 59:6 90:13,15,20,22
**involved** [6] 42:1 46:20 52:23,24 53: 14 68:14
**involvement** [1] 68:3
**involving** [4] 10:22 28:11 46:17 80: 14
**irrespective** [1]41:19
**issue** [5] 50:18 51:4,6 58:14 68:22
**issued** [3] 5:6 50:22 51:1
**issues** [3] 50:22 51:3 69:1
**it's** [37] 6:17 7:18,22,23,25 8:12 16: 22 20:16 23:4 27:9 34:10 40:13 43: 47:1,14 49:21 50:5,8,9 51:2,13 54:3, 6 58:15 59:24 70:18 76:8,9 78:3,5 79:11 80:12 83:20 84:24 87:14 89: 10,21
**ivonne** [9] 5:3 6:8 14:21 74:22 75:16, 24 79:2 80:3 87:10

**J**

**january** [2] 81:5,7
**job** [4] 35:18 66:15 67:15 68:16
**juan** [2] 62:5,9
**judge** [9] 6:20,21 7:9 33:18,23,23 34: 2,2,6
**judges** [1]25:23
**july** [2] 8:18 9:1
**june** [1] 5:5
**jury** [11] 6:19,22 14:5 21:6 44:25 66: 5 75:1,5,8,9 90:5
**juventino** [1] 62:6

**K**

**keep** [5] 57:23 73:23 74:2,4 81:3
**keeping** [1] 57:3
**keeps** [1] 56:20
**kept** [1] 28:18
**kind** [11] 19:17 25:18,20 26:9 32:18

67:15,18,21,22 68:12 69:16
**knowledge** [5] 52:12 53:3 59:9 75: 21 80:7
**known** [1] 60:8

**L**

**l.c** [30] 8:22,25 9:3,13,20 10:6,10,11 11:14 17:7 27:25 28:18 35:23 40:11 43:19 46:8 48:1,16 50:17 51:2,11 52:5,10 56:19,24 59:13,16 60:13 90: 16,20
**lady** [3] 74:25 75:2,12
**language** [5] 17:14 18:1,12 75:23 80:2
**last** [4] 26:5 35:2 54:18 85:6
**later** [5] 15:1 33:12 44:1,1 76:8
**law** [2] 32:17 41:13
**lawsuit** [2] 6:8 11:1
**lawyer** [8] 26:16 31:19 33:14 34:8 55:5 71:13 88:2,13
**lawyer's** [8] 25:19 30:10 32:21 33:8 34:16,20,22 41:11
**lawyers** [1] 25:22
**lead** [2] 74:19,19
**leading** [8] 68:1,24 69:6 70:9 71:25 88:7,11,14
**leads** [2] 74:13 75:13
**least** [1] 60:8
**ledger** [3] 9:7,8 67:20
**lee** [3] 35:11,12 84:1
**left** [1] 53:23
**left-hand** [1] 23:3
**legal** [13] 25:21 30:4,5 31:20,21 32: 16 33:6 41:8,10,18,18 69:7,22
**legible** [1] 23:4
**length** [1]84:11
**leocardio** [1] 62:5
**leonardo** [1] 62:6
**less** [1] 73:21
**let's** [1]75:10
**letter** [1] 83:8
**letters** [1] 79:11
**license** [1] 42:4
**licensed** [1] 41:13
**lieutenants** [1] 60:24
**likely** [1] 40:14
**likewise** [1] 87:5
**listening** [1] 88:1
**little** [1] 13:6
**live** [2] 7:13 8:9
**lived** [1] 8:11
**living** [1] 66:14
**loaded** [4] 23:19 24:23 28:14 42:20
**lobby** [1] 19:17
**located** [5] 24:14,15 28:3 78:9,10
**lodge** [1]41:20
**log** [12] 11:12,13,21 13:25 20:14,17 21:12 54:17,17 85:14 88:4 89:4
**long** [8] 8:11,24 9:19 20:19 61:4 62: 1,7,11 73:12 84:16 86:6

**longer** [1]36:3
**look** [11] 11:8,10,11,12 12:6 21:23 44:8,15 45:22 54:21 57:12
**looked** [6] 14:3 21:4 45:5 48:11 54: 23 77:6
**looking** [1] 87:16
**looks** [6] 18:3,6,7 21:7 79:16 87:19
**loren** [1] 15:8
**los** [4] 7:14,22,25 8:3
**lot** [1] 53:18
**lower** [3] 40:25 43:5 71:6

**M**

**ma'am** [16] 25:3,17 26:13,22 30:3,12, 13 31:19 32:8 40:21 41:8 55:3 70: 17 88:1 89:2,12
**made** [4] 58:2,2 71:2,3
**maintain** [1] 70:20
**maintained** [1] 70:13
**maintenance** [1] 63:7
**man** [1] 13:5
**manager** [1] 67:16
**managers** [1] 67:10
**many** [2] 60:13 66:18
**march** [2] 83:25 85:5
**marchantex** [1] 22:8
**maria** [9] 5:1 6:1,6,7 13:1 16:23 29:9 35:3 66:13
**mark** [2] 15:22,23
**marked** [11] 15:20 21:21 27:7,8 39:1, 2 42:25 43:1 45:25 54:24 57:18
**marking** [1] 87:11
**married** [1] 8:5
**matters** [2] 25:22 58:14
**maximum** [1] 77:9
**mean** [11] 38:17 41:22 50:4 51:22 52: 8 53:9 67:14 72:8,20 86:8 88:24
**means** [2] 32:17 37:8
**meet** [3] 14:25 15:2 64:13
**memory** [3] 78:3,4,14
**mentioned** [4] 50:24 53:11 63:22 89: 16
**mentions** [2] 11:13 21:12
**met** [5] 10:25 14:23 15:8 63:22 65:22
**metric** [7] 24:18 28:12 36:10,17 38:7, 9,21
**mexico** [12] 23:24 24:19 28:9,22 30: 22 36:6 37:15 39:23 45:9 48:23 68: 7 90:16
**middle** [1] 22:13
**might** [13] 50:15 51:4 53:8 54:15 55: 4 61:18 63:19 66:5,6 68:8 73:20 75: 19 87:3
**mile** [1]7:23
**miles** [2] 7:22,25
**mind** [3] 31:25 57:12 64:25
**minute** [11] 73:15,19 74:6 77:9,9 78: 6,7 86:12,12,16,16
**minutes** [2] 73:12 77:18
**mode** [1] 90:9

**moment** [1] 60:15
**monterrey** [3] 28:9 90:16,20
**month** [1] 11:7
**monthly** [1] 10:12
**months** [2] 44:1,1
**most** [2] 40:14 56:8
**mount** [74] 5:3 6:4,7 11:19,20 13:10
15:21 21:22 25:6,11,25 26:2,7,11,15
27:2,8 30:7,13 31:22 32:4,8,20 33:1,
20 34:12,19,23 35:1 38:25 39:2 40:
22 41:25 43:1 44:18,19 46:1 55:7,
15 56:3,4,7,8,18 57:14,19 58:8,12,
14 65:24 68:1,24 69:6,21 70:9 71:
25 72:11,16 73:6,14,18 74:15 76:1,5,
11,16 87:23 88:7,11,14 89:15 90:12
91:16,18
**move** [1] 75:12
**ms** [14] 14:21,23 15:5 35:16 40:22,23
47:10 57:8 63:22 64:19,23 66:4,14
87:19
**much** [1] 76:14
**multiplied** [1] 38:9
**must** [3] 5:10 70:4,4

## N

**name** [24] 6:5,7 15:9,10 16:22 32:15
35:3,12 43:11 61:2 66:12 77:3,7,20
80:4,8,9,12,14 87:10,11,14,19,21
**named** [1] 11:1
**names** [1] 62:4
**narrative** [2] 72:12,16
**navigation** [9] 9:14,15 66:21,24 67:
2
**near** [1] 58:2
**necessarily** [1] 20:14
**necessary** [1] 15:14
**need** [10] 7:9 25:12 33:20,22 34:12,
15,16 55:3 75:1,10
**needed** [1] 57:9
**never** [3] 51:8 59:21 65:16
**new** [1] 67:16
**next** [10] 13:13 22:17 31:13,14 82:10
83:1,5,15,25 85:5
**nine** [1] 44:1
**no.'s** [1] 36:25
**nonresponsive** [1] 73:6
**normal** [1] 13:4
**north** [3] 8:3,4,5
**notarization** [11] 17:19 18:2,12 19:3
81:5,7,8 83:13,15 86:15,18
**notarizations** [2] 88:4 89:3
**notarize** [21] 18:20 19:15 20:10,13,
17 70:3 71:23 72:8 73:2,23,24 75:
18 76:4,9 80:1,1 84:1,5,11,17 86:6
**notarized** [48] 11:23 12:12 13:23 14:
9,13 15:16,25 16:10,15 17:2 18:17
20:5,23 21:12,25 22:1 27:17 39:12
44:12,25 45:4 47:3 59:3 70:23 72:4
73:1,4 74:14,20,23 75:25 76:19,23
79:19 80:25 82:1,10,15,18 83:8,12,

18 84:25 85:8,12,18 86:8 89:8
**notarizing** [17] 16:6,7 27:20 72:14
76:24 77:1,6 81:15,17 82:7,20,24
83:6,23 84:4 85:25 88:22
**notary** [38] 5:12 11:12,13,20 12:14
13:19 16:23 20:19 45:3 54:17,17 55:
17,20 57:12,21,24 68:18,19,23 69:1,
5,10,14,17 70:7,14,16,19,20,24 71:1,
7,16 79:25 81:3 85:6 86:11 88:19
**notation** [2] 15:18 82:15
**notice** [4] 5:6 15:22 54:12 88:3
**november** [21] 13:21,24 15:5,14 21:
13 24:23 28:15 35:8 36:14 43:23 44:
3,16,19,20,21 47:7 83:2,2,5 85:22
86:19
**number** [23] 7:15 8:13,14 12:9,12 38:
5,6,9 39:5 43:2,3 46:5,21 54:19 55:
19,22 56:3,8,11 60:11 71:6,15 76:8
**numbered** [1] 15:7
**numbers** [2] 42:4 47:21

## O

**oath** [1] 6:24
**oaths** [1] 5:12
**object** [14] 25:4,25 30:5 31:20 41:23
55:6,13 68:24 69:21,21 74:15 76:1
88:11,14
**objection** [14] 26:1 41:20 68:1 69:6
70:9 71:25 72:11,16 73:6,14,18 76:
5,11 88:7
**obliged** [1] 21:1
**obtain** [2] 12:17 37:23 91:10
**obtained** [1] 91:8
**obtaining** [2] 38:19 91:2
**obviously** [1] 58:22
**occasion** [1] 63:23
**occasions** [2] 20:13 65:8
**october** [14] 11:14,17,21,24 13:20
15:5,14,17 16:1 17:13 36:7,11 78:
23 83:2
**offered** [1] 74:4
**office** [19] 9:17 11:2,4 14:20,24 20:1,
2 29:4 51:12,14,20 52:2 53:21 63:
24,25 64:3,5 72:24 87:3
**offices** [1] 51:13
**official** [5] 5:12 68:17 69:18 71:7,24
**okay** [60] 7:6,10,22 13:3,9 15:2 19:
21 22:16 23:3 24:5 30:20 32:22 34:
23,25 35:1 37:6,20,23 38:8 39:18,25
42:7,15 48:25 49:3,23 50:24 51:8,
14,25 52:10,21,22 53:6 54:6,14,18
55:19,22 56:7,23 57:5 60:24 61:2
62:11 63:12,19,22 65:16 72:23 77:
17 78:19 79:17 82:10 86:5 88:12,16
89:20,23 90:3
**once** [2] 11:2 14:24
**one** [31] 13:20 15:12 16:9 17:9 19:10,
12,21 27:4 34:10 42:1 43:3 52:19
54:19 56:9,10,11 57:10 63:23 64:25
71:15 73:15,19 74:6 75:1 77:18,18

80:8 85:21 86:19 89:9,20
**ones** [1] 70:1
**only** [5] 55:15 59:2 69:23 76:24 80:8
**opinion** [4] 18:7 32:2 58:22 69:25
**opinions** [1] 31:20
**opportunity** [2] 7:3,4
**oral/videotaped** [1] 5:1
**order** [7] 14:8 26:2 45:3,14 63:20 66:
6 91:10
**ordinary** [1] 57:24
**origin** [4] 49:7,15,18 50:6
**original** [17] 5:16 22:4 24:7,8,11,14,
15 27:22,24 28:2,2,4,21 39:13 45:5
47:4,14
**originals** [3] 45:8,14,15
**other** [43] 13:5,21 15:13,18 16:9 19:
23 20:10 26:25 40:3 42:22 44:2,2
48:8,9,11,20 50:14 51:3 52:17 61:
15,16,18,22 62:1 64:16 71:13 79:11
81:19 82:4 84:13,20 86:20,23 87:16
88:2,3,4,13,18 89:3,4 91:5,9
**out** [24] 9:25 23:20 24:18 28:9,24,25
31:9 36:6,13,21 37:15 47:25 51:2,
23 52:16 53:7,20,25 54:8 61:10 64:
11 78:6 90:15,19
**outgoing** [1] 53:24
**outside** [6] 7:25 26:25 51:15,16 88:
23,24
**over** [11] 5:13 10:22 13:5 55:1 58:15,
16 75:16 87:11,15,20 90:12
**own** [3] 51:14 52:12 72:10
**owned** [2] 58:23 59:10
**owner** [3] 37:19 38:14,16
**owners** [2] 67:10,16
**owns** [2] 58:16,19 59:10

## P

**p.m** [1] 91:20
**page** [16] 27:9,10 31:13,13,14 32:9
35:12 40:7,7,8 41:21 46:2,10,14 47:
11 54:19
**pages** [1] 46:3
**paid** [5] 10:9,12,12,13 59:24
**paper** [5] 71:18,20,23 74:24 75:4
**paperwork** [7] 50:15 53:14,15,17,22
54:7 84:5
**part** [5] 13:8 23:14 42:20 71:13,23
**particular** [66] 7:17 11:11,17 12:2
16:18 18:3,11,23 22:16 23:13 24:1,
3,5,17,25 25:6 26:17 27:17,20 28:11,
17 29:2 30:15,21 31:1,16 32:9,11
35:15 37:7 38:23 39:12 40:23 41:25
42:15 44:25 46:7 47:13,15 57:23 60:
12 65:3 69:13 72:5,14 76:17,19,21,
23 77:2 78:14 79:17,18 80:13,19 81:
18 82:8,21 83:11,13,23 84:4,9,20 86:
1,21
**parties** [1] 10:22
**party** [1] 55:11
**pass** [5] 65:24 76:13 87:23 89:13 91:

80:8 85:21 86:19 89:9,20
**16**
**passed** [1] 65:19
**past** [2] 7:22 20:9
**pay** [1] 63:10
**payable** [2] 9:5 67:20
**paycheck** [2] 10:8,9
**payroll** [4] 9:4 10:18,19 67:20
**people** [3] 63:8 86:23 88:18
**per** [2] 38:7,21
**perfect** [1] 13:14
**period** [2] 62:1 78:7
**persist** [2] 33:5,6
**person** [10] 18:20,23 29:15,16 51:3
57:2 68:12 70:3,4,5
**phonics** [1] 62:6
**phrased** [2] 25:4 55:14
**physical** [2] 14:6 21:7
**phyto** [9] 49:21 50:4 68:10 89:19,20,
24 90:5,21 91:7,7
**phytos** [3] 68:6 89:17 91:7
**picture** [1] 34:4
**pictures** [1] 33:4
**piece** [4] 71:18,20,23 74:24
**place** [2] 77:12 91:9
**placed** [1] 37:6
**play** [1] 6:18
**please** [7] 6:5 36:8 52:9 56:22 66:12
72:13 75:13
**point** [2] 41:7 75:13
**pointing** [1] 21:1
**porfirio** [1] 61:3
**port** [55] 6:9 8:21,24 9:2,12,17,20 10:
6,9,11 11:13 15:13 17:6 23:20,20,21
24:19 27:24 28:18 35:22 39:23,24
40:11 43:19 45:22 46:8 47:25 48:15
50:17 51:1,10 52:5,10 56:1,4,19,23
59:12,15,16 60:12,21,22 66:16,17,
20 67:3,6 68:17,22,25 77:12 78:10
90:16,19
**portion** [3] 36:14,22 87:20
**portions** [1] 18:24
**position** [1] 10:3
**possession** [4] 55:23 56:1,14,16
**power** [1] 81:15
**practice** [2] 18:19 41:13
**precise** [1] 89:3
**predicate** [1] 41:16
**preparation** [1] 54:20
**prepare** [2] 68:10 90:1
**prepared** [1] 53:24
**prepares** [1] 63:14
**preparing** [2] 16:19 63:12,16
**presence** [3] 18:17,21 31:4
**present** [11] 14:14,16,19,21 15:13
67:10 70:4 81:26 82:1,5 86:23
**presented** [1] 74:16
**presume** [6] 23:7 24:11 32:4,20 52:
2 55:1 56:4,23 64:6
**price** [7] 38:7,12,13,21,23 40:3 47:1

Port Elevator-Brownsville V. Ivonne Soto Vega
DEPOSITION OF MARIA GONZALEZ
6-22-01

printed [1] 41:21
prior [5] 9:12 54:11 55:8,16 77:6
probably [5] 20:1,2 38:8 55:16 75:8
procedure [2] 5:8,11
proceed [1] 34:24
process [6] 52:16 72:2,7,14 73:11, 13 77:8,11 86:11
produced [1] 56:5
product [10] 28:5,6,7 38:15,16 50:7, 7 90:7,8,9
proper [2] 70:7 80:1
protocol [1] 52:6
provided [1] 74:1
public [24] 5:12 16:23 55:20 57:21, 24 68:18,19,23 69:1,5,11,14,17 70:7, 14,16,19,20,24 71:1,8,16 84:5 85:6
public" [1] 43:12
puffelis [12] 14:15,17 16:12,14 19:6, 8 20:4 21:3,9 72:18 79:21 87:6
purchase [1] 70:6
purpose [2] 5:13 27:20
purposes [3] 26:24,25 58:11
pursuant [2] 5:6,7
put [8] 6:21 33:10 37:23 45:3 57:9 75:7 77:23 91:5

**Q**

quality [3] 49:7,9,12
ques [1] 34:14
question [50] 7:4 13:6,13 24:4 25:4, 4,6,16 26:3,5,8,12,13,22 28:1 30:5,8, 19 31:21,24 32:1,5,6,13,15 33:21 34: 1,3,6,14 35:2,5 36:8 42:21 50:23 52: 8,15,19 55:4,6,13,14 56:22 69:15 72: 3,11 73:7,17 80:9 88:16
question-answer [4] 13:14,15,16, 16
questions [19] 7:10 13:2 25:10,20 26:10 30:9,11 31:20 32:18 33:6,10, 14,17 41:17 55:10 66:7 71:14 81:2 88:2
quit [2] 33:16 35:25
quoted [1] 18:1

**R**

rail [2] 50:6 90:10
read [11] 6:20 13:8 18:12 66:5 69:9, 24 71:6 74:7,10 76:22 77:2
reading [5] 5:13 70:2
real [1] 58:11
really [7] 10:2 15:12 37:5 52:14 59:1 63:5 81:19
reask [1] 32:6
reason [1] 87:9
recall [7] 11:3,7 12:6 14:2,8,13,16 15:4,9 16:9,13 19:2,24 20:10,12,21, 24 21:3,9,11 22:15 29:20,21,22 36:2 37:25 38:5,20,22,24 42:12,18,21,23 44:7 45:2,4,13,16,20,21,23 47:16 48: 7 63:25 64:2,8,14,15,19,23 65:11 72:

4 79:22 80:4,6,17,24 81:17 82:4,21 83:12,22 84:3 85:18 86:1,4,6,11,13, 19,22,24 87:4,5 89:2,7
receipts [5] 50:18,21,24 51:3,6
receivable [1] 9:4
receive [1] 10:8
receives [1] 52:11
recent [1] 56:8
reception [1] 78:10
recognize [3] 21:15 57:20 71:18
recollection [1] 11:6
record [21] 6:5 7:10 13:7,14 25:11 26:2,23 32:25 33:2,3 57:2,15,17,21 59:5 66:12 70:20,22 71:8 87:8 90: 11
recorded [2] 5:15 89:4
records [5] 57:23,23 58:9
referenced [2] 36:23 42:8
referred [1] 36:17
referring [3] 35:22 42:2 48:21
reflected [1] 58:3
refusing [6] 25:15 26:3 30:7 31:24 32:4 33:1
regard [2] 37:12 88:17
regarding [2] 32:2 64:15
regulations [2] 69:4,10
relate [1] 55:12
related [1] 55:24
relation [1] 51:11
relationship [1] 88:18
release [1] 85:13
remember [7] 15:17 19:14 29:18 82: 1,7 87:12,13
repeat [3] 30:19 52:8 69:15
repeatedly [1] 34:3
rephrase [5] 36:8 42:14 50:23 52:8 91:6
reporter [4] 5:4 6:21 7:5,8
representative [2] 30:14,24
representing [1] 16:8
request [2] 54:12,16
resident [2] 12:7,8
resides [1] 5:2
respond [2] 7:5 56:15
responsive [1] 54:16
rest [2] 18:8 34:5
resume [1] 56:9
reviewed [2] 54:20 55:15
right-hand [6] 27:14 39:6,9 40:25 43:6 71:7
robert [1] 81:11
room [3] 62:23,24 73:17
rules [8] 5:7,11 69:4,10,20,23 70:1 79:25
running [1] 74:25
runs [1] 60:22

**S**

salary [2] 59:17,22
same [19] 7:6 18:6 40:3 42:7 46:20

51:13 62:15,17,21 66:5 67:14,15 73: 18 76:5 79:7,8,14 89:9,21
sandra [2] 84:1,13
sanitary [1] 49:22 50:4 68:11 89:17, 19,20,25 90:5,21 91:6,8
saw [4] 13:20 24:11 59:6 65:8
saying [2] 47:3,13
says [25] 13:25 16:22,23 17:19 18:1 22:3,20,21 23:4,5,13,14 32:15 35:3 37:7,11 39:5 41:19 42:16 43:12 79: 1 80:17 83:20 84:7 85:22
says,"my [1] 17:16
says,"sworn [1] 17:12
scratch [1] 11:19 38:25 44:18
seal [1] 45:3
second [6] 13:23 40:7,8 46:14 47:11
secondly [1] 87:11
seconds [2] 73:12,22
secure [1] 70:7
security [2] 8:13,14
see [21] 22:6,18,20 31:3 32:7 35:12 39:15,17 40:22,23 54:11 61:9 70:4 73:8,8 74:18 75:3 79:2,5 80:17 83: 16
seeing [1] 15:4
seen [5] 39:3 45:14 59:2 75:8,9
seller [2] 38:17,18
selling [2] 91:11,12
separate [1] 88:16
shadow [1] 75:3
she's [15] 6:9 26:9 33:7,13,21,22 34: 5,7,8,9,13,14,15,17,21
sheet [1] 5:15
shipment [6] 35:7 41:25 52:4,11 53: 7,21
shipments [6] 45:18 53:11,24 54:7 90:15,19
shipped [13] 23:20 24:18 28:24,25 30:22 31:9 35:8 36:6,13,21 37:15 39:22 48:22
shorthand [1] 5:4
show [8] 27:8 39:2 43:1 46:1 49:6 57:19 58:19 75:1
showed [3] 36:18 42:9 44:9
shown [1] 76:18
shows [4] 11:20 24:17 31:8 44:12
sic [1] 40:25
side [2] 19:21,23
sign [4] 18:20 31:4 37:10 77:20
signature [59] 16:3,6,7,10,11,16 17: 20 18:2,13 21:16,18,24,25 22:1,8,13, 14,14,18 27:13 31:2,14,17,22 32:8 39:9,15 40:8,17,23 41:19,21 43:5,11 46:2,10,14 47:10 70:3 71:20 73:2,4 75:17 76:24 77:1,7,14,19 79:21,22 80:1,1 84:25 85:8 86:9 87:11,15,20 89:9
signatures [5] 22:5,6 70:22 75:19 88:3

signed [14] 18:16 29:9 30:15,21 32: 11,12,14 35:2,15 44:4 73:3 75:14 80:7 87:14
significance [1] 32:17
signing [3] 10:18 16:14 18:20
signs [1] 10:18
similar [1] 18:4
since [10] 6:15 8:2 9:1,21 20:20 59: 20,20 60:8 62:13 70:16
sir [81] 6:12,23 7:2,7,11 8:6,8,10 10: 4,7,17,24 11:16 12:1,11 14:4,18,20, 22 16:5,8,17,20 17:3,5,8,15,18,22, 24 18:15,18,22 19:4 22:22,24 23:12 27: 12 28:10,20,23 29:11,14,25 30:25 31:5,15 35:17,21 36:12,20 39:4,7,21, 24 40:2 42:6,10 43:4,7,10,13,17 45: 16,24 46:25 47:2,9 49:17,25 50:2,16 51:7,24 59:14,19,23 60:10 61:20,24 66:9,11
sit [2] 76:7 84:19
sitting [3] 13:5 20:9 69:24
skaggs [57] 13:1,4 25:3,9,17 26:5,8, 12,16,20,21 27:2,4 30:3,9,17 31:19, 22,25 32:6,13,22,24 33:4,25 34:17, 21,25 35:5 40:20 41:6,10,13,16 55:3, 9,25 56:6,13 57:16 58:6,10,13 66:1, 3 68:2,25 69:23 72:13 73:8 76:13, 17 87:25 88:8,12 89:13 91:17
skaggs' [3] 25:7,14,25
slowly [1] 75:12
smith [1] 5:4
social [2] 8:13,13
sold [4] 23:24 24:19 90:1,7
somebody [3] 73:16 88:23,24
somehow [1] 48:18
someone [2] 24:19 60:20
sometimes [2] 34:19 51:1
sorry [1] 64:1
soto [9] 6:3 6:8 74:22 75:16,17,24 79:2 80:3 87:10
sound [2] 11:15 15:10
source [1] 91:5
south [1] 8:3
southwest [2] 6:10 59:25
spaces [1] 78:18
spanish [4] 13:12 14:10,11 21:10
speaking [3] 26:1 65:7 73:16
specifically [2] 67:2 86:3
speculation [2] 73:14 74:16
spoke [6] 14:8 21:9 38:20 64:5,8 65: 16
spoken [2] 64:19 65:14
standing [1] 20:8
stands [4] 22:25 29:12 37:3 43:8
start [2] 66:23 67:5
started [1] 9:21
starting [1] 44:11
state [12] 5:5 6:5 16:24 26:23 33:7 41:14 66:12 68:17,19 69:18 71:24

84:24
**statement** [2] 18:5 82:16
**states** [1] 50:6
**statutes** [2] 69:3,9
**stay** [1] 36:4
**still** [3] 31:23 35:20 75:2
**stipulate** [1] 58:6
**stipulating** [1] 58:9
**stipulations** [1] 15:8
**storage** [2] 63:12,14
**striving** [1] 13:15
**styled** [1] 5:6
**subject** [2] 55:24 70:6
**submitted** [2] 5:15 26:3
**subscribed** [1] 17:12
**subscribed"** [1] 78:1
**sued** [2] 6:9 55:11
**summarize** [1] 10:2
**summarizing** [1] 88:10,12
**supervision** [1] 33:9
**supervisor** [2] 9:9 83:9
**surrender** [1] 85:13
**swear** [2] 24:6 44:4
**sworn** [2] 6:2,24

**T**

**table** [1] 73:7
**talked** [4] 36:21 64:16 77:24 89:24
**telephone** [3] 7:15 64:20 65:14
**tells** [5] 33:18,18 34:2,2,6
**ten** [5] 38:21 40:4 44:1,1 61:5
**tenure** [1] 70:23
**term** [2] 31:23 46:15
**testified** [2] 6:2 89:2
**testimony** [4] 20:16 78:5 84:12 89:16
**texas** [6] 5:2,5 16:24 41:14 68:20 71:24
**that's** [108] 6:25 8:23 10:4,17 11:22 12:1,4,11,25 13:5,15,22 16:5,8,17 17:5,8,11,15,18 18:16,19 21:2,14,17,20,24 22:19 23:6 24:10 25:24 28:13,16 33:15,25 34:16 35:6,10,17,24 36:17,23 37:2,14 39:5,21 40:6,20,24 42:4,8,15,20 43:10 44:3 45:12 46:2,25 47:2,9 48:19 49:2,5 50:2,8,11 51:23 52:1,3,6,14 54:2 55:18,21 56:13 57:2,4 58:20 60:10 61:12 63:13 65:2 67:3,4,5,8,12 69:8 71:5,14 74:8 78:8,16,18,21 79:4,16 81:6,10,13,16 82:19 83:4 85:16 86:14 87:22 89:23,24
**there's** [4] 33:21 37:10 38:7 74:25
**therein** [1] 58:45
**they're** [5] 58:9,10,11 90:1 91:12
**thirty** [1] 73:22
**thirty-eight** [1] 8:20
**thirty-one** [1] 66:19
**thousand** [3] 36:9,10,16
**three** [3] 7:22,25 55:22
**ticket** [1] 48:24

**tickets** [5] 48:13,14 49:3 91:4,9
**timing** [1] 85:1
**title** [3] 10:2 35:18 83:21
**today** [6] 6:8,18,24 10:21 58:22 65:5 76:7 84:19
**together** [1] 16:21
**ton** [2] 38:7,21
**tons** [3] 24:18 28:12 36:10,17 38:9 11,22 84:11,16 86:5,6,10
**took** [12] 12:9,22 13:16 73:13 77:9,
**top** [4] 23:3,14 60:19,20
**towards** [1] 23:14
**town** [2] 54:8 64:11
**train** [3] 52:7,11 53:22
**trainload** [3] 52:13 53:2,3
**translates** [1] 13:12
**translator** [2] 13:11,12
**transportation** [1] 90:9
**traveling** [3] 53:7,20,25
**travels** [1] 53:18
**trouble** [1] 34:9,9
**truck** [2] 29:1 31:9
**truckload** [1] 42:1
**truckloaded** [1] 47:25
**truckloads** [2] 42:3 46:17
**trucks** [3] 31:11 42:20 50:6
**true** [7] 22:4 24:6 27:21 39:13 43:15 44:4 47:4
**truth** [1] 6:25
**try** [1] 64:13
**trying** [4] 33:6 45:21 51:2 52:16
**twenty** [2] 60:17,18
**twice** [1] 10:12
**two** [28] 12:3,20 14:13 15:1 19:10,13 20:3,21 27:9,10 31:11 36:9,10,16 38:20 40:4,4,4,7 42:3,4 46:2 55:19 65:1,8 75:19 83:1
**type** [23] 12:5 13:5 17:13,21 18:3,4,7,8,25 49:7 50:7 53:2 63:16 77:24 78:19,23 79:1,7,8 83:20 84:7 85:22 90:8
**typed** [17] 13:8 16:22,23,24 17:4,17,23 18:9,14 37:21 38:1 77:25 78:6 79:3 86:20 87:14,20
**typewriter** [5] 77:24 78:4,9,10 79:15
**typewriters** [1] 17:10
**typically** [1] 86:15
**typing** [4] 18:11 75:16 78:13,22

**U**

**ultimately** [1] 67:2
**under** [10] 21:18 32:15,17 33:9 39:9 41:19,21 60:25 61:13 85:23
**understand** [13] 6:10,22 7:1 10:23 24:4 25:22,23 28:1 52:15 66:4,7 69:3 70:2
**understanding** [9] 29:12 34:24 43:8 50:3 54:3,6 58:15 59:24 69:16
**unit** [2] 40:3 47:1
**unless** [3] 33:18,18 34:6

**until** [2] 44:1,5
**unusual** [2] 88:22 89:1
**up** [10] 11:8,10,11 16:22,23 33:10 37:21 38:1 74:24 75:10
**usda** [1] 50:5
**usual** [1] 88:22

**V**

**valley** [1] 35:13
**value** [5] 31:1,6,7,7,13,14,17,17,19,24 38:4,10 39:25 46:23,24
**vega** [5] 5:3 6:8 14:21,23 15:5 63:22 64:19,23 65:22 75:16
**vega's** [2] 87:10,19
**vega"** [4] 74:22 75:24 79:2 80:3
**vehicle** [1] 90:9
**vela** [5] 61:3,4,6,13,25
**verbal** [1] 17:9
**videographer** [1] 6:19
**videotape** [3] 6:19 74:25 75:1
**visiting** [1] 20:3
**vista** [1] 23:10
**voir** [1] 41:7

**W**

**walk** [1] 19:19
**walter** [2] 14:15 72:17
**walters** [1] 15:8
**wanted** [4] 19:15 64:10 73:1,2
**wanting** [1] 64:17
**wants** [2] 33:2,13
**warehouse** [4] 50:18,21,24 51:6
**wasn't** [2] 73:7 80:12
**way** [10] 7:20 11:11 15:12 16:9 21:15 40:10 72:4 79:16 86:19 88:16
**we'll** [7] 7:10 15:23 32:7,22,25 33:16 56:15
**we're** [11] 6:25 7:5 10:21 13:15 15:21,23 35:22 42:2 58:15,15 65:5
**we've** [3] 48:11 77:24 90:12
**week** [1] 10:13
**weekly** [1] 10:14
**weigh** [1] 62:23
**weighed** [2] 48:18 52:17
**weigher** [2] 84:6,7
**weigher's** [1] 84:22
**weighing** [1] 52:24
**weight** [12] 13:25 48:13,14,24 49:3 50:6 68:5 85:24 89:16 90:8 91:4,9
**welcome** [1] 58:13
**weren't** [1] 43:25
**west** [1] 8:3
**what's** [3] 50:3 54:1,3
**whatever** [4] 15:1 32:17 68:8 90:4
**whether** [15] 14:9 15:13 16:10 25:19 30:10 32:16 33:7,13 41:3 51:2 68:25 69:13 79:22 86:20 87:5
**whole** [1] 77:8
**will** [22] 6:21 13:7 20:17 25:9,14 26:13,19,23 32:18,20,24 33:2,8,9 34:3,

17,21 41:7 53:3 55:5,13 75:18
**william** [1] 5:3
**willing** [1] 25:8
**window** [1] 51:21
**within** [2] 51:14 78:6
**without** [1] 41:23
**witness** [32] 5:10,14 13:3,9,13 26:1 27:5 30:19 32:23 33:7 35:6 41:7,9,12,15 65:25 69:8 70:10 72:1,17 73:15,19 74:17 76:3,6,12,13 77:19 87:23 88:15 89:13 91:16
**witness'** [1] 26:23
**witnessed** [1] 70:23
**witnesses** [1] 34:19
**witnessing** [1] 77:14
**word** [4] 22:11,17 74:7,10
**words** [17] 21:18 22:17 27:14 35:12 39:10 40:17 41:21 42:23 43:6 44:2,2 46:11 52:17 72:10 77:24 79:11 87:16
**work** [17] 9:11,12,21 10:1 35:20 36:3 42:20 51:10,11,19,25 61:22 66:21 67:1,2,18 88:6
**worked** [2] 8:24 66:20
**working** [7] 8:21 9:2,12 35:25 57:9 66:23 67:5
**works** [5] 31:12 62:23 63:1
**wouldn't** [2] 15:12 57:3
**write** [3] 20:14,17 63:8
**wrote** [1] 12:14

**Y**

**year** [5] 8:19 11:3 15:1 64:23 70:16
**years** [7] 8:12 55:20 61:5 65:1 66:18 70:24 76:8
**you'll** [2] 33:4 66:10
**you're** [25] 9:6 10:12 13:1 15:4,24 21:22 25:12,15,19 26:3 30:10 32:4 41:4 52:24 57:5 58:8,13 59:1,12 68:13 69:3 75:3,9 77:17 85:14
**you've** [15] 6:15,24 11:23 39:19 48:11 51:8 56:24 59:2,20,21 64:19 66:7 67:9 69:24 70:14
**yourself** [4] 14:14 57:3 61:25 78:20

**Z**

**zoom** [1] 75:2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| PORT ELEVATOR - | § | |
| BROWNSVILLE, L.C. AND | § | |
| SOUTHWEST GRAIN CO., INC. | § | |
| | § | |
| VS. | § | CIVIL NO. B-98-23 |
| | § | |
| IVONNE SOTO VEGA, BERSAIN | § | JURY DEMANDED |
| GUTIERREZ, SYSCO DE BAJA, | § | |
| S.A. DE C.V. AND WALTER | § | |
| PUFFELIS, INDIVIDUALLY AND | § | |
| D/B/A AGI AKRON GROUP, INC. | § | |
| | § | |
| VS. | § | |
| | § | |
| CRAIG ELKINS, INDIVIDUALLY | § | |
| AND D/B/A PORT ELEVATOR- | § | |
| BROWNSVILLE, L.C., AND | § | |
| SOUTHWEST GRAIN CO. , INC. | § | |

NOTICE OF INTENTION TO TAKE THE ORAL AND VIDEO DEPOSITION
WITH SUBPOENA DUCES TECUM OF MARIA GONZALEZ

To:  All Parties, by and through their attorney of record:

John Skaggs
SKAGGS & ASSOCIATES, L.L.P.
710 Laurel
P.O. Drawer 2285
McAllen, Texas  78502

The oral and video deposition of **MARIA GONZALEZ** will be taken

pursuant to the Federal Rules of Civil Procedure at the **Law Offices**

**of DALE & KLEIN, L.L.P.**, located at **815 Ridgwood Rd., Brownsville,**

**Texas  78523; phone number: (956) 546-5596** at **10:00 a.m.** on **Friday,**

**June 22, 2001**.  It is hereby requested that the witness appear at

such time and place for the purpose of giving **her** deposition in

h:\p\99-3843\depos\notices\Maria Gonzalez

1



DEPOSITION
EXHIBIT
/
ACTION REPORTING

this cause, which deposition, when taken, may be used in evidence during the trial of said cause, and will continue from day to day until completed.

Notice is also hereby given that the deponent is to be produced by and through Port Elevator-Brownsville, L.C.'s attorney of record, JOHN SKAGGS, SKAGGS & ASSOCIATES, L.L.P., 710 Laurel, P.O. Drawer 2285, McAllen, Texas  78502, for her deposition.

**Please take notice** that in addition to having a stenographic record made, the undersigned intends to have a nonstenographic record made of the deposition of MARIA GONZALEZ by the use of videotape, when the same is taken on **Friday, June 22, 2001** at **10:00 a.m.,** pursuant to a notice to take the deposition issued by Mr. William D. Mount Jr., Attorney at Law or at such other time as MARIA GONZALEZ may be deposed.

**Please take further notice** that in connection with the taking of said deposition the witness shall produce at the commencement of the taking of said deposition the materials described in the **Subpoena Duces Tecum** attached hereto and incorporated herein for all purposes as if fully and at large set forth at this point.

Respectfully submitted,

DALE & KLEIN, L.L.P.
6301 North Tenth Street
McAllen, Texas  78504
(956) 687-8700 Tel.
(956) 687-2416 Fax.


WILLIAM D. MOUNT, JR.
State Bar No.: 14602950
Federal Bar No.: 14992

ATTORNEYS FOR YVONNE SOTO VEGA


## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that a true and correct copy of the above and foregoing NOTICE OF INTENTION TO TAKE THE ORAL and VIDEO DEPOSITION WITH SUBPOENA DUCES TECUM OF MARIA GONZALEZ has been forwarded to opposing counsel of record:

John Skaggs
SKAGGS & ASSOCIATES, L.L.P.
710 Laurel
P.O. Drawer 2285
McAllen, Texas 78502-2285


    VIA FACSIMILE AND CERTIFIED MAIL/RRR on the 15th day of June, 2001.


WILLIAM D. MOUNT, JR.


h:\p\99-3843\depos\notices\Maria Gonzalez

## SUBPOENA DUCES TECUM TO THE DEPOSITION OF
## MARIA GONZALEZ

1.    Any and all documents reviewed in anticipation of your deposition.

2.    Your Notary Public book for the years 1996, 1997, and 1998.

3.    Any and all documents in your possession, custody and/or control related to the corn that is the subject of this dispute.

4.    Your most current resume.

5.    Your employee file from Port Elevator-Brownsville, L.C.

h:\p\99-3843\depos\notices\Maria Gonzalez

4

```
A   G   I                          INVOICE  0000001
9480 MARCONI DRIVE SUITE F
OTAY MESA, SAN DIEGO CA. 92173     OCTOBER 25, 1996.
PHONE: 619) 661-6481
FAX:   619) 661-6484

SOLD TO:                           SHIP TO:

MRS. IVONNE SOTO VEGA              MRS. IVONNE SOTO VEGA
PASEO RIO TIJUANA No. 1716         BROWNSVILLE, TEXAS 78521
ZONA DEL RIO, TIJUANA B.C. MEXICO
```

| P. O. NUMBER | TERMS | | SALESMAN |
|---|---|---|---|
| 0008-08/23/96 | PRICE BASIS CIF BROWNSVILLE, TEXAS | | W.P. |

| QUANTITY | DESCRIPTION | PRICE | UNIT | AMOUNT |
|---|---|---|---|---|
| 2,444.434 TON/METRICAS<br><br>MERCHANDISE SPECIFICATION: | 2,444.434 TON/METRICAS DE MAIZ AMARILLO # 2 GRADO B PARA CONSUMO HUMANO CON LAS SIGUIENTES ESPECIFI-CACIONES: MOISTURE MAXIMUM 14.5 % MINIMUM TEDNSITY 67.5 % EXTRANEOUS FOREIGN 3.3 % CHIPPED MAIZE 3 % AFLATOXIN 15 PPB MAX. ORIGIN UNITED STATES | $ 170.00 | TONELADA METRICA | $ 415,553.78 |



```
                    RECEIVED BY:



   MR. BERSAIN GUTIERREZ
   OR MRS. IVONNE SOTO VEGA         MR. WALTER PUFFLIS III

   DATE: 10-30-96
   THIS NOTARIZATION IS TO AUTHENTICATE THAT THE ABOVE
   SIGNATURE IS THAT OF MR. BERSAIN GUTIERREZ.
```

| | | T O T A L | $ 415,553.78 |
|---|---|---|---|

```
        SWORN AND
SUBSCRIBED BEFORE ME THIS  30TH DAY  OCTOBER    19 96
MY COMMISSION EXPIRES
AUGUST 21, 1999
                        MARIA GONZALEZ   NOTARY PUBLIC
                        IN AND FOR CAMERON COUNTY  STATE OF TEXAS
```

DEPOSITION EXHIBIT 2 ACTION REPORTING

**D. G. GRAIN**
053 CAROLYN DR
CHULA VISTA CALIFORNIA 91913          Invoice no:B81
619-661-1333
                                      Date:    4-Nov-1996

---

Sold To:                    Loaded at: PORT OF BROWNSVILLE
MARCHANTEX COMERCIALIZADORES INTERNACIONALES.   BROWNSVILLE, TEXAS
S. DE R.L.
MONTERREY # 132  DESP. # 602
COL. ROMA
MEXICO D.F. MEXICO              Date Loaded:    4-Nov-1996

---

COVERING:
MAIZ AMARILLO PARA CONSUMO HUMANO

---

Sale No: 1001          GSM-102-N/A          PRICE/MT: $  210.00

| License No | Ticket | Net Wght (lbs) | License No | Ticket | Net Wght (lbs) |
|------------|--------|----------------|------------|--------|----------------|
| 041-TY2    | 26646  | 88,560         | 988-UK2    | 26647  | 88,320         |
| 202-TZ1    | 26648  | 87,540         | 215-UK3    | 26649  | 86,340         |

I HEREBY CERTIFY THAT THIS IS A TRUE COPY OF THE ORIGINAL DOCUMENT.
SWORN AND SUBSCRIBED BEFORE ME THIS  27TH  DAY OF AUGUST  1997

MY COMMISSION EXPIRES
AUGUST 21, 1999

                    MARIA GONZALEZ
                    NOTARY PUBLIC
                    IN AND FOR CAMERON COUNTY
                    STATE OF TEXAS

**DEPOSITION EXHIBIT 3**
ACTION REPORTING

        Total Pounds:    350,760

        Metric Tons    159,104  F.O.B. Value  $ 33,411.04

        by:
             D.G. GRAIN

```
  . G.  GRAIN
1053 CAROLYN DR.
CHULA VISTA, CALIFORNIA 91913                 Invoice no: BG2
619-661-1333
                                              Date:    5-Nov-1996

Sold To:                           Loaded at: PORT OF BROWNSVILLE
MARCHANTEX COMERCIALIZADORES INTERNACIONALES      BROWNSVILLE, TEXAS
S. DE R.L.
MONTERREY #132 DESP. #002
COL. ROMA
MEXICO, D.F. MEXICO                Date Loaded:      5-Nov-1996

COVERING:
MAIZ AMARILLO PARA CONSUMO HUMANO


Sale No: 1001          GSM-102-N/A          PRICE/MT: $ 210.00

License No    Ticket    Net Wght (lbs)   License No    Ticket    Net Wght (lbs)
623-UJ1       26650        78,060         945-UJ1       26651        77,640
947-UCB       26652        68,920         702-UJ5       26653        70,040
```

I HEREBY CERTIFY THAT THIS IS A TRUE COPY OF THE ORIGINAL DOCUMENT.
SWORN AND SUBSCRIBED BEFORE ME THIS  27TH  DAY OF AUGUST  19 97

MY COMMISSION EXPIRES
AUGUST 21, 1999

MARIA GONZALEZ
NOTARY PUBLIC
IN AND FOR CAMERON COUNTY
STATE OF TEXAS

DEPOSITION
EXHIBIT
4
ACTION REPORTING

```
Total Pounds:      294,660

Metric Tons       133.657    F.O.B. Value   $ 28,067.97
```

by: _____
    B.G. GRAIN

NOVEMBER 5, 1996

AS AUTHORIZED REPRESENTATIVE OF ALICIA AND ALFREDO GOMEZ, I AM
ACKNOWLEDGING RECEIPT OF THE ORIGINAL DOCUMENTS AND HEREBY ACCEPT
MERCHANDISE ON THE BELOW LISTED TRUCKS.

| LICENSE NO | TICKET | NET WGHT(LBS) | LICENSE NO | TICKET | NET WGHT(LBS) |
|------------|--------|---------------|------------|--------|---------------|
| 623-UJ1    | 26650  | 78,060        | 945-UJ1    | 26651  | 77,640        |
| 947-UCO    | 26652  | 68,920        | 702-UJ5    | 26653  | 70,040        |

|   METRIC TONS:   133.657   |   TOTAL POUNDS:   294,660   |

THE UNDERSIGNED AGENT DECLARES THAT THE ABOVE MENTIONED GOODS, SHIPPED
ON THE DATE OF    5-November-1996   AND CONSIGNED TO:
         MARCHANTEX COMERCIALIZADORES INTERNACIONALESS. DC R.L.
ARE PRODUCTS OF THE UNITED STATES OF AMERICA
DATED AT BROWNSVILLE, TEXAS ON           5-November-1996

AGENT FOR B.G. GRAIN

THE RIO GRANDE VALLEY CHAMBER OF COMMERCE, RECOGNIZED CHAMBER OF COMMERCE
UNDER THE LAW OF THE STATE OF TEXAS, HAS EXAMINED THE SHIPPER'S INVOICE
CONCERNING THE ORIGIN OF THE MERCHANDISE, AND ACCORDING TO THE BEST OF IT'S
KNOWLEDGE AND BELIEF, FINDS THAT THE PRODUCTS NAMED ORIGINATED IN THE
UNITED STATES OF AMERICA.

RIO GRANDE VALLEY CHAMBER OF COMMERCE

# J. G. GRAIN

1452 CAROLYN DR.
CHULA VISTA, CALIFORNIA 91913
619-661-1333

Invoice no: BG3

Date:   6-Nov-1996

---

Sold To:                                          Loaded at: PORT OF BROWNSVILLE
MARCHANTEX COMERCIALIZADORES INTERNACIONALES.        BROWNSVILLE, TEXAS
S. DE R.L.
MONTERREY #132 DESP. #602
COL. ROMA
MEXICO, D.F. MEXICO              Date Loaded:       6-Nov-1996

---

COVERING:
MAIZ AMARILLO PARA CONSUMO HUMANO

---

Sale No: 1001        OSM-102-N/A        PRICE/MT:  $  210.00

| License No | Ticket | Net Wght (lbs) | License No | Ticket | Net Wght (lbs) |
|---|---|---|---|---|---|
| 528-UCB | 26654 | 87,360 | 435-UJ1 | 26655 | 98,300 |

T HEREBY CERTIFY THAT THIS IS A TRUE COPY OF THE ORIGINAL DOCUMENT.
SWORN AND SUBSCRIBED BEFORE ME THIS  27TH  DAY OF AUGUST  1997

MY COMMISSION EXPIRES
AUGUST 21, 1999

MARIA GONZALEZ
NOTARY PUBLIC
IN AND FOR CAMERON COUNTY
STATE OF TEXAS


DEPOSITION
EXHIBIT
5
ACTION REPORTING

Total Pounds:     185,660

Metric Tons    84.213  F.O.B. Value   $ 17,685.15

by:  D.G. GRAIN

11/06/96

AS AUTHORIZED REPRESENTATIVE OF ALICIA AND ALFREDO GOMEZ. I AM
ACKNOWLEDGING RECEIPT OF THE ORIGINAL DOCUMENTS AND HEREBY ACCEPT
MERCHANDISE ON THE BELOW LISTED TRUCKS.

| LICENSE NO | TICKET | NET WGHT (LBS) | LICENSE NO | TICKET | NET WGHT (LBS) |
|------------|--------|----------------|------------|--------|----------------|
| 528-UGB | 26654 | 87,360 | 425-UJ1 | 26655 | 98,300 |

METRIC TONS:        84.215              TOTAL POUNDS:      185,660

THE UNDERSIGNED AGENT DECLARES THAT THE ABOVE MENTIONED GOODS, SHIPPED
ON THE DATE OF   6-November-1996   AND CONSIGNED TO:
          MARCHANTEX COMERCIALIZADORES INTERNACIONALESS. DE R.L.
ARE PRODUCTS OF THE UNITED STATES OF AMERICA
DATED AT BROWNSVILLE, TEXAS ON            6-November-1996

AGENT FOR B.G. GRAIN

THE RIO GRANDE VALLEY CHAMBER OF COMMERCE. A RECOGNIZED CHAMBER OF COMMERCE
UNDER THE LAW OF THE STATE OF TEXAS, HAS EXAMINED THE SHIPPER'S INVOICE
CONCERNING THE ORIGIN OF THE MERCHANDISE, AND ACCORDING TO THE BEST OF IT'S
KNOWLEDGE AND BELIEF, FINDS THAT THE PRODUCTS NAMED ORIGINATED IN THE
UNITED STATES OF AMERICA.

RIO GRANDE VALLEY CHAMBER OF COMMERCE

CERTIFIED BY
CHAMBER OF COMMERCE

# B. G. GRAIN
1853 CAROLYN DR.
CHULA VISTA, CALIFORNIA 91913                    Invoice no:BG4
619-661-1333

                                                 Date:   6-Nov-1996

---

Sold To:                         Loaded at: PORT OF BROWNSVILLE
MARCHANTEX COMERCIALIZADORES INTERNACIONALES      BROWNSVILLE, TEXAS
S. DE R.L.
MONTERREY #132 DESP. #602
COL. ROMA
MEXICO, D.F. MEXICO              Date Loaded:     6-Nov-1996

---

COVERING:
MAIZ AMARILLO PARA CONSUMO HUMANO

---

Sale No: 1001          GSM-102-N/A          PRICE/MT: $  210.00

| License No | Ticket | Net Wght (lbs) | License No | Ticket | Net Wght (lbs) |
|------------|--------|----------------|------------|--------|----------------|
| 749-UJ1    | 26656  | 103,320        | 832-UJ1    | 26659  | 102,800        |
| 043-UJ1    | 26660  | - 88,660       | 986-TZ5    | 26661  | 89,320         |
| 048-UJ1    | 26662  | 101,020        | 003-UD1    | 26663  | 103,660        |
| 061-UJ1    | 26664  | 75,780         | 500-UG5    | 26665  | 89,140         |
| 866-UG3    | 26666  | 92,680         | 983-TZ5    | 26667  | 88,560         |

I HEREBY CERTIFY THAT THIS IS A TRUE COPY OF THE ORIGINAL DOCUMENT.
SWORN AND SUBSCRIBED BEFORE ME THIS  27TH   DAY OF AUGUST  19 97 .

MY COMMISSION EXPIRES
AUGUST 21, 1999

                              MARIA GONZALEZ
                              NOTARY PUBLIC
                              IN AND FOR CAMERON COUNTY
                              STATE OF TEXAS

**DEPOSITION EXHIBIT**
6
**ACTION REPORTING**

Total Pounds:      935,020

Metric Tons    :  424.122   F.O.B. Value   $ 89,065.62

by:  _____
     B. G. GRAIN

11/06/96

AS AUTHORIZED REPRESENTATIVE OF ALICIA AND ALFREDO GOMEZ, I AM
ACKNOWLEDGING RECEIPT OF THE ORIGINAL DOCUMENTS AND HEREBY ACCEPT
MERCHANDISE ON THE BELOW LISTED TRUCKS.

| LICENSE NO | TICKET | NET WGHT(LBS) | LICENSE NO | TICKET | NET WGHT(LBS) |
|------------|--------|---------------|------------|--------|---------------|
| 549-UJ1 | 26656 | 102,320 | 832-UJ1 | 26659 | 102,880 |
| 043-UJ1 | 26660 | 88,660 | 986-TZ5 | 26661 | 89,320 |
| 048-UJ1 | 26662 | 101,020 | 003-UD1 | 26663 | 103,660 |
| 051-UJ1 | 26664 | 75,780 | 500-UG5 | 26665 | 89,140 |
| 866-UG3 | 26666 | 92,680 | 983-TZ5 | 26667 | 88,560 |

| METRIC TONS: | 424.122 | TOTAL POUNDS: | 935,020 |
|--------------|---------|---------------|---------|

THE UNDERSIGNED AGENT DECLARES THAT THE ABOVE MENTIONED GOODS, SHIPPED
ON THE DATE OF   6-November-1996   AND CONSIGNED TO:
        MARCHANTEX COMERCIALIZADORES INTERNACIONALESS. DE R.L.
ARE PRODUCTS OF THE UNITED STATES OF AMERICA
DATED AT BROWNSVILLE, TEXAS ON            6-November-1996

AGENT FOR B.G. GRAIN

THE RIO GRANDE VALLEY CHAMBER OF COMMERCE, A RECOGNIZED CHAMBER OF COMMERCE
UNDER THE LAW OF THE STATE OF TEXAS, HAS EXAMINED THE SHIPPER'S INVOICE
CONCERNING THE ORIGIN OF THE MERCHANDISE, AND ACCORDING TO THE BEST OF IT'S
KNOWLEDGE AND BELIEF, FINDS THAT THE PRODUCTS NAMED ORIGINATED IN THE
UNITED STATES OF AMERICA.

CERTIFIED BY

RIO GRANDE VALLEY CHAMBER OF COMMERCE

. G. GRAIN
1863 CAROLYN DR.
CHULA VISTA, CALIFORNIA 91913
619-661-1333

Invoice no:865

Date:  12-Nov-1996

Sold To:                            Loaded at: PORT OF BROWNSVILLE
MARCHANTEX COMERCIALIZADORES INTERNACIONALES      BROWNSVILLE, TEXAS
S. DE R.L.
MONTERREY #132 DESP. #602
COL. ROMA
MEXICO, D.F. MEXICO            Date Loaded:    12-Nov-1996

COVERING:
MAIZ AMARILLO PARA CONSUMO HUMANO

Sale No: 1001          GSM-102-N/A          PRICE/MT: $  210.00

| License No | Ticket | Net Wght (lbs) | License No | Ticket | Net Wght (lbs) |
|---|---|---|---|---|---|
| 024-UC9 | 26669 | 85,220 | 021-UC9 | 26670 | 83,660 |
| 023-UC9 | 26671 | 83,320 | 011-UC9 | 26672 | 84,660 |
| 46-UC9 | 26673 | 69,500 | | | |

I HEREBY CERTIFY THAT THIS IS A TRUE COPY OF THE ORIGINAL DOCUMENT.
SWORN AND SUBSCRIBED BEFORE ME THIS  27TH  DAY OF AUGUST  19 97

MY COMMISSION EXPIRES
AUGUST 21, 1999

MARIA GONZALEZ
NOTARY PUBLIC
IN AND FOR CAMERON COUNTY
STATE OF TEXAS

Total Pounds:    406,360

Metric Tons    184.324   F.O.B. Value  $ 38,700.04

by:  _____
B. G. GRAIN

DEPOSITION
EXHIBIT
#7
ACTION REPORTING

11/12/96

AS AUTHORIZED REPRESENTATIVE OF ALICIA AND ALFREDO GOMEZ, I AM
ACKNOWLEDGING RECEIPT OF THE ORIGINAL DOCUMENTS AND HEREBY ACCEPT
MERCHANDISE ON THE BELOW LISTED TRUCKS.

*Jorge Gómez*

| LICENSE NO | TICKET | NET WGHT(LBS) | LICENSE NO | TICKET | NET WGHT(LBS) |
|---|---|---|---|---|---|
| 024-UC9 | 26669 | 83,220 | 021-UC9 | 26670 | 83,660 |
| 023-UC9 | 26671 | 83,320 | 211-UC9 | 26672 | 84,660 |
| 946-UC8 | 26673 | 69,500 | | | |

| METRIC TONS: | 184.324 | TOTAL POUNDS: | 406,360 |
|---|---|---|---|

THE UNDERSIGNED AGENT DECLARES THAT THE ABOVE MENTIONED GOODS, SHIPPED
ON THE DATE OF  15-November-1996  AND CONSIGNED TO:
            MARCHANTEX COMERCIALIZADORES INTERNACIONALESS. DE R.L.
ARE PRODUCTS OF THE UNITED STATES OF AMERICA
DATED AT BROWNSVILLE, TEXAS ON         12-November-1996

AGENT FOR B.G. GRAIN

THE RIO GRANDE VALLEY CHAMBER OF COMMERCE, A RECOGNIZED CHAMBER OF COMMERCE
UNDER THE LAW OF THE STATE OF TEXAS, HAS EXAMINED THE SHIPPER'S INVOICE
CONCERNING THE ORIGIN OF THE MERCHANDISE, AND ACCORDING TO THE BEST OF IT'S
KNOWLEDGE AND BELIEF, FINDS THAT THE PRODUCTS NAMED ORIGINATED IN THE
UNITED STATES OF AMERICA.

CERTIFIED BY

**No. 880**



DEPOSITION
EXHIBIT

ACTION REPORTING



# NOTARY PUBLIC
# RECORD BOOK

*Published By*
DOME PUBLISHING CO., INC.
Dome Building
Warwick, RI 02886

# THIS IS A RECORD OF NOTARIAL ACTS FROM:

08/21/95 _____ to _____ 08/21/99

Date                                    Date

Name
Address
City, State

Notary
Notary
Notary

Name of
Address
City, State

*Property of:*

_____
NOTARY PUBLIC

Copyright © 1984, 1994
J.P. Everhart & Company, Inc.
Dallas, Texas

ii

# NOTARY PUBLIC COMMISSION INFORMATION

Name ___MARIA GONZALEZ___
Printed Official Signature

Address ___P.O. BOX 453___

City, State, Zip ___105 FRESNOS, TEXAS 78566___

Notary Public Commission Expires ___08/21/99___ Commission Number ___00651519-8___ Bond Number ___401352___

Notary Public Commission Expires _____ Commission Number _____ Bond Number _____

Notary Public Commission Expires _____ Commission Number _____ Bond Number _____

Name of My Bonding Company ___Merchants Bonding Co. - Mutual___

Address ___P.O. Box 26720___

City, State, Zip ___Austin, Texas 78755-0720___ Telephone ___512-343-9033___

Signed Official Signature

Telephone: Bus: ___831-8045___ Home: ___233-4142___

iii

| Page 1 | DATE NOTARIZED | TYPE OF NOTARIZATION | DATE OF DOCUMENT | TYPE OF DOCUMENT | PRINTED | SIGNATURE OF INDIVIDUAL SIGNATURE | |
|---|---|---|---|---|---|---|---|
| 1 | 1-4-94 | Acknowledgment | 1-4-94 | Power of Attorney | Robert W. Fielding | | 48 Brown P.O. |
| 2 | 5-17-96 | Signature | 5-17-96 | General Notarial | CRAIG - ELKINS | | 529 Brown |
| 3 | 10-30-96 | Signature | 10-25-96 | Commercial Invoice | ACOSTAIN GUTIEREZ | | 525 Brown |
| 4 | 11-01-96 | Signature | 10-31-96 | wet cert | Acestain Gutierrez | | P.O.L. Brown |
| 5 | 11-05-96 | Signature | 11-07-96 | Letter | CRAIG ELKINS | | 84 Brown |
| 6 | 02-24-97 | Signature | | Copies 12th | CRAIG ELKINS | | Brown at 9 |
| 7 | 03-03-97 | Signature | 02/24/97 | Bond Voucher | SANDRA LEE GONZALES | | San |
| 8 | 03-14-97 | Signature | 03/14/97 | Return | HENRY H GARIG | | Brown |
| 9 | | | | | | | |
| 10 | | | | | | | |
| 11 | | | | | | | |
| 12 | | | | | | | |
| 13 | | | | | | | |
| 14 | | | | | | | |
| 15 | | | | | | | |
| 16 | | | | | | | |
| 17 | | | | | | | |
| 18 | | | | | | | |

| ADDRESS OF INDIVIDUAL | DETAILED IDENTIFICATION OF INDIVIDUAL | FINGERPRINT AND/OR OTHER INFORMATION | NOTARY FEE |
|---|---|---|---|
| 48 Meadow Lane Brownsville, Texas 78521 | D.L. # 06882780 | | $ 0.00 |
| P.O. Box 4449 Brownsville, Texas 78523 | Personal Acquaintance | | $ 0.00 |
| 329 Canyon Drive Bonita, Ca. 91902 | I.D. Card from California Resident Alien Card # A092555962 | | $ 0.00 |
| 329 Canyon Drive Bonita, Ca. 91902 | I.D. Card from California Resident Alien Card # A092555562 | | $ 0.00 |
| P.O. Box 4449 Brownsville, Texas 78523 | Personal Acquaintance | | $ 0.00 |
| P.O. Box 4449 Brownsville, Texas 78523 | Personal Acquaintance | | $ 00 |
| 4449 Box 819 San Benito, Tx. 78586 | Personal Acquaintance | | $ 00 |
| Colindale Road Brownsville, Texas | Personal Acquaintance | | $ 00 |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

PORT ELEVATOR-          §
BROWNSVILLE, L.C.       §
                        §
VS.                     §     CIVIL NO. B-98-23
                        §
IVONNE SOTO VEGA, BERSAIN   §
GUTIERREZ, AND SYSCO DE BAJA   §
S.A. DE C.V.            §

PLAINTIFF IN INTERPLEADER'S RESPONSE
TO DEFENDANTS' MOTION FOR SANCTIONS AND COSTS;
INCLUDING CROSS-MOTION FOR SANCTIONS AND COSTS;
INCLUDING CERTIFICATE OF CONFERENCE;
INCLUDING CITATION TO AUTHORITIES

TABLE OF CONTENTS

Certificate of Conference                                    1

Authorities relevant hereto                                 1

Statement of the nature and the stage of the proceeding     1

Statement of the issues to be ruled upon by the Court       2

Cross-Motion for Costs and Fees                             2

Relief requested for Vega's discovery abuse                 6

Response to Defendant's Motion                              8

Memorandum of Authorities                                   12

A.    Basic Authority                                       12
B.    Subpoena Authority                                    12
C.    Vega's Authorities Distinguished                      14
D.    28 USC § 1927 Sanctions.  (As to Port Elevator)       15
E.    28 USC § 1927. Sanctions (as to Ivonne Soto Vega)     16
F.    Rule 30(g) considerations                             17

Discussion of Vega's claimed fees and expenses             17

Conclusion                                                  19

EXHIBIT ___L___          MOTION FOR SANCTIONS AND COSTS

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

PORT ELEVATOR-           §
BROWNSVILLE, L.C.        §
                         §
VS.                      §        CIVIL NO. B-98-23
                         §
IVONNE SOTO VEGA, BERSAIN §
GUTIERREZ, AND SYSCO DE BAJA §
S.A. DE C.V.             §

PLAINTIFF IN INTERPLEADER'S RESPONSE
TO DEFENDANTS' MOTION FOR SANCTIONS AND COSTS;
INCLUDING CROSS-MOTION FOR SANCTIONS AND COSTS;
INCLUDING CERTIFICATE OF CONFERENCE;
INCLUDING CITATION TO AUTHORITIES

1.    Certificate of Conference.

     I certify that I have conferred with opposing counsel in an
attempt to resolve the matters addressed in this Motion, without
success.

2.    Authorities relevant hereto.

     This response is made; and the Cross-Motion for relief is made
pursuant to FRCP 28 USC § 1927.  Other relevant authorities are
contained in the body of the response.

3.    Statement of the nature and the stage of the proceeding.

     The opposing parties have competing claims to title and
ownership of corn which was deposited solely for storage in a
warehouse in Brownsville, Texas.  The parties represented by the
undersigned counsel (the "Plaintiff in Interpleader") became
apprised of the competing claims to title and ownership of the corn
approximately a year after the deposit of the corn for storage in
the warehouse.  Attempts were made to have the claimed owners
remove the corn from the warehouse, without success.  Ultimately,

following notification, the corn was auctioned, and proceeds were placed into the registry of this Court by way of interpleader.

After the sale of the corn and the interpleader of cash, some of the Plaintiffs (specifically "Vega") sued the warehouse, essentially for mishandling the storage of and sale of the corn.

### Statement of the issues to be ruled upon by the Court

A. Whether Defendant Vega should be sanctioned for discovery abuse by the Court. Standard of review is "abuse of discretion" pursuant to 28 USC § 1927.

B. Whether Plaintiff Port Elevator-Brownsville L.C. Should be sanctioned for discovery abuse by the Court. Standard of review is "abuse of discretion" pursuant to 28 USC § 1927.

4. **Cross-Motion for Costs and Fees**.

Ivonne Soto Vega is Cross-Plaintiff in this action. Ivonne Soto Vega asserts that the warehouse owners in someway "mishandled" corn which was "hers". Ivonne Soto Vega (unlike Bersain Gutierrez) has made an appearance in this action and asserted a breach of contract. This allegation by Ivonne Soto Vega is notwithstanding the fact that her name appears no place on the storage contract (the only contract acknowledged by any of the parties in this action is marked Exhibit A, attached hereto and incorporated herein by reference; such contract makes no mention of Ivonne Soto Vega, but instead indicates that the contracting party is Bersain Gutierrez on behalf of "Sysco de Baja").

Both Bersain Gutierrez and Ivonne Soto Vega assert ownership

2

of the corn which was stored in the warehouse (reference is made to Exhibit B which is attached hereto and incorporated by reference at this point).

Since Ms. Vega's appearance in the suit, the warehouse and its attorneys have attempted to take her deposition on substantive issues, without success. In such connection, the warehouse, Port Elevator, would at this time as movant show the following facts, either supported by documentary exhibits or by affidavit which is also attached hereto:

A.  The warehouse took a partial deposition of Ms. Vega on September 8, 1999. Ms. Vega's attorneys refused to allow her to answer substantive questions, having requested that the Court limit the scope of her initial testimony to jurisdictional issues (see deposition exerpts of Ivonne Soto Vega's deposition taken on the indicated date, attached hereto as Exhibit C and incorporated at this point by reference). Jurisdiction was ultimately accepted by this Court, resolving any objections Vega's attorneys may have had regarding the giving of testimony on the merits of the action.

B.  The undersigned counsel, representing the warehouse, has either noticed Vega's deposition or written letters soliciting Ms. Vega's deposition on multiple occasions (see the group of documents collectively marked as Exhibit D, and incorporated herein by reference). To this date, the opposing attorneys have frustrated the

3

warehouse's attempt to take any sort of substantive deposition of Ms. Vega. In fact, opposing attorneys insist that the deposition of Ms. Vega be taken in California. Several of the five deposition notices bear the caption of the State District Court action which is identical to the Federal Court action. The State action was ultimately abated in favor of the Federal action by written order of the State District Judge. The competing jurisdiction of the State and Federal Courts was also the subject of previous motions in this Court. (See the State Court abatement order, which is the final page in Exhibit D in the Appendix.)

C.   Approximately 14 days prior to the deposition of Bersain Gutierrez in California, the undersigned forwarded correspondence to opposing counsel once again soliciting the deposition of Ivonne Soto Vega in California at the same time everybody was going to California to take Bersain Gutierrez' deposition. (See Exhibit E, attached hereto and incorporated at this point by reference.) Opposing counsel had taken the position that Ms. Vega was "not available" on the date that Mr. Gutierrez' deposition was scheduled to be taken (see Exhibit F, attached hereto and incorporated at this point by reference).

D.   Notwithstanding the opposing counsel's assertions that Ms. Vega would be unavailable for deposition on the

4

proposed date, when counsel arrived at the location for
the taking of Bersain Gutierrez' deposition, Ivonne Soto
Vega was present in person.    (See recitation of
appearances at the deposition of Bersain Gutierrez,
marked Exhibit G, attached hereto and incorporated herein
by reference).    Following Bersain Gutierrez' non-
appearance, and in keeping with previous correspondence
to opposing counsel requesting the Vega deposition, the
undersigned personally proposed to Ms. Vega's counsel
that Vega should be presented for deposition immediately;
especially in view of the fact that all counsel were
present, a conference room had been arranged, a court
reporter was present, a videographer was present, and a
Spanish language interpreter had been hired and was
present.

Opposing counsel declined to allow Ms. Vega to testify.
Any further efforts to take Ms. Vega's deposition prior
to trial have now been totally frustrated due to events
which have occurred within a few days after the
undersigned counsel travelled to San Diego.    See the
documents collectively marked as Exhibit H which are
attached hereto and incorporated by reference at this
point.    Ivonne Soto Vega is now reportedly a prisoner of
the Mexican Federal Judicial Police, and has been
arrested, detained, and moved to an undisclosed facility
in Mexico City.

5

5.    The undersigned gave opposing counsel plenty of advance warning of the desire to take Ms. Vega's deposition while in California.    Ms. Vega's asserted "unavailability" lead the undersigned counsel to refrain from actually noticing her deposition.    The undersigned was nothing short of surprised when Ms. Vega became "available" to attend to the deposition, but remained "unavailable" to give her deposition.    The undersigned counsel for the warehouse (Port Elevator) will therefore have to make a second trip to California; or more likely will have to travel to the Federal Prison in Mexico City (if it can be located and identified) at considerable cost.    Such cost would have been unnecessary had opposing counsel allowed the deposition of Ms. Vega as requested on the numerous occasions prior to her arrest on drug related money laundering charges.

6.    <u>Relief requested for Vega's discovery abuse</u>.

The undersigned, on behalf of Port Elevator-Brownsville, L.C. requests the imposition of the following costs and sanctions against Ivonne Soto Vega:

A.    That she be compelled to reimburse the undersigned counsel for the total cost of anticipated travel, lodging, arrangements of the deposition and reasonable attorney's fees, in view of the fact that such expenses will have to be incurred yet again in the future.    In fact, based on prior experience, the undersigned factually and formally asserts that the taking of a deposition at a federal prison in Mexico City,

6

considering the cost of locating (or importing) appropriate personnel to take the deposition, videotape the proceedings, and conduct interpretations would be far in excess of the expenses already incurred. The prior expenses are collectively marked as Exhibit I, attached hereto and incorporated at this point by reference. Attorney's fees are supported by the Affidavit of John Skaggs (attached hereto as Exhibit L and incorporated herein by reference). Such expenses and fees for the unsuccessful previous deposition in San Diego, California total $5,145.89. Such minimum amount would be necessary to travel to California or Mexico City to attempt a deposition of Vega in the future.

B.    Alternatively, that Ivonne Soto Vega be compelled to give a deposition in Cameron County, Texas, the county of venue; or if by agreement in Hidalgo County, Texas, the county where all counsel in this action reside and have their principal place of business. Such alternative remedy would defer the cost of unnecessary additional travel to California or to Mexico City.

C.    Additionally, and in the event the taking of Ms. Vega's deposition proves to be impossible prior to trial, the undersigned moves that Ivonne Soto Vega be prohibited from giving live trial testimony. This request is made in view of the fact that Ivonne Soto Vega had no factual relationship with any transaction related to the storage

7

of the corn at the warehouse in Brownsville; and that Port Elevator-Brownsville will be completely unable to ascertain Ivonne Soto Vega's claimed contractual or other relationship with Port Elevator-Brownsville prior to trial. It would be fundamentally unfair for the warehouse to have to respond to Ivonne Soto Vega's assertions and factual allegations for the first time at trial without the ability to have advance knowledge of the substance of such assertions; and without the ability of Port Elevator-Brownsville to consequently make advance preparation or investigation regarding such assertions by Ms. Vega.

7.   <u>Response to Defendant's Motion</u>.

The opposing party has filed a motion to impose a penalty of costs and other remedies as a consequence of appearing at a deposition in San Diego, California. Though all attorneys (and Ivonne Soto Vega) appeared at the deposition at the appointed time, the deposition did not occur.

By way of response, this party would show the following facts, either supported by appropriate affidavit or by documentary exhibit, as follows:

A.   The scheduled deposition was the deposition of Bersain Gutierrez. Bersain Gutierrez is a named party to this action who has been served with actual process, but has never made an appearance herein. Bersain Gutierrez is one of multiple claimants of the corn or the money

8

generated by the sale of the corn. Mr. Gutierrez has asserted his own ownership to the corn (see Exhibit B, attached hereto and incorporated at this point by reference).

B.     Though Bersain Gutierrez has various addresses in the United States, it is reported that he is a citizen of the Republic of Mexico. Mr. Gutierrez has limited command of the English language and communicates in Spanish. In view of the facts recited in this paragraph, and in the preceding paragraph, it is not believed that Bersain Gutierrez (though a party) is reasonably amenable to effective service in the United States.

C.     Port Elevator representatives contacted Bersain Gutierrez by telephone and met with him following the institution of this lawsuit. The substance of an interview conducted with Mr. Gutierrez was previously summarized and produced to opposing counsel. Such summary is attached hereto marked as Exhibit J and incorporated at this point by reference. Before the scheduled date of the deposition, Mr. Gutierrez had agreed to make an appearance for purposes of giving his deposition.

D.     Vega's counsel was opposed to the taking of the deposition of Mr. Bersain Gutierrez in San Diego, California, and filed a motion opposing the deposition. The filing of such motion was preceded by a conference between attorneys and during such conference, the various

9

facts recited in this motion were discussed.   Opposing counsel then requested an emergency hearing attempting to quash the subject deposition, and the substance of these various consideration were again discussed in the context of a telephone conference with the Court.   The pendency of the upcoming discovery deadline (dated July 16, 2001) was also discussed, and the uncertainty of Mr. Gutierrez' actual appearance was discussed. The opposing attorney's motion to quash the deposition was overruled by the Court.

E.   The undersigned counsel, and a representative of the Plaintiff in Interpleader (a Mr. Craig Elkins) travelled to San Diego, California a full day before the deposition in order to do what could be done to try to insure the appearance of Mr. Gutierrez at the scheduled deposition the following day.  During the 24 hour period preceding the deposition, Mr. Gutierrez failed to return telephone calls, failed to appear at requested meetings, and failed to communicate in any way with the undersigned, or with the client's representative.

F.   On the morning of the deposition, the undersigned counsel caused to have issued a subpoena compelling the appearance of Bersain Gutierrez at his scheduled deposition.  Such was done despite Mr. Gutierrez' prior failure to appear in the lawsuit following service of citation;  and such was done despite everyone's

understanding that Mr. Gutierrez is a Mexican citizen. As anticipated, the undersigned was unable to obtain personal service upon Mr. Gutierrez, though the original citation was left at one of his several addresses in the United States, specifically the address reputed to be one of his residences in the United States.  The subpoena could not be served on Mr. Gutierrez personally, but was left at this residence.  (It was reported to the undersigned by the process server that the location of the residence was in a "gated community", and the process server was either going to have to climb the fence or wait until another neighborhood resident entered or left the neighborhood.)  A copy of the subpoena along with the California return of service and the law office check paying for service are marked as Exhibit K, attached hereto and incorporated at this point by reference.

G.   Bersain Gutierrez failed to appear at his scheduled deposition.  A record was made of his failure to appear. The undersigned counsel and his client paid for the appearance by a California certified shorthand court reporter, a videographer, a court certified interpreter, and conference room space.   The client sent a representative (the aforementioned Craig Elkins) to also be in attendance at the deposition.   All of the arrangements recited in this paragraph were made in anticipation of the deposition occurring as scheduled.

8.  **Memorandum of Authorities**.

    A.  **Basic Authority**.

        Rule 30(a)(1) specifically states that "[A] party may take the testimony of any person, including a party, by deposition upon oral examination without leave of court except as provided in paragraph (2). (None of the provisions of paragraph (2) are applicable. The attendance of witnesses MAY be compelled by subpoena as provided in Rule 45. Fed.R.Civ.P. 30(a)(1).

    In the case at bar, Plaintiffs noticed the deposition of Bersain Gutierrez. Mr. Gutierrez is a party to this cause of action. Mr. Gutierrez was a willing participant and had given the date and time he would appear for his deposition when Plaintiff noticed the deposition. Even upon traveling to San Diego, California, Plaintiff was under the belief that Mr. Gutierrez was a willing participant and that would appear as he represented.

    In Defendant Vega's Motion to Quash, she expressed a concern that Bersain Gutierrez would not appear as a witness at the deposition despite his status as a party defendant in this action. If she and her counsel were truly concerned, she could have issued a subpoena. All of Bersain Gutierrez' known addresses in the United States had previously been provided to Vega's counsel (see Exhibit D-1 attached hereto and incorporated by reference herein).

    B.  **Subpoena Authority**.

        Rule 30(a)(1) does not mandate that all deposition

12

notices be issued with a subpoena.  In fact, the rule only states that the attendance of a witness MAY be compelled by a subpoena.  See Fed.R.Civ.P. 30(a)(1).  The rule does not state that a subpoena must be issued.  In the case at bar, it was unnecessary to issue a subpoena because Mr. Gutierrez, a party to this lawsuit was voluntarily appearing at the deposition.

However, after Plaintiff arrived in California, a subpoena was issued.

Rule 45 of the Federal Rules of Civil Procedure governs the manner in which subpoenas are issued.  Specifically, Rule 45(a)(3) states:

> "[A]n attorney as officer of the court may also issue and sign a subpoena on behalf of (A) a court in which the attorney is authorized to practice; or (B) a court for a district in which a deposition or production is compelled by the subpoena, if the deposition or production pertains to an action pending in a court in which the attorney is authorized to practice."

This rule allows an attorney to issue a subpoena from the district in which he is authorized to practice. Plaintiff's counsel is authorized to practice in the Southern District of Texas.  Moreover, Mr. Bersain Gutierrez is a party to a cause of action pending in the Southern District of Texas.  It is the Southern District

13

of Texas that would compel his attendance to the deposition pursuant to FRCP 45(a)(3)(B) because the action is pending in this district. As such, Plaintiff's counsel could issue a subpoena under both subsections of this rule and the subpoena was properly issued.

Rule 45(a)(1) also states that "[E]very subpoena shall (A) state the name of the court from which it is issued; and (B) state the title of the action, the name of the court in which it is pending, and its civil action number and (C) command each person to whom it is directed to attend and give testimony…." See Fed.R.Civ.P. 45(a)(1). The subpoena issued in this instance clearly followed these requirements. Based on the above, the subpoena was issued correctly.

C.   <u>Vega's Authorities Distinguished</u>.

Defendant cites to several cases that allegedly deal with the issues before the court. However, these cases are easily distinguished. The first case is <u>Greenwood v. Dittmer</u>, 776 F.2d 785 (8th Cir. 1985). The facts of the <u>Greenwood</u> case are clearly different from the case at bar. In the <u>Greenwood</u> case, the Plaintiff noticed a deposition of a non-party witness without the prior approval of that witness or a subpoena. These are clearly not the facts of the case at bar. Mr. Bersain Gutierrez, a party to this cause of action, knew of the date the deposition would take place and approved the

14

date.  He represented to Plaintiffs that he would appear at the scheduled time and place to give his testimony. Defendant also cites to a case called <u>Kupritz v. Savannah College of Art & Design</u>, 155 F.R.D. 84 (E.D. PA 1994). This case is also distinguishable because the subpoena at issue was served on a non-party witness.  (The witness was a party in another lawsuit not the subject of the subpoena.)  Moreover, the party attempting to compel the witness' appearance was asking the wrong court.  The subpoena was issued from the Southern District of Georgia, yet the party was asking a judge from the Eastern District of Pennsylvania to compel the witness to appear.  The judge from Pennsylvania was without jurisdiction because the subpoena was issued from Georgia where the action was pending.

In the case at bar, the subpoena was issued from the Southern District of Texas and the action is pending in the same district.  Any action on the subpoena would be taken by this Honorable Judge and not a judge in California.

D.    <u>28 USC § 1927 Sanctions</u>.  (As to Port Elevator)

Finally, Defendants argue, in the alternative, that sanctions be awarded under 28 U.S.C. §1927.  This statute allows sanctions to be awarded against the attorney personally who unreasonably and vexatiously multiplies the proceedings.  See 28 U.S.C. §1927.  This section

15

allows sanctions to be awarded when a party has acted in bad faith and causes unreasonable and unnecessary delay. The case cited by Defendant is <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 35-51, 111 S.Ct. 2123 (1991).  The facts of this case clearly show why the court allowed sanctions. The sanctioned party intentionally and in bad faith moved his property from the Court's reach to frustrate the subject of a temporary injunction.   This behavior is clearly at odds with the decorum the court intended to uphold.

The record in the case at bar clearly shows a lack of bad faith and intentional delay on the part of Port Elevator. Plaintiff has not acted in bad faith and is not trying to cause unnecessary delay.  The deposition was scheduled at a time when Mr. Bersain Gutierrez said he would be available and was willing to give testimony.   Any bad faith and unnecessary delay was on the part of Defendant, Mr. Bersain Gutierrez, and not Plaintiff.

E.   28 USC § 1927. Sanctions (as to Ivonne Soto Vega)

Ivonne Soto Vega's disregard of the orderly attempt to engage in necessary discovery is illustrated by:

i.   Five separate deposition notices.

ii.   Multiple letters from counsel requesting the deposition of Vega.

iii. Counsel's refusal to allow substantive testimony from Vega on the one occasion she was presented for

16

deposition; and the subsequent avoidance of Vega's deposition.

    iv.  Counsel's representation of Vega's unavailability to give testimony in California on July 10, 2001, coupled with a written request that such deposition occur, coupled with Vega's actual appearance on July 10, 2001 and her counsel's refusal to allow her to be deposed.

F.   Rule 30(g) considerations.

In addition to the other briefing and factual recitations contained in this motion and response, the face of the rule would indicate it is applicable to "witnesses", and not specifically to "parties". Bersain Gutierrez is a party to this action. Relief is discretionary pursuant to Rule 30(g)(2). The equities would indicate Port Elevator's good faith in attempting to obtain the testimony.

Based on the above, Defendant's motion for sanctions should be denied.

9.  Discussion of Vega's claimed fees and expenses.

In the unlikely event the Court orders Port Elevator-Brownsville to pay Ivonne Soto Vega costs, expenses, or attorneys' fees, Port Elevator-Brownsville would show that such requested amount (Vega requested $14,881.14) should be reduced in the following amounts for the following reasons:

A.   Vega sent two lawyers to California, when one would

suffice.  The lead lawyer in the case is Role Dale.  At the telephonic hearing on Vega's failed attempt to quash the deposition, Mr. Dale's partner Bill Mount argued that the deposition should not proceed because attorney Dale could not be in attendance.  The Court commented to Mr. Mount that he (Mount) had signed papers in the Court's files, and he could go to California to take the deposition in Mr. Dale's place.  Notwithstanding the representation of Mr. Dale's unavailability, both attorney Dale and attorney Mount attended the deposition. Accordingly, the following amounts should be deducted from Vega's claimed costs and expenses:

| | |
|---|---|
| Mount hotel | $  120.45 |
| Mount airfare | $  632.00 |
| Mount attorney's fees | $6,800.00 |
| Subtotal | $7,552.56 |

B.    In addition, the remaining attorneys' fees should be reduced by the following amounts to reflect any actual reasonable attorneys' fees.  As supported by the attached affidavit of the undersigned counsel, total air travel time to California, round trip should not exceed 12 hours.  A reasonable period of time for reviewing and preparing for the deposition should not exceed three hours.  Appearance at the non-appearance deposition should take no more than two hours.  The additional two full working days claimed by Mr. Dale for additional

18

preparation, client meetings, and additional travel time are not factually or reasonably supported. Therefore, all amounts in excess of reasonable and necessary amounts should be disallowed as follows:

| | |
|---|---|
| Total attorney's time charged by attorney Dale 31 hours | $ 6,200.00 |
| Less unwarranted additional time claimed 14 hours | $ 2,800.00 |
| Total or actual reasonable time 17 hours | $ 3,400.00 |

C.   **Recap**

| | |
|---|---|
| Total amount claimed | $14,881.14 |
| Less Mount fees and expenses | $ 7,552.45 |
| Less Unwarranted additional time (Dale) | $ 2,800.00 |
| Total remaining | $ 4,528.69 |

10.   **Conclusion**

Wherefore, premises considered, Port Elevator-Brownsville, L.C. prays that the relief requested by Ivonne Soto Vega be denied in its entirety (alternatively, reduced). Port Elevator-Brownsville, L.C. further prays that the relief recited in the body of this Motion, in the form of a cross-motion be granted, and that Port Elevator have sanctions, costs, and other relief as against Ms. Vega due to her lack of cooperation in the discovery process.

Respectfully Submitted,

John Skaggs
P.O. Drawer 2285
710 Laurel
McAllen, Texas 78502-2285
Phone (956) 687-8216
Fax (956) 630-6570

19

**JOHN SKAGGS**
**State Bar No. 18452500**
**Federal I.D. No. 1225**
**Attorney in Charge for**
**Port Elevator-Brownsville L.C.**
**and Craig Elkins**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and
foregoing document has been served on opposing counsel on this the
17 day of August , 2001:

Mr. Roy Dale
DALE & KLEIN
6301 N. 10th St.
McAllen, Texas 78504

John Skaggs

20

# Port Elevator - Brownsville, L.C.

### RATE & SERVICE CONTRACT

The term "grain" as used in this contract shall mean Corn. All rates in this contract will be quoted in U.S. dollars per bushel. Payment for Receiving is due upon completion of each unloading. Payment for Delivery is due weekly. All payments are to be in U.S. currency.

The minimum quantity of grain to be handled under this contract is ONE MILLION Bushels (1,000,000 bushels). If the minimum quantity handled requirement is not met, the Receiving and Delivering Charges increase by one hundred percent (100%).

### RECEIVING AND DELIVERING

Receiving From Railcars . . . . . . . . . $ 0.02    per bushel.

Delivering to Trucks:
    U.S. Trucks . . . . . . . . . . . . . $ 0.02    per bushel.
    Mexican Trucks . . . . . . . . . . . . $ 0.02    per bushel.

Delivering of grain will be done only upon the written instructions of SYSCO de BAJA, SA de CV and signed by Bersain Gutierrez. Fax instructions are acceptable with originals to follow by overnight courier.

RECEIVING INCLUDES INSURANCE AND 15 DAYS STORAGE.

STORAGE: ALL grain is to be stored Identity Preserved (I.P.)

  Each calendar day or fraction thereof after first fifteen days.

  All grains except Flax . . . . . . $ 0.001    per bushel.

TREATING AND CONDITIONING
    Treating for weevils in cars,
      trucks or elevator . . . . . . . . $ 0.045   per bushel.
    Mixing or Turning~~
      All loss in weight borne by owner . $ 0.015   per bushel.
      Cooling or Blowing . . . . . . . . $ 0.005   per bushel.
    Malathion Treatment . . . . . . . . . $ 0.015   per bushel.

NOTE: THIS IS A SPECIAL CONTRACT AT RATES OTHER THAN STATED IN OUR PUBLISHED TARIFF. SUCH RATES UNDER THE SAME TERMS WILL BE MADE AVAILABLE TO ALL DEPOSITORS. THIS CONTRACT EXPIRES DECEMBER 31st, 1996 AT 24:00 HOURS.

SYSCO DE BAJA, S.A. DE C.V.                    AKRON GROUP INC (AGI)

PORT ELEVATOR-BROWNSVILLE, L.C.

EXHIBIT D                                      CONTRACT

P.O. BOX 4448, BROWNSVILLE, TEXAS 78523-4448, (210) 831-8245, FAX (210) 831-3181

# RATES

The term "grain" as used in this tariff shall be understood to mean Wheat, Corn, Oats, rye, Barley, Grain Sorghum, Flaxseed and Soybeans. Rates to cover handling, storing and/or treating other commodities such as Meals, Beans, Seed, Rice, etc will be quoted by the elevator management upon request. All rates in this tariff will be quoted in U.S. cents per bushel unless otherwise stated.

## RECEIVING AND DELIVERING

Receiving From Railcars . . . . . . . . . $.04    per bushel.

Receiving From Trucks:
   U.S. Trucks . . . . . . . . . . . . . . $.04    per bushel.
   Mexican Trucks . . . . . . . . . . . . $.07    per bushel.

Receiving From Vessels/Barges:  . . . . . $.04    per bushel.

Delivering to Vessels:  . . . . . . . . . $.04    per bushel.

Delivering to Barges:  . . . . . . . . . $.04    per bushel.

Delivering to Railcars:  . . . . . . . . $.04    per bushel.

Delivering to Trucks:
   U.S. Trucks . . . . . . . . . . . . . . $.04    per bushel.
   Mexican Trucks . . . . . . . . . . . . $.10    per bushel.

RECEIVING INCLUDES INSURANCE AND 10 DAYS STORAGE.

COOPERING CARS:
   The elevator will not furnish grain doors or Cooper cars.

STORAGE:
   Each calendar day or fraction thereof after first ten days.

   All grains except Flax  . . . . . . . . $1/10    per bushel.
   Flax(all loss in weight or elevator)  . . $1/2    per bushel

TREATING AND CONDITIONING
   Treating for weevils in cars,
     trucks or elevator  . . . . . . . . . $.045  per bushel.
   Mixing or Turning--
     All loss in weight borne by owner . . . $.03    per bushel.

   Cooling or Blowing  . . . . . . . . . . $.01    per bushel.
   Malathion Treatment . . . . . . . . . . $.015    per bushel.

NOTE:  WE RESERVE THE RIGHT TO ENTER INTO SPECIAL CONTRACTS AT RATES OTHER THAN STATED IN THIS TARIFF FOR DEFINITE QUANTITIES OF GRAIN AND FOR DEFINITE STORAGE PERIODS IF APPLICABLE.  SUCH RATES UNDER THE SAME TERMS WILL BE MADE AVAILABLE TO ALL DEPOSITORS.

## RECEIPT OF GRAIN

Grain will be received, stored and handled in the elevator subject to the following rules, regulations and charges. All rates and charges shown in the Rate Schedule of this tariff covers work performed on straight time basis.

# RULES AND REGULATIONS

**ITEM 1 - INSPECTION -** All grain shall be inspected and graded in accordance with standards established under the United States Grain Standards Act before received into and discharged from the elevator. Fees for inspection and grading to be set by the Corpus Christ Grain Exchange on inbound grain. All outbound grain to be graded by Federal Grain Inspection Service. All inspections and grading expense to be borne by the owner.

**ITEM 2 - UNLOADING GRAIN INTO THE ELEVATOR -** The Elevator management reserves the right to refuse any grain which in its opinion is unmerchantable or is unfit condition for storage, transfer or handling. The primary purpose of the Elevator is for the transfer of grain from railcars, trucks, barges and vessels to transportation modes which will move grain through the elevator for export and will be used for storage of grain only to the extent not required for such primary purpose; therefore, the management reserves the right to preferentially unload those cars, trucks, barges or vessels for which outward shipping space has been engaged and is available.

**ITEM 3 - STORING REGARDLESS OF OWNERSHIP -** Grains will be placed in bins containing the same kind and grade regardless of ownership. Preserving identity or special binning will be done only by special arrangements.

**ITEM 4 - GRAIN AT OWNER RISK -** All grain placed in the elevator is at owners risk of depreciation in grade from heating, insects or any other cause including natural increase in dockage content resulting from repeated handling under normal grain elevator operational practices and methods.

**ITEM 5 - CONDITIONING GRAIN -** The Elevator management reserves the right after due diligence to treat, dry or otherwise recondition any grain on the elevator which in its judgment is in need of such handling without prior knowledge or consent of the owner. Necessity of such handling to be concurred in by a Corpus Christi Grain Exchange inspector. Owner of the grain so handled will be liable for payment of all charges resulting therefrom as well as weight shrinkage of the grain.

**ITEM 6 - REMOVAL OF GRAIN -** If any grain in the elevator should become out of condition, the Elevator reserves the right to order same out on three (3) days notice and if not removed from the elevator before expiration of that time, the elevator management shall have the right to remove and dispose of such grain at the expense of and for the account of the owner.

**ITEM 7 - INSURANCE -** Insurance on all grain stored under the above Schedule of Charges will be carried by the elevator operator against loss or damage by Fire and Extended Coverage perils(windstorm, lightning, hail, explosion, riot, riot attending a strike, civil commotion, smoke, vehicles and aircraft) for its market value, to the extent that such insurance is procurable. The cost of such insurance is included in the charges for receiving and shipping grain. Loss by any other insurable cause shall be at the owner's risk.

**ITEM 8 - CONGESTION -** In the event of congestion of cars, barges, vessels or trucks, the elevator operator reserves the right, without liability for loss, damage or demurrage, to unload those cars, barges, vessels, or trucks for which outward transportation has been engaged and is available.

**ITEM 9 - TRIMMERS -** Mechanical grain trimmers are available at the elevator dock for use on all cargoes loaded. Rental in the amount of 10 cents per gross ton plus $25.00 per hour to cover cost of maintenance man will be charged for their use.

**ITEM 10 - PERFORMANCE -** The Elevator will undertake to furnish all service specified in the tariff with reasonable promptness but it is not obligated to furnish services, or is it liable for failure to do so in event of Government intervention, labor troubles, war conditions or other causes beyond its control.

**ITEM 11 - DOCKAGE AND WHARFAGE -** Dockage is charged according to Brownsville Navigation District Tariff. Wharfage is 20 cents per metric ton loaded or unloaded. Where more than one gross tonnage is applicable to a vessel, the highest will apply.

**ITEM 12 - VESSELS REQUIRED TO WORK OVERTIME -** In order to secure the fullest possible use of the elevator's grain handling facilities, whenever there are ships waiting to load or unload, or there is, in the elevator manager's judgment, necessity of overtime work to avoid congestion, vessels will work unlimited overtime at their own expense if requested to do so by the by elevator management. Any vessel refusing to do so shall vacate the berth on order of the elevator management. Should any vessel fail to vacate the berth when ordered to do so under these circumstances or under the circumstances set forth in Item 13, a dockage charge of $800.00 per hour for each hour or fraction thereof, will be assessed against the vessel and/or its owners, and agents, after notice to vacate has been given the vessel and/or its owners, agents, master or mate.

This charge shall not affect the right of the elevator to effect removal of the vessel from the berth by any lawful means, at vessel's risk and expense. A vessel losing its right to berth by refusal to work overtime shall lose its turn in favor of the next vessel that is willing to work overtime, which vessel shall retain the berth so long as it is willing to work sucessive straight times and overtime periods until loading or unloading is completed. The vessel so losing its turn shall be entitled to berth first available thereafter, subject to the same overtime provisions set forth above if the circumstances requiring overtime work are then found to exist by the elevator management. When vessel is not required to work overtime but desires to at owner's expense, such desires must be made known to elevator manager by 3:30 P.M. of the day the overtime is to be worked. The elevator reserves the right to refuse to operate the elevator during overtime hours.

**ITEM 13 - BERTHING OF SHIPS -** Except as otherwise provided in this Tariff, vessels awaiting berth at the elevator will load or discharge in the order in which they file with the elevator office. A filing shall be deemed accomplished with the presentation of:
   (1)   Certificate of Readiness in all compartments in which grain is to be loaded, issued by the National Cargo Bureau Representative.
   (2)  Federal Grain Inspection Service satisfactory condition report.

   Liner vessels, will be given preference in the assignment of berths over other vessels except when, in the judgment of the elevator management such preference would not be in the best interest of the satisfactory operation of the elevator or when, in the judgement of the elevator management, it would impose an undue hardship on other vessels waiting to load or unload.

   The term liners as used herein, shall mean vessels of lines having regularly advertised scheduled sailing from the Port of Brownsville, Texas, and the quantity of grain for loading is not in excess of 2/3 of the vessel's deadweight tonnage for cargo.

   The Elevator management reserves the right to change the turn of vessels when confronted with congestion, the urgent need to load or unload a particular grade of grain or to otherwise facilitate elevator operations.

   Any vessel ordered to vacate the berth for such reasons will return to berth after the vessel loading/ or unloading immediately thereafter, if any completes loading/ or unloading or vacates the berth for other reasons, provided the aforesaid circumstance requiring the vessel to vacate the berth is found by elevator management to no longer exist.

   The elevator management of Port Elevator-Brownsville, Inc. reserves the right to refuse the berth at our facility to any vessel without at least ten (10) days prior advice in writing from the suppliers of the cargo of their intention to load or unload the vessel at Port Elevator-Brownsville, Inc.

**ITEM 14 - APPLICATION FOR BERTH -** All vessels, their owners or agents, desiring berth at this facility shall file with the elevator office an application for berth on forms provided by the elevator. This application should be filed as far in advance as possible but in no case should such filing be later than 5:00 P.M. on the business day preceding the day the vessel desires to berth. The filing of this application shall have no bearing on the time that the vessel will be placed on turn for the berth as this will be governed by Item 13 of this Tariff.

**ITEM 15 - GENERAL REGULATIONS ON VESSELS:**

(1)   The elevator operator shall not be liable for demurrage, damages, damages for delay or loss of dispatch time incurred by any vessel or charterer thereof for any causes other than willful or grossly negligent acts of the elevator operator.

(2)   The elevator operator shall not be responsible for marine loss or damage to grain or barges, ships or their waterborne vessels to the elevator dock.

(3)   In all other matters, the elevator shall not be responsible for delay caused by any cause beyond its control, however or wherever arising.

(4)   Any vessel in berth shall at all times maintain appropriate officers and crew aboard to permit reception of cargo at any time of day or night, including Saturdays, Sundays and holidays.

(5)   If in the opinion of the elevator operator the weather conditions so warrant, any vessel in berth may be ordered at any time of day or night to vacate said berth and anchor in the approved anchorage area until such time as weather conditions permit the vessel to return to berth. Appropriate officers and crew shall be maintained aboard the vessel for this purpose.

**ITEM 16 - RESPONSIBILITY FOR PAYMENT OF CHARGES -** All invoices for charges are due upon presentation of invoice and payable in Brownsville, Texas. Unless otherwise provided by special arrangement with the elevator management, the responsibility for payment of invoices for provisions or services rendered by this facility shall, in the first instance, be that of the local agent in Brownsville, Texas who orders or authorizes such provisions or services as well as of the vessel and vessel owner.

When necessity calls for enforcement of Item 12 of this Tariff, the charges incurred thereby shall have the effect of being authorized by the local agent of the vessel and/or charterer and responsibility for payment of such charges shall be that of the local agent.

The elevator reserves the right to refuse berth and load or unload ships of any local agent having unpaid accounts sixty days or older until such account is paid in full.

**ITEM 17 - OVERTIME:**

A)    Overtime per hour is $175.00 per hour except as provided in B and C Below.

B)    Overtime Hours:
      Overtime will be assessed for work before 8:00 A.M. and after 5:00 P.M. during weekdays. All work on Saturdays and Sundays will be overtime hours. Sundays and Holidays will assessed at the rate of $235.00 per hour.

C)    If elevator labor is called out for work, the following minimum hourly periods will assessed at overtime rate. 7:00 A.M. Call Out - 1 hour minimum; except Saturdays, Sundays or Holidays at which time, 4 hours overtime will be the minimum. 7:00 P.M. Call Out - 2 hours minimum. Overtime rate at $235.00 per hour will be assessed for time required to work during meal hours.

**ITEM 18 - HOLIDAYS** - The following days shall be recognized as Holidays by this facility and all work on these designated days will be performed at the discretion of the elevator management and at overtime rates as provided in Item No. 17 of this Tariff.

New Year's Day        Good Friday        Labor Day
Memorial Day          Thanksgiving Day   Christmas Day
Fourth of July

In addition to the days specifically listed above, we shall also recognize as Holidays, with work performed under the conditions of this time, all days subsequently designated as Holidays or overtime days by the United States Government, the State of Texas, the City of Brownsville or other entity having lawful jurisdiction.

Should any Holiday fall on Saturday, the preceding Friday will be observed as a Holiday. Should any Holiday fall on Sunday, the following Monday will be observed as a Holiday.

No work will be scheduled or performed on Labor Day or Christmas Day except in cases of emergency such as fire, or where the property of the Company and/or its customers are in danger or serious injury.

**ITEM 19 -    RENTAL AND USE OF ELEVATOR EQUIPMENT, FACILITIES, PROPERTY AND PERSONNEL:**

A)    General - All vessels, their owners, agents and stevedores or others, hereinafter call "user", renting or using the elevator equipment, shall be upon and subject to the following conditions andcharges, the renting or use of which shall constitute an agreement with Port Elevator-Brownsville, Inc. to pay such charges and be bound by such conditions.

**B)   Condition and Responsibility**

1) Equipment of the elevator is presumed to be in good condition when turned over to user, but Port Elevator - Brownsville, Inc does not warrant the mechanical condition thereof.

2) By receiving possession thereof, user of elevator equipment agrees that upon termination of the period of use, it will be returned in condition as when received, ordinary wear and tear alone accepted.

3) User assumes sole responsibility and liability for injury to or death of, any person whomsoever, or damage to or destruction of property of any person incident to or arising out of or connected with user's possession, use or operation of elevator equipment, or failure of such equipment to operate; and user shall protect, indemnify, and save harmless the Port Elevator - Brownsville, Inc. against any and all liability for or in respect of the same.

**C)** The use and maintenance of equipment (except mechanical trimmers, but including any and all miscellaneous spouting equipment) a charge per Metric Ton (2,204.6 pounds) loaded will be quoted upon request.

**ITEM 20 - VESSELS IN ELEVATOR BERTH SHALL AT ALL TIME MAINTAIN TAUT LINES TO AVOID DAMAGE AND INJURY TO ELEVATOR      PROPERTY AND PERSONNEL.**

**ITEM 21 - RIGHT TO CONTRACT WITH THE GOVERNMENT** - Port Elevator - Brownsville, Inc may enter into contracts with the government of the United States of America or the government of Mexico or any agency thereof, providing for storage and services rates other than storage and services rates provided herein, applicable only to grain or grain by-product, or a commodity defined in any such contract as grain or grain by-product, in which the United States of America or the government of Mexico, or the agency thereof contracting with the undersigned warehouseman as aforesaid, has an interest.

**ITEM 22 - WATER AND ELECTRICITY** - Water and electricity provided by the elevator will be set by the management of the elevator based on current utility rates.

**ITEM 23 - INSURANCE** - All contractors, stevedores or individuals performing work on the elevator property will at all times maintain adequate insurance coverage as required by Local, State and Federal Regulations. Under no circumstances does Port Elevator-Brownsville, Inc. assume or accept any responsibility for these contractors, stevedores or individuals or any employees thereof.

**ITEM 24 - SMOKING OR OPEN FLAME** - The Port Elevator-Brownsville,Inc is designated as a non-smoking area.  However, certain designated smoking areas are provided. No open flames are permitted.  Hot work permits may be issued on a case-by-case basis.

**ITEM 25 - VISITORS** -  All visitors to Port Elevator - Brownsville, Inc. must check in at the office.  Visitors to any vessels at the elevator berth enter the property at their own risk.  All visitors to vessels in the berth must have permission from the owners, agents, captain or mate of the vessel which they are visiting.



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| PORT ELEVATOR-<br>BROWNSVILLE, L.C.,<br>ET AL | §<br>§<br>§<br>§ | |
| VS. | §<br>§ | CIVIL NO. B-98-23 |
| IVONNE SOTO VEGA, BERSAIN<br>GUTIERREZ, SYSCO DE BAJA<br>S.A. DE C.V. AND WALTER<br>PUFFELIS, INDIVIDUALLY AND<br>D/B/A AGI/AKRON GROUP, INC. | §<br>§<br>§<br>§<br>§ | JURY DEMANDED |

SECOND AMENDED COMPLAINT

1.    This complaint is filed by Port Elevator-Brownsville, L.C.,

joined by Southwest Grain Co., Inc.

2.    Plaintiffs are corporations organized under the laws of the

State of Texas.

3.    Defendants are individuals or corporations who may be served

at the following addresses:

      1.    Ivonne Soto Vega (has been served and appeared)
      —     Paseo Rio Tijuana No. 1716
            Zona Del Rio, Tijuana B.C. Mexico

      2.    Bersain Gutierrez and
            Sysco De Baja S. A. de C.V.
            1853 Carolyn Drive
            Chula Vista, California 91913

      3.    Walter Puffelis and AGI/AKRON GROUP, INC.
            1330 Orange Avenue Suite 329
            Coronado, California 92118

4.    This Court has jurisdiction pursuant to 28 USC, Sections 1331,

1332, 1335 and 2361.

5.    Alternatively, this Complaint is filed pursuant to Rule 22

FRCP.   Plaintiff has heretofore tendered to the registry of the

Court the total amount of $76,000.00 and is still in possession of

EXHIBIT E

SECOND AMENDED
COMPLAINT

cash received from the sale of commodity in excess of said amount. It is estimated by Plaintiff that the total amount in controversy, less reasonable offsets for storage and handling, is in excess of $100,000.00.

6.    Plaintiff herein further asserts diversity between the stakeholder (Plaintiff) and one or more of the Defendants; and further asserts the existence of diversity as between the named Defendants.

7.    In compliance with the provisions of 28 USC Section 1335, Plaintiff asserts that it is in possession of money or property of value more than $500.00.

8.    Plaintiff is a stakeholder of cash, obtained from the sale of commodity, ownership to which is claimed by Defendants.  The cash is described as follows: cash from the sale of corn in a liquidated amount which is claimed to be owned by multiple Defendants. Certain cash from said sale is currently on deposit at the Plaintiff's Port of Brownsville warehouse facility; less reasonable storage, handling, and other fees deducted or charged by Plaintiff. Plaintiff has tendered checks payable to the "United States District Court Registry" representing certain cash on hand, there to abide to the judgment of the Court.  Plaintiff further asserts its intention to tender or retain cash representing the partial liquidated value of the corn, subject to counterclaims plead herein.

9.    As detailed below, Plaintiff may be exposed to double or multiple liability by reason of competing and inconsistent claims made by Defendants.

  
10. In the event Plaintiff should receive a counter-claim for breach of contract, conversion, violation of statutory trade practices laws, or a like pleading; in such event Plaintiff would affirmatively show that the commodity in question was specifically stored in the Plaintiff's warehouse pursuant to a contract and referenced tariffs, copies of which are attached hereto and incorporated by reference at this point. Conflicting claims of ownership of the commodity or any cash generated by the sale of said commodity have been asserted by Defendants, and allegations of actionable conduct on the part of Port Elevator have been alleged by one or more of the said Defendants.

11. Plaintiff previously proposed the voluntary tender of the herein referenced cash and commodities to a mutually acceptable neutral third-party, and such proposal was made in writing. The Defendants refused or neglected to respond, and each continued to assert respective superior ownership.

12. Thereafter, Plaintiff proposed the sale of the said commodity, pursuant to contract, so as to mitigate any damages resulting from spoilage or change in market value. Plaintiff received no response from Defendants related thereto.

13. Plaintiff finds itself with no alternative but to tender the corn or the partial value thereof to the Court for adjudication of the identity of the proper owner or owners.

<u>REQUEST FOR DECLARATORY RELIEF</u>

14. This Request for Relief is made pursuant to <u>28</u> U.S.C. <u>§2201</u>.

15. Ivonne Soto Vega has asserted claims against Port Elevator-Brownsville, L.C. which are derived from the contract and

transactions heretofore recited in this pleading.  Vega asserts duties and obligations arising as a result of the said contract and the asserted relationship between the parties.

16.  Vega has asserted such allegations in a suit which was filed later in time and filed in State District Court in Hidalgo County, Texas.  On the 22nd day of May, 2000, the State District Court ordered Vega's claims abated based on Port Elevator's assertions of the pendency of this prior filed action in the United States District Court.

17.  A copy of Vega's pleadings in connection with her State Court suit are attached hereto and incorporated at this point by reference, as evidence of Ms. Vega's assertion of rights pursuant to the contract which is the subject of this pleading.

18.  Port Elevator-Brownsville, L.C. now seeks a declaration of the rights, duties, legal relations and obligations of any interested party arising out of the said contract, and arising out of the assertions contained in Vega's aforementioned pleading which is attached hereto.  Port Elevator-Brownsville, L.C. seeks a determination of the relative liabilities, and any fault as asserted in connection with the aforementioned State Court action, which has been abated in deference to this action pending in the Federal Court.

19.  In this connection, Port Elevator-Brownsville, L.C. would further assert that at all material times related hereto, it was acting through its authorized agent, servant, or employee Craig Elkins.  Port Elevator-Brownsville, L.C. would further assert that Craig Elkins is a salaried employee of Southwest Grain Co., Inc.

To the extent of any involvement by the said Craig Elkins and Southwest Grain Co., Inc.  Port Elevator-Brownsville, L.C. would further request a determination of the relevant duties, faults and liabilities of said entities.  To the extent necessary, the said Southwest Grain Co., Inc. hereby appears in this action for all purposes consistent with this pleading.

## BREACH OF CONTRACT

20.  Plaintiff, through its agent, Craig Elkins, entered into a contract with Bersain Gutierrez, as representative for Sysco de Baja and Walter Puffelis, as representative for Akron Group, Inc., in October 1996.  The above mentioned contract is attached hereto and incorporated herein by reference.  Pursuant to this contract, the minimum quantity of corn to be deposited with Port Elevator was one million bushels.

21.  In consideration for the movement of a large volume of corn over a short period of time, Plaintiff gave Bersain Gutierrez and Walter Puffelis a special contract with lower receiving and delivering charges.  All deposits were to be made by Walter Puffelis of AGI/Akron Group, Inc., and withdrawals were to be made by Bersain Gutierrez of Sysco de Baja S.A. de C.V..  All deposits and withdrawals were to occur no later than December 31, 1996.

22.  At no time during the term of the contract were one million bushels of corn deposited with Port Elevator.  Defendants' failure to deposit and withdraw one million bushels of corn within the contract period, caused higher sums of money to accrue for the unloading, storage, fumigation, turning, aereation, cracking, and loading out in the amount of $81,438.04 plus interest.

liability related thereto.   Moreover, Plaintiff prays that the court find Defendants have breached the contract entered into between the parties.  Plaintiff further requests an award of actual damages related to the prosecution or defense of this action, for costs of Court, for pre-judgment interest, and post-judgment interest; and further for award of attorneys' fees arising out of the prosecution or defense of this action.

28.  A jury is demanded in connection with this Complaint.

Respectfully submitted,

John Skaggs
P.O. Drawer 2285
McAllen, Texas 78502-2285
Phone (956) 687-8203
Fax (956) 630-6570

_____
JOHN SKAGGS
State Bar No. 18452500
Fed I.D. No. 1225
ATTORNEY FOR PLAINTIFF

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel on this the

21 day of December 2000:

Roy Dale
6301 N. 10th St.
McAllen, Texas 78504

_____
JOHN SKAGGS