96

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

MAR 1 2 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| PORT ELEVATOR - BROWNSVILLE, L.C. AND SOUTHWEST GRAIN CO., INC. | §<br>§<br>§<br>§ | |
| VS. | §<br>§ | CIVIL NO. B-98-23 |
| IVONNE SOTO VEGA, BERSAIN GUTIERREZ, SYSCO DE BAJA, S.A. DE C.V. AND WALTER PUFFELIS, INDIVIDUALLY AND D/B/A AGI AKRON GROUP, INC. | §<br>§<br>§<br>§<br>§<br>§<br>§ | JURY DEMANDED |
| VS. | §<br>§ | |
| CRAIG ELKINS, INDIVIDUALLY AND D/B/A PORT ELEVATOR- BROWNSVILLE, L.C., AND SOUTHWEST GRAIN CO. , INC. | §<br>§<br>§<br>§<br>§ | |

**IVONNE SOTO VEGA'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

TO THE UNITED STATES DISTRICT COURT:

**IVONNE SOTO VEGA**, Defendant, Counter-Plaintiff and Third-Party Plaintiff (hereinafter **"MS. VEGA"**) files her Motion for Partial Summary Judgment and in support thereof would show:

**I.**

**INTRODUCTION**

**MS. VEGA** purchased on three separate dates in October and November, 1997 from **AGI** a total of about 5,000 metric tons of corn. The first two purchases were paid for by letter of credit. The last purchase was paid by personal check. **AGI** issued bills of lading or invoices to her, listing **MS. VEGA** as the owner. The corn

arrived on three different dates by rail car at **PORT ELEVATOR-BROWNSVILLE, L.C.** (hereinafter **"PORT ELEVATOR"**). **AGI** sent **BERSAIN GUTIERREZ** to Brownsville to confirm delivery of the corn. Within days of receipt of the first shipment of corn by **PORT ELEVATOR**, **PORT ELEVATOR** began releasing the corn to third parties at **MR. GUTIERREZ'S** request and without **MS. VEGA'S** permission. **PORT ELEVATOR** even released a portion of the corn to the company that sold the corn to **AGI**. In September 1997, **MS. VEGA** requested that **PORT ELEVATOR** release her corn to a buyer named Enrique Villarreal, but **PORT ELEVATOR** refused. **MS. VEGA** had a written contract to sell the corn to Mr. Villarreal which she could not fulfill because the corn was not released. Beginning in December 1997, **PORT ELEVATOR** began auctioning the remainder of **MS. VEGA'S** corn held in storage which was approximately 1,600 tons.

## II.

## PROCEDURAL HISTORY

On February 11, 1998, **PORT ELEVATOR** filed a Complaint in Interpleader, asserting there were two competing claims to the proceeds of the auction of corn stored at the elevator. The alleged claimants were **BERSAIN GUTIERREZ** and **IVONNE SOTO VEGA**. **MS. VEGA** has answered the lawsuit, claiming the corn. **MR. GUTIERREZ** was served, but did not appear and is in default.

### III.

### ISSUES TO BE DECIDED IN THE SUMMARY JUDGMENT

**MS. VEGA** moves for summary judgment on the following issues:

a.  Ownership of the approximately 5,000 metric tons of corn received at **PORT ELEVATOR** on October 31, 1996, November 13, 1996 and November 27, 1996;

b.  Ownership and entitlement to proceeds of the **PORT ELEVATOR** auction on corn claimed by **MS. VEGA** that includes the funds interpleaded by **PORT ELEVATOR**; and

c.  Entitlement to attorney's fees by **PORT ELEVATOR** on its Rule 22 interpleader action.

### IV.

### MS. VEGA'S EVIDENCE IN SUPPORT OF
### MOTION FOR PARTIAL SUMMARY JUDGMENT

1.  **CRAIG ELKINS'** deposition taken on December 21, 1999 -- Exhibit "1";

2.  Enrique Villarreal's deposition taken on May 10, 2000 -- Exhibit "2";

3.  October 25, 1996 invoice for 2,444.434 metric tons of corn -- Exhibit "3";

4.  November 12, 1996 invoice for 1,791.588 metric tons of corn -- Exhibit "4";

5.  November 13, 1996 invoice for 688.309 metric tons of corn -- Exhibit "5";

6.  Affidavit of Ownership executed by **IVONNE SOTO VEGA** on November 3, 1997, concerning 4,236 metric tons of corn -- Exhibit "6";

7.  Letter of Credit issued to the account of **IVONNE SOTO VEGA** with the beneficiary being **AGI** in the amount of $720,120.00 for the first two shipments of corn -- Exhibit "7";

8.  Complaint in Interpleader filed on February 11, 1998 --

Exhibit "8";

9.  October 28, 1997 correspondence from **AGI** representative, stating the **MS. VEGA** was sold 4,236 metric tons of corn on October 25, 1996 and November 12, 1996 -- Exhibit "9";

10. December 18, 1997 notice from **PORT ELEVATOR**, stating that bids/offers were now being accepted on approximately 1,600 metric tons of yellow corn -- Exhibit "10";

11. Deposition of Maria Gonzalez taken on June 22, 2001 -- Exhibit "11";

12. Affidavit of attorney, William D. Mount, Jr. taken on March 11, 2002 - Exhibit "12";

13. **PORT ELEVATOR'S** Second Amended Complaint -- Exhibit "13";

14. Return of summons for service of **BERSAIN GUTIERREZ** with affidavit -- Exhibit "14"; and

15. Avis Odenbaugh's report -- Exhibit "15".

**V.**

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) provides that a summary judgment shall be rendered if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). By its very terms, the rule permits summary judgment even if the parties disagree as to some facts. <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 247-48 (1986). Summary judgment is precluded under Rule 56(c) only when the facts in dispute might affect the outcome of the suit under governing law and the dispute is genuine. <u>Id</u>. at 248. Should it appear that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, the

district court should grant summary judgment.    Speaks v. Trikora
Lloyd P.T., 838 F.2d 1436, 1438-39 (5th Cir. 1988).

VI.

The movant need not disprove the non-moving party's claims in
order to secure a summary judgment.    Summary judgment is proper
whenever the movant demonstrates "an absence of evidence to support
the non-moving party's case."  Celotex Corp. v. Catrett, 477 U.S.
317 (1986); accord Slaughter v. Allstate Ins. Co., 803 F.2d 857,
860 (5th Cir. 1986).    Thus, the defendant is entitled to summary
judgment when the plaintiff "fails to make a showing sufficient to
establish the existence of an element essential to the plaintiff's
case, and on which [the plaintiff], will bear the burden of proof
at trial."    Celotex, 477 U.S. at 322; accord Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (the
burden is not on the moving party to produce evidence showing the
absence of a genuine issue of material fact).    See also Reese v.
Anderson, 926 F.2d 494, 498 (5th Cir. 1991); International Ass'n of
Machinists and Aerospace Workers No. 2504 v. International Mfg.
Co., 812 F.2d 219, 222 (5th Cir. 1987)("[M]ere conclusory
allegations are not competent summary judgment evidence, and they
are therefore insufficient to defeat or support a motion for
summary judgment"); Anderson, 477 U.S. at 249-50 (holding that
"there is no issue for trial unless there is sufficient evidence
favoring the nonmoving party for a jury to return a verdict for

that party....If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.").

## VII.

## MS. VEGA OWNED THE 5,000 METRIC TONS OF STORED CORN

The undisputed evidence reflects that **MS. VEGA** bought 2,444.434 metric tons of corn from **AGI** of San Diego, California on October 25, 1996. Exhibit "3", Invoice. On November 12, 1996 an additional 1,791.566 metric tons of corn was sold by **AGI** to **MS. VEGA**. Exhibit "4", Invoice. Both invoices or bills of lading state that the corn was sold to "Mrs. Ivonne Soto Vega, Paseo Rio Tijuana No. 1716, Zona del Rio, Tijuana B.C. Mexico". Exhibits "3" and "4", Invoices. Both further state that the corn is to be shipped to "Mrs. Ivonne Soto Vega, Brownsville, Texas 78521". Id. Both bills of lading are signed by **WALTER PUFFELIS, III**, the authorized representative for **AGI**, the seller. Id. Both bills of lading were signed by **BERSAIN GUTIERREZ**, under the line, "received by". The first invoice was notarized by Maria Gonzalez, an employee with **PORT ELEVATOR** and **CRAIG ELKINS'** secretary. Exhibit "3", Invoice; Exhibit "1", **CRAIG ELKINS'** deposition at p. 43-45. **CRAIG ELKINS** is the manager of **PORT ELEVATOR**. Exhibit "1", **CRAIG ELKINS'** deposition at p. 45. **PORT ELEVATOR** therefore was on notice as to who owned the 2,444.434 metric tons of corn identified in the first invoice. There has been no evidence produced that **AGI**, the

seller, issued invoices for the corn in any name other than **MS. VEGA**.

### VIII.

The total dollar amount of the two invoices was $720,120.00. Exhibits "3" and "4", Invoices. A letter of credit was issued for the account of **IVONNE SOTO VEGA** and in favor of **AGI** by Banoro, S.A. Tijuana, B.C. Mexico in September 1996 for the purchase of the first two shipments of corn. Exhibit "7", Letter of Credit. The letter of credit was in the amount of $722,120.00 which is the total of the two invoices. Neither the letter of credit document nor the two commercial sales invoices show that **BERSAIN GUTIERREZ** had any interest in the 4,236 metric tons of corn, comprising the first two corn shipments. There has been no evidence produced that anyone other than **MS. VEGA** paid for the first two shipments of corn.

### IX.

On November 3, 1997, **MS. VEGA** executed an affidavit stating that she was the owner of 4,236 metric tons of corn purchased from **AGI** by a letter of credit. Exhibit "6", Affidavit of Ownership. She further stated in her affidavit that her sole instructions were to **AGI** to transport the corn to the Port of Brownsville to store the grain at the elevator. Id. She stated in her affidavit that **MR. GUTIERREZ** had no ownership interest in the corn or authority to dispose of it. Id. **MR. PUFFELIS,** an authorized representative for

AGI, concurred by letter dated October 28, 1997 that a total of 4,236 metric tons of corn had been sold to **MS. VEGA** on October 25, 1996 and November 12, 1996 that was paid by letter of credit. Exhibit "9", Letter from **AGI** Representative.

**X.**

On November 13, 1996, **MS. VEGA** bought an additional quantity of corn from **AGI** in the amount of 688.309 metric tons.  Exhibit "5", Invoice.  The invoice stated that the corn was sold to "Mrs. Ivonne Soto Vega".  <u>Id</u>.  The invoice or bill of lading further stated that the corn was to be shipped to **MS. VEGA** in Brownsville. <u>Id</u>.  The purchase price was $117,012.53.  She paid for the corn by personal check.  Exhibit "2", Enrique Villarreal's deposition at p. 37.

**XI.**

The undisputed evidence reflects that **MS. VEGA** paid for three shipments of corn (4,924.331 metric tons) the amount of $837,132.53 that was shipped to **PORT ELEVATOR**.  **MS. VEGA** requests that the trial court find that she is the legal owner of the three shipments.

**XII.**

**MS. VEGA IS ENTITLED TO THE INTERPLEADED FUNDS**

Only **MS. VEGA** has filed an answer and counterclaim, claiming the interpleaded funds.  Further, she has produced evidence herein that the funds belong to her.  **MR. GUTIERREZ** was served, but has

not appeared.  Exhibit "14", return of summons and affidavit. **MS. VEGA** requests that the funds be immediately released to her.

## XIII.

## PORT ELEVATOR IS NOT ENTITLED TO ATTORNEY'S FEES ON ITS RULE 22 INTERPLEADER ACTION

A.    **PORT ELEVATOR** Is Not a Mere Stakeholder Which Bars a Fee Award

A district court has the authority to award reasonable attorney's fees in interpleader actions. Roades v. Casey, 196 F.3d 592, 603 (5th Cir. 1999); see Corrigan Dispatch Company v. Casa Guzman, S.A., 696 F.2d 359, 364 (5th Cir. 1983).  The award of attorney's fees is within the sound discretion of the trial court. See Phillips Petroleum Co. v. Hazlewood, 534 F.2d 61, 63 (5th Cir. 1976).  Attorney's fees may be denied when the interpleader is not a mere stakeholder, but has a substantial controversy with one of the claimants.  Roades, 196 F.3d at 603; Hazlewood, 534 F.2d at 63; Century Ins. Co. v. First National Bank of Hughes Springs, 102 F.2d 726 (5th Cir. 1939).  **PORT ELEVATOR** is not entitled to attorney's fees because **PORT ELEVATOR** is not a mere stakeholder.

## XIV.

In **PORT ELEVATOR'S** Second Amended Complaint filed on or about December 21, 2000, **PORT ELEVATOR** asserts at paragraph 24 that all Defendants "breached the contract entered into with Plaintiff in October 1996 and are liable for the damages proximately caused by this breach".  Exhibit "13", Second Amended Complaint.  At

paragraph 27, **PORT ELEVATOR** "prays that the court find Defendants have breached the contract entered into between the parties.... and further request an award of actual damages related to the prosecution or defense of this action, for costs of court, for pre-judgment interest, and post-judgment interest; and further for award of attorney's fees arising out of prosecution or defense of this action". Id. **PORT ELEVATOR'S** assertion of the breach of contract claim is overwhelming evidence that **PORT ELEVATOR** has a substantial controversy with **MS. VEGA** and is not a mere stakeholder. Due to the controversy, this court should exercise its discretion in not awarding attorney's fees.[1]

B.   **PORT ELEVATOR'S Delay Bars a Fee Award**

This suit has been pending since February 11, 1998 when **PORT ELEVATOR** filed its Complaint in Interpleader. Exhibit "8", Complaint in Interpleader. It is over four years old. **MR. GUTIERREZ** was served on November 8, 1998 and has been in default since November 29, 1998. **PORT ELEVATOR** has not requested discharge as to **MR. GUTIERREZ**. The only party who filed an Answer in response to the interpleader was **MS. VEGA**. **PORT ELEVATOR'S** delay in not seeking discharge bars the entity from seeking fees. Delay and laches bar the fee claim.

---

[1]**PORT ELEVATOR** also requests in its Second Amended Complaint declaratory judgment relief which also indicates that there is a substantial controversy between **PORT ELEVATOR** and **MS. VEGA**.

For the above reasons, **IVONNE SOTO VEGA**, Defendant and Counter-Plaintiff, respectfully requests that this court grant her Motion for Partial Summary Judgment, find that **IVONNE SOTO VEGA** is the true owner of 4,924.331 metric tons of corn received by **PORT ELEVATOR** on October 31, 1996, November 13, 1996 and November 27, 1996, that **IVONNE SOTO VEGA** is entitled to the funds in the registry of the court that have been interpleaded by **PORT ELEVATOR** which represent sales proceeds from a portion of the 4,924.331 metric tons owned by **MS. VEGA** and that the court deny **PORT ELEVATOR'S** claim for attorney's fees predicated on Rule 22 of the Federal Rules of Civil Procedure and grant such other and further relief which **MS. VEGA** may justly be entitled.

Respectfully submitted,

DALE & KLEIN, L.L.P.
6301 N. 10th St.
McAllen, Texas 78504
Tel. No. (956) 687-8700
Fax. No. (956) 687-2416

*Roy Dale by Bill mount with permission*

ROY S. DALE
State Bar No. 05326700
Federal I.D. No. 1184
WILLIAM D. MOUNT, JR.
State Bar No. 14602950
Federal I.D. No. 14992

ATTORNEYS FOR DEFENDANT, COUNTER-PLAINTIFF AND THIRD-PARTY PLAINTIFF IVONNE SOTO VEGA

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing document has been forwarded to counsel of record, to wit:

John Skaggs
SKAGGS & GARZA, L.L.P.
710 Laurel
P.O. Drawer 2285
McAllen, Texas 78502-2285

**VIA CERTIFIED MAIL/RRR** on this the 11TH day of March, 2002.

WILLIAM D. MOUNT, JR.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| PORT ELEVATOR - | § | |
| BROWNSVILLE, L.C. AND | § | |
| SOUTHWEST GRAIN CO., INC. | § | |
| | § | |
| VS. | § | CIVIL NO. B-98-23 |
| | § | |
| IVONNE SOTO VEGA, BERSAIN | § | JURY DEMANDED |
| GUTIERREZ, SYSCO DE BAJA, | § | |
| S.A. DE C.V. AND WALTER | § | |
| PUFFELIS, INDIVIDUALLY AND | § | |
| D/B/A AGI AKRON GROUP, INC. | § | |
| | § | |
| VS. | § | |
| | § | |
| CRAIG ELKINS, INDIVIDUALLY | § | |
| AND D/B/A PORT ELEVATOR- | § | |
| BROWNSVILLE, L.C., AND | § | |
| SOUTHWEST GRAIN CO. , INC. | § | |

## ORDER GRANTING IVONNE SOTO VEGA'S MOTION FOR PARTIAL SUMMARY JUDGMENT

On the _____ day of _____, 2002, came on for consideration **IVONNE SOTO VEGA'S** Motion for Partial Summary Judgment filed on March 11, 2002, any supplement(s), any response(s) and the court finds that the motion and any supplement(s) is well-taken.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED** that **IVONNE SOTO VEGA'S** Motion for Partial Summary Judgment is hereby **GRANTED** and the court finds that **IVONNE SOTO VEGA** is the legal owner of 4,924.331 metric tons of corn received by **PORT ELEVATOR-BROWNSVILLE, L.C.** on October 31, 1996, November 13, 1996 and November 27, 1996, that the funds placed in the registry of the court by **PORT ELEVATOR-BROWNSVILLE, L.C.** with interest are the

property of **IVONNE SOTO VEGA** and that **PORT ELEVATOR-BROWNSVILLE**, **L.C.** is not entitled to attorney's fees and costs on its Rule 22 interpleader claim.

      **SIGNED** on this \_\_\_\_\_ day of _____, 2002.


_____
UNITED STATES DISTRICT JUDGE

Ivonne Vega V. Port Elevator-Brownsville, et al.
# DEPOSITION OF CRAIG ELKINS
12-21-99

SHEET 1   PAGE 1

1

1                    CAUSE NO. C-2969-99-A

2   IVONNE SOTO VEGA              X IN THE DISTRICT COURT OF
                                  X
3   VS.                          X
                                  X
4   PORT ELEVATOR-BROWNSVILLE,   X
    L.C., SOUTHWEST GRAIN CO.,   X
5   INC., AGI/AKRON GROUP,       X HIDALGO COUNTY, TEXAS
    INC., SYSCO DE BAJA,         X
6   WALTER PUFFELIS GALVAN,      X
    III, INDIVIDUALLY AND         X
7   D/B/A AGI/AKRON GROUP,       X
    INC., CRAIG ELKINS,          X
8   INDIVIDUALLY AND D/B/A       X
    PORT ELEVATOR-BROWNSVILLE,   X
9   L.C. AND SOUTHWEST GRAIN     X
    CO., INC., BERSAIN           X
10  GUTIERREZ ZENTENO,           X
    INDIVIDUALLY AND D/B/A       X
11  SYSCO DE BAJA                X 92 'D JUDICIAL DISTRICT

12           ------------------------------------------
13            ORAL AND VIDEOTAPED DEPOSITION OF
                          CRAIG ELKINS
14                    December 21, 1999
             ------------------------------------------
15

16        ORAL AND VIDEOTAPED DEPOSITION OF CRAIG ELKINS,

17   produced as a witness at the instance of the Plaintiff,

18   and duly sworn, was taken in the above-styled and

19   numbered cause on the 21st day of December, 1999, from

20   10:15 a.m. to 7:21 p.m. before Carl Clayton, CSR in and

21   for the State of Texas, reported by stenography, at the

22   offices of Skaggs & Garza, 710 Laurel, McAllen, Texas,

23   pursuant to the Texas Rules of Civil Procedure and the

24   provisions stated on the record or attached hereto.

25

*Action Reporting*
(956) 631-1024 / 1-800-884-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
# DEPOSITION OF CRAIG ELKINS
12-21-99

---

SHEET 2   PAGE 2

2

1                    A P P E A R A N C E S:

2   FOR THE PLAINTIFF:

3       Mr. William D. Mount, Jr.
        Dale & Klein
4       6301 N. Tenth Street
        McAllen, Texas 78504

5       Mr. Guillermo Vega, Jr.
6       Attorney at Law
        302 Kings Highway, Suite 105
7       Brownsville, Texas 78521

8   FOR THE DEFENDANTS, PORT ELEVATOR-BROWNSVILLE, SOUTHWEST
    GRAIN COMPANY AND CRAIG ELKINS:
9
        Mr. John Skaggs
10      Skaggs & Garza
        710 Laurel
11      McAllen, Texas 78502

12  ALSO PRESENT:

13      Carl Clayton, CSR
        Sheila Dunagan, Videographer
14

15

16

17

18

19

20

21

22

23

24

25

ACTION REPORTING  (956) 631-1024

---

PAGE 3

3

1                        INDEX

2   Appearances . . . . . . . . . . . . . . . . .      2

3   Stipulations . . . . . . . . . . . . . . . . .     4

4       CRAIG ELKINS

5       Examination by Mr. Mount . . . . . . . .    5

6   Signature and Changes  . . . . . . . . . .     223

7   Reporter's Certificate  . . . . . . . . . .    225

8                      EXHIBITS

9

10  NO.     DESCRIPTION                          PAGE

11  1       Notice of Deposition                   61
    2       Defendant Port Elevator's Answers      61
12          to Plaintiff's Interrogatories
    3       Rate & Service Contract                62
13  4       Receiving & Delivering Rates           65
    5       10-25-96 Invoice                      183
14  6       11-12-96 Invoice                      190
    7       11-13-96 Invoice                      191
15  8       Vega Fax to Elkins, 10-24-97          198
    9       Vega Fax to Elkins, 10-29-97          199
16  10      Vega Fax to Elkins, 11-3-97           204
    11      Elkins Letter to Gutierrez, 11-12-97  207
17  12      Vega Letter to Elkins, 11-28-97       211
    13      Recap For Vega                        211
18  14      Elkins Fax to Vega, 11-12-97          213
    15      Vega Letter to Elkins, 11-14-97       216

19

20

21

22

23

24

25

ACTION REPORTING  (956) 631-1024

---

PAGE 4

4

1       Oral deposition and answers of Craig Elkins, who

2   resides in Hidalgo County, Texas, was taken herein by

3   the Counsel for the Plaintiff, before Carl Clayton, a

4   Certified Shorthand Reporter in and for the State of

5   Texas, on the 21st day of December, A.D., 1999, pursuant

6   to the Texas Rules of Civil Procedure and in accordance

7   with the following stipulations and agreements:

8       IT WAS AGREED that the witness must appear in

9   accordance with the Texas Rules of Civil Procedure

10  before any Notary Public or official authorized to

11  administer oaths for purposes of reading over the

12  deposition and making any corrections the witness finds

13  to be necessary, such corrections to be recorded on a

14  correction sheet submitted with the original of the

15  deposition.

16

17

18

19

20

21

22

23

24

25

ACTION REPORTING  (956) 631-1024

---

PAGE 5

5

1                    CRAIG ELKINS,

2   having been first duly sworn, testified as follows:

3                    EXAMINATION

4   BY MR. MOUNT:

5       Q.   State your full name for the record, please.

6       A.   William Craig Elkins.

7       Q.   Mr. Elkins, my name is Bill Mount and I'm an

8   attorney with the law firm of Dale and Klein today

9   representing Ivonne Soto Vega in a lawsuit that she's

10  brought against yourself and a number of other parties.

11  Do you understand that?

12      A.   Yes, I do.

13      Q.   Have you ever had your deposition taken before?

14      A.   No.

15      Q.   All right.  Well, let me tell you that you're

16  under oath and the testimony you give today can be used

17  in a court of law and the way we do that is we can play

18  the video that the videographer is taking to a judge

19  and/or a jury and additionally we can read the written

20  transcription that the court reporter will put together

21  to a judge and/or a jury.  Do you understand that?

22      A.   Yes, I do.

23      Q.   I'm sure your attorney has told you a little

24  bit about what a deposition is about prior to the

25  deposition.  There are a couple of rules.  Some of the

ACTION REPORTING  (956) 631-1024

---

## Action Reporting
(956) 631-1024 / 1-800-884-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

SHEET 3   PAGE 6

**6**

1  rules are that allow me to ask the entire question and
2  I'll allow you the opportunity to respond. The court
3  reporter can't take us down if we talk at the same time.
4  Is that okay?
5      A.   That's fine.
6      Q.   Secondly, we have to have verbal answers to
7  each question because a non-verbal answer can't be put
8  in a transcript. Is that all right also?
9      A.   That's fine.
10     Q.   Additionally, if you don't understand any of my
11 questions, please let me know because we're going to
12 assume at the end of the day that you've understood them
13 all if you haven't said otherwise.
14     A.   Okay.
15     Q.   All right? What is your current address?
16     A.   910 Rio Grande Drive, Mission, Texas.
17     Q.   What is your home telephone number?
18     A.   Unlisted.
19     Q.   And what would that be? What would your number
20 be?
21     A.   I choose to keep my home phone number unlisted.
22     Q.   All right. But for purposes of your deposition
23 and discovery we don't have to type it up, but I need to
24 know what your home telephone number is.
25         MR. SKAGGS: For the purposes of
         ACTION REPORTING (956) 631-1024

PAGE 7

**7**

1  disclosure at a later date I won't -- I'll stipulate
2  that I won't raise an objection regarding the omission
3  of a home telephone number. In view of the witness's
4  answer I'll instruct him not to answer and give his home
5  telephone number. If there's a reason that we need to
6  revisit that later I'll be happy to talk to you about
7  it, Bill, but if there's -- we don't have any problem
8  with him giving his business number and that would be
9  sufficient for disclosure for witness purposes later I
10 won't object to that on that basis if that's where
11 you're headed with that.
12     Q.   (BY MR. MOUNT) So you're refusing to answer
13 that question, correct, regarding your home telephone
14 number?
15         MR. SKAGGS: He's being instructed not to
16 answer that question.
17     Q.   (BY MR. MOUNT) Is that correct?
18     A.   I'm being instructed not to answer the
19 question, yes.
20     Q.   All right. How long have you lived at 910 Rio
21 Grande in Mission?
22     A.   March of '91.
23     Q.   Who do you live with at this particular
24 address?
25     A.   My wife and three children.
         ACTION REPORTING (956) 631-1024

PAGE 8

**8**

1      Q.   What is your wife's name?
2      A.   Rosa Maria Domit Elkins.
3      Q.   How many children do you have?
4      A.   Three.
5      Q.   How old is your oldest child?
6      A.   Six.
7      Q.   How old is your youngest child?
8      A.   Two.
9      Q.   Prior to living at this particular address in
10 Mission, where did you live?
11     A.   For a year I lived roughly three blocks north
12 of there on Sabinal Street in Mission. Address I don't
13 recall.
14     Q.   What is your date of birth?
15     A.   August 9th, 1956.
16     Q.   Your Social Security number?
17     A.   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.
18     Q.   And your Texas driver's license number is
19 02655209?
20     A.   Correct.
21     Q.   Does your wife work?
22     A.   She does not.
23     Q.   When were you married to Rosa Maria?
24     A.   In -- I have two wedding dates. You want the
25 U.S. wedding date or the Mexican wedding date?
         ACTION REPORTING (956) 631-1024

PAGE 9

**9**

1      Q.   Why don't you give me the year first of all?
2      A.   Well, split years.
3      Q.   All right. Give me the --
4      A.   U.S. wedding date is December 29th, 1986.
5      Q.   What is the Mexican wedding date?
6      A.   January 17th, 1987.
7      Q.   Where were you married in Mexico?
8      A.   Mexico City.
9      Q.   And where were you married in the United
10 States?
11     A.   Cameron County Courthouse.
12     Q.   Were you born here in the United States?
13     A.   Yes.
14     Q.   Where were you born?
15     A.   Harlingen, Texas.
16     Q.   Are you a high school graduate?
17     A.   Yes.
18     Q.   Did you graduate from Harlingen High School?
19     A.   Yes, sir.
20     Q.   What year did you graduate?
21     A.   1974.
22     Q.   Did you attend any college afterwards?
23     A.   Yes, sir.
24     Q.   Where did you go to college?
25     A.   Texas A & M University.
         ACTION REPORTING (956) 631-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

SHEET 4   PAGE 10

10

1   Q.   Did you graduate from Texas A & M?
2   A.   Yes, sir.
3   Q.   What year did you graduate?
4   A.   1979.
5   Q.   What was your major at Texas A & M?
6   A.   Agricultural economics.
7   Q.   Is this your first marriage, your marriage to
8   Rosa Maria?
9   A.   Yes, it is.
10   Q.   Do you have any other schooling other than
11   attending Texas A & M?
12   A.   You mean graduate schooling?
13   Q.   Graduate schooling or any other schooling after
14   that?
15   A.   Yes.
16   Q.   Where did you go to graduate school?
17   A.   Texas A & M.
18   Q.   And what did you study in graduate school?
19   A.   Agricultural economics.
20   Q.   So you received a master's in agricultural
21   economics?
22   A.   Yes, I did.
23   Q.   What year did you receive a master's in that?
24   A.   1981.
25   Q.   What is agricultural economics briefly?
        ACTION REPORTING  (956) 631-1024

PAGE 11

11

1   A.   It is the study of economics as applied to
2   agricultural situations.
3   Q.   Did you ever farm after you graduated from
4   A & M?
5   A.   Yes.
6   Q.   Did you farm on your own or with someone?
7   A.   I was in a farming partnership.
8   Q.   And who was in the partnership?
9   A.   Joe Hickey.
10   Q.   How do you spell his last name?
11   A.   H-i-c-k-e-y.
12   Q.   Was there anyone else in the partnership?
13   A.   No.
14   Q.   Where did you farm?
15   A.   McCook, Texas.
16   Q.   Was this right out of school that you began
17   farming?
18   A.   No.
19   Q.   Briefly from what year to what year did you
20   farm in this partnership with Joe Hickey?
21   A.   1986.  Leased the land in 1986, farmed in the
22   partnership '87, crop year '86, '87.  I think crop year
23   '87, '88 and then I farmed on my own for crop year '88,
24   '89 and crop year '89, '90.
25   Q.   During the time that you were a farmer, did you
        ACTION REPORTING  (956) 631-1024

PAGE 12

12

1   farm in McCook?  Is that where you farmed?
2   A.   The general vicinity of McCook, Texas, yes.
3   Q.   What particular crops did you grow while you
4   were a farmer around the McCook vicinity with Mr.
5   Hickey?
6   A.   Grain sorghum.
7   Q.   I believe you said you started farming in 1986.
8   What did you do between 1981 until 1986 when you began
9   farming?
10   A.   From 19 -- from December of '81 through '83 I
11   was employed by a farming company called R-o-z-i Farms
12   based out of Houston, Texas and then in December of '84
13   I was hired by Southwest Grain Company.
14   Q.   So then you worked for -- are you still working
15   for Southwest Grain Company?
16   A.   Yes.
17   Q.   So you've been working for them since December
18   of 1984; is that correct?
19   A.   Correct.
20   Q.   When you were hired by Southwest Grain Company
21   in December of 1984, what was the position that you were
22   hired for?
23   A.   Elevator manager.
24   Q.   Where is Southwest Grain Company located, their
25   business address?
        ACTION REPORTING  (956) 631-1024

PAGE 13

13

1   A.   Their business address is Route 3, Box 188F as
2   in Frank, Edinburg, Texas.
3   Q.   Is this where their business is located?
4   A.   The rural route mail delivery, yes.  The
5   physical location of their office is corner of FM490 and
6   FM681 with FM2058.
7   Q.   And there's a grain elevator located there?
8   A.   Uh-huh.  Yes, there is.
9   Q.   Okay.  Have you had the same position with
10   Southwest Grain Company since you started with them in
11   December of '84?
12   A.   No.
13   Q.   What other positions have you had with them?
14   A.   I guess let me rephrase the no.
15   Q.   Sure.
16   A.   By position or by responsibilities?  Southwest
17   Grain is a small company and titles are not -- it's not
18   like a bank where everybody who goes to work three weeks
19   later is an assistant vice-president.
20   Q.   How many employees roughly does Southwest Grain
21   Company have right now?
22   A.   I don't know.  I'm not involved in Southwest
23   Grain's day-to-day operations.
24   Q.   Could you give me an estimate, though, as far
25   as how many employees?
        ACTION REPORTING  (956) 631-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

SHEET 5    PAGE 14
14

1    A.    Inside the office, outside in the elevator?
2    Q.    If we started inside the office, about how
3 many --
4    A.    People does Southwest have?
5    Q.    Right, inside the office.
6    A.    Half a dozen or so.
7    Q.    What about personnel that run the elevator
8 or --
9    A.    Outside?
10    Q.    -- work outside?
11    A.    I would say it ranges depending on the season
12 from a low of three or four to a high of fourteen or
13 sixteen.
14    Q.    Now, when you say season, roughly when does the
15 season run from?
16    A.    You have harvest which is -- depends on weather
17 and it's either going to be early June, mid-June, late
18 June, for anywhere from two weeks of real heavy constant
19 type activity to a five or six week dragged-out harvest.
20    Q.    So we're looking at anywhere from two to six
21 weeks in early June for the grain?
22    A.    Early June, mid-June, late June. It just
23 depends on when the crop comes off.
24    Q.    And that would be when the grain elevator would
25 need the extra help during that time period?
    ACTION REPORTING  (956) 631-1024

PAGE 15
15

1    A.    Yes.
2    Q.    And you said you're not involved in the
3 day-to-day operations of the grain operation for
4 Southwest Grain Company. What is it that you currently
5 do for them?
6    A.    For Southwest?
7    Q.    Right, for Southwest.
8    A.    If Southwest has a problem with the shipment
9 into Mexico, with customers into Mexico, you know,
10 they'll call me and say, could you call customer X and
11 see what his problem is or could you call customer X and
12 say, you know, touch base with them, they called the
13 other day, inquired how you were, would you check on a
14 rail rate for us.
15    Q.    When you say they would call, who would
16 normally call you with a problem from Southwest Grain
17 Company?
18    A.    Either Tommy Joe Crutcher or Yvonne Gonzalez.
19    Q.    Is Tommy Joe Crutcher the manager of Southwest
20 Grain Company?
21    A.    No, sir.
22    Q.    What is Mr. Crutcher's position with Southwest
23 Grain Company?
24    A.    He is general manager.
25    Q.    What is Yvonne Gonzales's position with
    ACTION REPORTING  (956) 631-1024

PAGE 16
16

1 Southwest Grain Company?
2    A.    I guess she's basically a sales clerk.
3    Q.    Are you on the payroll of Southwest Grain
4 Company?
5    A.    Yes, I am.
6    Q.    So you're a paid employee of Southwest Grain
7 Company; is that correct?
8    A.    That's correct.
9    Q.    Have you been a paid employee of Southwest
10 Grain Company since you began with them in December of
11 1984?
12    A.    No.
13    Q.    There was a time period when you were not being
14 paid by Southwest Grain Company or you were not working
15 there?
16    A.    That's the time period when I was not being
17 paid by Southwest Grain Company, yes.
18    Q.    And what time period was that?
19    A.    I would have to go back and look at my tax
20 records, but it's going to be somewhere in the '91, '92,
21 '93, '94, '95, '96 time frame.
22    Q.    Was it a brief period that you weren't a paid
23 employee, say --
24    A.    No.
25    Q.    -- a year or two or was it longer?
    ACTION REPORTING  (956) 631-1024

PAGE 17
17

1    A.    It was probably three to four years, maybe
2 five.
3    Q.    Are there a set number of hours you're required
4 to work for Southwest Grain Company?
5    A.    No.
6    Q.    How is your compensation determined as far as
7 being paid by Southwest Grain Company?
8    A.    I'm a salaried employee.
9    Q.    So you receive a set salary yearly then?
10    A.    Correct.
11    Q.    Now, why was it that you were not with
12 Southwest Grain Company for that three to five year
13 period you just mentioned earlier?
14    A.    I began in December when Port
15 Elevator-Brownsville was purchased and established as a
16 company. I was sent to Brownsville to operate that
17 facility. In the beginning that facility paid my
18 salary.
19    Q.    Do you recall when it was that you were sent to
20 Brownsville to begin operations at the port elevator?
21    A.    July of '91.
22    Q.    So do you believe that you were working for
23 Southwest Grain Company at least from December of 1984
24 through July 1991?
25    A.    I don't understand.
    ACTION REPORTING  (956) 631-1024

SHEET 6   PAGE 18

**18**

1    Q.   All right.  You were working -- you testified
2    earlier that you began in December of 1984 working for
3    Southwest Grain Company.  Did you work for them or were
4    you paid from them yearly at least up until July 1991
5    when you went down to Brownsville?
6    A.   Yes, I was.
7    Q.   And then you said that when you went down to
8    Brownsville you were still being paid by Southwest Grain
9    Company for a certain time period to run the port
10   elevator?
11   A.   I don't recall exactly whether the salary
12   transition took place in July of '91 or if it took place
13   at the beginning of the year in January of '92.
14   Somewhere in the '91, '92 time frame my salary was being
15   paid by Port Elevator-Brownsville and not Southwest
16   Grain Company.
17   Q.   Now, Southwest Grain Company, that's a
18   corporation; is that correct?
19   A.   That is correct.
20   Q.   Do you know when it was incorporated?
21   A.   I think July of 1971.
22   Q.   And it's always been incorporated at least
23   since July 1971?
24   A.   I believe so, yes.
25   Q.   Do you have an ownership interest in Southwest

PAGE 19

**19**

1    Grain Company?
2    A.   Yes, I do.
3    Q.   Do you have an equity interest in it?
4    A.   Explain equity interest.
5    Q.   You're a stockholder or shareholder?  Do you
6    have --
7    A.   Yes.
8    Q.   -- an ownership interest?
9    A.   I have an ownership interest.
10   Q.   And what percent ownership interest do you have
11   in Southwest Grain Company at this time?
12   A.   Probably one fourth of a percent.
13   Q.   One fourth of one percent?
14   A.   Something like that.
15   Q.   So it would be a very --
16   A.   Very minor.
17   Q.   -- very minor interest?
18   A.   Uh-huh.
19   Q.   Who is the principal owner or first of all, is
20   there a principal owner of Southwest Grain Company,
21   someone that owns a majority of the shares or has a
22   majority interest?
23   A.   No.
24   Q.   The other shareholders or owners, who would
25   have the greatest interest in Southwest Grain Company?

PAGE 20

**20**

1    Would that be Mr. Crutcher or would that be someone else?
2    A.   I don't know.  I would have to go back and ask
3    Southwest Grain and see if there has been a change in
4    stock.
5    Q.   So at this particular point in time you really
6    couldn't tell me one way or the other who has the
7    majority interest in --
8    A.   Correct.
9    Q.   -- Southwest Grain?  Are you aware one way or
10   the other how many other owners or shareholders there
11   are in Southwest Grain?
12   A.   Yes.
13   Q.   How many others besides yourself?
14   A.   Either eight or nine.
15   Q.   And these eight or nine other owners they're
16   all individuals?
17   A.   Correct.
18   Q.   One of these individuals would be Mr. Crutcher;
19   is that correct?
20   A.   That's correct.
21   Q.   Do you receive annual reports or anything like
22   that from the business since you're an owner or --
23   A.   Southwest Grain?
24   Q.   Of Southwest Grain, yes.
25   A.   Yes.

PAGE 21

**21**

1    Q.   And you say that you're a paid employee again
2    for Southwest Grain Company, correct?
3    A.   Correct.
4    Q.   When was it -- can you recall, when was it that
5    you began receiving a salary again from Southwest Grain
6    Company?
7    A.   Either '96 or '97.
8    Q.   What was the reason that you began receiving a
9    salary again from them?
10   A.   Because Port Elevator-Brownsville's CPAs and
11   tax advisers brought up a little point saying that a
12   member of a limited liability company was also a -- I
13   guess the position of general manager would be -- would
14   possibly have tax implications for the entire gain or
15   loss of the company and that was not a -- that was not
16   something that they recommended that an individual have
17   and they said, why don't you go draw your salary from
18   Southwest Grain again instead of being a paid individual
19   from Port Elevator.
20   Q.   So do you receive a salary from Port Elevator?
21   A.   No.
22   Q.   You don't receive any compensation then from
23   Port Elevator at this time?
24   A.   That is correct.
25   Q.   And you haven't received any compensation from

Ivonne Vega V. Port Elevator-Brownsville, et al.
## DEPOSITION OF CRAIG ELKINS
12-21-99

SHEET 7   PAGE 22

PAGE 23

**22**

1   Port Elevator and that would be Port
2   Elevator-Brownsville, L period C period at least since
3   1996 or 1997; is that correct?
4       A.   Yes.
5       Q.   And you say the reason for this particular
6   change, the reason why you're receiving a salary is
7   because the accountants recommended it for tax purposes?
8       A.   Correct.
9       Q.   Who are the accountants that Port Elevator or
10  Southwest Grain Company would have dealt with concerning
11  making this particular decision?
12      A.   There is two different set of accountants.
13      Q.   Okay.  First of all, who would be the
14  accountants that Port Elevator-Brownsville, L period C
15  period would use or L.C. would use?
16      A.   Currently or at that time?
17      Q.   First of all currently.
18      A.   Currently, Burton, McCumber and Cortez.
19      Q.   Now, where are they located?
20      A.   Brownsville, Texas.
21      Q.   Is there a particular accountant within that
22  office that Port Elevator generally deals with?
23      A.   No.  At the time the individual that
24  recommended this was either Greg McCumber or Richard
25  Burton.

ACTION REPORTING  (956) 631-1024

**23**

1       Q.   So concerning this particular tax, and I hate
2   to use the word problem, but this -- I guess it is kind
3   of a problem as far as where you receive your salary
4   from, they're the ones, Mr. McCumber and Mr. Burton,
5   recommended you receive a salary from Southwest Grain?
6       A.   Well, what they pointed out was that as either
7   as the administrative as far as administrative member
8   because in an L.C. you've got two different -- you've
9   got an executive member or an administrative member and
10  as an administrative member you're -- as one of those
11  you are potentially liable personally for tax matters.
12      Q.   And so you were obviously an executive member,
13  so there was potential liability?
14      A.   Yes.
15      Q.   And you said there were a couple of sets of
16  accountants.  What were the other accountants that we
17  haven't talked about?
18      A.   Southwest Grain Company has their own
19  accountants.
20      Q.   All right.  So at least during the time period
21  of say from 1996 through present, who have been
22  Southwest Grain Company's accountants?
23      A.   Southwest Grain Company's accountants are
24  Johnson, Ewing, Hinojosa and Cron.
25      Q.   These have been their accountants at least

ACTION REPORTING  (956) 631-1024

PAGE 24

PAGE 25

**24**

1   since 1996 or 1997?
2       A.   Correct.
3       Q.   Is there any particular accountant within that
4   particular office that Southwest Grain Company normally
5   deals with?
6       A.   On audit issues John Ewing -- excuse me, John
7   Ebner.
8       Q.   And then on other issues?
9       A.   I guess it would depend on the issue.  Tax
10  matters whoever -- I'm assuming it's Jack Ewing.
11      Q.   Now, for the Port Elevator, Port
12  Elevator-Brownsville, L.C. their accountants at least
13  since 1996 or 1997 have been Burton, McCumber and
14  Cortez?
15      A.   Correct.
16      Q.   Do you have a personal accountant?
17      A.   John Ebner.
18      Q.   And he's with Johnson and Ewing?
19      A.   He does my income tax report, yes.
20      Q.   How long has he been doing your income tax
21  report?
22      A.   Off the top of my head, I don't know, the last
23  five, six years, seven years.
24      Q.   And what is the business purpose for Southwest
25  Grain Company?

ACTION REPORTING  (956) 631-1024

**25**

1       A.   The business purpose for Southwest Grain
2   Company?
3       Q.   Right.  Generally, what is it they do?
4       A.   They buy grain from farmers and other grain
5   elevators and they sell grain to other elevators and end
6   users of grain sorghum.
7       Q.   And they have been doing this since about 1971
8   then?
9       A.   I would believe so, yes.
10      Q.   Now, when was Port Elevator-Brownsville, L.C.
11  created?
12      A.   December of '92.
13      Q.   Whose idea was it to create this particular
14  business?
15      A.   I would say it was a variety of individuals'
16  ideas.  I was involved in looking at it.  Mr. Crutcher
17  was involved in looking at it.
18      Q.   Anyone else that you can think of that was
19  involved in deciding to establish this particular
20  business in Brownsville?
21      A.   The other stockholders of Southwest Grain,
22  potential investors in both the U.S. and Mexico.
23      Q.   What is an L.C. based on your understanding?
24      A.   It is similar to a sub S corp.
25      Q.   Do you know how it differs from a sub S?

ACTION REPORTING  (956) 631-1024

*Action Reporting*
**(956) 631-1024 / 1-800-884-1024**

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

SHEET 8    PAGE 26

26

1      A.    It allows I think foreign ownership and I think
2  it allows corporate ownership.
3      Q.    Now, Port Elevator-Brownsville, L.C. has a
4  lease with the Port of Brownsville; is that correct?
5      A.    That's correct.
6      Q.    Now, was that lease with the Port of
7  Brownsville, did it originate or did it begin back in
8  December 1992?
9      A.    The lease began in July of 1991.
10     Q.    So the business had a different status prior to
11  December 1992 when it became an L.C.?
12     A.    Correct.
13     Q.    What was its status before it became an L.C.?
14     A.    Straight corporation.
15     Q.    And what was the title or the name of the
16  corporation?
17     A.    Port Elevator-Brownsville, Inc.
18     Q.    Do you know why the business changed from a
19  corporation to a limited -- to an L.C.?
20     A.    Because the CPAs in Brownsville at the time
21  said, hey, look, we have a -- Texas has approved this
22  new type of company status and if you're trying to get
23  Mexican investors interested this will allow them to
24  participate.
25     Q.    Does Port Elevator-Brownsville, L.C., do they

ACTION REPORTING  (956) 631-1024

PAGE 27

27

1  have Mexican investors?
2      A.    At this time, no.
3      Q.    Have they ever had any Mexican investors?
4      A.    We have been close, but no.
5      Q.    Who are the owners of Port
6  Elevator-Brownsville, L.C.?
7      A.    The owners of Port Elevator-Brownsville, L.C?
8      Q.    Uh-huh.
9      A.    Charles Haze, Pete Retzlaff.
10     Q.    How do you spell Pete's last name?
11     A.    R-e-t-z-l-a-f-f, Walt Rolph, R-o-l-p-h, Tommy
12  Joe Crutcher, Craig Elkins, Southwest Grain Company.
13     Q.    Regarding the names that you just gave me, Mr.
14  Haze, Mr. Retzlaff, Mr. Rolph, Mr. Crutcher and Mr.
15  Elkins, do each of these individuals also have an
16  interest in Southwest Grain Company?
17     A.    Yes, they do.
18     Q.    Are there any one -- are there any other
19  individuals that have an interest in Southwest Grain
20  Company other than those five individuals that you just
21  gave me?
22     A.    Yes.
23     Q.    Who would be the other individuals?
24     A.    Maxie Baughn.
25     Q.    And do you spell Maxie's last name?

ACTION REPORTING  (956) 631-1024

PAGE 28

28

1      A.    B-a-u-g-h-n, maybe a-n.
2      Q.    B-a-u-g-h --
3      A.    N or a-n.
4      Q.    Okay.
5      A.    George Cantrell.
6      Q.    Spell George's last name.
7      A.    C-a-n-t-r-e-l-l, Claude Crabb.
8      Q.    Would that be C-r-a-b-b?
9      A.    Correct.  C. L. Miller.
10     Q.    Anyone else?
11     A.    I think that's it.
12     Q.    You said there were executive members and
13  administrative members of Port Elevator-Brownsville,
14  L.C.?
15     A.    Uh-huh.
16     Q.    Is that right?
17     A.    Correct.
18     Q.    What's the difference between an executive and
19  an administrative member?
20     A.    I would have to go back and look.  One I'm
21  assuming is -- I would have to go back and look.  I
22  mean, it's been so long.
23     Q.    Would that be something -- would those terms be
24  something we would find in the corporation or any part
25  of the start-up papers?

ACTION REPORTING  (956) 631-1024

PAGE 29

29

1      A.    No.  I think those terms are defined by the
2  IRS.
3      Q.    Now, Port Elevator, they've had a lease with
4  the Port of Brownsville since July 1991, correct?
5      A.    Correct.
6      Q.    What is it that Port Elevator-Brownsville, L.C.
7  leases from the Port of Brownsville?
8      A.    Roughly nineteen point three two or point six
9  one acres.
10     Q.    And this particular property would be located
11  where, at the Port of Brownsville?
12     A.    At the Port of Brownsville.
13     Q.    Do you have a business address for the office
14  for Port Elevator-Brownsville, L.C.?
15     A.    9155 RL Ostos, O-s-t-o-s Road.
16     Q.    O-s-t-o-s.  Your zip code?
17     A.    78521.
18     Q.    That would be in Brownsville?
19     A.    That is inside the Port of Brownsville, yes,
20  but -- city is Brownsville.
21     Q.    The business phone number would be what?
22     A.    956/831-8245.
23     Q.    Has this been the business address for Port
24  Elevator since July 1991?
25     A.    Yes and no.

ACTION REPORTING  (956) 631-1024

SHEET 9  PAGE 30

30

1  Q.  When you say yes and no, could you explain your
2  answer?
3  A.  The City of Brownsville, the Port of
4  Brownsville in the last twenty-four, thirty-six months
5  went in and renamed the streets. The post office put
6  addresses on the locations. Physically the land hasn't
7  moved. It's been there. It's the same piece of
8  property. It used to be called South Port Road. It
9  used to be called big grain elevator on south side of
10  ship channel.
11  Q.  Okay. So the office has basically been where
12  it's always been then?
13  A.  Correct. It's just --
14  Q.  The name of the streets changed over the years?
15  A.  Uh-huh.
16  Q.  That would be a yes, right?
17  A.  Yes.
18  Q.  Concerning the lease with the Port of
19  Brownsville you say it was about nineteen point three
20  two acres there. What was located on those acres?
21  A.  A grain elevator with accompanying offices and
22  grain handling equipment.
23  Q.  You say grain handling equipment?
24  A.  Yes.
25  Q.  So the lease not only includes the acreage that
ACTION REPORTING  (956) 631-1024

PAGE 31

31

1  you just mentioned, but it also includes equipment?
2  A.  No. The lease is just for the land.
3  Q.  The land, elevator and offices?
4  A.  No. The land.
5  Q.  The land?
6  A.  Port Elevator-Brownsville owns the
7  improvements.
8  Q.  When were the improvements placed on that
9  particular property?
10  A.  Back in the '60s.
11  Q.  Okay. So obviously the elevator and the
12  offices were there prior to July 1991 then?
13  A.  Correct.
14  Q.  You may have added to the facility, though,
15  since July 1991 or modernized them or whatever?
16  A.  Correct.
17  Q.  Now, this particular lease that was entered
18  into in July 1991, how long is the lease good for?
19  A.  It's a base lease of twenty years with four,
20  five year options.
21  Q.  So it appears you could get about forty years
22  out of the lease then?
23  A.  Correct.
24  Q.  What is the payment arrangement with the Port
25  of Brownsville for the lease of the land?
ACTION REPORTING  (956) 631-1024

PAGE 32

32

1  A.  They send me a bill every month.
2  Q.  You say they send you a bill every month. Is
3  it -- I mean, how is the number set as far as what you
4  have to pay each month?
5  A.  It's specified in the lease. Port of
6  Brownsville has a set tariff of land alongside the ship
7  channel based on that rate times the acres divided by
8  twelve.
9  Q.  So roughly, what do you pay monthly for the
10  lease?
11  A.  Somewhere between thirty-two and thirty-eight
12  hundred. We've reduced the land. We've expanded the
13  lease site. We've reduced the lease site. We've
14  expanded the lease site. We've reduced the lease site.
15  Q.  I don't think we were ever produced with a copy
16  of the lease. That will be qualifying in discovery.
17  Now, the lease has to be approved by the -- actually,
18  who does the lease have to be approved by as far as the
19  Port of Brownsville is concerned?
20  A.  The lease was approved by the Brownsville
21  Navigation District board of commissioners in July of
22  1991 and it's a fixed rate lease based on the acreage
23  for twenty years and at the end of twenty years it is
24  subject to a re-evaluation based on current market
25  values of their land.
ACTION REPORTING  (956) 631-1024

PAGE 33

33

1  Q.  Now, when you say the Port
2  Elevator-Brownsville, L.C. owns the buildings and the
3  equipment on the land, who did they purchase the
4  elevator and the offices from?
5  A.  Port Elevator-Brownsville, L.C. purchased them
6  from Port Elevator, Inc. Port Elevator, Inc. purchased
7  them from the Brownsville Navigation District.
8  Q.  And that would have been back in July 1991?
9  A.  That is correct.
10  Q.  Do you recall what Port Elevator-Brownsville,
11  Inc. paid for the elevator and the offices back in July
12  1991?
13  A.  I think it was somewhere in the neighborhood of
14  a million thirty-eight thousand or a million forty-nine
15  thousand dollars.
16  Q.  Now, according to the lease that you have with
17  the Port of Brownsville, are you required to carry
18  insurance?
19  A.  Yes, we are.
20  Q.  What type of insurance are you required to
21  cover or keep?
22  A.  The Port of Brownsville what they want is, I
23  think a million dollar liability policy with them named
24  as the -- as an also insured.
25  Q.  According to the lease agreement, though, what
ACTION REPORTING  (956) 631-1024

SHEET 10   PAGE 34

**34**

1  is the insurance for? What is it supposed to cover?
2      A.   The lease agreement basically stipulates that I
3  have to carry insurance in accordance with the Port of
4  Brownsville's posted tariff. And their posted tariff
5  references a million dollar liability package with the
6  Port of Brownsville as an also named insured.
7      Q.   Is the insurance that you're required to
8  purchase under the lease agreement, does it contemplate
9  instances such as what we have in this case regarding
10  the corn dispute we have here?
11      A.   I don't believe so.
12      Q.   So then earlier when I asked you what you
13  believe it covered, do you have a better understanding
14  as to what it would cover?
15      A.   Well, the Brownsville Navigation District
16  simply requires that I maintain insurance -- that I have
17  liability insurance for a million dollars with them as
18  the named insured.
19      Q.   And does that contemplate covering a loss of
20  what's in your elevator from say weather related damage?
21      A.   The Port of Brownsville has nothing to do with
22  the operations of my facility.
23      Q.   Who is the Port Elevator-Brownsville, L.C.'s
24  insurance agent? Who do you-all use for insurance
25  purposes?
               ACTION REPORTING  (956) 631-1024

PAGE 35

**35**

1      A.   Our current agent is Lee Shepherd.
2      Q.   Who is Mr. Shepherd with?
3      A.   Farmland Insurance Group.
4      Q.   Where are they located?
5      A.   Farmland's headquarters I believe is Des
6  Moines, Iowa.
7      Q.   Where is your agent located, Mr. Shepherd?
8      A.   He lives in Corpus.
9      Q.   What agency is he with?
10      A.   I think he is a salaried employee of Farmland.
11      Q.   Have you turned this particular claim over to,
12  the Vega claim, over to your insurance agent?
13      A.   I don't know.
14      Q.   All right. So that's not something that you
15  have done personally then?
16      A.   No. I have not personally turned anything over
17  to our insurance company.
18      Q.   Say from the time period 1996 through present,
19  has your insurance agent been Lee Shepherd?
20      A.   No.
21      Q.   You've had other agents?
22      A.   Yes.
23      Q.   Who are the other agents that you've had since
24  1996?
25      A.   Benny Neimic.
               ACTION REPORTING  (956) 631-1024

PAGE 36

**36**

1      Q.   How do you spell Benny's last name, if you
2  know?
3      A.   N-e -- I believe it's N-e-i-m-i-c.
4      Q.   Where is Mr. Neimic located?
5      A.   Well, he is now in Temple, Texas. He used to
6  be in Corpus.
7      Q.   Was he with Farmland Insurance?
8      A.   At that time, yes.
9      Q.   Have you had any other agent besides Mr. Neimic
10  and Mr. Shepherd since 1996?
11      A.   I would have to go back and look, but I don't
12  believe so.
13      Q.   So since 1996 it's been Farmland Insurance --
14  Farmland Insurance Group that's been writing policies
15  for Port Elevator-Brownsville, L.C.?
16      A.   I am ninety percent sure of that, yes. There
17  may have been a company that was writing it prior to
18  that, but I think the change over to Farmland took place
19  in July of '96.
20      Q.   What are some types of insurance plans that you
21  would have purchased from Farmland Insurance Group?
22      A.   Farmland has a package called commercial guard.
23      Q.   What is commercial guard?
24      A.   It's a general policy that covers fire,
25  explosion, stock, equipment.
               ACTION REPORTING  (956) 631-1024

PAGE 37

**37**

1      Q.   You don't think it covers theft?
2      A.   I don't know if theft is part of the commercial
3  guard or if theft is something that they toss in with
4  business interruption, vandalism, employee theft,
5  malicious mischief. I'm not certain if that's a
6  separate package or part of the commercial guard
7  feature.
8      Q.   Do you have that particular package also?
9      A.   The commercial guard?
10      Q.   When you say --
11      A.   Well, I've got automobile insurance with them.
12  We've got an umbrella policy with them and commercial
13  guard and we've got worker's comp through them, so I'm
14  assuming it's part of the commercial guard package, yes.
15      Q.   Do you have any idea what your limits are on
16  the commercial guard policy?
17      A.   Fire and explosion I believe is nine or twelve
18  million. It's a replacement cost.
19      Q.   When you say you have an umbrella policy, what
20  is your umbrella up to?
21      A.   Two million.
22      Q.   Do you know what the umbrella policy covers?
23      A.   I'm assuming it's covering everything that
24  commercial guard doesn't. There's a general liability
25  and then there's an umbrella.
               ACTION REPORTING  (956) 631-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

SHEET 11   PAGE 38

**38**

1   Q.   The general liability policy would be up to a
2 million?
3   A.   A million.
4   Q.   Then you have an umbrella up to two million?
5   A.   Uh-huh.
6   Q.   That would be a "yes," right?
7   A.   That would be a yes.
8   Q.   So Mr. Shepherd is with Farmland Insurance
9 Group in Corpus?
10   A.   He's with Farmland Insurance Group and he lives
11 in Corpus.
12   Q.   And you're not aware one way or the other
13 whether this particular claim has been turned over to
14 Mr. Shepherd or not, correct?
15   A.   To Farmland?
16   Q.   Correct.
17   A.   Correct.
18   Q.   Who handles the insurance matters at Port
19 Elevator-Brownsville, L.C.?
20   A.   The majority of the cases I do.
21   Q.   So you would generally from year to year
22 purchase insurance on behalf of Port
23 Elevator-Brownsville, L.C. and then you also evaluate
24 coverages for them?
25   A.   Yes.
ACTION REPORTING  (956) 631-1024

PAGE 39

**39**

1   Q.   About how many employees does Port
2 Elevator-Brownsville, L.C. have?
3   A.   It ranges from fourteen to twenty-three.
4   Q.   What is the business purpose of Port
5 Elevator-Brownsville, L.C.?
6   A.   We are a terminal export facility.  Our job is
7 to receive grain and ship grain.  We provide limited
8 short-term storage to our customers.
9   Q.   So does the Port Elevator-Brownsville, L.C. --
10 they store and ship for their customers.  Do they also
11 buy on their own behalf and later resell?
12   A.   No, we do not.  Well, on a very limited basis
13 in matters of a customer has three tons or eight tons or
14 something left over after a shipment and he says, I'll
15 sell this to you because it's not enough to put on a
16 truck or not enough to put in a rail car.
17   Q.   Does Port Elevator-Brownsville, L.C., does that
18 particular business, do they keep a customer list?
19   A.   I wouldn't call it a customer list, but it's --
20 it would be an accounts receivables list.
21   Q.   All right.  Is most of the grain that's
22 purchased and stored at Port Elevator-Brownsville, L.C.,
23 is most of it stored there and then later shipped into
24 Mexico?
25   A.   The vast majority is brought in and
ACTION REPORTING  (956) 631-1024

PAGE 40

**40**

1 transloaded, yes, destination Mexico.
2   Q.   Now, corn is also stored there?
3   A.   Very, very seldom.
4   Q.   Is there anything else that's stored there
5 besides grain and corn?
6   A.   Oats.  Past, present, future or what time
7 frame?
8   Q.   Let's just work from the time period of 1996
9 through present.
10   A.   1996 through present we've handled grain
11 sorghum, white wheat, soft red wheat, hard red winter
12 wheat, Canadian western red spring wheat and Canadian
13 prairie spring, barley malt sprout pellets, corn
14 screenings.
15   Q.   Corn what?
16   A.   Screenings.
17   Q.   Screenings?  What is that?
18   A.   You take corn and -- you got a big truck load
19 of corn, it does not meet specs.  Somebody runs it
20 across the cleaner so that it meets specs by taking out
21 the foreign matter and broken kernels.  There's a demand
22 in Mexico for corn screenings.  People have shipped in
23 corn screenings.  Popcorn, oats.  I think that's --
24 we've handled animal byproduct meal, meat and bone meal,
25 poultry meal, fish meal and some corn, both white and
ACTION REPORTING  (956) 631-1024

PAGE 41

**41**

1 yellow.
2   Q.   You say, though, the majority of what you store
3 is grain?
4   A.   The majority of what I -- different
5 commodities, different years -- no two years have been
6 the same.
7           MR. SKAGGS:  Mr. Mount, when you reach a
8 stopping point, it's been about an hour since we
9 started, at your option, whatever.
10          MR. MOUNT:  That's fine.  We can go ahead
11 and stop now.
12          MR. SKAGGS:  Off the record.
13          (Recess, 11:16-11:33)
14   Q.   (BY MR. MOUNT)  Now, you mentioned that the Port
15 Elevator-Brownsville, L.C. has between fourteen to
16 twenty-three employees depending upon the season,
17 correct?
18   A.   Correct.
19   Q.   And you also mentioned that you're paid by
20 Southwest Grain Company, that's where you receive your
21 salary in order to run Port Elevator-Brownsville, L.C.,
22 correct?
23   A.   Correct.
24   Q.   What about these other employees, these
25 fourteen to twenty-three employees that Port.
ACTION REPORTING  (956) 631-1024

*Action Reporting*
(956) 631-1024 / 1-800-884-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

SHEET 12  PAGE 42

42

1  Elevator-Brownsville, L.C. has?  Are they paid by Port
2  Elevator or are they paid by Southwest Grain Company?
3      A.  Port Elevator.
4      Q.  So they would actually -- so these other
5  employees would actually receive checks from Port
6  Elevator-Brownsville, L.C., correct?
7      A.  Correct.
8      Q.  And generally the payroll account for Port
9  Elevator-Brownsville, L.C., what bank would that be
10  drawn on?
11      A.  Norwest.
12      Q.  And that would be Norwest out of Brownsville?
13      A.  Yes.
14      Q.  What about the payroll check that you receive
15  from Southwest Grain Co., Inc., do you know what the
16  payroll account is or what bank the check would be drawn
17  on for your particular check?
18      A.  No.  My wife gets mine and I have no idea where
19  it comes from or how she can cash it without my
20  signature, but I don't see it.  All I know is whether it
21  showed up or it didn't show up.
22      Q.  Does she pick up the check from Southwest Grain
23  Company, Inc., from their office for you or is that why
24  she has it or --
25      A.  No.  It's mailed to the house.
                ACTION REPORTING  (956) 631-1024

PAGE 43

43

1      Q.  All right.  And where is the check mailed from?
2      A.  I don't know.
3      Q.  Is it mailed from Southwest Grain Company,
4  Inc.?
5      A.  I don't know if it's from Southwest Grain
6  Company, Inc. or from the payroll processing people who
7  do it.
8      Q.  Does Southwest Grain Company, Inc., do they
9  have their own bookkeeper, their own people in-house
10  that do the payroll?
11      A.  Not to my knowledge.  I don't know.
12      Q.  So you don't know if they contract out for
13  payroll services or whether they do it in-house?
14      A.  The payroll services are contracted out.  How
15  that's done, I don't know.
16      Q.  What about the payroll services for Port
17  Elevator-Brownsville, L.C., are the payroll services,
18  are they contracted out or are they done in-house?
19      A.  Done in-house.
20      Q.  Who in-house would actually prepare the checks?
21      A.  Maria Gonzalez.
22      Q.  What is Maria Gonzalez's position with Port
23  Elevator?  She's the bookkeeper?
24      A.  Payroll clerk, secretary.
25      Q.  Then who signs the checks?  Are you the one --
                ACTION REPORTING  (956) 631-1024

PAGE 44

44

1      A.  I do.
2      Q.  -- that signs the checks?
3      A.  I do.
4      Q.  All right.  Is anyone else authorized to sign
5  payroll checks besides yourself?
6      A.  Tommy Joe Crutcher is authorized to sign checks
7  on Port Elevator-Brownsville's account in my absence.
8      Q.  Does Mr. Crutcher receive any type of salary or
9  compensation from Port Elevator-Brownsville, L.C.?
10      A.  No.
11      Q.  It's your understanding that Mr. Crutcher
12  receives his compensation then from Southwest Grain Co.,
13  Inc.?
14      A.  I do not know where Mr. Crutcher gets his
15  compensation from.
16      Q.  Is he the general manager of Southwest Grain
17  Co., Inc.?
18      A.  Yes, he is.
19      Q.  Does Mr. Crutcher do anything else for Port
20  Elevator-Brownsville, L.C. other than -- other than what
21  he does as far as signing checks when you're not around?
22      A.  As I stated, Mr. Crutcher is on the signature
23  card at the bank, but he is a member of Port
24  Elevator-Brownsville, L.C. and like all other investors
25  he has an interest in what the company does, but he is
                ACTION REPORTING  (956) 631-1024

PAGE 45

45

1  not involved in the day-to-day activities.
2      Q.  So he doesn't receive any compensation then
3  from Port Elevator-Brownsville, L.C.?
4      A.  That is correct.
5      Q.  Does Maria Gonzales, does she have an assistant
6  as far as helping her with the payroll?
7      A.  No.
8      Q.  Now, you're the one that runs Port
9  Elevator-Brownsville, L.C.; is that right?
10      A.  That's correct.
11      Q.  Who would be directly below you in the --
12      A.  Everybody.
13      Q.  Is there someone right below you that's like
14  say your right-hand man or right-hand woman, someone
15  that would run the place in your absence?
16      A.  No.  I mean, it's a grain elevator.  If I'm not
17  there, you know, I'm a phone call away.  It's -- the
18  train comes in you unload the train.  You got cars to
19  load, you load cars.  I mean, it's fairly
20  straightforward.
21      Q.  All right.  So as far as management structure
22  goes for Port Elevator-Brownsville, L.C. you are the
23  man -- you are the management?
24      A.  Yes.
25      Q.  You're the final word and you are really the
                ACTION REPORTING  (956) 631-1024

*Action Reporting*
(956) 631-1024 / 1-800-884-1024

SHEET 13   PAGE 46

**46**

1  sole manager, correct?
2  A.   Correct.
3  Q.   Of course, you've got to answer to outside
4  investors or what have you, but you're the one that runs
5  day-to-day Port Elevator-Brownsville, L.C.?
6  A.   Correct.
7  Q.   Could you tell me briefly what your job duties
8  are as far as running the Port Elevator-Brownsville,
9  L.C.?
10  A.   In essence find people who want to run grain
11  through the elevator, convince them to run grain through
12  the elevator, talk with railroads, try and get freight
13  structures established so that customers can bring grain
14  into the elevator, make sure that my employees get paid,
15  make sure my bills get paid.
16  Q.   So as far as marketing Port
17  Elevator-Brownsville, L.C., how do you market the
18  elevator?
19  A.   A variety of ways.  You pick an area that you
20  feel you can provide better service to, either to a
21  supplier of product and you convince a supplier of
22  product that you could do them a better job than
23  somebody else.  The same holds true, you go to an end
24  user of product and say, you've got problems with this,
25  you've got problems with that, we're located on the

ACTION REPORTING  (956) 631-1024

PAGE 47

**47**

1  border rather than deal with somebody in Kansas City who
2  doesn't speak Spanish or who doesn't know the border who
3  will sell you a train of something that may or may not
4  make it to the border in three weeks.  Why not have that
5  person deliver your product to the elevator.  We'll run
6  it through the house for you, put on equipment for you
7  and ship it to you.
8  Q.   Does Port Elevator-Brownsville, L.C., do they
9  advertise anywhere?
10  A.   Through normal media channels, no.  By
11  attending functions in Mexico where end users are
12  located, yes.  By being members of the Texas Grain and
13  Feed Association.  Print advertising is done I would say
14  by the Port of Brownsville, promoting the Port of
15  Brownsville by the Brownsville Economic Development
16  Council promoting Brownsville.
17  Q.   So as far as -- at least as far as the print
18  advertising is concerned that's done by the Port of
19  Brownsville, it's not paid for by the Port
20  Elevator-Brownsville, L.C. or they don't contribute
21  towards those advertisements?
22  A.   Port of Brownsville doesn't directly advertise
23  Port Elevator-Brownsville services.  Port of Brownsville
24  blows a blanket ad saying we've got forty-two feet of
25  water, we've got sheltered harbor, we've got X amount of

ACTION REPORTING  (956) 631-1024

PAGE 48

**48**

1  dock space, we have stevedores, we have a grain
2  elevator, here are our contact people, that type of
3  situation.
4  Q.   Now, you say Port Elevator-Brownsville, L.C. is
5  a member of the Texas Grain and Feed Association.  What
6  is the Texas Grain and Feed Association?
7  A.   Texas Grain and Feed Association is an
8  association of grain elevators, suppliers of products to
9  grain elevators, end users.  It is something similar to
10  the American Bar Association or Texas Bar Association or
11  Cameron County or Hidalgo County Bar Association.
12  Q.   Do they have any regulatory powers over say the
13  Port Elevator-Brownsville, L.C.?
14  A.   Well, as a member of the Texas Grain and Feed
15  Association they have bylaws, a constitution, an
16  arbitration clause where if two members of the
17  association have a disagreement or a dispute then rather
18  than sit down in a setting like this there is an
19  arbitration panel.  The party who feels wronged files a
20  request for arbitration, sends in a nominal fee and the
21  association contacts the other member and arbitration
22  begins.
23  Q.   Where is the Texas Grain and Feed Association
24  located?
25  A.   Fort Worth, Texas.

ACTION REPORTING  (956) 631-1024

PAGE 49

**49**

1  Q.   Do you pay dues?
2  A.   Yes, we do.
3  Q.   Do you know about how many members there are in
4  the Texas Grain and Feed Association?
5  A.   No.  It varies.  They have -- I don't know if
6  they're up to a thousand members again or if they're
7  still in seven hundred and fifty, eight hundred.
8  Q.   Are there members that mainly -- persons who
9  run elevators or do they have other type members?
10  A.   Their members are mainly companies, either
11  grain elevator companies, suppliers of products to grain
12  elevator companies.  People sell elevator buckets,
13  people sell elevator legs.  Insurance companies, end
14  users, feed manufacturers, feed mills.
15  Q.   Is the Port Elevator-Brownsville, L.C., are
16  they regulated by anyone, by say any governmental agency
17  or entity?
18  A.   Texas Department of Agriculture.
19  Q.   Do you have to have a permit from the Texas
20  Department of Agriculture in order to run the port
21  elevator?
22  A.   You have a license, yes.
23  Q.   And what is the purpose of the license?
24  A.   State legislature wants grain elevators in
25  Texas to be licensed.  It is a means by which to protect

ACTION REPORTING  (956) 631-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

___ SHEET 14  PAGE 50 ___

**50**

1  the farmer who deposits grain at an elevator.
2      Q.   Are you aware one way or the other what
3  requirements the Texas Department of Agriculture looks
4  for in order to decide whether to issue a license say to
5  Port Elevator?
6      A.   They have an annual inspection.  Inspector
7  comes by, goes through your facility, checks your
8  records, measures the amount of grain you've got in the
9  elevator, compares that against the grain that you show
10  as having in the elevator and if you do not have the
11  same amount of grain within a volume metric measurement
12  tolerance they can either fine you or shut you down,
13  revoke your license.
14      Q.   Has Port Elevator-Brownsville, L.C., have they
15  ever had their license suspended or --
16      A.   No.
17      Q.   Have there ever been any complaints made to the
18  Texas Department of Agriculture about Port
19  Elevator-Brownsville, L.C.?
20      A.   One.
21      Q.   What was the nature of that complaint that was
22  made?
23      A.   The nature of that complaint was white corn
24  stored in the facility had deteriorated in quality.
25      Q.   Who made the complaint?

ACTION REPORTING  (956) 631-1024

___ PAGE 51 ___

**51**

1      A.   The Scoular Company.
2      Q.   The what?
3      A.   The Scoular, S-c-o-u-l-a-r.
4      Q.   Where is the Scoular Company located?
5      A.   Throughout the midwest.  I think their
6  headquarters is Omaha, Nebraska or Overland Park,
7  Kansas.
8      Q.   So the Scoular Company was running white corn
9  through the elevator and they made some type of
10  complaint that the corn had deteriorated in quality
11  while in the elevator?
12      A.   Correct.
13      Q.   What year was that complaint made?
14      A.   I think the complaint was filed in early '96.
15      Q.   Has the complaint been resolved?
16      A.   Yes.
17      Q.   How was it resolved?
18      A.   The Texas Department of Agriculture found no
19  basis for Scoular's claim.
20      Q.   So Port Elevator-Brownsville, L.C. was
21  basically exonerated by the Texas Department of
22  Agriculture?
23      A.   As far as the complaint that Scoular made, yes.
24      Q.   Was there any particular test -- was there any
25  testimony given in that case?

ACTION REPORTING  (956) 631-1024

___ PAGE 52 ___

**52**

1      A.   Scoular's counsel sent a letter to the Texas
2  Department of Agriculture.  I replied.  In a copy to me
3  I replied to Texas Department of Agriculture.  Texas
4  Department of Agriculture sent a copy of the state laws
5  to Scoular and their counsel, a copy of our posted
6  tariff and in essence told Scoular that they had no
7  basis for their claim.
8      Q.   Did Port Elevator-Brownsville, L.C., did they
9  have to hire a lawyer for that particular matter?
10      A.   No.
11      Q.   So that was something that you handled
12  yourself.  You wrote a letter back to the Texas
13  Department of Agriculture?
14      A.   Yes, it was.
15      Q.   And you answered the allegations then?
16      A.   Correct.
17      Q.   And how were the allegations or how was the
18  complaint decided?  Is there a board, say a group of
19  people that get together to decide whether there is a
20  complaint or not a complaint basically?  How does the
21  process work?
22      A.   All I know is I sent a letter into the Texas
23  Department of Agriculture's warehouse exams branch and
24  received sometime later a reply, a copy of the letter
25  that Texas Department of Agriculture had sent to Scoular

ACTION REPORTING  (956) 631-1024

___ PAGE 53 ___

**53**

1  and saying that that was it.  Inside TDA I have no idea.
2      Q.   Do you still have a copy of the letter that you
3  sent to the Texas Department of Agriculture along with
4  the correspondence that was sent back from Texas
5  Department of Agriculture?
6      A.   I believe so.
7      Q.   So concerning this matter that occurred in '96
8  concerning the white corn you still have all the
9  documents that surrounded the complaint then?
10      A.   I believe so.
11      Q.   And you store those particular -- you store
12  those particular documents at Port Elevator-Brownsville,
13  L.C.; is that correct?
14      A.   Yes.
15      Q.   So this would be located at your office in
16  Brownsville, correct?
17      A.   Correct.
18      Q.   Any other complaints made against Port
19  Elevator-Brownsville, L.C. to the Texas Department of
20  Agriculture?
21      A.   Not to my knowledge.
22      Q.   Has Port Elevator-Brownsville, L.C. or Port
23  Elevator-Brownsville, Inc. and you told me earlier
24  they've been in business since July 1991, have they ever
25  been sued before?

ACTION REPORTING  (956) 631-1024

SHEET 15   PAGE 54

**54**

1   A.   No.
2   Q.   So this is the first lawsuit?
3   A.   Yes.
4   Q.   Have any other claims been made against -- have
5   any other claims been made against these two entities
6   other than the claim made by the Scoular Company, the
7   Texas Department of Agriculture and then the claim Ms.
8   Vega is making?
9         MR. SKAGGS:  Which two entities?
10        MR. MOUNT:  It would be the Inc. and the
11  L.C.
12        MR. SKAGGS:  Okay.
13  A.   Not to my knowledge.
14  Q.   (BY MR. MOUNT) All right.  And again, when I'm
15  saying Inc. and L.C. it's Port Elevator-Brownsville,
16  L.C. and Port Elevator-Brownsville, Inc.
17  A.   Okay.
18  Q.   What kind of revenues did you-all have for 1998
19  at Port Elevator-Brownsville, L.C.?
20  A.   Gross or net?
21  Q.   Gross.
22  A.   Close to a million dollars.
23  Q.   What was your net income for 1998 with Port
24  Elevator-Brownsville, L.C.?
25  A.   I think a loss of two hundred and twenty-five

ACTION REPORTING  (956) 631-1024

PAGE 55

**55**

1   thousand or thereabouts.
2   Q.   Since Port Elevator-Brownsville, L.C. and Port
3   Elevator-Brownsville, Inc. have been in business, have
4   they had a profit for any given year?
5   A.   Yes.
6   Q.   What particular years did they have profits?
7   A.   1994.
8   Q.   Was that the only year that Port
9   Elevator-Brownsville, L.C. and Port
10  Elevator-Brownsville, Inc. had a profit?
11  A.   Yes.
12  Q.   What was their profit that particular year?
13  A.   I don't recall.  In the neighborhood of four
14  hundred thousand.
15  Q.   Then roughly -- I realize you don't have the
16  figures in front of you, but you are the manager of Port
17  Elevator-Brownsville, L.C.?
18  A.   Yes.
19  Q.   Do you recall what the operating loss or net
20  loss was for 1997?
21  A.   1997, I think a hundred and forty thousand, a
22  hundred and twenty-seven thousand, somewhere around
23  there.
24  Q.   So somewhere over a hundred thousand Port
25  Elevator-Brownsville, L.C. lost in 1997?

ACTION REPORTING  (956) 631-1024

PAGE 56

**56**

1   A.   Correct.
2   Q.   How is Port Elevator-Brownsville, L.C. doing
3   this year, 1999?
4   A.   We'll probably have a -- somewhere between a
5   seventy thousand and a hundred twenty thousand
6   dollar loss.
7   Q.   And that's what you're projecting at this
8   particular point in time?
9   A.   Pretty close, yes.
10  Q.   Do you do monthly P and Ls at Port
11  Elevator-Brownsville, L.C.?
12  A.   To some extent, yes.  We have changed computer
13  systems and gone from a DOS base system to a Windows
14  base system and they are not -- monthly, A.P. monthly,
15  A.R. is fine.  There's a posting problem between the
16  A.R. and the G.L. ledgers.
17  Q.   So I guess the answer to the question is yes --
18  A.   Yes and no.
19  Q.   -- and no?
20  A.   Uh-huh.  Yes, it is.
21  Q.   Do you receive from your accountant say a six
22  month P and L or something like that?
23  A.   No.
24  Q.   So what you receive from your accountant would
25  be an end of year P and L?

ACTION REPORTING  (956) 631-1024

PAGE 57

**57**

1   A.   An end of year audit.
2   Q.   End of year audit.  And your year is from
3   January --
4   A.   Calendar year.
5   Q.   Calendar year.  As far as the losses that Port
6   Elevator-Brownsville, L.C. has had I guess for a number
7   of years, how are they infused as far as capital goes?
8   Do they receive money from banks in order to continue
9   operating or is this from the investors?
10  A.   For the most part the loss is depreciation and
11  we have bank loans.  We've had no investor reinfusion of
12  capital.
13  Q.   So basically the losses that you've been
14  telling me about are tax losses, but if we added back in
15  depreciation business might be --
16  A.   Pretty close.
17  Q.   -- pretty close to breaking even?
18  A.   Uh-huh.
19  Q.   Is that correct?
20  A.   That's correct.
21  Q.   And what you're depreciating is -- I guess
22  you're depreciating the building and the elevator that
23  was bought in 1991, that would be the big depreciation
24  item?
25  A.   The big depreciation item is the building and

ACTION REPORTING  (956) 631-1024

SHEET 16   PAGE 58

**58**

1  the elevator that was purchased in '92 and the
2  improvements that we've made.
3      Q.   As far as depreciation goes, over how many
4  years did you depreciate the elevator and the building?
5      A.   In accordance with tax guidelines.
6      Q.   I guess you don't know.  In other words --
7      A.   Don't know, but the --
8      Q.   Whatever the accountant --
9      A.   Whatever the accountant is -- whatever the law
10  will allow us to do.
11      Q.   Okay.  Now, does Southwest Grain Co., Inc., do
12  they make a profit?
13      A.   Some years yes, they do.  Some years no, they
14  don't.
15      Q.   Now, you're an investor in Southwest Grain Co.,
16  Inc., right?
17      A.   That's correct.
18      Q.   Say for last year, 1998, did they make a profit
19  in 1998, Southwest Grain Co., Inc.?
20      A.   I would have to go back and look at the
21  financial statement.  I don't know.
22      Q.   Where do you keep your financial statements for
23  Southwest Grain Co., Inc.?
24      A.   Either at my office in Brownsville or at my
25  house.

ACTION REPORTING  (956) 631-1024

PAGE 59

**59**

1      Q.   Now, do you commute down to Brownsville every
2  day?
3      A.   Every day.
4      Q.   So there isn't an office here in Hidalgo County
5  for Port Elevator-Brownsville, L.C.?
6      A.   There is not.
7      Q.   Do you sometimes work out of your house?
8      A.   If I'm sick, yes.
9      Q.   Do you have a home office?
10      A.   No.
11      Q.   Does Port Elevator-Brownsville, L.C., do they
12  own anything else other than what you've already
13  mentioned, that is, the elevator and the buildings and
14  the equipment on those nineteen plus acres down at the
15  Port of Brownsville?
16      A.   As long as you include vehicles as part of the
17  equipment that's it.
18      Q.   Now, if a customer came to you say in 1996 and
19  wanted to store corn in your facility at Port
20  Elevator-Brownsville, L period C period take me through
21  the normal process as to how it would work, how the corn
22  would come in, what documents would be issued and then
23  the process as far as releasing the corn out of the
24  elevator for shipment.
25      A.   Initially it begins with a phone call.  You

ACTION REPORTING  (956) 631-1024

PAGE 60

**60**

1  would call me and say, my name is, I'm interested in
2  doing this.  This that you would describe you would tell
3  me what kind of products you're bringing in, how it's
4  going to come in, when it was going to come in, what
5  kind of volume was going to come in and what you wanted
6  to do with it.
7      Q.   Then would a contract be entered into say
8  between Port Elevator-Brownsville, L.C. and the
9  particular customer that called you on the telephone?
10      A.   Depends on the amount of grain, the volume of
11  grain you're talking about.  Most cases -- I mean, every
12  case is different.  I have a published tariff.  I will
13  provide you with a copy of my published tariff and those
14  are the rules that I would abide by.
15      Q.   Now, what would be on your published tariff?
16  What would be some of the items on there?
17      A.   One page is a rate page.  It would tell you
18  that if you brought it in by rail car it would cost X
19  amount per bushel.  If it came in by truck it would cost
20  X amount a bushel.  If it went out it would cost X
21  amount a bushel.  If it went out by Mexican truck it
22  would cost X amount a bushel.  If it came in by barge,
23  if it came in by vessel, if it went out by barge, if it
24  went out by vessel.  Basically it would itemize what the
25  charges would be.  It would tell you what the storage

ACTION REPORTING  (956) 631-1024

PAGE 61

**61**

1  charges were and then after that you would get into
2  general items such as if you're bringing cars in, you
3  know, everything is subject to being weighed.  The
4  weight that comes in that I physically receive is the
5  weight I give you credit for.  If there's a difference
6  in the unload weight and your original shipping weight
7  that's not my problem.  That's standard in the grain
8  industry.  It would have things describing -- rather
9  than trying to go through all the steps of explaining it
10  I believe you have a copy of it.
11      Q.   Would that be what was attached to the contract
12  that was entered into in this case between Port
13  Elevator-Brownsville, L.C. and Mr. Puffelis and Mr.
14  Gutierrez?
15      A.   If you show it to me I can tell you.
16      Q.   All right.  About how many pages is the
17  published tariff?
18      A.   I don't know.  Sixteen, seventeen, fourteen,
19  fifteen.  It depends on the type font I guess.
20          (Exhibit Nos. 1 and 2 marked)
21      Q.   (BY MR. MOUNT) What we've done, we've marked
22  Exhibit No. 1 in your deposition notice.  It's titled
23  first amended notice of intention to take the oral and
24  video deposition with subpoena duces tecum of Craig
25  Elkins and I marked as Exhibit No. 2 defendant Port

ACTION REPORTING  (956) 631-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

SHEET 17  PAGE 62

**62**

1  Elevator-Brownsville, L.C.'s answers to plaintiff's
2  first set of interrogatories and requests for
3  production. I went ahead on Exhibit No. 2 and numbered
4  them, each of the documents and the answers and
5  responses that were provided as numbers one through
6  sixty-six and I numbered those pages. If you look
7  through those pages is a copy of the published tariff
8  contained within those documents provided.
9     A. It is not in this set of documents, but you
10 just passed part of it in your hands right there.
11    Q. Okay. What we'll do is -- if I can find the
12 exhibit stickers.
13        (Exhibit No. 3 marked)
14    Q. (BY MR. MOUNT) Let me show you what we just
15 marked as Exhibit No. 3. It appears to be a one page
16 document titled rate of service contract.
17    A. Okay.
18    Q. Are you able to identify that particular
19 document?
20    A. Yes.
21    Q. Does your signature appear on that particular
22 document?
23    A. Yes, it does.
24    Q. Do you recognize the other signatures on that
25 document?

ACTION REPORTING  (956) 631-1024

PAGE 63

**63**

1     A. I was present when it was signed, yes.
2     Q. Who were the other persons present when the
3  contract was signed?
4     A. For Sysco De Baja was Bersain Gutierrez Zenteno
5  and for Akron Group, Inc. was Walter Puffelis.
6     Q. So you recognize Mr. Puffelis and Mr.
7  Gutierrez's signatures on this particular document?
8     A. I recognize the document as coming from my
9  lawyer's office and I recognize the fact that this is
10 the document that those two gentlemen signed.
11    Q. You were present when those two gentlemen --
12    A. I was present.
13    Q. -- signed the document, correct?
14    A. The three of us were sitting in my office when
15 this was signed.
16    Q. Do you recall about when this particular
17 document was signed?
18    A. Oh, on or before the first day -- the first
19 rail car was unloaded.
20    Q. So this would have been sometime in 1996 then?
21    A. It would have been in October of 1996.
22    Q. As far as the contract being prepared, who
23 would have prepared this particular contract?
24    A. I did.
25    Q. And then who would have typed it up?

ACTION REPORTING  (956) 631-1024

PAGE 64

**64**

1     A. I printed it off of my word processor.
2     Q. So you would have made the changes to it
3  yourself?
4     A. Yes.
5     Q. For instance you would have put in Akron Group,
6  Inc. (AGI) on there, you would have put Sysco De Baja
7  for a signature there also?
8     A. In talking with the two gentlemen that were
9  present that is how they wished their names to be.
10 That's how they wished to be identified.
11    Q. Do you keep a calendar or anything like that
12 that would enable us to know what particular day this
13 contract was signed?
14    A. I have a wall calendar that is marked on, but I
15 would not make a notation on a wall calendar that they
16 were here on that day.
17    Q. Do you have any -- does the Port
18 Elevator-Brownsville, L.C. or yourself, do you keep any
19 type of documentation that would reflect when this
20 particular contract was signed by all parties?
21    A. The closest I can get to it on a date is that
22 the -- this was done prior to any grain was unloaded.
23 It was done the very first time I met these two
24 individuals which happened to be the day before or the
25 same day the rail cars arrived.

ACTION REPORTING  (956) 631-1024

PAGE 65

**65**

1     Q. Now, the contract that was entered into between
2  these parties and Mr. Gutierrez and Mr. Puffelis and
3  Port Elevator-Brownsville, L.C., is this the complete
4  contract between the parties?
5     A. This is the rate page. They were also given
6  the Port Elevator's tariff at the time.
7     Q. And by tariff, is this the particular document
8  that we're talking about for the tariffs or rates?
9     A. Forgive my eyes.
10    Q. That's fine. Let's see.
11    A. This does appear to be it. It does appear to
12 be missing a page. No. It's just out of sequence.
13    Q. All right. So the first particular page is
14 titled rates and it's got your different rates on there,
15 correct?
16    A. Correct.
17    Q. Would these have been the rates that would have
18 applied back to your customers in October of 1996?
19    A. This is the rates that were being offered to my
20 customers in 1996, yes.
21    Q. Let's mark that particular document, that one
22 page document, as Exhibit No. 4.
23        (Exhibit No. 4 marked)
24    Q. (BY MR. MOUNT) All right. You would agree with
25 me we just marked as Exhibit No. 4 a copy of the rates

ACTION REPORTING  (956) 631-1024

SHEET 18   PAGE 66

**66**

1  that were in effect back in October 1996, that's the one
2  page document, correct?
3      A.  The entire package is together.
4      Q.  All right.  So when you say the entire package
5  it would include the second page then that's titled
6  rules and regulations?
7      A.  And the subsequent pages behind it, yes.
8      Q.  So what would have applied back to your
9  customers back in October 1996 would have been Exhibit
10 No. 4 and we'll mark it in its entirety it would include
11 eight pages and that would be the rates page along with
12 the rules and regulations, correct?
13     A.  Correct.
14     Q.  These were in effect back in October 1996; is
15 that correct?
16     A.  That is correct.
17     Q.  Now, this particular contract was entered
18 into -- when you had contracts and you've partially
19 answered this previously, but you had contracts with
20 some of your other customers, too and some particular
21 customers they wouldn't be on a contract basis?
22     A.  Well, if -- again, we go back to the example
23 that you asked me to walk you through.
24     Q.  Uh-huh.
25     A.  This is what I would have offered you and said,

ACTION REPORTING  (956) 631-1024

PAGE 67

**67**

1  here you go and if the items work for you then you would
2  accept them.  If the items didn't work for you then you
3  would come back and try and say something like, well,
4  gee, can I get something different for me and my reply
5  would be well, what am I getting out of it that I don't
6  normally get and you may say, well, I want to run a
7  large volume through here, you know, I will guarantee
8  you I will run a million bushels through your elevator
9  in a certain time span at which point in time I would
10 say, okay, for a million bushels I would replace the
11 rates page with something else.  If you just said, well,
12 all I want to do is unload two trucks and put them in a
13 rail car and I would say, fine, to unload two trucks and
14 put them in a rail car this is what you get.
15     Q.  So basically when you look at this rate and
16 service contract, Exhibit No. 3, they were -- for
17 instance under receiving -- under receiving free rail
18 cars it was two cents a bushel, but your regular rate
19 would be four cents a bushel, correct?
20     A.  Correct.
21     Q.  So they're getting it for half price, correct?
22     A.  Correct.
23     Q.  And then delivering trucks, U.S. trucks and
24 Mexican trucks looks like they're getting -- the U.S.
25 trucks were half price, correct?

ACTION REPORTING  (956) 631-1024

PAGE 68

**68**

1      A.  Correct.
2      Q.  And the Mexican trucks were getting an even
3  better deal on that, right?
4      A.  Correct.
5      Q.  So basically this particular document, Exhibit
6  No. 3, this contract that was entered into between Mr.
7  Puffelis and Mr. Gutierrez and Port
8  Elevator-Brownsville, L.C. were getting special rates
9  that were better than the average rate given to the
10 average customer, correct?
11     A.  That is correct.
12     Q.  Now, earlier you just said that you first met
13 Mr. Gutierrez and you first met Mr. Puffelis when they
14 came to you on that particular day when this contract
15 was entered; is that correct?
16     A.  That is correct.
17     Q.  So you had never met these two men before,
18 correct?
19     A.  Correct.
20     Q.  Had you ever spoken to either Mr. Puffelis or
21 Mr. Gutierrez on the telephone prior to them actually
22 coming down to your facility in Brownsville and sitting
23 in your office and signing this contract?
24     A.  I don't recall.  I know I had a phone
25 conversation with Mr. Puffelis or I had a message, phone

ACTION REPORTING  (956) 631-1024

PAGE 69

**69**

1  messages from Mr. Puffelis in the week or so prior to
2  their arrival.
3      Q.  So you believe that you probably did speak with
4  Mr. Puffelis on the phone prior to his arrival?
5      A.  I believe I did speak with him prior to his
6  arrival.
7      Q.  At this particular point in time, can you
8  recall what the conversation was about?
9      A.  I have some corn I would like to unload in your
10 elevator, can you do that and my answer was yes and how
11 much are you talking about and, you know, significant
12 amount of corn and that he was coming to town.
13     Q.  Was the conversation in Spanish or in English?
14     A.  I don't recall.  It may have been in English.
15     Q.  So the conversation was brief?
16     A.  Very.
17     Q.  When you say a significant amount of corn you
18 can't recall at this time how much he told you he was
19 going to run through the elevator?
20     A.  Fifty thousand tons.
21     Q.  Fifty thousand tons?
22     A.  Uh-huh.
23     Q.  And that was corn or grain?
24     A.  At the time he just said grain.
25     Q.  Did he give you any specifics as to how long it

ACTION REPORTING  (956) 631-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

SHEET 19  PAGE 70

**70**

1  would be in the elevator or where he would be running it
2  out to afterwards?
3  A.  In our phone conversations, no.
4  Q.  Did he tell you where he was coming down from
5  in your phone conversation with him?
6  A.  No.  Well, I don't recall if he did.  I don't
7  believe so.
8  Q.  Do you recall if he told you who he was working
9  for during your telephone conversation with him?
10  A.  No.
11  Q.  So basically all you remember is that he was
12  going to bring down some corn, that he wanted to unload
13  it in your elevator and it was a significant amount,
14  maybe fifty thousand tons actually.  It was your
15  understanding it was grain at the time?
16  A.  Correct.
17  Q.  And that's about all you can recall from that
18  conversation?
19  A.  From the phone conversation, yes.
20  Q.  Did he mention Mr. Gutierrez or anyone else in
21  the conversation?
22  A.  No.
23  Q.  He didn't mention Ms. Vega either, correct?
24  A.  Correct.
25  Q.  Did you enter into any other contracts with
ACTION REPORTING  (956) 631-1024

PAGE 71

**71**

1  either Mr. Puffelis on behalf of Akron Group, Inc. or
2  Mr. Gutierrez on behalf of Sysco De Baja other than what
3  we've marked as Exhibit No. 3, this particular contract?
4  A.  Nothing.  This is the sole arrangement.
5  Q.  Then you say -- was it grain or corn that
6  showed up either that day or the next day after the
7  contract was signed?
8  A.  It was corn.
9  MR. MOUNT:  Let's go ahead and take a
10  break.
11  (Recess, 12:21-1:58)
12  Q.  (BY MR. MOUNT) Prior to the lunch recess we
13  were talking about the conversation that you had between
14  Mr. Puffelis and yourself on the telephone prior to him
15  coming to your office and you mentioned that he told you
16  it was fifty thousand tons of grain that would be run
17  through your facility?
18  A.  No.  What he mentioned was in talking about
19  what was going to come I asked him what type of volume
20  are we talking about and he said fifty thousand metric
21  tons is something that I want to talk to you about
22  running through your facility.
23  Q.  How does a metric ton compare to a bushel?
24  A.  Rule of thumb depending on your grain you take
25  corn, grain sorghum which are fifty-six pound test
ACTION REPORTING  (956) 631-1024

PAGE 72

**72**

1  weights.  A twenty-five thousand metric tons is a
2  million bushels.  If you want to know exactly something
3  like thirty-nine point three six seven nine bushels
4  equals one metric ton.
5  Q.  All right.
6  A.  On corn and grain sorghum.  Wheat and soybeans,
7  it's thirty-six point seven four and a whole bunch of
8  threes.
9  Q.  All right.  I'm just interested in corn, so it
10  would be somewhere around thirty-nine point three six
11  seven nine; is that correct?
12  A.  Yes.
13  Q.  Now, when you had this particular meeting with
14  Mr. Puffelis and Mr. Gutierrez in your office, about how
15  long did the meeting take place?
16  A.  Well, they were there all day.
17  Q.  Were they meeting with you the entire day or
18  were they say looking over the facility also?
19  A.  No.  When they got there it was pretty much an
20  all day affair for a couple of days.  They were in town
21  three or four days I think.
22  Q.  Were they at your facility for three or four
23  days off and on?
24  A.  Off and on, yeah.  I think there may have been
25  a weekend involved, but --
ACTION REPORTING  (956) 631-1024

PAGE 73

**73**

1  Q.  So do you recall if this particular contract
2  was signed maybe on Friday or something?
3  A.  I mean, I would have to go back and look at a
4  calendar to see what day of the week, but they showed up
5  roughly the day before or the same day that the rail
6  cars did.
7  Q.  So were they still there when the rail cars
8  were coming in and bringing in the corn?
9  A.  The first twenty-seven rail cars, yes.
10  Q.  And you recall when the first twenty-seven rail
11  cars were brought in?
12  A.  It's in the document someplace.
13  Q.  Would that be in Exhibit No. 2 somewhere or
14  would you be able to find those documents in Exhibit No.
15  4?  Could that be on page thirty-three if you looked at
16  thirty-three on the bottom?
17  A.  No.  This is when the rail cars were loaded.
18  Q.  All right.
19  A.  That's sixteen -- this is when they were
20  loaded.
21  Q.  When you say loaded, loaded to leave the
22  facility?
23  A.  When they were -- this shows -- page
24  thirty-three is a train/multi unit detail inquiry
25  printed out looks like by Continental Grain that was
ACTION REPORTING  (956) 631-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
## DEPOSITION OF CRAIG ELKINS
12-21-99

SHEET 20   PAGE 74

**74**

1  shipped to Pillsbury and it shows that car number such
2  and such and such and such were loaded October 21st,
3  1996.
4      Q.  So how did you come in possession of this
5  particular document, Exhibit No. 2, which would be page
6  thirty-three of Exhibit No. 2?
7      A.  I can't see the fax headers on the top, but it
8  looks like the Xerox machine cut them off.  I don't
9  recall.
10      Q.  All right.  And then it looks like it says
11  Pillsbury up at the top of that fax.
12      A.  Uh-huh.
13      Q.  And then Continental Grain Company.  What is
14  Continental Grain Company?
15      A.  Well, Continental Grain Company appears to have
16  been the place that loaded the rail cars.  It appears
17  twenty-seven corn cars X-Topeka, Kansas.
18      Q.  And it appears that twenty-seven corn cars were
19  loaded at Topeka?
20      A.  At a Continental Grain Company facility.
21      Q.  Okay.  And you don't know how you got this
22  particular -- this document which is page thirty-three
23  of Exhibit No. 2?
24      A.  No.  Like I said, the copy that you provided me
25  here the top of the fax header is cut off, so I don't

ACTION REPORTING  (956) 631-1024

PAGE 75

**75**

1  know if it was a fax sent to me by Loren Walters from
2  Pillsbury.
3      Q.  And then I guess page thirty-four would be
4  another shipment.  It would be a sixteen car shipment
5  from --
6      A.  Motala, Nebraska.
7      Q.  -- Motala, Nebraska?
8      A.  Uh-huh.
9      Q.  And again, this would be this Continental Grain
10  Company also or is this another grain company?
11      A.  I don't know.  The format looks like
12  Continental's, but I don't see Continental's name on it
13  any place.
14      Q.  And are you able to identify whose handwriting
15  it is on this particular document?  Is this your
16  handwriting or any of your employees' handwriting that
17  you recognize on Exhibit 2, page thirty-four?
18      A.  On page thirty-four the 1-800-243-3228, trace a
19  few is my handwriting.
20      Q.  All right.  Thanks, Tina Coedy.  You don't know
21  whose handwriting that is?
22      A.  No.  I would imagine it's whoever loaded the
23  train because it's -- it appears to be similar to the
24  person who wrote attention Loren.
25      Q.  And then on this other page which is page

ACTION REPORTING  (956) 631-1024

PAGE 76

**76**

1  thirty-three, the previous page where it talks about
2  twenty-seven corn cars from Topeka, Kansas, do you know
3  whose handwriting that is?
4      A.  No idea.
5      Q.  Okay.  And then what is page thirty-five of
6  Exhibit No. 2?
7      A.  Looks like it's a continuation from -- that it
8  confirms that page thirty-four.  It did load at
9  Continental.  It says attention Loren, eleven cars, X
10  Motala to complete the twenty-seven car sale we have
11  with you, thanks, Tina whoever, Continental Grain, so
12  I'm assuming Pillsbury bought -- Pillsbury -- yeah, it
13  says sale.
14      Q.  And then the destination location on page
15  thirty-three, the bottom of the document says
16  Brownsville?
17      A.  Destination location, Brownsville.
18      Q.  It says that on page thirty-four also,
19  destination is Brownsville?
20      A.  Correct.
21      Q.  Page thirty-five it mentions Brownsville is the
22  destination also?
23      A.  Correct.
24      Q.  So do these three pages deal with the corn at
25  issue in this lawsuit?

ACTION REPORTING  (956) 631-1024

PAGE 77

**77**

1      A.  I believe so.
2      Q.  So we've got twenty-seven cars on page
3  thirty-three, sixteen on page thirty-four and then
4  eleven on page thirty-five?
5      A.  Correct.
6      Q.  And I believe the questioning that I started
7  you with before we got onto these three pages was
8  whether you could find what days -- what day the corn
9  arrived at the Port Elevator-Brownsville.
10      A.  On page forty-one I have a fax.  There's a fax
11  here that says call Walter Puffelis at such and such
12  phone number.  Page forty-two is dated October 31st of
13  '96 and it is in reference to samples that they took on
14  rail cars in Brownsville, so it was prior to December
15  31st -- I mean, excuse me, October 31st.
16      Q.  I guess a better question would be, what types
17  of documents would you normally keep at Port
18  Elevator-Brownsville, L.C. concerning railroad cars
19  coming in?
20      A.  Before I answer that, can I go back to the
21  pending question?
22      Q.  Right.
23      A.  On page twelve, answer number seventeen.
24      Q.  All right.
25      A.  Twenty-seven rail cars arrived on October 31st.

ACTION REPORTING  (956) 631-1024

## *Action Reporting*
(956) 631-1024 / 1-800-884-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

SHEET 21  PAGE 78

78

1    Q.  And then it says twenty-five rail cars arrived
2  on November 13th and then the two rail cars arrived on
3  November 27th?
4    A.  Correct.
5    Q.  And this was all '96, correct?
6    A.  That is correct.
7    Q.  However, where are the underlying documents to
8  support this particular answer?
9    A.  The underlying documents -- the originals were
10  sent to Mr. Bersain Gutierrez. As normal matter of
11  business we unload. A copy was sent to Walter Puffelis
12  at AGI and a copy was sent to Mr. Loren Walters at CSI.
13    Q.  Would you have kept a copy for your files?
14    A.  There is a copy in our files, yes, of the
15  unload ticket.
16    Q.  And you would have an unload ticket for each of
17  these three unloads on October 31st, November 13th and
18  November 27th, correct?
19    A.  We should, yes.
20    Q.  So there should be three different unload
21  tickets, correct?
22    A.  Yes.
23    Q.  And what type of information would be contained
24  on an unload ticket?
25    A.  Date, commodity, whether it's in or out and the
                ACTION REPORTING  (956) 631-1024

PAGE 79

79

1  rail car number and the weight.
2    Q.  Now, when you say the weight, would that be a
3  shipping weight or the weight that --
4    A.  We physically weigh.
5    Q.  -- you physically weigh?
6    A.  Uh-huh.
7    Q.  So I take it that you have a scale there at the
8  facility in order to weigh what comes in?
9    A.  Yes, we do.
10    Q.  Is there a particular person that normally runs
11  the scale or does the weigh-in or is it just whoever is
12  working that shift?
13    A.  No.  Juan Dorado.
14    Q.  And how do you spell his last name?
15    A.  D-o-r-a-d-o.
16    Q.  Mr. Dorado would be the one normally running
17  the scales?
18    A.  That is correct.
19    A.  He was with you back in 1996?
20    A.  Yes, he was.
21    Q.  Also on that particular ticket, would it say
22  whose commodity -- who owned the commodity? Would that
23  also be on the unload ticket?
24    A.  Yes.  It would have the shipper's name and the
25  account that it was going to.
                ACTION REPORTING  (956) 631-1024

PAGE 80

80

1    Q.  Any other information on the unload ticket?
2    A.  Ticket number, date in or out, commodity, rail
3  car number, weight. Unless there was some unusual
4  circumstance, bad seals, leaky bottom gate, something
5  missing, something like that. There's a remark section.
6    Q.  And you would agree with me that within Exhibit
7  No. 2 there's not a copy of those three unload tickets,
8  correct?
9    A.  There is not a copy of unload tickets, correct.
10    Q.  Then I take it you would also have tickets when
11  the corn or the commodity was moved out of the facility
12  also?
13    A.  Correct.
14    Q.  Would those be called load tickets?
15    A.  Scale tickets.
16    Q.  You would agree with me that contained within
17  Exhibit No. 2 we don't have the scale tickets concerning
18  the corn at issue, correct?
19    A.  Correct.
20    Q.  What would be contained on the scale tickets?
21    A.  The same information. It would have shipper's
22  name, the ticket number, date, weight.
23    Q.  So the shipment again would be weighed probably
24  by Mr. Dorado before it went out?
25    A.  No.
                ACTION REPORTING  (956) 631-1024

PAGE 81

81

1    Q.  You have a different weigher when it goes out?
2    A.  Different scale.
3    Q.  Different scale. And who would be in charge of
4  that scale?
5    A.  Depends on the time. I would have to go back
6  and -- it's either in '96 at the truck scale and
7  there's -- I've got three or four different people who
8  weigh trucks out.
9    Q.  Concerning the corn that was brought in on the
10  twenty-five rail cars -- first of all, I guess you had
11  twenty-seven rail cars on October 31st and twenty-five
12  rail cars on November 13th and two rail cars on November
13  27th. The corn that did leave the facility, how would
14  it have left the facility, by rail, by truck?
15    A.  Either/or and I think in -- everything came in
16  by rail and everything went out by truck. I may be
17  mistaken. There may be a few rail cars, but I'm fairly
18  confident everything went out by truck.
19    Q.  Do you have a different scale whether it goes
20  out by truck or rail or is it the same scale?
21    A.  Physically different scales and physically
22  different locations.
23    Q.  And as far as the truck scale, the outgoing
24  truck scale, at this time you can't remember who did it
25  back in '96?
                ACTION REPORTING  (956) 631-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

82

1  A.  No.
2  Q.  Is there any other type of paperwork that you
3  would keep concerning corn or grain that would come into
4  your facility other than what you've already mentioned
5  and have your unload ticket and then you would have your
6  scale tickets when the commodity or corn went out?  Any
7  other paperwork that you keep on the stuff?
8  A.  It all depends on the customer.  Different
9  customers say different -- I mean, have different
10  requirements.  Some customers require that any truck
11  that shows up have a load ticket that they have
12  previously approved of.  Some customers send down a fax
13  and say, I've sold X number of loads to company X.
14  Company X is authorized to load sixty tons or whatever.
15  Q.  Do you generally attempt to determine who owns
16  the commodity that's coming into?
17  A.  When three people show up in your office, one
18  of which is the seller of the corn, Mr. Loren Walters
19  and he introduces his client, Walter Puffelis, as the
20  man who bought the corn from him who then in turn
21  introduces Bersain Gutierrez as the man who bought the
22  corn from him, that's pretty much all identification
23  that I need.
24        MR. MOUNT:  I'll object to the
25  responsiveness.
          ACTION REPORTING  (956) 631-1024

PAGE 83

83

1  Q.  (BY MR. MOUNT) I guess the question more
2  generally is, do you generally attempt to determine when
3  a product comes in who the owner is when the commodity
4  comes into your facility?
5  A.  Generally before product comes into my facility
6  the owner of that commodity has contacted me and has
7  told me they have something coming in and the owner of
8  the commodity provides me with a list of rail cars or he
9  will tell me, I have bought two hundred and fifty
10  thousand bushels of grain sorghum from company X, it
11  will come in by truck.  Or I have X amount bought in
12  that's coming in, but it is -- if something shows up at
13  my facility that we've got no knowledge of it coming in
14  we don't unload it if someone hasn't contacted us prior.
15  Q.  So do you have any written rules or procedures
16  regarding taking in commodities in your facility, any
17  type standard operating procedure or anything like that?
18  A.  Exhibit 4.
19  Q.  Exhibit 4 --
20  A.  Exhibit 4 --
21  Q.  -- are your standard operating procedures?
22  A.  -- is our standard operating procedure on what
23  we do with anything that comes in.
24  Q.  Do you generally attempt to determine ownership
25  of the commodity that comes in through looking at
          ACTION REPORTING  (956) 631-1024

PAGE 84

84

1  underlying documentation or do you just take a person's
2  word for it if they call you up and say, hey, we're
3  sending in X number bushels of corn or X number bushels
4  of grain?
5  A.  In most cases you're not given underlying
6  documentation as far as -- all you're given is, I have a
7  fifty-four car train billed to your facility for
8  unloading or for loading, here are some car numbers,
9  call us when it gets there.
10  Q.  Now, concerning the particular transaction
11  involving Mr. Walters, Mr. Puffelis and Mr. Gutierrez
12  it's your testimony then that Mr. Walters came into your
13  office and he represented that the corn that was being
14  shipped in was his corn, that he was the seller and that
15  he sold the corn to Mr. Walter Puffelis who in turn sold
16  it to Mr. Bersain Gutierrez; is that correct?
17  A.  That is correct.
18  Q.  So it was your understanding that when the corn
19  arrived in or at the Port Elevator-Brownsville, L.C.
20  that the corn was owned by Mr. Bersain Gutierrez; is
21  that correct?
22  A.  No.
23  Q.  All right.  And when you say no go ahead and
24  explain.
25  A.  When Loren Walters at CSI contacted me to tell
          ACTION REPORTING  (956) 631-1024

PAGE 85

85

1  me that his customer, Walter Puffelis, AGI, was
2  rebilling a train from Midbridge into my facility, could
3  I do that and I said, yes, we can do that and he said,
4  now, I haven't been paid, so when this product comes to
5  your facility it's mine, it's CSI's.  I will be
6  delivering it to my customer, AGI.  AGI will be
7  responsible for all charges, unloading charges, storage
8  charges, any charge that is pending that will not be for
9  CSI's account, that will be for AGI's account.
10  Q.  So you were told by Mr. Walters to hold the
11  corn when it came in until CSI was paid -- CSC was paid?
12  A.  Until -- I was told to hold it until he
13  notified me otherwise.
14  Q.  Then it was your understanding that once he
15  notified you and told you that he had been paid you
16  could go ahead and release it to --
17  A.  AGI.
18  Q.  -- AGI which would have been Mr. --
19  A.  Puffelis.
20  Q.  And then did you have any instructions, though,
21  from Mr. Puffelis as far as Mr. Gutierrez is concerned?
22  A.  Exhibit 3 is my instructions from Mr. Puffelis.
23  Q.  When this conversation was had, was this --
24  were all three of these men in the same room when you
25  had this conversation, that is, you felt like everybody
          ACTION REPORTING  (956) 631-1024

*Action Reporting*
(956) 631-1024 / 1-800-884-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

SHEET 23 PAGE 86

**86**

1  understood or was -- I guess what you've just told me
2  concerning this particular transaction, were all three
3  men in the room and in agreement regarding this is what
4  was occurring concerning the transaction?
5      A.  Everybody was in the room when the
6  transaction -- when things were being discussed.  The
7  one who was not in agreement was Bersain Gutierrez who
8  was saying, I've paid for the corn, therefore it's mine.
9  Puffelis was saying yes to Gutierrez, that yes, it's
10  your corn, don't worry about it.  As soon as the payment
11  transaction between us is finalized then the payment
12  transaction between AGI and CSI will take place and yes,
13  the corn is yours.
14      Q.  So it was your understanding that Mr. Gutierrez
15  was saying that he had already paid for the corn?
16      A.  That payment arrangements had been made or
17  whatever sales and payment conditions and terms that he
18  had agreed to with Mr. Puffelis had been completed, that
19  he had performed.  He was ready to take delivery because
20  he felt he had performed his part of the -- completed
21  his portion of the transaction.
22      Q.  So evidently there was a dispute because Mr.
23  Gutierrez felt like he had performed, yet Mr. Puffelis
24  felt like that he hadn't received all the finances he
25  was due or all the moneys owed.  Is that your

ACTION REPORTING  (956) 631-1024

PAGE 87

**87**

1  understanding?
2      A.  No.  I didn't see Mr. Puffelis telling Mr.
3  Gutierrez no, you haven't performed.  What I saw was
4  Walters telling Mr. Puffelis, you haven't performed and
5  because you haven't performed I'm not releasing the corn
6  to you.  If you have -- if Mr. Gutierrez thinks that
7  that corn is his that's between you and Mr. Gutierrez,
8  that's not between you and me.  When you perform to me I
9  will release the corn to you.  Then what you do with it
10  I don't care.
11      Q.  So you were to wait for a phone call from
12  Walters before you released the corn?
13      A.  A phone call --
14      Q.  Fax --
15      A.  Whatever.
16      Q.  -- what have you?
17      A.  Yes.
18      Q.  You were waiting for instructions from Walters
19  to release the corn, correct?
20      A.  From CSI, correct.
21      Q.  Is it CSI or CSC?
22      A.  Maybe it's CSC, Commodity Specialists Corp.,
23  yeah.
24      Q.  Out of Overland Park, Kansas?
25      A.  Yes.  They're a subdivision of Pillsbury.

ACTION REPORTING  (956) 631-1024

PAGE 88

**88**

1      Q.  Did you ever receive that telephone call from
2  Mr. Walters or any instructions from Mr. Walters
3  allowing you to release the corn to Mr. Puffelis?
4      A.  Yes.  I was instructed to release the
5  twenty-seven cars.
6      Q.  And you say -- okay.  And how did you receive
7  your instructions?
8      A.  Phone call.  It could have been a fax.
9      Q.  It was either a phone call or a fax, but you
10  just can't recall at this time?
11      A.  Correct.
12      Q.  If it would have been a facsimile or a fax
13  piece of paper you would generally still have that in
14  your records somewhere?
15      A.  No.  I mean, there was no disputes or anything.
16  Everybody said release it.  We released it.
17      Q.  Do you recall when that phone call or fax was
18  received allowing you to release it to Mr. Puffelis?
19      A.  Sometime between October 31st and November 4th.
20      Q.  Why do you narrow it down to that particular
21  time period, October 31st through November 4th?
22      A.  Because looking through the documents here I
23  noticed that we loaded product out on November 4th and
24  we wouldn't have loaded product out without
25  notification.

ACTION REPORTING  (956) 631-1024

PAGE 89

**89**

1      Q.  When you say looking at documents that would be
2  this list that's been produced in discovery, Exhibit No.
3  2, page thirty-two?
4      A.  Correct.
5      Q.  It looks like the first shipment went out on
6  November 4, 1996; is that correct?
7      A.  That's correct.
8      Q.  Okay.  Do you know who created this particular
9  document, page thirty-two?
10      A.  I did.
11      Q.  When did you create it?
12      A.  I don't recall.  I don't know if I did it right
13  in -- when --
14      Q.  This was --
15      A.  -- in previous -- previous conversations with
16  Attorney Vega in September of '97 or if it was part of
17  what I did in preparing it for your questionnaire here.
18      Q.  So, in other words, this wasn't -- it wasn't
19  really anything you did in the normal course of
20  business, it was --
21      A.  Correct.
22      Q.  This was something you did because of the claim
23  that was made by Ms. Vega, correct?
24      A.  Correct.
25      Q.  Where do you get the underlying numbers to put

ACTION REPORTING  (956) 631-1024

SHEET 24   PAGE 90

**90**

1  in this particular document?
2      A.   From the scale tickets.
3      Q.   So you would have gone through each scale
4  ticket and wrote down the date of the time the corn was
5  released and then also the weight, correct?
6      A.   Yeah.
7      Q.   Does your scale -- is your scale ticket in
8  pounds, bushels and kilos?
9      A.   No.  My scale is in pounds.
10     Q.   All right.  But your scale ticket, though.
11     A.   The scale ticket indicates pounds.
12     Q.   It doesn't show bushels or kilos?
13     A.   No.  I made the conversion.
14     Q.   All right.  So it appears that the last
15  shipment out of the facility concerning the corn at
16  issue was October 31st, 1997; is that correct?
17     A.   No.
18     Q.   As far as Mr. Gutierrez is concerned?
19     A.   As far as Mr. Gutierrez is concerned, correct.
20     Q.   All right.  And it looks like a total of -- are
21  these totals at the bottom?
22     A.   Those are totals at the bottom.
23     Q.   If you look on this particular document, page
24  thirty-two, Exhibit No. 2, is this just a clerical
25  problem here, the November 12 and November 14 --
ACTION REPORTING  (956) 631-1024

PAGE 91

**91**

1      A.   No.
2      Q.   -- entry?  What do you mean when you -- well,
3  actually look at the November 14, 1996 entry.  What does
4  that mean?
5      A.   That means that four hundred and six thousand
6  one hundred and eighty pounds was unloaded back into the
7  elevator.
8      Q.   You mean one hundred and sixty pounds?
9      A.   Yeah, one sixty.
10     Q.   Okay.  Apparently a truck -- some trucks went
11  out and they came back, came back into the facility?
12     A.   Yes.  There's -- somewhere in here there
13  were -- trucks were loaded out and I think a weekend was
14  coming or something.  They couldn't cross the trucks.
15  The truck drivers wanted to be unloaded, so we unloaded
16  the grain off the truck back into the elevator.
17     Q.   You mean corn?
18     A.   Corn.
19     Q.   All right.  So you believe that was what the
20  nature of the problem was, for some reason the truck
21  drivers couldn't go where they needed to go or what have
22  you, it was a holiday and they had to come back?
23     A.   We loaded the trucks.  What problem they had I
24  don't know.  The truck drivers came back and said,
25  unload us.
ACTION REPORTING  (956) 631-1024

PAGE 92

**92**

1      Q.   So are you normally concerned with ownership or
2  you're not concerned with ownership when commodity comes
3  into your facility?  Are you concerned with who owns it
4  or not?
5      A.   Yes.  We're concerned with who owns it.
6      Q.   So generally when you open an account you
7  expect to open the account for the owner of the
8  commodity, correct or the commodity's agent or the
9  person's agent?
10     A.   Normally we open the account based on the
11  instructions we receive from the shipper of the grain.
12     Q.   Are there any documents that you've produced
13  here that reflect what the instructions were of the
14  shipper of the corn concerning the corn at issue here?
15     A.   I think page thirty-six dated November 1st is
16  from the shipper, CSC, has been billed to me for the
17  account of AGI not to be released to AGI until he's
18  received proper payment.
19     Q.   So it appears from Exhibit No. 2, page
20  thirty-six at least up until this particular point in
21  time you hadn't been given instructions from CSC to
22  release the corn to Mr. Puffelis, correct?
23     A.   No.  As I think I stated in one of my answers
24  that from October of 1996 through September of 1997,
25  early October 1997 there was no confusion, doubt,
ACTION REPORTING  (956) 631-1024

PAGE 93

**93**

1  dispute over ownership.  A lot of documents that I get
2  from CSC basically were normal day-to-day type
3  activities that you read once and say okay and you toss
4  it.  I did not necessarily keep a file that says all
5  incoming faxes from CSC go in this file.  It serves the
6  same as a phone call.  As long as Mr. Puffelis wasn't
7  claiming otherwise, as long as Mr. Gutierrez wasn't
8  claiming otherwise and as long as Mr. Walters wasn't
9  claiming otherwise I had no reason to dispute what we
10  were doing was not in compliance with all three parties
11  concerned.
12     Q.   Have you ever had any dealings with CSC prior
13  to Mr. Walters coming into your office with Mr. Puffelis
14  and with Mr. Gutierrez?
15     A.   I don't recall.
16     Q.   You don't recall?
17     A.   I don't recall.
18     Q.   Have you had any dealings with CSC since Mr.
19  Walters came into your office with Mr. Gutierrez and
20  with Mr. Puffelis --
21     A.   No.
22     Q.   -- other than this particular transaction?
23     A.   No.
24     Q.   Have you ever heard of CSC prior to Mr. Walters
25  coming down?
ACTION REPORTING  (956) 631-1024

SHEET 25   PAGE 94

**94**

1    A.   Yes.
2    Q.   It's your understanding they're a subdivision
3  of Pillsbury?
4    A.   They're a subdivision of Pillsbury. I believe
5  they're members of both National Grain and Feed
6  Association and the Texas Grain and Feed Association as
7  well.
8    Q.   You say they're members of what now?
9    A.   National Grain and Feed Association.
10    Q.   And what was the other one?
11    A.   Texas Grain and Feed Association.
12    Q.   Now, you're a member of Texas Grain and Feed
13  Association, correct?
14    A.   That's correct.
15    Q.   But you're not a member of the National Grain
16  and Feed Association?
17    A.   We were up until '94, '95, somewhere in there.
18    Q.   Why did you let that particular membership
19  lapse?
20    A.   Due structure and the arbitration rules in the
21  Texas Grain and Feed Association are parallel to the
22  national and since I only operate in Texas I just made a
23  decision to say, well, we'll just stay with the Texas
24  Association rather than double dip and go with the
25  national.
ACTION REPORTING  (956) 631-1024

PAGE 95

**95**

1    Q.   So the national basically serves the same
2  function as the Texas association?
3    A.   Pretty much. It is more geared towards multi
4  national -- well, companies with offices in more than
5  one state. The Cargyles, the Continentals, the
6  Scoulars, the Dryfusses, the Pillsburies.
7    Q.   Concerning Scoular, did they ever ship anything
8  through your facility after that particular arbitration
9  or actually it wasn't an arbitration, after they made
10  that particular complaint in 1996 to the Texas
11  Agricultural Commission?
12    A.   I'm uncertain. In the grain industry you have
13  something what's called a string trade and a string
14  trade would be where I would sell it to you who would in
15  turn sell it to Mr. Vega who would in turn sell it to
16  Mr. Skaggs who may in turn sell it back to me, so
17  directly I don't know.
18    Q.   It appears according to Exhibit No. 3 which is
19  the contract that was signed --
20    A.   Yes.
21    Q.   -- that the corn could not be released from
22  Port Elevator-Brownsville, L.C. unless Mr. Gutierrez
23  sent you written instructions concerning delivery of the
24  grain or corn to a third party, correct?
25    A.   Correct.
ACTION REPORTING  (956) 631-1024

PAGE 96

**96**

1    Q.   Did you ever release any of the corn without
2  written instructions from Mr. Gutierrez?
3    A.   From November 4th through October -- the time
4  in '97?
5    Q.   October of '97, yes.
6    A.   I think the only time was when Mr. Gutierrez
7  was present on November the 4th, 5th, 6th and the truck
8  showed up. He loaded them, but he was personally there.
9    Q.   The only time he was personally there at your
10  facility was when the contract was signed during that
11  couple of day time period when the contract was signed
12  and everyone was waiting for the first shipment to come
13  in?
14    A.   That was the first time he showed up at my
15  facility. He was there from October -- from that day
16  which I'm assuming was October 31st through like
17  November 4th or 5th, he and Mr. Puffelis both.
18    Q.   And was Mr. Walter Loren there also during that
19  time period?
20    A.   No. Loren Walters was I think just there for
21  the initial unloading and that was it.
22    Q.   So concerning the other two shipments that
23  you've identified in your answer to number seventeen, no
24  one was present for those two particular unloadings, so
25  that would be the ones on November 13, 1996 and the one
ACTION REPORTING  (956) 631-1024

PAGE 97

**97**

1  on November 27, 1996; is that correct?
2    A.   To the best of my recollection, yeah. No one
3  else was there.
4    Q.   Are you aware of any -- whether there were any
5  disputes concerning ownership for those two other
6  shipments? Earlier you told me there was a little bit
7  of a dispute on payment for the first shipment. What
8  about the other two shipments?
9    A.   Between them I don't know. Again, back to
10  pages thirty-six and thirty-nine, thirty-eight, forty,
11  those pages all deal with CSC's dispute that they have
12  with AGI for lack of payment and the fact that CSC
13  requested that a warehouse receipt for twenty-eight
14  thousand two hundred and eighty-eight point ninety-four
15  bushels of corn be made out into CSC's name and returned
16  to them.
17    Q.   When commodities are stored in your facility,
18  do you normally issue some type of warehouse receipt or
19  any type of document showing that a certain person or
20  entity stored a certain amount of commodity within your
21  facility?
22    A.   Warehouse receipts are issued only upon
23  request.
24    Q.   So if I came in and I wanted to store some corn
25  there in your facility and I didn't ask for a warehouse
ACTION REPORTING  (956) 631-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

SHEET 26   PAGE 98

98

1  receipt or any documentation showing that I had stored
2  some --
3     A.   The documentation that you receive would be
4  the -- either the original or a copy of the scale
5  ticket, be it a rail scale ticket or a truck scale
6  ticket.
7     Q.   So the only proof that I would have of me
8  storing something in your facility would be the rail or
9  the truck ticket that you would give me?
10    A.   Correct.
11    Q.   So then you say that pages thirty-six,
12 thirty-eight, thirty-nine and forty all dealt with CSC
13 saying they hadn't been paid in full by AGI?
14    A.   Correct.
15    Q.   Let's look at page thirty-six of Exhibit No. 2
16 first.
17    A.   Uh-huh.
18    Q.   It appears you were copied with this particular
19 memo from Loren Walter, correct?
20    A.   I received this directly from Loren Walters,
21 yes.
22    Q.   You received this by facsimile?
23    A.   Yes, sir.
24    Q.   I think you received it on or about November 1,
25 1996?

ACTION REPORTING  (956) 631-1024

PAGE 99

99

1     A.   I think I received it on or about November the
2  4th.
3     Q.   You say November 4th because that's the --
4     A.   The fax header.
5     Q.   -- fax at the top. So you believe that this
6  particular facsimile or this particular problem was
7  taken care of before November 4, 1996?
8     A.   No, sir.
9     Q.   And why do you say that?
10    A.   This is in reference to the sixteen and the
11 eleven car unit which are your pages thirty-four and
12 thirty-five.  This grain has as of November the 1st or
13 November the 4th had not physically arrived at
14 Brownsville.
15    Q.   So this would have been the shipments that
16 would have arrived in Brownsville on November 13, 1996
17 and November 27, 1996?
18    A.   Correct.
19    Q.   So again, this memo or facsimile or fax
20 wouldn't have anything to do with what arrived on
21 October 31st, correct?
22    A.   Correct.
23    Q.   That problem had already been resolved
24 regarding payment for the October 31st receiving the
25 shipment?

ACTION REPORTING  (956) 631-1024

PAGE 100

100

1     A.   Correct.
2     Q.   All right. And then the next page is page
3  thirty-eight of Exhibit No. 2 and what is the meaning of
4  this particular --
5     A.   Thirty-eight?
6     Q.   -- document?
7     A.   Page thirty-eight is a response to page forty.
8     Q.   Thirty-eight is a response to forty?
9     A.   Yes, sir.
10    Q.   What's the date on thirty-eight? Is there a
11 date on thirty-eight?
12    A.   No.
13    Q.   All right. Well, let's look at page forty
14 then. You said page forty is the next particular
15 document. That's dated December 19th, 1996, correct?
16    A.   Correct.
17    Q.   This is a letter or facsimile that you received
18 from Mr. Walter at Commodity Specialists Company; is
19 that correct?
20    A.   It's a facsimile, yes.
21    Q.   And your signature also appears at the bottom
22 of the facsimile; is that correct?
23    A.   As acknowledging receipt, yes.
24    Q.   Do you recognize Mr. Walter's signature on that
25 document, too?

ACTION REPORTING  (956) 631-1024

PAGE 101

101

1     A.   Yes.
2     Q.   And what is the purpose of this particular
3  document to your understanding?
4     A.   My understanding of it is Commodity Specialists
5  Company had not been paid by AGI, that they had
6  attempted to collect their moneys from AGI. They had
7  requested that Port Elevator issue a warehouse receipt
8  out of stocks held in the account totaling twenty-eight
9  thousand two hundred and eighty-eight point ninety-four
10 bushels and that I issue them a warehouse receipt and
11 send it to them.
12    Q.   Is this the twenty-seven rail cars?
13    A.   This is --
14    Q.   For the November 13th --
15    A.   I would imagine this is either payment off of
16 November the 13th looking at my letter which is
17 thirty-eight.  I see I'm referencing October 31st, so
18 apparently there was still a problem at hand on some of
19 the October 31 balances.
20    Q.   So as we sit here today this warehouse receipt
21 that was issued for twenty-eight thousand two hundred
22 eighty-eight point ninety-four bushels of corn, which
23 particular railroad cars that we're talking about?
24 Which particular shipments are we talking about?
25    A.   Corn is stored in bulk.  It's not stored

ACTION REPORTING  (956) 631-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

SHEET 27   PAGE 102

102

1  separately. Twenty-eight thousand two hundred and
2  eighty-eight point ninety-four bushels is just that.
3  It's just corn that's in the elevator. Which physical
4  rail cars did it come off of? I have no idea.
5      Q.  So all you know is that CSC was saying that
6  they hadn't been paid for that roughly twenty-eight
7  thousand bushels of corn, correct?
8      A.  Correct.
9      Q.  Additionally they're saying that they're going
10  to go ahead and pay your fees and expenses associated
11  with those --
12     A.  Through December 31st.
13     Q.  Through December 31st, 1996 concerning those
14  twenty-eight thousand bushels, correct?
15     A.  Correct.
16     Q.  And you don't know if those twenty-eight
17  thousand bushels came from the October 31st, November
18  13th or November 27th shipments, correct?
19     A.  Correct.
20     Q.  Do you know if this problem was ever cleared
21  up?
22     A.  Not to my knowledge.
23     Q.  Do you have any other documents here from CSC
24  dealing with this particular dispute as to whether CSC
25  has been paid by --

ACTION REPORTING  (956) 631-1024

PAGE 103

103

1      A.  Just page thirty-nine.
2      Q.  -- Puffelis or not? Page thirty-nine, is that
3  your signature on Exhibit 2, page thirty-nine at the
4  bottom?
5      A.  Yes.
6      Q.  Is that your handwriting also where it says
7  Port Elevator-Brownsville, L.C. acknowledges receipt of
8  this transmission at 17:12 on 5 December 1996?
9      A.  Correct.
10     Q.  You also recognize Mr. Walter's signature on
11  this document?
12     A.  Yes.
13     Q.  What is your understanding of the purpose of
14  this document?
15     A.  This was the precursor to items thirty-eight
16  and forty. That -- and the follow-up to thirty-six
17  where CSC has not been paid in full for product shipped
18  and we're basically -- I would imagine given the
19  misspelling, given the typo where he's got there he is
20  saying do not ship any of the grain until released by
21  CSC.
22     Q.  So you think there is a typo, it should be the?
23     A.  Yeah.
24     Q.  When it references the figure seventy-eight
25  thousand one hundred twenty dollars and sixty-three

ACTION REPORTING  (956) 631-1024

PAGE 104

104

1  cents, where does this figure come from?
2      A.  Basically -- apparently it's the amount of
3  money that AGI owes CSC.
4      Q.  Would this be on the roughly twenty-eight
5  thousand bushels or do you know how many bushels that
6  would be?
7      A.  I have no idea. I'm assuming it's for all
8  fifty-four rail cars.
9      Q.  So I take it from this particular facsimile
10  you're not to release any of the corn --
11     A.  That's my --
12     Q.  -- from the fifty-four rail cars?
13     A.  Correct.
14     Q.  Yet according to the documents you did release
15  some to Mr. Gutierrez to ship by truck, correct?
16     A.  Prior to receiving this I'm certain there was a
17  release where I could release partial amounts to them.
18     Q.  So you think you were instructed by Walter to
19  allow partial releases to Mr. Puffelis and Mr. Gutierrez
20  to ship?
21     A.  Possibly, yes. Otherwise I would not have
22  shipped to them.
23     Q.  But as we sit here today you don't have any
24  documentation to reflect that, correct?
25     A.  Correct.

ACTION REPORTING  (956) 631-1024

PAGE 105

105

1      Q.  Did you have a number of phone conferences with
2  Mr. Walter after you initially met with him when the
3  contract was signed?
4      A.  Loren Walters.
5      Q.  Loren Walters. I'm trying to get at whether
6  you talked to him on the phone.
7      A.  I talked with him on the phone prior and I
8  talked with him on the phone afterwards.
9      Q.  All right. And you also dealt with him by
10  facsimile, too, correct?
11     A.  Correct.
12     Q.  And what I'm trying to find out is afterwards,
13  after the contract was signed which was Exhibit No. 3
14  whether you mainly dealt with him by --
15     A.  By phone.
16     Q.  -- by phone or fax?
17     A.  Phone and fax.
18     Q.  Okay. Do you have any idea how many phone
19  calls you had with Mr. Walter after the contract was
20  signed, Exhibit No. 3 was signed?
21     A.  I would say less than a dozen.
22     Q.  Are you aware one way or the other whether the
23  dispute between CSC or Pillsbury and AGI was ever worked
24  out as far as payment?
25     A.  No idea.

ACTION REPORTING  (956) 631-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

SHEET 28  PAGE 106

106

1    Q.  So really the last document you got concerning
2    the matter was Exhibit -- would be Exhibit No. 39 then,
3    right or no, Exhibit No. 40?
4    A.  Correct.
5    Q.  So after December 19th, 1996 I guess you --
6    you're not really aware one way or the other what
7    dispute over payments were concerning CSC and AGI,
8    right?
9    A.  Correct.
10   Q.  So what was your understanding of who owned the
11   corn on November 4, 1996 when that first shipment went
12   out?
13   A.  Control of the corn was CSC.
14   Q.  So you don't really know who owned it on
15   November 4, 1996, you just know that CSC had control?
16   A.  Correct.
17   Q.  What about on November 14?  Are you aware of
18   who owned the corn on November 14, 1996 or again, is
19   your answer --
20   A.  Again, it's control.
21   Q.  Again, it's control?
22   A.  It's control.  The control of the corn was CSC.
23   Q.  So at least from October through December 19,
24   1996 -- I guess from October 31st, 1996 through at least
25   December 19th, 1996 control of the corn you always felt

ACTION REPORTING  (956) 631-1024

PAGE 107

107

1    like was with --
2    A.  Was CSC's.
3    Q.  You weren't really sure about ownership, but
4    you knew CSC controlled it?
5    A.  Correct.
6    Q.  Who was paying -- from October 31st, 1996
7    forward, who was paying the storage fees and all the
8    expenses associated with the corn that was shipped in?
9    A.  AGI was supposed to pay the unload fees.
10   Q.  Did they pay the unload fees, AGI?  Did they
11   ever pay any fees?
12   A.  Sometime mid-1996, yes.  Excuse me.  Mid-1997.
13   Q.  And did they pay the balance due, that is,
14   did --
15   A.  They paid in full.
16   Q.  -- they paid up to date?  Do you have any idea
17   what the storage fees were up until that particular
18   point in time up until mid-1997 that were owed?
19   A.  The storage fee -- AGI had nothing to do with
20   storage fees.  All AGI paid was unload.  All storage
21   fees were for Sysco De Baja's account and they would
22   have been calculated based on Exhibit 3 until December
23   31st, 1996.
24   Q.  So then it's your testimony that AGI paid the
25   unload fees sometime in mid-1997, correct?

ACTION REPORTING  (956) 631-1024

PAGE 108

108

1    A.  Correct.
2    Q.  And do you have any idea how much those unload
3    fees were?
4    A.  Four cents a bushel times the number of bushels
5    they had in the house, less the twenty-eight -- well,
6    four cents a bushel times the total number of bushels
7    unloaded, less the twenty-eight thousand two
8    eighty-eight ninety-four that CSC paid for.
9    Q.  And this would be for the fifty-four rail cars?
10   A.  Correct.
11   Q.  Are you aware one way or the other whether CSC
12   was ever reimbursed for what they paid, the roughly
13   twenty-eight thousand they paid for unload fees?
14   A.  CSC didn't pay twenty-eight thousand.  They
15   paid thirty-five hundred and sixty-four and that
16   thirty-five hundred and sixty-four is unload, load and
17   storage.
18   Q.  Where are you looking for that particular
19   figure?
20   A.  Page forty.
21   Q.  So are you aware one way or the other then
22   whether AGI was -- whether AGI reimbursed CSC for that
23   roughly thirty-five hundred dollars for storage and
24   unload fees?
25   A.  No idea.

ACTION REPORTING  (956) 631-1024

PAGE 109

109

1    Q.  Now, you said that control was basically with
2    CSC from the time period of October 31, 1996 through at
3    least December 19, 1996.  When did the control shift
4    to --
5    A.  AGI?
6    Q.  -- to AGI or Mr. Gutierrez?
7    A.  Sporadically.  From -- once the product came in
8    on October 31st we loaded out November 4th, so sometime
9    between November -- October 31st and November 4th
10   Walters, Loren Walters released X amount of quantity to
11   AGI who in turn released it to -- authorized the release
12   to Gutierrez.
13   Q.  And so then it's your testimony then that at
14   least each time there was a shipment out by Mr.
15   Gutierrez control must have at least shifted from CSC to
16   AGI to Mr. Gutierrez then?
17   A.  By December 31st, 1996 CSC had authorized
18   everything, the remaining balance into AGI stocks or had
19   transferred control to AGI.
20   Q.  Now, how did you arrive at that particular
21   understanding as of that particular date?
22   A.  We had conversations with Loren and the fact
23   that he's taking twenty-eight thousand two hundred and
24   eighty-eight bushels out.
25   Q.  So you're basing that on Exhibit No. 2, page

ACTION REPORTING  (956) 631-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

---

SHEET 29   PAGE 110
110

1  forty?
2     A.   Correct.
3     Q.   Are you basing that answer on any other
4  document?
5     A.   Phone conversations mainly with Loren, phone
6  conversations with Walter Puffelis.
7     Q.   So you feel like control had shifted by
8  December 31, 1996 at least from CSC to AGI to Mr.
9  Gutierrez?
10    A.   Yes.
11    Q.   Do you recall if you had any conversations with
12 Mr. Puffelis in 1997 or 1998 at all?
13    A.   1997 I had conversations with him trying to
14 collect my money.
15    Q.   So it wasn't really about control, it was more
16 about collecting your money --
17    A.   Correct.
18    Q.   -- at that point in time? And then you say in
19 mid -- like in mid-year that would be I guess July '97
20 you collected your money, some point in time?
21    A.   Some point in time there, yeah.
22    Q.   You haven't had any conversations with Mr.
23 Puffelis in '98 or '99, correct?
24    A.   Correct.
25    Q.   What about with Mr. Gutierrez? What were your
ACTION REPORTING  (956) 631-1024

---

PAGE 111
111

1  dealings like with him in 1997?
2     A.   Semi-frustrating.
3     Q.   And what do you mean by that when you say
4  semi-frustrating?
5     A.   Loading product out, trying to collect payment
6  from him. We were looking for a million bushels to come
7  in which is slightly higher than the ninety-six thousand
8  he delivered. Trying to look at adding -- justifying
9  space for him on what apparently became a phantom grain
10 shipment.
11    Q.   What do you mean a phantom grain shipment?  Are
12 you talking about the four thousand bushels that never
13 came?
14    A.   Well, no.  If you look at Exhibit 3 the first
15 sentence in the second paragraph, the minimum quantity
16 of grain to be handled under this contract is one
17 million bushels.  If the minimum quantity handled
18 requirement is not met receiving and delivering charges
19 will increase by one hundred percent.  Then at the
20 bottom of the note, this contract expires December 31st,
21 1996 at midnight or twenty-four hundred hours.  The only
22 reason I gave them such a cheap rate was because they
23 had a lot of grain.  I had a lot of corn that was going
24 to blow through the elevator in a relatively short
25 amount of time.
ACTION REPORTING  (956) 631-1024

---

PAGE 112
112

1     Q.   And I guess according to your testimony it --
2     A.   Never showed.
3     Q.   You never had a million bushels through the
4  elevator, correct?
5     A.   All they delivered was the quantity referenced
6  in my answer seventeen, the ninety-six thousand -- a
7  hundred eighty some odd thousand bushels, ninety-six
8  plus ninety plus seven.
9     Q.   About roughly what does that total there?
10    A.   Ninety-six and ninety is a hundred and
11 eighty-six and seven, one ninety-three, a hundred and
12 ninety-four thousand bushels, more or less.
13    Q.   So basically you had about a hundred and
14 ninety-four thousand bushels come through your elevator
15 concerning the corn at issue here and you had a
16 contract --
17    A.   A million bushels.
18    Q.   -- come through?  Did you revert the contract
19 to double the rates or what have you when you realized
20 that you --
21    A.   I --
22    Q.   -- weren't going to have a million bushels
23 coming through?
24    A.   When they failed to comply I reverted.
25    Q.   When did you revert?
ACTION REPORTING  (956) 631-1024

---

PAGE 113
113

1     A.   Effective December 31st and then effective
2  January 1st of '97 the contract expired and we defaulted
3  to the Exhibit 4.
4     Q.   So the rates on Exhibit 4 went into effect
5  beginning January 1, 1997?
6     A.   Correct.
7     Q.   Did Mr. Gutierrez ever pay to you or to Port
8  Elevator-Brownsville, L.C. what was owed under the
9  contract?
10    A.   He paid some portion, but he never paid his
11 balance.
12    Q.   Do you have any documentation to reflect what
13 partial payments he made?
14          MR. SKAGGS:  Give us a moment.  It's about
15 an hour and we'll try to figure out if there's an answer
16 to your question.
17          MR. MOUNT:  All right.  We'll go off the
18 record.
19          (Recess, 3:08-3:28)
20    Q.   (BY MR. MOUNT) Prior to taking the break I
21 believe I was asking you about whether you had any
22 underlying documentation concerning what Mr. Gutierrez
23 had paid or not paid.  I believe there was an off
24 discussion of record that you did produce some documents
25 to your attorney which your attorney evidently didn't
ACTION REPORTING  (956) 631-1024

---

*Action Reporting*
(956) 631-1024 / 1-800-884-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

— SHEET 30   PAGE 114 —

114

1  quite get to us, but he's going to get it to us as soon
2  as possible.
3      A.   That is correct.
4           MR. SKAGGS: And that is also correct,
5  yes.
6      Q.   (BY MR. MOUNT) So I'll probably defer asking
7  you any questions on those documents -- on that
8  particular matter until we get the documents because it
9  will go a lot quicker if we just get the document. But,
10 in any event, it's your understanding, though, that he
11 paid very little of what was owed by -- that is, Mr.
12 Gutierrez paid very little of what was owed by him,
13 correct?
14     A.   Correct.
15     Q.   Now, I want to go over some of these documents
16 with you just to see if you can identify what some of
17 them are in Exhibit No. 2. First of all, let's look
18 at -- let's look at page thirty of Exhibit No. 2.
19     A.   All right.
20     Q.   Apparently this is a document that shows the
21 corn that was sold by Port Elevator-Brownsville, L.C.
22 after their or after you first became aware there was a
23 dispute as to ownership of the corn that was originally
24 shipped in in fifty-four railroad cars, correct?
25     A.   Yes. It shows the corn that we sold after we
            ACTION REPORTING  (956) 631-1024

— PAGE 115 —

115

1  attempted to get it moved out.
2      Q.   So your first sale according to this particular
3  document was on December 29, 1997?
4      A.   Correct.
5      Q.   And then your last sale was on March 30, 1998?
6      A.   Correct.
7      Q.   It appears from my calculations that you still
8  have about thirty-seven thousand bushels of corn still
9  in the elevator from the fifty-four railroad cars. Does
10 that sound correct or incorrect? Basically what I'm
11 getting -- what I've gotten here is I've gotten a figure
12 of a hundred and ninety-three seven hundred and
13 seventy-two point thirty-nine bushels subtracted on your
14 list, fifty-five thousand three hundred twenty-seven
15 point eighty-six bushels sold for a total of a hundred
16 and thirty-eight thousand four hundred and forty-four
17 point fifty-three bushels and it appears from this other
18 document, Exhibit No. 2, you released a hundred and one
19 thousand one hundred seventy-one point seventy-nine
20 bushels at the request of Mr. Gutierrez for a total of
21 about thirty-seven thousand bushels left.
22     A.   And you're omitting the twenty-eight thousand
23 that was back to CSC?
24     Q.   And that would be per the October 19, 1996 --
25     A.   December 19th, item --
            ACTION REPORTING  (956) 631-1024

— PAGE 116 —

116

1      Q.   Exhibit 40?
2      A.   -- 40.
3      Q.   Exhibit 40. What I'm mentioning here I need to
4  subtract out from my roughly thirty-seven thousand two
5  hundred and seventy-two point seventy-four bushels. I
6  need to subtract that, twenty-eight thousand two hundred
7  and eighty-eight point ninety-four bushels?
8      A.   Correct.
9      Q.   Okay. These particular bushels here in Exhibit
10 No. 40, were these -- what happened to these particular
11 bushels?
12     A.   I got a warehouse receipt out to CSC, issued
13 the warehouse receipt to CSC. Sometime later CSC
14 presented the warehouse receipt and that corn was
15 shipped out for CSC's account.
16     Q.   I take it you would have documentation
17 concerning that particular shipment out for CSC, you
18 would have a scale ticket concerning the loading out?
19     A.   Yes, somewhere.
20     Q.   So concerning the transaction with CSC you've
21 got the warehouse receipt as evidence that you
22 transferred roughly twenty-eight thousand two hundred
23 and eighty-eight point ninety-four to CSC, so you would
24 probably have one or more scale tickets?
25     A.   Correct.
            ACTION REPORTING  (956) 631-1024

— PAGE 117 —

117

1      Q.   So it looks like there is roughly about eight
2  or nine thousand bushels left?
3      A.   No.
4      Q.   How much is left?
5      A.   None.
6      Q.   So it's your understanding that concerning the
7  corn at issue that all of it has been either -- that all
8  of it has been shipped out or sold?
9      A.   All of it was shipped out with the exception of
10 that which due to the length of time it stayed in the
11 bins either went sour or it stuck to the walls of the
12 bins and which we had to go clean the product out using
13 a variety of devices from a gyro whip to dropping a man
14 on a boatswain's chair down inside a silo to clean it.
15 Some of it is going to be what is known as handling
16 shrink and some of it is moisture shrink. Corn that is
17 brought from the midwest left in storage roughly
18 eighteen months is going to have a loss in weight due to
19 a change in moisture content.
20     Q.   As far as the storage of the corn from the
21 fifty-four rail cars it would be stored in a common area
22 with other corn, with other similar corn?
23     A.   Not this particular corn. This corn was stored
24 identity preserved for their account.
25     Q.   Is that normally what your procedure is to
            ACTION REPORTING  (956) 631-1024

SHEET 31  PAGE 118

118

1  store it identity preserved for a particular person's
2  account?
3      A.   Grain sorghum, no.  Corn, yes.
4      Q.   So if I brought in some corn that I bought from
5  the midwest and I want to store it at Port
6  Elevator-Brownsville, L.C. you would put it in a
7  separate bin just for me or a separate area or however
8  you store it?
9      A.   Mostly it would go into a separate bin and you
10  would not be allowed to store it beyond forty-five days.
11     Q.   Why do you say I wouldn't be allowed to store
12  it over forty-five days?  Is that some kind of new rule?
13     A.   No.  It is -- the Gulf Coast is hard on corn.
14  Corn that comes from the midwest is coming from a
15  completely different climate.  When it gets into a
16  semi-tropic area corn does what is called heating,
17  spontaneous reaction where due to the moisture content,
18  air, humidity, ambient temperature, et cetera, et
19  cetera.  Corn gets hot.  It starts to cook.  There's no
20  means to stop that, so as to avoid quality problems I
21  don't allow people to store corn in my facility longer
22  than forty-five days.
23     Q.   Was that your rule back in 1996?
24     A.   That was my rule back in 1996 and that is why
25  the contract was set up that everything would be out by
ACTION REPORTING  (956) 631-1024

PAGE 119

119

1  December 31st.
2      Q.   That's an unwritten rule, correct?  You don't
3  have any written rules or procedures anywhere that set
4  out this particular rule?
5      A.   In the tariff that is now in effect that I have
6  at Brownsville for '99, '98, yes, that is -- I specified
7  out as a line item in the tariff and have sent copies of
8  the tariffs out to my customers and said, look, this is
9  in effect.
10     Q.   That wasn't your tariff, though, in effect in
11  1996, correct, if we look at Exhibit No. 4?
12     A.   Item number 4 addresses the issue of heating in
13  grain.
14     Q.   Although it doesn't limit to a forty-five day
15  period?
16     A.   Does not limit to a forty-five day period.
17     Q.   Or mention corn?
18     A.   Corn is mentioned as all grain.
19     Q.   Where is that?
20     A.   First page of 4, the term grain is used in this
21  tariff shall be understood to mean wheat, corn, oats,
22  rye, barley, grain sorghum, flaxseed and soybeans.
23     Q.   So how would the corn, the fifty-four rail cars
24  of corn, how would it have been stored?
25     A.   It would have been stored in upright concrete
ACTION REPORTING  (956) 631-1024

PAGE 120

120

1  silos.
2      Q.   And for these fifty-four rail cars, how many
3  silos would you need?
4      A.   On a hundred and ninety-three thousand bushels
5  thirty thousand bushels per silo you're -- seven silos.
6      Q.   And give me an indication of about how high
7  these silos go up, their dimensions.
8      A.   I've got three types of silos.  We have -- main
9  silos are twenty foot diameter.  They have a cone bottom
10  and from the bottom of the cone to the top it's one
11  hundred and four point five feet.
12     Q.   So concerning the corn that was sold by the
13  elevator in Exhibit No. 2, page thirty it appears
14  roughly fifty-five thousand bushels was sold, correct?
15     A.   Correct.
16     Q.   And what would be the amount of money collected
17  for those fifty-five thousand bushels?  Do you have a
18  figure for that?
19     A.   It would be a hundred and twenty-three dollars
20  and fourteen cents times one thousand four hundred and
21  five point four 0 seven, a rough number.  I don't know
22  if the bottom number is a weighted average price or just
23  a straight average price.
24     Q.   Do you have any documentation reflecting how
25  much money you're holding for the corn that's at issue
ACTION REPORTING  (956) 631-1024

PAGE 121

121

1  in this lawsuit?
2      MR. SKAGGS:  If I have that I'll give it
3  to you.  That's one I don't recall, Bill.  I'm sorry.
4  There's no reason for -- in our pleadings we've
5  deposited a certain amount of money in the registry to
6  the federal court and acknowledged on the record that
7  there was more to deposit and in the pleadings indicated
8  that there was and if I have the figures I will find
9  them.  He can probably give you an approximate figure,
10  though.
11     Q.   (BY MR. MOUNT) Can you give me an approximate
12  figure?
13     A.   Of the total money?
14     Q.   Of the total money held concerning the corn at
15  issue?
16     A.   I would rather look at it and refresh my
17  memory.
18     Q.   All right.  Is there anything --
19     MR. SKAGGS:  When you take a break in a
20  second, when you get your end of your train of thought I
21  want to check on those other documents and also I need
22  to find out about that.
23     Q.   (BY MR. MOUNT) Now, when was this particular
24  document created which would be page thirty and
25  thirty-one of Exhibit No. 2?  Again, would this have
ACTION REPORTING  (956) 631-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

SHEET 32  PAGE 122

122

1  been after the litigation?
2      A.  Yes.  It would have been for this presentation.
3      Q.  Is this something you created yourself?
4      A.  Yes.
5      Q.  And you would have created these off of scale
6  tickets?
7      A.  Scale tickets and deposit books.
8      Q.  When you say deposit books, what do you mean by
9  deposit books?
10      A.  One of your questions asked was where did the
11  money go and in determining where the money went I went
12  back to Port Elevator's deposit slip book and looked at
13  every deposit for every small transaction and matched it
14  to an outbound ticket that said okay, X number of pounds
15  went to C & H Hygeia, Roque Garza, et cetera.
16      Q.  So when you got the buyers' names here, would
17  you have gotten that off the scale ticket or off the --
18      A.  Off the deposit slip.
19      Q.  Off the deposit slip.  What kind of information
20  would be on the deposit slip?
21      A.  Standard deposit slip.  I mean, it's -- go to
22  the bank, make a deposit and if you've got a hundred and
23  fifty dollars and twenty-three cents it's --
24      Q.  So we're talking about bank deposits --
25      A.  Right, bank deposit slips.
ACTION REPORTING  (956) 631-1024

PAGE 123

123

1      Q.  -- where you receive a particular amount of
2  money from such and such a person, put the person's name
3  down and the amount?
4      A.  Not quite that formal, but yes.
5      Q.  Not quite that formal.  How do you match that
6  deposit slip up, though, to this particular corn?
7      A.  Because this is the only corn that -- that's
8  the only thing we were selling.
9      Q.  All right.  It's the only thing you were
10  selling.  And what particular bank do you --
11      A.  Norwest.
12      Q.  Norwest in Brownsville?
13      A.  Well, yeah.  It was Mercantile at the time.
14      Q.  So it looks like -- if we move on to page
15  thirty-two of Exhibit No. 2 it looks like that Mr.
16  Gutierrez had authorized the release of at least half
17  the corn by October 3, 1997?
18      A.  Correct.
19      Q.  Then looking, and we've probably discussed
20  these documents, thirty-three through thirty-five, we've
21  briefly discussed these.  I might have some follow-up,
22  though, on thirty-three through thirty-five, Exhibit No.
23  2.
24      A.  Uh-huh, okay.
25      Q.  Car number or car NBR, is that the number of
ACTION REPORTING  (956) 631-1024

PAGE 124

124

1  the railroad car?
2      A.  Correct.
3      Q.  And then each number under that would signify
4  one railroad car?
5      A.  Correct.
6      Q.  And then under weight, what does that mean?
7      A.  The net weight of the corn inside the car in
8  pounds.
9      Q.  And then what does the G stand for?
10      A.  I have no idea.
11      Q.  TP, do you know what that's for?
12      A.  No idea.
13      Q.  What about TW?
14      A.  That's test weight.
15      Q.  Test weight.  And what figure would this --
16  what standard of measurement are we in?
17      A.  Bushels.
18      Q.  Bushels?
19      A.  That's pounds per bushel.
20      Q.  Pounds per bushel.  MST, do you know what that
21  stands for?
22      A.  Moisture.
23      Q.  DMG?
24      A.  Damage.
25      Q.  And tell me what moisture means.  Is there a
ACTION REPORTING  (956) 631-1024

PAGE 125

125

1  scale for moisture?
2      A.  The -- there is something called Grain
3  Standards Act that sets different factors for grain.
4  Moisture is no longer a grain standard, but it is just
5  something that people who ship corn, they want to know
6  what the moisture is and it's -- corn typically likes to
7  trade at fifteen five from a seller standpoint.  A buyer
8  wants it fourteen to.
9      Q.  What is DMG?
10      A.  Damage.
11      Q.  And what is the scale for that?
12      A.  Set by the government and it is -- that's just
13  a factor.  They go in, they -- they have a sample.  They
14  take out a hundred grams and that one hundred grams they
15  hand pick it and look for damage and then they weigh up
16  and they put the number down as whatever percentage
17  damage they got.
18      Q.  What's a good number for that, for a buyer?
19      A.  For a buyer?  Depends on what your use is.  If
20  you're going food grade you want it less than one.  If
21  you're going to animal feed it really doesn't matter.
22      Q.  What does BFM stand for?
23      A.  Broken and foreign material.
24      Q.  What grade would you want if you were a buyer?
25      A.  Depends on what your use is.
ACTION REPORTING  (956) 631-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
# DEPOSITION OF CRAIG ELKINS
12-21-99

SHEET 33 PAGE 126

126

1  Q.  For food?
2  A.  For food grade the smaller the number the
3  better.
4  Q.  Would you want one or less?
5  A.  One or less would be real nice.
6  Q.  Going to page forty-one of Exhibit No. 2.
7  A.  Okay.
8  Q.  This is addressed to you; is that correct?
9  A.  Correct.
10 Q.  Is it something you received from the Akron
11 Group?
12 A.  Yes.
13 Q.  And what day did you receive it?
14 A.  I'm assuming October 23rd, '96.
15 Q.  And what was the purpose of this document?
16 What's your understanding of this document?
17 A.  It says, please communicate with us at the
18 following phone number, that it's important.
19 Q.  And that's the extent of this document?
20 A.  That's the extent of the document.
21 Q.  Do you recall if you communicated with Mr.
22 Puffelis after receiving this fax?
23 A.  Yes.  This -- I'm sure I did.  I don't know if
24 I -- what day I communicated with him, but this is
25 probably a precursor to the phone conversation we had
ACTION REPORTING  (956) 631-1024

PAGE 127

127

1  prior to the train arriving.
2  Q.  The train arrived on October 31, correct?
3  A.  Correct.
4  Q.  And this also was received to you prior to you
5  entering into the contract with Mr. Puffelis and Mr.
6  Gutierrez?
7  A.  Correct.
8  Q.  It appears you probably spoke to him by
9  telephone and also got a fax from him at least prior to
10 entering into the contract which is Exhibit No. 3,
11 correct?
12 A.  Correct.
13 Q.  Page forty-two, Exhibit No. 2, what is your
14 understanding of this particular document?
15 A.  This is a document that was -- it is from a
16 company called SGS which provides grain inspections.
17 For whatever reason Mr. Puffelis, Mr. Gutierrez wanted
18 to use SGS as an independent laboratory and this is a
19 communication that came to my office addressed to Mr.
20 Puffelis and that they -- please -- I don't know if it's
21 a corrected weight certificate, some type of analysis to
22 follow later when she checked and basically it's just
23 a communication between an inspection company and Mr.
24 Puffelis talking about something that they had
25 previously discussed.
ACTION REPORTING  (956) 631-1024

PAGE 128

128

1  Q.  Do you know why you got a copy of this?
2  A.  They sent it to my office for Mr. Puffelis.
3  Q.  This wasn't really anything you were concerned
4  with, this was something Mr. Puffelis was concerned
5  with?
6  A.  Yeah.
7  Q.  That would be a yes, right?
8  A.  That would be a yes.
9  Q.  Concerns a sample?
10 A.  It says here, as discussed we're going to run
11 one analysis on composite and something something, if
12 you need then check later.  I guess retain.
13 Q.  Okay.  Let's move on to page forty-three of
14 Exhibit No. 2.  This appears to be addressed to Mr.
15 Elkins which is yourself, correct?
16 A.  Correct.
17 Q.  It appears to be dated September 24, 1997,
18 correct?
19 A.  Correct.
20 Q.  And what is your understanding of this
21 particular document?
22 A.  I don't know.  This is a document that -- I
23 don't recall if it was provided by Mr. Vega or if it was
24 left by Ms. Soto when she came to my office.  I'm
25 assuming it is -- it's one of the two looking at the
ACTION REPORTING  (956) 631-1024

PAGE 129

129

1  time because she's got a notary, a Brownsville notary on
2  it dated October the 7th and it's talking about that
3  they have sold to Mrs. Soto twenty-five hundred tons,
4  metric tons that should be delivered upon presentation
5  of this document before I need to cover the outstanding
6  debt that we have for concept of storage.  I beg that
7  you send me by DHL the corresponding document and you
8  should sign that she received this merchandise in the
9  original and two copies.
10 Q.  So from this document you're understanding he
11 was releasing twenty-five hundred tons to her?
12 A.  I have no idea.  The first time I saw this
13 document was after -- sometime early October of '97.
14 Q.  So this document, does it allow the release of
15 corn to Ms. Vega?
16 A.  Well, this document then has Ms. Vega signing
17 the bottom of it, but saying she's authorized -- Elfego
18 Rosales Torres and/or Harry Lacave Barrientos who in my
19 name shall retire the above mentioned merchandise at the
20 moment that they present this writing.
21 Q.  Do you know if this corn was picked up by these
22 two individuals, Mr. Torres or Mr. Barrientos?
23 A.  I don't recall Mr. Torres or Mr. Barrientos
24 showing up at my office.
25 Q.  So you say you didn't see this document until
ACTION REPORTING  (956) 631-1024

## Action Reporting
(956) 631-1024 / 1-800-884-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

SHEET 34   PAGE 130

PAGE 130

1  probably October '97?
2    A.   Correct.
3    Q.   Do you know under what circumstances you would
4  have received it?
5    A.   In a -- once disputed ownership became clear or
6  became apparent Mr. Vega and Mr. Skaggs had a series of
7  communications.
8    Q.   Do you believe that you received this document
9  after ownership became disputed and Mr. Skaggs and Mr.
10  Vega became involved?
11   A.   Correct.
12   Q.   So then you don't believe you received this
13  document on or about September 24, 1997?
14   A.   I did not receive this document, no, on
15  September 24th, 1997.
16   Q.   All right.  Let's go on to the next document,
17  page forty-four of Exhibit No. 2.  It appears to be Ms.
18  Vega's California driver's license, very illegible copy?
19   A.   Correct.
20   Q.   Whose handwriting is below her driver's
21  license?
22   A.   I do not know.
23   Q.   So you don't know if that's one of your
24  employees at Port Elevator-Brownsville, L.C. or not?
25   A.   Looking at the letter it does not appear to be
     ACTION REPORTING  (956) 631-1024

PAGE 131

1  one of my employees.
2    Q.   Do you know how this particular document came
3  about?
4    A.   Sometime in the late September, early October
5  time frame Ms. Soto came to my office, I was not there
6  and my staff took a copy of her driver's license.
7    Q.   So you think this is something from your own
8  file where your staff got a copy of her driver's license
9  and then also a copy of her home office and cellular
10  numbers?
11   A.   I'm assuming that she provided all of that.
12   Q.   Are you aware one way or the other when it was
13  that Ms. Vega came to Port Elevator-Brownsville?
14   A.   Vaguely, not specifically.  I do know that I
15  was out of town.
16   Q.   Do you recall where you were at the time?
17   A.   Mexico.
18   Q.   Were you on business at the time or pleasure?
19   A.   Business.
20   Q.   Did your staff notify you right away when Ms.
21  Vega came to the office?
22   A.   When I returned.
23   Q.   So you weren't aware of her visit until you
24  returned?
25   A.   Correct.
     ACTION REPORTING  (956) 631-1024

PAGE 132

1    Q.   Do you know about how long you were out of the
2  country for?
3    A.   Typically it's -- I try and keep them short,
4  two to three days tops.
5    Q.   It appears from your answer to number fifteen,
6  interrogatory number fifteen and that would be Port
7  Elevator's answer that Ms. Vega arrived at the facility
8  sometime in September or October of '97?
9    A.   Correct.
10   Q.   You've never met Ms. Vega; is that correct?
11   A.   That's correct.
12   Q.   Never had a telephone conversation with her?
13   A.   I don't recall having one with her.  I'm
14  assuming I called these numbers when I got back, but I
15  don't recall speaking with her.
16   Q.   And you're really not sure one way or the other
17  whether you called her or not?
18   A.   No.  I'm -- and usually very diligent about
19  returning phone calls.  I may have called her and got no
20  answers or I may have called and left a message.
21   Q.   All you know is you didn't speak to her?
22   A.   I did not speak with her, no.
23   Q.   And you've never spoken with Ms. Vega, correct?
24   A.   I do not know of any conversations I've had
25  with her, correct.
     ACTION REPORTING  (956) 631-1024

PAGE 133

1    Q.   And you've never met with her in person either,
2  correct?
3    A.   Correct.
4    Q.   Did you ever receive any documents or any
5  letters or memos or anything from Ms. Vega other than
6  through Ms. Vega's attorney, Mr. Vega?
7    A.   No.
8    Q.   Okay.  Let's go to forty-five of Exhibit No. 2.
9  Is this a document that you received?
10   A.   This is a document that I think we printed in
11  our office for the November 4th, November 5th loadings
12  of corn.
13   Q.   And you say it's a document printed in your
14  office.  Is the document in your office created that Mr.
15  Gutierrez signed?
16   A.   Most likely document that I printed up when Mr.
17  Gutierrez had trucks come in and we were just starting
18  his shipments and I said I -- he said, I'll be leaving,
19  I may be gone, here's loading order for ten truckloads.
20   Q.   Out of fifty-four rail cars, about how many
21  truckloads are you going to get out of fifty-four rail
22  cars?  Can you give me an estimate on that?
23   A.   You got two hundred thousand bushels.  Two
24  hundred thousand bushels were under -- there were
25  forty-six, forty-seven hundred tons.  Thirty -- we're in
     ACTION REPORTING  (956) 631-1024

*Action Reporting*
(956) 631-1024 / 1-800-884-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

SHEET 35 PAGE 134

134

1  '97? I think in '97 we were looking anywhere from
2  thirty-four to forty tons a truck. At forty tons a
3  truck into forty-four hundred that would be what?
4  Twelve hundred trucks. A hundred and twenty trucks.
5  I'm sorry.
6      Q.  In order to get the fifty-four rail cars
7  assuming your math is accurate --
8          MR. SKAGGS: I would like to see you do
9  that in your head, Mr. Mount.
10         MR. MOUNT: Which I could not do that in
11  my head. I'll stipulate to that.
12     Q.  (BY MR. MOUNT) But you think you could get --
13  how many trucks was that again?
14     A.  It would be a hundred and twenty at forty tons
15  a truck.
16     Q.  A hundred and twenty trucks. So you think a
17  hundred and twenty trucks equals about fifty-four rail
18  cars?
19     A.  I think a hundred and twenty trucks equals four
20  thousand eight hundred tons, thereabouts.
21     Q.  Okay. So then back to this document, you think
22  it was -- this was related to --
23     A.  It's definitely related to it because --
24     Q.  The first two shipments then of November 4th
25  and 5th of 1996, correct?

ACTION REPORTING  (956) 631-1024

PAGE 135

135

1      A.  Correct.
2      Q.  And just looking at your document, page
3  thirty-two that you created that will be roughly
4  fourteen thousand seven hundred bushels?
5      A.  That would be thirty-six -- thirty-seven --
6  yeah, it would be three hundred and seventy -- seven
7  tons, so yeah, thirty-seven tons of truck. It would be
8  three hundred and seventy-seven metric tons,
9  thirty-seven tons a truck.
10     Q.  So -- it says for the account on page
11  forty-five, it says for the account of Alicia Gomez and
12  Alfredo Gomez, what does that mean?
13     A.  That Alicia Gomez and/or Alfredo Gomez are
14  going to come by with trucks to load.
15     Q.  So those are the people that are going to be
16  picking up the corn or going to be credited with the
17  corn, it would be those two folks?
18     A.  Correct.
19     Q.  And do you know the Gomezes at all?
20     A.  I think I had met Alfredo several years prior
21  because he was also present in Brownsville when the rail
22  cars were being unloaded and he looked familiar, but I
23  can't swear that yes, I -- I've never had lunch or
24  dinner or cocktails with the man. You know, I might
25  have met him at a function in Mexico or something.

ACTION REPORTING  (956) 631-1024

PAGE 136

136

1      Q.  Do you know where the Gomezes were going to
2  take the corn? Do you have any idea?
3      A.  No.
4      Q.  All you know is they did pick up the ten
5  carloads -- the ten truckloads?
6      A.  They were taking it to Mexico.
7      Q.  Okay. Exhibit 46 -- excuse me, Exhibit 2, page
8  forty-six, do you know a Mr. Aguilar?
9      A.  That is Alfredo Gomez.
10     Q.  Oh, this is Mr. Gomez. That's correct.
11     A.  Uh-huh.
12     Q.  And what is the purpose of this November 4,
13  1996 correspondence to yourself?
14     A.  That he's telling me that the customs broker,
15  Victor M. Guerra, will be handling the exportation
16  paperwork for Mexico and that they shall represent them
17  before my company, Port Elevator-Brownsville, and
18  receive the documentation and that the receipt of these
19  documents by Victor Guerra represents that Alfredo Gomez
20  is accepting the merchandise.
21     Q.  Exhibit No. 47 -- Exhibit No. 2, page
22  forty-seven appears to be another letter from Mr. Gomez.
23  What's your understanding of this particular
24  correspondence dated November 5, 1996?
25     A.  That by means of this he is authorizing Ing.

ACTION REPORTING  (956) 631-1024

PAGE 137

137

1  Jorge Alberto Gomez Aguilar who shall in my name and
2  representation realize the necessary work for the
3  importation of corn and sign all class of documents that
4  require my signature. Thank you for your attention.
5      Q.  Then Exhibit 2, page forty-eight appears to
6  answer a question earlier in your deposition when you
7  were talking about trucks leaving and coming back. It
8  appears -- in your memo you say, the reason given for
9  the trucks coming back was a lack of unloading
10  destinations and truckers wanted to unload either here
11  or at destination, correct?
12     A.  Correct.
13     Q.  So this was related to the November 12, 1996
14  release of corn and then the November 14, 1996 loading
15  back into the facility the corn?
16     A.  Correct.
17     Q.  Exhibit 2, page forty-nine looks like a
18  document dated January 10, 1997 from Mr. Gutierrez to
19  yourself. What understanding did you reach from this
20  document?
21     A.  That he's going to load four trucks in the name
22  of Ricardo Hinojosa.
23     Q.  Do you know Ricardo Hinojosa?
24     A.  No.
25     Q.  Do you know if four trucks were loaded for Mr.

ACTION REPORTING  (956) 631-1024

SHEET 36   PAGE 138

138

1  Hinojosa?
2  A.  If the trucks arrived we loaded them.
3  Q.  So this was just a written instruction --
4  A.  Instruction --
5  Q.  -- given to you --
6  A.  -- as per --
7  Q.  -- as per your expired -- well, it -- yeah, as
8  per your expired agreement --
9  A.  Correct.
10  Q.  -- and to Mr. Puffelis, correct?
11  A.  Correct.
12  Q.  And you recognize Mr. Gutierrez's signature on
13  that document?
14  A.  The style of document, yes.
15  Q.  All right.  And then Exhibit 2, page fifty
16  looks like the same document, doesn't it?
17  A.  Better copy.
18  Q.  A better copy, okay.  So we'll move on to
19  fifty-one which again looks to be like the same document
20  again.
21  A.  No.  Well, it could be.
22  Q.  It's the same one.
23  A.  Okay.
24  Q.  Skip onto fifty-two, Exhibit 2, page fifty-two.
25  This appears to be a statement issued by Port

ACTION REPORTING  (956) 631-1024

PAGE 139

139

1  Elevator-Brownsville, L.C.; is that correct?
2  A.  Correct.
3  Q.  The date of the statement would have been the
4  end of the year for 1996, correct?
5  A.  Correct.
6  Q.  Are you aware whether this statement was sent
7  to Mr. Gutierrez's address in Chula Vista?
8  A.  It was mailed to him, yes.
9  Q.  And then who wrote past due on there?
10  A.  I'm assuming my young secretary.
11  Q.  That would be Maria Garcia or Gomez?
12  A.  No.  That's Maria Gonzalez and -- no.  I would
13  say that would have either been a temp at the time or
14  Sandra Gonzales with an S at the end and not a Z.
15  Q.  Okay.  She's still your secretary, Sandra
16  Gonzales?
17  A.  No.  She had a baby and decided she didn't want
18  to work any more.
19  Q.  When did she leave you?
20  A.  I want to say March of this year, April of this
21  year.
22  Q.  Page fifty-three of Exhibit No. 2, do you
23  recognize this as a document dated January 22, 1997 from
24  Mr. Gutierrez?
25  A.  Yes.

ACTION REPORTING  (956) 631-1024

PAGE 140

140

1  Q.  And you recognize Mr. Gutierrez's signature at
2  the bottom of that document?
3  A.  Yes.
4  Q.  What is your understanding of this particular
5  document?
6  A.  That Ricardo Hinojosa is going to send four
7  trucks to load, that the -- he's providing the truck
8  license plate and the trailer license plates and the
9  name of the driver.
10  Q.  Do you know if these particular drivers, these
11  four drivers came to pick up these four truckloads for
12  Mr. Hinojosa or not?
13  A.  If they showed up we loaded them.
14  Q.  All right.  And then Exhibit No. 54 looks to be
15  like a document from Mr. Gutierrez to you dated January
16  29, 1997 regarding two truckloads to be picked up for
17  Mr. Hinojosa also?
18  A.  Correct.
19  Q.  And again, you don't know whether those
20  truckloads would have been loaded, but they would have
21  been I guess if the drivers showed up?
22  A.  If they showed up we loaded them.
23  Q.  All right.  Exhibit No. 55 looks to be like a
24  document dated January 30, 1997 from Mr. Gutierrez
25  regarding his request that you load two truckloads for

ACTION REPORTING  (956) 631-1024

PAGE 141

141

1  Mr. Hinojosa and then the drivers are identified?
2  A.  Correct.
3  Q.  And again, you don't know if they were loaded,
4  but if the trucks showed up they would have been loaded?
5  A.  Correct.
6  Q.  All right.  Exhibit No. 56 would be three
7  truckloads for Mr. Hinojosa?
8  A.  Correct.
9  Q.  And this would be pursuant to Mr. Gutierrez's
10  instructions dated February 5, 1997?
11  A.  Correct.
12  Q.  And again, on these particular documents we've
13  just looked at, Exhibits 54 through 56 you recognize Mr.
14  Gutierrez's signature on these documents?
15  A.  The style of the fax and everything, yes.
16  Q.  All right.  And then looks like Exhibit No. 57
17  is a memo dated February 6, 1997 regarding two trucks to
18  be loaded for Mr. Hinojosa?
19  A.  Correct.
20  Q.  Do you recognize Mr. Gutierrez's signature and
21  style again?
22  A.  Correct.
23  Q.  And then 58, what is Exhibit No. 58?
24  A.  It is from Ricardo Hinojosa to Bersain
25  Gutierrez or -- it's talking about -- apparently he's

ACTION REPORTING  (956) 631-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

SHEET 37   PAGE 142

142

1 providing Mr. Gutierrez with the name and plates of some
2 trucks coming in from Transportes TNI and from
3 Transportes Jose Guajardo.
4    Q.   Do you know if these trucks came in?
5    A.   This is not to me.  This is -- if these trucks
6 would have showed up we wouldn't have loaded them.
7    Q.   And the reason for that is because?
8    A.   This isn't from Bersain.
9    Q.   It's from Mr. Hinojosa?
10   A.   Correct.
11   Q.   All right.  Exhibit 2, page fifty-nine appears
12 to be a signature of Mr. Gutierrez on the bottom of this
13 document?
14   A.   Correct.
15   Q.   And in this particular instruction he's
16 requesting that four truckloads be released to Mr.
17 Hinojosa?
18   A.   Correct.
19   Q.   And then whose handwriting is at the bottom
20 where it says only two of these trucks were loaded?
21   A.   Sandra Gonzales.
22   Q.   And that would be your secretary again,
23 correct?
24   A.   Correct.
25   Q.   And then Exhibit No. 2, page sixty it looks
ACTION REPORTING  (956) 631-1024

PAGE 143

143

1 like Sandra Lee Gonzales's signature is on that
2 document?
3    A.   Yeah.
4    Q.   And this particular document basically says
5 that Mr. Elkins was given oral permission on the
6 telephone to load four trucks, correct?
7    A.   Correct.
8    Q.   Do you know, was this for Mr. Hinojosa again or
9 for someone else?
10   A.   I don't recall.
11   Q.   But this would be regarding the transactions on
12 February 11 and February 12, 1997?
13   A.   Correct.  Well, actually if the trucks were
14 loaded on February the 11th I'm assuming the trucks came
15 in late in the afternoon.  I'm assuming the trucks came
16 in, we had no instructions to load.  Again, I'm assuming
17 we attempted to contact Mr. Gutierrez, got some type of
18 communication back from him and saying yes, load them.
19 They would have been loaded.  If they were loaded after
20 two o'clock in the afternoon they would not have crossed
21 into Mexico for -- because of Mexican importation
22 requirements and they would have physically been
23 released on the 12th.
24   Q.   Okay.  Moving onto page sixty-one, February 18,
25 1997, instruction from Mr. Gutierrez to yourself; is
ACTION REPORTING  (956) 631-1024

PAGE 144

144

1 that correct?
2    A.   Correct.
3    Q.   You recognize Mr. Gutierrez's signature and
4 style again?
5    A.   Correct.
6    Q.   This time it's five truckloads to Mr. Hinojosa?
7    A.   Correct.
8    Q.   And the five drivers are identified; is that
9 correct?
10   A.   Correct.
11   Q.   And again, you don't know if these were
12 released, but if --
13   A.   If they showed up we would have loaded them.
14        (Recess, 4:16-4:36)
15   Q.   (BY MR. MOUNT) Okay.  Do you know who Ricardo
16 Hinojosa is?
17   A.   No, other than he's somebody Gutierrez is
18 selling corn to.
19   Q.   So prior to Mr. Gutierrez beginning to sell
20 corn to Mr. Hinojosa you didn't have any understanding
21 as to who Mr. Hinojosa was?
22   A.   Correct.
23   Q.   Have you ever met Mr. Hinojosa?
24   A.   I don't believe so.  I mean, I've been in the
25 grain business since '86 and have met a lot of people.
ACTION REPORTING  (956) 631-1024

PAGE 145

145

1 Into Mexico since '85 and met a lot of people.  I
2 don't -- I mean, I may have met him, but --
3    Q.   You just don't recall if you've ever met him
4 before?
5    A.   Correct.  I don't know if I've met the Ricardo
6 Hinojosa.
7    Q.   Do you know where he's out of in Mexico?
8    A.   Monterrey I believe.
9    Q.   Do you know what company he's with, if any?
10   A.   I want to say Forlaca Los Cachorros.
11   Q.   And that would be -- is that on page sixty-six?
12 Look at sixty-six.
13   A.   Yeah.
14   Q.   Top of the page?
15   A.   Yeah.  Comercializadora Los Cachorros.
16   Q.   Okay.  This might be his address at the bottom,
17 correct?
18   A.   Possibly, yeah.  Carretera Laredo.  San Nicolas
19 de los Garza, Nuevo Leon.
20   Q.   You've never visited his business down here in
21 Mexico, have you?
22   A.   No.
23   Q.   I think we were up to page sixty-two, Exhibit
24 No. 2 and that appears to be correspondence dated
25 February 21, 1997 from Mr. Gutierrez to yourself
ACTION REPORTING  (956) 631-1024

*Action Reporting*
(956) 631-1024 / 1-800-884-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

SHEET 38   PAGE 146

**146**

1  concerning five truckloads that needed to be released to
2  Mr. Hinojosa and then the five drivers were identified;
3  is that correct?
4     A.   Correct.
5     Q.   And again, you recognize Mr. Gutierrez's
6  signature and the style of the document as being Mr.
7  Gutierrez's?
8     A.   Correct.
9     Q.   All right.  Sixty-three is an instruction dated
10  March 3, 1997 from Mr. Gutierrez to yourself concerning
11  again five truckloads to be released to Mr. Hinojosa; is
12  that correct?
13     A.   Correct.
14     Q.   Again, you recognize the style of the document
15  as being Mr. Gutierrez's along with Mr. Gutierrez's
16  signature; is that correct?
17     A.   Correct.
18     Q.   Exhibit No. 64 -- excuse me, page sixty-four,
19  Exhibit No. 2, again, this would be a March -- actually
20  this appears to be the same document as Exhibit -- as
21  page sixty-three except for there's handwriting on it?
22     A.   Yes.
23     Q.   All right.  And this is your assistant's
24  handwriting?
25     A.   No.  It's the secretary, Sandra Lee Gonzales.
          ACTION REPORTING  (956) 631-1024

PAGE 147

**147**

1     Q.   All right.  Sandra Lee Gonzales and she says,
2  came one day late because he was in an accident the day
3  before.  Do you know who she's referring to?
4     A.   I'm assuming it's the truck that's circled.
5     Q.   That would have been Mr. -- the truck driven by
6  Mr. Hernandez?
7     A.   Correct.
8     Q.   And again -- then move along I guess to Exhibit
9  2, page sixty-five, a March 12, 1997 instruction from
10  Mr. Gutierrez to yourself concerning six truckloads to
11  Mr. Hinojosa; is that correct?
12     A.   Correct.
13     Q.   Can you recognize the style of the document as
14  being Mr. Gutierrez's along with his signature?
15     A.   Correct.
16     Q.   There aren't any truck drivers identified
17  there, are there?
18     A.   No.  The trailer tags are.
19     Q.   The trailer tags, though, are.  Okay.  And this
20  would be sufficient in order to release the corn?
21     A.   Yes.  The driver's name may change because
22  certain drivers may not have a passport and can't cross
23  the bridge, so they may hire a passadore and it wouldn't
24  surprise me if on these where you've got a -- well, on
25  previous on page sixty-four, Santiago Reyes, that
          ACTION REPORTING  (956) 631-1024

PAGE 148

**148**

1  particular truck was driven by Juan Diaz or somebody.
2     Q.   Uh-huh.
3     A.   But as long as the trailer tag matches that's
4  what we're going for.
5     Q.   Concerning these particular instructions you
6  would pass these instructions down to some of the
7  employees at Port Elevator to let them know that these
8  individuals would be coming to pick up the corn?
9     A.   Most likely this fax would have come in and
10  Sandra would have picked it off the fax machine and if
11  she was working the scale that day then she would have
12  taken it with her out to the scale so when the trucks
13  showed up she would have known they were all right to
14  load.
15     Q.   So some of these faxes you might not have even
16  seen, correct?
17     A.   Correct.
18     Q.   Most of this stuff is just ministerial,
19  something that Sandra can take care of?
20     A.   Yeah.  Like I said, it's -- as long as we've
21  got a loading order from him and if there's any doubts
22  ask me or call or try and get a phone call in to him if
23  I'm not around.
24     Q.   Okay.  Exhibit -- I think I marked it as
25  sixty-five point or page sixty-five point five of
          ACTION REPORTING  (956) 631-1024

PAGE 149

**149**

1  Exhibit No. 2, May 6, 1997, correspondence from Mr.
2  Gutierrez to yourself concerning four truckloads?
3     A.   Yes.
4     Q.   Correct?
5     A.   Uh-huh.
6     Q.   Again, you recognize the style of the document
7  as being Mr. Gutierrez's along with his signature?
8     A.   Correct.
9     Q.   Then Exhibit No. 66 -- excuse me, Page 66
10  Exhibit 2.  This appears to be correspondence from Mr.
11  Hinojosa to yourself.
12     A.   Uh-huh.
13     Q.   And what is the purpose of this particular
14  correspondence dated May 13, 1997?
15     A.   He's saying that the destination of the four
16  trucks that I will be loading, crack corn, is this
17  address and that -- he's asking that I confirm the
18  departure of the trucks to him.
19     Q.   And so you ended up -- you ended up confirming
20  it to -- did you confirm it to him?
21     A.   I most likely would.  If not me, Sandra would
22  have called him and said, yes, your trucks is loaded, we
23  told the drivers that you wanted them to go to this
24  address.  Most likely we would have given the drivers a
25  copy of the fax so there would be no question as to
          ACTION REPORTING  (956) 631-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

SHEET 39   PAGE 150

150

1  where they would be going and then we would have called
2  him and said, yes, the trucks have loaded and they're
3  headed out.
4       Q.   Look at the bottom of this document. This is
5  your handwriting?
6       A.   Where?
7       Q.   At the bottom?
8       A.   On sixty-six?
9       Q.   On sixty-six?
10      A.   I have no -- none of this is my handwriting.
11      Q.   What does it say at the bottom of this document
12  on sixty-six? We're looking at -- let me see what you
13  have there. All right. That's sixty-six. What do you
14  have for sixty-seven?
15      A.   I don't. I mean, this is -- it ends at
16  sixty-six.
17      Q.   I found the others, sixty-seven through
18  ninety-one there. If we look at sixty -- look at
19  sixty-seven. That appears to be a May 12, 1997
20  correspondence --
21      A.   Okay.
22      Q.   -- from Mr. Gutierrez; is that correct?
23      A.   Correct.
24      Q.   Do you recognize Mr. Gutierrez's handwriting
25  and the style of the correspondence?

ACTION REPORTING  (956) 631-1024

PAGE 151

151

1       A.   Yes.
2       Q.   Okay. It appears to be four railroad cars to
3  Mr. Hinojosa again?
4       A.   No. Talking about four trucks, but there's
5  only two plates given.
6       Q.   All right. So there's -- again, we're dealing
7  with four trucks there; is that correct?
8       A.   Yes.
9       Q.   And this is very similar to the other documents
10  we've looked at concerning instructions to release?
11      A.   Uh-huh.
12      Q.   Then sixty-eight. Do you have a sixty-eight
13  there?
14      A.   I'm assuming the ones you've got remarked.
15      Q.   Right. Would that be May 14, 1997 at the top?
16      A.   Yes.
17      Q.   This is four trucks?
18      A.   Four trucks.
19      Q.   And again, you recognize Mr. Gutierrez's
20  signature and the style of the document as being Mr.
21  Gutierrez's?
22      A.   Correct.
23      Q.   It says sorghum out by the side of Mr.
24  Castillo's name. Do you know why it says that?
25      A.   Because at the bottom underneath the license

ACTION REPORTING  (956) 631-1024

PAGE 152

152

1  plates it says, favor de cargar 3 de maiz y uno de
2  sorgo, please load three with corn and one with sorghum.
3       Q.   Okay. And why would you -- and would you have
4  loaded one with sorghum?
5       A.   If he had sorghum stocks, yes.
6       Q.   And did Mr. Gutierrez have sorghum stocks
7  there?
8       A.   I'm assuming he did because we loaded one for
9  him and I'm assuming the previous fax he did because it
10  said he's going to load two with sorghum.
11      Q.   And if we look at Exhibit 69, is that a June 6,
12  1997 correspondence?
13      A.   Yes.
14      Q.   And what is your understanding concerning this
15  particular correspondence?
16      A.   Apparently it's a fax from a transportation
17  company telling Mr. Hinojosa that they're giving him the
18  license plates and the driver's name, the people they're
19  going to send to Brownsville.
20      Q.   And what particular company or business is
21  sending drivers to Brownsville? Does it say?
22      A.   Fletes y Materiales Martinez.
23      Q.   And have you heard of that particular business?
24      A.   Yes. It's a trucking line in Mexico.
25      Q.   Do you know where they're located in Mexico?

ACTION REPORTING  (956) 631-1024

PAGE 153

153

1       A.   I think they're in the Monterrey area.
2       Q.   Okay. Then the next document, page seventy,
3  Exhibit No. 2, May 15, 1997. I don't believe we've
4  covered that one yet. Do you recognize Mr. Gutierrez's
5  signature on that document?
6       A.   Yes.
7       Q.   That looks like two -- two truckloads of corn?
8       A.   Cracked -- he wants cracked corn.
9       Q.   Cracked corn?
10      A.   Uh-huh.
11      Q.   Okay. He identifies one driver, but not the
12  other; is that correct?
13      A.   Correct.
14      Q.   Again, you recognize the style of this document
15  as being Mr. Gutierrez's?
16      A.   Yes.
17      Q.   And you recognize the signature also?
18      A.   Yes.
19      Q.   On seventy-one it looks like correspondence
20  dated June 6, 1997 from Mr. Gutierrez to yourself
21  regarding three truckloads of -- is this sorghum or is
22  this corn?
23      A.   It's corn. No. This is grain sorghum.
24      Q.   Sorgo --
25      A.   Sorgo Americano.

ACTION REPORTING  (956) 631-1024

*Action Reporting*
(956) 631-1024 / 1-800-884-1024

SHEET 40  PAGE 154

154

1   Q.   -- Americano?
2   A.   Uh-huh.
3   Q.   And so I'm assuming that Mr. Gutierrez again
4  had sorghum at your facility, correct?
5   A.   Correct.
6   Q.   And again, you recognize Mr. Gutierrez's
7  signature in this document as being Mr. --
8   A.   The style and the fax --
9   Q.   -- Gutierrez's style?
10   A.   -- header, yeah.
11   Q.   All right.  Moving on to -- do you have any
12  idea when Mr. Gutierrez brought sorghum into your
13  facility?
14   A.   No.  I'm assuming he purchased it from somebody
15  who had sorghum there because I don't recall any grain
16  sorghum being received for his account.
17   Q.   Do you have any record reflecting a transaction
18  between one of your customers --
19   A.   No.
20   Q.   -- trading sorghum to another customer or
21  selling?
22   A.   No.  I mean, I could get a phone call from
23  Debruce or from Scoular or from Farmland or somebody
24  that says, I sold ten truckloads or four truckloads or
25  two hundred tons to so and so.  The grain industry is
ACTION REPORTING  (956) 631-1024

PAGE 155

155

1  probably the last industry that conducts business over
2  the phone verbally.
3   Q.   Okay.  Would there be any forms or any
4  documentation concerning the transfer that you would
5  keep at the facility?
6   A.   No.  There would just be a ticket that sorghum
7  was shipped out of somebody's account going to his
8  account.  I mean, when the truck loaded it would be
9  shipper so and so, account Sysco De Baja.
10   Q.   But if there was a sale for Mr. Gutierrez -- if
11  Mr. Gutierrez bought some sorghum from one of your
12  customers, would your customer notify say yourself that
13  there had been a sale with Mr. Gutierrez and then you
14  would credit Mr. Gutierrez's account --
15   A.   No.
16   Q.   -- with that particular sorghum?
17   A.   If it was an in-store sale, yes, in-store
18  meaning I have it in the elevator in my account.  I
19  don't know when you're going to pick it up, but I'm not
20  going to pay storage on it any more, I'm not going to
21  pay the loading out charges on it any more, that's for
22  your account and then I would get some type of
23  communication that says transfer bushels from my account
24  to so and so's account and storage from my account stops
25  on such and such day and starts for this guy's account
ACTION REPORTING  (956) 631-1024

PAGE 156

156

1  on such and such day.  If it's a sale most likely he
2  bought stuff loaded truck where the guy who owned the
3  product was responsible for all of the charges incurred
4  to put it on the truck and it was just a matter of
5  getting his trucks there.
6   Q.   So do you recall one way or the other whether
7  you ever charged Mr. Gutierrez for any storage fees or
8  loading fees --
9   A.   On sorghum?
10   Q.   -- on sorghum?
11   A.   No.
12   Q.   The answer is no, you never charged him or you
13  don't recall?
14   A.   Don't recall.
15   Q.   Okay.  We move up to I guess page seventy-two
16  of Exhibit No. 2.  This would be correspondence from Mr.
17  Gutierrez dated July 25, 1997 to yourself?
18   A.   Yes.
19   Q.   And this would be two truckloads of --
20   A.   Cracked corn.
21   Q.   -- cracked corn?
22   A.   Uh-huh.
23   Q.   And again, you recognize this as Mr. -- you
24  recognize Mr. Gutierrez's signature on this document and
25  you also recognize the style of this document as being
ACTION REPORTING  (956) 631-1024

PAGE 157

157

1  that of Mr. Gutierrez's?
2   A.   Correct.
3   Q.   And if we move on to page seventy-three of
4  Exhibit No. 2, what is this particular document?  What's
5  your understanding of this particular document?
6   A.   It's from Ricardo Hinojosa with a copy to
7  Leobardo Lozano.  It says, I send you the information
8  about the trucks that are going to load corn tomorrow
9  morning, cracked yellow corn tomorrow morning and it's
10  got a -- OP is operator, Dagoberto Ramirez and the
11  trailer number and the tractor number.  Truck is what
12  he's calling trailer and javla is the -- what we call a
13  trailer.
14   Q.   And Exhibit No. 2, page seventy-four,
15  correspondence dated August 21, 1997 from Mr. Gutierrez
16  to yourself concerning one truckload of cracked corn?
17   A.   Correct.
18   Q.   Do you recognize Mr. Gutierrez's signature on
19  this document?
20   A.   Yes.
21   Q.   This is a document you received; is that
22  correct?
23   A.   Correct.
24   Q.   You also recognize the style of the document as
25  being that of Mr. Gutierrez?
ACTION REPORTING  (956) 631-1024

SHEET 41   PAGE 158

158
1   A.  Correct.
2   Q.  Okay.  And then page seventy-five, Exhibit No.
3   2, is this the same document we just saw earlier or a
4   different document?  No.  This is a different document.
5   A.  Different document, same thing.
6   Q.  Okay.  And briefly, what is this document?
7   What's your understanding of this document?
8   A.  I'm passing you the information on the trucks
9   that are going to load cracked corn, the cracked corn of
10  Bersain Gutierrez, driver's name and license plates of
11  the truck and trailer.
12  Q.  Page seventy-six, Exhibit No. 2.  What is this
13  particular document?
14  A.  He's telling me that he's -- on Friday the 29th
15  of August due to problems with the truck driver
16  syndicate in Matamoros the customs broker, Israel
17  DeLeon, was impossible to cross the order of trucks
18  authorized by Bersain Gutierrez with the following
19  trucks and it lists the plate numbers and whatnot and
20  that he's asking that I cancel this order and that he is
21  going to send another unit to load Monday something, the
22  date is cut off, with the same agency and we hope that
23  there are no problems and he lists the trailer number
24  and the driver's name.
25  Q.  So he was just letting you know the problem?
ACTION REPORTING  (956) 631-1024

PAGE 159

159
1   A.  Yeah.
2   Q.  Then page seventy-seven would be correspondence
3   dated August 29, 1997 from Mr. Gutierrez to yourself
4   concerning two truckloads of cracked corn; is that
5   correct?
6   A.  Correct, which are the ones he's referencing
7   here in seventy-six.
8   Q.  Okay.  And again, you recognize Mr. Gutierrez's
9   signature and also this document as being the style that
10  Mr. Gutierrez puts out?
11  A.  Correct.
12  Q.  Then page seventy-eight, looks like a
13  correspondence dated October 2, 1997 from Mr. Gutierrez.
14  You recognize his signature; is that correct?
15  A.  Correct.
16  Q.  And you received this particular document?
17  A.  On the 2nd of October or thereabouts, yeah, 3rd
18  of October.
19  Q.  And what is being communicated to you in this
20  document?
21  A.  He's saying of the most urgent manner that they
22  will be importing corn as before and they'll be issuing
23  invoices in the name of Dunlop of Mexico and then he
24  goes on to say that his accountant will send the money
25  for the taxes and the customs broker.
ACTION REPORTING  (956) 631-1024

PAGE 160

160
1   Q.  All right.  Then page seventy-nine, Exhibit No.
2   2, do you recognize Mr. Gutierrez's signature on this
3   November 3, 1997 correspondence?
4   A.  Correct.
5   Q.  And you also recognize this document as being
6   the style that Mr. Gutierrez puts out?
7   A.  Correct.
8   Q.  Then you received this fax on or about November
9   4, 1997?
10  A.  Correct.
11  Q.  And what was the purpose of this fax?
12  A.  Basically he's saying that -- he begs that I
13  wait to his arrival to attend whatever dealing and
14  relation with the corn that is his property due to an
15  arrangement that he has with him and that they wish to
16  charge two times for the corn and for which he begs that
17  I do not deliver anything until he arrives with his
18  attorney and shows me documents that he has that he is
19  the person that has contracted -- that contracted with
20  me as a depository.
21  Q.  Did Mr. Gutierrez ever appear in person after
22  you received this particular document?
23  A.  No.
24  Q.  And I take it Mr. Gutierrez's attorney never
25  appeared in person with you or never contacted you
ACTION REPORTING  (956) 631-1024

PAGE 161

161
1   either after November 3, 1997, correct?
2   A.  There may have been some communications with
3   Gutierrez after this date, but no one appeared.
4   Q.  All right.  So you never met his attorney if,
5   in fact, he ever had an attorney, correct?
6   A.  Correct.
7   Q.  And again, he never appeared -- he never
8   appeared to you even though he said in this
9   correspondence he was going to appear to you after
10  November 3, 1997, correct?
11  A.  Correct.
12  Q.  Additionally, this particular correspondence
13  mentioned that he's going to be providing you certain
14  documents; is that right, to reflect ownership?
15  A.  That he will show documents that he has.
16  Q.  Did he ever show you any documents that he had
17  per this November 3, 1997 correspondence?
18  A.  No.
19  Q.  Did Mr. Gutierrez ever show you documents
20  prior, now, we're talking about prior to November 3,
21  1997 reflecting his ownership in the corn?
22  A.  No.
23  Q.  If we look at page eighty of Exhibit No. 2,
24  what is this particular document?
25  A.  It appears to be something from the San Diego
ACTION REPORTING  (956) 631-1024

SHEET 42   PAGE 162

162

1  National Bank on June the 3rd where he's paying some
2  money to Granos Southwest de Mexico.
3     Q.   Do you know what that is, Granos Southwest de
4  Mexico?
5     A.   It's a Mexican company.
6     Q.   Have you ever heard of that company?
7     A.   Yes.
8     Q.   And where are they located?
9     A.   Matamoros.
10    Q.   You don't have any affiliation with that
11 company, do you?
12    A.   Yes.
13    Q.   And what is your affiliation with it?
14    A.   I'm a stockholder in it.
15    Q.   And what does that particular company do?
16    A.   It is a company that buys, sells, trades grain
17 in Mexico.
18    Q.   Are there other partners in it from the U.S.
19 besides yourself?
20    A.   Yes.
21    Q.   Do you recall who some of the other partners
22 are within the United States?
23    A.   Charles Haze, Pete Retzlaff and Tommy Joe
24 Crutcher.
25    Q.   So apparently he's sending, Mr. Gutierrez is
         ACTION REPORTING   (956) 631-1024

PAGE 163

163

1  sending money to this particular company; is that right?
2     A.   Correct.
3     Q.   Do you know why he's sending money to this
4  particular company?
5     A.   Not off the top of my head.  Possibly for
6  something he bought from Granos at the time.
7     Q.   Does this particular company have any
8  affiliation with Southwest Grain Co., Inc.?
9     A.   No.
10    Q.   Do you know why he would be listing a McAllen
11 address on that particular document?  Right under Granos
12 it says McAllen, Texas.
13    A.   I think he's sending it to a bank in McAllen,
14 Texas.
15    Q.   And it mentions Texas Commerce Bank NA below
16 that?
17    A.   Uh-huh.
18    Q.   So this is just a particular document that you
19 have in your file concerning Mr. Gutierrez?
20    A.   Yes.  You asked for any document that I had
21 that had his name on it and any document I had that had
22 his name on it you got.
23    Q.   Do you know what owners there are of this
24 company from Mexico?
25    A.   Of what?
         ACTION REPORTING   (956) 631-1024

PAGE 164

164

1     Q.   Of Granos Southwest.
2     A.   The owners of Granos Southwest de Mexico are
3  Charles Haze, Pete Retzlaff, Tommy Joe Crutcher and
4  myself.
5     Q.   And those are the owners?
6     A.   Those are the owners.
7     Q.   There are no other owners?
8     A.   There are no other owners.
9     Q.   I hate to ask you again, but what were those
10 names again?
11    A.   Charles Haze.
12    Q.   All right.
13    A.   Pete Retzlaff, Tommy Joe Crutcher, Craig
14 Elkins.
15    Q.   Each of these individuals also have an interest
16 in Southwest Grain?
17    A.   Each of those individuals have an interest in
18 Southwest Grain.
19    Q.   Do you have any -- are you an employee of this
20 particular company?
21    A.   No.
22    Q.   So you don't receive any salary or income from
23 this particular company as an employee?
24    A.   Correct.
25    Q.   Does this company have employees?
         ACTION REPORTING   (956) 631-1024

PAGE 165

165

1     A.   No.
2     Q.   Does it have a physical address in Mexico
3  somewhere?
4     A.   Yes.
5     Q.   Where is its physical address?
6     A.   Honduras, Number 144, Colonia Morado,
7  Matamoros, Tamaulipas.
8     Q.   Who is the president of this company?
9     A.   I believe Tommy Joe Crutcher is.
10    Q.   And do you have a role as an officer?
11    A.   As an officer, no.
12    Q.   Who is the VP?  Would that be Pete or Charles?
13    A.   I think everybody else -- I think Tommy Joe is
14 president and Pete is vice-president and then everybody
15 else is just a stockholder.
16    Q.   Charles is the secretary or do you have a
17 secretary?
18    A.   It doesn't have a secretary.
19    Q.   How is the ownership divided on this?  Is it
20 divided into fourths?
21    A.   No.
22    Q.   How is the ownership divided, if you know?
23    A.   Roughly -- roughly thirds and then me.
24    Q.   Do you know if this company ever did any
25 business with Mr. Gutierrez and that would be Granos
         ACTION REPORTING   (956) 631-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

---

SHEET 43   PAGE 166

**166**

1 Southwest in Matamoros?
2    A. They might have done some business with him.
3    Q. Do you know what type of business?
4    A. Either sorghum sales or customs brokerage type
5 things where if he had a permit that had expired and his
6 company couldn't import the product then Granos
7 Southwest would have basically performed a in-name only
8 crossing type operation which is for the most part what
9 Granos does.
10    Q. Did this company, Granos, participate in any
11 way in the crossing of the corn into Mexico by Mr.
12 Gutierrez?
13    A. On some of his cracked corn it did.
14    Q. And why would it have participated on some of
15 the cracked corn versus the sorghum or the other corn?
16    A. Well, on whole corn it requires a cupo to cross
17 into Mexico and Granos did not have cupos in '97, so
18 Granos would have been unable to have done anything with
19 whole corn. Cracked corn pays a duty and does not
20 require a cupo.
21    Q. I'm not sure I understand your answer. Why
22 would Granos have needed --
23    A. Well, if -- take for example his customer,
24 Ricardo Hinojosa, if he's selling to Los Cachorros and
25 Los Cachorros is not in the alta importacion in Mexican
ACTION REPORTING (956) 631-1024

---

PAGE 167

**167**

1 customs then Cachorros cannot physically import product
2 and because he physically cannot import product he may
3 have gone to Granos and said, hey, I want to -- I need
4 you to pass merchandise for me or more likely he would
5 have gone to the customs brokers in Matamoros and said,
6 I have a problem passing product, is there somebody here
7 locally who could pass stuff for me and the brokers
8 could have gone to Granos and said, we've got somebody
9 who wants to pass some cracked corn, can we use your
10 name to pass it under and Granos would have said, sure,
11 for X amount of dollars a ton.
12    Q. So this particular charge here on page
13 thirty -- page eighty could be related to the crossing
14 of some of Mr. Gutierrez's corn?
15    A. It could be related to customs brokers' fees,
16 yes.
17    Q. Is any paperwork kept in the United States
18 concerning Granos business or is it all --
19    A. It's all in Matamoros.
20    Q. It's all in Matamoros at that address you gave
21 me?
22    A. Correct.
23    Q. And there are not any employees of Granos; is
24 that correct?
25    A. Correct.
ACTION REPORTING (956) 631-1024

---

PAGE 168

**168**

1    Q. So if you wanted to call Granos on the
2 telephone, who would answer?
3    A. The accounting firm.
4    Q. When you say the accounting firm, who is the
5 accounting firm?
6    A. Sergio Faragoso.
7    Q. That's an accounting firm in --
8    A. In Matamoros.
9    Q. -- Matamoros?
10    A. In 1996 the accounting firm's name was Say as
11 in Saenz.
12    Q. So if you want to do business with this
13 particular company in Matamoros you have to call the
14 accounting firm, the accounting firm of Faragoso,
15 correct?
16    A. To do business or --
17    Q. Right. Or if I want to contact the company.
18    A. If you want to contact the company that is the
19 legal registered agent name and all of that of the
20 company, address, the whole nine yards.
21    Q. What if I wanted to pass some corn or something
22 into Mexico through them, how would I go about doing it?
23    A. You would have contacted any one of the dozen
24 or two dozen customs brokers in Matamoros or Rio Bravo
25 or Carnargo or Nuevo Progreso and said, look, I got a
ACTION REPORTING (956) 631-1024

---

PAGE 169

**169**

1 problem passing corn, my permit has expired, do you know
2 anybody who's -- who can help me.
3    Q. Uh-huh.
4    A. And the brokers would say, yeah, there's us,
5 there's several others that are in the business of doing
6 it.
7    Q. Okay. And so you would get a recommendation
8 from a customs broker and --
9    A. You would talk to the customs broker and the
10 customs broker would say, well, let me -- let me go look
11 and see if I can get something worked out for you and
12 the broker would call and say, hey, I've got -- you
13 know, depending. The broker may have instructions that
14 says yes, the set fee is X, let us know if you get
15 something worked out or if it's something else call us
16 and see what happens.
17    Q. Let's go on to page eighty-one.
18    MR. SKAGGS: Before you do that let's take
19 a little break if you don't mind.
20    MR. MOUNT: Okay.
21    (Recess, 5:15-5:29)
22    Q. (BY MR. MOUNT) We're up to Exhibit 2, page
23 eighty-one. Do you have that in front of you?
24    A. Yes.
25    Q. That would appear to be correspondence dated
ACTION REPORTING (956) 631-1024

---

SHEET 44   PAGE 170

170
1  March 19, 1997 from Mr. Gutierrez to yourself?
2      A.   Uh-huh.
3      Q.   And you recognize Mr. Gutierrez's signature on
4  that document?
5      A.   Yes, sir.
6      Q.   What is Mr. Gutierrez -- what's your
7  understanding of this particular document?
8      A.   That he is taking the advantage of the
9  opportunity to say hello and to communicate that he's
10  interested in a barge that I have offered to him and
11  that he begs that I send him a pro forma for him to give
12  to his bank and to send me a letter of credit
13  immediately and to communicate his home phone number,
14  his cell number, call him as soon as I can and for the
15  other part that he begs that I don't mix him in with a
16  debt of Walter Puffelis and as he's told me he's going
17  to buy more and that he's going to pay me what he owes
18  me in storage and that he begs that I have a little
19  patience and that he's going to move the merchandise and
20  pay me, but please call me to make arrangements upon a
21  barge.
22      Q.   What about the barge?  You had a barge?  Who
23  had the barge?
24      A.   No.  He called and wanted to buy a barge of
25  corn and asked me what were barge of corn values and I
ACTION REPORTING  (956) 631-1024

PAGE 171

171
1  said, I don't know and I called a grain broker and said,
2  what are barge corn values or barge milo values or barge
3  wheat values, I don't recall what commodity it was, and
4  said barge values are roughly X and suggested that he
5  call Loren directly this time instead of going through
6  Walter and oh, by the way, Walter hadn't paid me and I
7  want my money, I'm not going to ship him anything until
8  Walter pays me.
9      Q.   So what is barge corn?
10      A.   A barge load, fifty-six thousand bushels.
11      Q.   All right.  And he was going to buy that from
12  where?  He was looking to buy --
13      A.   He was looking to buy a barge of corn delivered
14  to Brownsville to ship into Mexico.
15      Q.   Do you know if he ever found a barge of corn to
16  buy and to ship into Mexico?
17      A.   I don't know.
18      Q.   Do you have any idea why he was wanting to buy
19  a barge of corn when he still had --
20      A.   No idea.
21      Q.   -- corn in the elevator or he thought he had
22  corn in the elevator?
23      A.   In March of '97, I mean, I've got no idea what
24  his plans were.
25      Q.   Did you ever communicate to him about this
ACTION REPORTING  (956) 631-1024

PAGE 172

172
1  particular correspondence or not?
2      A.   We probably talked, but I never sent him a pro
3  forma.  I never sent instructions to his bank and I
4  never sold him a barge load of corn.
5      Q.   You never gave him a letter of credit?
6      A.   No.
7      Q.   And I guess the reason you never gave him a
8  letter of credit the guy wouldn't even pay his bill at
9  the Port Elevator, correct?
10      A.   He hadn't paid what he owed and he still had
11  product in the house and my primary goal was for him to
12  get his merchandise out as fast as possible.
13      Q.   Let's look at Exhibit No. 82.  Exhibit 2, page
14  eighty-two.  It's from Loren Walter to yourself.
15  Correspondence is dated November 21, 1996.  Do you
16  recognize Mr. Walter's signature?
17      A.   Yes.
18      Q.   Here he's asking not to release any corn until
19  AGI pays CSC, correct?
20      A.   No.  It just says, please do not release any
21  corn to AGI until you receive notice from CSC.
22      Q.   And again, the purpose of this particular
23  document or what's your understanding of the purpose of
24  this particular document?
25      A.   CSC has control over the product and that he
ACTION REPORTING  (956) 631-1024

PAGE 173

173
1  does not want to release any additional product to AGI
2  until further notice.
3      Q.   Is it your understanding CSC always had control
4  over the product?
5      A.   Until December of '96, yes.
6      Q.   And that would be December 31, 1996?
7      A.   December 19 --
8      Q.   Or December 19?
9      A.   When he took his twenty-eight thousand two
10  hundred eighty-eight bushels out that he released that
11  was --
12      Q.   That was --
13      A.   That covered him up.
14      Q.   So that was that December 19, 1996
15  correspondence that we've already talked about where he
16  wanted the warehouse receipt for those --
17      A.   Correct.
18      Q.   -- twenty-eight thousand bushels and he was
19  also paying you approximately thirty-five hundred bucks;
20  is that right?
21      A.   Yes.
22      Q.   I guess that's number forty, page forty,
23  Exhibit No. 2?
24      A.   Thirty-nine and forty, yes.
25      Q.   All right.  And so it was on December 19, 1996
ACTION REPORTING  (956) 631-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

--- SHEET 45 PAGE 174 ---

174

1  that you felt like control was in the hands of Mr.
2  Gutierrez?
3  A.  Control was now in the hands of Walter
4  Puffelis.
5  Q.  When did control pass to Mr. Gutierrez then?
6  A.  When -- according to Exhibit 3 that once AGI
7  had the corn Gutierrez could send instructions to load
8  it out.
9  Q.  It's your understanding that AGI had the corn
10 or control of the corn as of December 19, 1996?
11 A.  Yes.  At that point in time CSC did not care
12 what AGI did with the corn.
13 Q.  And we look at page eighty-three, Exhibit No.
14 2.  This is correspondence from Mr. Gutierrez regarding
15 ten truckloads?
16 A.  Yes.
17 Q.  The correspondence is dated November 5, 1996
18 and this is ten truckloads of what?
19 A.  Of whole corn.
20 Q.  Again, you recognize Mr. Gutierrez's signature
21 on page eighty-three?
22 A.  Yes.
23 Q.  This is in the style that Mr. Gutierrez
24 normally writes, correct?
25 A.  Correct.
ACTION REPORTING  (956) 631-1024

--- PAGE 175 ---

175

1  Q.  And Exhibit 2, page eighty-four.  Again, this
2  is correspondence from Mr. -- by the way, this is
3  correspondence from Mr. Gutierrez dated December 16,
4  1996?
5  A.  Yes.
6  Q.  What is the purpose of this particular
7  correspondence?
8  A.  He's turning loose two truckloads of corn.
9  Q.  Again, you recognize Mr. Gutierrez's signature?
10 A.  Excuse me.  Four truckloads of corn.
11 Q.  Okay.  And you recognize Mr. Gutierrez's
12 signature on this document?
13 A.  His signature and because it came in a
14 different style I also called him.
15 Q.  And you confirmed that yes, this was his --
16 A.  That he did send this, yes.
17 Q.  And does it say who the corn is being released
18 to?
19 A.  Two trucks, Transportes Cercados -- no.  Just
20 two trucks from Transportes Cercados and two trucks from
21 Transportes Serralvo.
22 Q.  And that's some type of shipping company in
23 Mexico?
24 A.  Yes.
25 Q.  Do you know where they're located?
ACTION REPORTING  (956) 631-1024

--- PAGE 176 ---

176

1  A.  No.
2  Q.  Page eighty-five --
3  A.  Okay.
4  Q.  -- Exhibit No. 2.  What's your understanding
5  concerning this particular document?
6  A.  It is a letter from Ivonne Soto asking that I
7  provide all the information related to a product that is
8  in my warehouse to Elfego Rosales and C.P. Humberto Del
9  Valle and with the purpose being to account for the
10 supporting documentation of movements incurred of the
11 mentioned product and that she's asked for a sample, a
12 two pound sample for an analysis and she signed it and
13 at the bottom it says a copy is to Bersain Gutierrez.
14 Q.  Is this the first correspondence that you
15 received from Ms. Vega, this correspondence dated
16 September 18, 1997?
17 A.  Correspondence is dated 18 September.  I
18 believe so and if I'm not lost I think this is when I
19 called her.
20 Q.  And were you able to talk to her when you
21 called her?
22 A.  I don't know.  I mean, I don't recall if I
23 spoke with her or with her office, but seeing as how I
24 had no idea who GTP was and that GTP had no product
25 stored in my facility I had no information to give her.
ACTION REPORTING  (956) 631-1024

--- PAGE 177 ---

177

1  Q.  So your answer is you don't know if you talked
2  to her or not then?
3  A.  I don't know if I talked with her or not, no.
4  Q.  So you didn't -- certainly didn't comply with
5  her request requiring releasing information to her
6  attorney and to her CPA, correct?
7  A.  She did not -- there is nothing in here that
8  says anybody is an attorney.  Licensio basically means
9  you've got a college degree.
10 Q.  So you didn't release any information to either
11 Mr. Rosales or to Mr. Del Valle?
12 A.  Correct.
13 Q.  Additionally, you didn't release two pounds for
14 analysis, correct?
15 A.  She -- GTP has no product in my house at that
16 time, prior to that or since then to my knowledge.
17 Q.  Well, but you see the signature at the bottom
18 it says Ms. Vega, so you're aware that Ms. Vega is
19 claiming that she did have product in your storage
20 facility?
21 A.  As of September 18th I don't believe she had.
22 I don't think Ms. Vega appeared at my office until late
23 September or early October.
24 Q.  Is this the only correspondence you believe you
25 received from Ms. Vega?
ACTION REPORTING  (956) 631-1024

*Action Reporting*
(956) 631-1024 / 1-800-884-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

SHEET 46  PAGE 178

178

1  A.  Either from her or from her through Mr. Vega.
2  Q.  Look at the next page.  This would be page
3  eighty-six, Exhibit No. 2.
4  A.  Uh-huh.
5  Q.  Okay.  This is correspondence dated September
6  19, 1997 from Mr. Gutierrez to yourself, correct?
7  A.  Correct.
8  Q.  You recognize Mr. Gutierrez's signature?
9  A.  Correct.
10  Q.  Do you recognize the style of the document as
11  being from Mr. Gutierrez?
12  A.  Yes.
13  Q.  It appears you received it by fax on September
14  19, 1997; is that correct?
15  A.  Correct.
16  Q.  And what is your understanding of the purpose
17  of this document?
18  A.  That I had squeezed on Gutierrez enough where
19  he had gone and squeezed on Puffelis and Puffelis had
20  coughed up the money that he owed me.
21  Q.  Okay.  And the check appears on page
22  eighty-seven, Exhibit No. 2; is that right?
23  A.  Correct.
24  Q.  And this is from Mr. Puffelis?
25  A.  Remitter, Star Flower Products, Inc.  The fax
ACTION REPORTING  (956) 631-1024

PAGE 179

179

1  that came with it said this is from -- Bersain is
2  telling me that it came from Puffelis, yes.
3  Q.  Do you recognize Puffelis's signature on this
4  particular check?
5  A.  This is a cashier's check.  There's no Puffelis
6  signature.
7  Q.  Do you know whose signature is on that
8  particular check?
9  A.  On this check?  I'm assuming it's an authorized
10  official from First International Bank in Chula Vista,
11  California.
12  Q.  Do you know who Star Flower Products, Inc. is?
13  A.  Do not know.
14  Q.  Would this be the balance of the storage fee
15  that Mr. Puffelis owed?
16  A.  This would be the balance of the unloading
17  charges for Mr. Puffelis, yes, possibly plus some Fed Ex
18  fees or something else that we did for him, less the
19  amount paid by CSC for his account, yes.
20  Q.  Additionally, in these documents I don't see
21  anything that reflects any statement that was owed by
22  AGI or Mr. Puffelis; is that correct?
23  A.  Correct.
24  Q.  You would also have a statement at the Port
25  Elevator concerning what was owed by Mr. Puffelis,
ACTION REPORTING  (956) 631-1024

PAGE 180

180

1  correct and AGI?
2  A.  In '96 we would have, yes.  In '97 we would
3  have, yes.  Whether I still have it or not I don't know.
4  Q.  You don't know?
5  A.  If -- if I had it I would have provided it.
6  Q.  Let me show you the next page, page
7  eighty-eight.  This is correspondence dated September
8  24, 1997 from Mr. Gutierrez to yourself?
9  A.  Correct.
10  Q.  Mr. Gutierrez's signature appears on this
11  document, page eighty-eight?
12  A.  Correct.
13  Q.  And what is your understanding of this
14  particular document?
15  A.  Basically saying that -- dated the 24th,
16  yesterday you communicated with me by telephone and I
17  asked about the balance of what I had with you and you
18  told me there was seventy-one thousand bushels and
19  according to my information there's eighteen hundred and
20  twenty-one tons more and that seven hundred and twenty
21  tons that was deposited -- that he's showing that there
22  was a deposit where he does not owe anything for this
23  money and that he has sent me the information on this,
24  how it was paid and it was paid immediately by a letter
25  of credit to Mr. Loren, the same which was collected on
ACTION REPORTING  (956) 631-1024

PAGE 181

181

1  and that was transmitted by the bank, San Diego National
2  Bank in the month of October and it was collected on
3  during the month of November and that was with which I
4  freed the merchandise that arrived in my name because I
5  had already paid for it to Walter and -- he's bitching
6  about the twenty-eight thousand two hundred and
7  eighty-eight bushels that CSC pulled out of his account
8  back in December of '96.
9  Q.  And that's really the substance of the letter?
10  A.  Yeah, that how he -- he's trying to explain how
11  he paid for it and this, that, the other and it's not my
12  fault.
13  Q.  Did you respond to his particular
14  correspondence here about the twenty-eight thousand
15  bushels?
16  A.  Yeah.  I told him that was between him and
17  Puffelis.
18  Q.  And so this was during a conversation on the
19  telephone?
20  A.  Most likely, yes.
21  Q.  So you don't believe you would have written him
22  back, correct?
23  A.  Well, in December of '96 they were all advised
24  by fax what had happened and by phone that CSC had
25  pulled product out and said that this was theirs and
ACTION REPORTING  (956) 631-1024

*Action Reporting*
(956) 631-1024 / 1-800-884-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

SHEET 49  PAGE 190

190

1  opportunity to give you this particular document,
2  correct?
3      A.  They had ample opportunity to give me anything
4  and everything they wanted to have given me.
5      Q.  And they also had ample opportunity to tell you
6  that Ms. Vega was the real owner of the corn if they so
7  chose to tell you that?
8      A.  Correct.
9          (Exhibit No. 6 marked)
10     Q.  (BY MR. MOUNT) Let me ask you if you've ever
11  seen Exhibit No. 6 before which appears to be an invoice
12  dated November 12, 1996, invoice number two from AGI
13  concerning corn allegedly sold to Ms. Vega.  Have you
14  ever seen Exhibit No. 6 before?
15     A.  I believe Attorney Vega presented a copy of
16  this to us earlier.
17     Q.  And again, this would be after their --
18     A.  September of '97.
19     Q.  September of --
20     A.  September, October, November of '97.
21     Q.  All right.  And again, this document reflects
22  that a certain amount of corn was sold from AGI to Ms.
23  Vega and then it was supposed to be delivered to Ms.
24  Vega in Brownsville, correct?
25     A.  Correct.  That's what the document reflects.
           ACTION REPORTING  (956) 631-1024

PAGE 191

191

1      Q.  And then the document also mentions at the
2  bottom, lower left-hand corner to Ms. Vega and Mr.
3  Gutierrez need to be notified, correct?
4      A.  Correct.
5      Q.  Again, you never saw this document on or about
6  November 12, 1996; is that correct?
7      A.  That is correct.
8      Q.  And you do recognize, though, Mr. Gutierrez's
9  signature on this document where it says received by Mr.
10  Gutierrez?
11     A.  It looks like his, yes.
12     Q.  All right.  And appears to be a date of
13  November 13, 1996 there; is that correct?
14     A.  Yes, but it's got something between November
15  13th and 1996 and I don't know what it is.  It could be
16  they --
17     Q.  I'm not sure if it's November 3, 1996 or
18  November 13 -- well --
19     A.  I think it's November 13th, DE 1996.
20     Q.  All right.  Let's go off the record for a
21  second.
22          (Recess, 6:03-6:11)
23          (Exhibit No. 7 marked)
24     Q.  (BY MR. MOUNT) Concerning Exhibit No. 6, are
25  you aware one way or the other whether your secretary
           ACTION REPORTING  (956) 631-1024

PAGE 192

192

1  may have notarized this particular document or not?
2      A.  No.  There was no one -- no one was in town at
3  that time from either AGI or Sysco De Baja when this
4  came in.
5      Q.  Okay.  Also it's your testimony that Mr.
6  Gutierrez, Mr. Puffelis and Mr. Walter did not send you
7  a copy of this particular document, correct?
8      A.  Correct.
9      Q.  Additionally, this particular document says
10  that when the material -- when the corn comes in to
11  notify Ms. Vega and Mr. Gutierrez.  It's your testimony
12  that Ms. Vega was not notified of this particular
13  shipment, correct?
14     A.  It's my testimony that I did not see either of
15  these documents until roughly one year had transpired
16  from the unloading of the corn, so I had no knowledge of
17  a Ms. Vega to notify.
18     Q.  So the answer would be no, Ms. Vega was not
19  notified, correct?
20     A.  Correct.  Ms. Vega was not notified, nor was
21  Mr. Gutierrez notified.
22     Q.  Additionally, Exhibit No. 5, Ms. Gutierrez was
23  not notified either concerning Exhibit No. 5 of the
24  October 25, 1996 shipment; is that correct?
25     A.  Correct.
           ACTION REPORTING  (956) 631-1024

PAGE 193

193

1      Q.  Have you ever seen Exhibit No. 7 before?
2      A.  Not to my recollection unless it's in part of
3  the documents that Attorney Vega provided to us in
4  September, October, November of '97.
5      Q.  Exhibit No. 7 references corn sold from AGI to
6  Ms. Vega, six hundred and eighty-eight metric tons,
7  correct?
8      A.  Correct.
9      Q.  And it also mentions that Ms. Vega should be
10  notified after the shipment is completed; is that
11  correct?
12     A.  Correct.  Can I point out one thing on this?
13     Q.  I'm asking the questions.  Your attorney can
14  ask you questions.
15     A.  Okay.
16     Q.  Okay.  On each of these three documents, 5
17  through 7, it looks like the sales price per ton was a
18  hundred and seventy dollars per ton; is that correct?
19     A.  That's what the paper indicates, yes.
20     Q.  Do you recall one way or the other whether that
21  was the going rate for corn back in November 1996?
22     A.  No, I do not.
23     Q.  So you don't have any idea what the going rate
24  for corn was back in that particular time period?
25     A.  I don't know the terms or conditions under
           ACTION REPORTING  (956) 631-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

SHEET 47   PAGE 182

**182**

1  that Puffelis, you know -- Puffelis and Walters were in
2  contact and Gutierrez was aware of it.
3      Q.   So it appears in this document that he wants to
4  talk to you about twenty-five hundred tons and whether
5  he gets reimbursed for it or not?  What is he mentioning
6  regarding the twenty-five hundred tons?
7      A.   He's saying that -- he that contracted your
8  storage and elevator was I, not Loren's, not Walter and
9  please -- suplico is kind of like begging, but politely
10  ask that you reintegrate that I deliver back to him this
11  merchandise because I have sold this twenty-five hundred
12  tons and I have to deliver them immediately.
13      Q.   So he's basically saying he's already sold
14  these twenty-five hundred dollars -- twenty-five hundred
15  tons to someone else and he wants them back?
16      A.   Yeah.  He's going back and trying to say that
17  eighteen hundred and twenty-one tons plus whatever is
18  missing adds up to his twenty-five hundred and he's got
19  that sold and so he needs that product back.
20      Q.   And so you think you would have responded to
21  him by telephone call referring him back to the
22  twenty-eight thousand bushels?
23      A.   I would have referred back to him saying, talk
24  to Puffelis about the incident, that corn is receipted
25  to CSC and nobody can touch it except whoever has the
ACTION REPORTING  (956) 631-1024

PAGE 183

**183**

1  warehouse receipt.
2      Q.   Let's go on to the next one, page eighty-nine
3  of Exhibit No. 2.  Have we covered this one, November 3,
4  1997?  We've covered this one I believe.
5      A.   If it's not this one we covered one very
6  similar.
7      Q.   Okay.  Let's skip that one and go to ninety,
8  okay?  January 27, 1998.  Do you recognize Mr.
9  Gutierrez's signature on this document?
10      A.   And the style, yes.
11      Q.   And the style, yes, okay.  And basically what's
12  your understanding concerning this particular document?
13      A.   That I send a sample of corn to --
14      Q.   Mr. Campos?
15      A.   -- Pablo Campos in Monterrey at that address.
16      Q.   Did you do so?
17      A.   I believe so, yes.
18      Q.   And you did that on Mr. Gutierrez's
19  instruction, correct?
20      A.   As per his request.
21      Q.   All right.
22          (Exhibit No. 5 marked)
23      Q.   (BY MR. MOUNT) Have you ever seen Exhibit No. 5
24  before?
25      A.   I would say yes.  Mr. Vega presented it to me
ACTION REPORTING  (956) 631-1024

PAGE 184

**184**

1  sometime in November of '97 or September of '97.
2      Q.   So you're saying the first time you ever saw
3  this document was after Mr. Vega presented it to you?
4      A.   Correct.
5      Q.   On this particular document, do you see Mr.
6  Gutierrez's signature on that document?
7      A.   Yes.
8      Q.   And also do you recognize Mr. Puffelis's
9  signature on that document?
10      A.   I see where Walter Puffelis, III has written
11  his name, yes.
12      Q.   All right.  But you're not able to identify
13  whether that's his signature or not?
14      A.   I was not present when this document was
15  signed, no.
16      Q.   All right.  But you do recognize Mr.
17  Gutierrez's signature?
18      A.   Correct.
19      Q.   All right.  Do you know who Maria Gonzalez is?
20      A.   Yes.  She's my secretary.
21      Q.   And you recognize her signature on this
22  particular document?
23      A.   Correct.
24      Q.   This document appears to show that the corn was
25  sold from -- was sold by AGI to Ms. Vega; is that
ACTION REPORTING  (956) 631-1024

PAGE 185

**185**

1  correct, with instruction to ship it to Ms. Vega in
2  Brownsville?
3      A.   From AGI sold to, shipped to, yes.
4      Q.   So it would appear from this document that Ms.
5  Vega owned some corn that she was wanting to ship to
6  your company in Brownsville; is that correct?
7      A.   Apparently so, yes.
8      Q.   And that's a document dated October 25, 1996;
9  is that correct?
10      A.   Correct.
11      Q.   And what type of document is this?
12      A.   Apparently one looks like AGI -- an invoice
13  dated number one from AGI.
14      Q.   So it looks like a sales receipt or an invoice;
15  is that correct?
16      A.   Looks like an invoice, yes.
17      Q.   And it's your understanding that Mr. Puffelis
18  was with AGI; is that correct?
19      A.   Correct.
20      Q.   Maria Gonzalez was an employee in your office
21  on October 30, 1996?
22      A.   Yes, she is.
23      Q.   Do you have any explanation why you didn't ever
24  see this document until Mr. Vega provided it to you --
25      A.   Most likely --
ACTION REPORTING  (956) 631-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

SHEET 48   PAGE 186

186

1    Q.   -- back in 1997?
2    A.   Sure.  Mostly likely because this is a document
3    that when the train arrived Loren Walters, Walter
4    Puffelis and Mr. Gutierrez asked if there was a notary
5    in my office that could notarize some documents
6    pertaining to the sale of commodities and I said, Maria
7    is a notary and they said, can she notarize some
8    documents for us and I said, yes and the three of them
9    got with her and presented some documents and she
10   notarized signatures.
11   Q.   According to this particular document it
12   doesn't show anywhere on this particular document where
13   Mr. Gutierrez was ever an owner of the corn that was
14   shipped; is that correct?
15   A.   All it says is this corn was received by Mr.
16   Bersain Gutierrez or Mrs. Ivonne Soto Vega and the work
17   that Ms. Gonzalez did was this notarization is to
18   authenticate that the above signature is that of Mr.
19   Bersain Gutierrez.  That's all Ms. Gonzalez did..
20   Q.   So it's your testimony then that your secretary
21   never provided you with a copy of this particular
22   document?
23   A.   She would have no reason to keep a copy of the
24   document if all she is doing is notarizing a document
25   for someone as a notary public.  That is not -- it has
          ACTION REPORTING  (956) 631-1024

PAGE 187

187

1    nothing to do with my operation.  This was something
2    that was asked of her by the three owners of the corn.
3    Q.   Doesn't this document reflect possibly who owns
4    the particular corn that was coming into your facility?
5    Isn't that something that you would want to know as the
6    manager of the facility?
7    A.   The three individuals who were at my facility,
8    all three claimed the same thing, that CSC had sold corn
9    to AGI, that Mr. Loren Walters on behalf of CSC said,
10   yes, Mr. Walter Puffelis is my customer, is my client.
11   Mr. Walter Puffelis said, yes, Bersain Gutierrez is my
12   customer, is my client and I sold this corn to him.  Any
13   arrangement that exists between Ms. Ivonne Soto Vega and
14   Bersain Gutierrez I don't know.  She could have sold the
15   corn to him immediately.  The document prepared by AGI
16   has a space for Bersain Gutierrez's signature as the
17   lead signature, not Ms. Vega's signature, so I would
18   have no idea if it was just a pass-through type deal,
19   but when the originator of the product presents me with
20   a customer and then that individual presents me with his
21   customer and then we enter into an agreement I mean, I
22   don't know.  What else is there for me to do except for
23   believe the people who were there saying this is what we
24   are, this is what we have.
25   Q.   Don't you believe it's important, though, to
          ACTION REPORTING  (956) 631-1024

PAGE 188

188

1    see the underlying documentation concerning ownership,
2    concerning property that comes into your facility?
3    A.   Ownership in grain is you have it today you
4    could have had it sold thirteen times and I don't know
5    that.  I act on the instructions given to me by my
6    customers and my customers in this case was CSC to AGI
7    to Sysco De Baja, Bersain Gutierrez.
8    Q.   So I guess what you're saying is underlying
9    documentation in the grain business or corn business
10   isn't necessarily important?
11            MR. SKAGGS:  That's not what he said.
12   I'll object to that question as argumentative and
13   misleading.
14            MR. MOUNT:  He can go ahead and --
15            MR. SKAGGS:  He can answer it if he can,
16   but --
17   Q.   (BY MR. MOUNT) Go ahead.
18   A.   Underlying documentation is I have three people
19   in a room.  All three people are the players on the
20   trade.  The conversations that are going on are Mr.
21   Gutierrez wants his corn, it is his corn.  Mr. Puffelis
22   is saying yes, it's your corn.  Mr. Gutierrez wants to
23   load his corn out immediately.  Mr. Walters is saying,
24   no, no, wait a minute, I haven't been paid.  Until CSC
25   gets paid I'm not going to release any corn to you, AGI,
          ACTION REPORTING  (956) 631-1024

PAGE 189

189

1    so therefore AGI -- I don't care what you do.  You can
2    do whatever you want, but my instructions to the
3    elevator are not to load anything out until CSC is paid.
4    Now, if AGI who was represented physically in person by
5    Walter Puffelis is telling me, this man here, Mr.
6    Gutierrez, is the guy I've got this corn sold to and
7    then signs a document saying yes, this is the man I've
8    got it sold to and this is the man who is going to give
9    you instructions on how to ship it out.  To me the
10   underlying document is this, Exhibit 3.
11   Q.   So basically you just took those men's word
12   for -- those two gentlemen's word for it concerning
13   ownership of the corn and instructions, correct and that
14   would be Mr. Puffelis and Mr. Loren and also -- I'm
15   sorry, the third man, Mr. Gutierrez also about what was
16   happening?
17   A.   Correct.
18   Q.   All right.
19   A.   I had no reason to disbelieve them.
20   Q.   Neither Mr. Puffelis, Mr. Gutierrez or Mr.
21   Loren Walter ever gave you Exhibit No. 5?
22   A.   Correct.
23   Q.   And I believe it's probably going to be your
24   testimony that you were there meeting with them on or
25   about October 31, 1996 and they obviously had the
          ACTION REPORTING  (956) 631-1024

*Action Reporting*
(956) 631-1024 / 1-800-884-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

— SHEET 50   PAGE 194 —

**194**

1  which the sale was made.  I do not know when the corn
2  was bought, when the corn was priced or anything of that
3  nature, so no.
4  Q.  When the corn came into your facility, did you
5  place a market value on it?  When the fifty-four rail
6  cars came in on three different --
7  A.  No.
8  Q.  -- occasions, did you place a value on the
9  corn?
10  A.  I had no reason to.
11  Q.  Wouldn't you have a reason, though, for
12  insurance purposes to place a value on the corn in case
13  we have a hurricane or some kind of natural disaster
14  that destroys what's in your elevator?
15  A.  The insurance companies would set a market
16  value on product in my facility at the time of a
17  disaster.
18  Q.  So you don't -- when you have a shipment coming
19  into your facility you don't place a market value on
20  that particular commodity?
21  A.  No.
22  Q.  Do you grade the particular commodity that
23  comes into your facility?
24  A.  He personally, no.
25  Q.  Is grading done, though, when it comes into
          ACTION REPORTING  (956) 631-1024

— PAGE 195 —

**195**

1  your facility?
2  A.  Grading is done when it comes into our facility
3  as per the tariff.  Corpus Christi Grain Exchange is who
4  I designate as a local company qualified to perform
5  grading.  AGI chose to go with SGS which I think is
6  referred back to one of the earlier exhibits, No. 37,
7  Exhibit 2, page thirty-seven.
8  Q.  So it is a facility requirement that grading be
9  done for each commodity that comes into your facility?
10  A.  Correct.
11  Q.  And why is it that grading be done?  What's the
12  purpose of grading?
13  A.  The purpose of the grading is so I will know what's
14  coming into my facility if I'm going to store something
15  commingled and I'm going to put a whole bunch of apples
16  together I need to make sure that they're all the same
17  kind of apple so to speak.
18  Q.  What about in this particular case where you're
19  going to segregate this particular -- these particular
20  shipments of corn, what is the purpose of having a
21  grading done if they're going to be put in their own
22  special area?
23  A.  Other than to eliminate any problems that we
24  might have what I want to look for on grading is
25  insects.
          ACTION REPORTING  (956) 631-1024

— PAGE 196 —

**196**

1  Q.  So that would be your chief concern then would
2  be insects on a segregated --
3  A.  Well, if it's coming in I'm going to store it
4  identity preserved then my only concern is whether it
5  comes in infested or not whether I would be needing to
6  fumigate it so as not to have an insect problem.
7  Q.  On Exhibit Nos. 5 through 7, do these invoices
8  roughly reflect what was brought into your facility?
9  A.  No.
10  Q.  And when you say no, can you explain?
11  A.  There is no such thing as grado B, para consumo
12  humano.
13  Q.  And that appears on Exhibits 5 through 7, each
14  of these documents?
15  A.  Correct.
16  Q.  So you say there's no such thing as that,
17  correct?
18  A.  That is correct.
19  Q.  Does that have any meaning to you one way or
20  the other?
21  A.  Number two corn has certain grade
22  characteristics.  Number two is the grade.  There is no
23  sub grade B on corn.
24  Q.  Was grade two the type of grade given to the
25  corn that came into your facility?
          ACTION REPORTING  (956) 631-1024

— PAGE 197 —

**197**

1  A.  The corn that came into my facility was the
2  most part U.S. number three or better.
3  Q.  As far as the quantity that came into your
4  facility in the fifty-four rail cars, does this match
5  the quantity that came in when we look at the invoices,
6  5 through 7?
7  A.  Roughly.  It's a little under five thousand
8  tons.
9  Q.  And that's roughly what came into your
10  facility, correct?
11  A.  Correct.
12  Q.  And on each of these three documents that
13  mentions the salesman is Walter Puffelis, WP?
14  A.  Mr. Walter Puffelis, III.
15  Q.  Under terms where it says price basis CIF
16  Brownsville, Texas, what does that mean?
17  A.  How they use it in this instance I do not know.
18  CIF stands for cost insurance and freight and that is
19  usually associated with a water shipment and not a rail
20  shipment.
21  Q.  If you did have a catastrophe at the facility,
22  let's say some of the commodities and they were
23  destroyed, what documents would you keep in order to
24  show to the insurance company what was there and in
25  order to present your claim to the insurance company?
          ACTION REPORTING  (956) 631-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

SHEET 51   PAGE 198

198

1    A.   Texas warehouse laws require that you maintain
2    something called a daily position record and the daily
3    position record would reflect the quantity of product on
4    hand on a daily basis and that is what the insurance
5    company would ask to see.
6    Q.   The daily position record, would it also
7    reflect ownership interest in the commodity, that is,
8    who owned each particular --
9    A.   Daily position record only reflects quantity of
10   a particular commodity in the house.
11           (Exhibit No. 8 marked)
12   Q.   (BY MR. MOUNT) Let me ask you whether you
13   received a copy of this particular document, Exhibit No.
14   8? Appears to be correspondence dated October 24, 1997
15   from Mr. Vega to yourself?
16   A.   I believe he did send this to me, yes, except
17   for -- yes.
18   Q.   Did you receive this by facsimile on or about
19   October 24, 1997, this particular exhibit?
20   A.   I don't recall if I received it by facsimile
21   first and then by mail or by mail and then by facsimile.
22   Q.   But in any event you got it on or about October
23   24 of 1997?
24   A.   In that time frame, yes.
25   Q.   At that particular point in time, why were you

ACTION REPORTING   (956) 631-1024

PAGE 199

199

1    unwilling to release the remaining corn to Ms. Vega?
2    A.   If I'm not mistaken at this point in time I had
3    already handed everything over to my legal counsel and
4    said, there's a dispute going on and how do I handle
5    this.
6    Q.   Do you recall when it was you specifically
7    handed over the dispute to your counsel?
8    A.   I will have to ask him.
9    Q.   But it's your testimony you believe it was
10   prior to this correspondence?
11   A.   I believe so, yes.
12   Q.   Let me ask you if you received a copy of this
13   correspondence which I'm going to mark as Exhibit No. 9.
14           (Exhibit No. 9 marked)
15   A.   (BY MR. MOUNT) It appears to be correspondence
16   dated October 29, 1997 from Mr. Vega, Guillermo Vega,
17   Jr. to yourself. Appears to be about six pages total.
18   Have you seen this particular document before?
19   A.   Yes.
20   Q.   You received this document on or about October
21   29, 1997?
22   A.   Or shortly thereafter, yes.
23   Q.   Again, after you received this particular
24   document you didn't release the corn to Ms. Vega,
25   correct?

ACTION REPORTING   (956) 631-1024

PAGE 200

200

1    A.   Correct.
2    Q.   Did you have any reason to dispute that these
3    particular documents were what they said they were, that
4    is, Mr. Vega's enclosures here?
5    A.   At the same time I have the prior experience of
6    being unable to collect money that was due to me from
7    Mr. Puffelis, his refusal to take my phone calls, his
8    refusal to return phone calls. I don't put a whole lot
9    of faith in Mr. Puffelis. The -- all of this material
10   was turned over to my attorney so as to avoid exactly
11   what we're going through today because I had Bersain
12   Gutierrez still telling me that it was his corn.
13   Q.   If you look -- well, what does this particular
14   document say, the one right after Mr. Vega's letter
15   that's under the AGI heading and appears to be signed by
16   Mr. Puffelis?
17   A.   It says, to who it may concern, by means of
18   this we ratify that the Senora Ivonne Soto has bought on
19   the dates 25th of October, 12th of November 1996.
20   Amparo the invoices one and two, yellow corn number two
21   for human consumption coming to a total of four thousand
22   two hundred and thirty-six ton metrics with the
23   following specifications and these purchases were
24   bought by a letter of credit by -- issued by Banoro and
25   Norwest Bank in El Paso, Texas and that he extends the

ACTION REPORTING   (956) 631-1024

PAGE 201

201

1    petition to the interested parties as it be -- as is
2    convenient.
3    Q.   Do you recognize Mr. Puffelis's signature on
4    this document?
5    A.   Yes.  It is somewhat different than his
6    signature on the invoices, but it is similar to the
7    signature that with which he signed the agreement with
8    me.
9    Q.   So you don't have any reason to dispute that
10   this is not Mr. Puffelis's signature; is that correct?
11   A.   I have no reason to dispute that it is not his
12   signature.
13   Q.   So it appears from this particular document
14   he's saying that the corn, that basically the fifty-four
15   rail cars that were shipped in were Ms. Vega's or Ms.
16   Vega's property?
17   A.   Well, no.  He's saying that invoices 001 and
18   002 are contracts that he entered -- were invoices that
19   he sent to her that she paid for out of a letter of
20   credit through Banoro and Norwest Bank.
21   Q.   It's your understanding those are Exhibits 5
22   and 6 that we just looked at earlier, correct?
23   A.   5 and 6.
24   Q.   And those particular -- on those particular
25   documents the total quantity adds up to four thousand

ACTION REPORTING   (956) 631-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

SHEET 52   PAGE 202 ————
202

1  two hundred and thirty-six tons?
2      A.  I'll take your word for it.
3      Q.  All right.  So at this particular point in time
4  I believe you attempted to call Mr. Puffelis.  Is that
5  your testimony?
6      A.  No.  At this particular time I turned the
7  product over to -- again, all of this was turned over to
8  my legal counsel.  I communicated with Mr. Gutierrez
9  telling him that he had a problem, that there was
10 disputed ownership and to please prove up his ownership.
11     Q.  Did you convey this to Mr. Gutierrez in writing
12 or on the telephone?  How did you communicate it to him?
13     A.  I think both by fax and by telephone and
14 possibly through attorney letters.
15     Q.  Do you have any reason to dispute what it says
16 in this particular document what Mr. Puffelis states
17 that Ms. Vega did, in fact, get a letter of credit from
18 Norwest Bank in order to pay for the corn?
19     A.  I had no reason to -- no reason to believe, nor
20 any reason to not believe.
21     Q.  All right.  So you don't really -- concerning
22 the fifty-four rail cars that came into your facility
23 you don't really know how those -- how that particular
24 transaction concerning the corn was financed, correct?
25     A.  Correct.
ACTION REPORTING  (956) 631-1024

PAGE 203 ————
203

1      Q.  So you don't know if it was faxed by Norwest or
2  by some other entity?
3      A.  Correct.
4      Q.  And again, you don't know who paid for those
5  fifty-four rail cars of corn, correct?
6      A.  Correct.
7      Q.  Did Walter Loren, Mr. Lorens, did he ever
8  communicate to you that the corn was paid, the
9  fifty-four rail cars of corn, they were paid by letter
10 of credit?
11     A.  It is -- on the day they arrived that was the
12 big heated discussion that was going on about the letter
13 of credit, whether the documents that they were signing
14 at the time complied with the terms of the letter of
15 credit, didn't comply with the terms of the letter of
16 credit or that Loren Walters had to leave to take the
17 documents back to present them to a bank for collection.
18     Q.  So you never saw the letter of credit?
19     A.  I never saw a letter of credit.
20     Q.  And Mr. Lorens really didn't mention too much
21 about the letter of credit in front of you other than
22 the fact that they were trying to ascertain whether the
23 letter of credit had been complied with?
24     A.  The issue of payment for the corn, the letter
25 of credit, cashier's check, whatever was never discussed
ACTION REPORTING  (956) 631-1024

PAGE 204 ————
204

1  with me.  Peripherally that was the conversations that
2  were taking place between the three of them and the
3  reason why they wanted Maria Gonzalez to notarize
4  Bersain's signature on some documents.
5          (Exhibit No. 10 marked)
6      Q.  (BY MR. MOUNT) Let me ask you if you've ever
7  seen Exhibit No. 10 before which appears to be
8  correspondence dated November 3, 1997 from Guillermo
9  Vega, Jr. to Mr. Elkins, yourself?
10     A.  Yes.  I believe it was presented by Mr. Vega to
11 us roughly in this time frame.
12     Q.  And that would be about November 3, 1997,
13 correct?
14     A.  Uh-huh.
15     Q.  It appears according to what Mr. Vega is
16 conveying to you is that Ms. Vega has a buyer for the
17 corn, Mr. Villarreal; is that correct?
18     A.  Correct.
19     Q.  And attached is a copy of the sales contract
20 between Ms. Vega and Mr. Villarreal; is that correct?
21     A.  Correct.
22     Q.  For roughly five thousand metric tons of corn?
23     A.  Correct.
24     Q.  Concerning -- and it also -- there's an
25 affidavit of ownership attached where Ms. Vega states
ACTION REPORTING  (956) 631-1024

PAGE 205 ————
205

1  that she owns the corn and she's agreeing to sell it to
2  Mr. Villarreal?
3      A.  Correct.
4      Q.  At this particular point in time you didn't
5  release the corn or any corn to Mr. Villarreal, correct?
6      A.  Correct.
7      Q.  Why did you not release any corn at that time
8  to Ms. Vega?
9      A.  Again, it was a disputed ownership.  I called
10 counsel and asked counsel what to do.  Counsel said,
11 make them prove ownership.
12     Q.  Well, it appears that Ms. Vega's proved
13 ownership through her affidavit.  Would that not be
14 correct?
15     A.  Not necessarily.
16     Q.  Did Mr. Gutierrez ever provide you with an
17 affidavit?
18     A.  No, he did not.
19     Q.  Did Mr. Villarreal come to your facility and
20 request that the corn be released?
21     A.  Mr. Villarreal came to my facility on various
22 occasions.  He came on one occasion looking, if there
23 was any corn available.  He came on another occasion
24 saying that Bersain Gutierrez had authorized him to pick
25 up some samples.  He came on another occasion saying
ACTION REPORTING  (956) 631-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

— SHEET 53   PAGE 206 ——————

**206**

1  that he was here to look at corn that belonged to
2  Gutierrez and the last time he came he came saying he
3  came to look at corn that belonged to Ms. Vega.
4  Q.   So about how many times did he come by based on
5  your recollection?
6  A.   Half a dozen or more.
7  Q.   So did you respond to Mr. Vega's correspondence
8  dated November 3, 1997?
9  A.   I don't recall whether I did or whether my
10 attorney did.
11 Q.   Well, how much proof was it that you wanted
12 before you would release any more corn?  What was it you
13 were looking at?
14                MR. SKAGGS:  Argumentative.  Don't answer
15 that question.
16 Q.   (BY MR. MOUNT) In order for this particular
17 corn to be released, the corn that was remaining, what
18 was it that you wanted in order to determine whether you
19 were going to release the rest of the corn?
20                MR. SKAGGS:  Same objection, same
21 instruction.
22 Q.   (BY MR. MOUNT) Are you refusing to answer those
23 two previous questions?
24                MR. SKAGGS:  He's not refusing to answer
25 those questions.  He is not refusing to answer.  He's
ACTION REPORTING  (956) 631-1024

PAGE 207 ——————

**207**

1  not going to answer because I've instructed him not to.
2  It's an argumentative question.
3  Q.   (BY MR. MOUNT) You're refusing to answer those
4  questions?
5                MR. SKAGGS:  Don't answer that question.
6  Q.   (BY MR. MOUNT) So after you received this
7  letter dated November 3, 1997, did you release any corn
8  to Mr. Gutierrez, any more corn to Mr. Gutierrez?
9  A.   I don't believe so.  I would have to go back
10 and look at Exhibit, whatever it is, Exhibit 2.  No.
11 The last corn that was released to Mr. Gutierrez was
12 October 3rd, 1997.
13 Q.   So once you started getting letters from Mr.
14 Vega concerning Ms. Vega saying she owned the corn it's
15 your testimony that you just really didn't know what to
16 do at that particular point in time?
17 A.   What I did at that point in time was contact
18 counsel to find out what I should do.
19                (Exhibit No. 11 marked)
20 Q.   (BY MR. MOUNT) Let me ask you about Exhibit No.
21 11.  It appears to be correspondence from yourself to
22 Mr. Gutierrez and I'm getting ready to hand you Exhibit
23 No. 11.  Is this a document that you created?
24 A.   Yes.  It's a letter I sent to him.
25 Q.   Did you create this letter before or after you
ACTION REPORTING  (956) 631-1024

PAGE 208 ——————

**208**

1  had counsel?
2  A.   To the best of my recollection I did this
3  letter after I had counsel.
4  Q.   Is everything written in this particular
5  correspondence true?
6  A.   The last paragraph is roughly a push on him,
7  but everything prior to that is true.  Even the last
8  paragraph is — it says, I have no alternative.
9  Q.   When you say it's a push on him when you're
10 talking about the last paragraph, what do you mean by
11 that?
12 A.   Well, he has told me that he has a letter from
13 his attorney stating that or from Ms. Vega's attorney in
14 Tijuana that he is the true owner of the corn, that he
15 has sent a letter to Mr. Vega telling Mr. Vega to leave
16 me alone and to address the issue strictly with him and
17 what I — my intent of this letter was to get some form
18 of corroborative evidence from his side if he's saying
19 he owns the corn.
20 Q.   Now, this correspondence, Exhibit No. 11,
21 contains your signature on the bottom; is that correct?
22 A.   That's correct.
23 Q.   And it appears that this is a document you
24 created, correct?
25 A.   Yes.  I wrote it.
ACTION REPORTING  (956) 631-1024

PAGE 209 ——————

**209**

1  Q.   And then you also sent a copy of this
2  document -- besides sending a copy to Mr. Gutierrez you
3  also sent a copy to Mr. Vega?
4  A.   Correct.
5  Q.   And you sent a copy to Mr. Vega by facsimile on
6  November 12, 1997; is that correct?
7  A.   That's correct.
8  Q.   Did you also fax a copy of this to Mr.
9  Gutierrez or did you just put it in the mail?
10 A.   I would imagine I faxed it to him and mailed
11 it.
12 Q.   All right.  And if you look at the first
13 paragraph it says that you had requested that Mr.
14 Gutierrez provide you a sworn affidavit?
15 A.   Uh-huh.
16 Q.   Concerning ownership?
17 A.   Uh-huh.
18 Q.   And that Mr. Gutierrez never provided you a
19 sworn affidavit; is that correct?
20 A.   That is correct.
21 Q.   And then also it mentions that Mr. Gutierrez
22 and his attorney would be coming to resolve the
23 ownership dispute.  At least that's what Mr. Gutierrez
24 told you on November 3, 1997, correct?
25 A.   Correct.
ACTION REPORTING  (956) 631-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
## DEPOSITION OF CRAIG ELKINS
12-21-99

SHEET 54   PAGE 210

**210**

1    Q.   And neither Mr. Gutierrez nor his attorney ever
2  came to you to resolve the dispute; is that correct?
3    A.   Correct.
4    Q.   Do you know one way or the other whether Mr.
5  Gutierrez ever met with Ms. Vega in Tijuana on or about
6  November 3, 1997?
7    A.   I do not know.
8    Q.   All right.  Do you know if Mr. -- this is your
9  last sentence in the first paragraph.  Do you know if
10 Mr. Gutierrez ever or his attorney ever communicated to
11 Mr. Vega about ownership?
12   A.   I believe in some of the documents provided to
13 us by Mr. Vega there was a copy of a letter he received
14 from Mr. Gutierrez in it.
15   Q.   All right.  But you don't know if that was
16 before your letter or after your letter of November 12,
17 1997?
18   A.   I do not know.  I don't recall the date.
19   Q.   Why did you not -- if you look at the very last
20 paragraph it says, until you present a notarized sworn
21 affidavit stating that you are the owner of this corn,
22 again, he didn't present the affidavit, you say, I have
23 no alternative, and you capitalize the word no, I have
24 no alternative but to load the corn as per Ms. Vega's
25 instructions.  Why didn't you load the corn per Ms.
ACTION REPORTING  (956) 631-1024

**211**

PAGE 211

1  Vega's instructions?
2    A.   Because my attorneys told me I would be foolish
3  to do so.
4    Q.   So upon advice of counsel you did not load per
5  Ms. Vega's instructions?
6    A.   Per advice of counsel I didn't do anything with
7  the corn for either party.
8        (Exhibit No. 12 marked)
9    Q.   (BY MR. MOUNT) Let me ask you if you received
10 this particular document, Exhibit No. 12.  Appears to be
11 correspondence dated November 28, 1997 from Mr. Vega to
12 yourself.  Have you seen this particular document
13 before?
14   A.   Yes.  I have seen this document before.
15   Q.   So you would agree with me you did receive this
16 DTPA demand correspondence; is that correct?
17   A.   Excuse me?
18   Q.   You did receive this particular correspondence,
19 correct, by certified mail?
20   A.   Correct.
21   Q.   All right.  And you received it close to the
22 time period it was sent, November 28th, 1997; is that
23 correct?
24   A.   I'm assuming, yes.
25       (Exhibit No. 13 marked)
ACTION REPORTING  (956) 631-1024

PAGE 212

**212**

1    Q.   (BY MR. MOUNT) Can you identify Exhibit No. 13?
2  And if so tell me what it is.
3    A.   I believe this is a recap that I did for Mr.
4  Vega sometime in the time frame when Mr. Enrique
5  Villarreal was asking to load out the corn and
6  subsequently sent him a fax saying that we had some
7  mathematical errors in here in the formulas and we're
8  sending him a redefined statement of charges that were
9  pending and due.
10   Q.   So is this the statement that has errors in it?
11   A.   This statement has errors in it.
12   Q.   All right.  And you sent to Mr. Vega another
13 statement; is that correct?
14   A.   That is correct.  I prepared another statement
15 to send him and on advice of counsel did not send it,
16 but I sent him a fax telling him that this was prepared
17 late in the evening one night when Mr. Vega was very
18 adamant about getting the corn loaded out for Mr.
19 Villarreal.
20   Q.   Do you recall what the errors were in this
21 particular statement?
22   A.   Yes.  They had -- charges had not been adjusted
23 for the breach of contract between or the failure to
24 complete the -- comply with the terms of the agreement.
25 The load out charges were calculated wrong.  There were
ACTION REPORTING  (956) 631-1024

PAGE 213

**213**

1  some cracking charges that were missing.  There was a
2  variety of clerical errors inside the total for charges.
3  I even think there was some additional errors in the
4  pounds shipped or pounds moved.
5    Q.   Is that statement too high or too low?
6    A.   This statement here?
7    Q.   Uh-huh.
8    A.   Is too low.
9    Q.   Do you recall at this point in time what it
10 should have been, ballpark?
11   A.   Ballpark, probably three times that.  There's a
12 mis-posting of a thirteen thousand dollar payment that
13 he did not make that we show as giving him credit for.
14   Q.   What would be three times that?  I don't have
15 it in front of me.
16   A.   Well, this amount here is nineteen thousand at
17 thirteen thousand back to it and your thirty-two
18 thousand, so the posting error -- the total charges due
19 are somewhere in the neighborhood of, I don't know,
20 seventy, eighty thousand bucks.
21   Q.   So the charges would be about seventy or eighty
22 thousand dollars then?
23   A.   Off the top of my head by the time we got to
24 March 30th of '98, yes.
25       (Exhibit No. 14 marked)
ACTION REPORTING  (956) 631-1024

SHEET 55  PAGE 214

**214**

1   Q.   (BY MR. MOUNT) Let me show you Exhibit No. 14.
2  Is that your correspondence to Mr. Vega mentioning there
3  was an error?
4   A.   Yes.
5   Q.   Do you recall signing this particular document
6  or not?
7   A.   What?
8   Q.   Exhibit No. 14. It doesn't appear to be signed
9  at the bottom.
10   A.   No.
11   Q.   So you didn't sign it, correct?
12   A.   Correct.
13   Q.   And did you attach -- in this particular
14  document it says, the attached pages reflect only those
15  charges incurred prior to the close of business October
16  31, 1997. Did you -- was there an enclosure to this
17  document?
18   A.   There should have been an enclosure to this
19  document, yes.
20         MR. SKAGGS: Excuse me. Off the record.
21         (Recess, 6:52-7:06)
22   Q.   (BY MR. MOUNT) You say the total charges for
23  this corn concerning the fifty-four rail cars, is that
24  somewhere in the neighborhood of seventy to eighty
25  thousand dollars; is that correct?
           ACTION REPORTING  (956) 631-1024

PAGE 215

**215**

1   A.   Yes, but again, I need to go look at the number
2  and see. It's -- I also say it was roughly three times
3  the nineteen thousand dollar number.
4   Q.   Which would be sixty thousand?
5   A.   Yeah.
6   Q.   Do you have an invoice prepared already?
7   A.   An invoice prepared?
8   Q.   Uh-huh.
9   A.   As soon as he shows me what I gave him I can
10  tell you.
11   Q.   As soon as what?
12   A.   As soon as they find what I gave him.
13   Q.   Okay. So you may have given that invoice --
14   A.   Yes.
15   Q.   -- to your counsel?
16   A.   Correct.
17   Q.   All right. So you think an invoice has already
18  been prepared?
19   A.   I think a recap was prepared with charges and
20  whatnot. An actual invoice cut, no.
21   Q.   So then concerning those particular charges
22  it's your position that Mr. Gutierrez is responsible for
23  those charges, the storing charges?
24   A.   As per the --
25   Q.   As per --
           ACTION REPORTING  (956) 631-1024

PAGE 216

**216**

1   A.   -- Exhibit 3, yes.
2   Q.   All right. So you're not trying to hold Ms.
3  Vega liable for those charges in any way, are you?
4         MR. SKAGGS: Well, I don't know. It
5  depends on if he's really her representative as
6  represented in this November 28th letter.
7         MR. MOUNT: I'm asking --
8         MR. SKAGGS: Well, I'm giving him advice
9  is what I'm doing. Anyway I'll instruct you not to
10  comment about legal theories on recovery.
11   Q.   (BY MR. MOUNT) So you're not going to comment
12  on that question --
13   A.   Correct.
14   Q.   -- per your counsel?
15   A.   Correct.
16         (Exhibit No. 15 marked)
17   Q.   (BY MR. MOUNT) All right. Let me show you what
18  we just marked as Exhibit No. 15 and ask you whether you
19  received Exhibit No. 15 which appears to be
20  correspondence from Mr. Vega dated November 14, 1997 to
21  yourself with the enclosure of a check in the amount of
22  nineteen thousand five hundred and seventy-four dollars
23  and twenty cents?
24   A.   Yes. It was delivered to us and the cashier's
25  check was returned to Mr. Vega.
           ACTION REPORTING  (956) 631-1024

PAGE 217

**217**

1   Q.   So you did receive this particular letter and a
2  check on or about November 14, 1997, within that time
3  period?
4   A.   Within that time frame, yes.
5   Q.   All right. And when was the check returned to
6  Mr. Vega?
7   A.   It would be in wherever that
8  letter is when I sent it back to Willy.
9   A.   I gave everything to counsel and counsel
10  returned it.
11   Q.   (BY MR. MOUNT) All right. And why was it that
12  the check was returned?
13   A.   For starters it's not made out to me and it's
14  the wrong amount.
15   Q.   And when you say wrong amount it's wrong amount
16  because the invoice that you mailed out was incorrect?
17   A.   I did not mail out an invoice. What I sent to
18  Mr. Vega was a recap of some charges that he asked me
19  for that I prepared at nine or ten o'clock at night as I
20  was leaving town and going over the math it was wrong,
21  so I sent him a fax saying, you know, it's wrong.
22   Q.   So who should have -- the checks should have
23  been made out to who? You said they're made out to the
24  incorrect payee?
25   A.   Well, pay to the order of would have been Port
           ACTION REPORTING  (956) 631-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

SHEET 56  PAGE 218

218

1  Elevator-Brownsville, L.C.
2  Q.  So it's your testimony then the check shouldn't
3  have been made out to Southwest Grain Elevator Company
4  or the Port of Brownsville?
5  A.  That's correct.  I've got no idea why Mr. Vega
6  made it out in that fashion.
7  Q.  Go to Exhibit No. 2, page eleven and if you
8  look at number three that's your answer or it's Port
9  Elevator's answer to interrogatory number three which
10  says, describe in detail your relationship with
11  Southwest Grain Co., Inc. and identify all documents
12  which describes the relationship.  The answer by Port
13  Elevator was that Southwest Grain is a member of Port
14  Elevator-Brownsville, L.C.  What do you mean by a
15  member?
16  A.  In L.C.s they're not called stockholders.
17  They're called members.
18  Q.  So you're a -- you're also a member of Port
19  Elevator, correct?
20  A.  Correct.
21  Q.  And you say Southwest Grain is a member, too,
22  correct?
23  A.  Correct.
24  Q.  Under number five we asked for potential -- and
25  does that -- on number five it asks for potential

ACTION REPORTING  (956) 631-1024

PAGE 219

219

1  parties to this lawsuit and you identified Mr. Loren
2  Walters and also Mr. Gomez?
3  A.  Correct.
4  Q.  Why did you identify Mr. Walters as a potential
5  party?
6  A.  Because the corn originated from Mr. Walters.
7  Q.  Additionally, it's your testimony you received
8  instructions about the corn from Mr. Walters also?
9  A.  Correct.
10  Q.  And it's your understanding he was an agent of
11  Commodity Specialists Company, correct?
12  A.  Agent/employee.
13  Q.  After this dispute as to ownership arose, after
14  you first say you discovered it in September, October
15  1997, did you attempt to contact Mr. Walters?
16  A.  No.
17  Q.  Is there any particular reason why you didn't
18  try and contact Mr. Walters since he was the first
19  figure in the matter concerning ownership?
20  A.  No.  I mean, it was -- when Mr. Walters was
21  down for the one or two days that he was in Brownsville
22  he made it quite clear that his client was AGI, Mr.
23  Walter Puffelis and Mr. Walter Puffelis made it quite
24  clear that his client was Bersain Gutierrez.
25  Q.  After looking at all the exhibits and documents

ACTION REPORTING  (956) 631-1024

PAGE 220

220

1  that have been produced in this case and receiving
2  things from Mr. Vega, do you feel that
3  misrepresentations were made to you by the three
4  gentlemen that were in your office on or about October
5  31, 1997?
6  A.  The parties who would have made
7  misrepresentations, AGI and Sysco De Baja, Bersain
8  Gutierrez, Walter Puffelis.
9  Q.  Also Mr. Walters, you feel like he made mis --
10  he could have made misrepresentations also?
11  A.  No.  I don't believe he misrepresented the fact
12  that he said he loaded cars coming down going to AGI's
13  account which is what he did.  Cars arrived and were
14  unloaded.
15  Q.  Mr. Walters was present in the room when
16  ownership of the corn was being discussed between Mr.
17  Gutierrez and Mr. Puffelis; is that correct?
18  A.  That is correct.
19  Q.  And he was present when Gutierrez and Puffelis
20  were representing that the corn was being sold or
21  transferred to Mr. Gutierrez, correct?
22  A.  Correct.
23  Q.  Why did you list Mr. Gomez as a potential party
24  to this lawsuit?
25  A.  Because the day after the cars were being

ACTION REPORTING  (956) 631-1024

PAGE 221

221

1  unloaded or very -- possibly the same day the cars were
2  being unloaded Mr. Gomez arrived with his sister and
3  Gutierrez presented Mr. Gomez as his buyer.  Said, this
4  is the man who I have sold this corn to and he will be
5  the man who is crossing this corn.
6  Q.  So was Mr. Gomez -- he evidently was the first
7  buyer on November 4th and 5th --
8  A.  Correct.
9  Q.  -- of the corn, correct?  Then later it became
10  Mr. Hinojosa, he was the chief buyer later?
11  A.  It appears that way in the faxes that we went
12  over this afternoon, yes.
13  Q.  What's the difference between whole corn and
14  cracked corn?
15  A.  In what regard?
16  Q.  What is whole corn?
17  A.  Whole corn is whole kernels of corn.
18  Q.  And what is cracked corn?
19  A.  Under USDA guidelines it is corn that is more
20  than fifty percent broken.
21  Q.  If you receive corn -- let's say in this
22  particular case you receive corn from the midwest and it
23  was brought to your facility in this particular case,
24  how long could you leave corn in your particular
25  facility before it went bad and wasn't say --

ACTION REPORTING  (956) 631-1024

*Action Reporting*
(956) 631-1024 / 1-800-884-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
**DEPOSITION OF CRAIG ELKINS**
12-21-99

---

SHEET 57   PAGE 222

222

1  A.   Where heating became a problem?
2  Q.   Right.
3  A.   Depends on the temperature of the corn when it
4  left the midwest. My personal experience is sixty days
5  I want it out of the elevator regardless of
6  circumstances.
7        MR. MOUNT:  I think at this particular
8  point in time I'm going to recess the deposition pending
9  whatever documents you're going to produce whether we
10 need to revisit those documents with him or not. I
11 mean, I can't tell you at this point.
12       MR. SKAGGS:  I understand.
13       MR. MOUNT:  We'll just wait and see what
14 happens, so that's it for now.
15       MR. SKAGGS:  I don't have any questions.
16
17
18
19
20
21
22
23
24
25

ACTION REPORTING  (956) 631-1024

---

PAGE 223

223

CHANGES AND SIGNATURE

1
2
PAGE    LINE    CHANGE              REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

ACTION REPORTING  (956) 631-1024

---

PAGE 224

224

1        I, CRAIG ELKINS, have read the foregoing deposition
2  and hereby affix my signature that same is true and
3  correct, except as noted above.
4
5                 _____
                        CRAIG ELKINS
6
7  THE STATE OF TEXAS
8  COUNTY OF HIDALGO
9
10      Before me, _____, on this day
11 personally appeared CRAIG ELKINS, known to me to be the
12 person whose name is subscribed to the foregoing
13 instrument and acknowledged to me that they executed the
14 same for the purposes and consideration therein
15 expressed.
16
17      Given under my hand and seal of office this _____
18 day of _____, 1999.
19
20
21                 _____
                    NOTARY PUBLIC IN AND FOR
22                  THE STATE OF TEXAS
23
24
25

ACTION REPORTING  (956) 631-1024

---

PAGE 225

225

                      CAUSE NO. C-2969-99-A

1
IVONNE SOTO VEGA          X IN THE DISTRICT COURT OF
2                         X
VS.                       X HIDALGO COUNTY, TEXAS
3                         X
PORT ELEVATOR-BROWNSVILLE, X
4  L.C., ET AL.           X 92ND JUDICIAL DISTRICT
5
6                  REPORTER'S CERTIFICATE
7              DEPOSITION OF CRAIG ELKINS
                    December 21, 1999
8
9       I, CARL CLAYTON, Certified Shorthand Reporter in
10 and for the State of Texas, hereby certify to the
11 following:
12      That the witness, CRAIG ELKINS, was duly sworn by
13 the officer and that the transcript of the oral
14 deposition is a true record of the testimony given by
15 the witness;
16      That the deposition transcript was submitted on
17 _____, to the witness for examination,
18 signature and return to me by _____;
19      That the amount of time used by each party at the
20 deposition is as follows:
21      Mr. William D. Mount, Jr.:  5 hours, 57 minutes
22      That pursuant to information given to the
23 deposition officer at the time said testimony was taken,
24 the following includes counsel for all parties of
25 record:

ACTION REPORTING  (956) 631-1024

---

*Action Reporting*
(956) 631-1024 / 1-800-884-1024

Ivonne Vega V. Port Elevator-Brownsville, et al.
## DEPOSITION OF CRAIG ELKINS
12-21-99

SHEET 58   PAGE 226

226

```
1        Mr. William D. Mount, Jr., Dale & Klein, 6301 N.
2   Tenth St., McAllen, Texas 78504, Attorney for Plaintiff
3        Mr. John Skaggs, Skaggs & Garza, 710 Laurel,
4   McAllen, Texas, Attorney for Defendants, Port
5   Elevator-Brownsville, Southwest Grain Company and Craig
6   Elkins
7        I further certify that I am neither counsel for,
8   related to, nor employed by any of the parties or
9   attorneys in the action in which this proceeding was
10  taken, and, further, that I am not financially or
11  otherwise interested in the outcome of the action.
12       Further certification requirements pursuant to Rule
13  203 of TRCP will be certified to after they have
14  occurred.
15       Certified to by me this _____ day of _____,
16  1999.
17
18
19                    CARL CLAYTON, Texas CSR #996
                      Expiration Date: 12/31/00
20                    Action Reporting
                      P. O. Box 4513
21                    McAllen, Texas 78502
                      (956) 631-1024
22
23
24
25
```

ACTION REPORTING   (956) 631-1024

PAGE 227

227

```
1        FURTHER_CERTIFICATION_PURSUANT_TO_RULE_203,_TRCP
2        The original deposition was/was not returned to the
3   deposition officer on _____;
4        If returned, the attached Changes and Signature
5   page contains any changes and the reasons therefore;
6        If returned, the original deposition was delivered
7   to William D. Mount, Jr., Custodial Attorney;
8        That $_____ is the deposition officer's
9   charges to William D. Mount, Jr. for preparing the
10  original deposition transcript and any copies of
11  exhibits;
12       That the deposition was delivered in accordance
13  with Rule 203.3 and that a copy of this certificate was
14  served on all parties shown herein on _____ and
15  filed with the Clerk.
16       Certified to by me this _____ day of _____,
17  1999.
18
19                    CARL CLAYTON, Texas CSR #996
                      Expiration Date:  12/31/00
20                    Action Reporting
                      P. O. Box 4513
21                    McAllen, Texas 78502
                      (956) 631-1024
22
23  XC:  Mr. John Skaggs
         Mr. William D. Mount, Jr.
24       Clerk
         File
25
```

## *Action Reporting*
(956) 631-1024 / 1-800-884-1024

CAUSE NO. C-2969-99-A

| | | |
|---|---|---|
| IVONNE SOTO VEGA | § | IN THE DISTRICT COURT OF |
| | § | |
| | § | |
| VS. | § | |
| | § | |
| PORT ELEVATOR-BROWNSVILLE, | § | |
| L.C., SOUTHWEST GRAIN CO., | § | |
| INC., AGI/AKRON GROUP, INC., | § | |
| SYSCO DE BAJA, WALTER PUFFELIS | § | HIDALGO COUNTY, TEXAS |
| GALVAN, III, INDIVIDUALLY AND | § | |
| D/B/A AGI/AKRON GROUP, INC., | § | |
| CRAIG ELKINS, INDIVIDUALLY AND | § | |
| D/B/A PORT ELEVATOR-BROWNSVILLE, | § | |
| L.C.   AND SOUTHWEST GRAIN CO., | § | |
| INC., BERSAIN GUTIERREZ ZENTENO, | § | |
| INDIVIDUALLY AND D/B/A SYSCO | § | |
| DE BAJA | § | 92ND JUDICIAL DISTRICT |

**FIRST AMENDED NOTICE OF INTENTION TO TAKE THE ORAL AND VIDEO DEPOSITION WITH DUCES TECUM SUBPOENA OR SUBPOENA**

To:    Defendant, Port Elevator-Brownsville, by and through its attorneys of record:

John Skaggs
SKAGGS & GARZA, L.L.P.
710 Laurel
McAllen, Texas 78502
(956) 687-8203
(956) 630-6570 Fax

The oral and video deposition of **CRAIG ELKINS** will be taken pursuant to the Texas Rules of Civil Procedure at the **offices of SKAGGS & GARZA L.L.P.** located at **710 Laurel, McAllen, Texas 78502; phone number: (956) 687-8203** at **10:00 a.m.** on **Tuesday, December 21, 1999**. It is hereby requested that the witness appear at such time and place for the purpose of giving his deposition in this cause, which deposition, when taken, may be used in evidence during the trial of said cause, and will continue from day to day until completed.

h:\p\99-3843\depos\notices\elkins.craig 2



EXHIBIT

_____

ACTION REPORTING

1

Notice is also hereby given that the deponent is to be produced by and through his attorney of record, JOHN SKAGGS, SKAGGS & GARZA L.L.P., 710 Laurel, McAllen, Texas 78502, for his deposition.

Please take notice that in addition to having a stenographic record made, the undersigned intends to have a nonstenographic record made of the deposition of CRAIG ELKINS by the use of videotape, when the same is taken on **Tuesday, December 21, 1999** at **10:00 a.m.**, pursuant to a notice to take the deposition issued by Mr. William D. Mount Jr., Attorney at Law or at such other time as CRAIG ELKINS may be deposed.

Please take further notice that in connection with the taking of said deposition the witness shall produce at the commencement of the taking of said deposition the materials described in the Subpoena Duces Tecum attached hereto and incorporated herein for all purposes as if fully and at large set forth at this point.

Respectfully submitted,

DALE & KLEIN, L.L.P.
6301 North Tenth Street
McAllen, Texas 78504
(956) 687-8700 Tel.
(956) 687-2416 Fax.

By: _Bill Mount_
WILLIAM D. MOUNT JR.
State Bar No.: 14602950
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing **NOTICE OF INTENTION TO TAKE THE ORAL and VIDEO DEPOSITION WITH SUBPOENA DUCES TECUM OF CRAIG ELKINS** has been forwarded to opposing counsel of record on this the **8TH day of December, 1999**:

### VIA FACSIMILE AND CM/RRR Z 149 878 360

John Skaggs
SKAGGS & GARZA L.L.P.
710 Laurel
P.O. Drawer 2285
McAllen, Texas 78502-2285
(956) 687-8203 / (956) 630-6570 Fax

WILLIAM D. MOUNT JR.

h:\p\99-3843\depos\notices\elkins.craig 2

4

## SUBPOENA DUCES TECUM TO THE DEPOSITION OF
## CRAIG ELKINS

1.      Any and all documents reviewed in anticipation of your deposition.

**d&k**

dale & klein, l.l.p.
attorneys at law
6301 North Tenth Street
McAllen, Texas 78504

*Mailed*
*12/6/99*

CERTIFIED

Z 149 878 360

MAIL

John Skaggs
SKAGGS & GARZA L.L.P.
710 Laurel
P.O. Drawer 2285
McAllen, Texas 78502-2285

99-3843
||..||..||..||....||..||..||..||..||..||...||

Transmit Confirmation Report

```
No.          :  004
Receiver     :           9566302353
Transmitter  :  DALEANDKLEIN
Date         :      Dec 08,99   16:10
Time         :  01'50
Mode         :      Norm
Pages        :  05
Result       :  OK
```

*action*

Transmit Confirmation Report

```
No.          :  003
Receiver     :           9566306570
Transmitter  :  DALEANDKLEIN
Date         :      Dec 08,99   15:59
Time         :  03'29
Mode         :      Norm
Pages        :  06
Result       :  OK
```

# Error Message

Dec 08,99   15:53

Please Transmit Again

*action*

| Remote Location | Mode | Start | Time | Pages | Result | Note |
|---|---|---|---|---|---|---|
| 9566302353 | Norm | 08,15:49 | 03'55 | 04 | T.3.1 | Manual |

NO. C-2969-99-A

| | | |
|---|---|---|
| IVONNE SOTO VEGA | § | IN THE DISTRICT COURT |
| | § | |
| VS. | § | |
| | § | |
| PORT ELEVATOR-BROWNSVILLE, | § | |
| L.C., SOUTHWEST GRAIN CO., | § | |
| INC., AGI/AKRON GROUP, INC., | § | |
| SYSCO DE BAJA, WALTER PUFFELIS | § | HIDALGO COUNTY, TEXAS |
| GALVAN, III, INDIVIDUALLY AND | § | |
| D/B/A/ AGI/AKRON GROUP, INC., | § | |
| CRAIG ELKINS, INDIVIDUALLY AND | § | |
| D/B/A PORT ELEVATOR-BROWNSVILLE, | § | |
| L.C. AND SOUTHWEST GRAIN CO., | § | |
| INC., BERSAIN GUTIERREZ ZENTENO, | § | |
| INDIVIDUALLY AND D/B/A SYSCO | § | |
| DE BAJA | § | 92ND JUDICIAL DISTRICT |

### DEFENDANT PORT ELEVATOR-BROWNSVILLE, L.C.,'S
### ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES AND
### REQUESTS FOR PRODUCTION

TO:  IVONNE SOTO VEGA, by and through her attorney of record, Roy S. Dale, William Mount, DALE & KLEIN, 6301 N. 10th Street, McAllen, Texas

COMES NOW, Port Elevator-Brownsville, L.C., one of the Defendants in the above entitled and numbered cause, and answers Interrogatories and Requests for Production propounded by Plaintiff, herein.  The answers contained herein are specifically made subject to any objections which may be filed.  The answers are attached hereto and incorporated by reference at this point.

The questions previously propounded to this party are also attached hereto, and such questions precede the answers in compliance with applicable Rules of Procedure.



EXHIBIT
2
ACTION REPORTING

Respectfully submitted,

SKAGG & GARZA, L.L.P.
P.O. Drawer 2285
710 Laurel
McAllen, Texas 78502-2285
Phone (956) 687-8203
Fax (956) 630-6570

_Lynn Howerton_
Lynn Howerton
State Bar No. 00787726
Attorney for Port Elevator-
Brownsville, L.C.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been served on opposing counsel on this the 19th day of November, 1999:

Mr. Roy S. Dale
Mr. William Mount
DALE & KLEIN
6301 N. 10th Street
McAllen, Texas 78504

_Lynn Howerton_
Lynn Howerton

2

## INTERROGATORIES

## IDENTIFICATION OF BUSINESS ENTITY

1.   Please state the full and correct name of the organization/
     entity herein identified as PORT ELEVATOR-BROWNSVILLE, L.C. at
     the present and in September 1997 and:

   (a)  If a corporation, the date on which incorporated, the
        state in which incorporated, the principal place of
        business, the names and addresses of all officers, and
        when the corporation was licensed to do business in the
        state of Texas; OR

   (b)  if a partnership, the names and address of each partner,
        whether general or limited, and the official business
        address of the partnership;  OR

   (c)  If a sole proprietorship, the name and address of each
        owner;  OR

   (d)  if a joint venture, the name and address of each joint
        adventurer. (P103)

ANSWER:

## CORRECT ENTITY SUED

2.   Without calling upon you to make any statement or admission as
     to the validity of the claim of this Plaintiff, please state
     whether you allege that Plaintiff, in suing you, has sued the
     wrong entity.  If you allege to be the wrong entity, please
     identify the correct entity with its correct name, address,
     telephone number and the name and address of its agent for
     service of process. (P104)

ANSWER:

H:\p\99-3843\discover\Int to PE

## RELATIONSHIP WITH SOUTHWEST GRAIN CO., INC.

3.  Describe in detail your relationship with Southwest Grain Co., Inc. and identify all documents which describes the relationship.

**ANSWER:**

## RELATIONSHIP WITH PORT OF BROWNSVILLE

4.  Describe in detail your relationship with Port of Brownsville and identify all documents which describes the relationship.

**ANSWER:**

## POTENTIAL PARTY

5.  Please provide the name, a brief description of the relevant facts known by each, address and telephone number of any potential party to this lawsuit, not already a party hereto. (P106)

**ANSWER:**

## STATEMENT BY PLAINTIFF

6.  Please state whether or not you have a copy of any statement which the Plaintiff(s) has previously made concerning the action or its subject matter and which is in your possession, custody or control and provide a copy. (P109)

**ANSWER:**

H:\p\99-3843\discover\Int to PE

## INSURANCE COVERAGE

7.  Describe any insurance agreement under which any insurance business may be liable to satisfy part or all of the judgment which may be entered in this action, or to indemnify or reimburse for payments made to satisfy the judgment, by stating the name of the person or entity insured, the name of the insurer, and the amount of any liability insurance coverage, including any umbrella coverage payouts to other claimants, and if the amount of coverage is subject to change or reduction by reason of prior claims during the policy period, or attorney's fees expended in this or any other, or for any other reason, state the present amount remaining to pays judgment in this case and describe in detail how the sum was arrived at. (P110)

ANSWER:


## SETTLEMENT

8.  Has any settlement of any character been made between you and any other person, party or entity whatsoever concerning or in connection with the occurrence made the basis of this suit? If so, give the date, person or entity with whom you have entered into such settlement, and attach to your answers to these Interrogatories a copy of such settlement. (111)

"Settlement" as used herein, means any oral or written, disclosed or undisclosed agreement, bargain, contract, settlement, partial settlement, limited settlement, "arrangement", "deal", "understanding", loan arrangement, credit arrangement, contingent settlement, limitation on the amount of liability or judgment, or a promise by or between plaintiff(s) and any defendant(s) or between any defendant(s) herein whereby plaintiff(s) or defendant(s) have in any way released or compromised, in whole or in part, directly or indirectly, or agreed to do so in the future, any of the matters in controversy in this lawsuit whether before, after or during trial or before or after any jury verdict is returned herein or a judgment is entered or rendered herein. The term "settlement" is also meant to include any resolution of the differences between the plaintiff(s) and defendant(s) by loan to the plaintiff(s) or any other device which is repayable in whole or in part out of any judgment the plaintiff(s) may recover against defendant(s). The term "settlement" shall also include " Mary Carter Agreements" as that term is used under Texas Law.

-6-

5

ANSWER:


## REGULAR COURSE OF BUSINESS TO CONDUCT INVESTIGATION

9.  Was it the regular course of business of the Defendant to conduct a post-incident investigation into an incident of this sort, whether litigation was anticipated or not?  If so, state whether an investigation was conducted and the date of same, and by whom such investigation was conducted.(P114)

ANSWER:


## CONTENTION-EXAGGERATION OF COMPLAINTS

10. Do you contend that the Plaintiff has exaggerated any complaint in connection with the injuries alleged to have been sustained in this accident and if so, explain. (P120)

ANSWER:


## DEFENDANT IN PREVIOUS SUITS

11. State the name and address of each person who has ever sued you or who has ever written or caused to be written any letter to you threatening to sue you within the last seven years, other than the present case.  State the nature of the suit or threatened suit, the name of any attorney who represented you and any other person in the suit and the final disposition of each.  Also, state the style, cause number, and court of each such suit. (P128)

ANSWER:


-7-

## REPRESENTATIONS, STATEMENTS, DECLARATIONS & ADMISSIONS BY PLAINTIFF

12. Please state completely and fully all representations, statements, declarations or admissions made by this party or any agents, servants or employees of this party of which you are aware which are relevant to any issue in this lawsuit. (P129)

ANSWER:

## CONTENTION - FACTS OF OCCURRENCE(S) IN QUESTION

13. What is the Defendant's understanding or contention with respect to how the occurrence(s) in question occurred, and how and why Plaintiff sustained her injuries or damages? (P130)

ANSWER:

## CONTACTS WITH BERSAIN GUTIERREZ

14. Identify by date, place and time all contacts that Defendant had with **BERSAIN GUTIERREZ** and the substance of what was discussed during each contact.

ANSWER:

## CONTACTS WITH IVONNE SOTO VEGA

15. Identify by date, place and time all contacts that Defendant had with **IVONNE SOTO VEGA** and the substance of what was discussed during each contact.

ANSWER:

-8-

7

## CONTACTS WITH WALTER PUFFELIS

16. Identify by date, place and time all contacts that Defendant had with **WALTER PUFFELIS** and the substance of what was discussed during each contact.

**ANSWER:**

## CORN STORED AT ELEVATOR

17. State the dates and times that the corn at issue arrived at Defendant's place of business, how it arrived, its condition or grade upon arrival, quantity that arrived and its dollar value.

**ANSWER:**

## CORN SOLD

18. State the dates and times you sold the corn at issue, to whom, the quantity sold each time, the condition or grade of the corn at the time of sale and the sales price.

**ANSWER:**

## INITIAL AWARENESS OF PROBLEM

19. State when you first became aware that there was a dispute as to the ownership of the corn at issue, who in your organization became aware of the dispute and how you became aware of the dispute.

**ANSWER:**

-9-

## OTHER INCIDENTS

20. Please identify(name, address and telephone number of claimants, names of their attorneys, nature of controversy and date of controversy, if any) all other incidents reported or known to this Defendant wherein there was a dispute as to ownership of a commodity stored with Defendant within the last seven years.

ANSWER:

## RELEASE OF CORN TO BERSAIN GUTIERREZ

21. Please provide dates that you released any of the corn at issue to **BERSAIN GUTIERREZ** and provide quantities released on the dates identified.

ANSWER:

## BASIS FOR RELEASE OF CORN TO BERSAIN GUTIERREZ

22. Please explain why you released any of the corn at issue to **BERSAIN GUTIERREZ**.

ANSWER:

## AFFIRMATIVE DEFENSES

23. If you have asserted any affirmative defenses in this matter or when you do assert one or more affirmative defenses, explain the factual basis supporting each defense.

ANSWER:

H:\p\99-3843\discover\Int to PE

9

## SUBSEQUENT ACTIONS

24.   Please state any and all actions taken by you to determine who
owned the corn at issue after you became aware that there were
two or more claimants to the corn at issue.

**ANSWER:**


## MS. VEGA'S REQUESTS FOR RELEASE OF CORN

25.   Please provide dates and times that YVONNE SOTO VEGA requested
release of any or all of the corn at issue and state how her
requests were communicated and to whom.

**ANSWER:**

H:\p\99-3843\discover\Int to PE

## ANSWERS TO INTERROGATORIES

1) Limited Liability Company under and in accordance with the laws of State of Texas dated December 23, 1992

   Port Elevator-Brownsville, LC
   9155 RL Ostos Road
   Brownsville, Texas 78521

2) Bersain Gutierrez Zenteno D/B/A Sysco de Baja and/or Walter Puffelis Galvan III D/B/A AGI/Akron Group, Inc.

3) Southwest Grain is a member of Port Elevator-Brownsville, LC.

4) Landlord/Tenant relationship. Lease with the Port of Brownsville.

5) Defendant objects to this Interrogatory to the extent it requests this party to state information under oath that it cannot attest to. Furthermore, it calls for this party to rely on information provided to it by persons and said information may not be accurate. There is no way that this party can state under oath the information known to the persons named herein. Said information can be and should be obtained directly from said persons. Subject to and without waiving the above and foregoing objections this party states as follows:

   Mr. Loren Walters
   Commodity Specialist Company
   55 Corporate Woods Suite 115
   9300 W. 110th Street
   Overland Park, Kansas 66210 1-800-745-2945


   Lic. Alfredo Gomez Aguilar
   Guerrero y 20 de Noviembre Esquina
   Rio Bravo, Tamaulipas
   Mexico: (893) 4-00-58; 4-12-58; 4-31-84

6) No.

7) None known at this time.

8) No.

9) Not applicable.

10) Not applicable.

11) Ivonne Soto Vega through her attorney, Mr. Guillermo Vega. Pending. Mr. John B. Skaggs

11

12) Plaintiff has made comments and statements alleging ownership.

13) Corn was delivered to Defendant by CSC. CSC authorized a specific quantity to be delivered to AGI. AGI presented Bersain Gutierrez Zenteno D/B/A Sysco de Baja to Defendant and authorized Defendant to deliver the corn to Bersain Gutierrez Zenteno D/B/A Sysco de Baja. At no time did AGI make mention of the Plaintiff to the Defendant nor give the Defendant instructions with regard to Plaintiff. Therefore, Defendant feels Plaintiff has sustained no injuries or damages.

14) Defendant objects to the question as being vague and over broad. Defendant further objects to this Interrogatory, to the extent the subject matter of such answer would more properly be the subject of deposition testimony. This party objects to this Interrogatory because it is overly broad, general, vague, indefinite, and fails to describe with reasonable particularity the items or information sought.

15) Defendant objects to the question as being vague and over broad. Defendant further objects to this Interrogatory, to the extent the subject matter of such answer would more properly be the subject of deposition testimony. Subject to and without waiving the above and foregoing objections this party states as follows: Defendant's only contact has been through Ms. Soto's attorneys, with the one exception when Ms. Soto arrived unannounced at Defendants facility in September or October of 1997 at which Defendant's secretarial staff obtained a copy of her driver's license. Substance of those conversations are a matter of record and revolve around her claim of ownership.

16) Defendant objects to the question as being vague and over broad. Defendant further objects to this Interrogatory, to the extent the subject matter of such answer would more properly be the subject of deposition testimony. This party objects to this Interrogatory because it is overly broad, general, vague, indefinite, and fails to describe with reasonable particularity the items or information sought.

17) 27 railcars arrived on 31 Oct 1996; 96,008.86 bushels were received; grade information unknown, assumed to be US #3 or Better; dollar value unknown. 25 railcars arrived on 13 November 1996; 90,638.03 bushels received; grade information unknown, assumed to be US #3 or Better; dollar value unknown. 2 railcars arrived on 27 November 1996; 7,125.50 bushels received; grade information unknown, assumed to be US #3 or Better; dollar value unknown.

18) The condition of the corn when sold was AS IS WHERE IS. The corn was sold as either cracked corn or whole corn.

        See attached listing #1.

12

19) In late September or early October of 1997, Defendant became aware of a dispute in ownership. Defendant's representative was Craig Elkins. Defendant was contacted by a Mr. Enrique Villarreal.

20) None

21) See attached listing #2.

22) The shipper, CSC, personally identified Mr. Puffelis as their buyer. Mr. Puffelis personally identified Mr. Gutierrez as his buyer. Mr Puffelis, Mr. Gutierrez and Defendant entered into a contract for services, whereby Mr. Gutierrez was identified as the person authorized to issue loading instructions.

23) Will supplement

24) Defendant contacted Mr. John B. Skaggs, attorney.

25) See copies of faxes from lawyer Vega.

13

STATE OF TEXAS       §
                        §
COUNTY OF   CAMERON    §

     BEFORE ME, the undersigned authority, on this day personally appeared     CRAIG ELKINS      , and first being duly sworn according to law and upon his/her oath deposed and said that he/she is    GENERAL MANAGER    of PORT ELEVATOR-BROWNSVILLE, L.C.Defendant, herein and as such is duly qualified and authorized in all respect to sign said Answers to Interrogatories on behalf of said Defendant; that he/she has read the above and foregoing Answers to Interrogatories; and that every statement contained herein is within his/her knowledge and true and correct.

_____
(Signature)

__CRAIG ELKINS_____
(Printed Name)

__GENERAL MANAGER_____
(Job Title)

     SWORN TO AND SUBSCRIBED BEFORE ME on the 19TH day of _____NOVEMBER_____ , 1999, to certify which witness my hand and official seal of office.

_____
NOTARY PUBLIC, STATE OF TEXAS

My Commission Expires on:
     08/21/03

-12-

14

## REQUESTS FOR PRODUCTION

1.    The complete personnel file of Craig Elkins.

RESPONSE:

2.    Any and all documents between Defendant and **BERSAIN GUTIERREZ**.

RESPONSE:

3.    Any and all documents between Defendant and **IVONNE SOTO VEGA**.

RESPONSE:

4.    Any and all expert's reports which have been prepared in connection with this lawsuit or the incident giving rise to this lawsuit, if the expert may testify in this cause as an expert.  If any such expert has not prepared a report, request is hereby made that one be prepared and furnished to Plaintiff's attorney.

RESPONSE:

5.    Any and all expert reports that were or will be relied upon in whole or in part by any testifying expert in this case.

RESPONSE:

-4-

15

6.   Any and all work papers, notes and documents in the file of
     any expert witness who may testify, or in the file of any
     expert witness who has written a report which is or will be
     relied upon in whole or in part by a testifying·expert.

RESPONSE:


7.   Any and all documents, reports and/or letters collected during
     your investigation of Plaintiff's allegations.

RESPONSE:


8.   Any and all books, documents, photographs, or other tangible
     things which may be used at the time of trial as evidence in
     this cause of action.

RESPONSE:


9.   Any and all statements made by persons not a party to this
     lawsuit, either written, recorded or otherwise, that pertain
     to any issue raised ·in this lawsuit obtained prior to the
     filing of this lawsuit.

RESPONSE:


10.  Any and all documents and tangible things pertaining to the
     Plaintiff and/or the Plaintiff's lawsuit, including, but not
     limited to investigation reports and inter-office memos.

RESPONSE:

11. Any and all documents that you made or obtained from any person while investigating the incident made the basis of this suit.

RESPONSE:

12. A copy of any and all agreements, understandings, and/or contracts entered into between Defendant and **BERSAIN GUTIERREZ.**

RESPONSE:

13. A copy of any and all agreements, understandings, and/or contracts entered into between Defendant and **IVONNE SOTO VEGA.**

RESPONSE:

14. A copy of any and all documents reflecting the names and addresses of all your employees working for Defendant in September 1997.

RESPONSE:

15. Any and all insurance agreements or policies under which any person or entity carrying on an insurance business may be liable to satisfy part or all of a judgment which may be rendered in this action or to indemnify or reimburse for payments made to satisfy the judgment, including but not limited to any liability insurance policy covering Defendant at the time in question.

RESPONSE:

-6-

17

16. Copies of any and all correspondence received from your insurance carrier and other documents asserting a reservation of rights by your insurance carrier and/or a non-waiver of rights of the insurance carrier related to the matter which is involved in this lawsuit. (631)

RESPONSE:

17. Any and all photographs, movies, videotapes or other visual representations which relates to the incident(s) made the basis of this suit.

RESPONSE:

18. The entire investigation file which relates to the incident made the basis of this lawsuit.

RESPONSE:

19. Any and all documents concerning policies and procedures for storing corn or other commodity in effect at any time within the last five years.

RESPONSE:

20. Any and all reports or complaints made against you for the past 10 years, including, but not limited to, computer stored information, notes, files, correspondence and papers relating to storage of commodities and/or corn.

RESPONSE:

-7-

21. Any and all written contracts, agreements, or understandings between you and SOUTHWEST GRAIN CO., INC.

RESPONSE:


22. Please provide documents identifying the net worth of this Defendant and those which this Defendant has referred to in calculating net worth.

RESPONSE:


23. All your employee manuals in effect at anytime with the last five years.

RESPONSE:


24. Any and all contracts, agreements, or understandings concerning your operation of the elevator in effect at anytime within the last five years.

RESPONSE:


25. Any and all documents reflecting that IVONNE SOTO VEGA owned corn stored with Defendant.

RESPONSE:


26. Any and all documents reflecting that BERSAIN GUTIERREZ owned corn stored with Defendant.

RESPONSE:


-8-

19

27. Any and all documents between Defendant and Guillermo Vega, Jr.

RESPONSE:

28. Any and all documents reflecting charges for storage fees for corn **IVONNE SOTO VEGA** claims she stored with Defendant.

RESPONSE:

29. Any and all documents reflecting charges for storage fees for corn **BERSAIN GUTIERREZ** claims he stored with Defendant.

RESPONSE:

30. Any and all documents identifying the relationship between Defendant and Southwest Grain Elevator Company.

RESPONSE:

31. Any and all documents in support of your refusal to release corn to **IVONNE SOTO VEGA**.

RESPONSE:

32. Any and all documents reflecting that **IVONNE SOTO VEGA** owned the corn stored with Defendant that she claimed she owned.

RESPONSE:

33. Any and all documents reflecting the market value of the corn stored with Defendant by either **IVONNE SOTO VEGA** or **BERSAIN GUTIERREZ** on the dates each shipment was received by Defendant.

RESPONSE:


34. Any and all documents concerning insuring the corn at issue by anyone.

RESPONSE:


35. Any and all documents between Defendant and **WALTER PUFFELIS**.

RESPONSE:


36. Any and all documents between Defendant and **SYSCO DE BAJA, S.A. DE C.V.**

RESPONSE:


37. Any and all documents reflecting that Defendant attempted or did mitigate Plaintiff's damages in this matter.

RESPONSE:


38. Any and all documents pertaining to one or more sales by Defendant of the corn at issue.

RESPONSE:


-10-

h:\p\99-3843\discovery\RFP to PE

21

39.  Any and all documents reflecting the amount of the corn at issue currently held by Defendant.

RESPONSE:


40.  Any and all documents reflecting the location of proceeds from one or more sales by Defendant of the corn at issue.

RESPONSE:


41.  Your articles of incorporation.

RESPONSE:


42.  Your bylaws.

RESPONSE:


43.  Any and all documents concerning your status as an l.c.

RESPONSE:


44.  Any and all documents between Akron Group, Inc. and Defendant.

RESPONSE:


45.  Any and all documents reflecting that **BERSAIN GUTIERREZ** had purchased the corn at issue.

RESPONSE:


-11-

h:\p\99-3843\discovery\RFP to PE

46. Any and all documents reflecting that **BERSAIN GUTIERREZ** is a U.S. citizen or permanent resident alien.

RESPONSE:

47. Any and all documents reflecting that **YVONNE SOTO VEGA** is a U.S. citizen or permanent resident alien.

RESPONSE:

48. Any and all documents concerning transportation of the corn at issue to Defendant.

RESPONSE:

49. Any and all bills of lading relating to the corn at issue.

RESPONSE:

50. Any and all documents which establish any relationship with the Port of Brownsville as such relationship, if any, has existed from 1995 to present.

RESPONSE:

51. Your income statements for 1995 through present.

RESPONSE:

52. Your balance sheets for 1995 through present.

RESPONSE:

-12-

h:\p\99-3843\discovery\RFP to PE

23

## RESPONSES TO REQUESTS FOR PRODUCTION

1. None exists

2. Due to the fact that there were no known problems, alleged or otherwise, until approximately 1 year after the corn in question arrived, copies of many documents were not kept as they dealt with issues at the moment. Notwithstanding refer to answers to Int. # 14 and please see attached .

3. Refer to answer to Int. #15 and #25. Otherwise see attached.

4. None at this time.

5. None at this time.

6. None at this time.

7. Refer to answers to Int. # 17, # 18, # 21 & # 25 as well as #2 above.

8. Defendant objects to this Request for Production to the extent the requested information calls for the disclosure of attorney work product or is otherwise outside the scope of discovery as provided by the Texas Rules of Civil Procedure.

   Defendant further objects to this Request for Production to the extent the requested information calls for the disclosure of attorney work product especially to the extent such information makes inquiry regarding counsel's strategy at the time of trial. This party further objects since it will be impossible to determine such information until after the conclusion of the presentation of Plaintiff's case at the time of trial.

   Defendant further objects any requirement to produce original documents or tangible things at the offices of the attorneys for the requesting party, without any provisions, time limit, terms or other arrangements which would serve to permit this party to retain custody and control of such documents and tangible things; and to the extent such documents and tangible things may be voluminous, large or unwieldy. This party would further show that it would be unreasonable or burdensome to produce such items at a location other than the place where they are kept in the usual course of business, or at the offices of this party's attorneys.

9. Defendant objects to this Request for Production to the extent the requested information calls for the disclosure of attorney work product or is otherwise outside the scope of discovery as provided by the Texas Rules of Civil Procedure.

24

10.  Defendant objects to this Request for Production to the extent the requested information calls for disclosure of information protected by attorney client privilege, or to the extent the requested information calls for the disclosure of privileged communications passing between agents or representatives or employees of any party to the action or communications between any party and his agents, representatives or their employees, where made subsequent to the occurrence or transactions upon which the suit is based, and made in connection with the prosecution investigation or defense of the claim or the investigation of the occurrence or transaction out of which the claim has arisen.

Defendant further objects to this Request for Production to the extent the requested information calls for the disclosure of attorney work product or is otherwise outside the scope of discovery as provided by the Texas Rules of Civil Procedure.

Defendant further objects to this Request for Production to the extent it goes beyond the scope of permissible discovery and seeks information privileged from discovery pursuant to the investigative privileged, attorney-client privileged, attorney work product or party communications privilege.

Subject to and without waiving the above and foregoing objections this party states as follows:  Refer to answer # 2 above.

11.  Defendant objects to this Request for Production to the extent the requested information calls for disclosure of information protected by attorney client privilege, or to the extent the requested information calls for the disclosure of privileged communications passing between agents or representatives or employees of any party to the action or communications between any party and his agents, representatives or their employees, where made subsequent to the occurrence or transactions upon which the suit is based, and made in connection with the prosecution investigation or defense of the claim or the investigation of the occurrence or transaction out of which the claim has arisen.

Defendant further objects to this Request for Production to the extent the requested information calls for the disclosure of attorney work product or is otherwise outside the scope of discovery as provided by Texas Rules of Civil Procedure.

Defendant further objects to this Request for Production to the extent it goes beyond the scope of permissible discovery and seeks information privileged from discovery pursuant to the investigative privileged, attorney-client privileged, attorney work product or party communications privilege.

Subject to and without waiving the above and foregoing objections this party states as follows:  Refer to answer # 2

25

above.

12.    Refer to answers to Int. # 13 and # 14 as well as # 2 above.

13.    Refer to answers to Int. # 15 and # 25 as well as # 2 and # 3 above.

14.    Defendant objects to this Request for Production to the extent the requested information is not relevant to the subject of this suit, and otherwise not calculated to lead to the discovery of relevant information; and is, otherwise outside the scope of discovery as permitted by the Texas Rules of Civil Procedure.

15.    None located yet.

16.    None exists.

17.    Defendant objects to this Request for Production to the extent the requested information calls for the disclosure of attorney work product or is otherwise outside the scope of discovery as provided by the Texas Rules of Civil Procedure.

18.    Defendant objects to this Request for Production to the extent the requested information calls for disclosure of information protected by attorney client privilege, or to the extent the requested information calls for the disclosure of privileged communications passing between agents or representatives or employees of any party to the action or communications between any party and his agents, representatives or their employees, where made subsequent to the occurrence or transactions upon which the suit is based, and made in connection with the prosecution investigation or defense of the claim or the investigation of the occurrence or transaction out of which the claim has arisen.

Defendant further objects to this Request for Production to the extent the requested information calls for the disclosure of attorney work product or is otherwise outside the scope of discovery as provided by the Texas Rules of Civil Procedure.

Defendant further objects to this Request for Production to the extent it goes beyond the scope of permissible discovery and seeks information privileged from discovery pursuant to the investigative privileged, attorney-client privileged, attorney work product or party communications privilege.

Defendant further objects to this Request for Production because it is overly broad, general, vague, indefinite, and fails to describe with reasonable particularity the items or information sought.

Subject to and without waiving the above and foregoing

26

objections this party states as follows: Refer to answer # 2, 3, 6, 7, 8, 9, 10, 11, 12, 13, and #15 above.

19. Refer to answer to Int. # 14 and # 16.

20. Defendant objects to this Request for Production to the extent the requested information is not relevant to the subject of this suit, and otherwise not calculated to lead to the discovery of relevant information; and is, otherwise outside the scope of discovery as permitted by the Texas Rules of Civil Procedure.

21. None exists.

22. Defendant objects to this Request for Production to the extent the requested information is not relevant to the subject of this suit, and otherwise not calculated to lead to the discovery of relevant information; and is, otherwise outside the scope of discovery as permitted by the Texas Rules of Civil Procedure.

23. None.

24. Defendant objects to this Request for Production because it is overly broad, general, vague, indefinite, and fails to describe with reasonable particularity the items or information sought.

Defendant further objects to this Request for Production to the extent the requested information is unduly burdensome since it has the effect of compelling the manufacture of a factual outline and requires presentation of a narrative answer or a summary of documents, depositions, affidavits and other evidence which is equally available to all of the parties.

Defendant further objects to this Request for Production because the requested discovery is privileged from disclosure because such discovery seeks the disclosure of confidential and private business information or trade secrets which are exempt from discovery pursuant to Texas Rules of Evidence, Rule 507 and applicable case law. Lewis, Skaggs & Reyna engaged in representations of their clients named herein and performed legal services which involve this lawfirm's utilization of legal strategy and mental processes and techniques which this lawfirm does not share with outsiders and does not intend to share with outsiders. Lewis, Skaggs & Reyna employs its own unique defense philosophies, billing practices, and means and methods of doing business, and such amounts to confidential or private business information or "trade secrets" which are privileged from disclosure.

25. Refer to answers to Int. #'s 14, 15, 16, 19 & 25 as well as #'s 3 & 13 above.

27

26.   Refer to answers to Int. #'s 10, 12, 13, 14, 16, 17, & 22 as well as # 2 above.

27.   Refer to answers to Int. # 25 as well as #'s 3, 6, 7, 8, 9, 10, 11, 12, 13, 18, 19, 24, & 25 above.

28.   Refer to material previously provided.

29.   Refer to material previously provided.

30.   Refer to material previously provided.

31.   Refer to material previously provided.

32.   Refer to material previously provided.

33.   Defendant has no knowledge of the "market price" paid.

34.   Refer to material previously provided.

35.   Refer to material previously provided.

36.   Refer to material previously provided.

37.   Refer to List # 1 from Int. #18

38.   Refer to material previously provided.

39.   Refer to material previously provided.

40.   See attached and will supplement.

41.   Defendant objects to this Request for Production to the extent the requested information is not relevant to the subject of this suit, and otherwise not calculated to lead to the discovery of relevant information; and is, otherwise outside the scope of discovery as permitted by the Texas Rules of Civil Procedure.

42.   Defendant objects to this Request for Production to the extent the requested information is not relevant to the subject of this suit, and otherwise not calculated to lead to the discovery of relevant information; and is, otherwise outside the scope of discovery as permitted by the Texas Rules of Civil Procedure.

43.   Defendant objects to this Request for Production to the extent the requested information is not relevant to the subject of this suit, and otherwise not calculated to lead to the discovery of relevant information; and is, otherwise outside the scope of discovery as permitted by the Texas Rules of Civil Procedure.

44.   Refer to material previously provided.

28

45.  Refer to material previously provided.

46.  None.

47.  Defendant objects to this Request for Production to the extent
     such information is equally available to the requesting party
     by examination of business records and other records or
     tangible discovery which has been provided or may be acquired
     from the various parties involved in this action  or to the
     extent such information is equally available to Plaintiff by
     reference to public records maintained in the office of the
     Hidalgo County Clerk.

48.  Refer to material previously provided.

49.  Refer to material previously provided.

50.  See Attached Lease agreement.

51.  Defendant objects to this Request for Production to the extent
     the requested information is not relevant to the subject of
     this suit, and otherwise not calculated to lead to the
     discovery of relevant information; and is, otherwise outside
     the scope of discovery as permitted by the Texas Rules of
     Civil Procedure.

52.  Defendant objects to this Request for Production to the extent
     the requested information is not relevant to the subject of
     this suit, and otherwise not calculated to lead to the
     discovery of relevant information; and is, otherwise outside
     the scope of discovery as permitted by the Texas Rules of
     Civil Procedure.

29

List #1

| Date | Pounds | Bushels | Kilos | Price/MT | Buyer |
|---|---|---|---|---|---|
| 29-Dec-97 | 47,600 | 850.00 | 21,591 | $142.00 | C & H Hygeia |
| 31-Dec-97 | 460 | 8.21 | 209 | $142.00 | Roque Garza |
| 05-Jan-98 | 260 | 4.64 | 118 | $142.00 | Lalo Alaniz |
| 07-Jan-98 | 600 | 10.71 | 272 | $142.00 | Lupe Garza |
| 09-Jan-98 | 420 | 7.50 | 191 | $142.00 | Bobby Fielding |
| 09-Jan-98 | 274,920 | 4,909.29 | 124,703 | $123.64 | Captadora Y Comercializadora |
| 09-Jan-98 | 1,120 | 20.00 | 508 | $142.00 | Valley Trucking |
| 12-Jan-98 | 168,640 | 3,011.43 | 76,495 | $123.64 | Ruben Morales |
| 14-Jan-98 | 3,740 | 66.79 | 1,696 | $125.00 | Roy Kosel |
| 19-Jan-98 | 340 | 6.07 | 154 | $142.00 | Gregorio Rivas |
| 28-Jan-98 | 6,200 | 110.71 | 2,812 | $125.00 | Cesar Gonzalez |
| 29-Jan-98 | 152,820 | 2,728.93 | 69,319 | $122.50 | Naval Enterprises |
| 29-Jan-98 | 211,460 | 3,776.07 | 95,918 | $122.50 | Naval Enterprises |
| 30-Jan-98 | 360 | 6.43 | 163 | $142.00 | Jesus Ochoa |
| 04-Feb-98 | 2,540 | 45.36 | 1,152 | $125.00 | Omar Saldivar |
| 05-Feb-98 | 3,720 | 66.43 | 1,687 | $125.00 | Roy Kosel |
| 06-Feb-98 | 141,300 | 2,523.21 | 64,093 | $122.50 | Naval Enterprises |
| 09-Feb-98 | 540 | 9.64 | 245 | $135.00 | Lalo Alaniz |
| 09-Feb-98 | 217,180 | 3,878.21 | 98,512 | $122.50 | Naval Enterprises |
| 10-Feb-98 | 6,620 | 118.21 | 3,003 | $125.00 | Cesar Gonzalez |
| 10-Feb-98 | 380 | 6.79 | 172 | $142.00 | Samuel Martinez |
| 11-Feb-98 | 281,360 | 5,024.29 | 127,624 | $122.50 | Naval Enterprises |
| 11-Feb-98 | 1,160 | 20.71 | 526 | $135.00 | Roy Floyd |
| 16-Feb-98 | 352,220 | 6,289.64 | 159,766 | $122.50 | Naval Enterprises |
| 16-Feb-98 | 305,980 | 5,463.93 | 138,792 | $122.50 | Naval Enterprises |
| 17-Feb-98 | 2,860 | 51.07 | 1,297 | $125.00 | Dave Sosten |
| 17-Feb-98 | 560 | 10.00 | 254 | $142.00 | Rey Ruiz |
| 20-Feb-98 | 141,240 | 2,522.14 | 64,066 | $122.50 | Naval Enterprises |
| 20-Feb-98 | 100 | 1.79 | 45 | $142.00 | A. Fernandez |

30

## List #1

| Date | Pounds | Bushels | Kilos | Price/MT | Buyer |
|---|---|---|---|---|---|
| 23-Feb-98 | 77,740 | 1,388.21 | 35,263 | $122.50 | Naval Enterprises |
| 23-Feb-98 | 356,220 | 6,361.07 | 161,580 | $122.50 | Naval Enterprises |
| 25-Feb-98 | 147,160 | 2,627.86 | 66,751 | $122.50 | Naval Enterprises |
| 25-Feb-98 | 74,220 | 1,325.36 | 33,666 | $122.50 | Naval Enterprises |
| 26-Feb-98 | 82,520 | 1,473.57 | 37,431 | $122.50 | Naval Enterprises |
| 02-Mar-98 | 2,740 | 48.93 | 1,243 | $135.00 | Leonel Munoz |
| 02-Mar-98 | 6,100 | 108.93 | 2,767 | $135.00 | Cesar Gonzalez |
| 05-Mar-98 | 3,460 | 61.79 | 1,569 | $135.00 | Roy Kosel |
| 05-Mar-98 | 640 | 11.43 | 290 | $145.00 | Samuel Martinez |
| 10-Mar-98 | 640 | 11.43 | 290 | $145.00 | Rey Ruiz |
| 13-Mar-98 | 6,180 | 110.36 | 2,803 | $128.00 | Cesar Gonzalez |
| 13-Mar-98 | 720 | 12.86 | 327 | $148.00 | Pedro Galvan |
| 18-Mar-98 | 6,820 | 121.79 | 3,094 | $128.00 | Cesar Gonzalez |
| 20-Mar-98 | 440 | 7.86 | 200 | $148.00 | Roque Garza |
| 24-Mar-98 | 3,240 | 57.86 | 1,470 | $135.00 | Roy Kosel |
| 30-Mar-98 | 2,820 | 50.36 | 1,279 | $135.00 | Leonel Munoz |
| Total Sold | 3,098,360 | 55,327.86 | 1,405,407 | $123.14 | Average Price |

31

List #2

| Date | Pounds | Bushels | Kilos |
|---|---|---|---|
| 04-Nov-96 | 350,760 | 6,263.57 | 159,104 |
| 05-Nov-96 | 480,320 | 8,577.14 | 217,872 |
| 06-Nov-96 | 935,020 | 16,696.78 | 424,122 |
| 12-Nov-96 | 406,360 | 7,256.44 | 184,324 |
| 14-Nov-96 | (406,160) | (7,252.86) | (184,233) |
| 16-Dec-96 | 135,620 | 2,421.79 | 61,517 |
| 15-Jan-97 | 151,860 | 2,711.79 | 68,883 |
| 21-Jan-97 | 152,140 | 2,716.79 | 69,010 |
| 23-Jan-97 | 293,760 | 5,245.71 | 133,249 |
| 29-Jan-97 | 154,220 | 2,753.93 | 69,954 |
| 31-Jan-97 | 148,780 | 2,656.79 | 67,486 |
| 05-Feb-97 | 232,460 | 4,151.07 | 105,443 |
| 06-Feb-97 | 145,480 | 2,597.86 | 65,989 |
| 07-Feb-97 | 165,440 | 2,954.29 | 75,043 |
| 11-Feb-97 | 176,720 | 3,155.71 | 80,160 |
| 19-Feb-97 | 252,160 | 4,502.86 | 114,379 |
| 21-Feb-97 | 249,860 | 4,461.79 | 113,336 |
| 03-Mar-97 | 187,340 | 3,345.36 | 84,977 |
| 04-Mar-97 | 51,480 | 919.29 | 23,351 |
| 13-Mar-97 | 302,580 | 5,403.21 | 137,249 |
| 06-May-97 | 338,640 | 6,047.14 | 153,606 |
| 12-May-97 | 150,380 | 2,685.36 | 68,212 |
| 14-May-97 | 208,100 | 3,716.07 | 94,394 |
| 25-Jul-97 | 38,320 | 684.29 | 17,382 |
| 21-Aug-97 | 77,000 | 1,375.00 | 34,927 |
| 08-Sep-97 | 62,320 | 1,112.86 | 28,268 |
| 03-Oct-97 | 224,660 | 4,011.79 | 101,905 |
| | 5,665,620 | 101,171.79 | 2,569,908 |

32

CONTINENTAL GRAIN CO ☎ 913 338 2051 10/22/96 13:14 :01/02 NO:199

## 27 Corn X-Topeka, KS

```
GIQ60D        6.6 - TRAIN/MULTI UNIT DETAIL INQUIRY     IQ60 10/22/96 13:09:5
XT UNIT TO        838  MODE R  COM 11  B/L           STR    SCALE
PAGE: 0001           CONT S 401 10771      SAN          LOC-PC

TRAIN ID: TO      838   COMMODITY DESC: YC   B/L DATE: 10/21/96   SAN:
```

| CAR NBR | WEIGHT | G | TP | TW | MST | DMG | BFM | HTDG | PRO | CM CD | STATS ULPSC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ATSF315271 | 201000 | 1 | OI | 59.6 | 14.3 | 1.8 | 1.0 | | | 11 | C |
| AEX    398 | 200000 | 1 | OI | 59.4 | 14.3 | 1.2 | 1.0 | | | 11 | C |
| AGIX   6598 | 202000 | 1 | OI | 59.5 | 14.3 | 2.1 | 1.5 | | | 11 | C |
| BN   455641 | 202000 | 1 | OI | 59.6 | 14.6 | 1.8 | 1.2 | | | 11 | C |
| ATSF302145 | 200000 | 1 | OI | 58.5 | 14.6 | 1.2 | 1.0 | | | 11 | C |
| ATSF304745 | 201000 | 1 | OI | 58.8 | 14.6 | 1.6 | 1.2 | | | 11 | C |
| GACX   4954 | 198000 | 1 | OI | 58.9 | 14.6 | 1.0 | 1.2 | | | 11 | C |
| BN   446170 | 199000 | 1 | OI | 59.2 | 15.0 | 1.4 | 1.3 | | | 11 | C |
| BN   446876 | 198000 | 1 | OI | 59.0 | 14.5 | 1.2 | 1.8 | | | 11 | C |
| BN   454159 | 199000 | 1 | OI | 59.3 | 14.1 | 0.8 | 1.4 | | | 11 | C |
| PLCX  25812 | 198000 | 1 | OI | 59.4 | 14.7 | 1.4 | 1.7 | | | 11 | C |
| LDCX  20877 | 200000 | 1 | OI | 59.0 | 14.7 | 1.2 | 1.3 | | | 11 | C |
| GFSX466364 | 200000 | 1 | OI | 59.0 | 14.9 | 1.0 | 1.9 | | | 11 | C |
| BN   454808 | 195000 | 2 | OI | 59.0 | 14.9 | 1.6 | 2.3 | | | 11 | C |
| BN   448282 | 200000 | 2 | OI | 58.6 | 15.0 | 1.5 | 2.5 | | | 11 | C |

```
PRESS <PF7> OR <PF8> TO PAGE
PF1=HELP  PF9=FURTHER DETAILS  PF10=SETTLE RECAP  PF11=PRE-SETTLE RECAP
B MY JOB                              LU #11
```

```
NEGIQ60D      6.6 - TRAIN/MULTI UNIT DETAIL INQUIRY     IQ60 10/22/96 13:10:03
XT UNIT TO        838  MODE R  COM 11  B/L           STR    SCALE
GE: 0002             CONT S 401 10771      SAN          LOC-PC

TRAIN ID: TO      838   COMMODITY DESC: YC   B/L DATE: 10/21/96   SAN:
```

| CAR NBR | WEIGHT | G | TP | TW | MST | DMG | BFM | HTDG | PRO | CM CD | STATS ULPSC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BN   460846 | 198000 | 1 | OI | 58.4 | 15.0 | 1.3 | 2.0 | | | 11 | C |
| RRRX182746 | 202000 | 1 | OI | 58.6 | 14.9 | 1.2 | 1.8 | | | 11 | C |
| RRRX182847 | 202000 | 2 | OI | 58.5 | 15.0 | 1.3 | 2.2 | | | 11 | C |
| HS   21038 | 202000 | 2 | OI | 58.4 | 15.0 | 1.2 | 2.2 | | | 11 | C |
| PLCX  19705 | 201000 | 1 | OI | 58.6 | 15.0 | 1.0 | 2.5 | | | 11 | C |
| BN   471693 | 199000 | 1 | OI | 58.3 | 15.0 | 1.4 | 2.0 | | | 11 | C |
| BN   466179 | 198000 | 1 | OI | 58.6 | 14.9 | 1.1 | 1.9 | | | 11 | C |
| BN   471088 | 199000 | 1 | OI | 58.3 | 15.0 | 1.4 | 1.7 | | | 11 | C |
| BN   467458 | 197000 | 1 | OI | 58.5 | 15.0 | 1.7 | 1.5 | | | 11 | C |
| CFWR 76894 | 201000 | 1 | OI | 59.0 | 14.9 | 1.3 | 1.6 | | | 11 | C |
| BN   469471 | 199000 | 1 | OI | 59.0 | 15.0 | 1.4 | 1.7 | | | 11 | C |
| BN   468681 | 198000 | 1 | OI | 58.5 | 14.7 | 1.4 | 1.6 | | | 11 | C |

```
END OF FILE REACHED, PRESS <PF7> OR <PF8> TO PAGE
PF1=HELP  PF9=FURTHER DETAILS  PF10=SETTLE RECAP  PF11=PRE-SETTLE RECAP
B MY JOB                              LU #11
```

```
NEGIQ61D      6.6 - TRAIN/MULTI UNIT SUMMARY INQUIRY     IQ61 10/22/96 13:10:08
NEXT UNIT TO      838  MODE R  COM 11  B/L           STR    SCALE
                     CONT S 401 10771      SAN          LOC-PC

RAIN ID: TO      838   COMMODITY CODE: YC   B/L DATE: 10/21/96   SAN:
```

ORIGIN LOCATION: TOPEKA ELEV A     DESTINATION LOCATION: BROWNSVILLE

CONTRACTS:     00000        00000        00000        00000

**33**

FREIGHT CONDITIONS: CP RATES:          U/M:     AMOUNT:     2780.51 (PER CAR)

345-0704        Attn: Loren    16 Cars X Motala, NE

```
N  IQ60D-     6.6 - TRAIN/MULTI UNIT DETAIL INQUIRY      IQ60 10/29/96 11:59:45
N  UNIT MO      6391  MODE R  COM 11  B/L            STR    SCALE
PAGE: 0001           CONT S 401 10813     SAN          LOC-PC

TRAIN ID: MO  -  6391   COMMODITY DESC: YC   B/L DATE: 10/26/96  SAN: 40115365

                                                                      CM STATS
   CAR NBR    WEIGHT G TP TW  MST  DMG  BFM  HTDG              PRO     CD ULPSC
PLCX 12207    203720 2 OI 56.6 14.3  0.6  2.5                          11  C A
BN   458504   202240 2 OI 56.8 14.5  1.4  2.1                          11  C A
ATSF303170    198080 2 OI 57.1 14.5  2.1  2.6                          11  C A
BN   449306   204750 2 OI 56.8 14.7  0.9  2.2                          11  C A
BN   461305   201170 2 OI 56.7 14.4  1.1  2.6                          11  C A
BN   456762   204140 2 OI 56.5 14.7  1.1  2.8                          11  C A
BN   446744   199670 2 OI 56.2 14.3  0.5  2.7                          11  C A
PLCX 20780    204490 2 OI 56.5 14.5  1.0  2.9                          11  C A
ATSF314579    198310 2 OI 56.4 14.1  1.0  2.7                          11  C A
BN   471923   203320 2 OI 57.0 13.7  0.7  2.5                          11  C A
RUSX 61047    204660 2 OI 57.1 13.9  1.2  2.3                          11  C A
GPSX  7033    202240 2 OI 57.1 14.7  1.2  2.2                          11  C A
GPSX  7194    201950 2 OI 56.7 14.5  0.9  2.1                          11  C A
GPSX  7137    202230 2 OI 56.6 14.6  0.7  2.3                          11  C A
BN   459693   202130 2 OI 56.4 14.5  0.7  2.6                          11  C A
  PRESS <PF7> OR <PF8> TO PAGE
  PF1=HELP  PF9=FURTHER DETAILS  PP10=SETTLE RECAP  PF11=PRE-SETTLE RECAP
B MY JOB                            LU #10
```

```
NEGIQ60D     6.6 - TRAIN/MULTI UNIT DETAIL INQUIRY      IQ60 10/29/96 11:59:53
N   UNIT MO     6391  MODE R  COM 11  B/L            STR    SCALE
1  E: 0002           CONT S 401 10813   SAN           LOC-PC

TRAIN ID: MO   6391   COMMODITY DESC: YC   B/L DATE: 10/26/96  SAN: 40115365

                                                                      CM STATS
   CAR NBR    WEIGHT G TP TW  MST  DMG  BFM  HTDG              PRO     CD ULPSC
USLX 18321    203360 2 OI 56.8 14.7  1.0  2.1                          11  C A
```

thanks.
Tina Coeds

1-800
243 3228

Trace a few

```
END OF FILE REACHED, PRESS <PF7> OR <PF8> TO PAGE
  PF1=HELP  PF9=FURTHER DETAILS  PF10=SETTLE RECAP  PF11=PRE-SETTLE RECAP
B MY JOB                            LU #10
```

```
NEGIQ61D     6.6 - TRAIN/MULTI UNIT SUMMARY INQUIRY    IQ61 10/29/96 11:59:59
NEXT UNIT MO    6391  MODE R  COM 11  B/L            STR    SCALE
                     CONT S 401 10813    SAN          LOC-PC

  IN ID: MO   6391   COMMODITY CODE: YC   B/L DATE: 10/26/96  SAN: 40115365

ORIGIN LOCATION: MOTALA        DESTINATION LOCATION: BROWNSVILLE
```

34

```
CONTRACTS: S40110813        00000        00000        00000

FREIGHT CONDITIONS:   RATES:        U/M:   AMOUNT:        (PER CAR)
```

11/08/96  14:02  ...
CONTINENTAL GRAIN CO   913 338 2051   Document 26   Filed in TXSD on 03/12/2002   Page 114 of 371   10/30/96   15:29   P:01/01  NO:952

*Attn: Loren*   *11 Cars X Motala NE to Complete the old 0104*
*27 Car sale we have with you.*

```
IQ60D      6.6 - TRAIN/MULTI UNIT DETAIL INQUIRY       IQ60 10/30/96 13:23:57
  T UNIT MO    6394  MODE C  COM 11  B/L 10 30 96  STR    SCALE
PAGE: 0001              CONT S 401 09946      SAN             LOC-PC 419

TRAIN ID: MO    6394   COMMODITY DESC: YC  B/L DATE: 10/30/96  SAN:
```

| CAR NBR | WEIGHT | G | TP | TW | MST | DMG | BFM | HTDG | PRO | CM CD | STATS ULPSX |
|---------|--------|---|----|----|----|-----|-----|------|-----|-------|-------|
| BN   447854 | 201900 | 2 | OI | 56.5 | 14.7 | 0.8 | 2.5 | | | 11 | C |
| BN   448161 | 204690 | 1 | OI | 56.4 | 14.6 | 0.7 | 1.9 | | | 11 | C |
| OFCX   655 | 204590 | 2 | OI | 56.5 | 14.5 | 1.1 | 2.5 | | | 11 | C |
| BN   448654 | 204200 | 2 | OI | 56.3 | 14.8 | 0.8 | 2.1 | | | 11 | C |
| AEX   388 | 204350 | 2 | OI | 56.4 | 15.0 | 0.8 | 2.1 | | | 11 | C |
| SOO  74320 | 204050 | 2 | OI | 56.9 | 14.9 | 0.9 | 2.1 | | | 11 | C |
| GGIX  187 | 203990 | 2 | OI | 56.4 | 15.0 | 0.8 | 2.2 | | | 11 | C |
| BN   462202 | 204690 | 1 | OI | 56.7 | 14.8 | 1.2 | 1.8 | | | 11 | C |
| BN   457054 | 204100 | 2 | OI | 56.8 | 14.6 | 1.0 | 2.3 | | | 11 | C |
| BN   448655 | 203810 | 1 | OI | 56.5 | 14.4 | 1.2 | 1.8 | | | 11 | C |
| RRRX460299 | 203530 | 1 | OI | 56.6 | 14.7 | 1.7 | 1.9 | | | 11 | C |

*Thanks*
*Jim Coady*
*Conte Grain*

```
END OF FILE REACHED, PRESS <PP7> OR <PP8> TO PAGE
PF1=HELP   PF9=FURTHER DETAILS   PF10=SETTLE RECAP   PF11=PRE-SETTLE RECAP
B MY JOB                            LU #34
```

```
NEGIQ61D      6.6 - TRAIN/MULTI UNIT SUMMARY INQUIRY      IQ61 10/30/96 13:24:08
 EXT UNIT MO    6394  MODE C  COM 11  B/L 10 30 96  STR    SCALE
                        CONT S 401 09946      SAN             LOC-PC 419

TRAIN ID: MO    6394   COMMODITY CODE: YC   B/L DATE: 10/30/96  SAN:

ORIGIN LOCATION: MOTALA              DESTINATION LOCATION: BROWNSVILLE

CONTRACTS:     00000        00000        00000        00000

FREIGHT CONDITIONS:   RATES:        U/M:      AMOUNT:              (PER CAR

              BUSHELS                   *** CAR TOTALS ***
APPLIED:                              APPLIED:
SETTLED:                   WEIGHTS    SETTLED:
UNLOADED:                             UNLOADED:
   LOADED:     40069.64     2243900      LOADED:    11

ADVANCE AMOUNT:                          TOTAL:    11
AVERAGE GRADES:
TW   56.6 MST  14.7 DMG    1.0 BFM   2.1 HTDG


PF1=HELP   PA1=PREVIOUS MENU   CLEAR=EXIT   ENTER=RETURN
B MY JOB                            LU #34
```

35



# COMMODITY SPECIALISTS COMPANY

To:     Craig Elkins
From:   Loren Walter, CSC
Date:   November 1, 1996
Re:     Yellow Corn, ex. Motala, NE

This letter is to inform you that a 16 and a 11 car unit have been billed to you for the account AGI. This unit is not to be released to AGI until I have received proper payment from AGI. Once again all charges incurred at your elevator will be for AGI's account. Thank you for your cooperation.

B6

 **SGS** SGS Control Services Inc.

P.O. Box 550
Deer Park, Texas 77536
Tel: (713) 479-7170
Fax: (713) 479-2734
TLX: 6868806

### AGRT FAX COVER SHEET

| | | |
|---|---|---|
| DATE | : | 10/1/1996 |
| TO | : | AGI |
| ATTENTION | : | Mr. Walter Puffelis II |
| FAX NO | : | 619-661-6484 |
| SENT BY | : | Willis WHITE |
| PAGES (TOTAL) | : | 1 |

REFERENCE :

Mr. Puffelis Moisture on Rail
Cars of Maize is out of Spec.

Mrs.

Moisture Results 15.0

CC 210 831-3181

SGS CSI 9/9/96 Approved by DLE/WW

Member of the SGS Group (Societe Generale de Surveillance)

37

# PORT ELEVATOR—BROWNSVILLE, L.C.
### P.O. BOX 4448
### Brownsville, Texas 78523
### Tel (210) 831-8245  Fax (210) 831-3181

Mr. Loren Walters
Commodity Specialists Company
55 Corporate Woods Ste 115
9300 W 110th St
Overland Park, Ks  66210


Dear Loren:

In accordance with your instructions, Port Elevator-Brownsville
has issued a warehouse receipt for 28,288.94 bushels of yellow
corn.   These bushels were deducted from those stocks delivered
by CSC to Port Elevator-Brownsville on October 31, 1996 for the
account of CSC/AGI.

Enclosed you will find original warehouse receipt # 0467 and 1
copy.  As you are aware, these bushels may not be loaded out
until such time the original warehouse receipt has been delivered
to Port Elevator-Brownsville.


Regards,


Craig Elkins

xc: AGI

38



# COMMODITY SPECIALISTS COMPANY

To:    Craig Elkins
From: Loren Walter
Re:    AGI Yellow Corn
Date: December 5, 1996

As of today 12/5/96, AGI has not paid for their corn in full.  Please do not
allow any of there grain to be shipped until released by CSC.  Please confirm
and acknowledge receipt of this fax to me via a return fax at 913-345-0704.  I
also request that bid me on the balance of the moneys owed to me from the
AGI group.  This amount is $78,120.63.  Please inform me how many bushels
you would need to wire me this amount.

Regards,

Loren Walter

Port Elevator-Brownsville, L.C. acknowledges
receipt of this transmission at 17:12 on
5 Dec 96.

39



# COMMODITY SPECIALISTS COMPANY

**To:** Craig Elkins
**From:** Loren Walter
**Re:** Yellow Corn @ Brownsville, TX
**Date:** December 19, 1996

Commodity Specialists Company is forced to request a warehouse receipt on 28,288.94 bushels of corn that was shipped to your elevator. CSC is forced to do this due to AGI's failure to pay in full for this grain. CSC will remit $3,564.40 to you for loadout and storage through December 31, 1996. After this date additional charges will be for the account of the receipt holder.

Please acknowledge receipt of this fax by signing below. This signature also acknowledges your intention to overnight this warehouse receipt to me today.

Commodity Specialists Company
55 Corporate Woods, Suite 115
9300 W. 110th Street
Overland Park, KS 66210

Thanks for your cooperation.

Regards,

Loren Walter
Commodity Specialists Company

Craig Elkins
Elevator Manager
Port of Brownsville

40

Oct. 23 '96  9:11          AKRON GROUP INC.          TEL 6195750426          P. 1

## A G I

**9870 MARCONI DRIVE, SUITE F**
**SAN DIEGO CA., 92173**
**Phone: 619) 661-8481**
**Fax: 619) 661-8484**

No. Pages. _____ 1

DATE: _Oct. 23/96_

TO: _Sr. Creig Elkins_

COMPANY: _Port Elevador_

FROM: _Sr. Walter Paffili_

REF: _____

MESSAGE: _____

_favor de comunicarse con nosotros_

_a el tel 619) 661-1404_

_es Importante_

_gracias_

41

**SGS** SGS Control Services Inc.

P.O. Box 888
Deer Park, Texas 77536
Tel: (713) 479-7170
Fax: (713) 479-2724
TLX: 6868806

*Phone # 210 831-8245*

AGRI FAX COVER SHEET

DATE : *10/3/96*

TO : *Port of Brownsville*

ATTENTION : *Walter Duffelin III*

FAX NO : *210 931-3131*

SENT BY TO → : *Mike Hill*

PAGES (TOTAL) : *2*

REFERENCE :

*Please find here
Corrected Weight.
Certificate.*

*Analysis to follow later
When we have checked*

*As discussed we are going to
Run one analysis on Composite
And retain each car if you need
them checked Later;*

SGS CRT 4/9/96 Approved by DLK/ws



# SYSCO DE BAJA
## 2295 PASEO DE LAS AMERICAS
## SUITE 22, SAN DIEGO CA 92173

SAN DIEGO CA A 24 DE SEPTIEMBRE DE 1997

ATENCION SR. CRAIG ELKIN
PORT ELEVATOR
BRONWSVILLE, TEXAS

SR. CRAIG ELKIN

POR MEDIO DE LA PRESENTE LE INFORMO QUE LE VENDI A LA SRA. IVONNE SOTO LA
CANTIDAD DE 2,500. TONELADAS METRICAS QUE DEBERA ENTREGARLE A LA PRESENTA-
CION DE ESTA DOCUMENTACION ANTES DEBERA CUBRIR EL ADEUDO PENDIENTE QUE
TENEMOS POR CONCEPTO DE ALMACEN. TE RUEGO ME ENVIES POR DHL LA DOCUMENTA-
CION CORRESPONDIENTE Y DEBERA FIRMARTE DE RECIBIDO ESTA MERCANCIA EN ORIGINAL
Y DOS COPIAS.

ATENTAMENTE.

LIC. BERNAN GUTIERREZ

EL PRECIO DE LA FACTURA SERA DE $170.00 DLRS. POR TONELADA.

YO, IVONNE SOTO, AUTORIZO A EL SR. ELFEGO ROSALES TORRES Y/O HARRY LACAVE
BARRIENTOS PARA QUE EN MI NOMBRE RETIREN LA MERCANCIA ARRIBA MENCIONADA
AL MOMENTO QUE SE PRESENTE ESTE ESCRITO.

SRA. IVONNE SOTO

THIS IS A TRUE AND CORRECT COPY TAKEN FROM THE ORIGINAL

SWORN AND SUSCRIBED TO BEFORE ME
THIS 07 DAY OF OCTOBER, 1997

MARTHA P. DE LA TORRE
NOTARY PUBLIC
HIDALGO COUNTY, TEXAS



MARTHA P. De la TORRE
Notary Public, State of Texas
My Commission Expires
MAY 2 2000

43



Juanne Soto

Home   619) 482 26 54   S. Diego.

Off   66) 82 93 34   tijuana

cellulor   66) 48 10 00   tijuana

44

# SYSCO DE BAJA, SA DE CV
## 1853 CAROLYN DR.
## CHULA VISTA, CA. 91913


## SPECIAL LOADING ORDER


FOR SPECIAL INSTRUCTIONS AND FOR THIS ONE TIME ONLY, LIC. BERSAIN GUTIERREZ AND SYSCO DE BAJA, SA DE CV AUTHORIZE THE LOADING OF TEN (10) TRUCKS WITH YELLOW CORN FOR THE ACCOUNT OF:


### ALICIA GOMEZ AND/OR ALFREDO GOMEZ


ALL FUTURE LOADING ORDERS WILL ORIGINATE FROM SYSCO DE BAJA, SA DE CV AND WILL BE SIGNED BY LIC. BERSAIN GUTIERREZ. ANY ADDITIONAL SIGNATURES MUST FIRST BE AUTHORIZED IN WRITING BY LIC. BERSAIN GUTIERREZ BEFORE THEY WILL BE VALID.

_____
LIC. BERSAIN GUTIERREZ

## LIC. ALFREDO GOMEZ AGUILAR
### GUERRERO Y 20 DE NOVIEMBRE ESQUINA
### RIO BRAVO, TAMAULIPAS   MEXICO
### Tel 893-40058

4 Noviembre 1996


Estimado Sr. Craig Elkins:


Con fin de autorizar que la Agencia Aduanal Victor M. Guerra tramite los permisos de exportacion hacia a Mexico, le damos autorizacion para que ellos nos representen ante su compania, Port Elevator-Brownsville, L.C. y reciba toda la documentacion.

La recepcion de estos documentos, representa que Lic. Alfredo Gomez Aguilar esta aceptando la mercancia.


Atentamente,


Lic. Alfredo Gomez Aguilar

46

*LIC. ALFREDO GÓMEZ AGUILAR.*
**CALLE V. GUERRERO Y 20 DE NOVIEMBRE ESQUINA.**
**CD. RÍO BRAVO, TAMOS.   4-00-58  4-12-58  4-31-84**

05 DE NOVIEMBRE DE 1996.

A QUIEN CORRESPONDA:

POR MEDIO DE LA PRESENTE ESTOY AUTORIZANDO AL ING. JORGE ALBERTO GÓMEZ AGUILAR. PARA QUE EN MI NOMBRE Y REPRESENTACION, REALIZE LOS TRAMITES NECESARIOS PARA LA IMPORTACION DE MAIZ Y FIRMAR TODA CLASE DE DOCUMENTOS EN LOS CUALES SE REQUIERA MI FIRMA.

SIN MAS POR EL MOMENTO AGRADECEMOS DE ANTEMANO LAS ATENCIONES QUE SE SIRVAN TENER .

ATENTAMENTE.

LIC. ALFREDO GÓMEZ AGUILAR

47

# Port Elevator - Brownsville, L.C.

November 14, 1996

To Whom It May Concern:

Lic. Alicia Gomez has returned five (5) truck loads of yellow corn that loaded out on 11/12/96 on Invoice BG5. These five (5) trucks unloaded on 11/14/96.

| Truck License No. | Inbound Weight |
|---|---|
| 024-UC9 | 85,020 |
| 021-UC9 | 83,660 |
| 023-UC9 | 83,400 |
| 211-UC9 | 84,760 |
| 946-UC8 | 69,320 |
| | 406,160 Pounds |

The reason given for having to unload the trucks was a Lack of Unloading Destinations and truckers wanted to unload, either here or at destination.

Craig Elkins, General Manager
Port Elevator - Brownsville, L.C.

48

FROM :                          PHONE NO. :                                    P31

**SYSCO DE BAJA**
**LIC. BERSAIN GUTIERREZ ZENTENO**

2295 PASEO DE LA AMERICAS SUITH·22
OTAY MESA CA. 92173
U.S.A

Fono (619)661-13-33
Fax (619)461-1666

ENERO 10 DE 1997

**PORT ELEVATOR BROWNSVILLE**
**ATENCION : CRAIG ELKING**
**BROWNSVILLE ,TEXAS**

ESTIMADO SR. CRAIG ELKING

Por medio de la presente y de la manera mas atenta me dirijo a usted para solicitarle muy atentamente se sirva entregarle 4 (cuatro) cargas mas a los camiones que enviara el ing. RICARDO HINOJOSA ,Esta orden reemplaza la anterior que mande de 4 que solo se cargaron dos y que faltaban de cargar 2 mas por lo que te ruego solo cargues 4 camiones y quede sin efecto los 2 camiones que faltan de la orden numero 3 anterior de cuatro y tambien sera en los mismos terminos que la anterior debera firmarle la factura y el recibo de la mercancia conteniendo el peso y numero de placas de cada camion que se cargue y le ruego se sirva enviarme las copias por fax y los originales por correo certificado a travez de federal express. los fax le ruego se sirva enviarmelos al (619)482-55-57 y los originales a 1853 CAROLYN DR. CHULA VISTA CA. 91913.

POR LA ATENCION A LA PRESENTE QUEDO DE USTED MUY

ATENTAMENTE.

LIC. BERSAIN GUTIERREZ ZENTENO
orden de carga No

H9

FROM :                                          PHONE NO. :                                          P01

**SISSOS DE BAJA**
LIC. BERSAIN GUTIERREZ ZENTENO

2295 PASEO DE LA AMERICAS SUITE 22.
OTAY MESA CA. 92173
U.S.A

Phone (619)461-13-33
Fax (619)461-1666

ENERO 10 DE 1997

**PORT ELEVATOR BROWNSVILLE**
**ATENCION : CRAIG ELKING**
**BROWNSVILLE , TEXAS**

ESTIMADO SR. CRAIG ELKING

Por medio de la presente y de la manera mas atenta me dirijo a usted para solicitarle
muy atentamente se sirva entregarle 4 (cuatro) cargas mas a los camiones que
enviara el ing. RICARDO HINOJOSA ,Esta orden reemplaza la anterior que
mande de 4 que solo se cargaron dos y que faltaban de cargar 2 mas por lo que te
ruego solo cargues 4 camiones y quede sin efecto los 2 camiones que faltan de la
orden numero 3 anterior de cuatro y tambien sera en los mismos terminos que la
anterior debera firmarle la factura y el recibo de la mercancia conteniendo el peso y
numero de placas de cada camion que se cargue y le ruego se sirva enviarme las
copias por fax y los originales por correo certificado a travez de federal express.
los fax le ruego se sirva enviarmelos al (619)482-55-57 y los originales a 1853
CAROLYN DR. CHULA VISTA CA. 91913.
POR LA ATENCION A LA PRESENTE QUEDO DE USTED MUY

ATENTAMENTE.

LIC. BERSAIN GUTIERREZ ZENTENO
orden de carga #4

FROM :                              PHONE NO. :                              P01

**STAGG DE BAJA**
**LIC. BERSAIN GUTIERREZ ZENTENO**

2295 PASEO DE LA AMERICAS SUITH. 22
OTAY MESA CA. 92171
U.S.A

Tpono (619)461-13-33
fax (619)461-1666

**ENERO 10 DE 1997**

**PORT ELEVATOR BROWNSVILLE**
**ATENCION : CRAIG ELKING**
**BROWNSVILLE , TEXAS**

**ESTIMADO SR. CRAIG ELKING**

Por medio de la presente y de la manera mas atenta me dirijo a usted para solicitarle
muy atentamente se sirva entregarle 4 (cuatro) cargas mas a los camiones que
enviara el ing. RICARDO HINOJOSA ,Esta orden reemplaza la anterior que
mande de 4 que solo se cargaron dos y que faltaban de cargar 2 mas por lo que te
ruego solo cargues 4 camiones y quede sin efecto los 2 camiones que faltan de la
orden numero 3 anterior de cuatro y tambien sera en los mismos terminos que la
anterior debera firmarle la factura y el recibo de la mercancia conteniendo el peso y
numero de placas de cada camion que se cargue y le ruego se sirva enviarme las
copias por fax y los originales por correo certificado a travez de federal express.
los fax le ruego se sirva enviarmelos al (619)482-55-57 y los originales a 1853
CAROLYN DR. CHULA VISTA CA. 91913.
POR LA ATENCION A LA PRESENTE QUEDO DE USTED MUY

**A T E N T A M E N T E.**

**LIC. BERSAIN GUTIERREZ ZENTENO**
orden de carga No.

51

Port Elevator-Brownsville, L.C
P.O. Box 4448
1/2 Mile South Port Rd.                                    Page 1 of 1
Brownsville, Texas 78523-4448

```
*****************************************
*                                       *
*         STATEMENT of ACCOUNT          *
*                                       *
*****************************************
```

SYSCO DE BAJA SA DE CV                     Statement Date: 12-31-96

1853 CAROLYN DRIVE                         Account number: SYSCO
CHULA VISTA, CALIFORNIA 91913

| Date | Invoice | Description | Charges | Credits | Amount Due | Balance |
|------|---------|-------------|---------|---------|------------|---------|
| 11-30 | 874 | MISCELLANEOUS CHARGE | 471.25 | | 471.25 | 471.25 |
| 11-30 | 876 | STORAGE/ELEVATION | 1332.48 | | 1332.48 | 1803.73 |
| 11-30 | 877 | OUT ELEVATION | 3875.45 | | 3309.67 | 5679.18 |
| 12-26 | | Credit memo, #143 | | -565.78 | | 5113.40 |
| 12-31 | 891 | STORAGE & ELEVATION | 6862.51 | | 6862.51 | 11975.91 |
| | | FinChg Current, 1.% / Month | 51.13 | | 51.13 | 12027.04 |



| Current | 1 to 30 | 31 to 60 | 61 to 90 | Over 90 | | Total |
|---------|---------|----------|----------|---------|---|-------|
| 6862.51 | 5113.40 | 0.00 | 0.00 | 0.00 | 52 | 12027.04 |

**SYSCO DE BAJA**
**LIC. BERSAIN GUTIERREZ ZENTENO**

2295 PASEO DE LA AMERICAS SUITE 22
OTAY MESA CA. 92173
U.S.A

Phone (619)661-63-33
Fax (619)661-1666

**ENERO 22 DE 1997**

**PORT ELEVATOR BROWNSVILLE**
**ATENCION : CRAIG ELKING**
**BROWNSVILLE ,TEXAS**

ESTIMADO SR. CRAIG ELKING

Por medio de la presente y de la manera mas atenta me dirijo a usted para solicitarle muy atentamente se sirva entregarle 4 (cuatro) cargas mas a los camiones que enviara el ing. RICARDO HINOJOSA . en los mismos terminos que la anterior debera firmarle la factura y el recibo de la mercancia conteniendo el peso y numero de placas de cada camion que se cargue y le ruego se sirva enviarme las copias por fax y los originales por correo certificado a travez de federal express.
los fax le ruego se sirva enviarmelos al (619)482-55-57 y los originales a 1853 CAROLYN DR. CHULA VISTA CA. 91913.

| placas camion | placas de caja | nombre chofer |
|---|---|---|
| 822BDI | 520UHS | EDUARDO AGUILAR |
| 165BD3 | 465UH9 | GREGORIO REYNA |
| 818BD3 | 035UH9 | FELIX SAN MIGUEL |
| 050BD2 | 289UK2 | GABRIEL DE LA GARZA |

POR LA ATENCION A LA PRESENTE QUEDO DE USTED MUY

ATENTAMENTE.

LIC. BERSAIN GUTIERREZ ZENTENO
orden de cargas

BANCO DE MEX
LIC. HERNAN GUTIERREZ ZENTENO

2295 PASEO DE LA AMERICAS SUITE 22
OTAY MESA CA. 92173
U.S.A.

ENERO 29 DE 1997

**PORT ELEVATOR BROWNSVILLE**
**ATENCION : CRAIG ELKING**
**BROWNSVILLE , TEXAS**

ESTIMADO SR. CRAIG ELKING

Por medio de la presente y de la manera mas atenta me dirijo a usted para solicitarle muy atentamente se sirva entregarle 2 (DOS) cargas mas a los camiones que enviara el Sr. RICARDO HINOJOSA , en los mismos terminos que la anterior debera firmarle la factura y el recibo de la mercancia conteniendo el peso y numero de placas de cada camion que se cargue y le ruego se sirva enviarme las copias por fax y los originales por correo certificado a travez de federal express.
los fax le ruego se sirva enviarmelos al (619)482-55-57 y los originales a 1853 CAROLYN DR. CHULA VISTA CA. 91913.

| placas camion | placas de caja | nombre chofer |
|---|---|---|
| 297 AF6 | S26UE7 | IRINEO POMPA |
| 818B3 | 035UH9 | FELIX  SAN MIGUEL |

POR LA ATENCION A LA PRESENTE  QUEDO DE USTED MUY

ATENTAMENTE.

LIC. HERNAN GUTIERREZ ZENTENO
orden de compra #

54

FROM :                              PHONE NO. :                              P01

**TARIMAS DE BAJA**
LIC. GERARDO GUTIERREZ ZENTENO

2295 PASEO DE LA AMERICAS SUITE 22
OTAY MESA CA. 92173
U.S.A

Phone (619)661-13-33
Fax (619)661-1666

ENERO 30 DE 1997

**PORT ELEVATOR BROWNSVILLE
ATENCION : CRAIG ELKING
BROWNSVILLE , TEXAS**

ESTIMADO SR. CRAIG ELKING

Por medio de la presente y de la manera mas atenta me dirijo a usted para solicitarle
muy atentamente se sirva entregarle 2 (DOS) cargas mas a los camiones que enviara
el ing. RICARDO HINOJOSA . en los mismos terminos que la anterior debera
firmarle la factura y el recibo de la mercancia conteniendo el peso y numero de
placas do cada camion que se cargue y le ruego se sirva enviarme las copias por fax
y los originales por correo certificado a travez de federal express.
los fax le ruego se sirva enviarmelos al (619)482-55-57 y los originales a 1853
CAROLYN DR. CHULAVISTA CA. 91913.

| placas camion | placas de caja | nombre chofer |
|---|---|---|
| 646 BD4 | 464UH9 | JOSE LUIS IBAÑES |
| 050 BD2 | 289UK2 | GABRIEL DE LA GARZA |

POR LA ATENCION A LA PRESENTE QUEDO DE USTED MUY

ATENTAMENTE.

LIC. BERNARDO GUTIERREZ ZENTENO
orden de carga #7

55

LIC. BERNARDO GUTIERREZ ZENTENO

2255 PASEO DE LA AMERICAS SUITE 77
OTAY MESA CA. 92173
U.S.A

FEBRERO 5 DE 1997

**PORT ELEVATOR BROWNSVILLE**
**ATENCION : CRAIG ELKING**
**BROWNSVILLE TEXAS**

ESTIMADO SR. CRAIG ELKING

Por medio de la presente y de la manera mas atenta me dirijo a usted para solicitarle muy atentamente se sirva entregarle 3 (TRES) cargas mas a los camiones que enviara el ing. RICARDO HINOJOSA : en los mismos terminos que la anterior debera firmarle la factura y el recibo de la mercancia conteniendo el peso y numero de placas de cada camion que se cargue y le ruego se sirva enviarme las copias por fax y los originales por correo certificado a travez de federal express.
los fax le ruego se sirva enviarmelos al (619)482-55-57 y los originales a 1853
CAROLYN DR. CHULAVISTA CA. 91913.

placas camion          placas de caja          nombre chofer

O35UH9
289UK2
371UE7

POR LA ATENCION A LA PRESENTE  QUEDO DE USTED MUY

A T E N T A M E N T E

LIC. BERNARDO GUTIERREZ ZENTENO

5-6

FROM :

PHONE NO. :

P01

**OTTOS DE MAIZ**
LIC. BENJAMIN GUTIERREZ ZENTENO

2255 PASEO DE LA AMERICAS SUITE 22
OTAY MESA CA. 92173
U.S.A.

Tel. (619)661-13-33
Fax (619)661-1466

FEBRERO 6 DE 1997

**PORT ELEVATOR BROWNSVILLE
ATENCION : CRAIG ELKING
BROWNSVILLE , TEXAS**

ESTIMADO SR. CRAIG ELKING

Por medio de la presente y de la manera mas atenta me dirijo a usted para solicitarle muy atentamente se sirva entregarle 2 (dos) cargas mas a los camiones que enviara el ing. RICARDO HINOJOSA . en los mismos terminos que la anterior debera firmarle la factura y el recibo de la mercancia conteniendo el peso y numero de placas de cada camion que se cargue y le ruego se sirva enviarme las copias por fax y los originales por correo certificado a travez de federal express.

los fax le ruego se sirva enviarmelos al (619)482-55-57 y los originales a 1853 CAROLYN DR. CHULAVISTA CA. 91913.

| placas camion | placas de caja | nombre chofer |
|---|---|---|
| 822 BB1 | 520 UH5 | EDUARDO AGUILAR |
| 410 BD4 | 463 UH9 | ISAIS CERNA |

POR LA ATENCION A LA PRESENTE QUEDO DE USTED MUY

**ATENTAMENTE.**

LIC. BENJAMIN GUTIERREZ ZENTENO
orden de compra no

5-7

ATN' SR. BERSAIN GUTIERREZ

DE: TRANSPORTES TNI

090-TY2

094-TY2

CHOFER ARMANDO PEDRAZA

PLACAS 787 BB3

CHOFER MIGUEL HUERTA

PLACAS 096 BD1

DE TRANSPORTES JOSE GUAJARDO

CHOFER HECTOR DORIA

PLACAS 043 AM1

CHOFER MANUEL HERNANDEZ

PLACAS 623 BB4

SR. RICARDO HINOJOSA.

58

FROM :                           PHONE NO. :                                    P01

**STYROS DE BAJA**
**LIC. BERNABE GUTIERREZ ZENTENO**

2190 PASEO DE LA AMERICAS SUITE 12
OTAY MESA CA. 92173

Phone (619)661-13-33
Fax (619)661-1666

FEBRERO 7 DE 1997

**PORT ELEVATOR BROWNSVILLE**
**ATENCION : CRAIG ELKING**
**BROWNSVILLE , TEXAS**

ESTIMADO SR. CRAIG ELKING

Por medio de la presente y de la manera mas atenta me dirijo a usted para solicitarle
muy atentamente se sirva entregarle 4 (CUATRO) cargas mas a los camiones que
enviara el ing. RICARDO HINOJOSA . en los mismos terminos que la anterior
debera firmarle la factura y el recibo de la mercancia conteniendo el peso y numero
de placas de cada camion  que se cargue y le ruego se sirva enviarme las copias por
fax y los originales por correo certificado a traves de fedgeral express.
lue fax le ruego se sirva enviarmelos al (619)482-46-67 y los originales a 1853
CAROLYN DR. CHULAVISTA CA. 91911

| placas camion | placas de caja | nombre chofer |
|---|---|---|
| 048AMO | 090ED2 | H.DORIA |
| 023BR3 | 096ED2 | HERNANDEZ |
|  | 727BB | A.PEDROSA |
| TMI | 096DD1 | M.HUERTA |

POR LA ATENCION A LA PRESENTE  QUEDO DE USTED MUY

A T E N T A M E N T E

LIC. BERNABE GUTIERREZ ZENTENO
orden de compra #9

*Only two of these Trucks were loaded*

5-9

FEBRUARY 11, 1997

TO WHOM IT MAY CONCERN BERSAIN GUTIERREZ GAVE MR. ELKINS PERMISSION TO LOAD FOUR (4) TRUCKS
BY PHONE. THEY WERE LOADED ON FEBRUARY 11, 1997 AND RELEASED ON FEBRUARY 12, 1997.

S. Lee Gonzales

60

**SYSCO DE BAJA**
**LIC. HERNAN GUTIERREZ ZENTENO**

2295 PASEO DE LA AMERICAS SUITE 22
OTAY MESA CA. 92173
U.S.A.

Phone (619)661-12.33
Fax (619)661-1666

**FEBRERO 18 DE 1997**

**ATENCION : CRAIG ELKING**
**BROWNSVILLE , TEXAS**

**ESTIMADO SR. CRAIG ELKING**

Por medio de la presente y de la manera mas atenta me dirijo a usted para solicitarle muy atentamente se sirva entregarle 5 (cinco) cargas mas a los camiones que enviara el Ing. RICARDO HINOJOSA . en los mismos terminos que la anterior debera firmarle la factura y el recibo de la mercancia conteniendo el peso y numero de placas de cada camion que se cargue y le ruego se sirva enviarme las copias por fax y los originales por correo certificado a traves de federal express.

los fax le ruego se sirva enviarmelos al (619)482-55-57 y los originales a 1853 CAROLYN DR. CHULAVISTA CA. 91913.

| placas camion | placas de caja | nombre chofer |
|---|---|---|
| 601A55 | 877UK1 | J.CASTILLO |
| 596AS5 | 791UE7 | L. ZAMORA |
| 904BB4 | 800UE7 | D. CASILLAS |
| 607A55 | 803UE7 | JOSE JMENDOZA |
| 608A55 | 780UE7 | J.HERNANDEZ |

POR LA ATENCION A LA PRESENTE QUEDO DE USTED MUY

**ATENTAMENTE**

LIC. HERNAN GUTIERREZ ZENTENO
orden de

**FEBRERO 21 DE 1997**

**PORT ELEVATOR BROWNSVILLE**
**ATENCION : CRAIG ELKING**
**BROWNSVILLE ,TEXAS**

**ESTIMADO SR. CRAIG ELKING**

Por medio de la presente y de la manera mas atenta me dirijo a usted para solicitarle muy atentamente se sirva entregarle 5 (cinco) cargas mas a los camiones que enviara el ing. RICARDO HINOJOSA , en los mismos terminos que la anterior debera firmarle la factura y el recibo de la mercancia conteniendo el peso y numero de placas de cada camion  que se cargue y le ruego se sirva enviarme las copias por fax y los originales por correo certificado a traves de federal express.
los fax le ruego se sirva enviarmelos al (619)482-55-57 y los originales a 1853 CAROLYN DR. CHULAVISTA CA. 91913.

| placas camion | placas de caja | nombre chofer |
|---|---|---|
| 595AFS | 789UE7 | M.PEREZ |
| 596AFS | 791UE7 | M.ZAMORA |
| 766W4 | 799UE7 | JOSE TORREZ |
| 600AFS | 802UE7 | JOSE MONTAÑO |
| 689AFS | 803UE7 | JUAN A  MENDOZA |

POR LA ATENCION A LA PRESENTE  QUEDO DE USTED MUY

**A T E N T A M E N T E.**

LIC.  ANDRES GUTIERREZ ZENTENO
orden de compra N10

**JYECO DE BAJA**
**LIC. BERMAN GUTIERREZ ZENTENO**

2295 PASEO DE LA AMERICAS SUITE 72
OTAY MESA CA 92173
U.S.A

Phone (619)661-13-33
Fax (619)661-1666

MARZO 3 DE 1977

## ESTIMADO SR. CRAIG ELKING

Por medio de la presente y de la manera mas atenta me dirijo a usted para solicitarle muy atentamente se sirva entregarle 5 (cinco) cargas mas a los camiones que tuviere al Ing. RICARDO ESPINOSA . en los mismos terminos que la anterior debera firmarse la factura y el recibo de la mercancia conteniendo el placas y numero de placas de cada camion que se cargue y le ruego se sirva enviarme las copias por fax y los originales por correo certificado a traves de federal express. los fax le ruego se sirva enviarmelos al (619)483 33-37 y los originales a 1853 CAROLYN DR. CHULAVISTA CA. 91913.

| placas camion | placas de caja | NOMBRE CHOFER |
|---|---|---|
| 592 AF5 | 787 UE7 | SANTIAGO REYES |
| 595 AF5 | 789 UE7 | MANUEL PEREZ |
| 600 AF5 | 793 UE7 | JOSE ALFONZO ROBLEDO |
| 608 AF5 | 780 UE7 | JUAN HERNANDEZ |
| 609 AF5 | 781 UE7 | ARNULFO SANCHEZ |

POR LA ATENCION A LA PRESENTE QUEDO DE USTED MUY

ATENTAMENTE.

LIC. BERMAN GUTIERREZ ZENTENO
orden de carga #11

63

**SYSCO DE MAR**
**LIC. BERMAN GUTIERREZ ZENTENO**

2293 PASEO DE LA AMERICAS SUITE 72
OTAY MESA CA. 92173
U.S.A.

Phone (619)661-13-13
Fax (619)661-6666

MARZO 3 DE 1977

ESTIMADO SR. CRAIG ELKING

Por medio de la presente y de la manera mas atenta me dirijo a usted para solicitarle muy atentamente se sirva entregarle 5 (cinco) cargas mas a los camiones que estuviera el ing. RICARDO SENSORA , en los mismos terminos que la anterior debera firmarle la factura y el recibo de la mercancia conteniendo el peso y numero de placas de cada camion que se cargue y le ruego se sirva enviarme las copias por fax y los originales por correo certificado a travez de federal express.
los fax le ruego se sirva enviarmelos al (619)482 33-37 y los originales a 1853 CAROLYN DR. CHULAVISTA CA. 91913.

| placas camion | placas de caja | NOMBRE CHOFER |
|---|---|---|
| 592 AF5 | 787 UE7 | SANTIAGO REYES |
| 595 AF5 | 789 UE7 | MANUEL PEREZ |
| 600 AF5 | 793 UE7 | JOSE ALEONZO ROBLEDO |
| 608 AF5 | 780 UE7 | JUAN HERNANDEZ |
| 609 AF5 | 781 UE7 | ARNULFO SANCHEZ |

POR LA ATENCION A LA PRESENTE QUEDO DE USTED MUY

ATENTAMENTE.

LIC. BERMAN GUTIERREZ ZENTENO
orden de caja #11

*Came one day late because che Was in an accident th day before*

*Sanche*

64

FROM :                          PHONE NO. :                          P01

**BUFETE DE BAJA**
**LIC. HERNAN GUTIERREZ ZENTENO**

2295 PASEO DE LAS AMERICAS SUITE 22,
OTAY MESA CA 92173
U.S.A

Phone (619)661-13-31
Fax (619)661-1666

MARZO 12 DE 1997

**PORT ELEVATOR BROWNSVILLE**
**ATENCION : CRAIG ELKING**
**BROWNSVILLE , TEXAS**

ESTIMADO SR. CRAIG ELKING

Por medio de la presente y de la manera mas atenta me dirijo a usted para solicitarle
muy atentamente se sirva entregarle 6 cargas mas a los camiones que enviara el ing.
RICARDO HINOJOSA . en los mismos terminos que la anterior debera firmarle la
factura y el recibo de la mercancia conteniendo el peso y numero de placas de cada
camion  que se cargue y le ruego se sirva enviarme las copias por fax y los
originales por correo certificado a travez de federal express.
los fax le ruego se sirva enviarmelos al (619)482-55-57 y los originales a 1853
CAROLYN DR. CHULAVISTA CA. 91913.

| placas camion | placas de caja | NOMBRE CHOFER |
|---|---|---|
| 1 | 877UKI | |
| 3 | 784UE7 | |
| 19 | 795UE7 | |
| 23 | 780UE7 | |
| 21 | 802UE7 | |
| 11 | 790UE7 | |

POR LA ATENCION A LA PRESENTE  QUEDO DE USTED MUY

ATENTAMENTE

LIC. HERNAN GUTIERREZ ZENTENO
orden de carga 142



**LIC. ▇▇▇▇▇ GUTIERREZ ZENTENO**

2205 PASEO DE LA AMERICAS SUITE 22
OTAY MESA CA. 92173
U.S.A

MAYO 6 DE 1997

**PORT ELEVATOR BROWNSVILLE**
**ATENCION : CRAIG ELKING**
**BROWNSVILLE , TEXAS**

ESTIMADO SR. CRAIG ELKING

Por medio de la presente y de la manera mas atenta me dirijo a usted para solicitarle muy atentamente se sirva entregarle 4 cargas mas a los camiones que enviara el ing. RICARDO HINOJOSA . en los mismos terminos que la anterior debera firmarle la factura y el recibo de la mercancia conteniendo el peso y numero de placas de cada camion que se cargue y le ruego se sirva enviarme las copias por fax y los originales por correo certificado a travez de federal express.
los fax le ruego se sirva enviarmelos al (619)482-55-57 y los originales a 1833 CAROLYN DR. CHULAVISTA CA. 91913.

| placas camion | placas de caja | NOMBRE CHOFER |
|---|---|---|
| 44 | 584-UJ1 | RODOLFO BOTELLO |
| 45 | 583-UJ1 | JUAN FRANCISCO FABELA |
| 9 | 278-UJ1 | JOSE RANGEL |
| 2 | 996-TZ5 | JUAN ARANDA |

POR LA ATENCION A LA PRESENTE QUEDO DE USTED MUY

ATENTAMENTE

LIC. BERNAL GUTIERREZ ZENTENO
orden de ▇▇▇▇▇

65. 5

## Comercializadora Los Cachorros, S.A. de C.V.

6/mayo/1997

CRAIG EIKINS.-

El destino de los 4 camiones que estos cargando de maíz quebrado es e:

carretera Laredo #1260 San Nicolás de los Garza. N.L.

Tel 3-76-28-72 (tel y fax)

P.D. te suplico la confirmación de la salido de estas Unidades

Ricardo Hinojosa

Carretera Laredo 1260 San Nicolas de los Garza, N.L.   Tel. 376-28-72

**STROS DE RAJA**
**LIC. GERSON GUTIERREZ ZENTENO**

2295 PASEO DE LA AMERICAS SUITE 22
OTAY MESA CA. 92173
U.S.A

Phone (619)482-55-57
fax (619)482-55-57

MAYO 12 DE 1997

**PORT ELEVATOR BROWNSVILLE**
**ATENCION : CRAIG ELKING**
**BROWNSVILLE ,TEXAS**

ESTIMADO SR. CRAIG ELKING

Por medio de la presente y de la manera mas atenta me dirijo a usted para solicitarle
muy atentamente se sirva entregarle 4 cargas mas a los camiones que enviara el ing.
RICARDO HINOJOSA . en los mismos terminos que la anterior debera firmarle la
factura y el recibo de la mercancia conteniendo el peso y numero de placas de cada
camion que se cargue y le ruego se sirva enviarme las copias por fax y los
originales por correo certificado a travez de federal express.
los fax le ruego se sirva enviarmelos al (619)482-55-57 y los originales a 1853
CAROLYN DR. CHULAVISTA CA. 91913.

| placas camion | placas de caja | NOMBRE CHOFER |
|---|---|---|
| 957 TZ5 | | LUIS SOTO |
| 992 TZ5 | | JORGE MARTINEZ |

Y DOS MAS QUE NO TENGO DATOS PERO SON DE SORGO QUE
OCUPAMOS ALLA EN MONTERREY.

POR LA ATENCION A LA PRESENTE  QUEDO DE USTED MUY

ATENTAMENTE

LIC. GERSON GUTIERREZ ZENTENO
orden de carga #14

STOS DE RAM
LIC. ********* GUTIERREZ ZENTENO

2295 PASEO DE LA AMERICAS SUITE 22
OTAY MESA CA. 92173
U.S.A

Phone (619)482-55-57
Fax (619)482-55-57

MAYO 14 DE 1997

**PORT ELEVATOR BROWNSVILLE**
**ATENCION : CRAIG ELKING**
**BROWNSVILLE ,TEXAS**

ESTIMADO SR. CRAIG ELKING

Por medio de la presente y de la manera mas atenta me dirijo a usted para solicitarle muy atentamente se sirva entregarle 4 cargas mas a los camiones que enviara el ing. RICARDO HINOJOSA . en los mismos terminos que la anterior debera firmarle la factura y el recibo de la mercancia conteniendo el peso y numero de placas de cada camion que se cargue y le ruego se sirva enviarme las copias por fax y los originales por correo certificado a travez de federal express.
los fax le ruego se sirva enviarmelos al (619)482-55-57 y los originales a 1853 CAROLYN DR. CHULAVISTA CA. 91913.

| placas camion | placas de caja | NOMBRE CHOFER |
|---|---|---|
| 303AJ3 | 242TY2 | JORGE ORTA |
| 046AL9 | 896UG4 | RAFAEL URBINA |
| 025ANY | 896UC9 | REGULO CASTILLO |
| 408AF4 | 486UL5 | JORGE CASTILLO |

FAVOR DE CARGAR 3 DE MAIZ Y UNO DE SORGO

POR LA ATENCION A LA PRESENTE QUEDO DE USTED MUY

A T E N T A M E N T E.

LIC. B********* GUTIERREZ ZENTENO
orden de venta 245

6/Junio/97

Comercializadora
Los Cachorros, S.A.

Atn: Sr. Ricardo Hinojosa

Le paso las placas y nombres
de los operadores que le
vamos a enviar a Brownsville.

| Placas Caja | Placas Tractor | Operador: |
|---|---|---|
| 369UE7 | 108AF5 | Armando Montelongo |
| 465UH9 | 822BD1 | Eduardo Aguilar |
| 372UE7 | 113AF5 | Ezequiel Serna |

Fletes y Materiales
Martinez.

4º Camion - 576-UJ5 - Camion Volteo

697

MAYO 15 DE 1997

**PORT ELEVATOR BROWNSVILLE**
**ATENCION : CRAIG ELKING**
**BROWNSVILLE, TEXAS**

ESTIMADO SR. CRAIG ELKING

Por medio de la presente y de la manera mas atenta me dirijo a usted para solicitarle muy atentamente se sirva entregarle 2 cargas mas a los camiones que enviara el ing. RICARDO HINOJOSA . en los mismos terminos que la anterior debera firmarlo la factura y el recibo de la mercancia conteniendo el peso y numero de placas de cada camion que se cargue y le ruego se sirva enviarme las copias por fax y los originales por correo certificado a travez de federal express.

los fax le ruego se sirva enviarmelos al (619)482-55-57 y los originales a 1853 CAROLYN DR. CHULAVISTA CA. 91913.

placas camion     placas de caja     NOMBRE CHOFER
101 AG9                              FERNANDO DE LA CRUZ
104 AG6
PARA CARGAR MAIZ QUEBRADO

POR LA ATENCION A LA PRESENTE  QUEDO DE USTED MUY

A T E N T A M E N T E.

LIC. BENJAMIN GUTIERREZ ZENTENO
orden de compra #16

FROM : LIC BERSAIN GUTIERREZ          PHONE NO. : 4825557          Jun. 06 1997 09:31AM P1

**SYSCO DE BAJA**
**LIC. BERSAIN GUTIERREZ ZENTENO**

2295 PASEO DE LA AMERICAS SUITE 22
OTAY MESA CA 92173
U.S.A

Phone (619)482-55-57
Fax (619)482-55-57

**JYUNIO 6 DE 1997**

**PORT ELEVATOR BROWNSVILLE**
**ATENCION : CRAIG ELKING**
**BROWNSVILLE , TEXAS**

ESTIMADO SR. CRAIG ELKING

Por medio de la presente y de la manera mas atenta me dirijo a usted para solicitarle muy atentamente se sirva entregarle 3 cargas mas a los camiones que enviara el ing. RICARDO HINOJOSA . en los mismos terminos que la anterior debera firmarle la factura y el recibo de la mercancia conteniendo el peso y numero de placas de cada camion que se cargue y le ruego se sirva enviarme las copias por fax y los originales por correo certificado a travez de federal express.
los fax le ruego se sirva enviarmelos al (619)482-55-57 y los originales a 1853 CAROLYN DR. CHULAVISTA CA. 91913.

| placas camion | placas de caja | NOMBRE CHOFER |
|---|---|---|
| 369ue7 | 108af5 | ARMANDO MONTELONGO |
| 465T74O | 833BD1 | EDUARDO AGUILAR |
| 372UL7 | 113AF5 | EZEQUIEL SERNA |

PARA CARGAR  SORGO AMERICANO

POR LA ATENCION A LA PRESENTE  QUEDO DE USTED MUY

A T E N T A M E N T E

LIC. BERSAIN GUTIERREZ ZENTENO

**SYSCO DE BAJA**
**LIC. BERSAIN GUTIERREZ ZENTENO**

2295 PASEO DE LA AMERICAS SUITE 22
OTAY MESA CA, 92173
U.S.A.

Phone (619)482-55-57
Fax (619)482-55-57

25 DE JULIO DE 1997

**PORT ELEVATOR BROWNSVILLE**
**ATENCION : CRAIG ELKING**
**BROWNSVILLE ,TEXAS**

ESTIMADO SR. CRAIG ELKING

Por medio de la presente y de la manera mas atenta me dirijo a usted para solicitarle
muy atentamente se sirva entregarle 2 cargas mas a los camiones que enviara el ing.
RICARDO HINOJOSA . en los mismos terminos que la anterior debera firmarle la
factura y el recibo de la mercancia conteniendo el peso y numero de placas de cada
camion que se cargue y le ruego se sirva enviarme las copias por fax y los
originales por correo certificado a travez de federal express.
los fax le ruego se sirva enviarmelos al (619)482-55-57 y los originales a 1853
CAROLYN DR. CHULAVISTA CA. 91913.

| placas camion | placas de caja | NOMBRE CHOFER |
| --- | --- | --- |
| T 424 AJ9 | | Q.P. JAVIER GARCIA |
| J 899 UH9 | | |

PARA CARGAR MAIZ QUEBRADO,YCOMO LO HABLE POR TELEFONO
CONTIGO ENTREGAMOS Y NOS PAGAN Y TE ENVIO DINERO.

POR LA ATENCION A LA PRESENTE  QUEDO DE USTED MUY

ATENTAMENTE

LIC. BERSAIN GUTIERREZ ZENTENO
orden de carga #1

72-77

9183762872    PARA: 952108313181    PAG.: 01

## Comercializadora Los Cachorros, S.A. de C.V.

20/08/97

Sr.

Craig Elkins.

Le mando los datos
del camión que va a cargar
el día de mañana Maíz —
Quebrado Amarillo.

OP. Dagoberto Ramírez

Trailer P.F. 114 A 5 5
Jaula P.I. 5 1 1 U H 5

Atte.

Ing. Ricardo Hinojosa
OP. Leobardo Lozano

Carretera Laredo 1260 San Nicolás de los Garza, N.L.  Tel 376-28-72

7375

**SYSCO DE BAJA**
**LIC. BERSAIN GUTIERREZ ZENTENO**

2295 PASEO DE LA AMISTADAS SUITE 22
OTAY MESA CA. 92173
U.S.A.

Phone (619)482-55-57
Fax (619)482-55-57

21 de agosto DE 1997

**PORT ELEVATOR BROWNSVILLE**
**ATENCION : CRAIG ELKING**
**BROWNSVILLE , TEXAS**

ESTIMADO SR. CRAIG ELKING

Por medio de la presente y de la manera mas atenta me dirijo a usted para solicitarle muy atentamente se sirva entregarle 1 carga mas al camion que enviara el ing. RICARDO HINOJOSA . en los mismos terminos que la anterior debera firmarle la factura y el recibo de la mercancia conteniendo el peso y numero de placas de cada camion que se cargue y le ruego se sirva enviarme las copias por fax y los originales por correo certificado a travez de federal express.
los fax le ruego se sirva enviarmelos al (619)482-55-57 y los originales a 1853 CAROLYN DR. CHULA VISTA CA. 91913.

placas camion          placas de caja          NOMBRE CHOFER
114-A55                518-UHS                 DAGOBERTO RAMIREZ
PARA CARGAR MAIZ QUEBRADO.

POR LA ATENCION A LA PRESENTE  QUEDO DE USTED MUY

ATENTAMENTE.

LIC. BERSAIN GUTIERREZ ZENTENO
orden de carga #18

74 70

## Comercializadora Los Cachorros, S.A. de C.V.

Atencion — Craig Elkins.

A Continuacion te paso datos de los camiones para carga de maiz quebrado de Bersain Gtz.

Op: Javier Garcia ①
pl: 974-AIF — Tractor
270-Veg — Jaula

Op: Acacia Aguilar ②
pl: 42I-FJ9 — Tractor
681-OH — Jaula.

Atte: Ing. Ricardo Hinojosa
L.P. Leobardo Lozano.

Carretera Laredo # 260 San Nicolás de los Garza, N.L. Tel. 376-28-72

75 77

# Comercializadora Los Cachorros, S.A. de C.V.

5/sep/l 97

De: Ing. Ricardo Hinojosa L

Para: CEDIS EXXINE.

CEDIS: Para comunicarte que el viernes 29 agosto,
debido a problemas con choferes sindicalizados en
llamanos temps de la Agencia Aduanal del Lic
Ismael de León, nos fué Imposible pasar a cargar
la orden Autorizada por el sr. Beizam Gtz en la
siguiente unidades: ① tractor- 974 AJB        ② tractor- 424 A.
                        Jaula- 330. 029         Jaula - 604 U
                        chofer- Javier García

Te suplico canceles esta orden y estoy
mandando otra unidad para cargar el Lunes 8:
con la misma agencia, esperamos que no tenga
problema.

                tractor- 974  AJB
                chofer - Javier García.

            Saludos

                                    Atte.
                            Ricardo Hinojosa López.

C/c Sr. Beizam Gtz
   Mn ch.

Carretera Laredo 1260 San Nicolás de los Garza, N L   Tel. 376-28-72

76 78

FROM : LIC BERSAIN GUTIERREZ          PHONE NO. : 4825557          Aug. 29 1997 08:34AM P1

**SYSCO DE BAJA**
**LIC. BERSAIN GUTIERREZ ZENTENO**

2295 PASEO DE LA AMERICAS SUITE 22
OTAY MESA CA. 92173
U.S.A

Phone (619)482-55-57
Fax (619)482-55-57

29 de agosto DE 1997

**PORT ELEVATOR BROWNSVILLE**
**ATENCION : CRAIG ELKING**
**BROWNSVILLE , TEXAS**

ESTIMADO SR. CRAIG ELKING

Por medio de la presente y de la manera mas atenta me dirijo a usted para solicitarle muy atentamente se sirva entregarle 2 cargas mas alos camiones que enviara el ing. RICARDO HINOJOSA . en los mismos terminos que la anterior debera firmarle la factura y el recibo de la mercancia conteniendo el peso y numero de placas de cada camion que se cargue y le ruego se sirva enviarme las copias por fax y los originales por correo certificado a travez de federal express.

los fax le ruego se sirva enviarmelos al (619)482-55-57 y los originales a 1853 CAROLYN DR. CHULAVISTA CA. 91913.

| placas camion | placas de caja | NOMBRE CHOFER |
|---|---|---|
| 974-AJ8 | 270-UE9 | JAVIER GARCIA |
| 424-AJ9 | 604-UH1 | A.A. |

PARA CARGAR MAIZ QUEBRADO.

POR LA ATENCION A LA PRESENTE  QUEDO DE USTED MUY

ATENTAMENTE.

LIC. BERSAIN GUTIERREZ ZENTENO
orden de carga #19

77 79

**SYSCO DE BAJA**
**LIC. BERSAIN GUTIERREZ ZENTENO**

2295 PASEO DE LA AMERICAS SUITE 22
OTAY MESA CA. 92173
U.S.A.

Tels (619)682-55-57
Fax (619)683-55-57

2 octubre DE 1997

**PORT ELEVATOR BROWNSVILLE**
**ATENCION : CRAIG ELKING**
**BROWNSVILLE , TEXAS**

## ESTIMADO SR. CRAIG ELKING

TE SUPLICO DE LA MANERA MAS ATENTA , NOS IMPORTES EL MAIZ IGUAL QUE LAS ANTERIORES
Y NOS FACTURES A DUNLOP DE MEXICO S.A. DE C.V. EL CONTADOR TE ENVIARA EL DINERO DE
LOS IMPUESTOS Y AGENCIA ADUANAL.

## POR LA ATENCION A LA PRESENTE  QUEDO DE USTED MUY

## ATENTAMENTE.

LIC. BERSAIN GUTIERREZ ZENTENO
orden de carga #20

78

FROM : LIC BERSAIN GUTIERREZ        PHONE NO. : 4825557        Nov. 04 1997 05:05PM P1

**STSCO DE BAJA**
**LIC. BERSAIN GUTIERREZ ZENTENO**

2295 PASSEO DE LA AMERICAS SUITE 22
OTAY MESA CA. 92173
U.S.A

Phone (619)482-55-57
Fax (619)482-55-57

**3 DE NOVIEMBRE DE 1997**

**PORT ELEVATOR BROWNSVILLE**
**ATENCION : CRAIG ELKING**
**BROWNSVILLE , TEXAS**

**ESTIMADO CRAIG :**

TE RUEGO TE ESPERES A MI ARRIBO PARA CUALQUIER ASUNTO EN RELACION AL MAIZ QUE ES DE MI PROPIEDAD. DEBIDO A UN ARREGLO QUE TENGO CON ELLOS Y ELLOS QUIEREN COBRAR DOS VECES ESTE MAIZ. POR LO QUE TE RUEGO NO ENTREGUES NADA HASTA QUE YO LLEGUE CON MI ABOGADO Y TE MUESTRE ESTOS DOCUMENTOS QUE YO TENGO Y QUE SOY LA PERSONA QUE TE CONTRATO COMO DEPOSITARIO.

POR LA ATENCION A LA PRESENTE QUEDO DE USTED MUY

**ATENTAMENTE.**

**LIC. BERSAIN GUTIERREZ ZENTENO**

79 84

FROM : LIC BERSAIN GUTIERREZ          PHONE NO. : 4825557          Jun. 03 1997 01:11PM P1

**San Diego National Bank**

S.D. National Bank

JUN - 3 97

TELLER 002

**OUTGOING WIRE TRANSFER/FOREIGN DRAFT APPLICATION**
Please fax to SDNB's Wire Department (619) 233-7017

All information indicated below must be completed for Wire Transfers of $3,000 (U.S. Dollars) or More. Also complete the reverse side if the originator is not an established customer (e.g., originator does not have a deposit or loan account with SDNB)

| | | | |
|---|---|---|---|
| ☒ WIRE | ☒ DOMESTIC | Amount $ 4058⁰⁰ | Currency _____ |
| ☐ DRAFT | ☐ FOREIGN | Exchange Rate _____ | USD $ 4058⁰⁰ |
| | | Trader Quote _____ | By _____ |

Name: BERSAIN GUTIERREZ
Address, City, State, Zip: 1853 CAROLYN DR CHULA VISTA CA 91913

GRUPOS SOUTHWEST. DE MEXICO
MCALLEN TEXAS
Account No.: 3610215558

TEXAS COMMERCE BANK N.A.
MCALLEN TX
ABA 111001150

☐ Debit Account No. 080721 1820    ☐ Check on Us No. ____    ☐ Cash ____    ☐ Other ____

3-6-97

FROM :            PHONE NO. :

**SYSCO DE BAJA**
**LIC. BENJAMIN GUTIERREZ ZENTENO**

2295 PASEO DE LA AMERICAS SUITE 22
OTAY MESA CA. 92173
U.S.A

Phone (619)661-13-13
Fax (619)661-1444

MARZO 19 DE 1997

**PORT ELEVATOR BROWNSVILLE**
**ATENCION : CRAIG ELKING**
**BROWNSVILLE , TEXAS**

ESTIMADO SR. CRAIG ELKING

APROBECHO LA OPORTUNIDAD PARA SALUDARTE Y COMUNICARTE
QUE ESTOY INTEREZADO EN LA BARCASA QUE ME OFRECES  TE
RUEGO ME ENVIES LA PROFORMA PARA DARSELA A MI BANCO Y
MANDARTE LA CARTA DE CREDITO DE INMEDIATO COMUNICATE
COMMIGO EL TELEFONO DE MI CASA ES EL (619) 482-3000 Y MI
CELULAR ES 0115266 485488 . COMUNICATE TAN PRONTO PUEDAS .
POR OTRA PARTE TE RUEGO NO ME MESCLES EN LOS ADEUDOS DE
WALTER PUFFELIS YO COMO TE DIJE VOY A COMPRAR MAS Y VOY A
PAGATE LO QUE TE DEBO DE ALMACEN TE RUEGO TENGAS UN POCO
DE PACIENCIA YA VOY A MOVER  ESA MERCANCIA Y TE PAGO.
PERO HABLAME POR FAVOR PARA ARREGLAR LO DE LA BARCASA.

A T E N T A M E N T E .

LIC. BENJAMIN GUTIERREZ

81  83

To:   Craig Elkins
From: Loren Walter, CSC
Re:   AGI yellow corn
Date: 11/21/96

Please do not release any corn to AGI until you receive notice from CSC.
Thank you for your cooperation.

Regards,

Loren Walter

82 84

FROM :                          PHONE NO. :                                      P01

**SYSCO DE BAJA**
**LIC. BERNABE GUTIERREZ ZENTENO**

2295 PASEO DE LA AMERICAS SUITE 22
OTAY MESA, CA. 92173
U.S.A

Phono (1-19)661-13-3)
Fax (619)661-1666

November 05, 1996

**PORT ELEVATOR BROWNSVILLE**
**ATENCION : CRAIG ELKING**
**BROWNSVILLE , TEXAS**

ESTIMADO SR. CRAIG ELKING

Por medio de la presente y de la manera mas atenta me dirijo a usted para solicitarle muy atentamente se sirva entregarle 10 (diez ) cargas mas a la LIC. ALICIA GOMEZ , En los mismos terminos que la anterior debera firmarle la factura y el recibo de la mercancia conteniendo el peso y numero de placas de cada camion que se cargue y le ruego se sirva enviarme las copias por fax y los originales por correo certificado a travez de federal express.
los fax le ruego se sirva enviarmelos al (619)482-55-57 y los originales a 1853 CAROLYN DR. CHULAVISTA CA. 91913.
POR LA ATENCION A LA PRESENTE QUEDO DE USTED MUY

A T E N T A M E N T E

LIC. BERNABE GUTIERREZ ZENTENO

8 3 8 5

SYSCO DE BAJA
LIC. BERSAIN GUTIERREZ ZENTENO

DICIEMBRE 16, 1996

PORT ELEVADORES BROWNSVILLE
ATENCION: CRAIG ELKING
BROWNSVILLE, TEXAS

ESTIMADO SR. CRAIG ELKING

POR MEDIO DE LA PRESENTE Y DE LA MANERA MAS ATENTA ME DIRIJO A USTED
PARA SOLICITARLE MUY ATENTAMENTE SE SIRVA ENTREGARLE 2 (DOS) CARGAS
A TRANSPORTES CERCADOS Y 2 (DOS) CARGAS A TRANSPORTES SERRALVO.
EN LOS MISMOS TERMINOS QUE LA ANTERIOR DEBERA FIRMARLE LA FACTURA Y
EL RECIBO DE LA MERCANCIA CONTENIENDO EL PESO Y NUMERO DE PLACAS DE
CADA CAMION QUE SE CARGUE Y LE RUEGO SE SIRVA ENVIARME LAS COPIAS -
POR FAX Y LOS ORIGINALES POR CORREO CERTIFICADO A TRAVES DE FEDERAL
EXPRESS, Y ASI COMO COPIAS DE GUIA DE CARTA PORTE.

LOS FAXES LE RUEGO SE SIRVAN ENVIARMELOS AL (619) 482-55-57 Y LOS -
ORIGINALES A 1653 CAROLYN DR. CHULA VISTA CA. 91913

POR LA ATENCION A LA PRESENTE QUEDO DE USTED MUY

A T E N T A M E N T E.

LIC. BERSAIN GUTIERREZ ZENTENO

ORDEN DE CARGA No. 3



D.C. A 18 DE SEPTIEMBRE DE 1997.


CRAIG ELKINS.

GENERAL MANAGER:


POR MEDIO DE LA PRESENTE AGRADECERE A USTED LE PRO
PORCIONE TODA INFORMACION RELATIVA AL PRODUCTO QUE SE TIENE DEPO
SITADO EN LAS INSTALACIONES DE LA EMPRESA QUE USTED REPRESENTA .
AL SR. LIC. ELFEGO ROSALES Y AL  C.P. HUMBERTO DEL VALLE .


LO ANTERIOR ES CON EL OBJETO DE CONTAR CON LA DOCU-
MENTACION SOPORTE DE LOS MOVIMIENTOS INCURRIDOS DEL MENCIONADO -
PRODUCTO.


ASI MISMO SE LE PROPORCIONE UNA MUESTRA REPRES...
VA DE DOS LIBRAS PARA SU ANALISIS RESPECTIVO.


AGRADECIENDO DE ANTEMANO LA ATEN...
TAR A LAS PERSONAS ANTES MECIONADAS QUEDO...


YVONNE SOTO V.

Av. Paseo Rio Tijuana No. 1716 Zona del Rio, Tijuana, B.C. México.
Tels. 82•9334  82•8352  Fax: 82•8646


C.C. P. BERSAIN GUTIERREZ.

85  87

**SYSCO DE BAJA**
**LIC. BERSAIN GUTIERREZ ZENTENO**

2295 PASEO DE LA AMERICAS SUITE 22
OTAY MESA CA. 92173
U.S.A

Phone (619)482-55-57
Fax (619)482-33-37

19 de SEPTIEMBRE DE 1997

**PORT ELEVATOR BROWNSVILLE**
**ATENCION : CRAIG ELKING**
**BROWNSVILLE , TEXAS**

## ESTIMADO SR. CRAIG ELKING

ADJUNTO A LA PRESENTE TE ENVIO COPIA DEL CHEQUE DE CAJA DEL ADEUDO QUE WALTER PUFFELIS TENIA CONTIGO AVISAME CUANDO LO RECIBAS HOY TE LO ENVIO POR TELEFONO.

## POR LA ATENCION A LA PRESENTE  QUEDO DE USTED MUY

## A T E N T A M E N T E.

## LIC. BERSAIN GUTIERREZ ZENTENO

LIC BERSAIN GUTIERREZ        PHONE NO. : 4825557              Sep. 19 1997 08:00AM P2

FIRST
INTERNATIONAL
BANK  398 FOURTH AVENUE
      CHULA VISTA, CA 91910

109150

EMITTER
STAR FLOWER PRODUCTS, INC.                                                    80-3781/1222

                                                                 September 17, 97

PAY TO THE
ORDER OF    ***********PORT ELEVATOR BROWNSVILLE, L.C.***********  $6,619.34***

                  ----FIRST---- 6,619 nni's 34 cts                        DOLLARS
                  INT'L BANX

This document has a multi-color background, a micro-print signature line, and a holographic foil strip; absence of these features will indicate a copy.

# CASHIER'S CHECK

⑈109150⑈ ⑆122237816⑆ 810⑈730006⑈

87 89

FROM : LIC BERSAIN GUTIERREZ          PHONE NO. : 4825557          Sep. 24 1997 09:32PM P1

## SYSCO DE BAJA
## LIC. BERSAIN GUTIERREZ ZENTENO

2295 PASEO DE LA AMERICAS SUITE 22
OTAY MESA CA. 92173
U.S.A.

Phone (619)482-55-57
Fax (619)482-55-57

SAN DIEGO CA A 24 DE SEPTIEMBRE DE 1997

ATENCION SR. CRAIG ELKING
PRESENTE.

ESTIMADO CRAIG:

EL DIA DE AYER QUE ME COMUNIQUE POR TELEFONO CONTIGO TE PREGUNTE EL SALDO DE
MATERIAL QUE TENGO CONTIGO Y ME DIJISTES QUE HABIA 71,000 BUSHELS Y ERA SEGUN ME
INFORMASTES 1821 TONELADAS MAS LAS 720 TONELADAS QUE HAY EN DEPOSITO DE ALGO QUE
NO DEBO TE INFORMO QUE YA TE ENVIE LOS DATOS DE ESTE MATERIAL COMO SE PAGO Y SE
PAGO MEDIANTE UNA CARTA DE CREDITO AL SR. LORENS MISMA QUE COBRO Y QUE LE FUE
TRNASMITIDA POR EL BANCO DE SAN DIEGO NATIONAL BANK EN EL MES DE OCTUBRE Y FUE
COBRADA DURANTE EL MES DE NOVIEMBRE Y FUE POR LO QUE LIBERO LA MERCANCIA QUE
LLEGO A MI NOMBRE PORQUE YO YA LE HABIA PAGADO A WALTER DE LO CONTRARIO EL NO LO
HUBIESE LIBERADO Y FIRMADO. EL QUE CONTRATO TU ALMACEN Y ELEVADOR FUI YO NO
LORENS NI WALTER ASI QUE POR FAVOR TE SUPLICO  REINTEGRES ESTA MERCANCIA YA QUE
TENGO VENDIDAS ESTAS 2500 TONELADAS Y TENGO QUE ENTREGARLAS DE IMMEDIATO ASI
QUE TE SUPLICO  HABLES CON LORENS Y ARREGLES ESTO PORQUE YO NO TENGO NADA QUE
VER EN ESO Y SI LE DEBEN DINERO QUE DEMANDE EL PAGO A LA PERSONA QUE LE DEBE NO A
MI QUE YO NO TENGO NINGUN ADEUDO PENDIENTE CON EL. YO PAGUE LA DESCARGA Y TODO
LO QUE TE ADEUDE TE LO PAGARE ASI QUE POR FAVOR ARREGLAME ESTO.
ESPERO QUE YA HAYAS RECIBIDO LA INFORMACION DEL BANCO CONLO QUE LE PAGUE A
WALTER ESTA MERCANCIA .
POR LA ATENCION A LA PRESENTE QUEDO DE TI MUY
ATENTAMENTE.

LIC. BERSAIN GUTIERREZ

88

FROM : LIC BERSAIN GUTIERREZ          PHONE NO. : 4825557          Nov. 04 1997 05:05PM P1

**STOCK DE BAJA**
**LIC. BERSAIN GUTIERREZ ZENTENO**

2295 PASEO DE LA AMERICAS SUITE 22
OTAY MESA CA. 92173
U.S.A

Phone (619) 482-55-57
Fax (619) 482-55-57

3 DE NOVIEMBRE DE 1997

**PORT ELEVATOR BROWNSVILLE**
**ATENCION : CRAIG ELKING**
**BROWNSVILLE, TEXAS**

ESITIMADO CRAIG :

TE RUEGO TE ESPERES A MI ARRIBO PARA CUALQUIER ASUNTO EN
RELACION AL MAIZ QUE ES DE MI PROPIEDAD. DEBIDO A UN
ARREGLO QUE TENGO CON ELLOS Y ELLOS QUIEREN COBRAR DOS
VECES ESTE MAIZ. POR LO QUE TE RUEGO NO ENTREGUES NADA
HASTA QUE YO LLEGUE CON MI ABOGADO Y TE MUESTRE ESTOS
DOCUMENTOS QUE YO TENGO Y QUE SOY LA PERSONA QUE TE
CONTRATO COMO DEPOSITARIO.

POR LA ATENCION A LA PRESENTE QUEDO DE USTED MUY

A T E N T A M A N T E.

LIC. BERSAIN GUTIERREZ ZENTENO

**SYSCO DE BAJA**
**LIC. BERSAIN GUTIERREZ ZENTENO**

2295 PASEO DE LA AMERICAS SUITE .22
OTAY MESA CA. 92173
U.S.A

Phone (619)482-55-57
Fax (619)482-55-57

27 de enero de 1998

**PORT ELEVATOR BOROWNSVILLE**
**ATENCION : CRAIG ELKING**
**BROWNSVILLE , TEXAS**

ESTIMADO SR. CRAIG ELKING

*Por medio de la presente y de la manera mas atenta me dirijo a usted para solicitarle te sirvas enviar una muestra del maiz al sr. contador PABLO CAMPOS a la ciudad de monterrey.a Fray Juan perez #5952 colonia condo casa mitras.monterrey nuevo leon codigo postal 64170.*

por la atención a la presente quedo de usted muy

ATENTAMENTE.

LIC. BERSAIN GUTIERREZ ZENTENO.

TOTAL P.01

United States District Court
Southern District of Texas
FILED

MAR 1 3 1998

Michael N. Milby, Clerk of Cou

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

PORT ELEVATOR –                        §
BROWNSVILLE, L.C.                      §
                                       §
VS.                                    §
                                       §        CIVIL NO. B-98-23
IVONNE SOTO VEGA, BERSAIN             §
GUTIERREZ, AND SYSCO DE BAJA,         §
S.A. DE C.V.                           §

## ORDER

The Court has considered the tender of a check in the amount of Twenty-Five Thousand and No/100ths Dollars ($25,000.00) in connection with this captioned matter. The Court orders the deposit of such check into the Registry of the Court pending further action by the Court.

DONE AT BROWNSVILLE, TEXAS, this _13th_ day of _March_, 1998.

_____
UNITED STATES DISTRICT JUDGE

TRUE COPY I CERTIFY
ATTEST:
MICHAEL N. MILBY, Clerk of Court
By _____
                        Deputy Clerk

98

11/26/97   16:53   LEWIS, SKAGGS & REYNA, L.L.P. → 19565421977          NO. 053   D05

Case 1:98-cv-00023   Document 96   Filed in TXSD on 03/12/2002   Page 172 of 371
11/18/1997  13:28   12100___181          PORT ELEVATOR BR__EU          PAGE  01

# Port Elevator - Brownsville, L.C.

## RATE & SERVICE CONTRACT

The term "grain" as used in this contract shall mean Corn.  All rates in
this contract will be quoted in U.S. dollars per bushel.  Payment for
Receiving is due upon completion of each unloading.  Payment for Delivery
is due weekly.  All payments are to be in U.S. currency.

The minimum quantity of grain to be handled under this contract is ONE
MILLION Bushels (1,000,000 bushels).  If the minimum quantity handled
requirement is not met, the Receiving and Delivering Charges increase by
one hundred percent (100%).

### RECEIVING AND DELIVERING

Receiving From Railcars . . . . . . . . . $ 0.02   per bushel.

Delivering to Trucks:
   U.S. Trucks . . . . . . . . . . . . . $ 0.02   per bushel.
   Mexican Trucks . . . . . . . . . . . $ 0.02   per bushel.

Delivering of grain will be done only upon the written instructions of
SYSCO de BAJA, SA de CV and signed by Bersain Gutierrez.  Fax instructions
are acceptable with originals to follow by overnight courier.

RECEIVING INCLUDES INSURANCE AND 15 DAYS STORAGE.

STORAGE:  ALL grain is to be stored Identity Preserved (I.P.)

Each calendar day or fraction thereof after first fifteen days.

All grains except Flax  . . . . . . $ 0.001   per bushel.

TREATING AND CONDITIONING
   Treating for weevils in cars,
   trucks or elevator . . . . . . . . . $ 0.045 per bushel.
   Mixing or Turning--
   All loss in weight borne by owner  . $ 0.015  per bushel.
   Cooling or Blowing  . . . . . . . . $ 0.005  per bushel.
   Malathion Treatment . . . . . . . . . $ 0.015  per bushel.

NOTE:  THIS IS A SPECIAL CONTRACT AT RATES OTHER THAN STATED IN OUR
PUBLISHED TARIFF.  SUCH RATES UNDER THE SAME TERMS WILL BE MADE AVAILABLE
TO ALL DEPOSITORS.  THIS CONTRACT EXPIRES DECEMBER 31st, 1996 AT 24:00
HOURS.


SYSCO DE BAJA, S.A. DE C.V.                    AKRON GROUP INC (AGI)


PORT ELEVATOR-BROWNSVILLE, L.C.

EXHIBIT
3
ACTION REPORTING

P.O. BOX 4448, BROWNSVILLE, TEXAS 78523-4448, (210) 831-8245, FAX (210) 831-3181

# RATES

The term "grain" as used in this tariff shall be understood to mean Wheat, Corn, Oats, rye, Barley, Grain Sorghum, Flaxseed and Soybeans. Rates to cover handling, storing and/or treating other commodities such as Meals, Beans, Seed, Rice, etc will be quoted by the elevator management upon request. All rates in this tariff will be quoted in U.S. cents per bushel unless otherwise stated.

## RECEIVING AND DELIVERING

Receiving From Railcars . . . . . . . . . . $.04    per bushel.

Receiving From Trucks:
  U.S. Trucks . . . . . . . . . . . . . $.04    per bushel.
  Mexican Trucks . . . . . . . . . . . . $.07    per bushel.

Receiving From Vessels/Barges:  . . . . . $.04    per bushel.

Delivering to Vessels:  . . . . . . . . . $.04    per bushel.

Delivering to Barges: . . . . . . . . . . $.04    per bushel.

Delivering to Railcars: . . . . . . . . . $.04    per bushel.

Delivering to Trucks:
  U.S. Trucks . . . . . . . . . . . . . $.04    per bushel.
  Mexican Trucks . . . . . . . . . . . . $.10    per bushel.

RECEIVING INCLUDES INSURANCE AND 10 DAYS STORAGE.

COOPERING CARS:
  The elevator will not furnish grain doors or Cooper cars.

STORAGE:
  Each calendar day or fraction thereof after first ten days.

  All grains except Flax . . . . . . . . $1/10   per bushel.
  Flax(all loss in weight or elevator)  . . $1/2    per bushel

TREATING AND CONDITIONING
  Treating for weevils in cars,
  trucks or elevator  . . . . . . . . . . $.045  per bushel.
  Mixing or Turning--
  All loss in weight borne by owner . . . $.03    per bushel.

  Cooling or Blowing  . . . . . . . . . . $.01    per bushel.
  Malathion Treatment . . . . . . . . . . $.015   per bushel.

NOTE:  WE RESERVE THE RIGHT TO ENTER INTO SPECIAL CONTRACTS AT RATES OTHER THAN STATED IN THIS TARIFF FOR DEFINITE QUANTITIES OF GRAIN AND FOR DEFINITE STORAGE PERIODS IF APPLICABLE.  SUCH RATES UNDER THE SAME TERMS WILL BE MADE AVAILABLE TO ALL DEPOSITORS.

EXHIBIT
2
ACTION REPORTING

## RECEIPT OF GRAIN

Grain will be received, stored and handled in the elevator subject to the following rules, regulations and charges. All rates and charges shown in the Rate Schedule of this tariff covers work performed on straight time basis.

# RULES AND REGULATIONS

**ITEM 1 - INSPECTION -** All grain shall be inspected and graded in accordance with standards established under the United States Grain Standards Act before received into and discharged from the elevator. Fees for inspection and grading to be set by the Corpus Christi Grain Exchange on inbound grain. All outbound grain to be graded by Federal Grain Inspection Service. All inspections and grading expense to be borne by the owner.

**ITEM 2 - UNLOADING GRAIN INTO THE ELEVATOR -** The Elevator management reserves the right to refuse any grain which in its opinion is unmerchantable or is unfit condition for storage, transfer or handling. The primary purpose of the Elevator is for the transfer of grain from railcars, trucks, barges and vessels to transportation modes which will move grain through the elevator for export and will be used for storage of grain only to the extent not required for such primary purpose; therefore,the management reserves the right to preferentially unload those cars,trucks,barges or vessels for which outward shipping space has been engaged and is available.

**ITEM 3 - STORING REGARDLESS OF OWNERSHIP -** Grains will be placed in bins containing the same kind and grade regardless of ownership. Preserving identity or special binning will be done only by special arrangements.

**ITEM 4 - GRAIN AT OWNER RISK -** All grain placed in the elevator is at owners risk of depreciation in grade from heating, insects or any other cause including natural increase in dockage content resulting from repeated handling under normal grain elevator operational practices and methods.

**ITEM 5 - CONDITIONING GRAIN -** The Elevator management reserves the right after due diligence to treat, dry or otherwise recondition any grain on the elevator which in its judgment is in need of such handling without prior knowledge or consent of the owner. Necessity of such handling to be concurred in by a Corpus Christi Grain Exchange inspector. Owner of the grain so handled will be liable for payment of all charges resulting therefrom as well as weight shrinkage of the grain.

**ITEM 6 - REMOVAL OF GRAIN** - If any grain in the elevator should become out of condition, the Elevator reserves the right to order same out on three (3) days notice and if not removed from the elevator before expiration of that time, the elevator management shall have the right to remove and dispose of such grain at the expense of and for the account of the owner.

**ITEM 7 - INSURANCE** - Insurance on all grain stored under the above Schedule of Charges will be carried by the elevator operator against loss or damage by Fire and Extended Coverage perils(windstorm, lightning, hail, explosion, riot, riot attending a strike, civil commotion, smoke, vehicles and aircraft) for its market value, to the extent that such insurance is procurable. The cost of such insurance is included in the charges for receiving and shipping grain. Loss by any other insurable cause shall be at the owner's risk.

**ITEM 8 - CONGESTION** - In the event of congestion of cars, barges, vessels or trucks, the elevator operator reserves the right, without liability for loss, damage or demurrage, to unload those cars, barges, vessels, or trucks for which outward transportation has been engaged and is available.

**ITEM 9 - TRIMMERS** - Mechanical grain trimmers are available at the elevator dock for use on all cargoes loaded. Rental in the amount of _10_ cents per gross ton plus $25.00 per hour to cover cost of maintenance man will be charged for their use.

**ITEM 10 - PERFORMANCE** - The Elevator will undertake to furnish all service specified in the tariff with reasonable promptness but it is not obligated to furnish services, or is it liable for failure to do so in event of Government intervention, labor troubles, war conditions or other causes beyond its control.

**ITEM 11 - DOCKAGE AND WHARFAGE** - Dockage is charged according to Brownsville Navigation District Tariff. Wharfage is _20_ cents per metric ton loaded or unloaded. Where more than one gross tonnage is applicable to a vessel, the highest will apply.

**ITEM 12 - VESSELS REQUIRED TO WORK OVERTIME** - In order to secure the fullest possible use of the elevator's grain handling facilities, whenever there are ships waiting to load or unload, or there is, in the elevator manager's judgment, necessity of overtime work to avoid congestion, vessels will work unlimited overtime at their own expense if requested to do so by the by elevator management. Any vessel refusing to do so shall vacate the berth on order of the elevator management. Should any vessel fail to vacate the berth when ordered to do so under these circumstances or under the circumstances set forth in item 13, a dockage charge of $800.00 per hour for each hour or fraction thereof, will be assessed against the vessel and/or its owners, and agents, after notice to vacate has been given the vessel and/or its owners, agents, master or mate.

This charge shall not affect the right of the elevator to effect removal of the vessel from the berth by any lawful means, at vessel's risk and expense. A vessel losing its right to berth by refusal to work overtime shall lose its turn in favor of the next vessel that is willing to work overtime, which vessel shall retain the berth so long as it is willing to work sucessive straight times and overtime periods until loading or unloading is completed. The vessel so losing its turn shall be entitled to berth first available thereafter, subject to the same overtime provisions set forth above if the circumstances requiring overtime work are then found to exist by the elevator management. When vessel is not required to work overtime but desires to at owner's expense, such desires must be made known to elevator manager by 3:30 P.M. of the day the overtime is to be worked. The elevator reserves the right to refuse to operate the elevator during overtime hours.

**ITEM 13 - BERTHING OF SHIPS -** Except as otherwise provided in this Tariff, vessels awaiting berth at the elevator will load or discharge in the order in which they file with the elevator office. A filing shall be deemed accomplished with the presentation of:

    (1)    Certificate of Readiness in all compartments in which grain is to be loaded, issued by the National Cargo Bureau Representative.

    (2) Federal Grain Inspection Service satisfactory condition report.

    Liner vessels, will be given preference in the assignment of berths over other vessels except when, in the judgment of the elevator management such preference would not be in the best interest of the satisfactory operation of the elevator or when, in the judgement of the elevator management, it would impose an undue hardship on other vessels waiting to load or unload.

    The term liners as used herein, shall mean vessels of lines having regularly advertised scheduled sailing from the Port of Brownsville, Texas, and the quantity of grain for loading is not in excess of 2/3 of the vessel's deadweight tonnage for cargo.

    The Elevator management reserves the right to change the turn of vessels when confronted with congestion, the urgent need to load or unload a particular grade of grain or to otherwise facilitate elevator operations.

    Any vessel ordered to vacate the berth for such reasons will return to berth after the vessel loading/ or unloading immediately thereafter, if any completes loading/ or unloading or vacates the berth for other reasons, provided the aforesaid circumstance requiring the vessel to vacate the berth is found by elevator management to no longer exist.

    The elevator management of Port Elevator-Brownsville, Inc. reserves the right to refuse the berth at our facility to any vessel without at least ten (10) days prior advice in writing from the suppliers of the cargo of their intention to load or unload the vessel at Port Elevator-Brownsville, Inc.

**ITEM 14 - APPLICATION FOR BERTH** - All vessels, their owners or agents, desiring berth at this facility shall file with the elevator office an application for berth on forms provided by the elevator. This application should be filed as far in advance as possible but in no case should such filing be later than 5:00 P.M. on the business day preceding the day the vessel desires to berth. The filing of this application shall have no bearing on the time that the vessel will be placed on turn for the berth as this will be governed by Item 13 of this Tariff.

**ITEM 15 - GENERAL REGULATIONS ON VESSELS:**

(1)   The elevator operator shall not be liable for demurrage, damages, damages for delay or loss of dispatch time incurred by any vessel or charterer thereof for any causes other than willful or grossly negligent acts of the elevator operator.

(2)   The elevator operator shall not be responsible for marine loss or damage to grain or barges, ships or their waterborne vessels to the elevator dock.

(3)   In all other matters, the elevator shall not be responsible for delay caused by any cause beyond its control, however or wherever arising.

(4)   Any vessel in berth shall at all times maintain appropriate officers and crew aboard to permit reception of cargo at any time of day or night, including Saturdays, Sundays and holidays.

(5)   If in the opinion of the elevator operator the weather conditions so warrant, any vessel in berth may be ordered at any time of day or night to vacate said berth and anchor in the approved anchorage area until such time as weather conditions permit the vessel to return to berth. Appropriate officers and crew shall be maintained aboard the vessel for this purpose.

**ITEM 16 - RESPONSIBILITY FOR PAYMENT OF CHARGES** - All invoices for charges are due upon presentation of invoice and payable in Brownsville, Texas. Unless otherwise provided by special arrangement with the elevator management, the responsibility for payment of invoices for provisions or services rendered by this facility shall, in the first instance, be that of the local agent in Brownsville, Texas who orders or authorizes such provisions or services as well as of the vessel and vessel owner.

When necessity calls for enforcement of Item 12 of this Tariff, the charges incurred thereby shall have the effect of being authorized by the local agent of the vessel and/or charterer and responsibility for payment of such charges shall be that of the local agent.

The elevator reserves the right to refuse berth and load or unload ships of any local agent having unpaid accounts sixty days or older until such account is paid in full.

B)   Condition and Responsibility

1) Equipment of the elevator is presumed to be in good condition when turned over to user, but Port Elevator - Brownsville, Inc does not warrant the mechanical condition thereof.

2) By receiving possession thereof, user of elevator equipment agrees that upon termination of the period of use, it will be returned in condition as when received, ordinary wear and tear alone accepted.

3) User assumes sole responsibility and liability for injury to or death of, any person whomsoever, or damage to or destruction of property of any person incident to or arising out of or connected with user's possession, use or operation of elevator equipment, or failure of such equipment to operate; and user shall protect, indemnify, and save harmless the Port Elevator - Brownsville, Inc. against any and all liability for or in respect of the same.

C)   The use and maintenance of equipment (except mechanical trimmers, but including any and all miscellaneous spouting equipment) a charge per Metric Ton (2,204.6 pounds) loaded will be quoted upon request.

**ITEM 20 - VESSELS IN ELEVATOR BERTH SHALL AT ALL TIME MAINTAIN TAUT LINES TO AVOID DAMAGE AND INJURY TO ELEVATOR          PROPERTY AND PERSONNEL.**

**ITEM 21 - RIGHT TO CONTRACT WITH THE GOVERNMENT** - Port Elevator - Brownsville, Inc may enter into contracts with the government of the United States of America or the government of Mexico or any agency thereof, providing for storage and services rates other than storage and services rates provided herein, applicable only to grain or grain by-product, or a commodity defined in any such contract as grain or grain by-product, in which the United States of America or the government of Mexico, or the agency thereof contracting with the undersigned warehouseman as aforesaid, has an interest.

**ITEM 22 - WATER AND ELECTRICITY** - Water and electricity provided by the elevator will be set by the management of the elevator based on current utility rates.

**ITEM 23 - INSURANCE** - All contractors, stevedores or individuals performing work on the elevator property will at all times maintain adequate insurance coverage as required by Local, State and Federal Regulations. Under no circumstances does Port Elevator-Brownsville, Inc. assume or accept any responsibility for these contractors, stevedores or individuals or any employees thereof.

**ITEM 17 - OVERTIME:**
A) Overtime per hour is $175.00 per hour except as provided in B and C Below.
B) Overtime Hours:
Overtime will be assessed for work before 8:00 A.M. and after 5:00 P.M. during weekdays. All work on Saturdays and Sundays will be overtime hours. Sundays and Holidays will assessed at the rate of $235.00 per hour.

C) If elevator labor is called out for work, the following minimum hourly periods will assessed at overtime rate. 7:00 A.M. Call Out - 1 hour minimum; except Saturdays, Sundays or Holidays at which time, 4 hours overtime will be the minimum. 7:00 P.M. Call Out - 2 hours minimum. Overtime rate at $235.00 per hour will be assessed for time required to work during meal hours.

**ITEM 18 - HOLIDAYS** - The following days shall be recognized as Holidays by this facility and all work on these designated days will be performed at the discretion of the elevator management and at overtime rates as provided in Item No. 17 of this Tariff.

New Year's Day      Good Friday      Labor Day
Memorial Day      Thanksgiving Day      Christmas Day
Fourth of July

In addition to the days specifically listed above, we shall also recognize as Holidays, with work performed under the conditions of this time, all days subsequently designated as Holidays or overtime days by the United States Government, the State of Texas, the City of Brownsville or other entity having lawful jurisdiction.

Should any Holiday fall on Saturday, the preceding Friday will be observed as a Holiday. Should any Holiday fall on Sunday, the following Monday will be observed as a Holiday.

No work will be scheduled or performed on Labor Day or Christmas Day except in cases of emergency such as fire, or where the property of the Company and/or its customers are in danger of serious injury.

**ITEM 19 - RENTAL AND USE OF ELEVATOR EQUIPMENT, FACILITIES, PROPERTY AND PERSONNEL:**

A) General - All vessels, their owners, agents and stevedores or others, hereinafter call "user", renting or using the elevator equipment, shall be upon and subject to the following conditions and charges, the renting or use of which shall constitute an agreement with Port Elevator-Brownsville, Inc. to pay such charges and be bound by such conditions.

**ITEM 24 - SMOKING OR OPEN FLAME** - The Port Elevator-Brownsville, Inc is designated as a non-smoking area. However, certain designated smoking areas are provided. No open flames are permitted. Hot work permits may be issued on a case-by-case basis.

**ITEM 25 - VISITORS** - All visitors to Port Elevator - Brownsville, Inc. must check in at the office. Visitors to any vessels at the elevator berth enter the property at their own risk. All visitors to vessels in the berth must have permission from the owners, agents, captain or mate of the vessel which they are visiting.

```
A   G   I                          INVOICE  0000001
9480 MARCONI DRIVE SUITE F
OTAY MESA, SAN DIEGO CA. 92173     OCTOBER 25, 1996.
PHONE: 619) 661-6481
FAX:   619) 661-6484

SOLD TO:                           SHIP TO:

MRS. IVONNE SOTO VEGA              MRS. IVONNE SOTO VEGA
PASEO RIO TIJUANA No. 1716         BROWNSVILLE, TEXAS 78521
ZONA DEL RIO, TIJUANA B.C. MEXICO
```

| P. O. NUMBER | TERMS | | SALESMAN | |
|---|---|---|---|---|
| 0008-08/23/96 | PRICE BASIS CIF BROWNSVILLE, TEXAS | | W.P. | |
| QUANTITY | DESCRIPTION | PRICE | UNIT | AMOUNT |
| 2,444.434 TON/METRICAS | 2,444.434 TON/METRICAS DE MAIZ AMARILLO # 2 GRADO B PARA CONSUMO HUMANO | $ 170.00 | TONELADA METRICA | $ 415,553.78 |
| MERCHANDISE SPECIFICATION: | CON LAS SIGUIENTES ESPECIFI-CACIONES:<br>MOISTURE MAXIMUM 14.5 %<br>MINIMUM TEDNSITY 67.5 %<br>EXTRANEOUS FOREIGN 3.3 %<br>CHIPPED MAIZE 3 %<br>AFLATOXIN 15 PPB MAX.<br>ORIGIN UNITED STATES | | | |

```
             RECEIVED BY:


        MR. BERSAIN GUTIERREZ              MR. WALTER PUFFELIS III
        OR MRS. IVONNE SOTO VEGA

        DATE: 10-30-96
        THIS NOTARIZATION IS TO AUTHENTICATE THAT THE ABOVE
        SIGNATURE IS THAT OF MR. BERSAIN GUTIERREZ.
```

| | | T O T A L | $ 415,553.78 |
|---|---|---|---|

EXHIBIT 5
ACTION REPORTING

```
            SWORN AND
     SUBSCRIBED BEFORE ME THIS  30TH DAY  OCTOBER      19 96
     MY COMMISSION EXPIRES
     AUGUST 21, 1999

                                 MARIA GONZALEZ   NOTARY PUBLIC
                                 IN AND FOR CAMERON COUNTY  STATE OF TEXAS
```

NOTIFY:

A   G   I
9480 MARCONI DRIVE SUITE F
OTAY MESA, SAN DIEGO CA. 92173
PHONE: 619) 661-6481
FAX:   619) 661-6484

INVOICE  0000002

NOVEMBER 12, 1996.

SOLD TO:

MRS. IVONNE SOTO VEGA
PASEO RIO TIJUANA No. 1716
ZONA DEL RIO, TIJUANA B.C. MEXICO

SHIP TO:

MRS. IVONNE SOTO VEGA
BROWNSVILLE, TEXAS 78521

| P. O. NUMBER | TERMS | | SALESMAN | |
|---|---|---|---|---|
| 0008-08/23/96 | PRICE BASIS CIF BROWNSVILLE, TEXAS | | W.P. | |
| QUANTITY | DESCRIPTION | PRICE | UNIT | AMOUNT |
| 1,791,566 TON/METRICAS<br><br>MERCHANDISE SPECIFICATION: | 1,791,566. TON/METRICAS DE MAIZ AMARILLO # 2 GRADO B PARA CONSUMO HUMANO CON LAS SIGUIENTES ESPECIFI-CACIONES:<br>MOISTURE MAXIMUM 14.5 %<br>MINIMUM TEDNSITY 67.5 %<br>EXTRANEOUS FOREIGN 3.3 %<br>CHIPPED MAIZE 3 %<br>AFLATOXIN 15 PPB MAX.<br>ORIGIN UNITED STATES | $ 170.00 | TONELADA METRICA | $ 304,566.22 |

RECEIVED BY:

MR. BERSAIN GUTIERREZ
OR MRS. IVONNE SOTO VEGA

DATE: _NOV 13 OF 1996_

THE ATTACHED NOTARIZATION IS TO AUTHENTICATE THAT
THE ABOVE SIGNATURE IS THAT OF BERSAIN GUTIERREZ

| | | | TOTAL | $ 304,566.22 |
|---|---|---|---|---|

NOTIFY: MRS. IVONNE SOTO VEGA AND BERSAIN GUTIERREZ
PASEO RIO TIJUANA No. 1716
ZONA DEL RIO, TIJUANA B.C. MEXICO

EXHIBIT
6
ACTION REPORTING

WALTER PUFFELIS III

```
    G   I                                    INVOICE   0000003
 480 MARCONI DRIVE SUITE F
OTAY MESA, SAN DIEGO CA. 92173              NOVEMBER 13, 1996.
PHONE: 619) 661-6481
FAX:   619) 661-6484
```

SOLD TO:                                      SHIP TO:

MRS. IVONNE SOTO VEGA                         MRS. IVONNE SOTO VEGA
PASEO RIO TIJUANA No. 1716                    BROWNSVILLE, TEXAS 78521
ZONA DEL RIO, TIJUANA B.C. MEXICO

| P. O. NUMBER | TERMS | | SALESMAN | |
|---|---|---|---|---|
| 0008-08/23/96 | PRICE BASIS CIF BROWNSVILLE, TEXAS | | W.P. | |

| QUANTITY | DESCRIPTION | PRICE | UNIT | AMOUNT |
|---|---|---|---|---|
| 688,309. TON/METRICAS | 688,309. TON/METRICAS DE MAIZ AMARILLO # 2 GRADO B PARA CONSUMO HUMANO | $ 170.00 | TONELADA METRICA | $ 117,012.53 |
| MERCHANDISE SPECIFICATION: | CON LAS SIGUIENTES ESPECIFI-CACIONES: MOISTURE MAXIMUM 14.5 % MINIMUM TENDSITY 67.5 % EXTRANEOUS FOREIGN 3.3 % CHIPPED MAIZE 3 % AFLATOXIN 15 PPB MAX. ORIGIN UNITED STATES | | | |

RECEIVED BY:

_____
  MR. BERSAIN GUTIERREZ        MR. WALTER PUFFELIS III
OR MRS. IVONNE SOTO VEGA

DATE:_____

| | | | T O T A L | $ 117,012.53 |
|---|---|---|---|---|

NOTIFY: MRS. IVONNE SOTO VEGA
PASEO RIO TIJUANA No. 1716
ZONA DEL RIO, TIJUANA B.C. MEXICO



EXHIBIT
7
ACTION REPORTING

# GUILLERMO VEGA, JR.

ATTORNEY AT LAW
302 KINGS HIGHWAY STE. 105
BROWNSVILLE, TEXAS 78521
956-546-5573-TELEPHONE
956-542-1977-TELEFAX

# FAX COVER SHEET

**FAX NUMBER TRANSMITTED TO:**  956-831-3181

**TO:**  CRAIG ELKINS

**OF:**  SOUTHWEST GRAIN CO.

**FROM:**  GUILLERMO VEGA, JR.

**CLIENT/MATTER:**  YVONNE SOTO VEGA

**DATE:**  OCTOBER 24, 1997

| DOCUMENTS | NUMBER OF PAGES |
|---|---|
| LETTER | 1 |
| INVOICE COPIES | 3 |
| LETTER BY YVONNE SOTO VEGA | 1 |
| | |

**COMMENTS:**  SEE ATTACHED DOCUMENTS



EXHIBIT

ACTION REPORTING

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS INFORMATION PROTECTED BY ATTORNEY-CLIENT AND/OR THE ATTORNEY/WORK PRODUCT PRIVILEGE. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL NAMED ABOVE AND THE PRIVILEGES ARE NOT WAIVED BY VIRTUE OF THIS HAVING BEING SENT BY FACSIMILE. IF THE PERSON ACTUALLY RECEIVING THIS FACSIMILE OR ANY OTHER READER OF THE FACSIMILE IS NOT THE NAMED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE NAMED RECIPIENT, ANY USE, DISSEMINATION, DISTRIBUTION, OR COPYING OF THE COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA U.S. POSTAL SERVICE

* INCLUDING COVER PAGE. IF YOU DO NOT RECEIVE ALL PAGES, PLEASE TELEPHONE US IMMEDIATELY AT 956-546-5573.

*Guillermo Vega, Jr.*
### Attorney at Law

———

*546-5573*

*Suite 105*
*302 Kings Highway*
*Brownsville, Texas 78521*

October 24, 1997

CRAIG ELKINS
SOUTHWEST GRAIN COMPANY
P.O. BOX 4448
PORT ELEVATOR-BROWNSVILLE, L.C.
BROWNSVILLE, TEXAS 78520

RE:    5,000 METRIC TONS
OF CORN OWNED BY
YVONNE SOTO VEGA

Dear Mr. Elkins,

Enclosed for your consideration is a copy of the original invoice in which AGI sold 2,444.434 metric tons of corn to Yvonne Soto Vega which was shipped to Yvonne Soto Vega and received by Bersain Gutierrez at the Port of Brownsville. Also enclosed is a copy of the original invoice in which AGI sold 1,791.566 metric tons of corn to Yvonne Soto Vega which was shipped to Yvonne Soto Vega and received by Bersain Gutierrez at the Port of Brownsville. Enclosed is a copy of the third invoice in which AGI sold 688,309 metric tons of corn to Yvonne Soto Vega which was shipped to Yvonne Soto Vega and received by Bersain Gutierrez at the Port of Brownsville. The first two shipments were paid by a letter of credit and the third shipment was paid with a check from Yvonne Soto Vega.

I am enclosing a copy of the original letter in which Yvonne Soto Vega states that she never gave Bersain Gutierrez authority to transfer, to sell, and/or dispose of the corn since the corn did not belong to Bersain Gutierrez.

If you have any questions please call me.

Respectfully,

GUILLERMO VEGA, JR.

GV/rb
Enclosures

```
A  G  1                          INVOICE   0000003
9480 MARCONI DRIVE SUITE F
OTAY MESA, SAN DIEGO CA. 92173   NOVEMBER 13, 1996.
PHONE: 619) 661-6481
FAX:   619) 661-6484
```

SOLD TO:                          SHIP TO:

MRS. IVONNE SOTO VEGA             MRS. IVONNE SOTO VEGA
PASEO RIO TIJUANA No. 1716        BROWNSVILLE, TEXAS 78521
ZONA DEL RIO, TIJUANA B.C. MEXICO

| P. O. NUMBER | TERMS | | SALESMAN |
|---|---|---|---|
| 0008-08/23/96 | PRICE BASIS CIF BROWNSVILLE, TEXAS | | W.F. |

| QUANTITY | DESCRIPTION | PRICE | UNIT | AMOUNT |
|---|---|---|---|---|
| 688,309. TON/METRICAS | 688,309. TON/METRICAS DE MAIZ AMARILLO # 2 GRADO B PARA CONSUMO HUMANO | $ 170.00 | TONELADA METRICA | $ 117,012.53 |
| MERCHANDISE SPECIFICATION: | CON LAS SIGUIENTES ESPECIFI-CACIONES: MOISTURE MAXIMUM 14.5 % MINIMUM TENDSITY 67.5 % EXTRANEOUS FOREIGN 3.3 % CHIPPED MAIZE 3 % AFLATOXIN 15 PPB MAX. ORIGIN UNITED STATES | | | |

RECEIVED BY:

**A   G   I**
9480 MARCONI DRIVE SUITE F
OTAY MESA, SAN DIEGO CA. 92173
PHONE: 619) 661-6481
FAX:   619) 661-6484

**INVOICE 0000L**

OCTOBER 25, 1996.

SOLD TO:

MRS. IVONNE SOTO VEGA
PASEO RIO TIJUANA No. 1716
ZONA DEL RIO, TIJUANA B.C. MEXICO

SHIP TO:

MRS. IVONNE SOTO VEGA
BROWNSVILLE, TEXAS 78521

| P. O. NUMBER | TERMS | | SALESMAN |
|---|---|---|---|
| 0008-08/23/96 | PRICE BASIS CIF BROWNSVILLE, TEXAS | | W.P. |

| QUANTITY | DESCRIPTION | PRICE | UNIT | AMOUNT |
|---|---|---|---|---|
| 2,444.434 TON/METRICAS<br><br>MERCHANDISE SPECIFICATION: | 2,444.434 TON/METRICAS DE MAIZ AMARILLO # 2 GRADO B PARA CONSUMO HUMANO CON LAS SIGUIENTES ESPECIFI-CACIONES:<br>MOISTURE MAXIMUM 14.5 %<br>MINIMUM TEDNSITY 87.5 %<br>EXTRANEOUS FOREIGN 3.3 %<br>CHIPPED MAIZE 3 % MAX.<br>AFLATOXIN 15 PPB MAX.<br>ORIGIN UNITED STATES | $ 170.00 | TONELADA METRICA | $ 415,553.78 |

RECEIVED BY:

MR. BERSAIN GUTIERREZ
OR MRS. IVONNE SOTO VEGA

DATE: 10-30-96

MR. WALTER PUFFELIS III

THIS NOTARIZATION IS TO AUTHENTICATE THAT THE ABOVE
SIGNATURE IS THAT OF MR. BERSAIN GUTIERREZ.

| | | | TOTAL | $ 415,553.78 |
|---|---|---|---|---|

UP.

SWORN AND
SUBSCRIBED BEFORE ME THIS  30TH DAY  OCTOBER  19 96

MY COMMISSION EXPIRES
AUGUST 21, 1999

MARIA GONZALEZ   NOTARY PUBLIC
IN AND FOR CAMERON COUNTY   STATE OF TEXAS

NOTIFY:
MRS. IVONNE SOTO VEGA
PASEO RIO TIJUANA No. 1716
ZONA DEL RIO, TIJUANA B.C. MEXICO

**A   G   I**
**9480 MARCONI DRIVE SUITE F**
**OTAY MESA, SAN DIEGO CA. 92173**
**PHONE: 619) 661-6481**
**FAX:   619) 661-6484**

**INVOICE  0000002**

**NOVEMBER 12, 1996.**

**SOLD TO:**

**SHIP TO:**

**MRS. IVONNE SOTO VEGA**
**PASEO RIO TIJUANA No. 1716**
**ZONA DEL RIO, TIJUANA B.C. MEXICO**

**MRS. IVONNE SOTO VEGA**
**BROWNSVILLE, TEXAS 78521**

| P. O. NUMBER | TERMS | | SALESMAN |
|---|---|---|---|
| 0008-08/23/96 | PRICE BASIS CIF BROWNSVILLE, TEXAS | | W.P. |

| QUANTITY | DESCRIPTION | PRICE | UNIT | AMOUNT |
|---|---|---|---|---|
| 1,791,566 TON/METRICAS<br><br>MERCHANDISE SPECIFICATION: | 1,791,566. TON/METRICAS DE MAIZ AMARILLO # 2 GRADO B PARA CONSUMO HUMANO CON LAS SIGUIENTES ESPECIFI-CACIONES: <br>MOISTURE MAXIMUM 14.5 % <br>MINIMUM TEDNSITY 67.5 % <br>EXTRANEOUS FOREIGN 3.3 % <br>CHIPPED MAIZE 3 % <br>AFLATOXIN 15 PPB MAX. <br>ORIGIN UNITED STATES | $ 170.00 | TONELADA METRICA | $ 304,566.22 |

RECEIVED BY:

MR. BERSAIN GUTIERREZ
OR MRS. IVONNE SOTO VEGA

DATE: NOV 13 OF 1996

THE ATTACHED NOTARIZATION IS TO AUTHENTICATE THAT
THE ABOVE SIGNATURE IS THAT OF BERSAIN GUTIERREZ

| | | | T O T A L | $ 304,566.22 |

**NOTIFY: MRS. IVONNE SOTO VEGA  AND BERSAIN GUTIERREZ**
**PASEO RIO TIJUANA No. 1716**
**ZONA DEL RIO, TIJUANA B.C. MEXICO**

WALTER PUFFELIS III

SAN DIEGO CA. A 14 DE OCTUBRE DE  1997.

YO IVONNE SOTO VEGA,POR MEDIO DE LA PRESENTE  HAGO DE SU CO-

NOCIMIENTO QUE A PARTIR DE ESTA FECHA , EN RELACION A LAS  -

FACTURAS 0001 , 0002 Y 0003  DE A.G.I. DE OTAY MESA SAN DIEGO

CA. DE MAIZ AMARILLO No.2 GRADO B DE FECHAS  OCTUBRE 25, NO-

VIEMBRE 12 Y NOVIEMBRE 13 DE 1996. EL SR. BERSAIN GUTIERREZ-

NO TIENE NINGUNA AUTORIZACION PARA ENTREGA , RECIBIR O CUI -

DAR EL PRODUCTO  ANTES MENCIONADO  DE MI PROPIEDAD, ALMACENA

DO  ACTUALMENTE EN SOUTH WEST GRAIN  CO. EN EL PUERTO DE   -

BROWNSVILLE, TEXAS  QUE ATIENDE EL SR.  CRAIG ELKIN.

POR LO CUAL ME COMPROMETO A CUBRIR EL ADEUDO QUE TENGO PENDI-

ENTE POR CONCEPTO DE ALMACEN .

IVONNE SOTO VEGA.

SUBSCRIBED AND SWORN TO BEFORE ME

THIS 14TH DAY OF OCT 19 97

NOTARY PUBLIC



CONSUELO CANCINO
Commission # 1156600
Notary Public — California
San Diego County
My Comm. Expires Sep 26. 2001

# GUILLERMO VEGA, JR.

ATTORNEY AT LAW
302 KINGS HIGHWAY STE. 105
BROWNSVILLE, TEXAS 78521
956-546-5573-TELEPHONE
956-542-1977-TELEFAX

# FAX COVER SHEET

**FAX NUMBER TRANSMITTED TO: 956-831-3181**

**TO:**  CRAIG ELKINS

**OF:**  SOUTHWEST GRAIN CO.

**FROM:**  GUILLERMO VEGA, JR.

**CLIENT/MATTER:** YVONNE SOTO VEGA

**DATE:**  OCTOBER 29, 1997

| DOCUMENTS | NUMBER OF PAGES |
|-----------|-----------------|
| LETTERS   | 2               |
|           |                 |
|           |                 |
|           |                 |

**COMMENTS:**



EXHIBIT
ACTION REPORTING

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS INFORMATION PROTECTED BY ATTORNEY-CLIENT AND/OR THE ATTORNEY/WORK PRODUCT PRIVILEGE. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL NAMED ABOVE AND THE PRIVILEGES ARE NOT WAIVED BY VIRTUE OF THIS HAVING BEING SENT BY FACSIMILE. IF THE PERSON ACTUALLY RECEIVING THIS FACSIMILE OR ANY OTHER READER OF THE FACSIMILE IS NOT THE NAMED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE NAMED RECIPIENT, ANY USE, DISSEMINATION, DISTRIBUTION, OR COPYING OF THE COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA U.S. POSTAL SERVICE

* INCLUDING COVER PAGE. IF YOU DO NOT RECEIVE ALL PAGES, PLEASE TELEPHONE US IMMEDIATELY AT 956-546-5573.

*Guillermo Vega, Jr.*

*Attorney at Law*

546-5573

*Suite 105*
*302 Kings Highway*
*Brownsville, Texas 78521*

October 29, 1997

Craig Elkins
Southwest Grain Company
P.O. Box 4448
Port Elevator - Brownsville, L.C.
Brownsville, Texas 78520

RE:    5,000 metric tons of corn
owned by Yvonne Soto Vega

Dear Mr. Elkins,

Enclosed is a copy of a letter that I got from AGI that states that AGI sold the corn to Yvonne Soto on October 25, 1996 and on November 12, 1996 that totaled 4,236.00 metric tons. AGI confirms that Yvonne Soto paid the corn with a letter of credit from Norwest Bank in El Paso, Texas.

AGI does not state that Bersain Gutierrez is the owner of the corn or that he bought the corn from AGI or that he paid AGI for the corn. Based on these findings I would like the corn to be released to Yvonne Soto at the earliest convenience.

If you are not in accord please advise so that my client, Yvonne Soto, can pursue the proper legal remedies in getting possession of her corn.

Thank you.

Respectfully,

Guillermo Vega, Jr.
Attorney at Law

GV/cs

**A G I**
*9870 MARCONI DRIVE SUITE F*
*SAN DIEGO CA. 92173*
*PHONE: 619) 661-1404*
*FAX: 619) 661-6484*

OCTUBRE 28, 1997.

A QUIEN CORRESPONDA,

POR MEDIO DE LA PRESENTE RATIFICAMOS QUE LA SRA: IVONNE SOTO, NOS COMPRO EN FECHAS 25 DE OCTUBRE Y 12 DE NOVIEMBRE DE 1996, AL AMPARO DE LAS FACTURAS 001 Y 002  MAIZ AMARILLO # 2 PARA CONSUMO HUMANO, HACIENDO UN TOTAL DE 4,236.00 TON/MET. CON LAS SIGUIENTES ESPECIFICACIONES:

| | |
|---|---|
| MOISTURE MAXIMUM | 15% |
| MINIMUM TEST DENSITY | 67.5% |
| EXTRANEOUS FOREIGN | 3.3% |
| CHIPPED MAIZE | 3.% |
| AFLATOXIN | 15 PPM MAX. |

DICHAS COMPRAS FUERON HECHAS ATRAVEZ DE CARTA DE CREDITO POR MEDIO DE BANORO Y NORWEST BANK, EN EL PASO TEXAS.

LA PRESENTE SE EXTIENDE A PETICION DEL INTERESADA Y PARA LOS FINES QUE ELLA JUZGUE CONVENIENTE.

ATENTAMENTE

SR. WALTER PEREZ

# Guillermo Vega, Jr.
### Attorney at Law

546-5573

Suite 105
302 Kings Highway
Brownsville, Texas 78521

October 29, 1997

Craig Elkins
Southwest Grain Company
P.O. Box 4448
Port Elevator - Brownsville, L.C.
Brownsville, Texas 78520

RE:  5,000 metric tons of corn
owned by Yvonne Soto Vega

Dear Mr. Elkins,

Enclosed is a copy of a letter that I got from AGI that states that AGI sold the corn to Yvonne Soto on October 25, 1996 and on November 12, 1996 that totaled 4,236.00 metric tons. AGI confirms that Yvonne Soto paid the corn with a letter of credit from Norwest Bank in El Paso, Texas.

AGI does not state that Bersain Gutierrez is the owner of the corn or that he bought the corn from AGI or that he paid AGI for the corn. Based on these findings I would like the corn to be released to Yvonne Soto at the earliest convenience.

If you are not in accord please advise so that my client, Yvonne Soto, can pursue the proper legal remedies in getting possession of her corn.

Thank you.

Respectfully,

Guillermo Vega, Jr.
Attorney at Law

GV/cs

**A G I**
*9870 MARCONI DRIVE SUITE F*
*SAN DIEGO CA. 92173*
*PHONE: 619) 661-1404*
*FAX: 619) 661-6484*

OCTUBRE 28, 1997.

A QUIEN CORRESPONDA,

POR MEDIO DE LA PRESENTE RATIFICAMOS QUE LA SRA: IVONNE SOTO, NOS COMPRO EN FECHAS 25 DE OCTUBRE Y 12 DE NOVIEMBRE DE 1996, AL AMPARO DE LAS FACTURAS 001 Y 002 MAIZ AMARILLO # 2 PARA CONSUMO HUMANO, HACIENDO UN TOTAL DE 4,236.00 TON/MET. CON LAS SIGUIENTES ESPECIFICACIONES:

| | |
|---|---|
| MOISTURE MAXIMUM | 15% |
| MINIMUM TEST DENSITY | 67.5% |
| EXTRANEOUS FOREIGN | 3.3% |
| CHIPPED MAIZE | 3.% |
| AFLATOXIN | 15 PPM MAX. |

DICHAS COMPRAS FUERON HECHAS ATRAVEZ DE CARTA DE CREDITO POR MEDIO DE BANORO Y NORWEST BANK, EN EL PASO TEXAS.

LA PRESENTE SE EXTIENDE A PETICION DEL INTERESADA Y PARA LOS FINES QUE ELLA JUZGUE CONVENIENTE.

ATENTAMENTE

SR. WALTER

# *A G I*

**9870 MARCONI DRIVE SUITE F**
**SAN DIEGO CA. 92173**
**PHONE: 619) 661-1484**
**FAX: 619) 661-6484**

No. PAGES ___2___

DATE: *Oct 29/97*

TO: *Sr. Guillermo Vargas Jr.*

FROM: *Walter Puffelis*

*Se envía carta solicitada por la Sra Ivonne Soto y Sr. Enrique Villarreal.*

*SINCERELY*

*MR. WALTER PUFFELIS*

# GUILLERMO VEGA, JR.

**ATTORNEY AT LAW**
302 KINGS HIGHWAY STE. 105
BROWNSVILLE, TEXAS 78521
956-546-5573-TELEPHONE
956-542-1977-TELEFAX

# FAX COVER SHEET

**FAX NUMBER TRANSMITTED TO:** <u>956-831-3181</u>

**TO:**           <u>CRAIG ELKINS</u>

**OF:**           <u>SOUTHWEST GRAIN CO.</u>

**FROM:**       **GUILLERMO VEGA, JR.**

**CLIENT/MATTER:**<u>YVONNE SOTO VEGA</u>

**DATE:**        <u>NOVEMBER 3, 1997</u>

| DOCUMENTS | NUMBER OF PAGES* |
|---|---|
| LETTER | 1 |
| SALE CONTRACT | 1 |
| AFFIDAVIT OF OWNERSHIP | 1 |
|  |  |

**COMMENTS:**



EXHIBIT
_10_
ACTION REPORTING

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS INFORMATION PROTECTED BY ATTORNEY-CLIENT AND/OR THE ATTORNEY/WORK PRODUCT PRIVILEGE. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL NAMED ABOVE AND THE PRIVILEGES ARE NOT WAIVED BY VIRTUE OF THIS HAVING BEING SENT BY FACSIMILE. IF THE PERSON ACTUALLY RECEIVING THIS FACSIMILE OR ANY OTHER READER OF THE FACSIMILE IS NOT THE NAMED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE NAMED RECIPIENT, ANY USE, DISSEMINATION, DISTRIBUTION, OR COPYING OF THE COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA U.S. POSTAL SERVICE

\* INCLUDING COVER PAGE. IF YOU DO NOT RECEIVE <u>ALL</u> PAGES, PLEASE TELEPHONE US IMMEDIATELY AT 956-546-5573.

*Guillermo Vega, Jr.*
*Attorney at Law*

---

546-5573

Suite 105
302 Kings Highway
Brownsville, Texas 78521

November 3, 1997

Craig Elkins
Southwest Grain Company
P.O. Box 4448
Port Elevator - Brownsville, L.C.
Brownsville, Texas 78520

RE:  Sale of Corn from
Yvonne Soto Vega
To
Enrique Villarreal

Dear Mr. Elkins,

Enclosed is the Affidavit of Ownership which has been executed by Ivonne Soto Vega and the Sales Contract which has been executed by Ivonne Soto Vega and Enrique Villarreal. As per our telephone conversation on October 29, 1997 you would release the corn to Enrique Villarreal upon execution of these documents and the payment of the fees and permits by the respective parties.

Please advise if these is a problem in releasing the corn. Thank you for your assistance in the manner.

Respectfully,

Guillermo Vega, Jr.
Attorney at Law

GV/cs
Enclosure

## SALES CONTRACT

**SELLER:**     IVONNE SOTO VEGA

**BUYER:**     ENRIQUE VILLARREAL

This contract confirms our agreement to sell you the following described goods on the terms and provisions herein set forth:

**Number of Units:**     5,000 metric tons of corn

**Ship to:**     Owner, Ivonne Soto Vega, will sell the corn to buyer, Enrique Villarreal, in store at the sprout (FOB - the elevator) at the Port of Brownsville, Texas.

**Ship by:**     The owner, Yvonne Soto Vega, will sell to the buyer, Enrique Villarreal, the corn in store at the sprout (FOB - the elevator) at the Port of Brownsville, Texas. The buyer, Enrique Villarreal, will pay the loading fee by cashier check prior to the trucks crossing into Mexico.

**Delivery Date:**     November 1, 1997

**Price terms:**     To be paid on date of delivery

**Special terms:**     The owner, Ivonne Soto Vega, shall pay the storage fees on or before date of purchase. The buyer, Enrique Villarreal, shall pay the transporting permits which shall include the USDA PHYTO SANITARY CERTIFICATES, loading of trucks permits, cracking of corn permits, grade certificates, aflatoxin certificates, certificate of origin, and shipper export certificates which shall become the responsibility of the buyer on the date of purchase.

Accepted on the __03__ day of __NOVEMBER__, 1997.

_Ivonne Soto_
Seller - Ivonne Soto Vega

_[signature]_
Buyer - Enrique Villarreal

## AFFIDAVIT OF OWNERSHIP

DATE:        OCTOBER 30, 1997

AFFIANT:     IVONNE SOTO VEGA

Affiant on oath swears that the following statement is true:

That affiant bought 4,236.00 metric tons of corn from AGI on October 25, 1996 and on November 12, 1996 respectively. Ivonne Soto Vega paid AGI with a letter of credit drawn from Norwest Bank in El Paso, Texas. The funds used to pay for the corn belonged solely to Ivonne Soto Vega. Ivonne Soto Vega gave instructions to the seller AGI to transport the corn to the Port of Brownsville to store at a grain elevator. Ivonne Soto Vega never entered into an agreement with Hernain Gutierrez wherein he would participate as owner of the corn.

Ivonne Soto Vega has never relinquish ownership of the corn from the date of purchase to the date of execution of this document. Ivonne Soto Vega has never given anyone authority to dispose of the corn from the date of purchase to the date of execution of this document.

Ivonne Soto Vega now desires to sell the corn that she bought to Enrique Villarreal for a price which has been agreed to between the parties. Ivonne Soto Vega is instructing the owner of the grain elevator to release the corn to the buyer, Enrique Villarreal, once the sale contract is executed.

Signed this ___3TH___ day of ___November___, 1997.

_Ivonne Soto_
Ivonne Soto Vega

## JURAT

SWORN AND SUBSCRIBED before me by Ivonne Soto Vega on this the ___THIRD___ day of ___November___, 1997.

_Consuelo Cancino_
Notary Public In and For the State
of California

Commission Expires: __Sept. 26, 2001__

CONSUELO CANCINO
Commission # 1154600
Notary Public — California
San Diego County
My Comm. Expires Sep 26, 2001

# Port Elevator - Brownsville, L.C.

Post-it® Fax Note   7871   Date 12 Nov 97 pages ▶ 4
To Guillermo Vega   From Craig Elkins
Co./Dept.   Co.
Phone #   Phone # 831-8245
Fax # 542-1977   Fax # 831-3181

Lic. Bersain Gutierrez
Sysco de Baja, SA de CV
2295 Paseo de la Americas Suite 32
Otay Mesa, Ca.   92173
12 November 1997

Dear Mr. Gutierrez:

As you know, in recent weeks a situation has developed whereby Yvonne Soto Vega has claimed an ownership interest in the corn that was unloaded during October and November of 1996. On multiple occasions we discussed this matter and you maintained that you, Bersain Gutierrez, were the owner of said corn and NOT Yvonne Soto Vega. I requested that you provide a sworn affidavit to that effect. On November 3rd, 1997 I received your fax stating that you and your attorney would be coming to resolve this ownership dispute. When neither of you arrived, I communicated with you by phone and you stated that you were to meet with Yvonne Soto Vega in Tijuana that same day. You also stated that you and/or your attorney would communicate your ownership to Mr. Guillermo Vega, Jr, attorney for Yvonne Soto Vega.

Since that conversation, Yvonne Soto Vega has presented, through her attorney, Mr. Guillermo Vega Jr., a notarized sworn affidavit stating she is the owner of said corn. She further states that as of October 31st, 1997 she sold this corn to Enrique Villarreal. Mr. Villarreal is now requesting that he be allowed to load his corn. Because the affidavit is dated after your meeting was to have taken place and none of my messages requesting you to contact me have been returned, I have no choice but to assume that Yvonne Soto Vega is the owner of the corn.

Until you present a notarized sworn affidavit stating that you are the owner of this corn, I have NO alternative but to load the corn as per Yvonne Soto Vega's instructions.

Sincerely,

Craig Elkins

EXHIBIT
11
ACTION REPORTING

cc: Guillermo Vega Jr.

*Guillermo Vega, Jr.*
*Attorney at Law*

———

*546-5573*

*Suite 105*
*302 Kings Highway*
*Brownsville, Texas 78521*

November 28, 1997

CRAIG ELKINS
GENERAL MANAGER OF
PORT ELEVATOR - BROWNSVILLE, L.C.
9155 R.L. OSTOS RD.
PORT OF BROWNSVILLE
BROWNSVILLE, TEXAS 78521
956-831-8245-TELEPHONE
956-831-3181-TELEFAX

RE:   IVONNE SOTO VEGA

Dear Mr. Elkins,

I have been retained to represent Ivonne Soto Vega with respect to a claim that she has against you. Please direct all communication concerning this matter to me.

As you know, on September 24, 1996, our client purchased 5,000 metric tons of corn and you agreed through her representative, Bersain Gutierrez, to store the corn at your grain elevator at the Port of Brownsville. At the time our client agreed to store the corn at your grain elevator you made several representations, among which are the following:

1.   That the corn would be safely stored at the grain elevator without fear of loss
2.   That you would agree to store the corn at the grain elevator and would release the corn to the owner as per owner's instructions.

In spite of the representations made, the corn was released without the consent of the owner of the corn to Bersain Gutierrez and other unknown third parties. When our client went to get the 5,000 metric tons of corn to sell to a potential buyer you had released approximately 3,300 metric tons of corn without the consent of our client to Bersain Gutierrez and other unknown third parties and you refused to release the remaining corn at the grain elevator to Ivonne Soto Vega.

It is our contention that your conduct constitutes false, misleading and deceptive acts and practices in violation of §17.46 (b)(1), (2), (3), and (8) of the Deceptive Trade Practices—Consumer Protection Act.

The damages which our client has suffered as a result of you releasing the corn without the consent of our client include, but are not limited to, the amount it cost our client to buy the corn, or alternatively, the difference between our client paid for the product and its actual value the potential buyer would have paid for it. You are also liable for the value and the cost associated with purchasing the corn which our client lost when the corn was wrongfully released by you to Bersain Gutierrez and other third parties unknown to the owner and

EXHIBIT
12
ACTION REPORTING

the mental anguish that our client suffered as a result of losing her corn.

In addition, our client was unable to sell the corn since you refused to release the corn to our client to sell to the potential buyer that the owner has obtained. Our client's inability to sell the corn has caused consequential damages to our client.

Based upon the information now available to us, and for purposes of this notice letter, we estimate that our client's actual damages and expenses are $875,000.00. Of course, we reserve the right to adjust this amount to conform to the information and evidence that will be available to us at the time of trial should litigation be necessary.

Our client has incurred reasonable attorney's fees in the pursuit of the claim stated in this letter. The amount of fees incurred as of the date of this letter is $15,000.00. Of course, I am sure you understand that if this matter is not settled quickly, the amount of time spent on this claim and the amount of attorneys' fees will increase dramatically.

Under the contract of employment we have with our client, I have been assigned an interest in this claim against you.

The purpose of this letter is to encourage you to resolve our client's claim in a fair and equitable manner without the need for further legal action. In the event you fail to respond to this letter with an offer of settlement that is acceptable to our client, I will have no alternative but to recommend our client that a lawsuit be filed against you. The lawsuit, will, among other authorities, be filed under the Texas Deceptive Trade Practices and Consumer Protection Act. In this lawsuit, rather than seeking only the amount of money we are asking of you at this time, we will seek to recover the full measure of our client's damages, expenses and attorney's fees as allowed by law.

In the event that you have insurance or a bond which you believe may cover all or any part of the claims made in this letter, you are requested to notify your insurance carrier or bonding company of this claim immediately.

If you are interested in resolving this matter without the necessity of litigation, please contact me within sixty days of your receipt of this letter, pursuant to Section 17.505 of the Deceptive Trade Practices— Consumer Protection Act.

A copy of this letter is being sent to Port of Brownsville and Bersain Gutierrez, who, in our opinion, is subject to the same claims and defenses our client has against you.

Sincerely,

Guillermo Vega, Jr.

GV/cs
Certified Mail: P 182 733 438

Storage Pending for Corn shipped in 1996                          $4,754.34
Out Loading Charges for Corn shipped in 1996                      $1,938.74
1996 Fed Ex; Phyto's; Aflatoxins & Grades                         $471.25

        1996 Total Due and Invoiced                               $7,164.33

| Date | Pounds | Bushels | Kilos | Days | |
|------|--------|---------|-------|------|---|
| 15-Jan-97 | 151,860 | 2,711.79 | 68,863 | 15 | $40.68 |
| 21-Jan-97 | 152,140 | 2,716.79 | 69,010 | 21 | $57.05 |
| 23-Jan-97 | 293,760 | 5,245.71 | 133,249 | 23 | $120.65 |
| 29-Jan-97 | 154,220 | 2,753.93 | 69,954 | 29 | $79.86 |
| 31-Jan-97 | 148,780 | 2,656.79 | 67,486 | 31 | $82.36 |
| Totals | 900,760 | 16,085.00 | 408,582 | | $380.60 |
| 31-Jan-97 | 6,464,393 | 115,435.59 | 2,932,229 | 31 | $3,578.50 |

Jan Balance Forward Storage                                       $3,959.10
Jan Out Loading Charges                                           $643.40
Jan Fed Ex; Phyto's; Aflatoxins & Grades                         $473.25
                                    Jan Total                     $5,075.75

| Date | Pounds | Bushels | Kilos | Days | |
|------|--------|---------|-------|------|---|
| 05-Feb-97 | 232,460 | 4,151.07 | 105,443 | 5 | $20.76 |
| 06-Feb-97 | 145,480 | 2,597.86 | 65,989 | 6 | $15.59 |
| 07-Feb-97 | 165,440 | 2,954.29 | 75,043 | 7 | $20.68 |
| 11-Feb-97 | 176,720 | 3,155.71 | 80,160 | 11 | $34.71 |
| 19-Feb-97 | 252,160 | 4,502.86 | 114,379 | 19 | $85.55 |
| 21-Feb-97 | 249,860 | 4,461.79 | 113,336 | 21 | $93.70 |
| Totals | 1,222,120 | 21,823.57 | 554,350 | | $270.99 |
| 9-Feb-97 | 5,242,273 | 93,612.02 | 2,377,879 | 28 | $2,621.14 |

eb Balance Forward Storage                                        $2,892.13
Feb Out Loading Charges                                           $872.94
Feb Fed Ex; Phyto's; Aflatoxins & Grades                         $457.50
                                    Feb Total                     $4,222.57

| Date | Pounds | Bushels | Kilos | Days | |
|------|--------|---------|-------|------|---|
| 03-Mar-97 | 187,340 | 3,345.36 | 84,977 | 3 | $10.04 |
| 04-Mar-97 | 51,480 | 919.29 | 23,351 | 4 | $3.68 |
| 13-Mar-97 | 302,580 | 5,403.21 | 137,249 | 13 | $70.24 |
| Totals | 541,400 | 9,667.86 | 245,577 | | $83.96 |
| 31-Mar-97 | 4,700,873 | 83,944.16 | 2,132,302 | 31 | $2,602.27 |

Mar Balance Forward Storage                                       $2,686.23
Mar Out Loading Charges                                           $386.71
Mar Fed Ex; Phyto's; Aflatoxins & Grades                         $278.75
                                    March Total                   $3,351.69

| Date | Pounds | Bushels | Kilos | Days | |
|------|--------|---------|-------|------|---|
| Totals | 0 | 0 | 0 | 0 | $0.00 |
| 30-Apr-97 | 4,700,873 | 83,944.16 | 2,132,302 | 30 | $2,518.32 |

Apr Balance Forward Storage                                       $2,518.32
                                    April Total                   $2,518.32



EXHIBIT
13
ACTION REPORTING

```
16-May-97   338,648      6,847.14     153,606        6        $36.28
.2-May-97   150,380      2,685.36      68,212       12        $32.22
14-May-97   208,100      3,716.07      94,394       14        $52.03
   Totals   697,120     12,448.57     316,212                $120.53
31-May-97 4,003,753     71,495.59   1,816,090       31      $2,216.36
May Balance Forward Storage                                 $2,336.89
May Out Loading Charges                                       $497.94
Fumigation + Turning                                        $3,217.30
May Fed Ex; Phyto's; Aflatoxins & Grades                     $361.25
                                        May Total           $6,413.38


   Totals       0            0             0         0          $0.00
30-Jun-97 4,003,753     71,495.59   1,816,090       30      $2,144.87
June Balance Forward Storage                                $2,144.87
                                       June Total           $2,144.87


25-Jul-97    38,320        684.29      17,382       25         $17.11
   Totals    38,320        684.29      17,382                  $17.11
31-Jul-97 3,965,433     70,811.30   1,798,709       31      $2,195.15
July Balance Forward Storage                                $2,212.26
July Out Loading Charges                                       $27.37
Cracking Charge                                               $34.76
July Fed Ex; Phyto's; Aflatoxins & Grades                     $26.25
                                       July Total           $2,300.64


21-Aug-97    77,000      1,375.00      34,927       21         $28.88
   Totals    77,000      1,375.00      34,927                  $28.88
1-Aug-97  3,888,433     69,436.30   1,763,782       31      $2,152.53
Aug Balance Forward Storage                                 $2,181.40
Aug Out Loading Charges                                        $55.00
Fumigtion Charge + Turning                                  $3,124.63
Cracking Charge                                               $69.85
Aug Fed Ex; Phyto's; Aflatoxins & Grades                      $26.50
                                     August Total           $5,457.38


08-Sep-97    62,320      1,112.86      28,268        8          $8.90
   Totals    62,320      1,112.86      28,268                   $8.90
30-Sep-97 3,826,113     68,323.45   1,735,513       30      $2,049.70
Sept Balance Forward Storage                                $2,058.60
Sept Out Loading Charges                                      $44.51
Cracking Charge                                               $56.54
Sept Fed Ex; Phyto's; Aflatoxins & Grades                     $83.00
                                   September Total           $2,242.65


03-Oct-97   224,660      4,011.79     101,905        3         $12.04
   Totals   224,660      4,011.79     101,905                  $12.04
31-Oct-97 3,601,453     64,311.66   1,633,608       31      $1,993.66
Oct Balance Forward Storage                                 $2,005.70
Oct Out Loading Charges                                       $160.47
Cracking Charge                                              $203.81
Oct Fed Ex; Phyto's; Aflatoxins & Grades                      $89.50
                                    October Total           $2,459.48
```

|  | Charges | Payments | Balance |
|---|---|---|---|
| 1996 Balance Forward |  |  | $7,164.33 |
| January | $5,075.75 |  | $12,240.08 |
| Payment (2/13) |  | $3,000.00 | $9,240.08 |
| February | $4,222.57 |  | $13,462.65 |
| March | $3,351.69 |  | $16,814.35 |
| April | $2,518.32 |  | $19,332.67 |
| Payment (5/2) |  | $3,000.00 | $16,332.67 |
| May | $6,413.38 |  | $22,746.06 |
| June Payment (6/25) |  | $13,708.99 | $9,037.07 |
| June | $2,144.87 |  | $11,181.94 |
| July Payment (7/28) |  | $5,000.00 | $6,181.94 |
| July | $2,300.64 |  | $8,482.58 |
| August | $5,457.38 |  | $13,939.96 |
| September | $2,242.65 |  | $16,182.62 |
| October | $2,459.48 |  | $18,642.10 |
| Late Charges | $932.10 |  | $19,574.20 |
| Total Due 31 Oct 97 |  |  | $19,574.20 |

# FACSIMILE COVER PAGE

**Date:** 11/12/97
**Time:** 20:08:58
**Page:** 3

**To:** Guillermo Vega Jr.
**Fax#:** 542-1977
**Company:** Attorney for Yvonne Soto Vega

**From:** Craig Elkins
**Company:** Port Elevator-Brownsville, LC
**Fax#:** 1-956-831-3161
**Voice#:** 1-956-831-8245
**Address:** 9155 R.L. Ostos Road
Port of Brownsville
Brownsville, Texas 78521

Mr. Vega:

As I mentioned in my last phone call, while reviewing the charges I found an error and have since corrected the billing. The attached pages reflect only those charges incurred prior to the close of business 31 October 1997.

As I mentioned to Mr. Villarreal, I will be out of town on Friday, but will be in touch with the office.

If you have any questions please do not hesitate to contact me at your earliest convenience.

Craig Elkins



EXHIBIT
14
ACTION REPORTING

# Guillermo Vega, Jr.
## Attorney at Law

546-5573

Suite 105
302 Kings Highway
Brownsville, Texas 78521

November 14, 1997

Craig Elkins
Port Elevator - Brownsville, L.C.
9155 R.L. Ostos Rd.
Port of Brownsville
Brownsville, Texas 78521

RE:    Sale of Corn from
Yvonne Soto Vega
to
Enrique Villareal

Dear Mr. Elkins,

Enclosed is a cashier check for $19,574.20 to cover the storage fees pursuant to your invoice dated November 13, 1997. Please remit a detailed itemized statement regarding these charges from October, 1996 to October, 1997 at the earliest convenience. If there should be any outstanding indebtedness after October 31, 1997 the buyer, Enrique Villarreal has agreed to assume the balance of the debt as per the sales contract.

Please release the corn to the buyer, Enrique Villareal, upon receipt of the cashier check as per our agreement of October 21, 1997 and pursuant to the amount of the invoice dated November 13, 1997. If you should have any questions regarding this matter please don't hesitate to call me.

Thank you.

Respectfully,

Guillermo Vega, Jr.

EXHIBIT
13
ACTION REPORTING

GV/rb
Enclosure of Cashier Check
cc: Yvonne Soto Vega
Enrique Villarreal

Texas
Commerce
Bank
NATIONAL ASSOCIATION

BROWNSVILLE, TEXAS 78520
Member FDIC

**CASHIER'S CHECK**

THE FACE OF THIS DOCUMENT HAS A MULTICOLORED
BACKGROUND - NOT A WHITE BACKGROUND
THE BACK OF THIS DOCUMENT CONTAINS AN ARTIFICIAL
WATERMARK - HOLD AT AN ANGLE TO VIEW

A 0300009760

REMITTER    IVONNE SOTO VEGA

11/14/97

DATE

$19,574.20

PAY TO THE
ORDER OF
PORT OF BROWNSVILLE AND
SOUTHWEST GRAIN ELEVATOR COMPANY

Exactly 19,574 dols 20 cts

A 90 day waiting period and
an indemnifying Bond is re-
quired to replace this check.

AUTHORIZED SIGNATURE

TBT/030

⑆0300009760⑆ ⑉11300115⑉: 100 10 1999496⑈

2

**CONDENSED TRANSCRIPT AND INDEX**

# ORAL DEPOSITION
# OF
# ENRIQUE VILLARREAL

## Taken on May 10, 2000

No. C-2969-99-A

| | | |
|---|---|---|
| IVONNE SOTO VEGA | § | THE 92ND DISTRICT COURT |
| | § | |
| VS. | § | OF |
| | § | |
| PORT ELEVATOR-BROWNSVILLE, | § | |
| L.C., SOUTHWEST GRAIN CO., | § | |
| INC., AGI/AKRON GROUP, INC., | § | |
| WALTER PUFFELIS GALVAN, III, | § | |
| INDIVIDUALLY AND D/B/A | § | |
| AGI/AKRON GROUP, INC., CRAIG | § | |
| ELKINS, INDIVIDUALLY AND D/B/A | § | |
| PORT ELEVATOR-BROWNSVILLE, L.C. | § | |
| AND SOUTHWEST GRAIN CO., INC. | § | HIDALGO COUNTY, T E X A S |



*Compliments of Action Reporting*

*4309 North 10th, Suite F / P.O. Box 4513*
*McAllen, Texas 78504*
*1-800-884-1024 / (956) 631-1024*

Case 1:98-cv-00023    Document 96    Filed in TXSD on 03/12/2002    Page 211 of 371

Vega vs. Port Elevator-Brownsville
**ENRIQUE VILLARREAL**
5-10-00

SHEET 1    PAGE 1
```
                                    1
            No. C-2969-99-A
IVONNE SOTO VEGA          S  THE 92ND DISTRICT COURT
                          S
VS.                       S  OF
                          S
PORT ELEVATOR-BROWNSVILLE, S
L.C., SOUTHWEST GRAIN CO., S
INC., AGI/AKRON GROUP, INC.,S
WALTER PUFFELIS GALVAN, III,S
INDIVIDUALLY AND D/B/A     S
AGI/AKRON GROUP, INC., CRAIG S
ELKINS, INDIVIDUALLY AND D/B/A S
PORT ELEVATOR-BROWNSVILLE, L.C. S
AND SOUTHWEST GRAIN CO., INC. S  HIDALGO COUNTY, T E X A S
--------------------------------------------------------
                ORAL DEPOSITION OF
                ENRIQUE VILLARREAL
                  May 10, 2000
--------------------------------------------------------
     ORAL DEPOSITION of ENRIQUE VILLARREAL, produced as a
witness at the instance of the Plaintiff, and duly sworn,
was taken in the above-styled and numbered cause on the 10th
day of May, 2000, from 2:50 p.m. to 5:48 p.m. before RONALD
DUNAGAN, CSR in and for the State of Texas, reported by oral
stenography at the Holiday Inn Express at Ave. Eugenio
Gorzazada 3680 Sur. Col. Country Monterrey, Nuevo Leon,
Mexico pursuant to the Texas Rules of Civil Procedure and
the provisions stated on the record or attached hereto.
```

PAGE 2
```
                                    2
                A P P E A R A N C E S
FOR THE PLAINTIFF:
    MR. ROY S. DALE
    MR. WILLIAM D. MOUNT, JR.
    Dale & Klein
    6301 North 10th Street
    McAllen, Texas 78504
FOR THE DEFENDANT:
    MR. MICHELE GONZALES
    Skaggs & Garza
    710 Laurel
    McAllen, Texas 78501
ALSO PRESENT:
    Mr. Guillermo Vega
    Ms. Cecilia Turrent de Caso, Interpreter
```

PAGE 3
```
                                    3
                I N D E X
Appearances......................................... 2
Stipulations........................................ 4
    Examination by Roy S. Dale ..................... 5
    Examination by Michele Gonzales.................48
    Re-Examination by Roy S. Dale..................62
Signature and Changes...............................65
Reporter's Certificate..............................67
                E X H I B I T S
NO.  DESCRIPTION                                  PAGE
    1................................................ 6
      Notice of Deposition
    2................................................ 6
      Letter of Credit
    3................................................ 6
      Invoices
    4................................................ 6
      Sales Contract
    5................................................ 6
      Affidavit of Ownership
    6................................................ 6
      Explanation of Ownership
    7................................................ 6
      Grain Inspection Certificate
    8................................................ 6
      Enrique Villarreal Check #119
    9................................................ 6
      (Exhibit withheld per Mr. Dale)
   10................................................ 6
      10-28-97 Letter from AGI
   11................................................ 6
      11-14-97 Letter from G. Vega to C. Elkins
```

PAGE 4
```
                                    4
        E X H I B I T S   C O N T I N U E D
NO.  DESCRIPTION                                  PAGE
   12................................................ 6
      Fax Message from Craig Elkins
   13................................................26
      Balance Summary (January to October)
   14................................................27
      Cashier's Check #0300009760
   15................................................64
      Business Card of Enrique Villarreal
   16................................................64
      Business Card of La Concordia Del Bravo
```

SHEET 2    PAGE 5

**5**

1  Oral deposition and answers of ENRIQUE VILLARREAL, who
2  resides in the Country of Mexico, was taken herein by the
3  Counsel for the Plaintiff, before Ronald Dunagan, a
4  Certified Shorthand Reporter in and for the State of Texas,
5  on the 10th day of May, A.D., 2000, pursuant to Notice
6  issued in the above styled and numbered cause, pursuant to
7  the Texas Rules of Civil Procedure and in accordance with
8  the following stipulations and agreements:
9  IT WAS AGREED that the witness must appear in
10 accordance with the Texas Rules of Civil Procedure before
11 any Notary Public or official authorized to administer oaths
12 for purpose of reading over the deposition and making any
13 corrections the witness finds to be necessary, such
14 corrections to be recorded on a correction sheet submitted
15 with the original of the deposition.
16 IT WAS FURTHER AGREED that Cecilia Turrent de Caso may
17 act as the interpreter for purposes of taking this
18 deposition and was sworn before the taking of this
19 deposition.
20
21                              * * *
22
23
24
25

PAGE 6

**6**

1              ENRIQUE VILLARREAL,
2  having been first duly sworn, testified through the duly
3  sworn Interpreter as follows:
4         (Exhibits 1 through 12 were marked.)
5           E X A M I N A T I O N
6  BY MR. DALE:                          (2:50 p.m.)
7   Q   What is your name, please.
8   A   Enrique Villarreal De Leon.
9   Q   Mr. Villarreal, for the record my name is Roy Dale
10 and I represent Ivonne Soto Vega who is a plaintiff in a
11 lawsuit against Port Elevator-Brownsville, L.C., Southwest
12 Grain Company, Inc. and others.  And this involves a lawsuit
13 pending in the 92nd District Court of Hidalgo County, Texas.
14 And you have been designated as a witness in this case.  Do
15 you understand that, sir?
16  A   Yes, of course.
17  Q   This deposition is being taken pursuant to a
18 Notice of Deposition.  And it's being taken today on May
19 10th, year 2000 in Monterrey, Mexico at the Holiday Inn
20 Express Hotel.  You understand that, sir?
21  A   Yes, of course.
22  Q   Mr. Villarreal, have you ever seen -- I'll hand
23 you Deposition Exhibit 1.
24  A   No.
25  Q   Okay.  If you would look at the deposition please.

PAGE 7

**7**

1  And that notice is to take your deposition today; is that
2  correct?
3   A   Okay.
4   Q   Thank you, sir.  Now where do you live, Mr.
5  Villarreal?
6   A   In Monterrey, Nuevo Leon.
7   Q   Okay.  And what is your occupation, Mr.
8  Villarreal?
9   A   At present I manufacture accessories.
10  Q   Okay.  And could you give me an idea about your
11 background, please, where you went to school, sir?
12  A   I attended the Nuevo Leon school for elementary
13 and I attended Preparatoria Number 1 and at the Universidad
14 Regiomontana.
15  Q   And what courses of study did you take at the
16 university?
17  A   Business Administration.
18  Q   Okay.  And when did you complete your studies in
19 Business Administration at the university?
20  A   Well, I didn't finish them, they're still pending.
21  Q   About how many courses did you take?
22  A   I only missed one year to finish my profession.
23  Q   And then you'll get your degree at that time; is
24 that correct?
25  A   Yes, of course.

PAGE 8

**8**

1   Q   Okay, how old a man are you, sir?
2   A   Forty-five years old.
3   Q   Okay.  Have you also been in the grain business,
4  buying and selling commodities like corn and other such farm
5  commodities?
6   A   Yes, of course.
7   Q   How long have you been in that business?
8   A   I've been involved in that type of business for
9  approximately five years.
10  Q   Okay.  Do you go under any kind of a business name
11 or operate any kind of a business name concerning the buying
12 and selling of grain?
13  A   Sometimes when I work for a company or sometimes
14 when I work on my own.
15  Q   And you work under your own name, Enrique
16 Villarreal?
17  A   Of course.
18  Q   And you work out of Monterrey, Mexico, correct?
19  A   Yes.
20  Q   Okay.  Now do you know a Mrs. Ivonne Soto Vega?
21  A   Yes, I do know her.
22  Q   Okay.  And do you know a Mr. Craig Elkins?
23  A   Yes, of course, I do know him.
24  Q   How long have you known Mr. Craig Elkins?
25  A   I have known Craig Elkins for approximately five

Vega vs. Port Elevator-Brownsville
**ENRIQUE VILLARREAL**
5-10-00

SHEET 3   PAGE 9
9

1  to six years.
2      Q    Okay.  Mr. Craig Elkins I understand is a manager
3  of an elevator known as the -- grain elevator known as Port
4  Elevator in Brownsville; is that true?
5      A    Yes, it's correct.
6      Q    Okay.  And is that how you got to know Mr. Elkins
7  through the grain business, buying and selling grain?
8      A    Of course.
9      Q    Could you tell me what kind of transactions you
10  were involved in the past, saying going back to 1994, 1995
11  with Mr. Elkins and the Port Elevator?
12      A    We were involved in the purchase of corn through a
13  company by the name of Mercado De Granos, S.A. de C.V.
14      Q    And what were you doing with reference to that
15  transaction?  What was your role in that transaction?
16      A    I was the operation manager at that company.  I
17  was the one who would buy and sell.
18      Q    And what were you buying and selling for that
19  company at that time?
20      A    Corn.  White corn.
21      Q    Okay.  And is this white corn is that used for
22  human consumption?
23      A    Exactly.
24      Q    Okay.  And did you negotiate with Mr. Elkins
25  concerning the purchase of that white corn?

PAGE 10
10

1      A    At that time it was negotiated by one of our
2  directors and then from then on the remaining of the
3  operations with that company I dealt with them personally in
4  order to prove to them that I was able to do that.
5      Q    Okay.  And what kind of negotiations did you have
6  with Mr. Elkins concerning the purchase of that corn?
7      A    Well, the type of negotiation that I had with him
8  was to buy corn from him, to store it so it could be later
9  on imported into Mexico.
10      Q    Okay.  Now were you required to know at that time
11  who owned the corn that was stored at the elevator -- at the
12  Port Elevator in Brownsville?
13      A    Excuse me?
14      Q    Yeah, did you have to determine who owned the corn
15  that you were going to purchase for the company you were
16  working with at the time?
17      A    Well, if we were going to buy it we request to
18  store it there.
19      Q    Okay.  In other words, you bought the corn and you
20  requested the corn to be stored at the elevator, at the Port
21  Brownsville elevator?
22      A    Exactly.
23      Q    Okay.  What were you required then to show the
24  Port Elevator or Elkins as to the ownership of that corn?
25      A    Well, that corn had to be stored because it wasn't

PAGE 11
11

1  coming with the required standards, quality standards.  That
2  way it had to be bought in another place so we could deal
3  with the other type of corn and leave it there pending.
4      Q    Okay.  Ultimately it was shipped to the Port
5  Elevator?
6      A    Exactly.
7      Q    What was required by the Port Elevator for it to
8  be store there?  What did you have to show?
9      A    All grain that is stored there at that elevator
10  has to have an invoice and certificate of origin,
11  certificate of weight and phytosanitary certificate.
12      Q    Okay.  So you had to show a certificate of origin;
13  is that correct?
14      A    Of course.
15      Q    And what about an indication of ownership, what
16  would you have to show on that?
17      A    Because we bought it directly from them.  It was a
18  letter of credit or the invoice.
19      Q    Okay.  So they would have -- there would be a
20  letter of credit and an invoice with -- Who would that be
21  with in that particular case?
22      A    In this case we proceeded to pay the elevator,
23  Southwest Grain.
24      Q    Okay.  Now you mentioned Southwest Grain, but yet
25  it was stored at Port Elevator; is that correct?

PAGE 12
12

1      A    It's the same thing.
2      Q    What do you mean it's the same thing?
3      A    They are the same owners.
4      Q    Okay.  So when you deal with Port Elevator you're
5  also dealing with Southwest Grain at the same time?
6          MS. GONZALES:  Objection, form.
7      A    Yes, it's the same thing.
8      Q    (Mr. Dale)  To whom was the check made payable to
9  concerning the grain that was stored there?
10      A    The letter of credit for the payment?
11      Q    Right.
12      A    Southwest Grain, to the company.
13      Q    And that was the grain that was stored at Port
14  Elevator?
15      A    In fact they didn't have the grain there, they had
16  to move it from Nebraska to Brownsville.
17      Q    Okay.  Was this back in 1994, more or less?
18      A    Approximately.
19      Q    Okay.  How long did you have the grain stored
20  there at Port Elevator?
21      A    I think it was approximately five months.
22      Q    And then I assume when you had the corn delivered
23  out of the elevator you paid the storage expenses and got
24  the corn delivered?
25      A    Yes, storage expenses, invoicing, phytosanitary

SHEET 4   PAGE 13

**13**

1 certificate, the certificate of origins and everything. We
2 also paid for a corn process so it could be according to the
3 market standards.
4    Q    Okay. Now when that letter of credit was given,
5 together with invoice and letter of credit -- that was given
6 to Southwest Grain; is that right?
7    A    Exactly.
8    Q    Was that a requirement before they would actually
9 store the grain there?
10       MS. GONZALES: Objection, form.
11    A    Yes, you have to pay in advance.
12    Q    (Mr. Dale) For the record I'll explain to you,
13 Mr. Villarreal, she'll be making some objections, but these
14 are objections for the court to determine at a later date.
15 So you can keep on answering the questions after she makes
16 the objection. But these are legal matters that don't
17 involve you, it just involves the attorneys and the court,
18 okay. So I just want to let you know. Have you already
19 given a deposition before?
20    A    No, this is the first time.
21    Q    Okay, you're doing very well. Now did you have --
22 at a time did you become acquainted with a Mrs. -- we asked
23 the question before, perhaps, but Mrs. Ivonne Soto Vega?
24    A    Yes --
25    Q    And more or less when did you --

PAGE 14

**14**

1    A    I was in touch with her.
2    Q    More or less when did you get in touch with Mrs.
3 Soto?
4    A    It was approximately the 17th of September. I
5 mean the month of September. A little bit before, maybe.
6    Q    Okay. And would that be in the year 1997?
7    A    1997.
8    Q    Could you please tell the jury what was the
9 background for your getting in touch with Mrs. Soto?
10    A    Well, one of Mrs. Soto's representatives found me
11 in Monterrey so I could buy some corn that they were trying
12 to sell me. I was referred to them through other companies
13 that devote themselves to corn flour.
14    Q    Okay. And what was your understanding at that
15 time about the amount of corn that Mrs. Soto was trying to
16 sell?
17    A    I was always offered the amount of five thousand
18 tons. At that moment when they offered me that amount I
19 immediately requested for the invoices and tried to find out
20 the way he had paid for it.
21    Q    Okay. And did you request -- Why did you request
22 invoices and how Mrs. Soto paid for the corn? Why did you
23 require that?
24    A    Whenever you do an operation you have to find out
25 who's the legal owner of the product.

PAGE 15

**15**

1    Q    Okay. So whenever you're attempting to buy corn
2 or such a product, grain product, you have to determine who
3 owns it before you buy it; is that your testimony?
4    A    Exactly. And when the product has been paid with
5 a letter of credit I have a lot of trust in dealing with
6 them.
7    Q    Okay. Now you said you requested these documents
8 from Mrs. Soto?
9    A    Yes, I requested those documents to see the way
10 she had acquired the product.
11    Q    Okay. Now I'll hand you Deposition Exhibit No. 2.
12 And would you please look at that document and tell me what
13 that document is?
14    A    This is an already transferred letter of credit
15 for the payment of corn. In this case, from Mrs. Soto. For
16 me this is a legal document for the payment of a product.
17 This is a letter of credit.
18    Q    Okay. Could you please describe to the jury what
19 a letter of credit does? How does a letter of credit mean
20 that Mrs. Soto in essence paid for the product, paid for the
21 grain?
22    A    In this type of grain business it's very common
23 and very trustworthy to buy a product through a letter of
24 credit because it's a legal document and a very safe
25 document. And the letter of credit specifies and mentions

PAGE 16

**16**

1 the amount that you are planning to buy. It also indicates
2 the destination, as well as all the specifications required
3 by a product. There always has to be somebody to sign in
4 agreeance (sic.), in acceptance that the product arrived in
5 the conditions in which it was requested. For me it's a
6 safe way to buy any product in any part of the world.
7    Q    Okay. And I assume that the letter of credit
8 means basically that a bank is going to pay the -- for the
9 grain upon delivery. It's paid by a reputable bank, is that
10 my understanding?
11    A    Exactly. There has to be a reception based on the
12 quality that has been specified or requested.
13    Q    Okay. And you look through this letter of credit
14 and did this satisfy that Mrs. Soto had paid for the grain
15 through this letter of credit?
16    A    For me it indicated that she was a legitimate
17 owner of the product.
18    Q    Okay. Now Deposition No. 3, would you please
19 describe what Deposition No. 3 is? And it appears -- And
20 there are three documents part of Deposition No. 3.
21    A    These three pages, one, two and three, are three
22 invoices. Three invoices from three shipments of corn
23 purchased by Mrs. Ivonne Soto and paid with a letter of
24 credit.
25    Q    Now do those three pages that appear in Exhibit

SHEET 5   PAGE 17

17

1  Number -- What's the number there?  Three.  Do these
2  coincide with the letter of credit?  These three invoices
3  match the letter of credit that was going to pay for -- that
4  paid for the grain?
5      A    Exactly.
6      Q    And these were the documents that were sent to you
7  by Mrs. Soto?
8      A    Exactly.
9      Q    Now when you received the documents, being the
10 letter of credit -- excuse me, Deposition Exhibit 2, and the
11 three invoices in Deposition Exhibit No. 3 what did you do
12 at that point?
13     A    I immediately proceeded to purchase the product
14 because I was happy knowing that she had purchased it.
15     Q    Okay.  What do you do with reference to checking
16 out the product at the -- at the Port Elevator?
17     A    I went there myself to the elevator to ask or
18 request some samples to see in what condition the product
19 was.  In receiving the samples I felt that the product was
20 good and so I asked for some tests to feel safer.
21     Q    Okay.  And was this time around September 16th or
22 so when you went to the Port Elevator in Brownsville of '97?
23     A    Yes, in fact there are receipts of the tests that
24 were done to those samples.
25     Q    Okay.  And I'll hand you Deposition Exhibit No. 7

PAGE 18

18

1  and could you identify that document, please.
2      A    These are the analyses made of these -- to these
3  two samples, 406 and 404.  These are inspection
4  certificates.
5      Q    Okay.  And who did the testing of that grain?
6      A    Of that grain it was the office who's in charge of
7  doing this kind of testing.
8      Q    Okay.  Did you have any conversation with Mr.
9  Elkins at that time concerning that corn?
10     A    The only conversation was to request for the
11 samples because I was interested in purchasing.  And I told
12 him that years before in '94 I had bought from him a big
13 amount of corn.  So he gave me the samples to send them to
14 be tested.
15     Q    Okay.  It was understood that this was the grain
16 that you were -- It was my understanding that this was the
17 grain that Mrs. Vega -- Mrs. Soto was wanting to sell?
18 Corn.
19     A    Exactly, in fact it was -- it was the only corn
20 stored in that place because they had sorghum and other
21 products.
22     Q    Okay.  So that was the only corn being stored at
23 that place?
24     A    That existed there, that's what I was told.
25     Q    Now did Mr. Elkins -- was the one that he referred

PAGE 19

19

1  to this testing lab to test it?  Did Mr. Elkins make the
2  arrangement at Port Elevator?
3      A    Yes, he told me that he could do it and that he
4  would give them back to me the next day.
5      Q    Okay.  Now when you saw the testing -- it's dated
6  September 18th, '97.  Would this be a couple days after you
7  had seen -- talked to Mr. Elkins?
8      A    Yes.
9      Q    There are two identification of samples, as you
10 see, 404 and 406; is that correct?
11     A    It's correct.
12     Q    Now looking at the samples what did that mean to
13 you as far as the grade of the corn?
14     A    I could see that it was the corn was a little bit
15 damaged.  When corn is stored for a period of time it tends
16 to damage.
17     Q    Okay.
18     A    But not too much.  If the elevator pays attention
19 it lasts longer.
20     Q    Okay.
21     A    When I saw the analysis I saw that I could make it
22 with this product going through a handling shrinking
23 process.  In selling them I wouldn't have any problem.
24     Q    Okay.  Would that be for human consumption?
25     A    For human consumption.

PAGE 20

20

1      Q    And with your handling of the corn when you got it
2  what would the grade be for human consumption, what grade or
3  number?
4      A    After all the processing corn could be graded
5  second grade.
6      Q    A grade two?
7      A    Grade two.
8      Q    And I understand, if I'm not mistaken, that the
9  grade of corn goes from one to five -- a scale of one to
10 five; is that correct?
11     A    Exactly.
12     Q    And what grades make up for human consumption?
13     A    For human consumption it's grand one, grade two
14 and three.
15     Q    And for animal consumption, what grade is that?
16     A    It can be five or a little more in excess.
17     Q    Okay.  And you felt that you had no problem
18 selling this as a grade two corn for human consumption?
19     A    No, that's why I did that analysis, then I could
20 proceed in importing it, because if the analysis are not
21 made I cannot do the importation.  I need a certificate of
22 quality, certificate of origin, doing the invoicing and the
23 phytosanitary certificate.
24     Q    Okay.  So at that point were you satisfied that
25 Mrs. Soto owned the corn and that the corn was of suitable

Vega vs. Port Elevator-Brownsville
**ENRIQUE VILLARREAL**
5-10-00

SHEET 6  PAGE 21

21

1  quality to sell for human consumption?
2      A    Of course.
3      Q    Now what did you do then? After you saw the test
4  results and after you felt that Mrs. Vega was in fact the
5  owner of the corn what was your -- what did you do?
6      A    I proceeded in a way to release the product.
7      Q    And how did you go about trying to release the
8  product, the five thousand metric tons?
9      A    The first step was for me to like the corn. I
10  liked it so the second step I asked Mr. Elkins if he could
11  release the corn for me. And he told me that he could not
12  deliver me that corn because that corn was not owned by
13  Mrs. Ivonne Soto. I told him that Mrs. Ivonne Soto had
14  purchased that product with a letter of credit, so he said,
15  well, bring me the invoices so I can deliver you the corn.
16  I proceeded to do all the corresponding things and when I
17  brought the invoices and the letter of credit to Mr.
18  Elkins --
19      Q    And the invoices would be Deposition Exhibit 3 and
20  the letter of credit, Deposition 2 that you identified?
21      A    That's what I showed him.
22      Q    And you produced that to Mr. Elkins?
23      A    I showed them to Mr. Elkins and he said that that
24  was no guarantee, that he needed a letter from whoever had
25  sold the corn. In this case it was AGI. And that he also

PAGE 22

22

1  needed an affidavit so he could believe that Mrs. Soto was
2  the owner. And he told me that Mrs. Soto was not doing
3  well, that she wasn't the owner.
4      Q    Did he say why he felt she wasn't the owner?
5      A    He thought that Mrs. Soto just bought it and
6  stored it. And she never went to Brownsville to take her
7  corn out. And I asked Mrs. Soto why didn't you go and look
8  at your corn and she said, "Well, I wasn't interested in
9  selling it."
10      Q    Is that what he said?
11      A    She said.
12      Q    Okay. Now when he indicated, Mr. Elkins, that he
13  wanted an affidavit of ownership, I believe, and also a
14  notation that AGI that indicated that she had
15  owned the corn and he wanted that documentation?
16      A    Yes, that's what Mr. Elkins mentioned. And I
17  showed it to Mr. Elkins.
18      Q    Okay, did you request these documents from Mrs.
19  Soto at the time that Mr. Elkins desired?
20      A    Of course.
21      Q    Okay. I'll hand you Deposition Exhibit No. 5 and
22  ask you to identify that document. It appears to be an
23  affidavit of ownership.
24      A    Yes, this is what I showed him.
25      Q    Do you recognize Mrs. Soto's signature on that

PAGE 23

23

1  document?
2      A    Yes, of course.
3      Q    Okay. And in that document -- May I have that,
4  please -- Deposition Exhibit No. 5, this is where Mrs. Soto
5  says that she owns so much metric tons of corn that she
6  bought from AGI; is that correct?
7      A    Correct.
8      Q    Okay. And in it I assume that she desires to sell
9  the corn that she bought to you, Enrique Villarreal?
10      A    Of course.
11      Q    She said for a price which has been agreed upon
12  between the parties?
13      A    Exactly.
14      Q    By the way what was that price?
15      A    The price was a $150 per ton.
16      Q    Okay. I'll hand you Deposition Exhibit No. 6 and
17  ask you to identify that, please.
18      A    Yes, I know about this document.
19      Q    And what is that document?
20      A    When I spoke with Mrs. Soto and I would tell her
21  that the situation was very complicated with Mr. Elkins
22  because Mr. Elkins could say that Mr. Bersain was the owner.
23  Then she proceeded to write a document in which would show
24  Mr. Elkins that Mr. Bersain had nothing to do with the
25  operation, but to receive the product. But at no point did

PAGE 24

24

1  he have any power to sell or to do anything with the
2  product.
3      Q    Okay. And you showed this Deposition Exhibit No.
4  6 to Mr. Elkins; is that correct?
5      A    Yes.
6      Q    Okay. Now do you recognize that signature on the
7  bottom of Deposition Exhibit No. 6?
8      A    It's Mrs. Ivonne Soto Vega's signature. Yes, it's
9  the same one.
10      Q    So you had originally shown the invoices together
11  with the letter of credit to show ownership in Mrs. Soto; is
12  that correct?
13      A    Exactly.
14      Q    And then based on Mr. Elkins request of an
15  affidavit of ownership by Mrs. Soto as well as a document
16  from AGI that she was the sole owner of the grain you
17  produced those documents to Mr. Elkins on his request; isn't
18  that true?
19      A    Exactly.
20      Q    And did Mr. Elkins then agree to release the corn
21  to you?
22      A    Mr. Elkins asked for some requirements that we had
23  to pay for some storage expenses. And I told him that there
24  was no problem with that, that that could be paid for.
25      Q    Did he tell how much storage, what the storage

SHEET 7   PAGE 25

25

1  expense was?
2       A    He would initially say somethinq about fifteen and
3  then thirty-five dollars. When I went to see him tryinq to
4  pay him that amount he told me that that was not the full
5  amount. He told me the amount was nineteen hundred five
6  hundred and seventy-four dollars and twenty cents.
7       Q    Would that be nineteen thousand, five hundred
8  seventy-four dollars and twenty cents?
9       A    Yes. So I proceeded to take him the check to see
10 if he could deliver me the product. And Mr. Elkins told me
11 that after -- at noontime he would deliver the corn to me.
12 So I proceeded to brinq the trucks aqain to the elevator so
13 I could load the corn after noontime.
14      Q    Do you remember what day that was that you brought
15 the trucks for the corn?
16      A    Approximately it was the 14th or 15th of November,
17 between that time. I qot there with the trucks and I
18 proceeded to qive him all the paperwork that he had
19 requested and he told me that he was not qoinq to qive me
20 anythinq, to leave the place. So I asked Mr. Elkins what
21 was the qame, so much paperwork and doinq so many thinqs and
22 having fulfilled and complied with all of the requirements
23 and now you tell me that you are not qoinq to qive me
24 anythinq and to talk to your attorney. That's the way
25 things happened. He still insists that she is not the

PAGE 26

26

1  owner.
2       Q    Did you actually bring the trucks there to pick up
3  the corn, the --
4       A    Yes, they were there ready at the Port of
5  Brownsville.
6            (Deposition Exhibit No. 13 was marked.)
7       Q    (Mr. Dale)  Okay. I'll hand you Deposition
8  Exhibit No. 13. Could you please identify that, Mr.
9  Villarreal?
10      A    This is the first amount that he told me that were
11 the charges for storing in the amount of $15,035. And Mr.
12 Craig Elkins asked me if I was willing to pay for this and I
13 said, yes, I was.
14      Q    Okay. Now those figures that he gave you that was
15 back in November '97 when he told you those were the store
16 charges for the corn?
17      A    Exactly.
18      A    And your name appears on that document?
19      A    Yes, it's my name and my signature.
20      A    And why was your name and signature on that
21 document?
22      A    Because I accepted the receipt of this document.
23 It says here I hereby receive and I accepted to pay this
24 amount on November 12th, '97.
25      Q    Okay. And that was a document prepared by Mr.

PAGE 27

27

1  Elkins?
2       A    He gave it to me. He told me that's what was
3  owed.
4       Q    Okay. And so that was the storage expenses and
5  then when you had the trucks and agreed to pay it he
6  wouldn't accept the check?
7            INTERPRETER: The last part, I lost it.
8       Q    (Mr. Dale)  He wouldn't accept the check.
9       A    I took him a check in this amount and he told me
10 this wasn't the amount, that it was more.
11      Q    Did he tell you then at that point it was -- did
12 he say how much more money it was?
13      A    He told me that he didn't have the amount, that he
14 would give it to me the next day.
15      Q    Did he give it to you the next day?
16      A    Yeah, the next day he gave me the amount, that it
17 was $19,574.20 and that I had to pay that in advance.
18 That's why I proceeded to request for the check.
19           (Deposition Exhibit No. 14 was marked.)
20      Q    (Mr. Dale)  I'll hand you Deposition Exhibit No.
21 14 and ask you to identify that, Mr. Villarreal.
22      A    Yes, this is the one. This is the check I took
23 him.
24      Q    And that was the check that was given to you by
25 Mrs. -- a cashier's check for Mrs. Soto?

PAGE 28

28

1       A    Yes, of course.
2       Q    So he wouldn't accept that check either?
3       A    No, he didn't accept.
4       A    And I understand he said he wouldn't accept it
5  because that wasn't Mrs. Vega's grain -- Mrs. Soto's grain?
6  Corn. Yeah, corn.
7       A    Yes, he continued insisting that that corn was not
8  the lady's.
9       Q    And I understand he refused to turn over any of
10 the corn to you?
11      A    In the morning when I got there around ten o'clock
12 in the morning when I showed him the check and all the
13 documents I noticed that he was a little nervous. And he
14 told me until the afternoon I will deliver you the grain.
15 So I said, okay, I'm going to move the trailers. And he
16 said, yes, please move them and I'll see you here at three
17 o'clock in the afternoon. And at three o'clock in the
18 afternoon when I showed him everything he told me that he
19 wasn't going to deliver anything, to leave the place and to
20 talk to the attorney -- to his attorney.
21      Q    Did he tell you who his attorney was?
22      A    He mentioned it. I must have the name written
23 down someplace.
24      Q    Now the check was made payable to Southwest Grain
25 I see -- Southwest Grain Elevator Company; is that right?

*ACTION REPORTING*
(956) 631-1024  (800) 884-1024

Case 1:98-cv-00023    Document 96    Filed in TXSD on 03/12/2002    Page 218 of 371

Vega vs. Port Elevator-Brownsville
**ENRIQUE VILLARREAL**
5-10-00

SHEET 8  PAGE 29

29
1   A   That's the way he requested it.
2   Q   He made the request himself?
3   A   He told me that the check had to be to the
4   elevator's name.
5   Q   Okay.  And he gave you the name Southwest Elevator
6   Grain?
7   A   Of course.  He gave me a card.
8   Q   Okay.  Now Mr. Villarreal, would you -- I'll show
9   you Deposition Exhibit No. 4 and it appears to be a sales
10  contract between you and Mrs. Soto, could you identify that,
11  please?
12  A   Yes, this is the one and here's my signature.
13  Q   And that document says you're going to purchase
14  five thousand metric tons of corn; is that correct?
15  A   Yes, of course, we always talked about five
16  thousand tons.
17  Q   Okay.  And that was dated, what, 3 November '97?
18  A   That's correct.
19  Q   Okay.  You mentioned a purchase price before of a
20  $150 per ton, that isn't written in that document, is it?
21  A   No, this was just left in a gentleman's agreement
22  -- oral gentleman's agreement.
23  Q   Okay.
24  A   Because the market fluctuates a lot.
25  Q   Okay.  Okay.  So at the time you went to pick up

PAGE 30

30
1   the corn the value was how much in your mind that you were
2   going to pay for the corn?
3   A   Well, what happens is that I did business based on
4   $150 and I had to ship more than ten trailers daily, so the
5   price that I had negotiated wouldn't move, wouldn't change
6   because Mrs. Ivonne Soto was afraid that I would take it on
7   time.  But I told her I wouldn't, that I would do things
8   fast.  In fact I was planning to ship ten trucks daily or
9   more.
10  Q   Okay.  And you agreed with her at that time it
11  would be a $150 a ton?
12  A   Of course, to ship it fast.  That's why I was
13  insisting in shipping it right away because the business
14  could skip with just -- just skip from your hands.  And I
15  had already compromised with many people here in Monterrey
16  and in Mexico.
17  Q   Okay.  Now Deposition Exhibit No. 3, which you
18  have identified as the invoices --
19  A   Of course.
20  Q   Okay.  In that we're talking about three different
21  shipments of grains of corn -- three different shipments of
22  corn; is that correct?
23  A   Yes, three different shipments with the same
24  letter of credit.
25  Q   And that was the letter of credit that we

PAGE 31

31
1   identified a moment ago under Deposition Exhibit No. 2?
2   A   Of course, yes.  That's the way it is.
3   Q   I'm looking at the invoices, is there any doubt at
4   all looking at that as to who the owner of that corn was?
5   A   Absolutely not.
6   Q   And who does it show to be the owner?
7   A   Ivonne Soto Vega.
8   Q   Okay.  Now was it your understanding that Mr.
9   Elkins had seen that document when the corn arrived at the
10  elevator?
11  A   He's obliged to receive the product together with
12  invoices with certificate of origin, certificate of weight
13  and phytosanitary analysis together with the list of the
14  train -- of all the car trains that would be coming that
15  have to agree with the tons that are stipulated on the
16  document.
17  Q   Did you have any conversation at all at that time
18  with Mr. Elkins that he had had seen those documents at the
19  time the corn was delivered?
20      MS. GONZALES:  Objection, form.
21  A   I didn't make those comments, but supposedly he
22  must have received them, because nothing can be moved
23  without invoices or without documents.
24  Q   (Mr. Dale)  Okay.  So in other words, that when
25  the elevator receives the corn it has to have documents who

PAGE 32

32
1   owns the corn?
2       MS. GONZALES:  Objection, form.
3   A   Otherwise you cannot receive it.
4   Q   Is that the standard business practice in the
5   industry of an elevator when its receiving corn?
6   A   Of course.
7   Q   Okay.
8       MR. MOUNT:  Let's go off record.
9       (OFF THE RECORD 3:49-4:15)
10  Q   (Mr. Dale)  Mr. Villarreal, we've had a little
11  recess and I'll continue with the questions here.  I don't
12  recall exactly -- Do you remember what the last question was
13  when we finished.
14      (The reporter read back the previous question.)
15  Q   Now Mr. Villarreal, was it ever made known to you
16  at any time about any corn that had been delivered from the
17  elevator before you even went to see Mr. Elkins at the
18  elevator?
19  A   Well, what I would know is that there was amount
20  of corn there.  And they also made me believe that that
21  amount of corn there did not belong to Ivonne Soto, but to
22  another person.  But Mr. Craig Elkins told me if you fulfill
23  with the requirements that I'm asking you for I will give
24  you the corn.
25      MS. GONZALES:  Objection, non-responsive to

Vega vs. Port Elevator-Brownsville
**ENRIQUE VILLARREAL**
5-10-00

SHEET 9   PAGE 33
33

1  after -- starting with the sentence of Mr. Elkins.
2      Q    (Mr. Dale) So Mr. Elkins never told you, if I
3  understand, that he had delivered corn to anyone, say to Mr.
4  Gutierrez, at an earlier date or Mr. Gutierrez instructions
5  before you got there that corn out of that 5,000 bushels of
6  corn that was stored there at the elevator?
7      A    Well, when I showed him the letters of credit as
8  well the invoices when he saw the name of Mr. Bersain there
9  he already thought that Mr. Bersain was the owner.
10      Q    Did he show you any documents himself to show that
11  Mr. Bersain Gutierrez was the owner of that corn?
12      A    Absolutely not.
13      Q    So the only documents that were shown at that
14  particular time were the documents contained in Deposition
15  No. 3 were the three invoices of the grain -- of the corn?
16              MS. GONZALES: I'm sorry, do you mean the
17  invoices he showed Mr. Elkins.
18      Q    (Mr. Dale) Yeah, the invoices that you showed Mr.
19  Elkins.
20      A    Yes.
21      Q    And Mr. Elkins never showed you any documents?
22      A    No, not in something like that.
23      Q    Okay.
24      A    Not something like that. He would only talk and
25  would say that Mr. Bersain was the owner.

PAGE 34
34

1      Q    So he showed you no documents to show that Mr.
2  Bersain Gutierrez was the owner?
3      A    He didn't show me any documents proving that he
4  was the owner, but he did mention the fact that he had
5  delivered the product to Mr. Bersain.
6      Q    And when did he tell you for the first time that
7  he had delivered the product or the corn to Mr. Bersain
8  Gutierrez?
9      A    At the end. Even at the end when I had given him
10  the check and the affidavit and trucks -- and when the
11  trucks were still outside he didn't even believe at that
12  time that Mrs. Soto was the owner. So I put pressure on him
13  and told him, well, what's the game. You ask me for things
14  and I have brought everything. And what he said was that
15  the owner was Mr. Bersain. What I told him I have shown you
16  that Mrs. Soto is the owner. And then he said I won't give
17  you anything, please leave this place. And then he brought
18  out a document and he said, well, I have delivered something
19  to him and please leave.
20      Q    What kind of a document did he show you at that
21  time?
22      A    I think it was an invoice. An invoice that Mr.
23  Elkins was giving to Mr. Bersain.
24      Q    So in other words an invoice or document showing
25  that Elkins at the Port Elevator had delivered the corn to

PAGE 35
35

1  Mr. Gutierrez?
2      A    Exactly. What wasn't right was the price per ton
3  which was approximately of eighty dollars. The product was
4  too cheap to be delivered.
5      Q    So the document that was shown to be delivered in
6  behalf of Mr. Gutierrez was only $80 a metric ton; is that
7  your testimony?
8      A    Approximately. It was below one hundred. It was
9  too cheap. And he also mentioned that Mr. Bersain was going
10  to come, but he never appeared.
11      Q    Okay. But until you had brought the trucks to
12  pick up the corn and deliver the check for the storage, the
13  nineteen thousand dollar check, up until that time did Mr.
14  Elkins ever tell you that that grain had been delivered on
15  behalf of Mr. Gutierrez -- the corn had been delivered on
16  behalf of Mr. Gutierrez?
17      A    At that moment he made that comment. He was still
18  denying at that time that the corn belonged to Mrs. Soto.
19      Q    I'll hand you Deposition Exhibit No. 8 and ask you
20  if you can identify that, please, Mr. Villarreal.
21      A    It's one of my checks. I gave it to him in
22  guarantee.
23      Q    A check you gave to who?
24      A    This check represents three parts that I was going
25  to -- to bring the product out in three different days.

PAGE 36
36

1  Because if a trailer can load 30,000 tons the idea was to
2  ship ten trucks daily. So I was giving guarantee for three
3  days in the amount of approximately a thousand dollars --
4  thirty-five thousand dollars, because I was going to pay
5  Mrs. Yvonne Soto as soon as the Mexican customs would
6  certify the weight of the corn in doing importation. So
7  because there was going to be a turn around I guaranteed for
8  three days.
9      Q    Okay. So this was like a partial payment, this
10  $135,240 was partial payment that you're paying up front?
11      A    Yes, only a guarantee. If I wouldn't pay for part
12  of it immediately she would go and -- It was like a
13  guarantee.
14      Q    Okay. Of course since it didn't go through, since
15  you didn't get the grain from Port Elevator then what
16  happened with that check?
17      A    The check is still in the hands of Mrs. Soto.
18      Q    Okay, but it's never been cashed?
19      A    No, never. It has never been cashed.
20      Q    Because you never got the grain? The corn, excuse
21  me. Okay, I've got a question for you concerning the amount
22  of corn -- The affidavit of ownership shows 4,236 metric
23  tons of corn. Is that correct?
24      A    It's correct.
25      Q    But if you look at the invoices how many -- how

Case 1:98-cv-00023    Document 96    Filed in TXSD on 03/12/2002    Page 220 of 371

Vega vs. Port Elevator-Brownsville
**ENRIQUE VILLARREAL**
5-10-00

SHEET 10    PAGE 37

PAGE 37

1  many tons of metric corn were delivered to the elevator?
2      A    Invoices show approximately an amount of 4,924
3  tons. What happens is that one part of it was paid with a
4  letter of credit and the remaining amount with checks.
5      Q    Okay.
6      A    And that's the difference.
7      Q    So that's the discrepancy? Okay. So actually it
8  was close to 5,000 metric tons that Mrs. Vega or Mrs. Soto
9  had stored that she was going to sell to you?
10     A    Five percent more or five percent less.
11     Q    Yeah, more or less.
12     A    That's the way you deal with -- you do operations,
13 five percent up or less.
14     Q    So it was 5,000 metric tons more or less?
15     A    Exactly, that's the way you deal with that. It's
16 not exact.
17     Q    Okay. You agreed to buy the corn from Mrs. Soto
18 for $150 a metric ton, what were you anticipating to sell
19 that corn for, at what price?
20     A    I was selling to sell it at $206. Of course with
21 that $150 anyway you had to consider that some handling had
22 to be done to the corn so you could leave it at the second
23 level, plus the shipment and my --
24     Q    Commission?
25     A    -- commission.

PAGE 38

1      Q    Your profit?
2      A    My profit. Because, yes, you had to include there
3  shipment expenses, cost of expenses.
4      Q    Now Mr. Elkins has testified in deposition that
5  the corn stored there at the time you went to see the corn
6  was grade five. Do you agree that it was a grade five corn?
7      A    I feel that it was grade three. That corn could
8  still be used for domestic use for human consumption.
9  That's why the idea of handling it so we could grade it
10 better. In fact the certificates do not say only for animal
11 consumption, they don't say that.
12     Q    Would that be required if it was only for animal
13 consumption? Would that have to be on the ticket to show
14 that it only could be used for animal consumption?
15     A    Yes, it has to be indicated. Yes, because you
16 cannot buy one thing for another. In the petition for
17 importation you have to specify that you imported something
18 for animal consumption or for human consumption. It has to
19 read only for human consumption or only for animal
20 consumption, that has to be written there.
21     Q    And this is customary in the trade to have that
22 notation that it's either for human consumption or for
23 animal consumption?
24     A    Yes, normally that's what's done.
25     Q    But you had no doubt at all that was for -- that

PAGE 39

1  corn was good for human consumption?
2      A    Yes, it was for human consumption. Otherwise it
3  would have been specified in the analysis due to the degree
4  aflatoxin. When that degree goes up then it goes to -- When
5  the aflatoxin degree goes up then it has to be used for
6  animal consumption or if it's broken as well.
7      Q    Now I'll represent to you that the corn had been
8  stored at the elevator more or less about a year, maybe
9  thirteen months or about that time frame. And Mr. Elkins
10 testified that during such a period of time you would have a
11 gross deterioration of the quality of the corn. What is
12 your opinion on that?
13     A    I feel that in certain ways suffers deterioration,
14 but it's all -- it all depends on the way you have your
15 elevator. If your elevator is not in a good condition --
16 The elevator has to keep on moving the grain so they don't
17 have that problem. That's why you are paying some storage
18 charges and also for spraying it and so the grain can be
19 moved so it's in a good condition.
20     Q    So your testimony it's up to the proper storage
21 use by the elevator operator to see that there's no great
22 deterioration?
23     A    It's less.
24     Q    Okay.
25     A    It's low.

PAGE 40

1      Q    Now did you -- You've had commodity experience
2  other than -- and I mean buying and selling corn and maybe
3  grain other than the purchase back in 1994 of the corn that
4  you indicated that was stored at the elevator; is that
5  correct?
6      A    Yes, in fact with this company Mercado de Granos
7  we beat people -- different people we bidded to see who was
8  able to deal with the volume that we dealt with at that
9  company. That's why one of the purchases was made by one of
10 the owners. And all later -- the following purchases were
11 done by me because I -- I was able to prove that I was able
12 to deal with that type of products. From then on I was in
13 charge of all purchase sales, operations and loading and
14 unloading in that company.
15     Q    What kind of products were you loading and
16 unloading?
17     A    Only corn. I was able to move 90 to 100,000 tons
18 in six months.
19     Q    Could you tell me from what countries you were
20 involved in with Mercado de Granos to purchase corn from,
21 what countries?
22     A    All grains were bought from the United States.
23     Q    Okay.
24     A    In relation to grains.
25     Q    Did you ever have anything to do with purchases

*ACTION REPORTING*
(956) 631-1024   (800) 884-1024

Vega vs. Port Elevator-Brownsville
**ENRIQUE VILLARREAL**
5-10-00

**SHEET 11   PAGE 41**

41

1   from say India, the country of India?
2       A    Yes.  In fact, I have gone to India on four
3   occasions.  And after the devaluation in Mexico in '95 they
4   suggested us to go to India to sell fertilizers, because a
5   very big plant burned in India so we went to bid there.  I
6   went on behalf of Mercado de Granos and we won a purchase
7   agreement from a company by the name of MMTC in India.  We
8   were going to send fertilizers from Mexico.  We were not
9   able to bring the fertilizers out of Mexico because we had
10  to take it from the Ukraine or from Morocco at that company,
11  Mercado de Granos.
12      Q    Now you had a business card when you were
13  associated with Mercado de Granos, S.A. and the title was
14  "Asesor"?
15      A    Of course.
16      Q    And what does that title mean?
17      A    At that company, Mercado de Granos, we were three
18  people; two owners and I was in charge of all the operations
19  from the company.
20      Q    And what does the company do mainly, what's their
21  function?
22      A    What that company does the purchase or sale of
23  grains.  One of its partners has Del Valle Grain in
24  Progreso, Texas and La Concordia Del Bravo at Rio Bravo,
25  Tamaulipas.  And other companies that are involved in the

**PAGE 42**

42

1   buying and selling of corn.
2       Q    Are you also associated with a company or have
3   been known as La Concordia Del Bravo?
4       A    I was in partnership with Mr. Roberto Juarez.  All
5   those companies were associated with Mercado de Granos,
6   transportation, warehouses, everything.
7       Q    Concerning grain and foreign products?
8       A    Exactly.
9       Q    Now I'll hand you a document marked as Deposition
10  Exhibit No. 12 and ask you if you could identify that
11  document, Mr. Villarreal.
12      A    This document belongs to the company by the name
13  of Grupesa who bid with Port Elevator from Brownsville or
14  with Southwest for the tons that they were offering.  I
15  suggested Mr. Geronimo to bid so he could win that product.
16      Q    And what was the date of that --
17      A    I have an understanding that he was the only one.
18      Q    What was the date of that document?
19      A    It was December the 21st, 1997.
20      Q    Okay.
21      A    I asked Mr. Geronimo who is the director from
22  Grupesa to try and get and buy that corn because it was in a
23  very good condition.  In fact, he had a sample of that corn
24  and he liked it.  In fact, we both had the same opinion in
25  the sense that it was a good corn to be sold to Mexico.  And

**PAGE 43**

43

1   the man from Grupesa told me that Mr. Elkins had sent him a
2   notation where there were different figures from varying
3   from $125 to $135 per ton.  Those were the prices in which
4   Mr. Elkins wanted to sell the product.
5       Q    Okay.  Was that the same corn that -- it was your
6   understanding that this was the corn left over that he still
7   had that was delivered to the elevator through Mrs. Vega --
8   through Mrs. Soto?
9       A    Yes, because at some point Mr. Elkins at the end
10  said that he was going just to auction it.  So Mr. Elkins
11  asked me if I wanted to bid for it.  And I asked him why
12  since the corn didn't belong to him, but he mentioned that
13  they owed him some storage, some rent.  So I need to auction
14  it so I can recover some money.  And then I told him you
15  already have a with the payments, why don't you cash it?  So
16  I asked Grupesa to bid for it to see if they could keep the
17  corn.  This man called me and told me that this man was
18  asking for a lot of money for this corn.  So he bid again,
19  he did a second bidding, and then from then on I didn't know
20  anything else.
21      Q    Okay.  But this was the -- It was your
22  understanding that it was -- the balance of corn left from
23  the original 5,000 more or less metric tons was the 1,600
24  tons that they were asking for bids?
25      A    Approximately 1,600 tons of yellow corn.

**PAGE 44**

44

1       Q    And you indicated those bids were in your opinion
2   below -- he was asking for bids below what the corn was
3   actually worth?
4       A    Yes, I suggested Geronimo to bid below -- bid low
5   because there's not going to be anybody else to bid for it
6   because of the same reason because Elkins is a little
7   complicated person.
8       Q    Do you know what the corn was actually finally
9   sold for?  Do you have that knowledge?
10      A    No, I have no idea.  But he was trying to obtain a
11  hundred and thirty something dollars.
12      Q    Although you felt the corn was worth at least a
13  $150 per metric ton.
14      A    Of course.
15      Q    Is that correct?
16      A    It's correct.
17      Q    And Mr. Elkins said he was trying to recover
18  storage money even though he had been given a $19,000 plus
19  check for the storage money that he had requested; is that
20  correct?
21      A    Yes, because I told him there you have the check.
22  No, but that he said he was going to recover his rent from
23  that.
24      Q    Okay.  I'll hand you Deposition Exhibit No. 10 and
25  ask you if you can identify that, Mr. Villarreal.

*ACTION REPORTING*
(956) 631-1024   (800) 884-1024

Vega vs. Port Elevator-Brownsville
**ENRIQUE VILLARREAL**
5-10-00

SHEET 12   PAGE 45

45

1   A   Yes, this is a letter that was sent to AGI
2 confirming that Mrs. Soto is the owner of the corn that was
3 with Mr. Elkins.
4   Q   Was that a document that had been requested from
5 Mr. Elkins from you originally to show that Mrs. Vega was
6 the -- Mrs. Soto was the only owner of that?
7   A   Exactly, that she was the owner, correct.
8   Q   Okay. And this is -- AGI is the one that sold the
9 grain or the corn to Mrs. Soto; is that correct?
10   A   Yes, of course based on the letter of credit,
11 correct.
12   Q   And you gave this letter to Mr. Elkins?
13   A   I gave him that letter and I gave him the
14 affidavit as well.
15   Q   So Mr. Elkins had the affidavit from Mrs. Soto
16 that she owned the corn; is that correct?
17   A   Exactly.
18   Q   In addition Mr. Elkins had a copy that you
19 provided him with a bill of -- an invoice together with a
20 letter of credit showing that Mrs. Soto owned the corn?
21   A   Yes, of course, in fact Mr. Elkins would say that
22 he didn't want any copies, that he wanted originals. That's
23 why I took him the affidavit and the originals --
24   Q   So you gave him the originals?
25   A   -- as well this letter.

PAGE 46

46

1   Q   You gave him the originals?
2   A   Yes, I showed them to him, everything an original.
3   Q   And in addition you gave him the document from AGI
4 indicating that Mrs. Soto was the only owner of that corn;
5 is that correct?
6   A   That she was the owner, exactly.
7   Q   And still Mr. Elkins would not deliver the corn?
8   A   He would be denying that Mrs. Soto was the owner.
9 He didn't deliver the corn to me. And that's the way he had
10 me for two and a half months.
11   Q   Did you ever have any doubt after talking to Mrs.
12 Soto and after looking through the documents that she was
13 the actual owner of the corn?
14   A   At no time. With the letter of credit and with
15 that I didn't.
16   Q   Did Mr. Elkins and the Port Elevator at any time
17 have any authority to deliver that corn to anyone other than
18 through Mrs. Soto?
19       MS. GONZALES:  Objection to form.
20   A   Since Mrs. Soto -- Ivonne Soto was the owner she
21 was the only one who was able to make the authorization.
22   (Mr. Dale)  Was there anything to indicate to you
23 from looking at all the documents and all the records that
24 Mr. Gutierrez, Bersain Gutierrez, had any right at all to
25 have the corn delivered on his behalf?

PAGE 47

47

1   A   No, he wasn't credited on no document. No
2 document states that he was the owner.
3       (OFF THE RECORD 4:52-4:56)
4       (Exhibits No. 15 and 16 were marked.)
5   Q   (Mr. Dale) Okay, Mr. Villarreal, we're back on
6 the record again. I'll hand you Deposition Exhibit No. 15
7 and ask you to identify that, sir.
8   A   It's my business card.
9   Q   Okay, and what's the name of that company?
10   A   The name of the company is Mercado de Granos, S.A.
11 de C.V. in Monterey, Nuevo Leon.
12   Q   And that's the company that deals with corn and
13 grain purchase and sale?
14   A   Exactly.
15   Q   Okay. And I'll hand you Exhibit No. 16 and ask
16 you to identify that, please.
17   A   This is also my business card.
18   Q   Okay.
19   A   With this card I'm representing different
20 companies involving the same with grains, transportation,
21 shipment and storage.
22   Q   Okay. Now Mr. Villarreal, do you know who the
23 person was that ultimately bought the 1,600 metric tons of
24 the corn that had been stored out of the 5,000 metric tons
25 that had been stored at the elevator?

PAGE 48

48

1   A   No, I never learned about it. And I had problems
2 with many people and I forgot about it.
3   Q   Okay. And was it more or less a month from the
4 time that you went to the elevator with your trucks to pick
5 up the corn, which you didn't get as you indicated, it was
6 approximately more or less a month that passed until the
7 bids or the offer, the request for bids was issued by Port
8 Elevator concerning the 1,600 metric tons of corn that was
9 left over?
10   A   Are you affirming that?
11   Q   No, I mean is that what actually occurred?
12   A   I understand that that's what happened.
13   Q   Okay.
14   A   That they asked for bidding a month after.
15   Q   Okay. And the corn that were bidding you felt, as
16 you testified earlier, that that was corn that -- good corn
17 that could be used for human consumption?
18   A   Yes, the corn was in good condition.
19   Q   Thank you very much, Mr. Villarreal.
20       MR. DALE:  And I'll pass the witness.
21       E X A M I N A T I O N
22 BY MS. GONZALES:                         (5:00 p.m.)
23   Q   Mr. Villarreal, my name is Michele Gonzales and I
24 represent Port Elevator, one of the defendants. Mr.
25 Villarreal, it's my understanding that you were not

Vega vs. Port Elevator-Brownsville
**ENRIQUE VILLARREAL**
5-10-00

---

SHEET 13   PAGE 49

49

1  subpoenaed to come here today.
2      A    I was advised.
3      Q    Who advised you to be here today?
4      A    Mr. Vega.
5      Q    Mr. Villarreal, do you know Bersain Gutierrez?
6      A    Not physically.
7      Q    Have you talked to him on the phone?
8      A    Not even once.
9      Q    How do you know of him?
10     A    Through Mr. Craig Elkins.
11     Q    And what is your knowledge of Mr. Gutierrez in
12  this case?
13     A    I don't know much.  I don't know much.
14     Q    What do you know?
15     A    When I went to the elevator I went to buy product
16  and I was mainly devoted to that, to prove who was the owner
17  and to see if the product was legal.  And I didn't pay too
18  much attention to the comments they had about Mr. Bersain.
19     Q    When you went to see the quality of the corn was
20  that the first time you went to Port Elevator regarding that
21  corn?
22     A    If it was the first time that I would go to that
23  port?
24     Q    Regarding buying the corn from Ivonne.
25     A    In relationship to Ivonne's purchase, yes.

---

PAGE 50

50

1      Q    So you had never prior to that approached Craig
2  Elkins regarding wanting to buy some corn?
3      A    I did know Craig Elkins before and I knew that
4  there was -- I knew about the existence of that elevator and
5  about the existence of another elevator by the name of
6  Garbar that was there also at the port.  And many people
7  from Monterrey know that Craig Elkins sells grains, many
8  people from Mexico.
9          MS. GONZALES:  I'll object to
10  non-responsiveness.
11     Q    (Ms. Gonzales)  But had you approached Mr. Elkins
12  regarding wanting to buy some corn prior to your purchase
13  from Ivonne?
14     A    I did try to see him on behalf of that company
15  Mercado de Granos.  In fact, I do have letters that were
16  addressed to me where he was interested in talking to me so
17  we could handle more purchases.
18     Q    Do you personally know Guillermo Vega?
19     A    Yes, I do know Mr. Guillermo Vega.
20     Q    And how do you know Mr. Vega?
21     A    I was referred to him through a person, a friend,
22  that I care for a lot in the United States.  She referred me
23  to Mr. Vega.
24     Q    So you have had prior dealings with Mr. Vega?
25     A    No.

---

PAGE 51

51

1      Q    Have you ever met Walter Puffelis?
2      A    No.
3      Q    When did you enter into the agreement to buy the
4  corn from Ivonne?
5      A    Since the first time that I spoke with them I
6  showed them my interest, because I was interested in moving
7  that product to Mexico since I have customers.
8      Q    Do you remember when that was, the date?
9      A    It was in September.
10     Q    Of what year?
11     A    Of '97.
12     Q    And what was the agreement?
13     A    The agreement was that they offered me a product.
14  In this case it was corn and there was demand to be sold in
15  Mexico.
16     Q    And Ivonne told you she had 5,000 metric tons of
17  corn?
18     A    We always talked about that amount.
19     Q    How were you going to buy it?
20     A    How was I going to buy it?
21     Q    Yes.
22     A    With cashier checks.
23     Q    Did you have a Cupo.
24          MS. GONZALEZ:  A cupo.  C-U-P-O.
25     A    On my check book you mean?

---

PAGE 52

52

1      Q    (Ms. Gonzales)  To cross the corn from the United
2  States into Mexico?
3      A    Of course.
4      Q    Where did you get it?
5      A    That if I had a quota.
6      Q    Oh, I'm sorry, they told me it was a Cupo.
7      A    A quota, yes --
8      Q    The papers.
9      A    -- that's the quota that Conosupo assigns you so
10  you can buy something.
11     Q    And how do you go about getting the papers?
12     A    What do you mean to obtain the papers?
13     Q    The quota.
14     A    That kind of permissions or quotas regularly
15  belong to a person and then you deal through a custom's
16  agent.  And then the agent's calculates the use of the
17  permission, custom expenses and taxes in case you need to
18  pay taxes.
19     Q    So someone else owns the quota or the permission
20  and then you get it from them?
21     A    Yes, permissions are being used for people who
22  want to buy grain.  When there is corn for human consumption
23  you are required for a permission or a quota.  And when it's
24  for animal consumption you are not required to have a
25  permission, it's free.  At that time, right now I don't know

---

Vega vs. Port Elevator-Brownsville
**ENRIQUE VILLARREAL**
5-10-00

SHEET 14   PAGE 53

53

1  how things are.
2    Q    Okay.  And you said -- I'm sorry, what business
3  are you in right now?
4    A    Right now in the manufacturing of accessories, car
5  accessories.
6    Q    So you no longer deal with corn or grain?
7    A    No.
8    Q    And how long have you been in car accessories?
9    A    Nine months.
10    Q    Who were you going to sell the corn to?
11    A    Here in Monterrey to different people, AMINSA in
12  Ramos Arizpe Coahuila and to other buyers here in Monterrey.
13  In fact I know almost all the buyers of the country.
14    Q    So when you entered into this agreement with
15  Ivonne you were not aware that she may not own the corn?
16            MR. DALE: I'll object to the form.  I'll
17  object to the form.
18            MS. GONZALES:  And what was his answer?
19            INTERPRETER:  "No."
20    Q    (Ms. Gonzales)  Mr. Villarreal, you were not
21  present when the delivery of the corn was made to Port
22  Elevator, were you?
23    A    No.
24    Q    So you have no personal knowledge as to any
25  agreement that was made at that time?

PAGE 54

54

1    A    No, not that I know of.
2    Q    And also you were not present when Ivonne Soto
3  Vega purchased the corn, were you?
4    A    No, of course not.
5    Q    So you were not there when she signed any of the
6  documents?
7    A    No, of course not.  She bought it directly through
8  her bank.
9            MS. GONZALES:  Can I see the exhibits?
10            MR. DALE:  Sure.
11    Q    (Ms. Gonzales)  Mr. Villarreal, you stated that
12  when you buy corn or products like that you have to show
13  certain documents of ownership?
14    A    Yes, the person has to identify herself or himself
15  showing that he's the owner or she's the owner and that's
16  only for precaution measurements.
17    Q    And you also testified that Ms. Vega gave you
18  those documents saying that she owned the corn?
19    A    Of course.
20    Q    Okay, but you also testified that you were not
21  present when the delivery of the corn was made?
22    A    Yes, of course, I wasn't present, but she has
23  documents stating that she's the owner.
24    Q    But being that you were not there you don't know
25  what documents were shown to Craig Elkins at that time?

PAGE 55

55

1    A    I want to think that they were those documents
2  because a payment was made through a letter of credit.
3    Q    But you were not there?
4    A    I wasn't present, but it's a certain mechanism to
5  be followed when the purchase is made.
6            MS. GONZALES:  I'll object to non-responsive.
7    Q    (Ms. Gonzales)  Now Mr. Villarreal, you stated
8  that you were going to buy 5,000 tons of corn?
9    A    Exactly.
10    Q    And you also testified that you were going to have
11  three -- ten trucks daily that could hold 3,000 tons of corn
12  each?
13    A    30,000 tons daily.  Thirty per truck.
14    Q    If you were only going to buy 5,000 pounds you
15  wouldn't need ten trucks daily.  5,000 tons, I'm sorry.
16    A    Excuse me, how was your question?
17    Q    I'm just trying to understand this.  You stated
18  that you were going to have over several days ten trucks?
19    A    Ten trucks.
20    Q    Each truck can hold three thousand tons.
21    A    Thirty tons.
22    Q    Thirty tons.  But yet you were only going to buy
23  5,000 tons of corn?
24    A    Of corn.
25    Q    Is that correct?

PAGE 56

56

1    A    Yes, the agreement was to buy corn.  And in order
2  to take the corn out from there you need trucks.  And each
3  truck can only be loaded with thirty tons, approximately.
4  The idea was to use ten trucks daily to take the grain out.
5    Q    All right.
6            MS. GONZALES:  We can go ahead and -- because
7  I'm going to need a minute to look at the exhibits.
8            (OFF THE RECORD 5:15-5:28)
9    Q    (Ms. Gonzales)  Okay, Mr. Villarreal, I wanted to
10  talk a little bit more about the corn that you were going to
11  buy.  You said you were going to purchase the corn for $150
12  a ton?
13    A    It's correct.
14    Q    And how do you know the value of the corn?
15    A    All grains are being dealt through a market.
16    Q    And so you take the current market price at that
17  time?
18    A    That's the convenient thing to do so you can sell
19  it.
20    Q    And the market it fluctuates quite a bit?
21    A    Yes.
22    Q    So as you were saying -- You had testified earlier
23  that you were in a hurry because you didn't want to miss out
24  on the price that you were paying?
25    A    Yes.

Vega vs. Port Elevator-Brownsville
**ENRIQUE VILLARREAL**
5-10-00

SHEET 15   PAGE 57

57

1    Q    And who did you -- Okay, so when you negotiate the
2    price who do you negotiate the price with or how do you
3    determine the market value at that time?
4    A    What happens is that the grain market is being
5    handled both in Mexico and in the United States.  In order
6    to be able to buy a product you have to be based on that
7    margin, included all the expenses such as freight, custom
8    expenses, up to the point where it reaches its destination.
9    Q    Do you have a U.S. Social Security Number?
10   A    No.
11   Q    How about a driver's license number?
12   A    Neither that.
13   Q    When you delivered the check for the storage fees
14   to Mr. Elkins it was in the amount of $19,574.20; is that
15   right?
16   A    Yes.
17   Q    And were you -- or state whether you were or were
18   not aware that this check was never cashed.
19   A    In fact the check was cashed -- Well, not that
20   one.  What check are you referring to, because there were
21   two checks?
22   Q    The nineteen --
23   A    No, that one, that has not been cashed as far as I
24   know.
25   Q    Mr. Villarreal, you stated that you had done prior

PAGE 58

58

1    dealings with Port Elevator through a company by the name of
2    Mercado de Granos?
3    A    That purchase was done by Mr. Roberto Juarez.  And
4    all following purchases that were done through that company
5    were done by me.
6    Q    So you did do some purchases for Mercado de
7    Granos?  You did do some purchases for them?
8    A    Yes, of course.  Of course.  Of course.
9    Q    Did you ever -- Have you ever done any business
10   with Banco Portugues Atlantico?
11   A    Banco Portugues Atlantico?  I have never had that
12   name.
13   Q    And so you said there was two owners to Mercado de
14   Granos?
15   A    Two owners and I that was working as an operation
16   manager -- operation director.  And that's what -- the three
17   of us would do everything.
18   Q    You were not an owner?
19   A    No.
20   Q    Did you ever hold yourself to be an owner of
21   Mercado de Granos?
22   A    No.  I'm just an advisor or an operation director.
23   Q    Was one of the companies that you sold to here in
24   Mexico was that the name of that company Grupo Minsa?
25   A    Of course.  To all the plants, Guadalajara, in

PAGE 59

59

1    Coatzacoalcos, in Mexico and in Arriaga, Chiapas and in
2    Jaltipan, Veracruz.
3    Q    Who is Maria Guadalupe Reyes Chapa?
4    A    Maria Guadalupe Reyes Chapa.  The last name maybe
5    -- No, Reyes Chapa I don't know.
6    Q    Or it could be Chapa Reyes.
7    A    Maria Guadalupe Chapa Reyes, try to remind me
8    where from?
9    Q    Did you ever have any dealings with her in the
10   Mercado de Granos?
11   A    Maria Guadalupe?  Unless she's one of the Elkins'
12   employees.  Only in that case.  We bought from different
13   companies so it's very hard to remember all the names.  My
14   position was to buy to company and to check if the shipment
15   would arrive to its destination.
16   Q    Are you involved with the lawsuit that's going on
17   with Mercado de Granos?
18   A    No, it's been long since I left that company,
19   since '95 I quit.  The last thing I did with Mercado de
20   Granos was the bidding for fertilizers for India in '95.
21   Q    Have you ever done business -- Had you ever done
22   business with Ivonne Vega prior to this purchase of corn?
23   A    No.
24   Q    Have you done business since then?
25   A    No.

PAGE 60

60

1    Q    Mr. Villarreal, I'm going to show you what was
2    marked as Deposition Exhibit 13.  That was -- just to remind
3    the jury that's the statement that Craig Elkins gave you as
4    being the storage price?
5    A    That was the initial thing, the first thing.
6    Q    But later on he told you that that amount was
7    different?
8    A    There was a difference.
9    Q    Earlier you had testified that he changed it on
10   you and he told you it was one thing and then it was
11   another.
12   A    First it's this and then the second thing was the
13   amount of $19,574.20.
14   Q    Mr. Villarreal, what is a letter of credit
15   supposed to state?
16   A    A letter of credit should be issued by a bank with
17   a corresponding person in the foreign country when you deal
18   with these kind of purchases.  So the name of the buyer
19   should appear there and the seller, and the destinations as
20   well, as well as all the documents that are necessary in
21   order to cash the letter of credit, invoices, weight
22   certificates, and everything that's indicated in the letter
23   of credit.  Because if there is something specified in the
24   letter of credit that is not the product you will never be
25   able to collect the money from the letter of credit.  If it

*ACTION REPORTING*
(956) 631-1024   (800) 884-1024

SHEET 16   PAGE 61

**61**
1  specifies sorghum, it's for sorghum.  If it's for corn, it's
2  for corn.
3      Q    Are there special banks that do this or can you
4  get this at just any bank?
5      A    Majority of the banks are the banks who have its
6  correspondents in the foreign countries.  In this case if
7  you are buying something locally it can be the same bank
8  with which you deal with the letter of credit.
9      Q    So you can get these pretty much just about in any
10 bank?
11     A    Not at any bank.  You need to be a customer of the
12 bank, have very good references, because not everybody can
13 get a letter of credit.
14     Q    So basically as long as you're a customer, you
15 have good credit, and the bank has another corresponding
16 bank in another country you can get a letter of credit?
17     A    Of course, depends if it agrees with the bank that
18 you have bought the letter of credit with.  And if this bank
19 has a corresponding bank, like Bank of America or another
20 bank in California, if it has a correspondent there there's
21 no problem.  You look for the shorter ways to speed up
22 things.
23     Q    And does it have -- You stated earlier that it has
24 to have a specific area of destination?
25     A    You have to specify the product, the destination,

PAGE 62

**62**
1  if it's going to half bridge or if it's going to remain in
2  the United States for the transportation company, together
3  with all the certificates and documents.  You have to
4  specify everything in the letter of credit when you do the
5  letter of credit.
6      Q    So if you don't have a destination, a specific
7  destination, you won't be able to pick up your corn?
8      A    If there's no destination and there's nobody to
9  receive the product to your agreement and according to the
10 specifications you wouldn't be able to collect your letter
11 of credit.  That's why it's a letter of credit because it
12 gives you a lot of security to you as a purchaser.
13     Q    Mr. Villarreal, you thought you were buying some
14 corn from Ivonne Vega at the time you entered into the
15 agreement, right?
16     A    That's the way it was always.
17     Q    But you have no personal knowledge as to anything
18 other than your agreement with Ms. Vega?
19     A    Absolutely not.
20         MR. DALE:  Pass the witness.
21         (R E - E X A M I N A T I O N)
22 BY MR. DALE:                              (5:45 p.m.)
23     Q    Mr. Villarreal, in your experience in buying and
24 selling grain, and buying corn, and in this case we're
25 involved with buying and selling corn, with the documents

PAGE 63

**63**
1  that you reviewed that were sent to you by Mrs. Vega or Mrs.
2  Soto, were those the type of documents you rely upon in your
3  profession to show that the person that you're buying the
4  corn from has the ownership and the satisfactory title to
5  sell the corn to you?
6      A    For me those documents that Mrs. Ivonne Vega
7  showed me for me personally she is the owner of the product,
8  because I didn't see any other document.  Elkins never
9  showed my anything else.  He asked me for some requirements
10 and I complied with those requirements, but he never showed
11 me something different telling me that, well, "X" person is
12 the owner or -- He never showed me anything like that.  And
13 for me Ivonne Soto Vega is the owner because she's the one
14 that bought the letter of credit.  She's the one who paid.
15 And invoices show that same thing as well.
16         MS. GONZALES:  Objection, non-responsive.
17     Q    (Mr. Dale)  The invoice or bill of lading and the
18 letter of credit, those were documents that you had
19 requested from Mrs. Soto to document her ownership and right
20 to the corn?
21     A    Of course.
22     Q    And in your profession at the time were those
23 adequate documents or were those documents adequate to show
24 that Mrs. Vega or Mrs. Soto had the right to sell the corn
25 to you?

PAGE 64

**64**
1      A    Of course.
2      Q    And were those the documents in your profession
3  that you relied upon to prove ownership and right to
4  possession of the product?
5      A    Of course, yes.
6         MR. DALE:  I have no further questions.
7  Thank you.
8         MS. GONZALES:  I have no further questions.
9         (Exhibits No. 15 and No. 16 were marked.)
10        (END OF DEPOSITION 5:48 p.m.)

CAUSE NO. C-2969-99-A

| | | |
|---|---|---|
| IVONNE SOTO VEGA | § | IN THE DISTRICT COURT OF |
| | § | |
| | § | |
| VS. | § | |
| | § | |
| PORT ELEVATOR-BROWNSVILLE, | § | |
| L.C., SOUTHWEST GRAIN CO., | § | |
| INC., AGI/AKRON GROUP, INC., | § | HIDALGO COUNTY, TEXAS |
| WALTER PUFFELIS | § | |
| GALVAN, III, INDIVIDUALLY AND | § | |
| D/B/A AGI/AKRON GROUP, INC., | § | |
| CRAIG ELKINS, INDIVIDUALLY AND | § | |
| D/B/A PORT ELEVATOR-BROWNSVILLE, | § | |
| L.C.   AND SOUTHWEST GRAIN CO., | § | |
| INC., | § | 92ND JUDICIAL DISTRICT |

---

## NOTICE OF INTENTION TO TAKE THE ORAL AND VIDEO DEPOSITION OF ENRIQUE VILLARREAL

---

TO:   The Appearing Defendants, by and through their attorney of record:

John Skaggs
SKAGGS & GARZA, L.L.P.
710 Laurel
McAllen, Texas 78502
(956) 687-8203
(956) 630-6570 Fax

Plaintiff, **IVONNE SOTO VEGA**, will take the oral and video deposition of **ENRIQUE VILLARREAL** as allowed by Texas Rule of Civil Procedure 199.    The person or persons designated under this notice, as required by Texas Rule of Civil Procedure 199.2, are directed to appear at the <u>Hotel- Holiday Inn Express</u> located at <u>Ave. Eugenio Gorzazada 3680 Sur. Col. Country, Monterrey, Nuevo Leon, Mexico; phone number:</u>

DEPOSITION
EXHIBIT
I

ACTION REPORTING

**8-329-6000** at **1:30 p.m.** on **Wednesday, May 10, 2000**.  It is hereby requested that the witness appear at such time and place for the purpose of giving his deposition in this cause, which deposition, when taken, may be used in evidence during the trial of said cause, and will continue from day to day until completed.

**Please take notice** that in addition to having a stenographic record made, the undersigned intends to have a nonstenographic record made of the deposition of **ENRIQUE VILLARREAL**, by the use of videotape, when the same is taken on **Wednesday, May 10, 2000** at **1:30 p.m.**, pursuant to a notice to take the deposition issued by Honorable Roy S. Dale or at such other time as **ENRIQUE VILLARREAL** may be deposed.

Respectfully submitted,

DALE & KLEIN, L.L.P.
6301 N. 10th Street
McAllen, Texas 78504
Tel. No. (956) 687-8700
Fax. No. (956) 687-8416

_____
ROY S. DALE
State Bar No. 05326700
WILLIAM D. MOUNT, JR.
State Bar No. 01602950

ATTORNEY FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing

**NOTICE OF INTENTION TO TAKE THE ORAL AND VIDEO DEPOSITION OF ENRIQUE**

**VILLARREAL** was forwarded to opposing counsel, to-wit, on this the **2nd  day of May,**

**2000**:

**VIA FAX &  CMRRR**
John Skaggs
SKAGGS & GARZA, L.L.P.
710 Laurel
McAllen, Texas  78502
(956) 687-8203
(956) 630-6570 Fax


**VIA FAX & REGULAR MAIL**
Action Court Reporting
4309 N. 10th street Suite F
McAllen, Texas 78504
(956) 631-1024


WILLIAM D. MOUNT, JR.

566823 BCSME
25.09 11.05
023187148+

VIA TRT
566823 BCSMEWEST BK ELPASO

566823 BCSME
TIJUANA, B.C. SEP. 24, 1996.

TO: NORWEST BANK, EL PASO TEXAS, N.A., EL PASO TEXAS.

FROM: BANORO, S.A. TIJUANA, B.C. MEXICO.

ATTN LETTER OF CREDIT DEPT.
TEST ▓▓▓▓ FOR USD 720,120.00 DATED SEP 25, 1996 TESTED
BETWEEN YOURSELVES AND OUR CULIACAN HEAD OFFICE.

PLEASE NOTIFY THIS LETTER OF CREDIT THROUGH SAN DIEGO NATIONAL
BANK, CHULA VISTA CALIFORNIA.

WE ARE ESTABLISHING OUR IRREVOCABLE DOCUMENTARY CONFIRMED AND
TRANSFERABLE LETTER OF CREDIT NO. CCI 08/96.

ACCOUNT OF:        IVONNE SOTO VEGA,
                   PASEO RIO TIJUANA NO. 1716, ZONA DEL RIO,
                   TIJUANA, B.C. MEXICO.

   BENEFICIARY:    AGI
                   9480 MARCONI DRIVE SUITE ''F'' OTAY MESA,
                   SAN DIEGO CALIFORNIA 92173
                   PHONE (619) 661-6481

EXPIRY DATE:       DECEMBER 10, 1996, IN SAN DIEGO CALIFORNIA.
UP TO THE AMOUNT OF 720,120.00 USD MAXIMUM (SEVEN HUNDRED TWENTY
THOUSAND ONE HUNDRED AND TWENTY DOLLARS 00/100 USCY) 125
AVAILABLE AGAINST DRAFT(S) AT 21 DAYS AFTER RECEIVED THE GOODS.
(BY IVONNE SOTO VEGA AND GERSAIN GUTIERREZ WHO MUST SIGN AND DATE
ALL INVOICE) DRAWN ON NORWEST BANK, EL PASO TEXAS, N.A. BEAPING
THE CLAUSE ''DRAWN UNDER LETTER OF CREDIT CCI 08/96 OF BANORO,
S.A.'' AND ACCOMPANIED BY THE FOLLOWING DOCUMENTS:

1- ORIGINAL AND TWO COPIES OF COMMERCIAL INVOICE SIGNED IN INK IN
THE NAME OF IVONNE SOTO VEGA, PASEO RIO TIJUANA NO. 1716, ZONA
DEL RIO, TIJUANA, B.C. MEXICO, COVERING ''4236 TON METRICAS DE
MAIZ AMARILLO NO. 2 GRADO B, CON LAS SIGUIENTES ESPECIFICACIONES:
MOISTURE MAXIMUM 14.5 O/O, MINIMUM TEST DENSITY 67.5 C/C, EXTRA-
NEOUS FOREIGN 3.3 O/O, CHIPPED MAIZE 3 O/O, AFLATOXIN 15 PPM MAX.
ORIGIN UNITED STATES''.

2- FULL SET OF CLEAN ON BOARD RAILROAD BILL OF LADING CONSIGNED TO
SAN DIEGO NATIONAL BANK AND/OR ANTONIO GOMEZ AGUILAR, MARKED FREIGHT
PREPAID EVIDENCING SHIPMENTS FROM ANY PLACE OF THE UNITED STATES
OF NORTHAMERICA TO BROWNSVILLE TEXAS, NOTIFY IVONNE SOTO VEGA, PASEO
RIO TIJUANA 1716, ZONA DEL RIO, TIJUANA, B.C. MEXICO.

3- INSURANCE POLICY IN ORIGINAL COVERING ALL RISKS FROM SELLERS
WAREHOUSE TO BUYERS WAREHOUSE IN BROWNSVILLE TEXAS INCLUDING NA-
TURAL DISASTERS, FLOODINGS, METEREOLOGICAL PHENOMENA.

4- ORIGIN CERTIFICATE SHOWING THE MERCHANDISE SPECIFICATIONS:
MOISTURE MAXIMUM 14.5 O/O, MINIMUM TEST DENSITY 67.5 C/C, EXTRA-
NEOUS FOREIGN 3.3 O/O, CHIPPED MAIZE 3, AFLATOXIN 15 PPM MAX.

DEPOSITION EXHIBIT
09-01-5
ACTION REPORTING

```
566823 BCSME
25.09 17.23
023187148+

VIA TRT
566823 BCSMEPVRPPIINTUNLPASO

566823 BCSME
TIJUANA, B.C. MEXICO SEP 25, 1996.

TO: NORWEST BANK, EL PASO TEXAS, N.A., EL PASO TEXAS.
FROM: BANORO, S.A. TIJUANA, B.C. MEXICO.

ATTN LETTER OF CREDIT DEPT.
TEST          NO AMOUNT DATED SEP 25, 1996 TESTED BETWEEN
YOURSELVES AND OUR CULIACAN OFFICE.

PLEASE MODIFY LETTER OF CREDIT NO. CCI D8/96 AS FOLLOWS:

IN THE LINE WHICH READS '' EXPIRY DATE: DECEMBER 10, 1996 IN
SAN DIEGO CALIFORNIA.''

NOW MUST READ ''EXPIRY DATE: DECEMBER 10, 1996 IN EL PASO
TEXAS.''

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGE.

BANORO SA
INT DIVISION
TIJUANA BC MEX.

NORWEST BK ELPASO
```

566823 P
16.10 14.5. (...)
023187140

VIA TPT
566823 BCSME
RHNORUEST BK ELPASO

566823 BCSME

TIJUANA, B.C. MEXICO OCT. 16, 1996.

TO: NORWEST BANK EL PASO N.A., EL PASO TEXAS.
FROM: BANORO, S.A. TIJUANA, B.C. MEXICO.

ATTN LETTER OF CREDIT DEPT./GUADALUPE MENDOZA.
THIS IS A CONFIRMATION OF OUR MESSAGE DATED OCT. 11, 1996
UNDER ~~xxxxxxxx~~ BETWEEN YOURSELVES AND OUR CULIACAN HEAD
OFFICE.

REF OUR IRREVOCABLE DOCUMENTARY CONFIRMED LETTER OF CREDIT
NO. CCI 03/96.
B/O: IVONNE SOTO VEGA.
F/O: AGI

PLEASE MODIFY AS FOLLOWS:

REGARDING POINT 1 ABOUT COMMERCIAL INVOICE: ADD ''INVOICES
MUST BE NOTARIZED IN THE UNITED STATES AUTHENTICATING THE SIGNA-
TURES OF IVONNE SOTO VEGA OR BERSAIN GUTIERREZ WHO MAY SIGN
INDISTINCTLY ANY INVOICE''.

REGARDING POINT 2 ABOUT BILL OF LADING WHICH READS: ''FULL SET
OF CLEAN ON BOARD RAILROAD BILL OF LADING CONSIGNED TO SAN DIE-
GO NATIONAL BANK, MARKED FREIGHT PREPAID EVIDENCING SHIPMENTS
FROM ANY PLACE OF THE UNITED STATES OF NORTHAMERICA TO BROWNS-
VILLE TEXAS, NOTIFY IVONNE SOTO VEGA, PASEO RIO TIJUANA 1716,
ZONA DEL RIO, TIJUANA, B.C. MEXICO.''

NOW THE BILL OF LADING MUST READ: ''COPY OF FULL SET OF CLEAN
ON BOARD RAILROAD BILL OF LADING CONSIGNED TO AGI MARKED FREIGHT
PREPAID EVIDENCING SHIPMENTS FROM ANY PLACE OF THE UNITED STATES
OF AMERICA TO BROWNSVILLE TEXAS, NOTIFY IVONNE SOTO VEGA AND
BERSAIN GUTIERREZ, PASEO RIO TIJUANA 1716, ZONA DEL RIO, TIJUANA
B.C. MEXICO''.

DELETE POINT NO 3

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGE.
BANORO SA
INTD DIVISION
TIJUANA BC MEX

NORWEST BK ELPASO

566823 BCSME
23.10 18.00
023187148*

VIA IP1
566823 BCSDEPP
        UPK ELPASO

566823 BCSME
TIJUANA, B.C. MEXICO OCT. 23, 1996.

TO: NORWEST BANK EL PASO N.A. EL PASO TEXAS.
FROM: BANORO, S.A. TIJUANA, B.C. MEXICO.

ATTN LETTER OF CREDIT DEPT/GUADALUPE MENDOZA.
TEST ████ NO AMOUNT DATED OCT. 23, 1996 TESTED BETWEEN YOUR-
SELVES AND OUR CULIACAN SINALOA MEXICO OFFICE.

REF OUR IRREVOCABLE DOCUMENTARY CONFIRMED LETTER OF CREDIT CCI
08/96.

B/O: IVONNE SOTO VEGA.
F/O: AGI
PLEASE MODIFY AS FOLLOWS:

1- REGARDING THE LINES ABOUT DRAFTS AT 21 DAYS AFTER RECEIVED
THE GOODS BY IVONNE SOTO VEGA AND BERSAIN GUTIERREZ, NOW THESE
LINES MUST READ ''DRAFTS AT 21 DAYS AFTER RECEIVED THE GOODS
BY IVONNE SOTO VEGA OR BERSAIN GUTIERREZ WHO MUST SIGN AND DATE
ALL INVOICE''.

2- UNDER SPECIAL INSTRUCTIONS THE LINES REFERING THAT INVOICES
MUST SHOW THE SIGNATURE AND DATE OF RECEIVED THE GOODS BY IVONNE
SOTO VEGA AND BERSAIN GUTIERREZ, NOW THESE LINES MUST READ
''THAT THE INVOICES MUST SHOW THE SIGNATURE AND DATE OF RE-
CEIVED THE GOODS BY IVONNE SOTO VEGA OR BERSAIN GUTIERREZ''.

3- REGARDING THE INSURANCE, WE CLARIFY THAT IT WON'T BE NECE-
SSARY THAT BENEFICIARY PRESENTS THE INSURANCE POLICY, DUE INVOI-
CES WILL SHOW THE SIGNATURES OF RECEIVED THE MERCHANDISE BY THE
BUYERS, HOWEVER THE INSURANCE WILL BE COVERED BY THE SELLER
WITHOUT REQUIRING THE INSURANCE POLICY.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGE.

BANORO, S.A.
INTERNATIONAL DIVISION
TIJUANA, B.C. MEX.

NORWEST BK ELPASO

BANORO
INT DIVIS. DN
TIJUANA BC MEX U

566823 BCSME
30.09 13.40
023187148+

VIA TRT
566823 BCSMEORWEST BK ELPASO

566823 BCSME
TIJUANA, B.C. MEXICO SEP 30, 1996.

TO: NORWEST BANK EL PASO TEXAS, N.A. EL PASO TEXAS.
FROM: BANORO, S.A. TIJUANA, B.C. MEXICO.

AATN LETTER OF CREDIT DEPT.
TEST NO

566823 BCSME
30.09 13.42
023187148+

VIA TRT
566823 BCSMEORIAPK ELPASO

566823 BCSME
TIJUANA, B.C. MEXICO SEP 30, 1996.

TO: NORWEST BANK EL PASO TEXAS, N.A. EL PASO TEXAS.
FROM: BANORO, S.A. TIJUANA, B.C. MEXICO.

ATTN LETTER OF CREDIT DEPT.
TEST NO AMOUNT ▮▮▮▮ DATED SEP 30, 1996 TESTED BETWEEN YOUR-
SELVES AND OUR CULIACAN HEAD OFFICE.
REF. IRREVOCABLE LETTER OF CREDIT OUR CCI 08/96
B/O: IVONNE SOTO VEGA.
F/O: AGI

PLEASE MODIFY LETTER OF CREDIT AS FOLLOWS:
POINT NO. 1 IN THE LINE 4 WHERE READS MAIZ AMARILLO NO. 2 ADD
PARA CONSUMO HUMANO AND DELETE NUMBERS 8783-533O3:8:8:-:89.31
POINT NO. 1 IN THE LINE 6 WHERE READS AFLATOXIN 15 PARTES POR
MILLAR NOW MUST READ AFLATOXIN 15 PPB MAX.

POINT NO. 2 WHERE READS BILL OF LADING CONSIGNED TO SAN DIEGO NATIO-
NAL BANK AND /OR ANTONIO GOMEZ AGUILAR, NOW MUST READ BILL OF LA-
DING CONSIGNED TO SAN DIEGO NATIONAL BANK.

POINTS NO. 4,5,6 AND 7 WHERE READS AFLATOXIN 15 PPM MAX, NOW MUST
READ AFLATOXIN 15 PPB MAX.

POINT NO. 8 AFTER SEAL NUMBER ADD ''AND FGIS (FEDERAL GRAIN INSPEC-
TION SERVICE OF U.S. DEPT OF AGRICULTURAL.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGE.

BANORO SA
INT DIVISION
TIJUANA BC MEX.

NORWEST BK ELPASO

5- PHYTOSANITARY CERTIFICATE SHOWING THE MERCHANDISE SPECIFICATIONS:
MOISTURE MAXIMUM 14.5 O/O, MINIMUM TEST DENSITY 67.5 O/O, EXTRA-
NEOUS FOREIGN 3.3 O/O, CHIPPED MAIZE 3 O/O, AFLATOXIN 15 PPM MAX. ORI
GIN UNITED STATES.

6- WEIGHT CERTIFICATE SHOWING THE MERCHANDISE SPECIFICATIONS:
MOISTURE MAXIMUM 14.5 O/O, MINIMUM TEST DENSITY 67.5 O/O, EXTRA-
NEOUS FOREIGN 3.3 O/O, CHIPPED MAIZE 3 O/O, AFLATOXIN 15 PPM,MAX. ORI
GIN UNITED STATES.

7- QUALITY CERTIFICATE SHOWING THE MERCHANDISE SPECIFICATIONS:
MOISTURE MAXIMUM 14.5 O/O, MINIMUM TEST DENSITY 67.5 O/O, EXTRA-
NEOUS FOREIGN 3.3 O/O, CHIPPED MAIZE 3 O/O, AFLATOXIN 15 PPM,
MAX. ORIGIN UNITED STATES.

8- SGS OR LLOYDS OF LONDON OR BABU BARITA CERTIFICATE OF INS-
PECTION CERTIFYING QUALITY, WEIGHT AND SEAL NUMBER.

SPECIAL INSTRUCTIONS:
THE INVOICE MUST SHOW THE SIGNATURE AND DATE OF RECEIVED THE
GOODS BY IVONNE SOTO VEGA AND BERSAIN GUTIERREZ.
PLEASE ADD YOUR CONFIRMATION.
INSURANCE WILL BE COVERED BY SELLERS.
PARTIAL SHIPMENTS PERMITTED, TRANSHIPMENTS PERMITTED.
PRICE BASIS C.I.F. BROWNSVILLE TEXAS.
ALL COMMISSIONS AND EXPENSES OUTSIDE MEXICO WILL BE COVERED BY
BENEFICIARY.
FOR REIMBURSEMENT WE AUTHORIZED YOU TO DEBIT OUR ACCOUNT AT MA-
TURITY HELD BETWEEN YOURSELVES AND OUR CULIACAN SINALOA HEAD
OFFICE UNDER TELEX ADVISE TO US 72 HOURS BEFORE YOUR DEBIT TO
OUR TELEX 566823 BCSME, KINDLY SEND ALL CORRESPONDENCE TO BANO-
RO, S.A., PASEO DE LOS HEROES 9611, ZONA DEL RIO, TIJUANA, B.C.
MEXICO, ATTN INTERNATIONAL DIVISION.

THIS LETTER OF CREDIT IS SUBJECT TO THE UNIFORM CUSTOMS AND PRAC-
TICE FOR DOCUMENTARY CREDITS 1983 REVISION, INTERNATIONAL CHAM-
BER OF COMMERCE BROCHURE 500.

THIS IS THE OPERATIVE INSTRUMENT NO MAIL CONFIRMATION WILL FO-
LLOW.

BANORO SA
INTERNATIONAL DIVISION
TIJUANA BC MEXICO.

INVOICE 0000001

OCTOBER 25, 1996

(1)

OLD TO:

MRS. IVONNE SOTO VEGA
PASEO RIO TIJUANA No. 1716
ZONA DEL RIO, TIJUANA B.C. MEXICO

SHIP TO:

MRS. IVONNE SOTO VEGA
BROWNSVILLE, TEXAS 78521

| P. O. NUMBER | TERMS | | SALESMAN |
|---|---|---|---|
| 000-08/23/96 | PRICE BASIS CIF BROWNSVILLE, TEXAS | | W.P. |

| QUANTITY | DESCRIPTION | PRICE | UNIT | AMOUNT |
|---|---|---|---|---|
| 2,444.434 TON/METRICAS | 2,444.434 TON/METRICAS DE MAIZ AMARILLO # 2 GRADO B PARA CONSUMO HUMANO CON LAS SIGUIENTES ESPECIFI-CACIONES: | $ 170.00 | TONELADA METRICA | $ 415,553.78 |
| MERCHANDISE SPECIFICATION: | MOISTURE MAXIMUM 14.5 % MINIMUM TEDNSITY 67.5 % EXTRANEOUS FOREIGN 3.3 % CHIPPED MAIZE 3 % AFLATOXIN 15 PPB MAX. ORIGIN UNITED STATES | | | |

RECEIVED BY:

MR. BERSAIN GUTIERREZ
OR MRS. IVONNE SOTO VEGA

MR. WALTER PURCELL III

DATE: 10-30-96

THIS NOTARIZATION IS TO AUTHENTICATE THAT THE ABOVE
SIGNATURE IS THAT OF MR. BERSAIN GUTIERREZ.

| | | T O T A L | $ 415,553.78 |
|---|---|---|---|

SWORN AND
SUBSCRIBED BEFORE ME THIS 30TH DAY OCTOBER 19 96
MY COMMISSION EXPIRES
AUGUST 21, 1999

MARIA GONZALEZ   NOTARY PUBLIC
IN AND FOR CAMERON COUNTY   STATE OF TEXAS

NOTIFY:
MRS. IVONNE SOTO VEGA
PASEO RIO TIJUANA No. 1716
ZONA DEL RIO, TIJUANA B.C. MEXICO

DEPOSITION
EXHIBIT
3
ACTION REPORTING

A . G . I
9480 MARCONI DRIVE SUITE F
OTAY MESA, SAN DIEGO CA. 92173
PHONE: 619) 661-6481
FAX:    619) 661-6484

INVOICE  0000-92

NOVEMBER 12, 1996.

②

SOLD TO:

MRS. IVONNE SOTO VEGA
PASEO RIO TIJUANA No. 1716
ZONA DEL RIO, TIJUANA B.C. MEXICO

SHIP TO:

MRS. IVONNE SOTO VEGA
BROWNSVILLE, TEXAS 78521

| P. O. NUMBER | TERMS | | | SALESMAN |
|---|---|---|---|---|
| 0008-08/23/96 | PRICE BASIS CIF BROWNSVILLE, TEXAS | | | W.P. |

| QUANTITY | DESCRIPTION | PRICE | UNIT | AMOUNT |
|---|---|---|---|---|
| 1,791,566. TON/METRICAS | 1,791,566. TON/METRICAS DE MAIZ AMARILLO # 2 GRADO B PARA CONSUMO HUMANO | $ 170.00 | TONELADA METRICA | $ 304,566.20 |
| MERCHANDISE SPECIFICATION: | CON LAS SIGUIENTES ESPECIFI-CACIONES: | | | |
| | MOISTURE MAXIMUM 14.5 % | | | |
| | MINIMUM TEDNSITY 67.5 % | | | |
| | EXTRANEOUS FOREIGN 3.3 % | | | |
| | CHIPPED MAIZE 3 % | | | |
| | AFLATOXIN 15 PPB MAX | | | |
| | ORIGIN UNITED STATES | | | |

RECEIVED BY

MR. BERSAIN GUTIERREZ
OR MRS. IVONNE SOTO VEGA

DATE: NOV 13 OF 1996

THE ATTACHED NOTARIZATION IS TO AUTHENTICATE THAT
THE ABOVE SIGNATURE IS THAT OF BERSAIN GUTIERREZ

TOTAL    $ 804,566.22

NOTIFY: MRS. IVONNE SOTO VEGA AND BERSAIN GUTIERREZ
PASEO RIO TIJUANA No. 1716
ZONA DEL RIO, TIJUANA B.C. MEXICO

WALTER PHILLIS III

```
A    G    1                              INVOICE   0000003
9480 MARCONI DRIVE SUITE F
OTAY MESA, SAN DIEGO CA. 92173           NOVEMBER 13, 1996.      3°
PHONE: 619) 661-6481
FAX:   619) 661-6404


SOLD TO:                                 SHIP TO:

MRS. IVONNE SOTO VEGA                    MRS. IVONNE SOTO VEGA
PASEO RIO TIJUANA No. 1716               BROWNSVILLE, TEXAS 78521
ZONA DEL RIO, TIJUANA B.C. MEXICO.
```

| P. O. NUMBER | TERMS | | SALESMAN |
|---|---|---|---|
| 0008-08/23/96 | PRICE BASIS CIF BROWNSVILLE, TEXAS | | W.F. |

| QUANTITY | DESCRIPTION | PRICE | UNIT | AMOUNT |
|---|---|---|---|---|
| 688,309. TON/METRICAS | 688,309. TON/METRICAS DE MAIZ AMARILLO # 2 GRADO B PARA CONSUMO HUMANO | $ 170.00 | TONELADA METRICA | $ 117,012.53 |
| MERCHANDISE SPECIFICATION: | CON LAS SIGUIENTES ESPECIFI-CACIONES: MOISTURE MAXIMUM 14.5 % MINIMUM TENDSITY 67.5 % EXTRANEOUS FOREIGN 3.3 % CHIPPED MAIZE 3 % AFLATOXIN 15 PPB MAX. ORIGIN UNITED STATES | | | |

```
                     RECEIVED BY:
```

RA DEL RIO
SEO RIO TIJUANA No. 1716
S. IVONNE SOTO VEGA

## SALES CONTRACT

**SELLER:**    IVONNE SOTO VEGA

**BUYER:**    ENRIQUE VILLARREAL

This contract confirms our agreement to sell you the following described goods on the terms and provisions herein set forth:

| | |
|---|---|
| Number of Units: | 5,000 metric tons of corn |
| Ship to: | Owner, Ivonne Soto Vega, will sell the corn to buyer, Enrique Villarreal, in store at the sprout (FOB - the elevator) at the Port of Brownsville, Texas. |
| Ship by: | The owner, Yvonne Soto Vega, will sell to the buyer, Enrique Villarreal, the corn in store at the sprout (FOB - the elevator) at the Port of Brownsville, Texas. The buyer, Enrique Villarreal, will pay the loading fee by cashier check prior to the trucks crossing into Mexico. |
| Delivery Date: | November 1, 1997 |
| Price terms: | To be paid on date of delivery |
| Special terms: | The owner, Ivonne Soto Vega, shall pay the storage fees on or before date of purchase. The buyer, Enrique Villarreal, shall pay the transporting permits which shall include the USDA PHYTO SANITARY CERTIFICATES, loading of trucks permits, cracking of corn permits, grade certificates, aflatoxin certificates, certificates of origin, and shipper - export certificates which shall become the responsibility of the buyer on the date of purchase. |

Accepted on the ___03___ day of ___NOVEMBER___, 1997

_signature_
Seller - Ivonne Soto Vega

_signature_
Buyer - Enrique Villarreal

**DEPOSITION
EXHIBIT
4
ACTION REPORTING**
5-10-00

## AFFIDAVIT OF OWNERSHIP

**DATE:**         OCTOBER 30, 1997

**AFFIANT:**      IVONNE SOTO VEGA

Affiant on oath swears that the following statement is true:

That affiant bought 4,236.00 metric tons of corn from AGI on October 25, 1996 and on November 12, 1996 respectively. Ivonne Soto Vega paid AGI with a letter of credit drawn from Norwest Bank in El Paso, Texas. The funds used to pay for the corn belonged solely to Ivonne Soto Vega. Ivonne Soto Vega gave instructions to the seller AGI to transport the corn to the Port of Brownsville to store at a grain elevator. Ivonne Soto Vega never entered into an agreement with Bersain Gutierrez wherein he would participate as owner of the corn.

Ivonne Soto Vega has never relinguish ownership of the corn from the date of purchase to the date of execution of this document. Ivonne Soto Vega has never given anyone authority to dispose of the corn from the date of purchase to the date of execution of this document.

Ivonne Soto Vega now desires to sell the corn that she bought to Enrique Villarreal for a price which has been agreed to between the parties. Ivonne Soto Vega is instructing the owner of the grain elevator to release the corn to the buyer, Enrique Villarreal, once the sale contract is executed.

Signed this ___3TH___ day of ___November___, 1997.

_____
Ivonne Soto Vega

LS

### JURAT

SWORN AND SUBSCRIBED before me by Ivonne Soto Vega on this the ___THIRD___ day of ___November___, 1997.

_Consuelo Cancino_
Notary Public In and For the State
of California

Commission Expires: ___Sept 26, 2001___

CONSUELO CANCINO
Commission # 1154620
Notary Public — California
San Diego County
My Commission Expires Sept 26 2001

DEPOSITION
EXHIBIT
5
ACTION REPORTING

SAN DIEGO , CA. A 14 DE OCTUBRE DE 1997.

YO IVONNE SOTO VEGA, POR MEDIO DE LA PRESENTE HAGO DE SU CO-
NOCIMIENTO QUE A PARTIR DE ESTA FECHA ; EN RELACION A LAS -
FACTURAS 0001,0002 y 0003 DE A.G.I. DE OTAY MESA SAN DIEGO
CA. DE MAIZ AMARILLO No. 2 GRADO B DE FECHAS OCTUBRE 25 -
NOVIEMBRE 12 Y NOVIEMBRE 13 DE 1996, EL SR. BERSAIN GUTIERREZ
NO CUENTA CON NINGUNA AUTORIZACION PARA ENTREGAR, RECIBIR -
O CUIDAR EL PRODUCTO ANTES MENCIONADO DE MI PROPIEDAD, AL-
MACENADO ACTUALMENTE EN SOUTH WEST GRAIN CO. EN BROWNSVILLE
TEXAS. QUE ATIENDE EL SR. CRAIG ELKIN.

POR LO CUAL ME COMPROMETO A CUBRIR EL ADEUDO QUE TENGO PEN--
DIENTE POR CONCEPTO DE ALMACEN.

IVONNE SOTO VEGA.

SUBSCRIBED AND SWORN TO BEFORE ME

THIS 14Th DAY OF Oct 1997

NOTARY PUBLIC



DEPOSITION
EXHIBIT
6
ACTION REPORTING

CONSUELO CANCINO
Commission # 1156600
Notary Public — California
San Diego County
My Comm. Expires Sep 26, 2001

**CORPUS CHRISTI GRAIN EXCHANGE**
**GRAIN INSPECTION CERTIFICATE**
SUBMITTED SAMPLE INSPECTION
(MUESTRA SOMETIDA)

ORIGINAL

P   5352

PROGRESO, TEXAS                    9/18/97
ISSUED AT                          DATE OF INSPECTION

The sample identified below was not drawn by the Corpus Christi Grain Exchange. We certify that the factors were determined by GRAIN INSPECTORS employed by the Corpus Christi Grain Exchange; and to the best of our knowledge, the results stated below are true and correct.

QUANTITY OF GRAIN SAMPLE   APPROX 2000 GRAMS   IDENTIFICATION OF SAMPLE   # 104

SAMPLE SUBMITTED BY   SOUTHWEST

GRADE AND KIND   NO.   SAMPLE GRADE YELLOW CORN

| TEST WEIGHT PER BUSHEL | MOISTURE | BROKEN KERNELS AND FOREIGN MATERIAL AND BITES GRAINS | BROKEN CORN AND FOREIGN MATERIAL | FOREIGN MATERIAL | HEAT DAMAGED KERNELS | DAMAGED KERNELS (TOTAL) | SHRUNKEN AND BROKEN KERNELS | | OTHER CLASSES (TOTAL) | |
|---|---|---|---|---|---|---|---|---|---|---|
| 58.2 LBS. | 12½ % | % | 2.8 % | % | % | 32.5 % | % | % | % | % |

REMARKS   SOUR

The above results are assigned only to the grain in the submitted sample herein described and not to the grain from which the sample may have been taken.
(Resultados de esta inspección fueron asignada solamente por la muestra presentada, y no necesariamente de donde la dicha muestra se dice que fue obtenido.)

CHIEF INSPECTOR   WILLIAM BOHACH        NAME AND/OR SIGNATURE   M. Daily (DB)   TITLE   GRAIN INSPECTOR

This inspection was not conducted under the supervision of the Federal Grain Inspection Service, U.S. Department of Agriculture and this is not an official F.G.I.S. Certificate.

Void if altered, forged or erased. - (Este certificado será anulado si presenta tachaduras ó enmendaduras.)

---

Muestra de grano

**CORPUS CHRISTI GRAIN EXCHANGE**
**GRAIN INSPECTION CERTIFICATE**
SUBMITTED SAMPLE INSPECTION
(MUESTRA SOMETIDA)

ORIGINAL

P   5353

PROGRESO, TEXAS                    9/18/97
ISSUED AT                          DATE OF INSPECTION

The sample identified below was not drawn by the Corpus Christi Grain Exchange. We certify that the factors were determined by GRAIN INSPECTORS employed by the Corpus Christi Grain Exchange; and to the best of our knowledge, the results stated below are true and correct.

QUANTITY OF GRAIN SAMPLE   APPROX 2000 GRAMS   IDENTIFICATION OF SAMPLE   # 40?

SAMPLE SUBMITTED BY   SOUTHWEST

GRADE AND KIND   NO.   SAMPLE GRADE YELLOW CORN

| TEST WEIGHT PER BUSHEL | MOISTURE | BROKEN KERNELS AND FOREIGN MATERIAL AND BITES GRAINS | BROKEN CORN AND FOREIGN MATERIAL | FOREIGN MATERIAL | HEAT DAMAGED KERNELS | DAMAGED KERNELS (TOTAL) | SHRUNKEN AND BROKEN KERNELS | | OTHER CLASSES (TOTAL) | |
|---|---|---|---|---|---|---|---|---|---|---|
| 58.5 LBS. | 12.1 % | % | 4.4 % | % | % | 20.0 % | % | % | % | % |

REMARKS   SOUR

The above results are assigned only to the grain in the submitted sample herein described and not to the grain from which the sample may have been taken.
(Resultados de esta inspección fueron asignada solamente por la muestra presentada, y no necesariamente de donde la dicha muestra se dice que fue obtenido.)

CHIEF INSPECTOR   WILLIAM BOHACH        NAME AND/OR SIGNATURE   M. Daily (DB)   TITLE   GRAIN INSPECTOR

DEPOSITION EXHIBIT
7
5-10-00
ACTION REPORTING



ENRIQUE VILLARREAL DE LEON
TEL. (83) 45-48-50
SONORA 1083, COL. NUEVO REPUEBLO
MONTERREY, N.L., MEXICO

OnePlusBanking™                    119
                                   32-115/1110

12 Nov 19 97

PAY TO THE
ORDER OF   Ivonne Soto Vega          $ 1,35,290 00

One thousand thirty-five hundred two hundred     DOLLARS

Texas
Commerce
Bank
TEXAS COMMERCE BANK NATIONAL ASSOCIATION
DOWNTOWN BROWNSVILLE OFFICE
1004 EAST LEVEE
BROWNSVILLE, TEXAS 78520

Forty and 0/100

MEMO  Purchase of Corn at
      Port of Brownsville Tx.

⑈:111001150019⑈:06700390094⑈

DEPOSITION
EXHIBIT
B
ACTION REPORTING
5-10-00


*A G I*

*9870 MARCONI DRIVE SUITE F*
*SAN DIEGO CA. 92173*
*PHONE: 619) 661-1404*
*FAX: 619) 661-6484*

OCTUBRE 28, 1997.

A QUIEN CORRESPONDA.

POR MEDIO DE LA PRESENTE RATIFICAMOS QUE LA **SRA: IVONNE SOTO,** NOS COMPRO EN FECHAS 25 DE OCTUBRE Y 12 DE NOVIEMBRE DE 1996 AL AMPARO DE LAS FACTURAS 001 Y 002 MAIZ AMARILLO # 2 PARA CONSUMO HUMANO, HACIENDO UN TOTAL DE 4,236.00 TON.MET. CON LAS SIGUIENTES ESPECIFICACIONES

| | |
|---|---|
| MOISTURE MAXIMUM | 15% |
| MINIMUM TEST DENSITY | 67.5% |
| EXTRANEOUS FOREIGN | 3.3% |
| CHIPPED MAIZE | 3 % |
| AFLATOXIN | 15 PPM MAX. |

DICHAS COMPRAS FUERON HECHAS ATRAVEZ DE CARTA DE CREDITO POR MEDIO DE BANORO Y NORWEST BANK, EN EL PASO TEXAS.

LA PRESENTE SE EXTIENDE A PETICION DEL INTERESADA Y PARA LOS FINES QUE ELLA JUZGUE CONVENIENTE.

ATENTAMENTE

SR. WALTER PUCERS

AKRON GROUP INC.
CALIFORNIA
CORPORATION
U.S.A.
IMPORT & EXPORT

DEPOSITION
EXHIBIT
10
ACTION REPORTING
88-10-15

# Guillermo Vega, Jr.
### Attorney at Law

546-5573

Suite 105
302 Kings Highway
Brownsville, Texas 78521

November 14, 1997

Craig Elkins
Port Elevator - Brownsville, L.C.
9155 R.L. Ostos Rd.
Port of Brownsville
Brownsville, Texas 78521

RE:    Sale of Corn from
       Yvonne Soto Vega
       to
       Enrique Villareal

Dear Mr. Elkins,

Enclosed is a cashier check for $19,574.20 to cover the storage fees pursuant to your invoice dated November 13, 1997. Please remit a detailed itemized statement regarding these charges from October, 1996 to October, 1997 at the earliest convenience. If there should be any outstanding indebtedness after October 31, 1997 the buyer, Enrique Villarreal has agreed to assume the balance of the debt as per the sales contract.

Please release the corn to the buyer, Enrique Villareal, upon receipt of the cashier check as per our agreement of October 21, 1997 and pursuant to the amount of the invoice dated November 13, 1997. If you should have any questions regarding this matter please don't hesitate to call me.

Thank you.

Respectfully,

Guillermo Vega, Jr.

GV/rb
Enclosure of Cashier Check
cc: Yvonne Soto Vega
    Enrique Villarreal



DEPOSITION
EXHIBIT
11
ACTION REPORTING

Texas
Commerce
Bank
NATIONAL ASSOCIATION

BROWNSVILLE, TEXAS 78520
Member FDIC

CASHIER'S CHECK

32-115
1110

THE FACE OF THIS DOCUMENT HAS A MULTICOLORED
BACKGROUND, NOT A WHITE BACKGROUND.
THE BACK OF THIS DOCUMENT CONTAINS AN ARTIFICIAL
WATERMARK-HOLD AT AN ANGLE TO VIEW.

A 0300009760

DATE                    11/14/97

REMITTER        IVONNE SOTO VEGA

$19,574.20

TEXAS
COMMERCE BANK 19,574 dols 20 cts

PAY TO THE
ORDER OF

PORT OF BROWNSVILLE AND
SOUTHWEST GRAIN ELEVATOR COMPANY

A 60 day waiting period and
an indemnifying Bond is re-
quired to replace this check.

TST/030

_Minerva Zapata, VP_
AUTHORIZED SIGNATURE

⑈0300009760⑈ ⑆111001150⑆ ⑈0010199979611⑈

# PORT ELEVATOR-BROWNSVILLE, L.C.

9155 R.L. Ostos Road
Brownsville, Texas 78521
Tel (956) 831-8245  Fax (956) 831-3181

## TELEFAX MESSAGE

### Pages ( 1 )

:       Interested Parties

om:     Craig Elkins
        Port Elevator-Brownsville, L.C.
.te:    18 December 1997

f:      Approximately 1,600 metric tons of yellow corn

Port Elevator-Brownsville, LC is now accepting bids/offers on
approximately 1,600 metric tons of yellow corn. This corn has been in
storage and is subject to both a handling shrink and moisture shrink.
On average this corn is US Sample Grade or US #5 due to heating.  This
corn can be purchased as either whole corn or cracked corn.

A deposit of 25% of the total value must be made prior to 4:00 PM CST
Monday December 22nd 1997.  Shipment must be completed prior to
January 9th, 1998.  Payment is required the same day shipments are
made.

Please fax your bid/offer to (956) 831-3181 no later than 12:00 AM
CST, Monday December 22nd, 1997.  The successful bidder will be
notified by fax or telephone no later than 2:00 PM CST that same day.
All bids/offers must be in US dollars and specifing as whole or
cracked corn.

Port Elevator-Brownsville, LC esta aceptando ofrecimientos para
aproximadamente 1,600 toneladas metricas de maiz amarillo.  Este maiz
estaba almacenado y esta sujecto a mermas de maniobras y humedad.  En
general la calidad de este maiz es US Sample Grade o US #5 por razones
de calor.  Este maiz puede ser comprado como maiz entero o maiz
quebrado.

Se require un deposito de 25% del valor total antes de las 4:00 PM CST
lunes el dia 22 de diciembre 1997.  Los embaques tiene que  estar
completos antes del dia 9 de enero 1998.  Se require el pago el mismo
dia de los embarques.

Favor de enviar su ofrecimiento via fax a (956) 831-3181 antes de las
12:00 AM CST viernes el dia 22 de diciembre 1997.  Notificaremos el
ganador por fax o telefono a mas tardar las 2:00 PM CST el mismo dia.
Todo los ofrecimientos tiene que ser en US dolares y specificando si
es para maiz entero o maiz quebrado.

DEPOSITION
EXHIBIT
12
ACTION REPORTING
5-10-06

# PORT ELEVATOR—BROWNSVILLE, L.C.

9155 R.L. Ostos Road
Brownsville, Texas 78521
Tel (956) 831-8245  Fax (956) 831-3181

### TELEFAX MESSAGE

### Pages ( 1 )

To:        Interested Parties

From:      Craig Elkins
           Port Elevator-Brownsville, L.C.
Date:      22 December 1997

Ref:       Sale of yellow corn

Port Elevator-Brownsville, LC is offering yellow corn on a first come first serve basis F.O.B. buyer's truck at 9155 RL Ostos Road, Port of Brownsville. This corn has been in storage and whose quality in general is US Sample Grade or US #5 due to heating. This corn can be purchased as either whole corn or cracked corn. Payment is required the same day shipments are made.

Port Elevator-Brownsville, LC esta ofreciendo maiz amarillo, primer en tiempo primer en derecho L.A.B. camion del comprador en 9155 RL Ostos Road, Puerto de Brownsville. Este maiz estaba almacenado y por lo general la calidad es US Sample Grade o US #5 por razones de calor. Este maiz puede ser comprado como maiz entero o maiz quebrado. Se require el pago el mismo dia de los embarques.

Price Reference/Referencia de Precio
CBOT Corn Futures CH8 @ $2.6325

| Quantity/Cantidad (1,000 kgs) | Basis (usd/bushel) | Price/Precio ($usd/1,000 kgs) |
|---|---|---|
| 30 +/- | $0.675 | $130.21 |
| 60 +/- | $0.64 | $128.83 |
| 90 +/- | $0.63 | $128.44 |
| 120 +/- | $0.6225 | $128.14 |
| 150 ++ | $0.62 | $128.04 |

Documents Included/Documentos Incluidos

1) Quality Certificate/Certificado de Calidad;
2) Aflatoxin Certificate (20ppb or less)/Certificado de Aflatoxinas (20ppb o menos);
3) Weight Ticket/Boleto de Peso;
4) Certificate of Origin/Certificado de Origen;
5) Phytosanitary Certificate/Certificado Phytosanitaria;
6) Commercial Invoice/Factura Comercial.

Dec-22-97 03:55A                                                                                    P.01

# GRUPESA-IMPORTS & EXPORTS
### 800 E. REBECA, WESLACO TX.    PHONE: (210) 565 1591    FAX: (210) 565 9811


WESLACO, TX. A 21 DE DICIEMBRE DE 1997


PORT  ELEVATOR BROWNSVILLE, L.C.

AT'N. CRAIG ELKINS


POR MEDIO DE LA PRESENTE SE PROPONE:

EL MAIZ AMARILLO U.S. #5, SAMPLE GRADE CON UN TOTAL APRO-
XIMADO DE 1,600 T.M. .

EL OFRECIMIENTO ES DE:

$86.00 DLLS. (OCHENTA Y SEIS DLLS.) POR TONELADA METRICA-
                DE MAIZ QUEBRADO, EN CASO DE SER MAIZ ENTERO
                SE DESCUENTE LA MAQUILA.

NO DEPOSITO Y EL PAGO CUANDO ESTEN CARGADOS LOS CAMIONES
Y TENGA LOS PESOS DE CADA UNO.

SIN OTRO ASUNTO QUE TRATAR RECIBO NOTIFICACION EN EL FAX
(956) 565 9811  Y EL TELEFONO (956) 778 5841  Y  565 1591.


A T E N T A M E N T E .


GERONIMO PEREZ

ATT'N  ERRICK VILLARREAL

| EXAMPLE | @ 3 YC | @ 4 YC | @ 5 YC | @ 6 YC |
|---|---|---|---|---|
| March Corn Close | @2.6550 | @2.6550 | @2.6550 | @2.6550 |
| F.O.B. Corpus Area | @0.3400 | @0.3400 | @0.3400 | @0.3400 |
| Freight to Valley | @0.2500 | @0.2500 | @0.2500 | @0.2500 |
| Put Thru | @0.0000 | @0.0000 | @0.0000 | @0.0000 |
| Shrink 1/4 of 1% | @0.0002 | @0.0002 | @0.0002 | @0.0002 |
| Phytosanitary 159 | @0.0017 | @0.0017 | @0.0017 | @0.0017 |
| Grade Certificate | @0.0054 | @0.0054 | @0.0054 | @0.0054 |
| Aflatoxin Certificate | @0.0000 | @0.0000 | @0.0000 | @0.0000 |
| Checking | @0.0000 | @0.0000 | @0.0000 | @0.0000 |
| Discounts | @0.0000 | (0.1000) | (0.2000) | (0.3000) |
| Basis | @0.8265 | @0.7265 | @0.6265 | @0.5265 |
| F.O.B. Value $/bu | $3.4019 | $3.3819 | $3.2819 | $3.1819 |
| F.O.B. Value $/mt | $137.08 | $133.14 | $129.20 | $125.27 |

|                          | Principal       |
|--------------------------|-----------------|
| 1996 Balance Forward     | $5,225.59       |
| January                  | $4,432.36       |
| February                 | $3,349.62       |
| Feb Payment (2/13)       | ($3,000.00)     |
| March                    | $2,964.97       |
| April                    | $2,518.32       |
| May                      | $5,915.45       |
| May Payment (5/2)        | ($3,000.00)     |
| June                     | $2,144.87       |
| June Payment (6/25)      | ($13,708.99)    |
| July                     | $2,273.27       |
| July Payment (7/28)      | ($5,000.00)     |
| August                   | $5,402.38       |
| September                | $2,231.53       |
| October                  | $2,457.87       |
| Late Charges             | $827.80         |
| Total Due 31 Oct 97      | $15,035.05      |
|                          |                 |
| Bal. Pending             | $15,035.05      |

CONCEPTO

ALMACENAMIENTO

FUMIGACIONES / SERVICIOS VARIOS

Recibi dia hoy 12 Nov. 97

Enrique Villarreal de León

DEPOSITION
EXHIBIT
13
ACTION REPORTING

Texas
Commerce
Bank
BROWNSVILLE, TEXAS 78520
Member FDIC
NATIONAL ASSOCIATION

CASHIER'S CHECK

THE FACE OF THIS DOCUMENT HAS A MULTICOLORED
BACKGROUND, NOT A WHITE BACKGROUND.
THE BACK OF THIS DOCUMENT CONTAINS AN ARTIFICIAL
WATERMARK-HOLD AT AN ANGLE TO VIEW.

A 0300009760

32-115
1110

DATE    11/14/97

REMITTER    IVONNE SOTO VEGA

PAY TO THE
ORDER OF    PORT OF BROWNSVILLE AND
SOUTHWEST GRAIN ELEVATOR COMPANY

$19,574.20

comm nineteen thousand 19,574 dols 20 cts

NOT NEGOTIABLE
CUSTOMER COPY

AUTHORIZED SIGNATURE

TBT/AN30

A 60 day waiting period and
an indemnifying Bond is re-
quired to replace this check.

COPY MUST BE PRESENTED
FOR REFUND OR RE-ISSUE.

⑈0300009760⑈ ⑆⑈11100⑈150⑆ ⑈0010199979⑈


DEPOSITION
EXHIBIT
14
ACTION REPORTING
5-10-00



# MERCADO DE GRANOS S.A. DE C.V.

## Sr. Enrique Villarreal de León
**ASESOR**

PROL. MADERO 68 A OTE.
RIVERAS DE LA PURISIMA
GUADALUPE, N.L. C.P. 67190

TELS. MTY. 345-48-50
377-82-19
FAX. 344-75-48
FAX. 345-45-74



DEPOSITION
EXHIBIT
_15_
ACTION REPORTING



## LA CONCORDIA DEL BRAVO

SOC. DE PRODUCION RURAL DE RESPONSAB. LIM.
Río Bravo, Tamps.

| GRANEROS DEL VALLE, S.A. | TRANSPORTES STA. CRUZ |
|---|---|
| Río Bravo Tamps. | Río Bravo, Tamps. |

| DEL VALLEY GRAIN INTERNAC. | MERCADO DE GRANOS |
|---|---|
| Progreso, Tx.   Donna, Tx. | S.A. DE C.V. |
| La Feria, Tx. U.S.A. | Monterrey, N. L. |

Mty. Tel. (8) 345 48 50
Fax (8) 344 75 48

*Sr. Enrique Villarreal*
ASESOR

Tamps. Tel. (893) 4 22 06
Fax (893) 4 27 27



DEPOSITION
EXHIBIT
16
ACTION REPORTING

**3**

INVOICE 0000001

OCTOBER 25, 1996

(F)

OLD TO:

IRS. IVONNE SOTO VEGA
ASEO RIO TIJUANA No. 1716
ONA DEL RIO, TIJUANA B.C. MEXICO

SHIP TO:

MRS. IVONNE SOTO VEGA
BROWNSVILLE, TEXAS 78521

| P. O. NUMBER | TERMS | | SALESMAN |
|---|---|---|---|
| 000-08/23/96 | PRICE BASIS CIF BROWNSVILLE, TEXAS | | W.P. |

| QUANTITY | DESCRIPTION | PRICE | UNIT | AMOUNT |
|---|---|---|---|---|
| 2,444.434 TON/METRICAS | 2,444.434 TON/METRICAS DE MAIZ AMARILLO # 2 GRADO B PARA CONSUMO HUMANO CON LAS SIGUIENTES ESPECIFI- CACIONES: | $ 170.00 | TONELADA METRICA | $ 415,553.78 |
| MERCHANDISE SPECIFICATION: | MOISTURE MAXIMUM 14.5 % MINIMUM TEDNSITY 67.5 % EXTRANEOUS FOREIGN 3.3 % CHIPPED MAIZE 3 % AFLATOXIN 15 PPB MAX. ORIGIN UNITED STATES | | | |

RECEIVED BY:

MR. BERSAIN GUTIERREZ
OR MRS. IVONNE SOTO VEGA

DATE: 10-30-96

THIS NOTARIZATION IS TO AUTHENTICATE THAT THE ABOVE
SIGNATURE IS THAT OF MR. BERSAIN GUTIERREZ.

MR. WALTER PFEFFER III

| | | | T O T A L | $ 415,553.78 |
|---|---|---|---|---|

DEPOSITION
EXHIBIT
5
ACTION REPORTING

SWORN AND
SUBSCRIBED BEFORE ME THIS    30TH DAY    OCTOBER    19 96

MY COMMISSION EXPIRES
AUGUST 21, 1999

MARIA GONZALES    NOTARY PUBLIC
IN AND FOR CAMERON COUNTY    STATE OF TEXAS

NOTIFY:
MRS. IVONNE SOTO VEGA
PASEO RIO TIJUANA No. 1716

4

A . G . I
9460 MARCONI DRIVE SUITE F
OTAY MESA, SAN DIEGO CA. 92173
PHONE: 619) 661-6481
FAX:   619) 661-6484

INVOICE  0000-92

NOVEMBER 12, 1996.

2°

SOLD TO:

MRS. IVONNE SOTO VEGA
PASEO RIO TIJUANA No. 1716
ZONA DEL RIO, TIJUANA B.C. MEXICO

SHIP TO:

MRS. IVONNE SOTO VEGA
BROWNSVILLE, TEXAS 78521

| P. O. NUMBER | TERMS | | | SALESMAN |
|---|---|---|---|---|
| 0008-08/23/96 | PRICE BASIS CIF BROWNSVILLE, TEXAS | | | W.P. |

| QUANTITY | DESCRIPTION | PRICE | UNIT | AMOUNT |
|---|---|---|---|---|
| 1,791,566 TON/METRICAS | 1,791,566. TON/METRICAS DE MAIZ AMARILLO # 2 GRADO B PARA CONSUMO HUMANO CON LAS SIGUIENTES ESPECIFI-CACIONES: | $ 179.00 | TONELADA METRICA | $ 991,566.00 |
| MERCHANDISE SPECIFICATION: | MOISTURE MAXIMUM 14.5 % MINIMUM TEDNSITY 67.5 % EXTRANEOUS FOREIGN 3.0 % CHIPPED MAIZE 3 % AFLATOXIN 15 PPB MAX. ORIGIN UNITED STATES | | | |

RECEIVED BY:

MR. BERSAIN GUTIERREZ
OR MRS. IVONNE SOTO VEGA

DATE: NOV 13 DE 1996

THE ATTACHED NOTARIZATION IS TO AUTHENTICATE THAT
THE ABOVE SIGNATURE IS THAT OF BERSAIN GUTIERREZ

T O T A L        $ 891,566.22

NOTIFY: MRS. IVONNE SOTO VEGA AND BERSAIN GUTIERREZ
PASEO RIO TIJUANA No. 1716
ZONA DEL RIO, TIJUANA B.C. MEXICO

WALTER PLOWELL III

```
A    G    I                              INVOICE   000003
9480 MARCONI DRIVE SUITE F
OTAY MESA, SAN DIEGO CA. 92173           NOVEMBER 13, 1996.      3?
PHONE: 619) 661-6481
FAX:   819) 661-6484

SOLD TO:                                 SHIP TO:

MRS. IVONNE SOTO VEGA                    MRS. IVONNE SOTO VEGA
PASEO RIO TIJUANA No. 1716               BROWNSVILLE, TEXAS 78521
ZONA DEL RIO, TIJUANA B.C. MEXICO.
```

| P. O. NUMBER | TERMS | | SALESMAN | |
|---|---|---|---|---|
| 0008-08/23/96 | PRICE BASIS CIF BROWNSVILLE, TEXAS | | W.F. | |
| QUANTITY | DESCRIPTION | PRICE | UNIT | AMOUNT |
| 688,309. TON/METRICAS | 688,309. TON/METRICAS DE MAIZ AMARILLO # 2 GRADO B PARA CONSUMO HUMANO | $ 170.00 | TON/FLADE METRICA | $ 117,612.53 |
| MERCHANDISE SPECIFICATION: | CON LAS SIGUIENTES ESPECIFI-CACIONES: MOISTURE MAXIMUM 14.5 % MINIMUM TENDSITY 67.0 % EXTRANEOUS FOREIGN 3.3 % CHIPPED MAIZE 3 % AFLATOXIN 15 PPB MAX ORIGIN UNITED STATES | | | |

```
                    RECEIVED BY:
```

S. IVONNE SOTO VEGA
SEO RIO TIJUANA No. 1716
NA DEL RIO

6

## AFFIDAVIT OF OWNERSHIP

**DATE:**      OCTOBER 30, 1997

**AFFIANT:**      IVONNE SOTO VEGA

Affiant on oath swears that the following statement is true:

That affiant bought 4,236.00 metric tons of corn from AGI on October 25, 1996 and on November 12, 1996 respectively. Ivonne Soto Vega paid AGI with a letter of credit drawn from Norwest Bank in El Paso, Texas. The funds used to pay for the corn belonged solely to Ivonne Soto Vega. Ivonne Soto Vega gave instructions to the seller AGI to transport the corn to the Port of Brownsville to store at a grain elevator. Ivonne Soto Vega never entered into an agreement with Bersain Gutierrez wherein he would participate as owner of the corn.

Ivonne Soto Vega has never relinguish ownership of the corn from the date of purchase to the date of execution of this document. Ivonne Soto Vega has never given anyone authority to dispose of the corn from the date of purchase to the date of execution of this document.

Ivonne Soto Vega now desires to sell the corn that she bought to Enrique Villarreal for a price which has been agreed to between the parties. Ivonne Soto Vega is instructing the owner of the grain elevator to release the corn to the buyer, Enrique Villarreal, once the sale contract is executed.

Signed this ___3TH___ day of ___November___, 1997.

_____
Ivonne Soto Vega

LS

### JURAT

SWORN AND SUBSCRIBED before me by Ivonne Soto Vega on this the ___THIRD___ day of ___November___, 1997.

_Consuelo Cancino_
Notary Public In and For the State
of California

Commission Expires: ___Sept 26, 2001___

CONSUELO CANCINO
Commission # 1155600
Notary Public — California
San Diego County
My Comm. Expires Sept 26 2001

DEPOSITION
EXHIBIT
5
ACTION REPORTING

566823 BCSME
25.09 11.05
023187148+

VIA TRT
566823 BCSMEWEST RK ELPASO

566823 BCSME
TIJUANA, B.C. SEP. 24, 1996.

TO: NORWEST BANK, EL PASO TEXAS, N.A., EL PASO TEXAS.

FROM: BANORO, S.A. TIJUANA, B.C. MEXICO.

ATTN LETTER OF CREDIT DEPT.
TEST ~~~~~~~ FOR USD 720,120.00 DATED SEP 25, 1996 TESTED
BETWEEN YOURSELVES AND OUR CULIACAN HEAD OFFICE.

PLEASE NOTIFY THIS LETTER OF CREDIT THROUGH SAN DIEGO NATIONAL
BANK, CHULA VISTA CALIFORNIA.

WE ARE ESTABLISHING OUR IRREVOCABLE DOCUMENTARY CONFIRMED AND
TRANSFERABLE LETTER OF CREDIT NO. CCI 08/96.

ACCOUNT OF:         IVONNE SOTO VEGA,
                    PASEO RIO TIJUANA NO. 1716, ZONA DEL RIO,
                    TIJUANA, B.C. MEXICO.

   BENEFICIARY:     AGI
                    9480 MARCONI DRIVE SUITE ''F'' OTAY MESA,
                    SAN DIEGO CALIFORNIA 92173
                    PHONE (619) 661-6481

EXPIRY DATE:        DECEMBER 10, 1996, IN SAN DIEGO CALIFORNIA.
UP TO THE AMOUNT OF 720,120.00 USD MAXIMUM (SEVEN HUNDRED TWENTY
THOUSAND ONE HUNDRED AND TWENTY DOLLARS 00/100 USCY)125
AVAILABLE AGAINST DRAFT(S) AT 21 DAYS AFTER RECEIVED THE GOODS.
(BY IVONNE SOTO VEGA AND BERSAIN GUTIERREZ WHO MUST SIGN AND DATE
ALL INVOICE) DRAWN ON NORWEST BANK, EL PASO TEXAS, N.A. BEARING
THE CLAUSE ''DRAWN UNDER LETTER OF CREDIT CCI 08/96 OF BANORO,
S.A.'' AND ACCOMPANIED BY THE FOLLOWING DOCUMENTS:

1- ORIGINAL AND TWO COPIES OF COMMERCIAL INVOICE SIGNED IN INK IN
THE NAME OF IVONNE SOTO VEGA, PASEO RIO TIJUANA NO. 1716, ZONA
DEL RIO, TIJUANA, B.C. MEXICO, COVERING ''4236 TON METRICAS DE
MAIZ AMARILLO NO. 2 GRADO B, CON LAS SIGUIENTES ESPECIFICACIONES:
MOISTURE MAXIMUM 14.5 O/O, MINIMUM TEST DENSITY 67.5 C/C, EXTRA-
NEOUS FOREIGN 3.3 O/O, CHIPPED MAIZE 3 O/O, AFLATOXIN 15 PPM MAX.
ORIGIN UNITED STATES''.

2- FULL SET OF CLEAN ON BOARD RAILROAD BILL OF LADING CONSIGNED TO
SAN DIEGO NATIONAL BANK AND/OR ANTONIO GOMEZ AGUILAR, MARKED FREIGHT
PREPAID EVIDENCING SHIPMENTS FROM ANY PLACE OF THE UNITED STATES
OF NORTHAMERICA TO BROWNSVILLE TEXAS, NOTIFY IVONNE SOTO VEGA, PASEO
RIO TIJUANA 1716, ZONA DEL RIO, TIJUANA, B.C. MEXICO.

3- INSURANCE POLICY IN ORIGINAL COVERING ALL RISKS FROM SELLERS
WAREHOUSE TO BUYERS WAREHOUSE IN BROWNSVILLE TEXAS INCLUDING NA-
TURAL DISASTERS, FLOODINGS, METEREOLOGICAL PHENOMEN.

4- ORIGIN CERTIFICATE SHOWING THE MERCHANDISE SPECIFICATIONS:
MOISTURE MAXIMUM 14.5 O/O, MINIMUM TEST DENSITY 67.5 C/C, EXTRA-
NEOUS FOREIGN 3.3 O/O, CHIPPED MAIZE 3 .... FLATOXIN 15 PPM MAX. ....

DEPOSITION EXHIBIT
90-01-5
ACTION REPORTING

566823 BCSME
25.09 11.05
023187148+

VIA TRT
566823 BCSMEWEST BK ELPASO

566823 BCSME
TIJUANA, B.C. SEP. 24, 1996.

TO: NORWEST BANK, EL PASO TEXAS, N.A., EL PASO TEXAS.

FROM: BANORO, S.A. TIJUANA, B.C. MEXICO.

ATTN LETTER OF CREDIT DEPT.
TEST ▓▓▓▓ FOR USD 720,120.00 DATED SEP 25, 1996 TESTED
BETWEEN YOURSELVES AND OUR CULIACAN HEAD OFFICE.

PLEASE NOTIFY THIS LETTER OF CREDIT THROUGH SAN DIEGO NATIONAL
BANK, CHULA VISTA CALIFORNIA.

WE ARE ESTABLISHING OUR IRREVOCABLE DOCUMENTARY CONFIRMED AND
TRANSFERABLE LETTER OF CREDIT NO. CCI 08/96.

ACCOUNT OF:        IVONNE SOTO VEGA,
                   PASEO RIO TIJUANA NO. 1716, ZONA DEL RIO,
                   TIJUANA, B.C. MEXICO.

    BENEFICIARY:   AGI
                   9480 MARCONI DRIVE SUITE ''F'' OTAY MESA,
                   SAN DIEGO CALIFORNIA 92173
                   PHONE (619) 661-6481

EXPIRY DATE:       DECEMBER 10, 1996, IN SAN DIEGO CALIFORNIA.
UP TO THE AMOUNT OF 720,120.00 USD MAXIMUM (SEVEN HUNDRED TWENTY
THOUSAND ONE HUNDRED AND TWENTY DOLLARS 00/100 USCY)125
AVAILABLE AGAINST DRAFT(S) AT 21 DAYS AFTER RECEIVED THE GOODS.
(BY IVONNE SOTO VEGA AND GERSAIN GUTIERREZ WHO MUST SIGN AND DATE
ALL INVOICE) DRAWN ON NORWEST BANK, EL PASO TEXAS, N.A. BEARING
THE CLAUSE ''DRAWN UNDER LETTER OF CREDIT CCI 08/96 OF BANORO,
S.A.'' AND ACCOMPANIED BY THE FOLLOWING DOCUMENTS:

1- ORIGINAL AND TWO COPIES OF COMMERCIAL INVOICE SIGNED IN INK IN
THE NAME OF IVONNE SOTO VEGA, PASEO RIO TIJUANA NO. 1716, ZONA
DEL RIO, TIJUANA, B.C. MEXICO, COVERING ''4236 TON METRICAS DE
MAIZ AMARILLO NO. 2 GRADO B, CON LAS SIGUIENTES ESPECIFICACIONES:
MOISTURE MAXIMUM 14.5 O/O, MINIMUM TEST DENSITY 67.5 C/C, EXTRA-
NEOUS FOREIGN 3.3 O/O, CHIPPED MAIZE 3 O/C, AFLATOXIN 15 PPM MAX.
ORIGIN UNITED STATES''.

2- FULL SET OF CLEAN ON BOARD RAILROAD BILL OF LADING CONSIGNED TO
SAN DIEGO NATIONAL BANK AND/OR ANTONIO GOMEZ AGUILAR, MARKED FREIGHT
PREPAID EVIDENCING SHIPMENTS FROM ANY PLACE OF THE UNITED STATES
OF NORTHAMERICA TO BROWNSVILLE TEXAS, NOTIFY IVONNE SOTO VEGA, PASEO
RIO TIJUANA 1716, ZONA DEL RIO, TIJUANA, B.C. MEXICO.

3- INSURANCE POLICY IN ORIGINAL COVERING ALL RISKS FROM SELLERS
WAREHOUSE TO BUYERS WAREHOUSE IN BROWNSVILLE TEXAS INCLUDING NA-
TURAL DISASTERS, FLOODINGS, METEREOLOGICAL PHENOMEN.

4- ORIGIN CERTIFICATE SHOWING THE MERCHANDISE SPECIFICATIONS:
MOISTURE MAXIMUM 14.5 O/O, MINIMUM TEST DENSITY 67.5 C/C, EXTRA-
NEOUS FOREIGN 3.3 O/O, CHIPPED MAIZE 3      FLATOXIN 15 PPM MAX.

DEPOSITION EXHIBIT
EO-01-S
ACTION REPORTING

```
566823 BCSME
25.09 17.23
023187148+

VIA TRT
566823 BCSMEPVRPPIINTUNLPASO

566823 BCSME
TIJUANA, B.C. MEXICO SEP 25, 1996.

TO: NORWEST BANK, EL PASO TEXAS, N.A., EL PASO TEXAS.
FROM: BANORO, S.A. TIJUANA, B.C. MEXICO.

ATTN LETTER OF CREDIT DEPT.
TEST ##### NO AMOUNT DATED SEP 25, 1996 TESTED BETWEEN
YOURSELVES AND OUR CULIACAN OFFICE.

PLEASE MODIFY LETTER OF CREDIT NO. CCI 08/96 AS FOLLOWS:

IN THE LINE WHICH READS '' EXPIRY DATE: DECEMBER 10, 1996 IN
SAN DIEGO CALIFORNIA.''

NOW MUST READ ''EXPIRY DATE: DECEMBER 10, 1996 IN EL PASO
TEXAS.''

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGE.

BANORO SA
INT DIVISION
TIJUANA BC MEX.

NORWEST BK ELPASO
```

566823 P
16.10 14.5
023187143

VIA TLT
566823 BCSME
RHNORWEST BK ELPASO

566823 BCSME

TIJUANA, B.C. MEXICO OCT. 16, 1996.

TO: NORWEST BANK EL PASO N.A., EL PASO TEXAS.
FROM: BANORO, S.A. TIJUANA, B.C. MEXICO.

ATTN LETTER OF CREDIT DEPT./GUADALUPE MENDOZA.
THIS IS A CONFIRMATION OF OUR MESSAGE DATED OCT. 11, 1996
UNDER ~~~~~~~~ BETWEEN YOURSELVES AND OUR CULIACAN HEAD
OFFICE.

REF OUR IRREVOCABLE DOCUMENTARY CONFIRMED LETTER OF CREDIT
NO. CCI 08/96.
B/O: IVONNE SOTO VEGA.
F/O: AGI

PLEASE MODIFY AS FOLLOWS:

REGARDING POINT 1 ABOUT COMMERCIAL INVOICE: ADD ''INVOICES
MUST BE NOTARIZED IN THE UNITED STATES AUTHENTICATING THE SIGNA-
TURES OF IVONNE SOTO VEGA OR BERSAIN GUTIERREZ WHO MAY SIGN
INDISTINCTLY ANY INVOICE'.

REGARDING POINT 2 ABOUT BILL OF LADING WHICH READS: ''FULL SET
OF CLEAN ON BOARD RAILROAD BILL OF LADING CONSIGNED TO SAN DIE-
GO NATIONAL BANK, MARKED FREIGHT PREPAID EVIDENCING SHIPMENTS
FROM ANY PLACE OF THE UNITED STATES OF NORTHAMERICA TO BROWNS-
VILLE TEXAS, NOTIFY IVONNE SOTO VEGA, PASEO RIO TIJUANA 1716,
ZONA DEL RIO, TIJUANA, B.C. MEXICO.''

NOW THE BILL OF LADING MUST READ: ''COPY OF FULL SET OF CLEAN
ON BOARD RAILROAD BILL OF LADING CONSIGNED TO AGI MARKED FREIGHT
PREPAID EVIDENCING SHIPMENTS FROM ANY PLACE OF THE UNITED STATES
OF AMERICA TO BROWNSVILLE TEXAS, NOTIFY IVONNE SOTO VEGA AND
BERSAIN GUTIERREZ, PASEO RIO TIJUANA 1716, ZONA DEL RIO, TIJUANA
B.C. MEXICO''.

DELETE POINT NO 3

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGE.
BANORO SA
INTD DIVISION
TIJUANA BC MEX

NORWEST BK ELPASO

```
566823 RCSME
23.10 18.00
023187148+


VIA TPT
566823 RCSMEPP
                 UPK ELPASO

566823 PESME
TIJUANA, R.C. MEXICO OCT. 23, 1996.

TO: NORWEST BANK EL PASO N.A. EL PASO TEXAS.
FROM: BANORO, S.A. TIJUANA, B.C. MEXICO.

ATTN LETTER OF CREDIT DEPT/GUADALUPE MENDOZA.
TEST ▓▓▓▓▓ NO AMOUNT DATED OCT. 23, 1996 TESTED BETWEEN YOUR-
SELVES AND OUR CULIACAN SINALOA MEXICO OFFICE.

REF OUR IRREVOCABLE DOCUMENTARY CONFIRMED LETTER OF CREDIT CCI
08/96.

B/O: IVONNE SOTO VEGA.
F/O: AGI
PLEASE MODIFY AS FOLLOWS:

1- REGARDING THE LINES ABOUT DRAFTS AT 21 DAYS AFTER RECEIVED
THE GOODS BY IVONNE SOTO VEGA AND BERSAIN GUTIERREZ, NOW THESE
LINES MUST READ ''DRAFTS AT 21 DAYS AFTER RECEIVED THE GOODS
BY IVONNE SOTO VEGA OR BERSAIN GUTIERREZ WHO MUST SIGN AND DATE
ALL INVOICE''.

2- UNDER SPECIAL INSTRUCTIONS THE LINES REFERING THAT INVOICES
MUST SHOW THE SIGNATURE AND DATE OF RECEIVED THE GOODS BY IVONNE
SOTO VEGA AND BERSAIN GUTIERREZ, NOW THESE LINES MUST READ
''THAT THE INVOICES MUST SHOW THE SIGNATURE AND DATE OF RE-
CEIVED THE GOODS BY IVONNE SOTO VEGA OR BERSAIN GUTIERREZ''.

3- REGARDING THE INSURANCE, WE CLARIFY THAT IT WON'T BE NECE-
SSARY THAT BENEFICIARY PRESENTS THE INSURANCE POLICY, DUE INVOI-
CES WILL SHOW THE SIGNATURES OF RECEIVED THE MERCHANDISE BY THE
BUYERS, HOWEVER THE INSURANCE WILL BE COVERED BY THE SELLER
WITHOUT REQUIRING THE INSURANCE POLICY.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

BANORO, S.A.
INTERNATIONAL DIVISION
TIJUANA, B.C. MEX.

NORWEST BK ELPASO
```

BANORO
INT DIVIS. DN
TIJUANA BC MEX U

566823 BCSME
30.09 13.40
023187148+

VIA TRT
566823 BCSMEORWEST BK ELPASO

566823 BCSME
TIJUANA, B.C. MEXICO SEP 30, 1996.

TO: NORWEST BANK EL PASO TEXAS, N.A. EL PASO TEXAS.
FROM: BANORO, S.A. TIJUANA, B.C. MEXICO.

AATN LETTER OF CREDIT DEPT.
TEST NO

566823 BCSME
30.09 13.42
023187148+

VIA TRT
566823 BCSMEORIAPK ELPASO

566823 BCSME
TIJUANA, B.C. MEXICO SEP 30, 1996.

TO: NORWEST BANK EL PASO TEXAS, N.A. EL PASO TEXAS.
FROM: BANORO, S.A. TIJUANA, B.C. MEXICO.

ATTN LETTER OF CREDIT DEPT.
TEST NO AMOUNT ███ DATED SEP 30, 1996 TESTED BETWEEN YOUR-
SELVES AND OUR CULIACAN HEAD OFFICE.
REF. IRREVOCABLE LETTER OF CREDIT OUR CCI 08/96
B/O: IVONNE SOTO VEGA.
F/O: AGI

PLEASE MODIFY LETTER OF CREDIT AS FOLLOWS:
POINT NO. 1 IN THE LINE 4 WHERE READS MAIZ AMARILLO NO. 2 ADD
PARA CONSUMO HUMANO AND DELETE NUMBERS 8783-53303:8:8:-:89.31
POINT NO. 1 IN THE LINE 6 WHERE READS AFLATOXIN 15 PARTES POR
MILLAR NOW MUST READ AFLATOXIN 15 PPB MAX.

POINT NO. 2 WHERE READS BILL OF LADING CONSIGNED TO SAN DIEGO NATIO-
NAL BANK AND /OR ANTONIO GOMEZ AGUILAR, NOW MUST READ BILL OF LA-
DING CONSIGNED TO SAN DIEGO NATIONAL BANK.

POINTS NO. 4,5,6 AND 7 WHERE READS AFLATOXIN 15 PPM MAX, NOW MUST
READ AFLATOXIN 15 PPB MAX.

POINT NO. 8 AFTER SEAL NUMBER ADD ''AND FGIS (FEDERAL GRAIN INSPEC-
TION SERVICE) OF U.S. DEPT OF AGRICULTURAL.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGE.

BANORO SA
INT DIVISION
TIJUANA BC MEX.

NORWEST BK ELPASO

5- PHYTOSANITARY CERTIFICATE SHOWING THE MERCHANDISE SPECIFICATIONS: MOISTURE MAXIMUM 14.5 O/O, MINIMUM TEST DENSITY 67.5 O/O, EXTRANEOUS FOREIGN 3.3 O/O, CHIPPED MAIZE 3 O/O, AFLATOXIN 15 PPM MAX. ORIGIN UNITED STATES.

6- WEIGHT CERTIFICATE SHOWING THE MERCHANDISE SPECIFICATIONS: MOISTURE MAXIMUM 14.5 O/O, MINIMUM TEST DENSITY 67.5 O/O, EXTRANEOUS FOREIGN 3.3 O/O, CHIPPED MAIZE 3 O/O, AFLATOXIN 15 PPM,MAX. ORIGIN UNITED STATES.

7- QUALITY CERTIFICATE SHOWING THE MERCHANDISE SPECIFICATIONS: MOISTURE MAXIMUM 14.5 O/O, MINIMUM TEST DENSITY 67.5 O/O, EXTRANEOUS FOREIGN 3.3 O/O, CHIPPED MAIZE 3 O/O, AFLATOXIN 15 PPM, MAX. ORIGIN UNITED STATES.

8- SGS OR LLOYDS OF LONDON OR BABU BABITA CERTIFICATE OF INSPECTION CERTIFYING QUALITY, WEIGHT AND SEAL NUMBER.

SPECIAL INSTRUCTIONS:
THE INVOICE MUST SHOW THE SIGNATURE AND DATE OF RECEIVED THE GOODS BY IVONNE SOTO VEGA AND BERSAIN GUTIERREZ.
PLEASE ADD YOUR CONFIRMATION.
INSURANCE WILL BE COVERED BY SELLERS.
PARTIAL SHIPMENTS PERMITTED, TRANSHIPMENTS PERMITTED.
PRICE BASIS C.I.F. BROWNSVILLE TEXAS.
ALL COMMISSIONS AND EXPENSES OUTSIDE MEXICO WILL BE COVERED BY BENEFICIARY.
FOR REIMBURSEMENT WE AUTHORIZED YOU TO DEBIT OUR ACCOUNT AT MATURITY HELD BETWEEN YOURSELVES AND OUR CULIACAN SINALOA HEAD OFFICE UNDER TELEX ADVISE TO US 72 HOURS BEFORE YOUR DEBIT TO OUR TELEX 566823 BCSME, KINDLY SEND ALL CORRESPONDENCE TO BANORO, S.A., PASEO DE LOS HEROES 9611, ZONA DEL RIO, TIJUANA, B.C. MEXICO, ATTN INTERNATIONAL DIVISION.

THIS LETTER OF CREDIT IS SUBJECT TO THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS 1993 REVISION, INTERNATIONAL CHAMBER OF COMMERCE BROCHURE 500.

THIS IS THE OPERATIVE INSTRUMENT NO MAIL CONFIRMATION WILL FOLLOW.

BANORO SA
INTERNATIONAL DIVISION
TIJUANA BC MEXICO.



United States District Court
Southern District of Texas
FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

FEB 11 1998

Michael N. Milby, Clerk of Court

| PORT ELEVATOR –<br>BROWNSVILLE, L.C. | § |
|---|---|
| | § |
| | § |
| VS. | § |
| | § |
| IVONNE SOTO VEGA, BERSAIN | § |
| GUTIERREZ, AND SYSCO DE BAJA, | § |
| S.A. DE C.V. | § |

B - 98 - 23

CIVIL NO. _____
"JURY"

## COMPLAINT IN INTERPLEADER

TO THE HONORABLE UNITED STATES DISTRICT JUDGE

1.     This complaint is filed by Port Elevator – Brownsville, L.C.

2.     Plaintiff is a corporation organized under the laws of the State of Texas.

3.     Defendants are individuals who may be served at the following address:

　　　1.　　Ivonne Soto Vega
　　　　　　Paseo Rio Tijuana No. 1716
　　　　　　Zona Del Rio, Tijuana B.C. Mexico

　　　2.　　Bersain Gutierrez and
　　　　　　Sysco de Baja S.A. de C.V.
　　　　　　2295 Paseo de la Americas, Suite 22
　　　　　　Otay Mesa, California  92173

4.     This Court has jurisdiction pursuant to 28 USC, Sections 1332, 1335 and 2361, in that it is alleged that all Respondents are citizens of the Republic of Mexico.

Alternatively, this Complaint is filed pursuant to Rule 22 FRCP.

Plaintiff herein further asserts diversity between the stake holder (Plaintiff) and one or more of the Defendants; and further asserts the existence of diversity as between the named Defendants.

In compliance with the provisions of 28 USC Section 1335, Plaintiff asserts that it is in possession of money or property of value more than $500.00.

5.  Plaintiff is merely a stakeholder of cash, and other commodities of value, ownership to which is claimed by Defendants. The cash and commodities are described as follows:  cash and corn in an as yet undetermined value, currently on deposit at the Plaintiff's Port of Brownsville warehouse facility; less reasonable storage and handling fees deducted by Plaintiff.  Plaintiff tenders herewith a check payable to the "United States District Court Registry" in the total amount of any cash on hand, there to abide to the judgment of the Court.  Plaintiff further asserts its intention to tender additional cash representing the liquidated value of the corn, as such cash amounts accrue or come in the possession of Plaintiff.

6.  As detailed below, Plaintiff may be exposed to double or multiple liability by reason of competing and inconsistent claims made by Defendants.

7.  In the event Plaintiff should receive a counter-claim for breach of contract, conversion, violation of statutory trade practices laws, or a like pleading; in such event Plaintiff would affirmatively show that the commodity in question was specifically stored in the Plaintiff's warehouse pursuant to a contract and referenced tariffs, copies of which are attached hereto and incorporated by reference at this point.  Conflicting claims of ownership of the commodity or any cash generated by the sale of said commodity has been asserted by Defendants, and allegations of

actionable conduct on the part of Port Elevator have been alleged by one or more of the said Defendants.

8.   Plaintiff previously proposed the voluntary tender of the herein referenced cash and commodities to a mutually acceptable neutral third-party, and such proposal was made in writing.  The Defendants refused or neglected to respond, and each continued to assert respective superior ownership.

9.   Thereafter, Plaintiff proposed the sale of the said commodity, pursuant to contract, so as to mitigate any damages resulting from spoilage or change in market value.  Plaintiff received no response from Defendants related thereto.

10.  Plaintiff finds itself with no alternative but to tender the corn or the value thereof to the Court for adjudication of the identity of the proper owner or owners.

11.  Plaintiff herein specifically prays that the Court adjudicate the ownership of the corn, or the value thereof; and if raised by Defendants that the Court determine that Plaintiff is without fault in the circumstances related to the contracting, storage, and disposal of the corn, and money which is the subject of this action.  Plaintiff further prays that the Court discharge Plaintiff from further liability herewith.

12.  A jury is demanded in connection with this Complaint.

                         Respectfully Submitted,

                         SKAGGS & REYNA, L.L.P.
                         P.O. Drawer 2285
                         710 Laurel
                         McAllen, Texas 78502-2285
                         Phone (956) 687-8216
                         Fax (956) 630-6570

**JOHN SKAGGS**
**State Bar No. 18452500**
**ATTORNEYS FOR PLAINTIFF**

11/18/1997  13:28    121083    81              PORT ELEVATOR    /LEU                    PAGE  01

# Port Elevator - Brownsville, L.C.

## RATE & SERVICE CONTRACT

The term "grain" as used in this contract shall mean Corn.   All rates in this contract will be quoted in U.S. dollars per bushel.  Payment for Receiving is due upon completion of each unloading.  Payment for Delivery is due weekly.  All payments are to be in U.S. currency.

The minimum quantity of grain to be handled under this contract is ONE MILLION Bushels (1,000,000 bushels).  If the minimum quantity handled requirement is not met, the Receiving and Delivering Charges increase by one hundred percent (100%).

### RECEIVING AND DELIVERING

Receiving From Railcars  . . . . . . . . . $ 0.02    per bushel.

Delivering to Trucks:
   U.S. Trucks . . . . . . . . . . . . $ 0.02    per bushel.
   Mexican Trucks  . . . . . . . . . . . $ 0.02    per bushel.

Delivering of grain will be done only upon the written instructions of SYSCO de BAJA, SA de CV and signed by Bersain Gutierrez.  Fax instructions are acceptable with originals to follow by overnight courier.

RECEIVING INCLUDES INSURANCE AND 15 DAYS STORAGE.

STORAGE:  ALL grain is to be stored Identity Preserved (I.P.)

Each calendar day or fraction thereof after first fifteen days.

All grains except Flax   . . . . . .     $ 0.001   per bushel.

TREATING AND CONDITIONING
   Treating for weevils in cars,
     trucks or elevator  . . . . . . . . $ 0.045  per bushel.
   Mixing or Turning--
     All loss in weight borne by owner  . $ 0.015  per bushel.
     Cooling or Blowing  . . . . . . . . $ 0.005  per bushel.
   Malathion Treatment . . . . . . . . . $ 0.015  per bushel.

NOTE:  THIS IS A SPECIAL CONTRACT AT RATES OTHER THAN STATED IN OUR PUBLISHED TARIFF.  SUCH RATES UNDER THE SAME TERMS WILL BE MADE AVAILABLE TO ALL DEPOSITORS.  THIS CONTRACT EXPIRES DECEMBER 31st, 1996 AT 24:00 HOURS.

SYSCO DE BAJA, S.A. DE C.V.                    AKRON GROUP INC (AGI)

PORT ELEVATOR-BROWNSVILLE, L.C.

# RATES

The term "grain" as used in this tariff shall be understood to mean Wheat, Corn, Oats, rye, Barley, Grain Sorghum, Flaxseed and Soybeans. Rates to cover handling, storing and/or treating other commodities such as Meals, Beans, Seed, Rice, etc will be quoted by the elevator management upon request. All rates in this tariff will be quoted in U.S. cents per bushel unless otherwise stated.

### RECEIVING AND DELIVERING

Receiving From Railcars . . . . . . . . . . $ .04 ___ per bushel.

Receiving From Trucks:
  U.S. Trucks . . . . . . . . . . . . . . $ .04 ___ per bushel.
  Mexican Trucks . . . . . . . . . . . . . $ .07 ___ per bushel.

Receiving From Vessels/Barges: . . . . . . $ .04 ___ per bushel.

Delivering to Vessels: . . . . . . . . . $ .04 ___ per bushel.

Delivering to Barges: . . . . . . . . . . $ .04 ___ per bushel.

Delivering to Railcars: . . . . . . . . . $ .04 ___ per bushel.

Delivering to Trucks:
  U.S. Trucks . . . . . . . . . . . . . . $ .04 ___ per bushel.
  Mexican Trucks . . . . . . . . . . . . . $ .10 ___ per bushel.

**RECEIVING INCLUDES INSURANCE AND 10 DAYS STORAGE.**

**COOPERING CARS:**
  The elevator will not furnish grain doors or Cooper cars.

**STORAGE:**
  Each calendar day or fraction thereof after first ten days.

  All grains except Flax . . . . . . . . $1/10 ___ per bushel.
  Flax(all loss in weight or elevator) . . $1/2 ___ per bushel

**TREATING AND CONDITIONING**
  Treating for weevils in cars,
   trucks or elevator . . . . . . . . . $ .045 ___ per bushel.
  Mixing or Turning--
   All loss in weight borne by owner . . . $ .03 ___ per bushel.

  Cooling or Blowing . . . . . . . . . . $ .01 ___ per bushel.
  Malathion Treatment . . . . . . . . . . $ .015 ___ per bushel.

NOTE: WE RESERVE THE RIGHT TO ENTER INTO SPECIAL CONTRACTS AT RATES OTHER THAN STATED IN THIS TARIFF FOR DEFINITE QUANTITIES OF GRAIN AND FOR DEFINITE STORAGE PERIODS IF APPLICABLE. SUCH RATES UNDER THE SAME TERMS WILL BE MADE AVAILABLE TO ALL DEPOSITORS.

### RECEIPT OF GRAIN

Grain will be received, stored and handled in the elevator subject to the following rules, regulations and charges. All rates and charges shown in the Rate Schedule of this tariff covers work performed on straight time basis.

## RULES AND REGULATIONS

**ITEM 1 - INSPECTION -** All grain shall be inspected and graded in accordance with standards established under the United States Grain Standards Act before received into and discharged from the elevator. Fees for inspection and grading to be set by the Corpus Christ Grain Exchange on inbound grain. All outbound grain to be graded by Federal Grain Inspection Service. All inspections and grading expense to be borne by the owner.

**ITEM 2 - UNLOADING GRAIN INTO THE ELEVATOR -** The Elevator management reserves the right to refuse any grain which in its opinion is unmerchantable or is unfit condition for storage, transfer or handling. The primary purpose of the Elevator is for the transfer of grain from railcars, trucks, barges and vessels to transportation modes which will move grain through the elevator for export and will be used for storage of grain only to the extent not required for such primary purpose; therefore, the management reserves the right to preferentially unload those cars, trucks, barges or vessels for which outward shipping space has been engaged and is available.

**ITEM 3 - STORING REGARDLESS OF OWNERSHIP -** Grains will be placed in bins containing the same kind and grade regardless of ownership. Preserving identity or special binning will be done only by special arrangements.

**ITEM 4 - GRAIN AT OWNER RISK -** All grain placed in the elevator is at owners risk of depreciation in grade from heating, insects or any other cause including natural increase in dockage content resulting from repeated handling under normal grain elevator operational practices and methods.

**ITEM 5 - CONDITIONING GRAIN -** The Elevator management reserves the right after due diligence to treat, dry or otherwise recondition any grain on the elevator which in its judgment is in need of such handling without prior knowledge or consent of the owner. Necessity of such handling to be concurred in by a Corpus Christi Grain Exchange inspector. Owner of the grain so handled will be liable for payment of all charges resulting therefrom as well as weight shrinkage of the grain.

**ITEM 6 - REMOVAL OF GRAIN** - If any grain in the elevator should become out of condition, the Elevator reserves the right to order same out on three (3) days notice and if not removed from the elevator before expiration of that time, the elevator management shall have the right to remove and dispose of such grain at the expense of and for the account of the owner.

**ITEM 7 - INSURANCE** - Insurance on all grain stored under the above Schedule of Charges will be carried by the elevator operator against loss or damage by Fire and Extended Coverage perils(windstorm, lightning, hail, explosion, riot, riot attending a strike, civil commotion, smoke, vehicles and aircraft) for its market value, to the extent that such insurance is procurable. The cost of such insurance is included in the charges for receiving and shipping grain. Loss by any other insurable cause shall be at the owner's risk.

**ITEM 8 - CONGESTION** - In the event of congestion of cars, barges, vessels or trucks, the elevator operator reserves the right, without liability for loss, damage or demurrage, to unload those cars, barges, vessels, or trucks for which outward transportation has been engaged and is available.

**ITEM 9 - TRIMMERS** - Mechanical grain trimmers are available at the elevator dock for use on all cargoes loaded. Rental in the amount of _10_ cents per gross ton plus $25.00 per hour to cover cost of maintenance man will be charged for their use.

**ITEM 10 - PERFORMANCE** - The Elevator will undertake to furnish all service specified in the tariff with reasonable promptness but it is not obligated to furnish services, or is it liable for failure to do so in event of Government intervention, labor troubles, war conditions or other causes beyond its control.

**ITEM 11 - DOCKAGE AND WHARFAGE** - Dockage is charged according to Brownsville Navigation District Tariff. Wharfage is _20_ cents per metric ton loaded or unloaded. Where more than one gross tonnage is applicable to a vessel, the highest will apply.

**ITEM 12 - VESSELS REQUIRED TO WORK OVERTIME** - In order to secure the fullest possible use of the elevator's grain handling facilities, whenever there are ships waiting to load or unload, or there is, in the elevator manager's judgment, necessity of overtime work to avoid congestion, vessels will work unlimited overtime at their own expense if requested to do so by the by elevator management. Any vessel refusing to do so shall vacate the berth on order of the elevator management. Should any vessel fail to vacate the berth when ordered to do so under these circumstances or under the circumstances set forth in Item 13, a dockage charge of $800.00 per hour for each hour or fraction thereof, will be assessed against the vessel and/or its owners, and agents, after notice to vacate has been given the vessel and/or its owners, agents, master or mate.

This charge shall not affect the right of the elevator to effect removal of the vessel from the berth by any lawful means, at vessel's risk and expense. A vessel losing its right to berth by refusal to work overtime shall lose its turn in favor of the next vessel that is willing to work overtime, which vessel shall retain the berth so long as it is willing to work sucessive straight times and overtime periods until loading or unloading is completed. The vessel so losing its turn shall be entitled to berth first available thereafter, subject to the same overtime provisions set forth above if the circumstances requiring overtime work are then found to exist by the elevator management. When vessel is not required to work overtime but desires to at owner's expense, such desires must be made known to elevator manager by 3:30 P.M. of the day the overtime is to be worked. The elevator reserves the right to refuse to operate the elevator during overtime hours.

ITEM 13 - BERTHING OF SHIPS - Except as otherwise provided in this Tariff, vessels awaiting berth at the elevator will load or discharge in the order in which they file with the elevator office. A filing shall be deemed accomplished with the presentation of:
   (1)  Certificate of Readiness in all compartments in which grain is to be loaded, issued by the National Cargo Bureau Representative.
   (2) Federal Grain Inspection Service satisfactory condition report.

Liner vessels, will be given preference in the assignment of berths over other vessels except when, in the judgment of the elevator management such preference would not be in the best interest of the satisfactory operation of the elevator or when, in the judgement of the elevator management, it would impose an undue hardship on other vessels waiting to load or unload.

The term liners as used herein, shall mean vessels of lines having regularly advertised scheduled sailing from the Port of Brownsville, Texas, and the quantity of grain for loading is not in excess of 2/3 of the vessel's deadweight tonnage for cargo.

The Elevator management reserves the right to change the turn of vessels when confronted with congestion, the urgent need to load or unload a particular grade of grain or to otherwise facilitate elevator operations.

Any vessel ordered to vacate the berth for such reasons will return to berth after the vessel loading/ or unloading immediately thereafter, if any completes loading/ or unloading or vacates the berth for other reasons, provided the aforesaid circumstance requiring the vessel to vacate the berth is found by elevator management to no longer exist.

The elevator management of Port Elevator-Brownsville, Inc. reserves the right to refuse the berth at our facility to any vessel without at least ten (10) days prior advice in writing from the suppliers of the cargo of their intention to load or unload the vessel at Port Elevator-Brownsville, Inc.

**ITEM 14 - APPLICATION FOR BERTH -** All vessels, their owners or agents, desiring berth at this facility shall file with the elevator office an application for berth on forms provided by the elevator. This application should be filed as far in advance as possible but in no case should such filing be later than 5:00 P.M. on the business day preceding the day the vessel desires to berth. The filing of this application shall have no bearing on the time that the vessel will be placed on turn for the berth as this will be governed by Item 13 of this Tariff.

**ITEM 15 - GENERAL REGULATIONS ON VESSELS:**

(1)    The elevator operator shall not be liable for demurrage, damages, damages for delay or loss of dispatch time incurred by any vessel or charterer thereof for any causes other than willful or grossly negligent acts of the elevator operator.

(2)    The elevator operator shall not be responsible for marine loss or damage to grain or barges, ships or their waterborne vessels to the elevator dock.

(3)    In all other matters, the elevator shall not be responsible for delay caused by any cause beyond its control, however or wherever arising.

(4)    Any vessel in berth shall at all times maintain appropriate officers and crew aboard to permit reception of cargo at any time of day or night, including Saturdays, Sundays and holidays.

(5)    If in the opinion of the elevator operator the weather conditions so warrant, any vessel in berth may be ordered at any time of day or night to vacate said berth and anchor in the approved anchorage area until such time as weather conditions permit the vessel to return to berth. Appropriate officers and crew shall be maintained aboard the vessel for this purpose.

**ITEM 16 - RESPONSIBILITY FOR PAYMENT OF CHARGES -** All invoices for charges are due upon presentation of invoice and payable in Brownsville, Texas. Unless otherwise provided by special arrangement with the elevator management, the responsibility for payment of invoices for provisions or services rendered by this facility shall, in the first instance, be that of the local agent in Brownsville, Texas who orders or authorizes such provisions or services as well as of the vessel and vessel owner.

When necessity calls for enforcement of Item 12 of this Tariff, the charges incurred thereby shall have the effect of being authorized by the local agent of the vessel and/or charterer and responsibility for payment of such charges shall be that of the local agent.

The elevator reserves the right to refuse berth and load or unload ships of any local agent having unpaid accounts sixty days or older until such account is paid in full.

**ITEM 17 - OVERTIME:**

A)   Overtime per hour is $175.00 per hour except as provided in B and C Below.

B)   Overtime Hours:
Overtime will be assessed for work before 8:00 A.M. and after 5:00 P.M. during weekdays. All work on Saturdays and Sundays will be overtime hours. Sundays and Holidays will assessed at the rate of $235.00 per hour.

C)   If elevator labor is called out for work, the following minimum hourly periods will assessed at overtime rate. 7:00 A.M. Call Out - 1 hour minimum; except Saturdays, Sundays or Holidays at which time, 4 hours overtime will be the minimum. 7:00 P.M. Call Out - 2 hours minimum. Overtime rate at $235.00 per hour will be assessed for time required to work during meal hours.

**ITEM 18 - HOLIDAYS** - The following days shall be recognized as Holidays by this facility and all work on these designated days will be performed at the discretion of the elevator management and at overtime rates as provided in Item No. 17 of this Tariff.

| | | |
|---|---|---|
| New Year's Day | Good Friday | Labor Day |
| Memorial Day | Thanksgiving Day | Christmas Day |
| Fourth of July | | |

In addition to the days specifically listed above, we shall also recognize as Holidays, with work performed under the conditions of this time, all days subsequently designated as Holidays or overtime days by the United States Government, the State of Texas, the City of Brownsville or other entity having lawful jurisdiction.

Should any Holiday fall on Saturday, the preceding Friday will be observed as a Holiday. Should any Holiday fall on Sunday, the following Monday will be observed as a Holiday.

No work will be scheduled or performed on Labor Day or Christmas Day except in cases of emergency such as fire, or where the property of the Company and/or its customers are in danger or serious injury.

**ITEM 19 -   RENTAL AND USE OF ELEVATOR EQUIPMENT, FACILITIES, PROPERTY AND PERSONNEL:**

A)   General - All vessels, their owners, agents and stevedores or others, hereinafter call "user", renting or using the elevator equipment, shall be upon and subject to the following conditions andcharges, the renting or use of which shall constitute an agreement with Port Elevator-Brownsville, Inc. to pay such charges and be bound by such conditions.

B) Condition and Responsibility

1) Equipment of the elevator is presumed to be in good condition when turned over to user, but Port Elevator - Brownsville, Inc does not warrant the mechanical condition thereof.

2) By receiving possession thereof, user of elevator equipment agrees that upon termination of the period of use, it will be returned in condition as when received, ordinary wear and tear alone accepted.

3) User assumes sole responsibility and liability for injury to or death of, any person whomsoever, or damage to or destruction of property of any person incident to or arising out of or connected with user's possession, use or operation of elevator equipment, or failure of such equipment to operate; and user shall protect, indemnify, and save harmless the Port Elevator - Brownsville, Inc. against any and all liability for or in respect of the same.

C) The use and maintenance of equipment (except mechanical trimmers, but including any and all miscellaneous spouting equipment) a charge per Metric Ton (2,204.6 pounds) loaded will be quoted upon request.

**ITEM 20 - VESSELS IN ELEVATOR BERTH SHALL AT ALL TIME MAINTAIN TAUT LINES TO AVOID DAMAGE AND INJURY TO ELEVATOR        PROPERTY AND PERSONNEL.**

**ITEM 21.- RIGHT TO CONTRACT WITH THE GOVERNMENT -** Port Elevator - Brownsville, Inc may enter into contracts with the government of the United States of America or the government of Mexico or any agency thereof, providing for storage and services rates other than storage and services rates provided herein, applicable only to grain or grain by-product, or a commodity defined in any such contract as grain or grain by-product, in which the United States of America or the government of Mexico, or the agency thereof contracting with the undersigned warehouseman as aforesaid, has an interest.

**ITEM 22 - WATER AND ELECTRICITY -** Water and electricity provided by the elevator will be set by the management of the elevator based on current utility rates.

**ITEM 23 - INSURANCE -** All contractors, stevedores or individuals performing work on the elevator property will at all times maintain adequate insurance coverage as required by Local, State and Federal Regulations. Under no circumstances does Port Elevator-Brownsville, Inc. assume or accept any responsibility for these contractors, stevedores or individuals or any employees thereof.

**ITEM 24 - SMOKING OR OPEN FLAME -** The Port Elevator-Brownsville,Inc is designated as a non-smoking area. However, certain designated smoking areas are provided. No open flames are permitted. Hot work permits may be issued on a case-by-case basis.

**ITEM 25 - VISITORS -** All visitors to Port Elevator - Brownsville, Inc. must check in at the office. Visitors to any vessels at the elevator berth enter the property at their own risk. All visitors to vessels in the berth must have permission from the owners, agents, captain or mate of the vessel which they are visiting.



٩

**A G I**
*9870 MARCONI DRIVE SUITE F*
*SAN DIEGO CA. 92173*
*PHONE: 619) 661-1404*
*FAX: 619) 661-6484*

OCTUBRE 28, 1997.

A QUIEN CORRESPONDA.

POR MEDIO DE LA PRESENTE RATIFICAMOS QUE LA **SRA: IVONNE SOTO.** NOS COMPRO EN FECHAS 25 DE OCTUBRE Y 12 DE NOVIEMBRE DE 1996 AL AMPARO DE LAS FACTURAS 001 Y 002 MAIZ AMARILLO # 2 PARA CONSUMO HUMANO, HACIENDO UN TOTAL DE 4,236.00 TON MET CON LAS SIGUIENTES ESPECIFICACIONES

| | |
|---|---|
| MOISTURE MAXIMUM | 15% |
| MINIMUM TEST DENSITY | 67.5% |
| EXTRANEOUS FOREIGN | 3.3% |
| CHIPPED MAIZE | 3 % |
| AFLATOXIN | 15 PPM MAX. |

DICHAS COMPRAS FUERON HECHAS ATRAVEZ DE CARTA DE CREDITO POR MEDIO DE BANORO Y NORWEST BANK, EN EL PASO TEXAS.

LA PRESENTE SE EXTIENDE A PETICION DEL INTERESADA Y PARA LOS FINES QUE ELLA JUZGUE CONVENIENTE

ATENTAMENTE

SR. WALTER PUCKETT

DEPOSITION
EXHIBIT
10
ACTION REPORTING
5-10-00

10

# PORT ELEVATOR-BROWNSVILLE, L.C.

9155 R.L. Ostos Road
Brownsville, Texas 78521
Tel (956) 831-8245  Fax (956) 831-3181

## TELEFAX MESSAGE

### Pages ( 1 )

To:       Interested Parties

From:     Craig Elkins
          Port Elevator-Brownsville, L.C.

Date:     18 December 1997

Rf:       Approximately 1,600 metric tons of yellow corn


Port Elevator-Brownsville, LC is now accepting bids/offers on
approximately 1,600 metric tons of yellow corn.  This corn has been in
storage and is subject to both a handling shrink and moisture shrink.
On average this corn is US Sample Grade or US #5 due to heating.  This
corn can be purchased as either whole corn or cracked corn.

A deposit of 25% of the total value must be made prior to 4:00 PM CST
Monday December 22nd 1997.   Shipment must be completed prior to
January 9th, 1998.   Payment is required the same day shipments are
made.

Please fax your bid/offer to (956) 831-3181 no later than 12:00 AM
CST, Monday December 22nd, 1997.  The successful bidder will be
notified by fax or telephone no later than 2:00 PM CST that same day.
All bids/offers must be in US dollars and specifing as whole or
cracked corn.

Port Elevator-Brownsville, LC esta aceptando ofrecimientos para
aproximadamente 1,600 toneladas metricas de maiz amarillo.  Este maiz
estaba almacenado y esta sujecto a mermas de maniobras y humedad.  En
general la calidad de este maiz es US Sample Grade o US #5 por razones
de calor.  Este maiz puede ser comprado como maiz entero o maiz
quebrado.

Se require un deposito de 25% del valor total antes de las 4:00 PM CST
lunes el dia 22 de diciembre 1997.  Los embaques tiene que  estar
completos antes del dia 9 de enero 1998.  Se require el pago el mismo
dia de los embarques.

Favor de enviar su ofrecimiento via fax a (956) 831-3181 antes de las
12:00 AM CST viernes el dia 22 de diciembre 1997.  Notificaremos el
ganador por fax o telefono a mas tardar las 2:00 PM CST el mismo dia.
Todo los ofrecimientos tiene que ser en US dolares y specificando si
es para maiz entero o maiz quebrado.

DEPOSITION
EXHIBIT
12
ACTION REPORTING
5-10-00

SHEET 1   PAGE 1

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

PORT ELEVATOR - BROWNSVILLE,    *
L.C. AND SOUTHWEST GRAIN        *
COMPANY, INC.                   *
                                *
VS.                             *   C. A. NO. B-98-23
                                *
IVONNE SOTO VEGA, BERSAIN       *   JURY DEMANDED
GUTIERREZ, SYSCO DE BAJA,       *
S.A. DE C.V. AND WALTER         *
PUFFELIS, INDIVIDUALLY AND      *
D/B/A AGI AKRON GROUP, INC.     *
                                *
VS.                             *
                                *
CRAIG ELKINS, INDIVIDUALLY      *
AND D/B/A PORT ELEVATOR-        *
BROWNSVILLE, L.C., AND          *
SOUTHWEST GRAIN CO., INC.       *

---------------------------------------------------------------

ORAL/VIDEOTAPED DEPOSITION OF
MARIA GONZALEZ
June 22, 2001

---------------------------------------------------------------

Oral/Video deposition of MARIA GONZALEZ, produced as a
witness on behalf of Ivonne Soto Vega, and duly sworn, was
taken in the above-styled and numbered cause on the 22nd day
of June, 2001, from 10:15 a.m. to 12:23 p.m. before GERALD
SMITH, CSR in and for the State of Texas, reported by oral

SHEET 2   PAGE 2                                                        2

stenography at the offices of Dale & Klein, 815 Ridgewood,
Brownsville, Cameron County, Texas, pursuant to the Federal
Rules of Civil Procedure and the provisions stated on the
record or attached hereto.

---

PAGE 3                                                                 3

A P P E A R A N C E S

FOR PORT ELEVATOR-BROWNSVILLE:
    MR. JOHN SKAGGS
    Skaggs & Associates
    710 Laurel
    McAllen, Texas  78501
FOR IVONNE SOTO VEGA:
    MR. WILLIAM D. MOUNT
    Dale & Klein
    6301 N. 10th
    McAllen, Texas  78504
ALSO PRESENTS:
    MS. DONANN SMITH, Videographer

---

PAGE 4                                                                 4

I N D E X

Appearances ........................................... 2
Stipulations .......................................... 4
    Examination by Mr. Mount ......................... 6
    Examination by Mr. Skaggs ........................ 66
    Re-Examination by Mr. Mount ...................... 76
    Re-Examination by Mr. Skaggs ..................... 87
    Re-Examination by Mr. Mount ...................... 89
Signature and Changes ................................ 92
Reporter's Certificate ............................... 94

E X H I B I T S

NO.     DESCRIPTION                           MARKED
No. 1   Deposition Notice .......................... 15
No. 2   10/25/96 Invoice ........................... 15
No. 3   11/4/96 Invoice ............................ 21
No. 4   11/5/96 Invoice ............................ 27
No. 5   11/6/96 Invoice ............................ 39
No. 6   11/6/96 Invoice ............................ 42
No. 7   11/12/96 Invoice ........................... 45
No. 8   Notary Public Records ...................... 57

---

PAGE 5                                                                 5

1       Oral/Videotaped deposition and answers of MARIA
2   GONZALEZ, who resides in Cameron County, Texas, was taken
3   herein by William D. Mount, Counsel for Ivonne Soto Vega,
4   before Gerald Smith, a Certified Shorthand Reporter in and
5   for the State of Texas, on the 22nd day of June, A.D., 2001,
6   pursuant to the Notice issued in the above styled and
7   numbered cause, pursuant to the Federal Rules of Civil
8   Procedure and with the following stipulations and
9   agreements:
10      IT WAS AGREED that the witness must appear in
11  accordance with the Federal Rules of Civil Procedure before
12  any Notary Public or official authorized to administer oaths
13  for purpose of reading over the deposition and making any
14  corrections the witness finds to be necessary, such
15  corrections to be recorded on a correction sheet submitted
16  with the original of the deposition.
17
18
19
20
21
22
23
24
25

SHEET 3    PAGE 6

6

1                          MARIA GONZALEZ,
2              having been first duly sworn, testified as follows,
3                      E X A M I N A T I O N
4    BY MR. MOUNT:
5         Q    State your name for the record, please?
6         A    Maria Gonzalez.
7         Q    Maria Gonzalez, my name is Bill Mount, and I'm an
8    attorney today representing Ivonne Soto Vega in a lawsuit
9    where she's been sued by Port Elevator-Brownsville and
10   Southwest Grain Company in federal court.  Do you understand
11   that?
12        A    Yes, sir.
13        Q    Have you ever been deposed before?
14        A    Yes.
15        Q    Has it been a while since you've been deposed?
16        A    Yes.
17        Q    Well, let me just tell you that a deposition, it's
18   just like being in court today, and we can play the
19   videotape that the videographer is taking to the jury and to
20   the judge and also we can read the booklet that the court
21   reporter will put together for the benefit of the judge and
22   jury.  Do you understand that?
23        A    Yes, sir.
24        Q    And also you've sworn an oath today to tell the
25   truth, and that's exactly what we also do when we're in

PAGE 7

7

1    court.  Do you understand that?
2         A    Yes, sir.
3         Q    As we go along, allow me the opportunity to ask a
4    complete question and then I'll allow you the opportunity to
5    respond.  The court reporter can't take us down if we're
6    both talking at the same time.  Is that okay?
7         A    Yes, sir.
8         Q    And, additionally, the court reporter and the
9    judge and I, we need verbal answers to all of these
10   questions so we'll have a complete record.  Is that okay?
11        A    Yes, sir.
12        Q    Could you tell me what your current address is,
13   that is where you live?
14        A    FM 2893, Los Fresnos.
15        Q    What is your home telephone number?
16        A    956-233-4142.
17        Q    As far as this particular address is concerned,
18   it's on FM 2893; is that right?
19        A    Yes.
20        Q    Is there a better way to be able to identify where
21   your house is?
22        A    Okay.  It's about three miles past Los Fresnos and
23   then it's about a mile and a half off of FM 2893, you know,
24   on FM 2893.
25        Q    So it's about three miles outside of Los Fresnos?

PAGE 8

8

1         A    Yes.
2         Q    And since I'm not familiar with FM 2893, is that
3    north, south, east or west of Los Fresnos?
4         A    North.
5         Q    North.  Now are you married?
6         A    No; no, sir.
7         Q    Do you have any children?
8         A    No, sir.
9         Q    Do you live alone?
10        A    Yes, sir.
11        Q    How long have you lived at this address on 2893?
12        A    It's more than forty years.
13        Q    Your social security number, what is your social
14   security number?
15        A    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.
16        Q    I'm going to have to ask you what your date of
17   birth is.  What is your date of birth?
18        A    July the 9th.
19        Q    And what year was that?
20        A    Thirty-eight.
21        Q    1938.  Now are you currently working at Port
22   Elavator-Brownsville, L.C.?
23        A    That's correct.
24        Q    How long have you worked for Port Elavator-
25   Brownsville, L.C.?

PAGE 9

9

1         A    Since July the 13th, 1970 -- 15th, I believe.
2         Q    As far as working for Port Elevator-Brownsville,
3    L.C., what is it that you do for the business?
4         A    Bookkeeping, payroll, accounts receivable, GL,
5    accounts payable.
6         Q    And when you say GL, you're talking about the
7    general ledger?
8         A    General ledger, yes.
9         Q    Who is your supervisor?
10        A    Mr. Craig Elkins.
11        Q    As far as your work history is concerned, where
12   did you work prior to working for Port Elavator-Brownsville,
13   L.C.?
14        A    Brownsville Navigation District.
15        Q    What did you do for Brownsville Navigation
16   District?
17        A    Just a general office clerk with the Port
18   Elevator.
19        Q    As far as Mr. Elkins is concerned, how long has he
20   been down at Port Elevator-Brownsville, L.C.?
21        A    Since the day we started to work.
22        Q    And that would be back, what, 1970?
23        A    Yes.
24        Q    As far as -- as far as what you do, do you have
25   any assistants that help you out?

SHEET 4    PAGE 10

10

1    A    Not in my work, no.
2    Q    So then, really, to summarize your title or your
3    position would be, basically, the bookkeeper?
4    A    Yes; that's correct, sir.
5    Q    As far as your employer is concerned, is your
6    employer Port Elevator-Brownsville, L.C.?
7    A    That is correct, sir.
8    Q    So as far as when you receive a paycheck, does the
9    paycheck say on it paid by or does it have Port Elevator-
10   Brownsville, L.C. on the check?
11   A    Port Elevator-Brownsville, L.C.
12   Q    And when you're paid, are you paid twice monthly
13   or are you paid every week?  How does it --
14   A    Weekly.
15   Q    And you actually cut the checks for the business,
16   right?
17   A    That's correct, sir.
18   Q    And then as far as signing payroll, who signs
19   payroll?
20   A    Mr. Craig Elkins.
21   Q    Now we're here today because there -- because of a
22   dispute over some corn involving a couple of parties.  Do
23   you understand that?
24   A    Yes, sir.
25   Q    Have you ever met Bersain Gutierrez, who has been

PAGE 11

11

1    named as a defendant in this lawsuit?
2    A    He was by the office once.
3    Q    Do you recall what year it was that he was by the
4    office?
5    A    1996.
6    Q    And as far as your recollection is concerned, do
7    you recall the month or the day?
8    A    No.  I would have to look that up, as to what day
9    it was.
10   Q    As far as being able to look it up, is there any
11   particular way you would be able to look it up?
12   A    Look at my notary log.
13   Q    In your notary log it mentions that he was by Port
14   Elevator-Brownsville, L.C. in October of 1996.  Does that
15   sound right?
16   A    That is correct, sir.
17   Q    And I believe the particular date was October 25,
18   19 --
19        MR. MOUNT:  Scratch that.
20   Q    (Mr. Mount)  The date that shows in your notary
21   log is October 30, 1996, correct?
22   A    That's correct.
23   Q    So it appears that you've notarized a document, a
24   commercial invoice for Mr. Gutierrez, on October 30, 1996,
25   correct?

PAGE 12

12

1    A    That's correct, sir.
2    Q    And when you notarized that particular document,
3    you also asked for his ID card?
4    A    That's correct.
5    Q    And when you asked for his ID card, what type of
6    ID card did you look at, do you recall?
7    A    It was his resident alien card.
8    Q    And as far as his resident alien card is
9    concerned, you actually took down the number off of his
10   card?
11   A    That's correct, sir.
12   Q    And what was that number?
13   A    A092555562.
14   Q    Then also in your notary book you wrote down an
15   address for Mr. Gutierrez, correct?
16   A    Yes.
17   Q    Where did you obtain the address?
18   A    Off of his ID card from California.
19   Q    All right.  So you didn't ask him what his address
20   was --
21   A    No.
22   Q    -- you took it off of his --
23   A    Yes.
24   Q    -- card?
25   A    That's correct.

PAGE 13

13

1         MR. SKAGGS:  Maria, when you're answering
2    questions, give him a chance to finish the answers.
3         WITNESS:  Okay.
4         MR. SKAGGS:  In normal conversation we talk
5    over each other, but the man that's sitting here has to type
6    a question and then an answer.  I know it feels a little
7    awkward, but go ahead and do that.  It will make the record
8    read better in the typed part.
9         WITNESS:  Okay.
10   Q    (Mr. Mount)  The best depositions that we do are
11   when we have a translator and it goes from English to
12   Spanish, because the translator translates everything and
13   the witness gets to answer, and then the next question comes
14   so the record is perfect, as far as question-answer,
15   question-answer, and that's what we're striving for is
16   question-answer, question-answer.  Now the address you took
17   from the ID card was what?
18   A    529 Canyon Drive, Bonita, California, 91902.
19   Q    So it appears from your notary book that you
20   actually saw him on two dates, one was October 30, 1996 and
21   the other date was November 1, 1996, correct?
22   A    That's correct.
23   Q    The second document that you notarized for Mr.
24   Gutierres on November 1, 1996, what was that document?
25   A    What I have in my log book says weight

SHEET 5    PAGE 14

**14**

1  certificate.
2      Q      Concerning Mr. Gutierrez, do you recall what his
3  -- what he looked like?
4      A      No, sir. I do not.
5      Q      So you can't describe to the jury what his
6  physical appearance was?
7      A      No.
8      Q      Do you recall when you spoke with him in order to
9  get the documents notarized, whether the conversation was in
10 English or in Spanish?
11     A      Spanish.
12     Q      Then as far as talking to him to get these
13 documents notarized on these two dates, do you recall anyone
14 else being present besides yourself?
15     A      Mr. Walter Puffelis.
16     Q      Do you recall anyone else being present besides
17 Mr. Puffelis?
18     A      No, sir.
19     Q      Was Mr. Elkins present?
20     A      He was in the office, yes, sir.
21     Q      What about Ms. Ivonne Vega, was she present?
22     A      No, sir, she was not.
23     Q      Have you ever met Ms. Vega before?
24     A      She came by the office once.
25     Q      So you did meet her?

PAGE 15

**15**

1      A      A year or two later, whatever.
2      Q      Okay. So, yes, you did meet her, correct?
3      A      Yes.
4      Q      So then you're sure that you don't recall seeing
5  Ms. Vega there on October 30, 1996, or November 1, 1996,
6  correct?
7      A      That is correct.
8      Q      Have you ever met Loren Walters?
9      A      I do not recall that name.
10     Q      The name doesn't sound familiar?
11     A      No.
12     Q      So then you wouldn't really know, one way or the
13 other, whether he was present in Brownsville at the Port on
14 October 30, 1996 or November 1, 1996, correct?
15     A      Correct.
16     Q      Now as far as the document that was notarized on
17 October 30, 1996, do you remember what that document was,
18 other than your notation that it was a commercial invoice?
19     A      Just that it was an invoice.
20            (Exhibits No. 1 and 2 were marked.)
21     Q      (Mr. Mount) What we're going to do is we're going
22 to mark as Exhibit No. 1 your deposition notice, and then
23 we'll mark Exhibit No. 2 a commercial invoice. And I'll ask
24 you if you're able to identify Exhibit No. 2? Are you able
25 to identify Exhibit No. 2 as a document that you notarized

PAGE 16

**16**

1  on October 30, 1996?
2      A      Yes.
3      Q      Your signature appears at the bottom of that
4  document, correct?
5      A      That's correct, sir.
6      Q      And as far as the signature you were notarizing,
7  you were notarizing Mr. Gutierrez' signature, correct?
8      A      That's correct, sir.
9      Q      Do you recall, one way or the other, at the time
10 you notarized this document whether the signature to the
11 right of Mr. Gutierrez, that is the signature of Mr.
12 Puffelis, had already been done or not?
13     A      I do not recall.
14     Q      So as far as Mr. Puffelis signing Exhibit No. 2,
15 he could have done it either before you notarized Gutierrez'
16 signature or after?
17     A      That's correct, sir.
18     Q      As far as this particular document is concerned,
19 did you have a hand in preparing it at all?
20     A      No, sir. I did not.
21     Q      As far as what appears on the bottom of the
22 document where it has your name typed up, it says -- it's
23 typed up Maria Gonzales, and it says notary public in and
24 for Cameron County, State of Texas. Was that already typed
25 on the document --

PAGE 17

**17**

1      A      No.
2      Q      -- at the time you notarized it?
3      A      No, sir. It was not.
4      Q      That was something that you typed on the document?
5      A      That's correct, sir.
6      Q      And you did that at Port Elevator-Brownsville,
7  L.C., correct?
8      A      That's correct, sir.
9      Q      And you used -- I guess you used one of their
10 typewriters to do it?
11     A      That's correct.
12     Q      Then, also, where it says, "Sworn and subscribed
13 before me this 30th day October 1996" did you type that
14 language on Exhibit No. 2?
15     A      That's correct, sir.
16     Q      And then where it says, "My commission expires
17 August 21, 1999", you typed that, also, correct?
18     A      That's correct, sir.
19     Q      Where it says, "This notarization is to
20 authenticate that the above signature is that of Mr. Bersain
21 Gutierrez", did you type that, also?
22     A      No, sir. I did not.
23     Q      Are you aware of who may have typed that?
24     A      No, sir. I am not.
25     Q      Would you agree with me or disagree with me that

Port Elevator-Brownsville V. Ivonne Soto Vega
DEPOSITION OF MARIA GONZALEZ
6-22-01

SHEET 6  PAGE 18

18

1 that language I just quoted you that says, "This
2 notarization is to authenticate that the above signature is
3 that of Mr. Bersain Gutierrez", that particular type looks
4 very similar to the type you used? Would you agree or
5 disagree with that statement?
6    A   I don't think it looks the same.
7    Q   So then, in your opinion, that type looks more
8 like the type on the rest of the document than what you
9 typed?
10   A   Yes.
11   Q   So as far as that particular typing is concerned,
12 the language I read to you, "This notarization is to
13 authenticate that the above signature is that of Mr. Bersain
14 Gutierrez, you don't know who typed that, correct?
15   A   No, I do not, sir.
16   Q   Now I assume that Mr. Gutierrez signed in your
17 presence when you notarized the document, correct?
18   A   That's correct, sir.
19   Q   And, generally, that's your practice, when you
20 notarize documents you have the person who is signing sign
21 in your presence, correct?
22   A   That is correct, sir.
23   Q   As far as the person who created this particular
24 document, do you have any idea who created the portions of
25 the document that you didn't type?

PAGE 19

19

1    A   No, I do not.
2    Q   Do you recall who it was that handed you this
3 document for notarization?
4    A   No, I do not, sir.
5    Q   So you don't know if it was Mr. Gutierrez, Mr.
6 Puffelis, or Mr. Elkins, correct?
7    A   No.  It would have been either Mr. Gutierrez or
8 Mr. Puffelis.
9    Q   So when you say it would have had to have been
10 either one of those two individuals --
11   A   Uh-huh.
12   Q   -- why is it that you believe it was one of those
13 two individuals?
14   A   Because I remember clearly they were at the
15 counter in front and they wanted me to notarize.
16   Q   So as far as the counter in front, is there some
17 kind of lobby or area when you --
18   A   Yes.
19   Q   -- first walk in the door there?
20   A   Uh-huh.
21   Q   Okay.  And they were -- you were on one side of
22 the counter and --
23   A   And they were on the other side.
24   Q   And then as far as Mr. Elkins, do you recall where
25 he was at that time?

PAGE 20

20

1    A   Probably in his office.
2    Q   Well, as far as probably being in his office,
3 could have also been there visiting with these two
4 gentlemen, Mr. Gutierrez and Mr. Puffelis?
5    A   At the time that this was notarized, no.
6    Q   And when you say that, why is it that you say
7 that?
8    A   Because they were alone and standing in front, and
9 I was sitting at my desk, which is right past that counter.
10   Q   Do you recall if they had you notarize any other
11 documents that day?
12   A   No.  I do not recall.
13   Q   Are there occasions where you notarize a document
14 and you don't necessarily write it down in your log book?
15   A   No.
16   Q   So then it's your testimony that every time you
17 notarize a document you will write it down in your log book?
18   A   Yes.
19   Q   How long have you been a notary for?
20   A   Since 199 -- 1991, I believe.
21   Q   Do you recall if those two gentlemen asked you to
22 make copies of this document, this commercial invoice,
23 Exhibit No. 2, after it was notarized?
24   A   I do not recall.
25   Q   If they would have asked you to make copies, you

PAGE 21

21

1 certainly would have obliged them?
2    A   That's correct.
3    Q   Concerning Mr. Puffelis, do you recall what he
4 looked like?
5    A   No, I do not.
6    Q   So you can't describe to the jury what his
7 physical appearance looks like, correct?
8    A   No.
9    Q   When you spoke with Mr. Puffelis, do you recall if
10 the conversations were in English or in Spanish?
11   A   I do not recall.
12   Q   Then your log book mentions that you notarized
13 something on November 1, 1996 for Mr. Gutierrez, correct?
14   A   That's correct.
15   Q   By the way, on Exhibit No. 2 you do recognize Mr.
16 Gutierrez' signature on that document, correct?
17   A   That's correct.
18   Q   His signature appears under the words "received
19 by", correct?
20   A   That's correct.
21       (Deposition Exhibit No. 3 was marked.)
22   Q   (Mr. Mount) Let me ask you if you're able to
23 identify Exhibit No. 3?  Does the document look familiar?
24   A   That's my signature.  It is an invoice.
25   Q   As far as the signature that was notarized, it

**SHEET 7   PAGE 22**

22

1 appears that you notarized Mr. Gutierrez' signature; is that
2 correct?
3     A    No.  It says, "I hereby certify that this is a
4 true copy of the original document."
5     Q    So as far as the signatures on this document, who
6 -- what signatures do you see on this document?
7     A    Craig Elkins.
8     Q    Then below -- and your signature is on this
9 document, too --
10    A    Yes.
11    Q    -- above the word "Maria Gonzalez", correct?
12    A    Uh-huh.
13    Q    Who is the middle signature, between your
14 signature and Mr. Elkins' signature?
15    A    I do not recall.  I don't know.
16    Q    Okay.  And as far as this particular document is
17 concerned, above the words "by" -- or next to the word "by"
18 you see Craig Elkins' signature, correct?
19    A    That's correct.
20    Q    And then it says "B. G. Grain"?  Do you see where
21 it says "B. G. Grain"?
22    A    Yes, sir.
23    Q    What is B. G. Grain?
24    A    B. G. Grain, Bersain Gutierrez.
25    Q    So B. G. Grain stands for Bersain Gutierrez Grain,

**PAGE 23**

23

1 correct?
2     A    I believe so, but I am not certain.
3     Q    Okay.  And then also the top left-hand corner of
4 the document it says -- it's not too legible there, but it
5 says "G. Grain", correct?
6     A    That's correct.
7     Q    We would presume that there could be a "B" there
8 for B. G. Grain, correct?
9     A    Correct.
10    Q    This gives an address of California, Chula Vista,
11 California, correct?
12    A    Correct.
13    Q    As far as this particular document, it says --
14 towards the right, on the top part of the document it says,
15 "Invoice No. BG1", correct?
16    A    Correct.
17    Q    What is this an invoice concerning?
18    A    This is covering corn.
19    Q    This invoice is covering corn that was loaded at
20 Port of -- at the Port of Brownsville and being shipped out
21 of the Port of Brownsville, correct?
22    A    Correct.
23    Q    And it appears that it was corn that was going to
24 be sold to a business down in Mexico, correct?
25    A    Correct.

**PAGE 24**

24

1     Q    Now as far as this particular document is
2 concerned, what were you asked to do concerning this
3 particular document?
4     A    I didn't understand that question.
5     Q    Okay.  Concerning this particular document, you
6 were asked to swear that this was a true and correct copy of
7 the original?
8     A    Of the original document.
9     Q    Is that correct?
10    A    That's correct.
11    Q    And so I presume that you saw the original
12 document before you certified that this was a copy?
13    A    That is correct, sir.
14    Q    As far as where the original document is located,
15 do you know where the original was located?
16    A    No, I do not know.
17    Q    So this particular document, basically, shows that
18 159,104 metric tons of corn is going to be shipped out of
19 Port of Brownsville being sold to someone in Mexico,
20 correct?
21    A    Correct.
22    Q    And it appears that the corn was going to be
23 loaded on November 4, 1996?
24    A    Correct.
25    Q    So it appears from this particular document that

**PAGE 25**

25

1 Mr. Elkins is acting as an agent for B. G. Grain; is that
2 correct?
3         MR. SKAGGS:  Ma'am, don't answer that
4 question as phrased.  I object to that question based on
5 form.
6     Q    (Mr. Mount)  Concerning that particular question,
7 are you going to follow Mr. Skaggs' advice and not answer
8 it, or are you willing to answer it?
9         MR. SKAGGS:  No, she will not answer
10 questions that I instruct her not to answer.
11    Q    (Mr. Mount)  As far as -- as far as the record is
12 concerned, I need you to say either, yes, you're going to
13 answer it or --
14    A    I will follow Mr. Skaggs' advice.
15    Q    All right.  So you're refusing to answer that
16 question, correct?
17        MR. SKAGGS:  Ma'am, I'm going to instruct you
18 that you don't have to engage in any kind of conversations
19 with him about whether you're going to follow your lawyer's
20 advice or not.  I'll answer those kind of questions for you,
21 and I'm going to instruct you not to be guessing about legal
22 matters that have to do with what lawyers understand and
23 judges understand about what an agent is and who agents are
24 and things like that.  And that's my instruction to you.
25        MR. MOUNT:  And I'll object to Mr. Skaggs'

SHEET 8    PAGE 26

26

1 speaking objection, as far as what he just told the witness.
2     Q    (Mr. Mount)  So in order to make the record clear,
3 you're refusing to answer the question I submitted you
4 earlier, correct?
5          MR. SKAGGS:  Don't answer that last question
6 that you were asked.
7     Q    (Mr. Mount)  Is that correct?
8          MR. SKAGGS:  I'm answering the question for
9 her, Counsel.  She's not going to answer those kind of
10 questions.
11     Q    (Mr. Mount)  Is that correct?
12          MR. SKAGGS:  Don't answer the question.  If
13 the question is asked again, ma'am, we will adjourn the
14 deposition.
15     Q    (Mr. Mount)  As far as this deposition is
16 concerned, do you consider Mr. Skaggs your lawyer for this
17 particular deposition?
18     A    That is correct.
19     Q    So as this deposition goes along, you will be
20 taking advice from Mr. Skaggs; is that correct?
21     A    You don't have to answer that
22 question, ma'am, and I'll instruct you that you don't have
23 to, and I will state for the record that I am the witness'
24 attorney for all purposes during the course of this
25 deposition and for other purposes outside the context of

PAGE 27

27

1 this deposition.
2     Q    (Mr. Mount)  Is Mr. Skaggs correct in what he
3 said?
4          MR. SKAGGS:  You can answer that one.
5     A    (Witness)  Yes.
6     Q    Thank you.
7          (Deposition Exhibit No. 4 was marked.)
8     Q    (Mr. Mount)  Let me show you what we just marked
9 as Exhibit No. 4.  It's a two page document, it appears to
10 be a two page document.  Are you able to identify Exhibit
11 No. 4?
12     A    Yes, sir.
13     Q    Concerning Exhibit No. 4, your signature appears
14 in the bottom right-hand corner above the words "B. G.
15 Grain", correct?
16     A    Correct.
17     Q    And then also you notarized this particular
18 document, correct?
19     A    Correct.
20     Q    And the purpose for you notarizing this particular
21 document is to certify that this is a true and correct copy
22 of the original, correct?
23     A    Correct.
24     Q    The original would be at Port Elevator-
25 Brownsville, L.C., correct?

PAGE 28

28

1     A    I didn't understand your question.
2     Q    The original document -- where would the original
3 document be located?
4     A    I believe the original document would go to the --
5 to the company who bought the product.
6     Q    So as far as the company who bought the product,
7 who is the company that bought the product?
8     A    Marchantex.
9     Q    That is a company out of Monterrey, Mexico?
10     A    Yes, sir.
11     Q    Now this particular invoice is involving 133,657
12 metric tons of corn; is that correct?
13     A    That's correct.
14     Q    The date the corn was loaded would have been
15 November 5, 1996?
16     A    That's correct.
17     Q    So as far as this particular invoice is concerned,
18 Port Elevator-Brownsville, L.C. would have kept a copy of
19 the document; is that right?
20     A    Yes, sir.
21     Q    And you say the original would have gone to the
22 company from Mexico, right?
23     A    Yes, sir.
24     Q    And as far as it being shipped out, how was the
25 corn shipped out?

PAGE 29

29

1     A    By truck.
2     Q    As far as this particular document is concerned,
3 Exhibit No. 4, do you know who created this document?
4     A    It was created in the elevator office.
5     Q    And as far as being created, was it created by
6 you?
7     A    I believe so.
8     Q    And then you would assign the document for -- or
9 actually you signed it by Maria Gonzalez for B. G. Grain,
10 correct?
11     A    Correct, sir.
12     Q    And B. G. Grain, to your understanding, stands for
13 Bersain Gutierrez Grain?
14     A    Yes, sir.
15     Q    As far as the person that gave you instructions to
16 create this document, Exhibit No. 4, who was the person that
17 gave you the instructions to create the document?
18     A    I do not remember.
19     Q    So as far as creating the document, you just can't
20 recall who it was?  As far as who asked you to create this
21 document you can't recall, correct?
22     A    No, I can't recall.
23     Q    But you would agree with me that you were acting
24 for Mr. Gutierrez when this document was created, correct?
25     A    Correct, sir.

SHEET 9  PAGE 30 ─────────────────────── PAGE 31

30

1    Q    So then you were acting as his agent, as far as
2  this document is concerned, correct?
3         MR. SKAGGS: Ma'am, you do not have to
4  comment on a legal conclusion and I'll instruct you not to
5  do so. I'll object to that question as calling for a legal
6  conclusion.
7    Q    (Mr. Mount) Are you refusing to answer that
8  question?
9         MR. SKAGGS: Do not answer questions
10 inquiring whether you're going to follow your lawyer's
11 instructions. You do not have to answer questions like
12 that, ma'am.
13   Q    (Mr. Mount) Would you agree with me, ma'am, that
14 you were acting as Bersain Gutierrez' representative when
15 you created and you signed this particular document, Exhibit
16 No. 4?
17        MR. SKAGGS: You can answer that, if you
18 know.
19   A    (Witness) Would you repeat your question?
20   Q    Okay. Would you agree with me that when you
21 created and you signed this particular document concerning
22 the corn that was going to be shipped into Mexico, Exhibit
23 No. 4, that you were acting as Mr. Gutierrez'
24 representative?
25   A    Correct, sir.

31

1    Q    Also, in this particular document, there is
2  another signature of a Mr. Gomez; is that correct?
3    A    I see it on here.
4    Q    Did he sign in your presence or do you know?
5    A    No, sir. He did not.
6    Q    Do you know who Mr. Gomez is?
7    A    No, I do not.
8    Q    And this invoice basically shows that the corn is
9  going to be shipped out by truck?
10   A    That is correct.
11   Q    Appears to be two different trucks?
12   A    Four.
13   Q    Four. Then on the following page, the next page,
14 does your signature appear to be on the next page?
15   A    Correct, sir.
16   Q    And your -- and concerning that particular
17 signature, you were acting as an agent for B. G. Grain at
18 the time, correct?
19        MR. SKAGGS: Ma'am, don't answer lawyer
20 questions that have to do with legal opinions. I object to
21 that question as calling for a legal conclusion.
22        MR. MOUNT: Mr. Skaggs, her signature appears
23 right above the term "agent for B. G. Grain". Are you still
24 refusing to have her answer that question?
25        MR. SKAGGS: I don't mind you asking any

PAGE 32 ─────────────────────────────── PAGE 33

32

1  question about a factual -- something that factually appears
2  in a document, but regarding her opinion about something,
3  I'll instruct her not to answer.
4    Q    (Mr. Mount) So I presume you're refusing to
5  answer that question, correct?
6         MR. SKAGGS: Well, reask your question.
7  We'll see.
8    Q    (Mr. Mount) Ma'am, your signature appears on this
9  particular document, page 2 of Exhibit No. 4, correct?
10   A    Correct.
11   Q    And when you signed on that particular document,
12 you signed as agent for B. G. Grain, correct?
13        MR. SKAGGS: Don't answer the question that
14 asks you in what capacity you signed. If he asks you a
15 question about what it says under your name, you can answer
16 that; but about whether you think that that has some legal
17 significance or whatever that actually means under the law,
18 don't answer those kind of questions, and I will instruct
19 you not to do that.
20   Q    (Mr. Mount) So I presume you will follow your
21 lawyer's advice, correct?
22        MR. SKAGGS: Okay. We'll go --
23   A    (Witness) Correct.
24        MR. SKAGGS: We will adjourn the deposition
25 at this time and we'll go off the record.

33

1         MR. MOUNT: I'm refusing to go off the
2  record. If counsel will tell me why he wants to go off the
3  record.
4         MR. SKAGGS: Then you'll be taking pictures
5  of an empty chair, because I indicated that if we persist in
6  asking legal conclusion questions or if we persist in trying
7  to get a witness to state whether she's going to answer --
8  or take her lawyer's advice, that we will conclude the
9  deposition and take it under court supervision. She will
10 not answer those questions and she doesn't have to put up
11 with that, Bill. However you want to handle that, but you
12 can ask the court later on if you want her to -- if the
13 court wants to instruct her to say whether she's going to
14 answer questions that her lawyer has told her not to answer,
15 that's fine, but we don't have to continually have the
16 argument. We'll quit having it now. I'll bring her back,
17 but I'm not going to have her answer questions like that
18 unless the court tells us -- unless the judge tells us we
19 have to.
20        MR. MOUNT: What I need from you is if
21 there's a question she's not going to answer, I generally
22 need to hear that from her that she's not going to answer
23 it. So if I certify it to the judge and ask the judge to
24 have her answer it, I can do so.
25        MR. SKAGGS: I don't believe that's correct,

SHEET 10 PAGE 34 _____

34
1  and I don't believe you can ask her that question. If the
2  judge tells me I'm wrong, then the judge tells her to answer
3  that question, then she will, but if asked repeatedly, I'll
4  adjourn the deposition and you can take a picture of an
5  empty chair for the rest of the day, but she's not going to
6  have to answer that question unless a judge tells her she
7  does. She's been instructed not to answer. I am her
8  lawyer. I've told her not to. If she's going to get in
9  trouble about it, she's not going to get in trouble, I am,
10 because I'm the one who told her not to do it, if it's
11 wrong.
12          MR. MOUNT: Well, I need an agreement from
13 you, I guess, that every time she's not going to answer a
14 ques -- when you say she's not going to answer a question, I
15 need an agreement from you that she's going to follow her
16 lawyer's advice. That's what I need to know, because --
17          MR. SKAGGS: I will agree that she's going to
18 follow --
19          MR. MOUNT: -- sometimes witnesses don't
20 follow their lawyer's advice.
21          MR. SKAGGS: Yeah. I will agree that she's
22 going to follow her lawyer's advice.
23          MR. MOUNT: Okay. Well, with that
24 understanding, then we can proceed.
25          MR. SKAGGS: Okay. Sure.

PAGE 35 _____

35
1          Q    (Mr. Mount) Okay. And I don't think that I got
2  an answer to my last question, which is that you signed your
3  name, Maria Gonzalez, and below that it says "agent for B.
4  G. Grain"; is that correct?
5          MR. SKAGGS: You can answer that question.
6          A    (Witness) That's correct.
7          Q    All right. And as far as the shipment of corn is
8  concerned, this was corn that was shipped on November 5,
9  1996; is that right?
10         A    That's correct.
11         Q    As far as S. Lee Gonzalez is concerned, who is S.
12 Lee Gonzalez? Do you see her name on page 2 above the words
13 "Rio Grande Valley Chamber of Commerce"?
14         A    She was an employee of the Elevator.
15         Q    So this particular document would have been signed
16 by you and by Ms. Gonzalez at the Elevator, correct?
17         A    That's correct, sir.
18         Q    What is her title or her job duty at the Elevator?
19         A    She was a clerk at the Elevator at the time.
20         Q    Does she still work at the Elevator?
21         A    No, she does not, sir.
22         Q    And by Elevator, we're referring to Port Elevator-
23 Brownsville, L.C., correct?
24         A    That's correct.
25         Q    When did she cease or quit working for the

PAGE 36 _____

36
1  Elevator?
2          A    I do not recall the -- the exact date.
3          Q    Do you know why she doesn't work there any longer?
4          A    She chose to stay home.
5          Q    As far as the Exhibit No. 4, the corn being
6  shipped out to Mexico, this is all corn that would have come
7  in to the Elevator on October 30, 1996?
8          A    Could you rephrase your question, please?
9          Q    Sure. It appears that about two thousand, forty
10 -- two thousand, four hundred and forty-four metric tons of
11 corn came to the Elevator on or about October 30, 1996?
12         A    Correct, sir.
13         Q    And the corn that was being shipped out on
14 November 5, 1996 was a portion of that corn, correct?
15         A    Correct.
16         Q    And that two thousand, four hundred and forty-four
17 metric tons of corn that I just referred to earlier, that's
18 corn dealing with the invoice that I showed you, which is
19 Exhibit No. 2, I believe?
20         A    Correct, sir.
21         Q    Then the corn that were shipped out that we talked
22 about concerning Exhibit No. 3, that is a portion of the
23 corn that's referenced in Exhibit No. 2, also, correct?
24         A    Correct.
25         Q    As far as Exhibit No.'s 3 and 4 go, they both have

PAGE 37 _____

37
1  an F.O.B. value on them, correct?
2          A    That's correct.
3          Q    As far as F.O.B., that stands for what, for free
4  on board?
5          A    I do not really know.
6          Q    Okay. When a value is placed, what is that
7  particular value, when it says F.O.B. value? Do you know
8  what that means or is?
9          A    No, I do not.
10         Q    So when there's a dollar sign, say on Exhibit No.
11 3, and it says $33,411.04, do you know what that is in
12 regard to?
13         A    To the value of the corn on that invoice.
14         Q    So that would be the value of the corn that's
15 being shipped out to Mexico?
16         A    Correct.
17         Q    As far as determining the value, how is the value
18 determined?
19         A    The owner determines the value.
20         Q    Okay. So for Exhibit No. 3, you already told me
21 you typed up this document, correct, Exhibit No. 3?
22         A    Yes.
23         Q    Okay. Where did you obtain the information to put
24 the value of the corn?
25         A    I do not recall.

Port Elevator-Brownsville V. Ivonne Soto Vega
DEPOSITION OF MARIA GONZALEZ
6-22-01

SHEET 11  PAGE 38

38

```
1      Q    And then also Exhibit No. 4 you typed up, too; is
2  that right?
3      A    Correct.
4      Q    As far as getting the value of $28,087.97, do you
5  recall where you got that number from, that is who gave you
6  that number?
7      A    There's a price on here of $210 per metric ton.
8      Q    Right.  Okay.  And so you probably would have
9  multiplied the $210 times the number of metric tons to get
10 the value, correct?
11     A    Correct.
12     Q    As far as getting the price is concerned, do you
13 know where you would have gotten the price from?
14     A    It would have to come from the owner of the
15 product.
16     Q    And when you say the owner of the product, do you
17 mean the buyer or the seller?
18     A    Seller.
19     Q    And as far as obtaining that information, you
20 can't recall who it was that you spoke to to get that two
21 dollars and ten cents per metric ton price?
22     A    No, I do not recall.
23     Q    And so as far as getting that particular price, do
24 you recall if you --
25               MR. MOUNT:  Scratch that.
```

PAGE 39

39

```
1               (Deposition Exhibit No. 5 was marked.)
2      Q    (Mr. Mount)  Let me show you what we just marked
3  as Exhibit No. 5.  Have you seen Exhibit No. 5 before?
4      A    The invoice, yes, sir.
5      Q    This is invoice number BG3.  That's what it says
6  in the right-hand corner; is that correct?
7      A    Correct, sir.
8      Q    And as far as this invoice is concerned, your
9  signature appears in the bottom right-hand corner under the
10 words "B. G. Grain", correct?
11     A    Correct.
12     Q    Then also you notarised this particular document
13 as being a true and correct copy of the original, correct?
14     A    Correct.
15     Q    And then we also see a signature of a Mr. Gomez,
16 correct?
17     A    I see it on here now, yes.
18     Q    Okay.  But as far as Mr. Gomez is concerned,
19 you've already told us that you don't know who Mr. Gomez is,
20 correct?
21     A    That's correct, sir.
22     Q    Now this was, again, corn that was shipped into
23 Mexico from the Port of Brownsville?
24     A    From Port Elevator, sir.
25     Q    Okay.  And that corn had a value of $17,685.15,
```

PAGE 40

40

```
1  correct?
2      A    Correct, sir.
3      Q    And, again, it's the same unit price on the other
4  two invoices, two dollars and -- two hundred and ten
5  dollars.
6      A    That's correct.
7      Q    Then on the second page of this two page exhibit,
8  your signature appears on the second page, correct?
9      A    Correct.
10     Q    And, by the way, this is a document that would
11 have been created at Port Elevator-Brownsville, L.C.,
12 correct?
13     A    Correct.
14     Q    And most likely you would have created it,
15 correct?
16     A    Correct.
17     Q    And then your signature appears above the words
18 "agent for B. G. Grain", correct?
19     A    Correct.
20               MR. SKAGGS:  That's something you can answer,
21 yes, ma'am.
22     Q    (Mr. Mount)  And then did we see Ms. -- or do we
23 see Ms. Gonzales' signature on this particular document?
24     A    That's correct.
25     Q    Her document (sic) appears in the lower right-hand
```

PAGE 41

41

```
1  corner, correct?
2      A    Correct.
3      Q    And as far as whether you were acting as an agent
4  or not for B. G. Grain, you're not going to let me know
5  that, right?
6               MR. SKAGGS:  Not if she doesn't know.  I'll
7  take the witness on voir dire at this point.  I will ask
8  you, ma'am, do you have a legal education?
9               WITNESS:  I do not.
10              MR. SKAGGS:  Do you have a legal degree, a
11 lawyer's degree?
12              WITNESS:  No, I do not.
13              MR. SKAGGS:  Are you licensed to practice law
14 in the state of Texas?
15              WITNESS:  No, I am not.
16              MR. SKAGGS:  With that predicate, I am going
17 to continue to instruct her not to answer questions that
18 call for a legal conclusion about the legal definition of
19 agency, irrespective of what it says under her signature.  I
20 don't lodge an objection to you asking her what the actual
21 words are on the printed page under her signature; just what
22 they mean is something I'm not going to let her go there
23 without any more background or education.  I object on that
24 basis, and make the instruction on that basis, as well.
25     Q    (Mr. Mount)  As far as this particular shipment
```

SHEET 12    PAGE 42

42

1  was concerned, this involved one truckload of corn, correct?
2  And, again, we're referring to Exhibit No. 5.
3      A   That is two truckloads.
4      Q   That's correct. We have two license numbers,
5  correct?
6      A   Correct, sir.
7      Q   Okay. And then, again, this is the same corn
8  that's referenced in Exhibit No. 2, the invoice that I
9  showed you earlier?
10     A   Correct, sir.
11     Q   And as far as creating this invoice, you don't
12 recall who it was that asked you to create Exhibit No. 5,
13 correct?
14     A   Would you rephrase --
15     Q   Okay. This particular invoice that's created that
16 says BG3?
17     A   Yes.
18     Q   You don't recall who asked you to create it,
19 correct?
20     A   That's part of our work when trucks are loaded.
21     Q   But I guess the question is you don't recall who
22 it was that asked you to create it, this invoice? In other
23 words, who asked you to create this invoice, do you recall?
24     A   No, I do not.
25         (Deposition Exhibit No. 6 was marked.)

PAGE 43

43

1      Q   (Mr. Mount) Let me show you what we just marked
2  as Exhibit No. 6, and it appears to be an invoice number BG
3  number 4, and ask you if you are able to identify that one?
4      A   Yes, sir.
5      Q   This document has your signature on the lower
6  right-hand corner above the words "B. G. Grain", correct?
7      A   Correct, sir.
8      Q   And it's your understanding B. G. Grain stands for
9  Bersain Gutierrez Grain, correct?
10     A   That's what I believe, sir.
11     Q   Then your signature appears above your name where
12 it says "notary public" also, correct?
13     A   Correct, sir.
14     Q   And it appears that you certified that this was a
15 true and correct copy of the document on August 27, 1997,
16 correct?
17     A   Correct, sir.
18     Q   And this is a document that would have been
19 created at Port Elevator-Brownsville, L.C., Exhibit No. 6,
20 correct?
21     A   Correct.
22     Q   As far as its creation date, would it have been
23 created on or about November 6, 1996?
24     A   Correct.
25     Q   So then you weren't asked to certify that it was a

PAGE 44

44

1  copy until about ten months later, nine or ten months later,
2  right? In other words, you were -- in other words, the
3  document was created on November 6, 1996, and that's the
4  date you signed it, yet you didn't swear that it was a true
5  and correct copy of the document until August 27, 1997,
6  correct?
7      A   I do not recall this.
8      Q   Well, if we look at each of those documents that
9  I've showed you --
10     A   Yes.
11     Q   -- starting with Exhibit No. 3, and go 3, 4, 5 and
12 6, each of those shows that you notarized them on August 27,
13 1997.
14     A   1997.
15     Q   Right. Yet, each of the documents -- if we look
16 at Exhibit No. 3, was created on November 4, 1996; Exhibit
17 No. --
18         MR. MOUNT: Scratch that.
19     Q   (Mr. Mount) Exhibit No. 3 was created on November
20 4, 1996. Exhibit No. 4 was created on November 5, 1996, and
21 then Exhibits 5 and 6 were created on November 6, 1996,
22 correct?
23     A   Correct.
24     Q   Are you aware of why it was that you -- or can you
25 tell the jury why it was that you notarized these particular

PAGE 45

45

1  documents, each of these four documents, on August 27, 1997?
2      A   I do not recall.
3      Q   In order to put your notary seal on them, these
4  four documents, Exhibits 3 through 6, do you recall if you
5  would have looked at the original and compared it to the
6  copy before you notarized the document?
7      A   That is correct.
8      Q   But earlier you said the originals would have gone
9  with the corn into Mexico, right?
10     A   With the broker, yes.
11     Q   With the broker?
12     A   That's correct.
13     Q   So do you recall who it was that you would have
14 seen the originals in order to say these were copies of the
15 originals?
16     A   I do not recall, sir.
17     Q   And as far as the broker is concerned for these
18 four shipments of corn contained in Exhibits 3 through 6, do
19 you know who the broker would have been?
20     A   I do not recall.
21     Q   As far as trying to attempt to recall, are there
22 any documents that you could look at at Port Elevator that
23 would help you to recall?
24     A   No, sir.
25         (Deposition Exhibit No. 7 was marked.)

SHEET 13  PAGE 46

**46**

1   Q   (Mr. Mount) Let me show you Exhibit No. 7.
2 That's a two page exhibit that has your signature on both
3 pages of it, right?
4   A   Correct.
5   Q   And this is invoice number BG5, correct?
6   A   Yes.
7   Q   This particular document would have been created
8 at Port Elevator-Brownsville, L.C., correct?
9   A   Correct.
10   Q   Your signature is on the first page of the
11 document above the words "B. G. Grain" or "Bersain Gutierrez
12 Grain", correct?
13   A   Correct.
14   Q   And on the second page your signature is above the
15 term "agent for B. G. Grain", correct?
16   A   Correct.
17   Q   This is involving five truckloads of corn,
18 correct?
19   A   Correct.
20   Q   Again, this is the same corn involved in the
21 invoice number 2, correct?
22   A   Correct.
23   Q   This corn has a value of -- appears to have a
24 value of $38,700.04, correct?
25   A   That's correct, sir.

PAGE 47

**47**

1   Q   And, again, it's based on a unit price of $210?
2   A   That's correct, sir.
3   Q   Then, again, you notarized this saying it was a
4 true and correct copy of the original on August 27, 1997,
5 correct?
6   A   Correct.
7   Q   But the document was created on November 12, 1996,
8 correct?
9   A   That's correct, sir.
10   Q   And then Ms. Gonzalez' signature also appears on
11 the second page of the document?
12   A   Correct.
13   Q   As far as this particular document and you saying
14 it's a copy on August 27, 1997, of the original, you don't
15 know why you did it on that particular day, correct?
16   A   I do not recall.
17   Q   As far as these exhibits are concerned, Exhibits 3
18 through 7, these are all invoices from or concerning B. G.
19 Grain, correct?
20   A   Correct.
21   Q   I believe we have invoice numbers BG1 through BG5,
22 correct?
23   A   Correct.
24   Q   As far a these invoices are concerned, each of
25 these invoices concern corn that was truckloaded out of Port

PAGE 48

**48**

1 Elevator-Brownsville, L.C., right?
2   A   Correct.
3   Q   You say these documents would have gone along with
4 the broker, right?
5   A   Correct.
6   Q   And you don't know who the broker is, right?
7   A   I do not recall.
8   Q   As far as other documentation that would have gone
9 along with the broker, do you know of any other
10 documentation that would generally go along with the broker,
11 other than what you've -- what we've looked at, Exhibits 3
12 through 7?
13   A   Weight tickets.
14   Q   As far as the weight tickets are concerned, those
15 are something that is created at Port Elevator-Brownsville,
16 L.C., correct?
17   A   Correct.
18   Q   The corn is weighed somehow before --
19   A   That's correct.
20   Q   What other documentation, generally, would go
21 along with the corn? And, again, I'm referring to Exhibits
22 3 through 7 concerning the corn that was shipped into
23 Mexico.
24   A   Weight ticket and invoice.
25   Q   Okay. So we have the invoices here, 3 through 7,

PAGE 49

**49**

1 right?
2   A   Uh-huh. That's correct.
3   Q   Okay. And then weight tickets, too, right, that
4 would go along?
5   A   That's correct.
6   Q   Then what about any documentation to show the
7 quality or the origin of the corn? Any type of documents
8 that --
9   A   The quality.
10   Q   And, for instance --
11   A   A grade.
12   Q   Would we have like a certificate of quality
13 document that would go along with the corn?
14   A   I believe so, yes.
15   Q   And what about a certificate of origin document,
16 would that go along with the corn to?
17   A   No, sir.
18   Q   What is a certificate of origin document, if you
19 know?
20   A   No.
21   Q   What about a -- I think it's called a phyto
22 sanitary certificate?
23   A   Okay.
24   Q   Are you familiar with those?
25   A   Yes, sir.

---

SHEET 14    PAGE 50

50

1    Q    Do those go along with the corn, too?
2    A    Yes, sir; that's correct.
3    Q    What is a -- what's your understanding of what a
4    phyto sanitary certificate is? I mean, what is it?
5    A    It's a government certificate by the USDA that
6    states the amount of trucks, rail and weight, and the origin
7    of the product and type of product.
8    Q    It's a document that's created by the government,
9    right? It's created by the government or the Department of
10    Agriculture?
11    A    Yes. That's correct.
12    Q    Generally, that would go along with the corn, too?
13    A    Yes.
14    Q    And then can you think of anything else, any other
15    paperwork that might go along with the corn?
16    A    No, sir.
17    Q    At Port Elevator-Brownsville, L.C., does the
18    business -- do they issue warehouse receipts for either corn
19    or grain that they hold?
20    A    I believe so, yes.
21    Q    And as far as those warehouse receipts being
22    issued, who generally issues them?
23    A    Rephrase your question.
24    Q    Okay. You mentioned that warehouse receipts --
25    A    Yes.

---

PAGE 51

51

1    Q    -- sometimes are issued by Port Elevator-
2    Brownsville, L.C. I'm trying to find out whether it's Mr.
3    Elkins that issues these receipts or is it some other person
4    that might issue them?
5    A    It would be Mr. Elkins.
6    Q    Do you ever issue warehouse receipts?
7    A    No, sir. I do not.
8    Q    Okay. So you've never done that, right?
9    A    No.
10    Q    As far as where you work at Port Elevator-
11    Brownsville, L.C., where is it that you work in relation to
12    where Mr. Elkins works or has his office?
13    A    It's the same building, different offices.
14    Q    Okay. Do you have your own office within the
15    building or are you outside in a general area?
16    A    Outside in a general area.
17    Q    Is your area close to where Mr. Elkins is?
18    A    Yes.
19    Q    About how far is where you work from where his
20    office is?
21    A    From here to the window.
22    Q    So -- I mean, I'm not very good at figuring that
23    out, but that's not very far away, is it?
24    A    No, sir.
25    Q    Okay. And you work at a desk, right?

---

PAGE 52

52

1    A    That's correct.
2    Q    I presume Mr. Elkins has a desk in his office?
3    A    That's correct.
4    Q    As far as a shipment of corn or grain coming into
5    Port Elevator-Brownsville, L.C., what is the general
6    protocol or what have you, as far as corn or grain that's
7    coming in by train? How is that usually handled?
8    A    Would you rephrase -- I mean repeat your question,
9    please?
10    Q    Okay. When Port Elevator-Brownsville, L.C.
11    receives a shipment of grain or corn by train into the
12    facility, based on your knowledge, how is the -- how is
13    it usually handled, as far as the trainload coming in?
14    A    That's handled by Mr. Elkins, so -- I don't really
15    understand your question as to --
16    Q    I'm trying to find out what the process is. In
17    other words, is it weighed when it comes in?
18    Q    Yes.
19    Q    That would be one question.
20    A    Yes.
21    Q    Okay.
22    A    Okay.
23    Q    So -- and as far as being involved in the
24    weighing, you're not involved in that?
25    A    No. No, I am not.

---

PAGE 53

53

1    Q    And then as far as the documentation that comes
2    with the trainload, is there any type of documentation that
3    will come with a trainload of corn, based on your knowledge?
4    A    Not -- no. I don't handle that, so I would not
5    know.
6    Q    Okay. Let me ask you this. On days that Mr.
7    Elkins is out traveling, who would handle a shipment of corn
8    or grain that might come into the Elevator?
9    A    Let me ask, how would you -- what do you mean by
10    handle?
11    Q    Well, you mentioned that as far as shipments of
12    corn or grain coming into the Elevator, that usually Mr.
13    Elkins handles the corn or grain coming in, as far as --
14    A    The paperwork involved.
15    Q    -- as far as the paperwork?
16    A    Yes.
17    Q    As far as the paperwork, correct? And Mr. Elkins
18    travels a lot, does he not?
19    A    Correct.
20    Q    On days that he's out traveling and he's not in
21    the office and you may get a shipment of corn or grain by
22    train in, who would handle the paperwork on those days?
23    A    Everything has been -- he has left everything
24    prepared in advance for any incoming or outgoing shipments.
25    Q    All right. So even if he's out traveling or what

---

SHEET 15   PAGE 54

**54**

1  have you, he's aware of what's going --
2  A   That's correct.
3  Q   It's your understanding he's aware of what's going
4  on?
5  A   That is correct.
6  Q   Okay. And so then it's your understanding that he
7  handles all the paperwork concerning the shipments that are
8  coming in, even if he's out of town?
9  A   That is correct.
10  Q   As far as your deposition is concerned, did you
11  get to see Exhibit 1 prior to your deposition, which is the
12  deposition notice along with the request for documents?
13  A   Yes.
14  Q   Okay. And as far as documents are concerned, did
15  you bring anything with you to your deposition that might be
16  responsive to the document request?
17  A   Notary log. Notary log.
18  Q   Okay. Let me -- if you could hand me the last
19  page and just let me ask you, number one asks for any and
20  all documents that you reviewed in preparation for your
21  deposition. Did you look at any documents?
22  A   A copy of --
23  Q   What you looked at was a copy of the invoice that
24  we marked as Exhibit No. 2, correct?
25  A   Correct.

PAGE 55

**55**

1  Q   And I presume that you went over this document
2  with your counsel or discussed it with your counsel?
3  MR. SKAGGS:  Ma'am, you don't need to answer
4  that question about conversations you might have had with
5  your lawyer, and I will instruct you that you don't have to
6  answer that, and I'll object to that question.
7  Q   (Mr. Mount) Did you discuss this document at all
8  with Mr. Elkins prior to your deposition?
9  MR. SKAGGS:  I'll instruct you that you don't
10  have to answer questions that have to do with conversations
11  between you and your employer who has been sued as a party
12  in this case that relate to the facts having to do with the
13  case. I'll object to that question and I will instruct you
14  not to answer that question as phrased.
15  Q   (Mr. Mount) So the only document you reviewed
16  prior to your deposition was probably your -- was Exhibit
17  No. 2 and your notary book, correct?
18  A   That's correct.
19  Q   Okay. And then number two, you brought your
20  notary public book for the years '96 through '98, right?
21  A   That's correct.
22  Q   Okay. And then number three we asked for any and
23  all documents in your possession, custody and/or control
24  related to the corn that is the subject of this dispute.
25  MR. SKAGGS:  All of those documents are in

PAGE 56

**56**

1  the possession, custody, or control of her employer, Port
2  Elevator, so she has no such documents.
3  Q   (Mr. Mount) Number four asks for --
4  MR. MOUNT:  And I presume that Port Elevator
5  has produced those documents already?
6  MR. SKAGGS:  I don't know if --
7  MR. MOUNT:  You don't know, okay.
8  Q   (Mr. Mount) Number four asks for your most recent
9  resume, if you have one. No?
10  A   I do not have one.
11  Q   You don't have one. Number five asks for your
12  file, your employee file with your employer.
13  MR. SKAGGS:  And, again, that's in the
14  possession of her employer, and if asked of her employer,
15  we'll respond to it appropriately, but she does not have
16  possession, custody, or control of her employer's employee
17  file on her.
18  Q   (Mr. Mount) As far as the employee files there at
19  Port Elevator-Brownsville, L.C., who is the custodian of
20  those files or who keeps them in the daily course of
21  business?
22  A   Ask that question again, please.
23  Q   Okay. I presume that at Port Elevator-
24  Brownsville, L.C. you've got employee files on employees,
25  right?

PAGE 57

**57**

1  A   Correct.
2  Q   As far as the person that's in charge of record
3  keeping there, wouldn't that be yourself --
4  A   That's correct.
5  Q   -- as the bookkeeper? Okay. So you're in charge
6  of the employee files there, correct?
7  A   Correct.
8  Q   All right. So if -- say when Ms. Gonzalez was
9  working there and you needed to put something in her
10  employee file, you would be the one to do that?
11  A   Correct.
12  Q   Do you mind if I take a look at your notary book,
13  briefly? Thank you.
14  MR. MOUNT:  Why don't we just go off the
15  record briefly.
16  MR. SKAGGS:  Sure.
17  (OFF THE RECORD) (11:30-11:39)
18  (Deposition Exhibit No. 8 was marked.)
19  Q   (Mr. Mount) Let me show you Exhibit No. 8. Do
20  you recognize Exhibit No. 8 as being excerpts from your
21  notary public record book?
22  A   Correct.
23  Q   Those particular records are records that you keep
24  in the ordinary course of your business as a notary public,
25  correct?

Port Elevator-Brownsville V. Ivonne Soto Vega
DEPOSITION OF MARIA GONZALEZ
6-22-01

SHEET 16   PAGE 58

58

```
1     A    Correct.
2     Q    The entries made in that book are made at or near
the time of the events, act, or conditions reflected
therein, correct?
5     A    Correct.
6          MR. SKAGGS:  I'll stipulate that those are
authentic documents.
8          MR. MOUNT:  Thank you.  And you're
stipulating that they're her business records, correct?
10         MR. SKAGGS:  Well, yes, they're authentic for
all evidentiary purposes.  They're real.
12         MR. MOUNT:  Thank you.
13         MR. SKAGGS:  You're welcome.
14    Q    (Mr. Mount)  Concerning the issue or the matters
that we're here for, it's your understanding we're here over
a dispute over who owns some corn, correct?
17    A    Correct.
18    Q    And as far as that dispute goes, do you have any
evidence or know of any evidence that would show who owns
the corn that's in dispute?
21    A    No, I do not.
22    Q    And so, obviously, you don't have an opinion today
as to who owned the corn that is in dispute, correct?
24    A    Correct.
25    Q    And as far as any documents that have -- that
```

PAGE 59

59

```
1     you're aware of concerning the corn in dispute, really the
only thing you've ever seen has been Exhibit No. 2, that
commercial invoice that you notarized, correct?
4     A    Correct.
5     Q    And I guess -- I guess for clarity on the record,
you also saw Exhibits 3 through 7, which were BG invoices,
correct?
8     A    Correct.
9     Q    So as far as your knowledge is concerned, you
don't know who owns or owned the corn in dispute, right?
11    A    Correct.
12    Q    You're just here as a bookkeeper for Port
Elevator-Brownsville, L.C., right?
14    A    That is correct, sir.
15    Q    As a bookkeeper for Brownsville Port -- excuse me.
As a bookkeeper for Port Elevator-Brownsville, L.C., do you
ever cut checks for Mr. Elkins, as far as his salary is
concerned?
19    A    No, sir.  I do not.
20    Q    So as far as since you've been there since, I
think you said, 1970, you've never cut a check for him for
his salary, correct?
23    A    No, that is not correct, sir.
24    Q    It's your understanding that he's paid by
Southwest Grain Co., Inc.?
```

PAGE 60

60

```
1     A    I do not know.
2     Q    You don't know?
3     A    No.
4     Q    So you don't know how Mr. --
5     A    No.
6     Q    -- Elkins is compensated, right?
7     A    No.
8     Q    And at least since 1996 you haven't known how he's
been compensated, correct?
10    A    That's correct, sir.
11    Q    And as far as the number of employees there at
that particular business is concerned, Port Elevator-
Brownsville, L.C., how many employees does the business
have?
15    A    At the moment?
16    Q    Yes.
17    A    Twenty.
18    Q    Twenty.  And as far as the hierarchy is concerned,
Mr. Elkins would be at the top of the hierarchy; is that
right, or would there be someone else at the top?
21    A    At Port Elevator?
22    Q    Right.  Who runs the Port Elevator?
23    A    Mr. Craig Elkins.
24    Q    Okay.  And are there any lieutenants or anybody
right under him that assist him?
```

PAGE 61

61

```
1     A    We have a foreman.
2     Q    Okay.  And what is the foreman's name?
3     A    Porfirio Vela.
4     Q    How long has Mr. Vela been there?
5     A    Ten years.
6     Q    What does Mr. Vela do?
7     A    He's a foreman at the Elevator.
8     Q    And what do foremen do?  For instance, what does
he do on a daily basis that you see that he does?
10    A    Carries out the instructions from Mr. Craig
Elkins.
12    Q    And does Mr. Elkins have anybody else that's right
under him that helps him besides Mr. Vela?
14    A    Not at the Elevator.
15    Q    Are there other businesses that Mr. Elkins is into
other than the business at the Elevator?
17    A    I do not know.
18    Q    So you don't know what other businesses he might
be into?
20    A    No.  I do not know, sir.
21    Q    When he's at the Elevator, does he ever conduct
work concerning other businesses, while he's at the
Elevator?
24    A    I would not know, sir.
25    Q    Besides yourself and Mr. Vela, can you think of
```

Port Elevator-Brownsville V. Ivonne Soto Vega
DEPOSITION OF MARIA GONZALEZ
6-22-01

SHEET 17   PAGE 62

62
1  any other employees that have been there for a long period
2  of time?
3      A   Yes.
4      Q   Could you give me some of those names?
5      A   Juan Antonio Dorado;  Leocardio Gutierrez;
6  (phonics) Juventino Abrego;  Leonardo Gamez.
7      Q   How long has Mr. Alvarado been there?
8      A   Alvarado?
9      Q   Didn't you say Juan Antonio --
10     A   Dorado.
11     Q   Dorado.  Okay.  How long has Mr. Dorado been
12  there?
13     A   He's been there since 1970.
14     Q   And then Mr. Gutierrez?
15     A   Same.
16     Q   Mr. Abrego?
17     A   Same.
18     Q   Mr. Gomez?
19     A   Gamez.
20     Q   Gamez.
21     A   Same.
22     Q   What does Mr. Dorado do?
23     A   He works in the control room, the weigh in, in the
24  control room.
25     Q   What does Mr. Gutierrez do?

PAGE 63

63
1      A   I believe he works in the basement.
2      Q   And then Mr. Abrego, what does he do?
3      A   I believe he's in the head house.
4      Q   What does he do in the head house?
5      A   I really do not know.
6      Q   Mr. Gamez.  Do you know what Mr. Gamez does?
7      A   Maintenance.
8      Q   You write checks for all of these people, right?
9      A   That is correct.
10     Q   You pay them, right?
11     A   Yes.
12     Q   Okay.  As far as preparing storage charges on corn
13  or grain that's being held at the Elevator, who is it that
14  prepares the bills on those storage charges?
15     A   Mr. Elkins.
16     Q   So as far as preparing those type of bills, those
17  aren't something that you do, right?
18     A   I just input into computer.
19     Q   Okay.  So Mr. Elkins might give you some
20  information in order to create a bill; is that right?
21     A   That is correct.
22     Q   Okay.  You mentioned earlier that you met Ms. Vega
23  on one occasion, right?
24     A   She came by the office, yes.
25     Q   Do you recall when it was she came by the office?

PAGE 64

64
1      A   I'm sorry?
2      Q   Do you recall when it was that she came by the
3  office?
4      A   No.
5      Q   When she came by the office, she spoke to you, I
6  presume.  Did she speak to you?
7      A   Yes, she did.
8      Q   Do you recall what was discussed when you spoke
9  with her?
10     A   She wanted to talk to Mr. Craig Elkins.  I believe
11  he was out of town at the time.
12     Q   Was there anybody else with her when she came to
13  try and meet with Mr. Elkins?
14     A   I do not recall.
15     Q   Do you recall anything else regarding that
16  conversation other than she came and talked to you about
17  wanting to speak with Mr. Elkins?
18     A   No.
19     Q   Do you recall if you've ever spoken with Ms. Vega
20  on the telephone?
21     A   No, I have not.
22     Q   As far as her coming to the Elevator, and that
23  would be Ms. Vega, you can't recall what year it was, right?
24     A   I don't know if it was '97 or '98.
25     Q   So, in your mind, it could have been one of those

PAGE 65

65
1  two years, either '97 or '98?
2      A   That's correct.
3      Q   Have you ever discussed this particular -- well,
4  actually, have you ever discussed with Mr. Elkins this
5  dispute concerning the corn that we're here for today?
6      A   No, I have not.
7      Q   As far as speaking to Mr. Gutierrez, I think you
8  saw him on, what, two occasions?
9      A   I believe so, yes.
10     Q   And as far as any conversations that you ever had
11  with him, can you recall any of your conversations that you
12  ever had with him?
13     A   No.
14     Q   Have you ever spoken with him on the telephone?
15     A   If he called, yes, to speak to Mr. Elkins.
16     Q   Okay.  But you never spoke to him about any
17  elevator business?
18     A   No.  No, I did not.
19     Q   That is if he ever called, you would have passed
20  the call directly on to Mr. Elkins?
21     A   He would call to speak to him, yes.
22     Q   Have you ever met Guillermo Vega?
23     A   No.
24         MR. MOUNT:  I believe at this time I'll pass
25  the witness.  (11:51)

*Compliments of Action Reporting*
1-800-884-1024 / 956-631-1024

SHEET 18   PAGE 66

**66**

1    MR. SKAGGS: Thank you, Counsel.
2         E X A M I N A T I O N
3    BY MR. SKAGGS:
4    Q    Ms. Gonzalez, you understand that this deposition
5    might not be read to or presented to the jury in the same
6    order it was taken, and so I might have to ask you some
7    questions that you've already answered?  Do you understand
8    that?
9    A    Yes, sir.
10   Q    And you'll bear with me while I do that?
11   A    Yes, sir.
12   Q    Please state your name for the record.
13   A    Maria Gonzalez.
14   Q    And, Ms. Gonzalez, what did you do for a living,
15   what did you do for a job, back in 1996?
16   A    1996 I was employed by Port Elevator-Brownsville.
17   Q    You have been employed at the Port of Brownsville
18   for how many years?
19   A    Going on thirty-one.
20   Q    Before you worked for Port of Brownsville, did you
21   work for the Brownsville Navigation District?
22   A    That is correct.
23   Q    And when did you start working for the Brownsville
24   Navigation District?
25   A    August the 17th of 1970.

PAGE 67

**67**

1    Q    And then you continued to work at the Brownsville
2    Navigation District and ultimately went to work specifically
3    at the grain elevator that's at the Port; is that right?
4    A    That's correct.
5    Q    Did you start working at the grain elevator that's
6    at the port before Craig Elkins became associated with the
7    grain elevator?
8    A    That's correct.
9    Q    So you've been there as an employee at the grain
10   elevator even before the present owners or managers of the
11   Elevator were there; is that correct?
12   A    That's correct.
13   Q    During all of that time, have you, basically, done
14   the same thing at the Elevator?  And by that, I mean have
15   you had the same kind of job duties and so forth, or did
16   they change when the new owners or manager --
17   A    They changed some.
18   Q    In 1996, what kind of work did you do for the
19   Elevator?
20   A    Payroll, general ledger, accounts payable.
21   Q    Kind of the bookkeeper; is that right?
22   A    Kind of bookkeeper, yes.
23   Q    All right.  In connection with that employment,
24   you handle certain documents and you file certain documents
25   and so forth; do you do that?

PAGE 68

**68**

1    MR. MOUNT: Objection, leading.
2    Q    (Mr. Skaggs) Tell me what you do -- what your
3    involvement with document handling is.  What do you do with
4    documents when -- that you have to handle in the Elevator?
5    A    Documents would be like weight certificates and do
6    phytos on things that are exported, that are going into
7    Mexico?
8    Q    Whatever it is that you might handle on a day-to-
9    day basis.  What do you do with them?
10   A    That would be about it.  I prepare the phyto
11   sanitary certificates.
12   Q    All right.  Are you the filing person for the kind
13   of documents that have to do with the things that you're
14   involved with as a bookkeeper?
15   A    Yes.
16   Q    All right.  Separate and apart from your job and
17   your duties at Port Elevator, are you also a State official?
18   A    Notary public.
19   Q    Your notary public commission comes from the State
20   of Texas, is that correct?
21   A    That is correct.
22   Q    Port Elevator-Brownsville does not issue your
23   notary public certificate; is that right?
24   MR. MOUNT: Object to form, leading.
25   Q    (Mr. Skaggs) Do you know whether Port Elevator

PAGE 69

**69**

1    issues your notary public certificate?
2    A    They do not.
3    Q    Do you understand that you're bound by statutes
4    and rules and regulations that govern the behavior of a
5    notary public?
6    MR. MOUNT: Objection, leading and calls for
7    a legal conclusion.
8    A    (Witness)  That's correct.
9    Q    Have you eve read any of the statutes or
10   regulations or rules that have to do with being a notary
11   public?
12   A    Yes.
13   Q    Do you know whether or not you have any particular
14   duties as a notary public?
15   A    Would you repeat your question?
16   Q    Well, do you have any understanding about the kind
17   of things you can and can't do as a notary public -- as a --
18   as a State official?
19   A    Yes.
20   Q    And, generally, what are those rules?
21   MR. MOUNT: Object -- object as calling for a
22   legal conclusion.
23   Q    (Mr. Skaggs)  I only ask you for the rules that
24   you know about or are aware of sitting here that you've read
25   about.  I'm not going to ask you what your opinion of those

SHEET 19    PAGE 70

70
1   rules is.  I just want to know which ones you know about,
2   what you understand from your reading of those.
3        A    When you notarize a signature of a person, that
4   person must be present.  You must see his ID to be sure he
5   is the person that he claims, you know, to be.
6        Q    Right.  Do you purchase and are you subject to a
7   bond as a notary public to secure the proper function of
8   your duties?
9             MR. MOUNT:  Objection, leading.
10       A    (Witness)  Yes.
11       Q    Is your bond current?
12       A    Yes.
13       Q    Have you maintained the bond for the entire time
14  you've been a notary public?
15       A    Yes.
16       Q    Since what year have you been a notary public,
17  ma'am?
18       A    I believe it's 1991.
19       Q    In connection with your duties as a notary public,
20  do you maintain a notary public record book?
21       A    Yes.
22       Q    Is that a faithful record of all of the signatures
23  that you have witnessed and notarized during your tenure as
24  a notary public during the years 1996 and 1997?
25       A    Yes.

PAGE 71

71
1        Q    There has been a copy of your notary public book
2   which has been made and which has been attached to your
3   deposition that contains the entries that you have made; is
4   that correct?
5        A    That's correct.
6        Q    Could you read the exhibit number from the lower
7   right-hand corner of that copy of your official notary
8   public record book?
9        A    Eight.
10       Q    That would be Exhibit No. 8?
11       A    Uh-huh.
12       Q    All right.  You have been asked at a different
13  part of the deposition by the other lawyer in this case some
14  questions about something that's called Deposition Exhibit
15  No. 2, which is a different exhibit number from the one that
16  is your notary public book.
17       A    Yes.
18       Q    Do you recognize that piece of paper?
19       A    Yes.
20       Q    Does that piece of paper have your signature on
21  it?
22       A    Yes, it does.
23       Q    Did you notarize that piece of paper as part of
24  your formal duties as an official of the State of Texas?
25            MR. MOUNT:  Objection, leading.

PAGE 72

72
1        A    (Witness)  Yes.
2        Q    Can you describe the process -- and what I'm
3   curious about right now is -- well, let me ask the question
4   this way.  Do you actually recall the day that you notarized
5   this particular document, this Exhibit No. 2?
6        A    Yes.
7        Q    Can you describe the process of what happened?
8   And by that I mean who asked you to notarize the document,
9   who handed you the document, what you asked from them and so
10  forth, and you can tell it in your own words?
11            MR. MOUNT:  Objection, compound question, and
12  it calls for a narrative.
13       Q    (Mr. Skaggs)  Would you please describe the
14  process of notarizing this particular document, Exhibit No.
15  2?
16            MR. MOUNT:  Objection, calls for a narrative.
17       A    (Witness)  Mr. Bersain Gutierrez and Mr. Walter
18  Puffelis appeared there and they had this document with
19  them.
20       Q    And when you say appeared, do you mean like came
21  in the door?
22       A    They came in the door.
23       Q    Okay.
24       A    They came into the office.
25       Q    All right.

PAGE 73

73
1        A    They were there, and they wanted this notarized.
2   They wanted me to notarize Mr. Bersain Gutierrez' signature,
3   so I asked for his ID and he signed in front of me and I
4   notarized his signature.
5        Q    All right.
6             MR. MOUNT:  Objection, nonresponsive.  There
7   wasn't a question on the table.
8        Q    (Mr. Skaggs)  And you did see -- and did you see
9   Mr. Bersain Gutierrez' ID?
10       A    Yes, I did.
11       Q    That entire process that you have just described,
12  can you estimate, in seconds or minutes, how long that
13  process took?
14            MR. MOUNT:  Objection, calls for speculation.
15       A    (Witness)  One minute.
16       Q    All right.  There was somebody else speaking in
17  the room.  Can you go ahead and answer that question again?
18            MR. MOUNT:  Same objection.
19       A    (Witness)  One minute.
20       Q    All right.  Do you think it might have taken more
21  or less time, or do you have any idea?
22       A    Maybe thirty seconds more.
23       Q    When you notarize a document, do you keep copies
24  of the documents that you notarize?
25       A    No, I do not.

SHEET 20  PAGE 74

**74**

1  Q   Were you provided with a copy of this document,
2  this Exhibit No. 2, to keep?
3  A   No, I was not.
4  Q   Was it offered to you to keep?
5  A   No, it was not.
6  Q   During the, approximately, one minute that you
7  described, would you have read every word of everything
8  that's in that document?
9  A   No, I would not.
10 Q   In fact, did you read every word?
11 A   No, I did not.
12 Q   Is there anything factually about this document
13 that leads you to believe that it was altered, changed,
14 after you notarized the document?
15     MR. MOUNT:  Object to form.  Calls for
16 speculation.
17 A   (Witness)  Yes.
18 Q   Would you tell me just the things that you see on
19 that document which factually lead you to believe or lead to
20 conclude that the document was altered after you notarized
21 it?
22 A   It has "Or Mrs. Ivonne Soto Vega", and that was
23 not on there, or I would not have notarized it.
24 Q   All right.  Would you hold that piece of paper up?
25 There's a lady who is running a videotape who is going to

PAGE 75

**75**

1  get to show the videotape to the jury one day.  You need to
2  hold it very very still so that the lady can zoom in on what
3  you're talking about.  Now I know you can see the shadow of
4  my finger through the paper, and I'll ask you am I pointing
5  to what you were just describing to the jury?
6  A   That is correct.
7  Q   All right.  That -- you can put that down now.  I
8  think the jury has probably seen it.  Do you -- now that the
9  jury has seen what you're talking about -- well, I tell you
10 what, let's hold it up again because you may need to
11 describe it.  I'm going to hold it for you.  I'm going to
12 move it slowly so the lady can follow us, and I'm going to
13 ask you to please point to what it was that leads you to
14 conclude that the document was altered after it was signed
15 by you or acknowledged by you.
16 A   The typing of Mrs. Ivonne Soto Vega is over the
17 signature of Mr. Bersain Soto.
18 Q   Will you notarize a document that has an alternate
19 or two signatures that might have appeared in a blank?
20 A   No, I would not.
21 Q   Have you ever done that, to your knowledge?
22 A   No, I have not.
23 Q   If the language "Mr. Bersain Gutierrez or Mrs.
24 Ivonne Soto Vega" had appeared in the document that you were
25 handed that day, would you have notarized it in that form?

PAGE 76

**76**

1      MR. MOUNT:  Object to form.  Assumes facts
2  not in evidence.
3  A   (Witness)  No.
4  Q   Did you notarize it in that form?
5      MR. MOUNT:  Same objection.
6  A   (Witness)  No, I did not.
7  Q   Are you certain, as you sit here today, to the
8  best you can say, and it's a number of years later, did you
9  -- did you notarize that document in the form it's in right
10 now?
11     MR. MOUNT:  Objection, asked and answered.
12 A   (Witness)  No, I did not.
13     MR. SKAGGS:  I'll pass the witness, and thank
14 you very much.  (12:02)
15          R E - E X A M I N A T I O N
16 BY MR. MOUNT:
17 Q   Concerning the particular document that Mr. Skaggs
18 has shown you, Exhibit No. 2, you earlier said that you
19 notarized this particular document, correct?
20 A   Correct.
21 Q   And as far as this particular document is
22 concerned, would you agree with me that you may have read
23 this particular document before you notarized it?
24 A   No.  I was only notarizing his signature on the
25 document.

PAGE 77

**77**

1  Q   And as far as notarizing his signature on the
2  document, then you would have actually read his particular
3  name on the document, correct?
4  A   That is correct.
5  Q   So you would have actually -- you would have
6  looked at the document prior to notarizing it, correct?
7  A   His name and his signature.
8  Q   Right.  And earlier you said this whole process
9  took a minute to a minute and a half maximum, correct?
10 A   Correct.
11 Q   And as far as the process is concerned, it took
12 place at the counter there at the front of Port Elevator; is
13 that right?
14 A   The witnessing of his signature?
15 Q   Right.
16 A   Yes.
17 Q   Right.  Okay.  And so what you're telling me that
18 during that entire one to one and a half minutes, you were
19 able to witness his signature and then also take his ID and
20 to sign your name, correct?
21 A   Correct.
22 Q   And does that also include the time that it took
23 for you to actually take this document and put it in your
24 typewriter and type in the words that we've already talked
25 about that you typed in, correct?

Port Elevator-Brownsville V. Ivonne Soto Vega
DEPOSITION OF MARIA GONZALEZ
6-22-01

SHEET 21   PAGE 78

78
```
1       A    The "sworn and subscribed"?
2       Q    Right.
3       A    I have that in memory, so that just -- it's in
4  memory on my typewriter.
5       Q    Right.  And so it's your testimony that you were
6  able to have that typed out also within that minute to a
7  minute and a half period, correct?
8       A    That's correct.
9       Q    And as far as your typewriter is located, is your
10 typewriter located right there at the reception area of Port
11 Elevator?
12      A    Yes.
13      Q    And as far as your typing is concerned, you say
14 that you have that particular form in your memory; is that
15 right?
16      A    Yes, that's correct.
17      Q    But you would have to change the date?
18      A    No, that's blank spaces and I filled them in.
19      Q    Okay.  So you would have actually had to type
20 those in yourself, correct?
21      A    That's correct.
22      Q    So as far as actual typing is concerned, you would
23 have actually had to type October 30th, and then '96,
24 correct?
25      A    Correct.
```

PAGE 79

79
```
1       Q    And as far as the type is concerned where it says
2  "Mr. Bersain Gutierrez or Mrs. Ivonne Soto Vega" -- you see
3  that typed right there?
4       A    That's correct.
5       Q    You see that?
6       A    Yes.
7       Q    That appears to be in the same type format,
8  correct?  That appears to be in the same type format,
9  correct?
10      A    Yes.
11      Q    In other words it's all in capital letters,
12 correct?
13      A    Correct.
14      Q    And it appears to have come from the same
15 typewriter, correct?
16      A    That's the way it looks.
17      Q    Okay.  And as far as this particular document is
18 concerned, who was it that you gave this particular document
19 back to after you notarized it?
20      A    Mr. Gutierrez.
21      Q    And as far as the signature for Mr. Puffelis is
22 concerned, do you recall whether his signature was on that
23 document at the time or not?
24      A    I believe it was, but I am not certain.
25      Q    As far as notary rules are concerned, when you
```

PAGE 80

80
```
1  notarize a signature, is it proper to notarize a signature
2  such as Mr. Gutierrez' here when you have the language "Mr.
3  Bersain Gutierrez or Mrs. Ivonne Soto Vega"?
4       A    No, it would not be, but I do not recall her name
5  as being on there.
6       Q    It may have been on there, you just don't recall?
7       A    He signed it and I -- the best of my knowledge,
8  his name was the only one on there.
9       Q    My question is her name could have been on there
10 at the time?
11      A    I do not believe so.
12      Q    And if it's your belief her name wasn't on this
13 particular document, you have no idea the circumstances
14 involving how that name got on there or not, correct?
15      A    Correct.
16      Q    As far as this document is concerned, do you
17 recall where it says date, 10-30-96, do you see that there?
18      A    Yes.
19      Q    Concerning that particular date, is that your
20 handwriting for the date?
21      A    No, it is not.
22      Q    Do you know whose handwriting that is?
23      A    No, I do not.
24      Q    Do you recall if that date was on there at the
25 time you notarized the document?
```

PAGE 81

81
```
1       A    No, I do not.
2       Q    Let me ask you some questions here about your
3  notary book.  Actually, I'll let you keep the book and I'll
4  take the exhibit.  You have an acknowledge -- you have a
5  notarization done on January 4, 1996, correct, in your book?
6       A    That's correct.
7       Q    And the notarization that was done on January 4,
8  1996 is the first notarization that appears in your book,
9  right?
10      A    That's correct.
11      Q    And this was concerning a Robert W. Fielding; is
12 that correct?
13      A    That's correct.
14      Q    And it appears from what you say, you were
15 notarizing a power of attorney; is that correct?
16      A    That's correct.
17      Q    Do you recall the circumstances of notarizing that
18 particular document?
19      A    No, not really, other than Bobby was employed at
20 the Elevator.
21      Q    As far as what that document was for --
22      A    No.
23      Q    -- you don't know?
24      A    No, I do not know.
25      Q    And as far as who would have been present at the
```

SHEET 22   PAGE 82

82

1  time it was notarized, you don't remember who was present,
2  do you?
3      A   Bobby Fielding.
4      Q   Other than Mr. Fielding, do you recall if anyone
5  else was present or not?
6      A   No.
7      Q   Do you remember the circumstances of notarizing
8  that particular document?
9      A   No, I do not.
10     Q   Okay.  The next document you notarized was on May
11 17, 1996, according to your book, correct?
12     A   Uh-huh.
13     Q   Is that a "yes"?
14     A   Yes.
15     Q   And you have a notation that you notarized a
16 financial statement, correct?
17     A   Correct.
18     Q   And you notarized that for Craig Elkins, correct?
19     A   That's correct.
20     Q   Concerning the circumstances of notarizing that
21 particular document, do you recall what the circumstances
22 were --
23     A   No.
24     Q   -- concerning notarizing that document?
25     A   No, I do not.

PAGE 83

83

1      Q   Then your next two entries are for Mr. Gutierrez,
2  dated November -- dated October 3, 1996 and November 1,
3  1996, correct?
4      A   That's correct.
5      Q   The next entry you have is November 8, 1996,
6  concerning notarizing a document, correct?
7      A   Correct.
8      Q   And according to your book, you notarized a letter
9  for your supervisor or boss, Craig Elkins, correct?
10     A   Correct.
11     Q   Concerning that particular document that was
12 notarized, do you recall the circumstances of that
13 particular notarization?
14     A   No, I do not.
15     Q   Then your next notarization that was done was on
16 February 26, 1997.  Do you see that in your book?
17     A   Yes.
18     Q   You notarized a document for Craig Elkins, right?
19     A   Correct.
20     Q   And your book says it's for what type of document?
21     A   Title.
22     Q   Do you recall the circumstances concerning
23 notarizing that particular document?
24     A   No, I do not.
25     Q   And then your next entry is March 3, 1997, where

PAGE 84

84

1  you notarize a document for Sandra Lee Gonzalez, correct?
2      A   Yes.
3      Q   Do you recall what the circumstances were
4  concerning notarizing that particular document?
5      A   I had to notarize the paperwork for a public
6  weigher.
7      Q   It says type of document, correct, bond weigher?
8      A   Yes.
9      Q   All right.  But as far as the particular
10 circumstances as to who was there, what was done, or the
11 length of time that it took to notarize that document, you
12 couldn't give me testimony?
13     A   No.  Who was there, other than Sandra?
14     Q   Right.  You couldn't give me --
15     A   No.
16     Q   And you couldn't give me how long it took to
17 notarize that document, either?
18     A   No.
19     Q   And you couldn't tell me, as we sit here today,
20 what was on that particular document, other than the
21 description of the document?
22     A   On the weigher's bond?
23     Q   Right.
24     A   It's a bond that comes from the State, and I
25 notarized her signature on there.

PAGE 85

85

1      Q   So again as far as the exact timing and the
2  circumstances, you couldn't tell me that information,
3  correct?
4      A   Correct.
5      Q   Then the next entry is March 14, 1997, which is
6  the last entry in your notary public book, correct?
7      A   Correct.
8      Q   You notarized a signature for who?
9      A   Henry Hart Garig.
10     Q   Who is Mr. Garig?
11     A   He was employed there at that time.
12     Q   You notarized what for him?
13     A   Cash surrender release.
14     Q   You're getting that information from your log
15 book, correct?
16     A   Yes, that's correct.
17     Q   As far as the exact circumstances concerning what
18 happened when it was notarized, you can't recall the
19 circumstances?
20     A   No.
21     Q   And then the one entry we have here for Mr.
22 Gutierrez, November 1, 1996, where it says type of document
23 and under that we have what?
24     A   Weight certificate.
25     Q   Concerning the circumstances of notarizing that

Port Elevator-Brownsville V. Ivonne Soto Vega
DEPOSITION OF MARIA GONZALEZ
6-22-01

SHEET 23   PAGE 86

86

1  particular document, you don't recall --
2     A    No.
3     Q    -- specifically what happened, right?
4     A    No. I do not recall.
5     Q    Okay. So as far as the time that it took you to
6  notarize that document, you can't recall how long it took,
7  correct?
8     A    I just notarized it. I mean -- yes, his
9  signature.
10    Q    Right. But as far as the exact time that it took
11 to do the notary process you can't recall?
12    A    A minute, a minute and a half.
13    Q    You actually recall the time?
14    A    No, but that's what it would take to --
15    Q    Typically, when you do a notarization, it takes a
16 minute to a minute and a half for you, correct?
17    A    Correct.
18    Q    As far as this notarization that you did for Mr.
19 Gutierrez on November 1, 1996, do you recall, one way or the
20 other, whether you had to have anything typed on that
21 particular document?
22    A    I do not recall.
23    Q    And as far as other people being present, you
24 can't recall either, correct?
25    A    Correct.

PAGE 87

87

1     Q    So you don't know if Mr. Elkins was there or not
2  at the time?
3     A    He might have been in his office. I do not
4  recall.
5     Q    And you also don't recall, likewise, whether Mr.
6  Puffelis was there, either, correct?
7     A    Correct.
8     Q    Now just to clarify the record and be clear, the
9  reason you say on Exhibit No. 2 that you believe that Mrs.
10 Ivonne Soto Vega's name was not on that document is that the
11 signature or marking comes over her name, and, secondly, you
12 don't remember it being there on that day?
13    A    I do not remember it being there, and this appears
14 that -- where Mr. Gutierrez signed his name, it's been typed
15 over, his signature.
16    Q    So, in other words, you think from looking at
17 Exhibit No. 2 --
18    A    Yes.
19    Q    -- it looks like that Ms. Vega's name has been
20 typed over the portion of the signature that goes through
21 her name, correct?
22    A    That's correct.
23         MR. MOUNT: I'll pass the witness. (12:18)
24         R E - E X A M I N A T I O N
25 BY MR. SKAGGS:

PAGE 88

88

1     Q    Ma'am, in listening to the answers to the
2  questions that the other lawyer was just asking you, I
3  couldn't help but notice that all of the other signatures
4  and all of the other notarizations in your log, with the
5  exception of Mr. Gutierrez', are actually employees at the
6  Elevator where you work.
7         MR. MOUNT: Objection leading.
8     Q    (Mr. Skaggs) Am I correctly --
9     A    Correct.
10    Q    -- summarizing your deposition?
11         MR. MOUNT: Object, leading.
12    Q    (Mr. Skaggs) Okay. Am I correctly summarizing
13 what you told the other lawyer?
14         MR. MOUNT: Object, leading.
15    A    (Witness) Correct.
16    Q    Okay. Well, let me ask you the question this way.
17 With regard to everybody except Mr. Gutierrez, what
18 relationship do all of the other people that appear in your
19 notary book have with the Elevator?
20    A    Employees.
21    Q    Let me ask you this then. Would it have been
22 usual or unusual for you to have been notarizing something
23 for somebody from the outside during 1996 and 1997? By the
24 outside, I mean somebody who was not an employee at the
25 Elevator.

PAGE 89

89

1     A    Unusual.
2     Q    Ma'am, you have testified that you don't recall
3  the precise circumstances of the other notarizations that
4  you have recorded in your log, other than that of Mr.
5  Gutierrez; is that correct?
6     A    Correct.
7     Q    How is it that you can recall the details of the
8  encounter that you had with Mr. Gutierrez when you notarized
9  his signature, that same one which appears on Exhibit No. 2?
10    A    Because it's not something that was done very --
11 done at all.
12    Q    I appreciate that. Thank you, ma'am.
13         MR. SKAGGS: And I'll pass the witness.
14         R E - E X A M I N A T I O N
15 BY MR. MOUNT: (12:19)
16    Q    You mentioned earlier in your testimony weight
17 certificates, phytos and sanitary certificates; is that
18 right?
19    A    Phyto sanitary certificates.
20    Q    Okay. So a phyto sanitary certificate is one
21 document, it's the same document?
22    A    Yes.
23    Q    Okay. And is that -- that's the document that we
24 talked about that's created by the government, a phyto
25 sanitary certificate?

*Compliments of Action Reporting*
1-800-884-1024 / 956-631-1024

Port Elevator-Brownsville V. Ivonne Soto Vega
DEPOSITION OF MARIA GONZALEZ
6-22-01

SHEET 24   PAGE 90

90
1    A    They're sold by the government.  I usually prepare
2  them.
3    Q    Okay.
4    A    But they inspect whatever is on that.
5    Q    So tell the jury what a phyto sanitary certificate
6  is.
7    A    It describes who sold the product or who is
8  importing the product where, the amount or weight, the type
9  of product, and mode of transportation, be it vehicle or
10  rail.
11        (OFF THE RECORD) (12:20-12:21)
12    Q    (Mr. Mount)  We've gone over exhibits 3 through 7,
13  which are invoices for B. G. Grain, correct?
14    A    Correct.
15    Q    And these invoices deal with shipments of corn out
16  of Port Elevator-Brownsville, L.C. to Monterrey, Mexico,
17  correct?
18    A    Correct.
19    Q    And concerning shipments out from Port Elevator-
20  Brownsville, L.C. to Monterrey in these invoices Exhibits 3
21  through 7, would phyto sanitary certificates have also been
22  created to go along with these invoices?
23    A    Correct.
24    Q    Those certificates would be certificates that you
25  would have created, correct?

PAGE 91

91
1    A    Correct.
2    Q    And as far as obtaining the information for those
3  certificates, where would you get that information?
4    A    The information?  From the weight tickets.
5    Q    Any other source of information to put into those
6  sanitary certificates?  Let me go ahead and rephrase it.
7  You say that to do the phyto -- the phytos or the phyto
8  sanitary certificates you obtained information from the
9  weight tickets.  Is there any other place that you would
10  obtain information from in order to do those certificates?
11    A    We would have to know who is selling it and who
12  they're selling to.
13    Q    And as far as getting that information, where
14  would you get that information?
15    A    From the invoice.
16        MR. MOUNT:  I believe I'll pass the witness.
17        MR. SKAGGS:  We are finished.
18        MR. MOUNT:  Thank you.
19
20        (The deposition was concluded at 12:23 p.m.)
21
22
23
24
25

PAGE 92

92
CHANGES AND SIGNATURE
PAGE     LINE        CHANGE                REASON

PAGE 93

93
     I, MARIA GONZALEZ, have read the foregoing deposition
and hereby affix my signature that same is true and correct,
except as noted above.
                              _____
                              MARIA GONZALEZ
THE STATE OF TEXAS        *
     Before me, _____, on this day personally
appeared MARIA GONZALEZ, known to me (or proved to me under
oath or through _____) (description of identity
card or other document) to be the person whose name is
subscribed to the foregoing instrument and acknowledged to
me that they executed the same for the purposes and
consideration therein expressed.
     Given under my hand and seal of office this ____ day
of _____, 2001.

                              _____
                              NOTARY PUBLIC IN AND FOR
                              THE STATE OF TEXAS

SHEET 25  PAGE 94

94

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

PORT ELEVATOR - BROWNSVILLE,      *
L.C. AND SOUTHWEST GRAIN          *
COMPANY, INC.                     *
                                  *
VS.                               *  C. A. NO. B-98-23
                                  *
IVONNE SOTO VEGA, BERSAIN         *  JURY DEMANDED
GUTIERREZ, SYSCO DE BAJA,         *
S.A. DE C.V. AND WALTER           *
PUFFELIS, INDIVIDUALLY AND        *
D/B/A AGI AKRON GROUP, INC.       *
                                  *
VS.                               *
                                  *
CRAIG ELKINS, INDIVIDUALLY        *
AND D/B/A PORT ELEVATOR-          *
BROWNSVILLE, L.C., AND            *
SOUTHWEST GRAIN CO., INC.         *

REPORTER'S CERTIFICATION
DEPOSITION OF MARIA GONZALEZ
Taken on 6-22-01
     I, GERALD SMITH, Certified Shorthand Reporter in and
for the State of Texas, hereby certify to the following:
     That the witness, MARIA GONZALEZ, was duly sworn by the
officer and that the transcript of the oral deposition is a
true record of the testimony given by the witness;
     That the deposition transcript was submitted on
    , to the witness or to the attorney for the
witness for examination, signature and return to me by
    ;
     That $          is the deposition officer's charge to

PAGE 95

95

William D. Mount, for preparing the original deposition
transcript and any copies of exhibits;
     That pursuant to information given to the deposition
officer at the time said testimony was taken, the following
includes counsel for all parties of record:
     MR. JOHN SKAGGS
     Skaggs & Associates
     710 Laurel
     McAllen, Texas  78501
     MR. WILLIAM D. MOUNT
     Dale & Klein
     6301 N. 10th
     McAllen, Texas  78504
     I further certify that I am neither counsel for,
related to, nor employed by any of the parties or attorneys
in the action in which this proceeding was taken, and
further, that I am not financially or otherwise interested
in the outcome of the action.
     Certified to by me this          day of              ,
2001.

                         GERALD SMITH, Texas CSR #2305
                         Expiration Date: 12-31-01
                         Action Reporting
                         P. O. Box 4513
                         McAllen, Texas  78502
                         (956)  631-1024

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

PORT ELEVATOR –                §
BROWNSVILLE, L.C. AND          §
SOUTHWEST GRAIN CO., INC.      §
                               §
VS.                            §          CIVIL NO. B-98-23
                               §
IVONNE SOTO VEGA, BERSAIN      §          JURY DEMANDED
GUTIERREZ, SYSCO DE BAJA,      §
S.A. DE C.V. AND WALTER        §
PUFFELIS, INDIVIDUALLY AND     §
D/B/A AGI AKRON GROUP, INC.    §
                               §
VS.                            §
                               §
CRAIG ELKINS, INDIVIDUALLY     §
AND D/B/A PORT ELEVATOR-       §
BROWNSVILLE, L.C., AND         §
SOUTHWEST GRAIN CO. , INC.     §

NOTICE OF INTENTION TO TAKE THE ORAL AND VIDEO DEPOSITION
WITH SUBPOENA DUCES TECUM OF MARIA GONZALEZ

To:  All Parties, by and through their attorney of record:

John Skaggs
SKAGGS & ASSOCIATES, L.L.P.
710 Laurel
P.O. Drawer 2285
McAllen, Texas  78502

The oral and video deposition of **MARIA GONZALEZ** will be taken

pursuant to the Federal Rules of Civil Procedure at the **Law Offices**

**of DALE & KLEIN, L.L.P.**, located at **815 Ridgwood Rd., Brownsville,**

**Texas  78523; phone number: (956) 546-5596** at **10:00 a.m.** on **Friday,**

**June 22, 2001**.  It is hereby requested that the witness appear at

such time and place for the purpose of giving her deposition in


DEPOSITION
EXHIBIT
/
ACTION REPORTING

this cause, which deposition, when taken, may be used in evidence during the trial of said cause, and will continue from day to day until completed.

Notice is also hereby given that the deponent is to be produced by and through Port Elevator-Brownsville, L.C.'s attorney of record, **JOHN SKAGGS, SKAGGS & ASSOCIATES, L.L.P.**, 710 Laurel, **P.O. Drawer 2285, McAllen, Texas** 78502, for her deposition.

**Please take notice** that in addition to having a stenographic record made, the undersigned intends to have a nonstenographic record made of the deposition of **MARIA GONZALEZ** by the use of videotape, when the same is taken on **Friday, June 22, 2001** at **10:00 a.m.**, pursuant to a notice to take the deposition issued by Mr. William D. Mount Jr., Attorney at Law or at such other time as **MARIA GONZALEZ** may be deposed.

**Please take further notice** that in connection with the taking of said deposition the witness shall produce at the commencement of the taking of said deposition the materials described in the **Subpoena Duces Tecum** attached hereto and incorporated herein for all purposes as if fully and at large set forth at this point.

h:\p\99-3843\depos\notices\Maria Gonzalez

2

Respectfully submitted,

DALE & KLEIN, L.L.P.
6301 North Tenth Street
McAllen, Texas  78504
(956) 687-8700 Tel.
(956) 687-2416 Fax.


WILLIAM D. MOUNT, JR.
State Bar No.: 14602950
Federal Bar No.: 14992

ATTORNEYS FOR YVONNE SOTO VEGA


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing **NOTICE OF INTENTION TO TAKE THE ORAL and VIDEO DEPOSITION WITH SUBPOENA DUCES TECUM OF MARIA GONZALEZ** has been forwarded to opposing counsel of record:

John Skaggs
SKAGGS & ASSOCIATES, L.L.P.
710 Laurel
P.O. Drawer 2285
McAllen, Texas 78502-2285


VIA FACSIMILE AND CERTIFIED MAIL/RRR on the 15th day of June, 2001.


WILLIAM D. MOUNT, JR.


h:\p\99-3843\depos\notices\Maria Gonzalez

3

SUBPOENA DUCES TECUM TO THE DEPOSITION OF
**MARIA GONZALEZ**

1. Any and all documents reviewed in anticipation of your deposition.

2. Your Notary Public book for the years 1996, 1997, and 1998.

3. Any and all documents in your possession, custody and/or control related to the corn that is the subject of this dispute.

4. Your most current resume.

5. Your employee file from Port Elevator-Brownsville, L.C.

h:\p\99-3843\depos\notices\Maria Gonzalez

4

```
A   G   I                                    INVOICE  0000001
9480 MARCONI DRIVE SUITE F
OTAY MESA, SAN DIEGO CA. 92173               OCTOBER 25, 1996.
PHONE: 619) 661-6481
FAX:   619) 661-6484

SOLD TO:                                     SHIP TO:

MRS. IVONNE SOTO VEGA                        MRS. IVONNE SOTO VEGA
PASEO RIO TIJUANA No. 1716                   BROWNSVILLE, TEXAS 78521
ZONA DEL RIO, TIJUANA B.C. MEXICO
```

| P. O. NUMBER | TERMS | | | SALESMAN | |
|---|---|---|---|---|---|
| 0008-08/23/96 | PRICE BASIS CIF BROWNSVILLE, TEXAS | | | W.P. | |
| QUANTITY | DESCRIPTION | PRICE | UNIT | AMOUNT | |
| 2,444.434 TON/METRICAS<br><br>MERCHANDISE SPECIFICATION: | 2,444.434 TON/METRICAS DE MAIZ AMARILLO # 2 GRADO B PARA CONSUMO HUMANO CON LAS SIGUIENTES ESPECIFI-CACIONES:<br>MOISTURE MAXIMUM 14.5 %<br>MINIMUM TEDNSITY 67.5 %<br>EXTRANEOUS FOREIGN 3.3 %<br>CHIPPED MAIZE 3 %<br>AFLATOXIN 15 PPB MAX.<br>ORIGIN UNITED STATES | $ 170.00 | TONELADA METRICA | $ 415,553.78 | |

DEPOSITION
EXHIBIT
2
ACTION REPORTING

```
RECEIVED BY:


MR. BERSAIN GUTIERREZ                MR. WALTER PUFFLIS III
OR MRS. IVONNE SOTO VEGA

DATE:  10-30-96

THIS NOTARIZATION IS TO AUTHENTICATE THAT THE ABOVE
SIGNATURE IS THAT OF MR. BERSAIN GUTIERREZ.
```

| | | | | T O T A L | $ 415,553.78 |

SWORN AND
SUBSCRIBED BEFORE ME THIS  30TH DAY  OCTOBER  19 96
MY COMMISSION EXPIRES
AUGUST 21, 1999

MARIA GONZALEZ  NOTARY PUBLIC
IN AND FOR CAMERON COUNTY   STATE OF TEXAS

NOTLEY:

# _. O. GRAIN
.053 CAROLYN DR
CHULA VISTA CALIFORNIA 91913
619-661-1333

Invoice no:BB1

Date:    4-Nov-1996

---

Sold To:                                      Loaded at: PORT OF BROWNSVILLE
MARCHANTEX COMERCIALIZADORES INTERNACIONALES.      BROWNSVILLE, TEXAS
S. DE R.L.
MONTERREY # 132  DESP. # 602
COL. ROMA
MEXICO D.F. MEXICO                Date Loaded:       4-Nov-1996

COVERING:
MAIZ AMARILLO PARA CONSUMO HUMANO

---

Sale No: 1001          GBM-102-N/A          PRICE/MT: $ 210.00

---

| License No | Ticket | Net Wght (lbs) | License No | Ticket | Net Wght (lbs) |
|------------|--------|----------------|------------|--------|----------------|
| 041-TY2    | 26646  | 88,560         | 98A-UK2    | 26647  | 88,320         |
| 202-TZ1    | 26648  | 87,540         | 215-UK3    | 26649  | 86,340         |

I HEREBY CERTIFY THAT THIS IS A TRUE COPY OF THE ORIGINAL DOCUMENT.
SWORN AND SUBSCRIBED BEFORE ME THIS  27TH  DAY OF  AUGUST   1997

MY COMMISSION EXPIRES
AUGUST 21, 1999

MARIA GONZALEZ
NOTARY PUBLIC
IN AND FOR CAMERON COUNTY
STATE OF TEXAS

DEPOSITION
EXHIBIT
5
ACTION REPORTING

Total Pounds:      350,760

Metric Tons      159.104   F.O.B. Value    $ 33,411.04

by:

D. C. GRAIN

```
. G.  GRAIN
1053 CAROLYN DR.
CHULA VISTA, CALIFORNIA 91913                Invoice no:BG2
619-661-1333
                                             Date:    5-Nov-1996
```

Sold To:                                  Loaded at: PORT OF BROWNSVILLE
MARCHANTCX COMERCIALIZADORES INTERNACIONALES      BROWNSVILLE, TEXAS
S. DE R.L.
MUNTERREY #132 DESP. #602
COL. ROMA
MEXICO, D.F. MEXICO                       Date Loaded:    5-Nov-1996

COVERING:
MAIZ AMARILLO PARA CONSUMO HUMANO

Bale No: 1001        GSM-102-N/A        PRICE/MT: $  210.00

| License No | Ticket | Net Wght (lbs) | License No | Ticket | Net Wght (lbs) |
|---|---|---|---|---|---|
| 623-UJ1 | 26650 | 78,060 | 945-UJ1 | 26651 | 77,640 |
| 947-UCB | 26652 | 68,920 | 702-UJ5 | 26653 | 70,040 |

I HEREBY CERTIFY THAT THIS IS A TRUE COPY OF THE ORIGINAL DOCUMENT.
SWORN AND SUBSCRIBED BEFORE ME THIS  27TH   DAY OF AUGUST  19 97

MY COMMISSION EXPIRES
AUGUST 21, 1999

                         MARIA GONZALEZ
                         NOTARY PUBLIC
                         IN AND FOR CAMERON COUNTY
                         STATE OF TEXAS

DEPOSITION
EXHIBIT
4
ACTION REPORTING

Total Pounds:      294,660

Metric Tons      133,657   F.O.B. Value    $ 28,067.97

by:  B.G. GRAIN

NOVEMBER 5, 1996

AS AUTHORIZED REPRESENTATIVE OF ALICIA AND ALFREDO GOMEZ, I AM
ACKNOWLEDGING RECEIPT OF THE ORIGINAL DOCUMENTS AND HEREBY ACCEPT
MERCHANDISE ON THE BELOW LISTED TRUCKS.

| LICENSE NO | TICKET | NET WGHT(LBS) | LICENSE NO | TICKET | NET WGHT(LBS) |
| --- | --- | --- | --- | --- | --- |
| 623-UJ1 | 26650 | 78,060 | 945-UJ1 | 26651 | 77,640 |
| 947-UCO | 26652 | 68,920 | 702-UJ5 | 26653 | 70,040 |

| METRIC TONS: | 133.657 | | TOTAL POUNDS: | 294,660 |
| --- | --- | --- | --- | --- |

THE UNDERSIGNED AGENT DECLARES THAT THE ABOVE MENTIONED GOODS, SHIPPED
ON THE DATE OF  5-November-1996  AND CONSIGNED TO:
         MARCHANTEX COMERCIALIZADORES INTERNACIONALESS. DC R.L.
ARE PRODUCTS OF THE UNITED STATES OF AMERICA
DATED AT BROWNSVILLE, TEXAS ON         5-November-1996

AGENT FOR B. G. GRAIN

THE RIO GRANDE VALLEY CHAMBER OF COMMERCE, A RECOGNIZED CHAMBER OF COMMERCE
UNDER THE LAW OF THE STATE OF TEXAS, HAS EXAMINED THE SHIPPER'S INVOICE
CONCERNING THE ORIGIN OF THE MERCHANDISE, AND ACCORDING TO THE BEST OF IT'S
KNOWLEDGE AND BELIEF, FINDS THAT THE PRODUCTS NAMED ORIGINATED IN THE
UNITED STATES OF AMERICA.

RIO GRANDE VALLEY CHAMBER OF COMMERCE

# J. O. GRAIN

7463 CAROLYN DR.
CHULA VISTA, CALIFORNIA 91913
619-661-1233

Invoice no: 883

Date:    6-Nov-1996

---

Sold To:                              Loaded at: PORT OF BROWNSVILLE
MARCHANTEX COMERCIALIZADORES INTERNACIONAL FR.         BROWNSVILLE, TEXAS
S. DE R.L.
MONTERREY #132 DESP. #602
COL. ROMA
MEXICO, D.F. MEXICO               Date Loaded:     6-Nov-1996

---

COVERING:
MAIZ AMARILLO PARA CONSUMO HUMANO

---

Sale No: 1001          CCM-100-N/A          PRICE/MT: $ 210.00

---

| License No | Ticket | Net Wght (lbs) | License No | Ticket | Net Wght (lbs) |
|------------|--------|----------------|------------|--------|----------------|
| 528-UC8    | 26654  | 87,360         | 425-UJ1    | 26655  | 90,300         |

T HEREBY CERTIFY THAT THIS IS A TRUE COPY OF THE ORIGINAL DOCUMENT.
SWORN AND SUBSCRIBED BEFORE ME THIS 27TH DAY OF AUGUST 1997

MY COMMISSION EXPIRES
AUGUST 21, 1999

MARIA GONZALEZ
NOTARY PUBLIC
IN AND FOR CAMERON COUNTY
STATE OF TEXAS

**DEPOSITION EXHIBIT 5**
ACTION REPORTING

Total Pounds:     185,660

Metric Tons     84.215   F.O.B. Value   $ 17,685.15

by: _____
      J.G. GRAIN

11/06/96

AS AUTHORIZED REPRESENTATIVE OF ALICIA AND ALFREDO GOMEZ, I AM
ACKNOWLEDGING RECEIPT OF THE ORIGINAL DOCUMENTS AND HEREBY ACCEPT
MERCHANDISE ON THE BELOW LISTED TRUCKS.

| LICENSE NO | TICKET | NET WGHT(LBS) | LICENSE NO | TICKET | NET WGHT(LBS) |
|------------|--------|---------------|------------|--------|---------------|
| 528-UG8 | 26654 | 87,360 | 425-UJ1 | 26655 | 98,300 |

| METRIC TONS: | 84.215 | TOTAL POUNDS: | 185,660 |

THE UNDERSIGNED AGENT DECLARES THAT THE ABOVE MENTIONED GOODS, SHIPPED
ON THE DATE OF   6-November-1996   AND CONSIGNED TO:
          MARCHANTEX COMERCIALIZADORES INTERNACIONALESS, DE R.L.
ARE PRODUCTS OF THE UNITED STATES OF AMERICA
DATED AT BROWNSVILLE, TEXAS ON          6-November-1996

AGENT FOR B.G. GRAIN

THE RIO GRANDE VALLEY CHAMBER OF COMMERCE, A RECOGNIZED CHAMBER OF COMMERCE
UNDER THE LAW OF THE STATE OF TEXAS, HAS EXAMINED THE SHIPPER'S INVOICE
CONCERNING THE ORIGIN OF THE MERCHANDISE, AND ACCORDING TO THE BEST OF IT'S
KNOWLEDGE AND BELIEF, FINDS THAT THE PRODUCTS NAMED ORIGINATED IN THE
UNITED STATES OF AMERICA.

CERTIFIED BY

RIO GRANDE VALLEY CHAMBER OF COMMERCE

# B. G. GRAIN
1853 CAROLYN DR.
CHULA VISTA, CALIFORNIA 91913
619-661-1333

Invoice no:BG4

Date:    6-Nov-1996

Sold To:                                    Loaded at: PORT OF BROWNSVILLE
MARCHANTEX COMERCIALIZADORES INTERNACIONALES        BROWNSVILLE, TEXAS
S. DE R.L.
MONTERREY #132 DESP. #602
COL. ROMA
MEXICO, D.F. MEXICO                  Date Loaded:    6-Nov-1996

COVERING:
MAIZ AMARILLO PARA CONSUMO HUMANO

Sale No: 1001          GSM-102-N/A          PRICE/MT: $  210.00

| License No | Ticket | Net Wght (lbs) | License No | Ticket | Net Wght (lbs) |
|---|---|---|---|---|---|
| 749-UJ1 | 26656 | 103,320 | 832-UJ1 | 26659 | 102,800 |
| 043-UJ1 | 26660 | 88,660 | 986-TZ5 | 26661 | 89,320 |
| 048-UJ1 | 26662 | 101,020 | 003-UD1 | 26663 | 103,660 |
| 061-UJ1 | 26664 | 75,780 | 500-UG5 | 26665 | 89,140 |
| 866-UG3 | 26666 | 92,680 | 983-TZ5 | 26667 | 88,560 |

I HEREBY CERTIFY THAT THIS IS A TRUE COPY OF THE ORIGINAL DOCUMENT.
SWORN AND SUBSCRIBED BEFORE ME THIS 27TH  DAY OF AUGUST  19 97

MY COMMISSION EXPIRES
AUGUST 21, 1999

MARIA GONZALEZ
NOTARY PUBLIC
IN AND FOR CAMARO COUNTY
STATE OF TEXAS

DEPOSITION
EXHIBIT
6
ACTION REPORTING

Total Pounds:      935,020

Metric Tons    : 424.122   F.O.B. Value    $ 89,065.62

by:
B. G. GRAIN

11/06/96

AS AUTHORIZED REPRESENTATIVE OF ALICIA AND ALFREDO GOMEZ, I AM
ACKNOWLEDGING RECEIPT OF THE ORIGINAL DOCUMENTS AND HEREBY ACCEPT
MERCHANDISE ON THE BELOW LISTED TRUCKS.

| LICENSE NO | TICKET | NET WGHT(LBS) | LICENSE NO | TICKET | NET WGHT(LBS) |
|---|---|---|---|---|---|
| 349-UJ1 | 26656 | 103,320 | 832-UJ1 | 26659 | 102,880 |
| 043-UJ1 | 26660 | 88,660 | 986-TZ5 | 26661 | 89,320 |
| 048-UJ1 | 26662 | 101,020 | 003-UD1 | 26663 | 103,660 |
| 061-UJ1 | 26664 | 75,780 | 500-UG5 | 26665 | 89,140 |
| 866-UG3 | 26666 | 92,680 | 983-TZ5 | 26667 | 88,560 |

METRIC TONS:    424.122              TOTAL POUNDS:    935,020

THE UNDERSIGNED AGENT DECLARES THAT THE ABOVE MENTIONED GOODS, SHIPPED
ON THE DATE OF   6-November-1996   AND CONSIGNED TO:
              MARCHANTEX COMERCIALIZADORES INTERNACIONALESS. DE R.L.
ARE PRODUCTS OF THE UNITED STATES OF AMERICA
DATED AT BROWNSVILLE, TEXAS ON              6-November-1996

AGENT FOR B.G. GRAIN

THE RIO GRANDE VALLEY CHAMBER OF COMMERCE, A RECOGNIZED CHAMBER OF COMMERCE
UNDER THE LAW OF THE STATE OF TEXAS, HAS EXAMINED THE SHIPPER'S INVOICE
CONCERNING THE ORIGIN OF THE MERCHANDISE, AND ACCORDING TO THE BEST OF IT'S
KNOWLEDGE AND BELIEF, FINDS THAT THE PRODUCTS NAMED ORIGINATED IN THE
UNITED STATES OF AMERICA.

RIO GRANDE VALLEY CHAMBER OF COMMERCE

# B. G. GRAIN
1863 CAROLYN DR.
CHULA VISTA, CALIFORNIA 91913
619-661-1333

Invoice no:1695

Date:   12-Nov-1996

Sold To:
MARCHANTEX COMERCIALIZADORES INTERNACIONALES
S. DE R.L.
MONTERREY #122 DESP. #602
COL. ROMA
MEXICO, D.F. MEXICO

Loaded at: PORT OF BROWNSVILLE
           BROWNSVILLE, TEXAS

Date Loaded:    12-Nov-1996

COVERING:
MAIZ AMARILLO PARA CONSUMO HUMANO

Sale No: 1001          GSM-102-N/H          PRICE/MT: $  210.00

| License No | Ticket | Net Wght (lbs) | License No | Ticket | Net Wght (lbs) |
|------------|--------|----------------|------------|--------|----------------|
| 024-UC9    | 26669  | 85,220         | 021-UC9    | 26670  | 85,660         |
| 023-UC9    | 26671  | 83,320         | 011-UC9    | 26672  | 84,660         |
| 46-UC9     | 26673  | 69,500         |            |        |                |

I HEREBY CERTIFY THAT THIS IS A TRUE COPY OF THE ORIGINAL DOCUMENT.
SWORN AND SUBSCRIBED BEFORE ME THIS    27TH    DAY OF AUGUST   19 97

MY COMMISSION EXPIRES
AUGUST 21, 1999

MARIA GONZALEZ
NOTARY PUBLIC
IN AND FOR CAMERON COUNTY
STATE OF TEXAS

Total Pounds:      408,360

Metric Tons _____ 184.324   F.O.B. Value  $ 38,700.04

by: _____
    B.G. GRAIN

DEPOSITION
EXHIBIT
# 7
ACTION REPORTING

11/12/96

AS AUTHORIZED REPRESENTATIVE OF ALICIA AND ALFREDO GOMEZ, I AM
ACKNOWLEDGING RECEIPT OF THE ORIGINAL DOCUMENTS AND HEREBY ACCEPT
MERCHANDISE ON THE BELOW LISTED TRUCKS.

*Jorge Gomez*

| LICENSE NO | TICKET | NET WGHT(LBS) | LICENSE NO | TICKET | NET WGHT(LBS) |
|---|---|---|---|---|---|
| 024-UC9 | 26669 | 83,220 | 021-UC9 | 26670 | 83,660 |
| 023-UC9 | 26671 | 83,320 | 211-UC9 | 26672 | 84,660 |
| 946-UC8 | 26673 | 69,500 | | | |

METRIC TONS:    184.324             TOTAL POUNDS:    406,360

THE UNDERSIGNED AGENT DECLARES THAT THE ABOVE MENTIONED GOODS, SHIPPED
ON THE DATE OF 15-November 1996 AND CONSIGNED TO:
                    MARCHANTEX COMERCIALIZADORES INTERNACIONALESS. DE R.L.
ARE PRODUCTS OF THE UNITED STATES OF AMERICA
DATED AT BROWNSVILLE, TEXAS ON             12-November-1996

AGENT FOR B. G. GRAIN

THE RIO GRANDE VALLEY CHAMBER OF COMMERCE, A RECOGNIZED CHAMBER OF COMMERCE
UNDER THE LAW OF THE STATE OF TEXAS, HAS EXAMINED THE SHIPPER'S INVOICE
CONCERNING THE ORIGIN OF THE MERCHANDISE, AND ACCORDING TO THE BEST OF IT'S
KNOWLEDGE AND BELIEF, FINDS THAT THE PRODUCTS NAMED ORIGINATED IN THE
UNITED STATES OF AMERICA.

CERTIFIED BY

No. 880





# NOTARY PUBLIC RECORD BOOK

*Published By*
DOME PUBLISHING CO., INC.
Dome Building
Warwick, RI 02886

# THIS IS A RECORD OF NOTARIAL ACTS FROM:

08/21/95
Date

to

08/21/99
Date

Name
Address
City, St.

Notary
Notary
Notary

Name
Address
City, Sta

Property of:

NOTARY PUBLIC

Copyright © 1984, 1994
J.P. Everhart & Company, Inc.
Dallas, Texas

ii

# NOTARY PUBLIC COMMISSION INFORMATION

Name MARIA GONZALEZ
_Printed Official Signature_

Address P.O. BOX 793

City, State, Zip 103 FRESNOS, TEXAS 78566

Notary Public Commission Expires 08/21/99 Commission Number 006515179-8 Bond Number 401352

Notary Public Commission Expires _____ Commission Number _____ Bond Number _____

Notary Public Commission Expires _____ Commission Number _____ Bond Number _____

Name of My Bonding Company Merchants Bonding Co. - Mutual

Address P.O. Box 26720

City, State, Zip Austin, Texas 78755-0720 Telephone 512 - 343 - 9033

_Signed Official Signature_
Telephone: Bus: 831-5245 Home: 233-4142

iii

| Page 1 | DATE NOTARIZED | TYPE OF NOTARIZATION | DATE OF DOCUMENT | TYPE OF DOCUMENT | PRINTED | SIGNATURE OF INDIVIDUAL SIGNATURE | |
|---|---|---|---|---|---|---|---|
| 1 | 1-4-96 | Acknowledgment | 1-4-96 | Power of Attorney | Robert W. Fielding | | 418 Bond P.O. Box |
| 2 | 5-17-96 | Signature | 5-17-96 | General Statement | CRAIG - ELKINS | | 520 Bond P.O. Box |
| 3 | 10-30-96 | Signature | 10-29-96 | Commenced Purpose | RECSAIN GUTIERREZ | | 921 Bond P.O. Box |
| 4 | 11-01-96 | Signature | 10-31-96 | Wt Cert | BEESAIN GUTIERREZ | | P.O. Box |
| 5 | 11-08-96 | Signature | 11-07-96 | Letter | CRAIG ELKINS | | P.O. Box |
| 6 | 02-26-97 | Signature | | Copies Etc | CRAIG ELKINS | | et Bond |
| 7 | 03-03-97 | Signature | 03/24/97 | Bond Supplies Cards Schwoche | SANDRA LEE GONZALES | | et Bond |
| 8 | 03-14-97 | Signature | 03/14/97 | Release | HENRY H CRAIG | | Bond |
| 9 | | | | | | | |
| 10 | | | | | | | |
| 11 | | | | | | | |
| 12 | | | | | | | |
| 13 | | | | | | | |
| 14 | | | | | | | |
| 15 | | | | | | | |
| 16 | | | | | | | |
| 17 | | | | | | | |
| 18 | | | | | | | |

| ADDRESS OF INDIVIDUAL | DETAILED IDENTIFICATION OF INDIVIDUAL | FINGERPRINT AND/OR OTHER INFORMATION | NOTARY FEE |
|---|---|---|---|
| 418 Meadow Lane Brownsville, Texas 78521 | D.L.# 08682180 | | $ 0.00 |
| P.O. Box 4449 Brownsville, Texas 78523 | Personal Acquaintance | | $ 0.00 |
| 529 Canyon Drive Benito, Ca 91902 | I.D. Card from California | | $ 0.00 |
| 929 Canyon Drive Benito, Ca 91902 | Resident Alien Card # A092555662 Resident Alien Card # A092555662 | | $ 0.00 |
| P.O. Box 4449 Brownsville Texas 78643 | Personal Acquaintance | | $ 0.00 |
| P.O. Box 4449 Seguinville, TX 78823 | Personal Acquaintance | | $ .00 |
| Rt 9 Box 819 San Benito, Tx 78584 | Personal Acquaintance | | $ .00 |
| Cabristle Road Brownsville, Texas | Personal Acquaintance | | $ .00 |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |

12

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

PORT ELEVATOR –                 §
BROWNSVILLE, L.C. AND       §
SOUTHWEST GRAIN CO., INC.    §
                               §
VS.                             §      CIVIL NO. B-98-23
                               §
IVONNE SOTO VEGA, BERSAIN   §      JURY DEMANDED
GUTIERREZ, SYSCO DE BAJA,    §
S.A. DE C.V. AND WALTER     §
PUFFELIS, INDIVIDUALLY AND   §
D/B/A AGI AKRON GROUP, INC.   §
                               §
VS.                             §
                               §
CRAIG ELKINS, INDIVIDUALLY   §
AND D/B/A PORT ELEVATOR-     §
BROWNSVILLE, L.C., AND      §
SOUTHWEST GRAIN CO. , INC.    §

## AFFIDAVIT OF WILLIAM D. MOUNT, JR.

STATE OF TEXAS
COUNTY OF HIDALGO

     **BEFORE ME**, the undersigned Notary Public, personally appeared **WILLIAM D. MOUNT, JR.**, who being by me duly sworn did depose and state the following:

     "My name is **WILLIAM D. MOUNT, JR.** I am over the age of eighteen years, have never been convicted of a felony or a misdemeanor involving moral turpitude and I am competent to make this Affidavit and make this Affidavit upon personal knowledge. Everything herein is true and correct.

     "I am one of two attorneys who represent **IVONNE SOTO VEGA** in the above-referenced action. Roy S. Dale is the lead lawyer."

     "Exhibits "1", "2" and "11" to **MS. VEGA'S** Motion for Partial

Summary Judgment are true and correct copies of depositions with exhibits taken in this case.

"Exhibits "3", "4", "5", "6", "7", "9", and "10" to **MS. VEGA'S** Motion for Partial Summary Judgment were attached as exhibits to either Craig Elkins, Enrique Villarreal, or Maria Gonzalez's depositions.  These exhibits were true and correct copies of what was attached to the depositions.

"Exhibit "15" is a true and correct copy of Avis Odenbaugh's report with other items provided by her.  The document is a Dale & Klein, L.L.P. business record.  It is also a business record of Ms. Odenbaugh's.

"FURTHER AFFIANT SAYETH NOT."

William D. ~~~

WILLIAM D. MOUNT, JR.

**SUBSCRIBED AND SWORN TO BEFORE ME** on this the 11th day of March, 2002, to certify which witness my hand and official seal.

NOTARY PUBLIC, STATE OF TEXAS

My commission expires: 11/1/2003



OLIVIA LONGORIA
MY COMMISSION EXPIRES
November 1, 2003

13

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

PORT ELEVATOR-                        §
BROWNSVILLE, L.C.,                    §
ET AL                                 §
                                      §
VS.                                   §        CIVIL NO. B-98-23
                                      §
IVONNE SOTO VEGA, BERSAIN             §        JURY DEMANDED
GUTIERREZ, SYSCO DE BAJA              §
S.A. DE C.V. AND WALTER               §
PUFFELIS, INDIVIDUALLY AND            §
D/B/A AGI/AKRON GROUP, INC.           §

### SECOND AMENDED COMPLAINT

1.   This complaint is filed by Port Elevator-Brownsville, L.C.,

joined by Southwest Grain Co., Inc.

2.   Plaintiffs are corporations organized under the laws of the

State of Texas.

3.   Defendants are individuals or corporations who may be served

at the following addresses:

        1.   Ivonne Soto Vega (has been served and appeared)
             Paseo Rio Tijuana No. 1716
             Zona Del Rio, Tijuana B.C. Mexico

        2.   Bersain Gutierrez and
             Sysco De Baja S. A. de C.V.
             1853 Carolyn Drive
             Chula Vista, California 91913

        3.   Walter Puffelis and AGI/AKRON GROUP, INC.
             1330 Orange Avenue Suite 329
             Coronado, California 92118

4.   This Court has jurisdiction pursuant to 28 USC, Sections 1331,

1332, 1335 and 2361.

5.   Alternatively, this Complaint is filed pursuant to Rule 22

FRCP.  Plaintiff has heretofore tendered to the registry of the

Court the total amount of $76,000.00 and is still in possession of

cash received from the sale of commodity in excess of said amount. It is estimated by Plaintiff that the total amount in controversy, less reasonable offsets for storage and handling, is in excess of $100,000.00.

6.    Plaintiff herein further asserts diversity between the stakeholder (Plaintiff) and one or more of the Defendants; and further asserts the existence of diversity as between the named Defendants.

7.    In compliance with the provisions of 28 USC Section 1335, Plaintiff asserts that it is in possession of money or property of value more than $500.00.

8.    Plaintiff is a stakeholder of cash, obtained from the sale of commodity, ownership to which is claimed by Defendants.  The cash is described as follows: cash from the sale of corn in a liquidated amount which is claimed to be owned by multiple Defendants. Certain cash from said sale is currently on deposit at the Plaintiff's Port of Brownsville warehouse facility; less reasonable storage, handling, and other fees deducted or charged by Plaintiff. Plaintiff has tendered checks payable to the "United States District Court Registry" representing certain cash on hand, there to abide to the judgment of the Court.  Plaintiff further asserts its intention to tender or retain cash representing the partial liquidated value of the corn, subject to counterclaims plead herein.

9.    As detailed below, Plaintiff may be exposed to double or multiple liability by reason of competing and inconsistent claims made by Defendants.

10.  In the event Plaintiff should receive a counter-claim for breach of contract, conversion, violation of statutory trade practices laws, or a like pleading; in such event Plaintiff would affirmatively show that the commodity in question was specifically stored in the Plaintiff's warehouse pursuant to a contract and referenced tariffs, copies of which are attached hereto and incorporated by reference at this point.  Conflicting claims of ownership of the commodity or any cash generated by the sale of said commodity have been asserted by Defendants, and allegations of actionable conduct on the part of Port Elevator have been alleged by one or more of the said Defendants.

11.  Plaintiff previously proposed the voluntary tender of the herein referenced cash and commodities to a mutually acceptable neutral third-party, and such proposal was made in writing.  The Defendants refused or neglected to respond, and each continued to assert respective superior ownership.

12.  Thereafter, Plaintiff proposed the sale of the said commodity, pursuant to contract, so as to mitigate any damages resulting from spoilage or change in market value.  Plaintiff received no response from Defendants related thereto.

13.  Plaintiff finds itself with no alternative but to tender the corn or the partial value thereof to the Court for adjudication of the identity of the proper owner or owners.

<u>REQUEST FOR DECLARATORY RELIEF</u>

14.  This Request for Relief is made pursuant to 28 U.S.C. §2201.

15.  Ivonne Soto Vega has asserted claims against Port Elevator-Brownsville, L.C. which are derived from the contract and

transactions heretofore recited in this pleading. Vega asserts duties and obligations arising as a result of the said contract and the asserted relationship between the parties.

16. Vega has asserted such allegations in a suit which was filed later in time and filed in State District Court in Hidalgo County, Texas. On the 22nd day of May, 2000, the State District Court ordered Vega's claims abated based on Port Elevator's assertions of the pendency of this prior filed action in the United States District Court.

17. A copy of Vega's pleadings in connection with her State Court suit are attached hereto and incorporated at this point by reference, as evidence of Ms. Vega's assertion of rights pursuant to the contract which is the subject of this pleading.

18. Port Elevator-Brownsville, L.C. now seeks a declaration of the rights, duties, legal relations and obligations of any interested party arising out of the said contract, and arising out of the assertions contained in Vega's aforementioned pleading which is attached hereto. Port Elevator-Brownsville, L.C. seeks a determination of the relative liabilities, and any fault as asserted in connection with the aforementioned State Court action, which has been abated in deference to this action pending in the Federal Court.

19. In this connection, Port Elevator-Brownsville, L.C. would further assert that at all material times related hereto, it was acting through its authorized agent, servant, or employee Craig Elkins. Port Elevator-Brownsville, L.C. would further assert that Craig Elkins is a salaried employee of Southwest Grain Co., Inc.

To the extent of any involvement by the said Craig Elkins and Southwest Grain Co., Inc. Port Elevator-Brownsville, L.C. would further request a determination of the relevant duties, faults and liabilities of said entities. To the extent necessary, the said Southwest Grain Co., Inc. hereby appears in this action for all purposes consistent with this pleading.

### BREACH OF CONTRACT

20. Plaintiff, through its agent, Craig Elkins, entered into a contract with Bersain Gutierrez, as representative for Sysco de Baja and Walter Puffelis, as representative for Akron Group, Inc., in October 1996. The above mentioned contract is attached hereto and incorporated herein by reference. Pursuant to this contract, the minimum quantity of corn to be deposited with Port Elevator was one million bushels.

21. In consideration for the movement of a large volume of corn over a short period of time, Plaintiff gave Bersain Gutierrez and Walter Puffelis a special contract with lower receiving and delivering charges. All deposits were to be made by Walter Puffelis of AGI/Akron Group, Inc., and withdrawals were to be made by Bersain Gutierrez of Sysco de Baja S.A. de C.V.. All deposits and withdrawals were to occur no later than December 31, 1996.

22. At no time during the term of the contract were one million bushels of corn deposited with Port Elevator. Defendants' failure to deposit and withdraw one million bushels of corn within the contract period, caused higher sums of money to accrue for the unloading, storage, fumigation, turning, aereation, cracking, and loading out in the amount of $81,438.04 plus interest.

23. Ivonne Soto Vega has asserted she was a party to the above referenced contract by her own statement. Ms. Vega filed her petition in the 92nd Judicial District Court in Hidalgo County, Texas, Cause No. C-2969-99-A. On page seven, paragraph "o", of Ms. Vega's state court pleading, Ms. Vega alleged that she "entered into a contract" with Plaintiff to "store corn at their facility in Brownsville, Texas" in the fall of 1996. Although Plaintiff denies Defendant Vega was a contracting party as herein described; in the event contractual privity status should be determined or adjudicated by the court, then Plaintiff asserts such contract has in fact also been breached individually by Defendant Vega.

24. All Defendants in this cause of action breached the contract entered into with Plaintiff in October 1996 and are liable for the damages proximately caused by this breach.

25. Plaintiff herein specifically prays that the court adjudicate the ownership of the corn, or the value thereof; that the Court determine that Plaintiff is without fault in the circumstances related to the contracting, storage, and disposal of the corn, and money which is the subject of this action. Plaintiff further prays that the Court discharge Plaintiff from further liability herewith.

26. Plaintiff further prays for an award of reasonable attorneys' fees, the award of which is within the equitable powers of this Court.

27. Port Elevator-Brownsville, L.C., Craig Elkins, and Southwest Grain Co., Inc. further seek a declaration from the Court regarding the duties and liabilities connected with the transactions addressed herein; and further seek a declaration of no fault or

liability related thereto. Moreover, Plaintiff prays that the court find Defendants have breached the contract entered into between the parties. Plaintiff further requests an award of actual damages related to the prosecution or defense of this action, for costs of Court, for pre-judgment interest, and post-judgment interest; and further for award of attorneys' fees arising out of the prosecution or defense of this action.

28. A jury is demanded in connection with this Complaint.

Respectfully submitted,

John Skaggs
P.O. Drawer 2285
McAllen, Texas 78502-2285
Phone (956) 687-8203
Fax (956) 630-6570

JOHN SKAGGS
State Bar No. 18452500
Fed I.D. No. 1225
ATTORNEY FOR PLAINTIFF

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel on this the 21 day of December 2000:

Roy Dale
6301 N. 10th St.
McAllen, Texas 78504

JOHN SKAGGS

14

AO 440 (Rev. 10/93) Summons in a Civ.   ction

# United States District Court

SOUTHERN ————————— DISTRICT OF ———— TEXAS ————

### BROWNSVILLE DIVISION

PORT ELEVATOR - BROWNSVILLE, L.C.

V.

IVONNE SOTO VEGA, BERSAIN GUTIERREZ,
& SISCO DE BAJA, S.A. DE C.V.

## SUMMONS IN A CIVIL CASE

CASE NUMBER:     B-98-23

TO: (Name and address of defendant)

Bersain Gutierrez
1853 Carolyn Drive
Chula Vista, CA 91913

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

John Skaggs
SKAGGS, REYNA & GARZA, L.L.P.
710 Laurel
P.O. Drawer 2285
McAllen, Texas 78502

an answer to the complaint which is herewith served upon you, within ___TWENTY DAYS (20)___ days after
service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken
against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a
reasonable period of time after service.

Michael N. Milby, Clerk

10-27-98

CLERK
_____     DATE

(BY) DEPUTY CLERK

IN THE UNITED DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| PORT ELEVATOR – | § | |
| BROWNSVILLE, L.C. | § | |
| | § | |
| VS. | § | CIVIL NO.  B-98-23 |
| | § | |
| IVONNE SOTO VEGA, BERSAIN | § | |
| GUTIERREZ, AND SYSCO DE BAJA | § | |
| S.A. DE C.V. | § | |

AFFIDAVIT

| | |
|---|---|
| STATE OF CALIFORNIA | § |
| | § |
| COUNTY OF _SAN DIEGO_ | § |

BEFORE ME, the undersigned authority, on this day personally appeared Gabriel Aguilar, who by me being duly sworn on oath, deposes and says:

"My name is Gabriel Aguilar.  I am over the age of 18 years and competent to make this affidavit.  The facts contained in this affidavit are within my knowledge and are true and correct.

1.   I am over 18 years of age.

2.   I am not a party nor have I ever been a party to this lawsuit.

3.   I am employed as a process server with Legal Support, Inc. in Vista, California.

1

The factual statements contained in this affidavit are true".

GABRIEL AGUILAR

SWORN AND SUBSCRIBED TO before me on the _14TH_ day of _JANUARY_ 1998.

Notary Public in and for the State of California
My commission expires: _August 7, 2000_



LAURIE J. VANDEN BERG
Commission # 1107822
Notary Public - California
San Diego County
My Comm. Expires Aug 7, 2000

2

15

# Avis Odenbaugh

*Owner, President Handwriting On the Wall, Inc.*

## Board Certified
### Forensic Document Examiner

5536 Wist Avenue
Kansas City, Missouri 64129-1845                                    Phone and Fax (816) 923-5585

William D. Mount, Jr.
Dale and Klein, L. L. P.
6301 North Tenth Street
McAllen, Texas 78504

Re:     Civil Action B-98-23: Port Elevator-Brownsville, L.C., et al. vs. Ivonne Soto Vega, et al
        Your file number: 99-3843
My file number:   071701

On July 7, 2001, I received the following documents from Barbara Shipper by Federal Express, tracking number 8285 2746 5404.

**Document number one:**
    An original document, headed A G I, Invoice 0000001, dated October 25, 1996. There are numerous staple holes in the upper left hand corner, and two holes for binder filing at the top of this document. Numerous check marks or slashes have been placed on numerous places on the document. A correction for the word TEDNSITY was made with an initial in blue ink over the correction. This document has been signed with the names, Walter Puffelis, III, Maria Gonzales, as notary, and an illegible name over the typed name, Bersain Gutierrez. The date this document was signed is recorded as 10/30/96. There is a notary seal impression for Maria Gonzalez.

**Document number two:**
    The major portion of this document is a copy of document one. The correction of the word TEDNSITY, the check marks, the initials and the signatures are original as is the notary seal. There are numerous staple holes in the upper left corner, and two holes for binder filing at the top of this document.

**Document number three:**
    The major portion of this document is a copy of document one. The correction of the word TEDNSITY, the check marks, the initials and the signatures are original as is the notary seal. There are numerous staple holes in the upper left corner, and two holes for binder filing at the top of this document.

Page 1 of 3

**EXHIBIT**

**Assignment:**

1. Determine if the typed, or copied words "Mr. Bersain Gutierrez or Mrs. Ivonne Soto Vega was placed on the documents prior or post signing of the name purported to be that of Bersain Gutierrez on each of these documents.

2. Determine if the words, "This notarization is to authenticate that the above signature is that of Mr. Bersain Gutierrez." is typed (or printed) with the same machine that typed (or printed) the phrase, "Sworn and subscribed before me this 30th day of October, 1996."

3. Determine if the name, "Mrs. Ivonne Soto Vega" and the address following that name on the lower left hand corner of each document was printed or typed by the same machine that printed or typed the top half of the respective documents.

4. Does each document appear to be an original, notarized document containing the original signature of Mr. Bersain Gutierrez?

**Procedure:**

This examination was aided by handheld magnifiers, a Meiji stereoscopic microscope using a fiberoptic lamp with dual light pipes in the conventional manner and as coaxial illumination using an SL 39 photographic filter. Light balancing 80 B filters are used with each of the pipes of the fiberoptic lamp. Photographs were taken for demonstrative purposes.

**Conclusions:**

1. The signature purported to be that of Bersain Gutierrez was written after the words, "Mr. Bersain Gutierrez or Mrs. Ivonne Soto Vega."

2. The type font used to print the phrase, "This notarization is to authenticate that the above signature is that of Mr. Bersain Gutierrez," is not the same type font used to print the phrase, "Sworn and subscribed before me this 30th day of October 1996." A different escapement of the two fonts was noted.

3. The name, Mrs. Ivonne Soto Vega and the following address on the lower left hand corner of each document was printed with the same font type as the top portion of the document. No discernable differences between the fonts nor escapement were observed.

4. The notary impression was placed over a portion of the letter "l" in Gonzales on each of the documents. This is normal. It is my understanding Barbara Shipper will contact the Secretary of State's office in Austin, Texas to determine if Maria Gonzales is in fact a commissioned notary in the state of Texas. I have no seal impressions authorized by the state of Texas for comparison. Therefore, no

Page 2 of 3

judgment was made from this examination as to the authenticity of the notarization of the document. It was noted, however, that the signatures purported to be that of Bersain Gutierrez on the documents in question were written by the same person.

Attached to this report is a copy of:

1. A current Statement of Qualification for Avis Odenbaugh
2. A list of all court testimonies given by Avis Odenbaugh in the past four years
3. A list of all deposition testimony given by Avis Odenbaugh in the past four years.
4. A list of all published papers written by Avis Odenbaugh in the past ten years.
5. A copy of my fee schedule: HOWEVER, as this case was originally sent to Barbara Shipper, I have agreed to work at her scheduled rate of $85.00 per hour and court rate, plus expenses, including travel time, if necessary.
6. A statement of hours billed to this date.
7. A copy of all documents examined
8. A copy of charts which may be submitted as exhibits at trial or during a deposition.

All documents are being returned to Mr. Mount with this report on July 13, 2001 by Federal Express, tracking number 839 613 3093.

Respectfully,

*Avis M. Odenbaugh*

Avis M. Odenbaugh
Board Certified Forensic Document Examiner
July 13, 2001

Page 3 of 3

*Avis Odenbaugh*

*Owner, President Handwriting On the Wall, Inc.*
*Board Certified*
*Forensic Document Examiner*

*2836 White Avenue*
*Kansas City, Missouri 64129-1148*                                    *Telephone and Fax (816) 923-5595*

## STATEMENT OF QUALIFICATIONS
### Owner, President, Handwriting On the Wall, Inc.
### January, 2001

Certified forensic document examiner - 14 years of professional experience

**Education and Training**
- Bemidji State University, Bemidji: MN 1951-1953
- St. Luke's Hospital School of Medical Technology: Kansas City, MO, 1953-1954
- World Association of Document Examiner's Residency Training Program, 1989 -96
- University of Missouri at Kansas City: Chancellor's Certificate in photography, 1993-1994
- University of Missouri at Kansas City, Management of Computer Security, (1 credit hr.) 1996

**Certifications**
- Certified (by testing) Document Examiner
    - World Association of Document Examiners, 1988
    - *Independent Association of Questioned Document Examiners, 1994*
- Registered Professional Document Examiner, World Association of Document Examiners 1987
- Proficiency Recognition Certificate, World Association of Document Examiners, 1991
- Medical Technologist, M.T. (ASCP), 1954

**Professional Organizations**
- World Association of Document Examiners, 1986 -2000
- Independent Association of Questioned Document Examiners, 1992 -
- Association of Certified Fraud Examiners, Associate Member, 1995 -
- American Society for Industrial Security, 1997 -

**Instructor of Questioned Document Examination**
- World Association of document Examiners Resident Training Program, Chicago, IL, 1993, 1994, 1995, 1996, 1997, 1998, 1999
- Independent Association of Questioned Document Examiners, Kansas City 1995, workshop on instrumentation as applicable to document examiners

**Major seminars attended** (over 1,500 actual seminar hours)
- World Association of Document Examiners, Chicago Illinois: 1987, 1988, 1989, 1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, 1999
- World Association of Document Examiners, Houston, T, 1989, 1992; Warwick, RI, 1990; Sarasota, FL, 1993
- Independent Association of Questioned Document Examiners, Troy, MI, 1991; Portland, OR; 1992; St. Louis, MO, 1993; Madison, WI, 1994; Kansas City, MO, 1995, (chairman and seminar coordinator) Honolulu, HI, 1996; Las Vegas, NV, 1997; Dallas TX, 1998; Scottsdale, AZ, 1999; Dallas, TX, 2000
- Trial Advocacy Workshop, Houston TX, 1992
- American Academy of Forensic Sciences, San Antonio, TX, 1994; Seattle, WA, 1995; Nashville, TN, 1996
- Document Photography, Honolulu, HI, 1996, Las Vegas, NV, 1997
- Adobe PhotoShop 3 for Document Examiners, Las Vegas, NV, 1997
- Greater Kansas City Chapter of the Association of Certified Fraud Examiners, Overland Park, KS, 1997; Kansas City, MO, 1997, 1998, Overland Park, KS, 1999
- Association of Forensic Document Examiners, Milwaukee, WI, 1998, 2000



(Avis Odenbaugh, Statement of Qualifications, page 2)

**Court Experience**
>County Courts in Missouri: Jackson, Harrison, Cole, Polk, Howard, Clay, Douglas, Cass, Jasper, and Howard
>County Courts in Kansas: Johnson, Shawnee, Wyandotte
>County Courts in Arkansas: Puluski (Chancery Court)
>Federal Courts: Kansas City, Kansas, Kansas City, Missouri, Omaha, Nebraska
>>Full list of court appearances is available on request.

**Arbitration Hearing**
>Buchanan County, MO, Johnson County, KS

**Presentations**
>Full list upon request

**Library**
>Full list upon request

**Laboratory Equipment**
>Bausch and Lomb 7 - 30 power magnification stereoscopic microscope with camera adaptor
>Meiji stereoscopic microscope, triocular, 6 - 135 power magnification
>R.F. Inter-Science Macro Zoom System, 18 - 36 power zoom lens with camera adaptor
>Lee Tech IVS-100 infrared video scanning document examiner with filters for infrared and infrared luminescence examinations
>Indentation Materializer Electrostatic Detection Device  (IMEDD, ESDA type)
>Ultra violet lamps, long and short wavelengths
>Pentax Super Program Cameras (2)
>>Lenses for Pentax Camera, 35 - 70 mm, 28 - 90 mm, 70 - 210 mm, all with macro capabilities
>>Vivitar extension tubes
>Nikon FE camera with a 50 mm macro, 50 mm 1.8, and Tokina AT -X Macro Extender lenses
>>Nikon PB - 5 focusing bellows
>Strobes, several, including a Sunpack ring strobe for the above cameras
>Filters, numerous, close-up lenses, reversing rings for the above cameras
>Polaroid MP-4 camera with copy stand
>Sekonic DigLite F light meter (ambient, incident and spot)
>Darkroom equipped for developing of  black and white and reversal films, and printing of black and white, and color negative, and positive film
>Dolan-Jenson Industries fiber optic lamp with bifurcation and lenses
>Indirect (transmitted) light boxes
>Mitutoyo electronic micrometer
>Various gauges, magnifiers and measuring grids
>Typeface Identification plates and grids

## Avis Odenbaugh

*Owner, President Handwriting On the Wall, Inc.*

### Board Certified

*Forensic Document Examiner*

2236 White Avenue
Kansas City, Missouri 64129-1148

Phone and Fax (816) 923-5595

### COURT APPEARANCE RECORD
(Past four years)

1.  **7/22/97**      Platte County Circuit Court, Platte City, MO
    Judge        Daniel Czamanske
    Case         Melvin Newsom, plaintiff vs. Roger Smith, defendant, #96CC-00151
    Plaintiff    William Merryman, Cassandra Terhune
    Defense      Ben Schmitt of Harris, McCausland, & Schmitt, P.C.

2.  **12/15/97**     Leavenworth District Court, Leavenworth, KS
    Judge        David King
    Case         Robert Miller, plaintiff vs. Terry Bartkoski, defendant, # 97 - 5 CV - 178
    Plaintiff    Garry Nelson
    Defense      James J. Cramer of Payne & Jones, Chartered.

3.  **5/5/98**       Johnson County District Court, Division 16, Olathe, KS
    Judge        John Anderson, III
    Case         State of Kansas v. Denise Theus AKA Donita Summit
    Prosecutor   John Cowels
    Defense      Robert Kuchar

4.  **7/20/98**      Jackson County Circuit Court, Kansas City, Mo.
    Judge        K. Preston Dean
    Case         M.S. White Candy & Tobacco Co., Inc. vs. Bill L. Wiggs, et al CV95 - 2556
    Plaintiff    Ronald Byers
    Defense      Dale Morris

5.  **1/5/99**       Johnson District Court, Division 11, Olathe, KS
    Judge        Thomas Bornholdt
    Case         State of Kansas, v. John Iturralde, 98CR2349
    Prosecutor   Richard Guinn
    Defense      Daniel Stewat

6.  **3/11/99**      United States District Court for Western Missouri, Kansas City, MO
    Judge        Howard F. Sachs
    Case         Premier Bank, et al. Vs. Thomas W. Tierney et al, 95-1003-CV-W-6
                 Sunwest Bank of Clovis, N.A., et al. Vs. Thomas W. Tierney et al.
                      95-1005-CV-W-6
    Plaintiff    Michael Healy
    Defense      Craig T. Kenworthy



7.  6/10/99        Arbitration Hearing, Overland Park, Kansas
    Arbitrator     Joseph Nitka
    Case           Kansas Gas Service Company and United Steelworkers of America -- labor
                   arbitration
    Company        David Mudrick
    Union          William Jolley

8.  6/21/99        Jackson Curcuit Court, Independence, MO
    Judge          William Ely
    Case           Prime American Life Insurance Company v. May Norwood et al, CV 98-21499
    Plaintiff      Bernard Eveloff
    Defense        Edward Pendelton

9.  11/17/99       U. S. District Court, Western District of MO, Jefferson, City, MO
    Judge          Scott O. Wright
    Case           Jami Crouch v O"Reilly Automotive, 98-4215-CV-C-SOW
    Plaintiff      David M. Skeens
    Defense        Carole DeWald

10. 5/11/00 &      U. S. District Court of Nebraska, Omaha, NE
    5/15/00        U. S. Court of Appeals
    Judge          Joseph F. Bataillon
    Case           U. S. v. Kent Rutherford, 8:99 CR - 120
    Prosecution    Asst. U. S. Attorney Russell X. Mayer
    Defense        Clarence Mock

11. 8/23/00        Arbitration hearing
    Arbitrator     Joseph J. Nitka
    Case           Willamette Industries, Inc., (Kansas City, Kansas) and PACE, Local 726
                   FMCS No: 00-02226    Issue: Salazar Suspension
    Company        James A. Mertes
    Union          Mike Susic

12. 10/24/00       Atchison County District Court, Atchison, KS
    Judge          Philip Lacey
    Case:          Ivan Boldridge, Plaintiff v. Ethel Campbell, Defendant
    Plaintiff      Prince S. Adebayo Hassan
    Defense        Richard Seneca

13. 1/24/01        Johnson County District Court, Olathe, KS
    Judge          John Anderson
    Case           State of Kansas v Clyde Danny Robinson, 99-CR 2764
    Prosecutor     Brent Venneman
    Defense        Angela Keck

14.  3/28//01    Riley County District Court, Manhattan, KS
     Judge       Paul Miller
     Case:       Browner Turnout Company v. Ralph Roudybush, et al, 99 C-45
     Plaintiff   Darin Conklin
     Defense     Tom Kier

# Avis Odenbaugh

### Board Certified
### Forensic Document Examiner

2236 Witts Avenue
Kansas City, Missouri 64129-1148

Phone and Fax (816) 923-5595

## DEPOSITIONS
### (Past 4 years)

| | | | |
|---|---|---|---|
| 10/14/97 | Overland Park, KS (Robert Miller) | James Cramer | 9705-CV-178 |
| 10/28/97 | Overland Park (Thomas Fritzlen) | Scott C. Nehrbass | 97-2153-GTV |
| 12/12/97 | Kansas City, MO (Alan Clever) | James Roody | 97-6923 |
| 3/2/99 | Kansas City, MO (Michael Healy) | Craig T. Kenworthy | 95-1003-CV-W-6 95-1005-CV-W-6 |
| 5/22/99 | Kansas City, MO (Marc Wallis) | Robert Wulff | 972-00538 |
| 8/18/99 | Kansas City, MO (Carole DeWald) | J. M. Vaughn | 98-4215-CV-C-SOW |
| 11/30/99 | Kansas City, MO (Brandan Donedon / Dan Craig) | Brian Finucane | 98-0692-CV-W-5 |
| 5/18/00 | Overland Park, KS (David Madden) | Michael L. Hodges | CV98-025033 |
| 4/3/01 | Kansas City, MO (Douglass Noland) | Christopher Rackers | CV-499-893-CC |



# Avis Odenbaugh
## Board Certified
### Forensic Document Examiner

2236 White Avenue
Kansas City, Missouri 64129-1148

Phone and Fax (816) 923-5595

## PUBLISHED PAPERS

"A Study Of Carbonless Papers" *World Association of Document Examiners Journal*, Sept. 1992

"Form Blindness,: A Contrasting Perspective" *World Association of Document Examiners Journal*, Sept. 1993

"Pictrostat, A Report On New Photographic Equipment" *Journal of Document Examination*, Mar. 1994, Volume 3, Number 1

"Book Reports" *Journal of Questioned Document Examination*, Oct. 1994, Vol.3, #2

"Basic Photography, Part 1" *Independent Association of Questioned Document Examiners Newsletter*, Nov. 1994

"Is the Expert Correct Only 50% Of the Time?" *Journal of the World Association of Document Examiners*, Dec. 1994

"Basic Photography, Part II," *Independent Association of Questioned Document Examiners Newsletter*, Feb. 1995

"Foreign Writings: Within Our Expertise?" *Journal of Questioned Document Examination*, Spring, 1995, Vol. 4, #1

"Basic Photography, Part III," *Independent Association Of Questioned Document Examiners Newsletter*, August, 1995

"Basic Photography, Part IV," *Independent Association of Questioned Document Examiners Newsletter*, Feb. 1996

"Aids in Deciphering Obliterated Writing" *WADE Exchange*, Issue 211 May, 1997

"Is the Expert Correct Only 50% Of the Time?" *Journal of the World Association of Document Examiners*, June, 1997

"Snappy: A Video Frame Grabber," *WADE Exchange*, January 1998, #218

"The Document Examiner's Role in the Petition System" *WADE Exchange*, November, 1998, #227

"Sequence of Line Crossings," *Journal of Questioned Document Examination*, Winter, 2000, Volume 8, Number 1



**DOCUMENT 1**                                                    **CHART 1**

 





RECEIVED BY:

MR. BERSAIN GUTIERREZ
OR MRS. IVONNE SOTO VEGA

DATE: __10-30-96__

THIS NOTARIZATION IS TO AUT


EXHIBIT "F"

DOCUMENT

CHART 2



ME ME

MEXICO

OTAY MESA, /SAN

SUI

DRIVE     F

SOTO

GO

ANA

CA

SOTO VEGA
TIJUANA

DIE

171

173

No. 1716

92

NOTIFY:
MRS. IVONNE SOTO VEGA
PASEO RIO TIJUANA No. 1716
ZONA DEL RIO, TIJUANA B.C. MEXICO

DOCUMENT .                                                        CHART 3



THIS NOTARIZATION IS TO



OCTOBER



AUTHENTICATE THAT





SWORN

BEFORE ME

**REZ**

MR. BERSAIN GUTIERREZ.

**ORE**

SUBSCRIBED BEFORE

THIS NOTARIZATION IS TO AUTHENTICATE THAT THE ABOVE
SIGNATURE IS THAT OF MR. BERSAIN GUTIERREZ.



DOCUMENT 2                                                          CHART 4



RECEIVED BY:



MR. BERSAIN GUTIERR
OR MRS. IVONNE SOTO V

DATE: 10-30-96

MRS.





CHART 5



SOTO VEGA

SOTO VE

MEXICO

MEX▇CO

NOTIFY:
MRS. IVONNE SOTO VEGA
PASEO RIO TIJUANA No. 1716
ZONA DEL RIO, TIJUANA B.C. MEXICO

SOLD TO:



THIS NOTARIZATION IS TO AUTHENTICATE THAT THE ABOVE
SIGNATURE IS THAT OF MR. BERSAIN GUTIERREZ.

7









RECEIVED BY:

MR. BERSAIN GUTIERREZ
OR MRS. IVONNE SOTO VEGA

DATE: 10·30·96

CHART 8

DOCUMENT 3



SOTO

MEXICO

VEGA

NOTIFY:
MRS. IVONNE SOTO VEGA
PASEO RIO TIJUANA No. 1716
ZONA DEL RIO, TIJUANA B.C. MEXICO

DOCUMENT 3

CHART 9

# TH TH

↑ ↑

AUTHENTICATE

# TH

## THAT AND

THAT

IS

## ATION FORE

THIS NOTARIZATION

BEFORE ME

THIS NOTARIZATION IS TO AUTHENTICATE THAT THE ABOVE
SIGNATURE IS THAT OF MR. BERSAIN GUTIERREZ.

## *Avis Odenbaugh*

*President, Handwriting On the Wall, Inc.*

### *Board Certified*

### *Forensic Document Examiner*

*2836 White Avenue*
*Kansas City, Missouri 64129-1148*

*Phone, Fax (816)923-5595*

## *Statement*

July 12, 2001

Federal I.D. # 43-1434750

Barbara Shipper
Shipper & Associates
5820 Townhouse Lane
Beaumont, Texas 77707

William D. Mount, Jr.
Dale and Klein, L.L.P.
6301 North Tenth Street
Mc Allen, Texas 78504

Re:     Civil Action B-98-23: Port elevator-Brownsvilie, L.C., et al. vs. Ivonne Sogo Vega, et al
         Your file number: 99-3843
My file number: 071701

**Document Examination Services**
         Examination, photographypreparation of chart to be submitted
         as exhibits, and report
                 13 hours @ $85.00 / hour                                  $1,105.00
**Expenses**
         Film and processing, 3 rolls                                              70.00
         Color copies                                                                   30.00
         Fed Ex Letter (Saturday delivery requested)                   36.00
**Deposition**

**Court appearance**

**Total**                                                                          $1241.00

**Less payment received**

**Balance**                                                                      $1241.00

**Thank you**



Member World Association
of Document Examiners
Member Certified Fraud Examiners
Member Independent Association
of Questioned Document Examiners
Court Qualified

*Barbara Shipper, CFE, CDE*
Certified Fraud Examiner
Certified Document Examiner
P.O. Box 12190
Beaumont, Texas 77726-2190
Phone (409) 866-6767
Fax (409) 866-8558



# SHIPPER
### AND
## ASSOCIATES

# STATEMENT OF QUALIFICATIONS
### Barbara J. Shipper, BCFDE, CFE

## Profession
Board Certified Forensic Document Examiner - Full time

## Certifications
Association of Certified Fraud Examiners
World Association of Document Examiners

## Honor
Jan'97-'98    Appointed Early Ballot Judge/Board Manager for Jefferson County elections.
Duties included comparing signatures to deter mail-in voting fraud.

## Education and Training
1980    Bachelor of Business Administration, Lamar University

Sep'95-'00    Independent Association of Questioned Document Examiners, Seminar,
Kansas City, MO; Honolulu, HI; Las Vegas, NV; Dallas, TX, Scottsdale, AZ

Sep'97    Digital Imaging for Forensic Document Examiners, Educational Seminar
Las Vegas, NV

Jul'95-'00    World Association of Document Examiners, Residency Training Program
Chicago, IL; Puerto Vallarto, Mexico.

Fall'96    Photography I, Lamar University
Sep'96    Document Photography, Educational Seminar, Honolulu, HI
Oct'94-Aug'98    Private training with Lillian Hutchison, CDE, Houston, TX (over 37 hours)
Oct'95    National Association of Document Examiners, Seminar, San Antonio, TX
Jun'79-Aug'80    Lamar State Bank bookkeeper & teller, included verifying signatures
for security/fraud, Beaumont, TX

1978    Criminology, Lamar University, Beaumont, TX

## Other Related Special Training-selective
Feb'91-Mar'96    Computer/Administrative technician for State of Texas-Beaumont, TX
Feb'81-Feb'91    Accountant for State of Texas-Beaumont, TX
1991    Continuing Education-Psychology 131, Lamar University, Beaumont, TX
1980    College courses include: Various Management, Computer and Accounting
courses, Lamar University, Beaumont, TX
Sep'83-Dec'83    Instructor at night, word processing/typing, Chenier Business College,
Beaumont, TX

## Professional Memberships
Association of Certified Fraud Examiners - Austin Home Office
Independent Association of Questioned Document Examiners
World Association of Document Examiners



*QUESTIONED DOCUMENTS    •    ALTERATIONS    •    HANDWRITING IDENTIFICATION*

Barbara Shipper – Forensic Document Examiner (Con't)
Statement of Qualifications (409)866-6767
Page 2 of 2

## Library List

| AUTHOR | TITLE |
|---|---|
| Association of Certified Fraud Examiners | "Fraud Examination Standards and Practices" |
| J. Newton Baker | "Law of Disputed and Forged Documents" |
| Bradford and Bradford | "Introduction to Handwriting Examination and Identification" |
| James V.P. Conway | "Evidential Documents" |
| Luciano V. Caputo | "Questioned Document Case Studies" |
| James E. Doyle | "Physical Evidence Handbook" |
| Wilson R. Harrison | "Suspect Documents" |
| Ordway Hilton | "Scientific Examination of Questioned Documents" |
| Ordway Hilton | "Detecting and Deciphering Erased Pencil Writing" |
| Joe Nickell | "Pen, Ink, and Evidence" |
| Albert S. Osborn | "Questioned Documents" |
| Albert S. Osborn | "The Problem of Proof" |
| Dan Poynter | "The Expert Witness Handbook" |
| Edna W. Robertson | "Fundamentals of Document Examination" |
| Taft and England | "Criminology" |

## Laboratory Equipment (Partial List)

1866T Trinocular stereo zoom microscope; Zoom ratio 10.5x-67.5x with closed circuit camera and 20" monitor/receiver; Southern Precision
Illuminator with blue filter in mount; Lumigold
CCD digital camera; spectrum 500-860nm; Pictor 416XT; Meade Instruments Corporation
Infrared filter; spectrum 700-1100nm; Edmund Scientific
Infrared filter; spectrum 700-950nm; Kodak Wratten 89B; Calumet Photographic, Inc.
CCD camera; Sony Handycam with Nightshot for recording Ultraviolet and Infrared
Ultraviolet light; long and short wave; Edmund
Portable transmitted light box; 15 watts; Apollo Glow Pro
Copy machine-enlarge 200%; Xerox 5314
Camera; Pentax ZX-5 AF SLR
Macro camera lens; Pentax 50mm; f/2.8; 1:1
External flash; Pentax AF 500 FTZ
Copy Stand; Quadra-Pod
ESDA (Electrostatic Detection Apparatus)
Handheld magnifier with light; 2X; Bausch and Lomb
Handheld magnifier, 4x
Diamond loupe; 10x; triplet; 18mm lens

## Journal and Newletter Subscriptions

"World Association of Document Examiners Journal" and "Exchange"
"Independent Association of Questioned Document Examiners-Journal of Questioned Document Examination" and "Newsletter"
"The White Paper-Topical Issues on White Collar Crime"

## Paper(s) Published in:

Journal of World Association of Document Examiners
Journal of Independant Association of Questioned Document Examiners

## FEE SCHEDULE

Retainer Fee (payable in advance & not refundable) . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ 400.00

Additional Hourly Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ 85.00

      Hourly fee is for time spent on your behalf in excess of 4 1/2 hours. Such time includes but not limited to examinations, comparisons, technical investigations laboratory work, photography, research, court exhibit preparation, consultation, written letter of opinion, preparation of court testimony, pre-trial conference and travel time. The balance of the fee is due upon oral and/or written report of findings.

Depositions, Court Appearance or Arbitrations. Minimum Fees . . . . . . . . . . . . . . . . . . . per hour . . . $  100.00

      Day set aside waiting for court appearance (Refundable if cancelled one working day in advance.) . . . . . . . . . . $  85.00

      Video Deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .per hour . . . . $  150.00

